1  DALE L. ALLEN, JR., SBN 145279
   KEVIN P. ALLEN, SBN 252290
2  LOW, BALL & LYNCH
   505 Montgomery Street, 7th Floor
3  San Francisco, California 94111
   Telephone:     (415) 981-6630
4  Facsimile:     (415) 982-1634
   Email: dallen@lowball.com
5  Email: kallen@lowball.com

6  Attorneys for Defendants
   SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
7  AND BART DEPUTY POLICE CHIEF DAN HARTWIG

8

9                    UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  DAVID MORSE,                          Case No. C12-5289 JSC (DMR)

12              Plaintiff,                **DEFENDANTS' NOTICE OF MOTION
                                          AND MOTION FOR SUMMARY
13       vs.                              JUDGMENT/ADJUDICATION;
                                          MEMORANDUM OF POINTS AND
14  SAN FRANCISCO BAY AREA RAPID          AUTHORITIES (F.R.C.P. 56)**
    TRANSIT DISTRICT (BART); and BART
15  Deputy Police Chief DAN HARTWIG, sued **Date:   January 27, 2014**
    in his official and individual capacities, **Time: 9:00 a.m.**
16                                        **Courtroom:   F, 15th Floor (San Francisco)**
                Defendants.               **Judge: Hon. Jacqueline Scott Corley**
17
                                          **Trial Date:    March 31, 2013**
18

19  **TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

20       NOTICE IS HEREBY GIVEN that on January 27, 2014, at 9:00 a.m., in Courtroom F of the

21  above entitled Court, located on the 15th floor of 450 Golden Gate Ave. in San Francisco, California,

22  94102, Defendants SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT (hereinafter

23  "BART") and DAN HARTWIG, sued in his official and individual capacities (collectively

24  "Defendants") will, and hereby do, move the Court for an order granting summary judgment or, in the

25  alternative, summary adjudication, in their favor, and against Plaintiff DAVID MORSE ("Plaintiff")

26  with respect to the following causes of action in Plaintiff's Complaint, pursuant to FRCP 56:[1]

27  _____

28  [1] On November 25, 2013, the Court ordered January 27, 2014 as the hearing date for dispositive motions (Docket
    No. 53).

1.      State-law False Arrest/False Imprisonment (First Cause of Action);

2.      Unlawful Seizure (Fourth Amendment) (42 U.S.C. § 1983) (Second Cause of Action);

3.      First Amendment Retaliation (First Amendment) (42 U.S.C. § 1983) (Third Cause of Action); and

4.      Plaintiff's Prayer for Punitive Damages Relief

This motion is made pursuant to Federal Rules of Civil Procedure, Rule 56, on the grounds that no genuine issue of material fact exists as to the above-mentioned claims, and Defendants are entitled to judgment as a matter of law. Specifically, the first and second claims fail because probable cause existed for Plaintiff's arrest; the third claim fails because Hartwig was not motivated by Plaintiff's speech; and the second and third claim fail because Hartwig possesses qualified immunity. The state and federal prayers for punitive damage relief fail because there is no evidence Hartwig acted with malice, oppression, or fraud.

This motion is further based on this Notice, on the Memorandum of Points and Authorities below, on the declaration of Kevin P. Allen filed herewith and all exhibits attached thereto, on the declaration of Kenton W. Rainey filed herewith and all exhibits attached thereto, on the Court's file in this matter, and on such oral and/or documentary evidence as may be presented at the hearing of this motion.

///
///
///
///
///
///
///
///
///

1

## STATEMENT OF RELIEF SOUGHT

2

3        Defendants seek an order granting summary judgment or, in the alternative, summary

4   adjudication, in their favor, and against Plaintiff, with respect to the following portions of Plaintiff's

5   Complaint: the first cause of action (state-law false arrest/false imprisonment); the second cause of

6   action (unlawful seizure under the Fourth Amendment, pursuant to 42 U.S.C. § 1983); the third cause

7   of action (First Amendment retaliation under the First Amendment, pursuant to 42 U.S.C. § 1983); and

8   Plaintiff's prayers for punitive damages, under both state-and-federal law.

9        Dated: December 23, 2013

10                              LOW, BALL & LYNCH

11

12                      By____/s/_____Kevin P. Allen_____
                              DALE L. ALLEN, JR.
13                            KEVIN P. ALLEN
                              Attorneys for Defendants
14                            SAN FRANCISCO BAY AREA RAPID TRANSIT
                              DISTRICT AND BART DEPUTY POLICE CHIEF
15                            DAN HARTWIG

16

17

18

19

20

21

22

23

24

25

26

27

28

-iii-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx                                    Case No: C12-5289 JSC (DMR)

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION .................................................................................................1

II.   STATEMENT OF FACTS ...................................................................................1

      A.   DEPUTY CHIEF HARTWIG ....................................................................1

      B.   PLAINTIFF'S ACTIVIST HISTORY .......................................................1

      C.   PRE-INCIDENT EVENTS ........................................................................3

      D.   INCIDENT ................................................................................................5

      E.   NOT IN RETALIATION FOR PLAINTIFF'S SPEECH ...........................7

III.  LEGAL ARGUMENT .........................................................................................9

      A.   Standard of Review ..................................................................................9

      B.   Retaliation Claims Fails Due to No Speech Motivation and Qualified Immunity ............9

           1.   Hartwig Not Motivated by Plaintiff's Speech ...............................9

           2.   Hartwig Entitled to Qualified Immunity ....................................11

      C.   Federal Arrest Claim Fails Due to Probable Cause and Qualified Immunity .................16

           1.   Probable Cause to Arrest ...........................................................16

           2.   Qualified Immunity ...................................................................18

      D.   State-Law False Arrest/Imprisonment Fails Due to State-Law Immunity ......................20

      E.   No Punitive Damages ............................................................................20

           1.   No Punitive Damages Under Federal Law ..................................21

           2.   No Punitive Damages Under State Law ......................................22

IV.   CONCLUSION .................................................................................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES

**Page(s)**

### SUPREME COURT

*Ashcroft v. al-Kidd* — U.S. —, 131 S. Ct. 2074 (2011) ----------------------------------------------11

*Baker v. McCollan* 443 U.S. 137 (1979) ----------------------------------------------------------18

*Celotex Corp. v. Catrett* 477 U.S. 317 (1986)------------------------------------------------------ 9

*Florida v. Harris* 133 S. Ct. 1050 (2013) -------------------------------------------------------18

*Harlow v. Fitzgerald* 457 U.S. 800 (1982) -----------------------------------------------------11

*Hartman v. Moore*, 126 S. Ct. 1695 (2006)-----------------------------------------------------14

*Henry v. United States* 361 U.S. 98 (1959) -----------------------------------------------------18

*Howards v. McLaughlin*, 634 F. 3d 1131 --------------------------------------------------------14

*Maryland v. Pringle* 540 U.S. 366 (2003) ------------------------------------------------------16

*Reichle v. Howards*, 132 S. Ct. 2088 (2012) ---------------------------------------------------14

*Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625 (1983) ----------------------------------------21

### UNITED STATES NINTH CIRCUIT COURT OF APPEAL

*Acosta v. City of Costa Mesa*, 718 F. 3d 800 (9th Cir. May 3, 2013) ---------------------------------15

*Adkins v. Limtiaco*, 11-17543, 2013 WL 4046720 (9th Cir. Aug. 12, 2013) -------------------------15

*Beck v. City of Upland*, 527 F. 3d 853 (9th Cir. 2008)------------------------------------------------12

*Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008) ------------------------------------------12

*Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010) ---------------------------------------------19

*Crowe v. Cnty. of San Diego*, 608 F.3d 406 (9th Cir. 2010) ------------------------------------------19

*Duran v. City of Douglas, Ariz.*, 904 F. 2d 1372 (9th Cir. 1990)-------------------------------------12

*Ford v. Yakima*, 706 F. 3d 1188 (9th Cir. 2013) ----------------------------------------------------13

*Harper v. City of Los Angeles* 533 F.3d 1010 (9th Cir. 2008) ----------------------------------------16

*Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916 (9th Cir. 2012) ------------------------------------------ 9

*Lacey v. Maricopa County*, 693 F. 3d 896 (9th Cir. 2012) --------------------------------------------13

*Mattos v. Agarano*, 661 F.3d 433, 448 (9th Cir. 2011) -----------------------------------------------19

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.* 210 F.3d 1099, 1102 (9th Cir. 2000) ----- 9

*Skoog v. County of Clackamas*, 469 F. 3d 1221 (9th Cir. 2006)----------------------------------------14

TABLE OF AUTHORITIES

**Page(s)**

*Sloman v. Tadlock*, 21 F. 3d 1462 (9th Cir. 1994)-----------------------------------------------------------------12

### UNITED STATES DISTRICT COURT

*Sorgen v. City & Cnty. of San Francisco*, C 05-03172 TEH, 2006 WL 2583683 (N.D. Cal. Sept. 7, 2006) ----------------------------------------------------------------------------------------------------------20

*Vidal v. Warden*, CV 09-3795-DSF PLA, 2010 WL 4181268 (C.D. Cal. Oct. 18, 2010) ----------------19

*Vidal v. Yates*, CV 09-3795-DSF PLA, 2010 WL 4180042 (C.D. Cal. Sept. 17, 2010) ------------------19

### CALIFORNIA SUPREME COURT

*Sierra Club v. Superior Court* (2013) 57 Cal. 4th 157 -----------------------------------------------------------17

### CALIFORNIA COURT OF APPEAL

*Beck v. State Farm Mutual Automobile Insurance Co.* (1976) 54 Cal.App.3d 347------------------------22

*Collins v. City and County of San Francisco* (1975) 50 Cal. App. 3d 671-----------------------------------20

*O'Toole v. Superior Court* (2006) 140 Cal. App. 4th 488--------------------------------------------------------20

### FEDERAL RULE OF CIVIL PROCEDURE

56(c) ----------------------------------------------------------------------------------------------------------------------- 9

56(e) ----------------------------------------------------------------------------------------------------------------------- 9

### CIVIL CODE

§ 3294(a) ----------------------------------------------------------------------------------------------------------------22

### CALIFORNIA PENAL CODE

§ 185----------------------------------------------------------------------------------------------------------------------- 3

§ 847----------------------------------------------------------------------------------------------------------------------20

### CODE OF CIVIL PROCEDURE

§ 3294 -------------------------------------------------------------------------------------------------------------------22

**STATEMENT OF ISSUES TO BE DECIDED**

This motion presents the following issues to be decided:

1. Whether probable cause existed to arrest Plaintiff;

2. Whether Plaintiff's arrest was retaliation for his speech;

3. Whether Deputy Chief Hartwig is entitled to qualified immunity as to the Complaint's Section 1983 claims;

4. Whether Deputy Chief Hartwig is liable for punitive damages, under state or federal law.

**I.    INTRODUCTION**

This lawsuit arises out of Plaintiff's arrest on September 8, 2011. He was not arrested in retaliation for his speech, but because probable cause existed that he violated Penal Code § 369i. Journalists are not immune from obeying lawful police commands.

The first and second causes of action (state-law false arrest/false imprisonment and federal-law unlawful seizure under the Fourth Amendment) fail because probable cause existed to arrest Plaintiff. The third cause of action (First Amendment retaliation) fails because Deputy Chief Hartwig was not motivated by Plaintiff's speech. The second and third causes of action also fail because Hartwig possesses qualified immunity. The state and federal prayers for punitive damage relief fail because there is no evidence Hartwig acted with malice, oppression, or fraud.

**II.    STATEMENT OF FACTS**

**A.    DEPUTY CHIEF HARTWIG**

Daniel Hartwig became a sworn peace officer in April 1982. (*Daniel Hartwig Dep.* 4:6-19, October 15, 2013, attached as Ex. A to the Declaration of Kevin P. Allen) ["Allen"]. He retired in 2013, after a 31-year career in law enforcement. (*Id.*) Hired by BART in 1982, Hartwig rose through the ranks, eventually obtaining the rank of deputy chief. (*Id.*, at 4:14-15; 9:16-20). He received training throughout his career, including on the First Amendment. (*Id.*, at 9:24-10:9).

**B.    PLAINTIFF'S ACTIVIST HISTORY**

Plaintiff writes and posts articles to IndyBay, an Internet news site. (*David Morse Dep.* 15:6-8; 17:15-18, attached as Ex. B to Allen). He has posted to IndyBay since at least January 1, 2009. (*Id.*, at 49:5-7). He characterizes himself as a fact-based reporter (as opposed to a columnist/opinion-writer).

1    (*Id.*, at 37:13-17).

2         Plaintiff was first introduced to Christopher Cantor about 2-3 years before the subject incident.

3    (*Id.*, at 46:8-18). He saw Cantor again 12-18 months later (after Oscar Grant's death). (*Id.*, at 46:19-24).

4    At that time, they established a friendly relationship centered on Plaintiff covering Cantor's activism.

5    (*Id.*, at 46:25-47:6). Plaintiff documented him; Cantor sometimes called Plaintiff and told him when

6    demonstrations would occur. (*Id.*, at 47:23-48:5). Plaintiff associated Cantor with No Justice No BART.

7    (*Id.*, at 47:14-15).

8         Between January 1, 2009 and September 8, 2011, Plaintiff attended an indeterminate number of

9    meetings for the BART Board of Directors. (*Id.*, at 24:12-17; 25:1-14). Specifically, he attended

10   meetings of the Board's Public Safety Committee, and a subcommittee on police oversight. (*Id.*, at

11   33:7-17). Plaintiff admittedly had a great interest in police oversight, civil rights, and the Oscar Grant

12   incident. (*Id.*, at 25:15-26:1).

13        When Plaintiff attended one of the committee or subcommittee meetings, he reported on it and

14   provided Board resource material on-line. (*Id.*, at 28:15-19; 29:11-17). At times, he also spoke during

15   the public comment section. (*Id.*, at 28:15-19; 31:7-21). Plaintiff denied a clear-cut distinction as to his

16   speaking capacity (i.e. whether he spoke as a private citizen or a reporter). (*Id.*, at 31:22-32:12; 32:23-

17   33:6). Rather, the role was mixed: he spoke both as a reporter and a citizen. (*Id.*) This played-out in his

18   reports: he also reported on his own comments (and the Board's response). (*Id.*, at 31:7-21).

19        Deputy Chief Hartwig first learned of Plaintiff during these Board meetings. (*Hartwig Dep.*

20   42:16-22). He met Morse while head of security programs in the BART General Manager's office. (*Id.*)

21   During these meetings, Hartwig witnessed Plaintiff as a reporter and as a citizen. (*Id.*, at 44:9-15). He

22   did not know Plaintiff's real name at the time; Hartwig only learned it after September 8, 2011. (*Id.*, at

23   66:9-12).

24        BART Police Chief Kenton Rainey also learned of Plaintiff via BART meetings. (*Kenton

25   Rainey Dep.* 13:10-20, attached as Ex. C to Allen). Plaintiff appeared at monthly Board committee

26   meetings (2-3 directors) regarding the Police Department. (*Id.*) Chief Rainey recalled Plaintiff speaking

27   on at least one occasion. (*Id.*, at 14:2-4). He spoke about disarming a person holding a weapon. (*Id.*, at

28   14:5-15). In his 35 or so years in law enforcement, Chief Rainey had never seen a journalist get-up and

1   become part of the story (i.e. public comment and addressed a political body/oversight committee). (*Id.*,

2   at 14:5-15:3).

3         BART Police Officer Shane Coduti, for his part, first saw Plaintiff 1-2 weeks before the subject

4   incident. (*Shane Coduti Dep.* 13:15-23, attached as Ex. D to Allen). He saw him at a BART board

5   meeting; Plaintiff had stood up during the comment section. (*Id.*, at 13:20-14:4). Plaintiff was

6   criticizing BART police for not being able to take guns out of peoples' hands. (*Id.*, at 14:5-12). He did

7   not know all of Plaintiff's comments: Coduti was walking out of the boardroom for a shift rotation. (*Id.*,

8   at 14:13-19). Like Hartwig, Coduti did not know Plaintiff's true name. (*Id.*, at 14:20-21).

9   **C.       PRE-INCIDENT EVENTS**

10        During the fall and summer 2011, the groups No Justice No BART and Anonymous staged

11  protests against BART. (*Benson H. Fairow Dep.* 7:2-22, attached as Ex. E to Allen). Among other

12  things, the protests concerned the death of Charles Hill on July 3, 2011.[2] (*Fairow Dep.* 7:2-22).

13  Christopher Cantor was one of the public faces of No Justice No BART. (*Id.*, at 28:22-29:9).

14        The protests posed a substantial obstruction to BART operations and threatened public safety.

15  (*Rainey Dep.* 17:9-14). In August 2011, Chief Kenton Rainey contacted Contra Costa District Attorney

16  Mark Peterson. (*Declaration of Kenton Rainey*, ¶ 3). He requested their legal opinion as to what would

17  be necessary for prosecution of Penal Code §§ 185 and 369i(b). (*Id.*). On August 29, 2011, the Contra

18  Costa District Attorney's Office provided Rainey with a memo. (*Id.*, at ¶ 4). Among other things, the

19  Contra Costa memo stated that Section 369i makes it a crime to anyone whose entry, presence, or

20  conduct interrupts or hinders the safe and efficient operations of a rail-line or rail-related facility. (*Id.*).

21  The memo also specified that "there are no cases shedding light on what constitutes an interruption in

22  'efficient operation' of the rail facility." (*Id.*). Those few cases that did exist did not discuss civilians on

23  the ticket gates, platforms, etc. (*Id.*)

24        Another protest was scheduled for September 8, 2011. BART Police held a briefing on

25

26  _____

27        [2] As a matter of law, that shooting has been found a lawful, reasonable use of force. Please see
    4:12-cv-00372-DMR, Docket No. 44 (Order Granting Defendants' Motion for Summary Judgment) and
    No. 45 (Entry of Judgment for Defendants). See also *Hill v. Bay Area Rapid Transit Dist.*, C-12-00372

28  DMR, 2013 WL 5272957 (N.D. Cal. Sept. 18, 2013).

1   September 8th, before the protest. (*Kenton Rainey Dep.* 25:20-26:4; *Ken Dam Dep.* 16:7-17:5, attached

2   as Ex. F to Allen). An operations order was prepared for the protest; it was approved by the incident

3   commander (Deputy Chief Fairow). (*Fairow Dep.* 16:9-17:10). Deputy Chief Hartwig reviewed it.

4   (*Hartwig Dep.* 57:3-10). The Order included a chart with criminal statutes common to protests. (*Fairow*

5   *Dep.* 36:4-12). The chart was provided as a reference guide to officers; akin to traffic officers carrying

6   an abridged version of the Vehicle Code. (*Id.*) The Order also stated that "[o]fficers will be assigned to

7   intervene as soon as possible, making immediate arrests without prior warning of protestors who …

8   block fare gates to prevent patron access to the system." (*Hartwig Dep.* 34:3-19). To Deputy Chief

9   Hartwig, "blocking the fare gates" is: (1) blocking and impeding the flow of traffic in either direction;

10  or (2) interfering with the direction of flow either into the BART station or out of the BART station.

11  (*Hartwig Dep.* 22:13-16).

12      Prior to the protest, it was Deputy Chief Hartwig's understanding that BART operations would

13  be disrupted. (*Hartwig Dep.* 29:4-20). Deputy Chief Fairow had provided Hartwig with the following

14  information: there was a threat of blocking the fare gates to force BART to open the gates (and thus

15  allow free access to the BART system). (*Hartwig Dep.* 29:7-20).

16      BART also created and distributed an informational flier before the incident. (*Shane Coduti*

17  *Dep.* 28:10-29:6; *Dam Dep.* 12:12-21; 16:7-10; *Fairow Dep.* 39:17-40:8). The flier included the names

18  and photographs of Christopher Cantor and Plaintiff. (*Fairow Dep.* 39:7-16). Plaintiff's real name was

19  unknown: the flier listed him as Dave Id. (*Id.*) Each and every one of the at least 6 officers deposed on

20  this subject explained that the flier was <u>not</u> a BOLO (be on the lookout for). (*Coduti Dep.* 28:19-29:6;

21  *Dam Dep.* 12:22-13:20; *Fairow Dep.* 39:17-40:8; *Hartwig Dep.* 63:1-64:25; *Michael Hayes Dep.*

22  11:21-12:24, attached as Ex. G to Allen; and *Rainey Dep.* 19:4-20:24). Rather, it was an intelligence

23  bulletin. (*Rainey Dep.* 20:6-24).

24      The flier was created because, based upon past protests, Cantor usually showed-up wherever

25  Plaintiff appeared. (*Fairow Dep.* 28:15-21). It was a fair predictor of where the protest would be. (*Id.*)

26  BART had a public safety interest in such information because it helped allocate resources. (*Id.* at

27  42:11-43:4). There was confusion that day where the protest would actually occur and it is difficult for

28  a law enforcement agency to mobilize enough resources to cover every single contingency. (*Id.*)

1    Knowing where Cantor or Morse appeared would help BART most efficiently apply its police

2    resources, so police were not playing catch-up. (*Id.*)

3         The intelligence bulletin was correct: Plaintiff showed-up at Powell station; Cantor arrived

4    sometime thereafter and the protest began. (*Morse Dep.* 53:2-10; 65:13-23; 66:3-7). The protest had

5    been publicly announced for Embarcadero station. (*Id.,* at 52:21-53:1).

6         **D.    __INCIDENT__**

7         Deputy Chief Hartwig arrived at Powell station between 4:30-5:00 p.m. on September 8, 2011.

8    (*Hartwig Dep.* 70:24-71:2). He was the on-scene commander. (*Id.,* 21:17-22:2).

9         Plaintiff also arrived at Powell station -- he took BART from Oakland. (*Morse Dep.* 53:2-10).

10   He could not account for the fact that Cantor announced the demonstration for Embarcadero station.

11   (*Id.*, at 52:21-53:1).

12        Upon arriving at Powell, Plaintiff took the escalator up from the train platform level to the

13   concourse level. (*Id.*, at 54:4-55:5). He exited onto the concourse at the Hallidie Plaza/Westfield Mall

14   area (as opposed to the 4th & Stockton area). (*Id.*). He left the paid area of the station and walked

15   through the fare gate, into the free area. (*Id.*, at 60:18-22). The north side of the concourse was Hallidie

16   Plaza; the south side was the entrance to the Westfield Mall. (*Id.*, at 61:19-62:14). The fare gates were

17   located to the west of the Mall entrance. (*Id.*, at 62:15-21).

18        Entering into the free area, Plaintiff saw protestors standing primarily Hallidie Plaza and the

19   ticket machines. (*Id.*, at 61:8-18). Plaintiff then stood around, waiting for the protest to begin. (*Id.*, at

20   64:23-65:12). The demonstrators grew. (*Id.*, at 65:6-8). During this time, Plaintiff did not recall any

21   BART police officer (including Hartwig) speaking to him. (*Id.*, at 65:24-66:2).

22        Christopher Cantor eventually arrived -- Plaintiff saw him about 30 minutes after his own

23   arrival. (*Morse Dep.* 65:13-23). Plaintiff proceeded to speak with Cantor a couple of times before the

24   demonstration began. (*Id.*, at 68:1-17).

25        The protest began at approximately 5:00 p.m. (*Hartwig Dep.* 94:22-24). Using a rolled-up piece

26   of paper, Mr. Cantor spoke and made announcements to the huge crowd around him. (*Morse Dep.* 66:3-

27   6; 66:25-67:10; 70:18-71:3). But before Cantor did so, Plaintiff recalled an officer announcing via

28   bullhorn that anyone blocking the fare gates would be arrested. (*Id.*, at 77:19-78:8; 80:12-17; 81:5-18;

82:1-4). This recollection corroborates Deputy Chief Hartwig, who testified that BART warned the demonstrators not to block the fare gates. (*Hartwig Dep.* 127:19-22). Plaintiff understood the announcement to be a warning: the protest had been announced as a spare the fare; there had been talk of potentially blocking the fare gates (i.e. civil disobedience). (*Morse Dep.* 83:8-16).

After no more than five minutes of Cantor speaking, he started moving; the crowd moved in a circle around the ticket machines. (*Morse Dep.* 67:3-10). People were chanting -- Cantor led some of the chants. (*Id.*, at 71:4-9). Plaintiff walked in the circle ("documenting the circle," to use Plaintiff's language). (*Id.,* at 71:10-16). He admitted the circle passed in front of the fare gates. (*Id.*, at 72:5-7). He further admitted that, if a patron was attempting to walk from the ticket machine to the fare gate at the moment in time the protestors were in front of the fare gates, the patron would have to walk around the protestors. (*Id.*, at 73:1-74:12). The circle traveled clockwise: from in front of the ticket machines to in front of the fare gates and back to the machines (in order to complete one loop). (*Id.*, at 76:3-77:24).

Deputy Chief Hartwig observed, among other things, Plaintiff: (1) walk with the crowd in the protest; (2) block the fare gates and block patrons; and (3) interact with Mr. Cantor. (*Hartwig Dep.* 39:10-15; 46:6-13; 47:1-15). Per Hartwig, Plaintiff was with Cantor at moments during the protest. (*Id.*, at 85:21-25). This is consistent with Plaintiff, who admitted to walking with Cantor during the protest. (*Morse Dep.* 71:10-16).

From Hartwig's observations, Plaintiff was more than a journalist during the protest: he was also an active participant. (*Hartwig Dep.* 36:19-37:5; 39:5-15). Hartwig's definition of "active participant" included walking around the fare gates and blocking the fare gates. (*Id.*, at 39:21-25). Hartwig readily agreed that marching and picketing are expressive activities protected by the First Amendment, but that they become violations of the law when they block patrons and fare gates. (*Id.*, 46:14-47:6). The same ruled applied to journalists:  they could remain on-scene of an incident, so long as they obeyed the law. (*Id.*, at 11:6-11). Plaintiff himself acknowledged, with respect to what a journalist can or cannot do at a demonstration, he/she can cover the event. (*Morse Dep.* 22:9-12).

As the protestors were about to complete their first circle, a line of officers had formed between the station agent booth and the ticket machines. (*Morse Dep.* 75:1-24). They could not make a second loop around the station. (*Id.*) The protestors proceeded to bunch up. (*Id.*, at 77:14-18). Another line of

1   police stood in front of the fare gates. (*Id.*, at 86:18-87:1). Patrons passed behind the police and through

2   the fare gates. (*Id.*)

3         Mr. Cantor and another individual, Christian Ream, proceed to confront an officer moving

4   through the crowd. (*Id.*, at 87:2-12). Plaintiff stood behind Cantor and Ream, documenting the

5   situation. (*Id.*, at 88:5-13). The officer did not say anything to Cantor and Ream -- they eventually tired

6   of confronting him. (*Id.*, at 90:1-7). The situation ended. (*Id.*)

7         Plaintiff proceeded to walk towards the police line in front of the fare gates. (*Id.*, at 90:8-13).

8   Within a few minutes, the police formed a circle around the protestors. (*Id.*). Plaintiff stood within 2-3

9   arms lengths of Mr. Cantor. (*Id.*, at 96:25-97:10). People were chanting. (*Id.*) During the next 10

10   minutes, Deputy Chief Hartwig formed an arrest team. (*Id.*, at 97:11-14; 98:18-20). Once formed,

11   Hartwig walked through a line of officers and directed Plaintiff to be removed from the crowd. (*Id.*, at

12   99:17-100:13). Hartwig ordered Plaintiff's removal because he had witnessed Plaintiff violate Penal

13   Code § 369i. (*Hartwig Dep.* 16:14-22; 27:4-8). Plaintiff was not the only one -- multiple 369i arrests

14   were made. (*Fairow Dep.* 37:5-38:3).

15         Over the course of the protest, police issued three orders for the crowd to disperse -- the orders

16   specified Penal Code § 369i. (*Hartwig Dep.* 13:8-18; 14:1-4). BART police told demonstrators not to

17   block the fare gates. (*Id.* 127:19-22). Plaintiff corroborated these facts. (*Morse Dep.* 77:19-78:8). He

18   recalled that, while Cantor was speaking with the rolled-up paper, an officer announced via bullhorn

19   that anyone blocking the fare gates would be arrested. (*Id.*)

20         Deputy Chief Hartwig himself had walked throughout the crowd and said dispersal orders have

21   been read, you need to leave, and you will be subject to arrest if you choose not to leave. (*Hartwig Dep.*

22   99:1-6). Plaintiff recalled Hartwig cutting through the crowd at one point. (*Morse Dep.* 85:2-5).

23         After Hartwig directed Plaintiff's removal, an officer removed Plaintiff from the crowd,

24   handcuffed him, and brought him to a police substation at Powell. (*Morse Dep.* 100:8-13; 101:18-

25   102:10). He was subsequently transported to the Hall of Justice, where he was cited and released. (*Id.*,

26   at 112:17-21). They also returned Plaintiff's possessions. (*Id.*, at 112:22-23).

27       **E.**       **<u>NOT IN RETALIATION FOR PLAINTIFF'S SPEECH</u>**

28         Plaintiff has never come across any information that Deputy Chief Hartwig held any personal

1    animosity towards Plaintiff before the incident. (*Morse Dep.* 114:21-115:3). On the contrary -- from the

2    numerous times they spoke at the BART Board meetings -- Plaintiff characterized his relationship with

3    Hartwig as cordial, professional, and sometimes friendly. (*Id.,* at 26:15-25). They sometimes bantered

4    with one other. (*Id.*, at 27:1-2). He never felt threatened or intimidated by Hartwig during their Board

5    interactions; he never felt threatened or intimidated by Hartwig any time before the September 8th

6    protest. (*Id.*, at 27:3-13).

7        Asked -- point-blank -- why he selected people for arrest, Deputy Chief Hartwig answered:

8    "[v]iolation of the law … 369i PC." (*Hartwig Dep.* 16:14-22). He answered the same when asked

9    specifically about Plaintiff. (*Id.*, at 27:3-8). He did not say it was because of Plaintiff's speech, or had

10   anything to do with Plaintiff's speech. Hartwig noted that Penal Code § 369i is a statute frequently used

11   by BART, as it "[e]ncompasses a broad spectrum. Essentially interfering with the operation of a transit

12   district or transit property." (*Id.*, at 122:16-123:2). Hartwig acknowledged the critical news coverage of

13   BART leading up to the subject incident, but also plainly stated he felt no pressure resulting from that

14   coverage. (*Id.*, at 58:8-59:9).  He repeatedly recognized the right to free speech, whether as a journalist

15   or a protestor. (*Id.*, at 11:6-11; 41:5-24; 46:14-47:6). Deputy Chief Hartwig was not upset when he

16   heard the criminal charges against Plaintiff were dismissed. (*Id.*, at 83:1-5).

17       Hartwig visited Plaintiff twice while he was at the Powell police substation. (*Morse Dep.* 104:7-

18   9). Hartwig never used profanity or spoke derogatorily towards Plaintiff. (*Id.*, at 105:10-17). He never

19   verbally belittled Plaintiff. (*Id.*, at 105:22-106:7). Hartwig never suggested or stated that Plaintiff was

20   arrested because he wrote articles critical of BART. (*Id.*, at 107:11-15). During his entire time at the

21   substation, Plaintiff never heard any officer reference the fact that he (Plaintiff) had written articles

22   critical of BART. (*Morse Dep.* 110:5-8). Plaintiff has no evidence (eyewitnesses or documents) that he

23   was arrested because he wrote articles critical of BART. (*Id.* at 111:8-15).

24       When Plaintiff's possessions were returned to him at the Hall of Justice, this included his two

25   cameras. (*Id.*, at 112:22-113:1). He had used them to document the protest (photos and video). (*Id.*, at

26   55:25-56:9; 66:7-16; 88:5-13). Upon their return, neither camera was damaged; each was in working

27   order. (*Id.*, at 112:22-113:1; 113: 9-10). There was no indication of tampering with either camera (or

28   any of his personal belongings). (*Id.*, at 113:11-18). Nothing had been deleted from Plaintiff's cameras.

-8-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

1   (*Id.*, at 113:5-10). All his personal belongings were returned intact. (*Id.*, at 113: 15-18).

2   **III.     LEGAL ARGUMENT**

3         **A.     Standard of Review**

4         Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories,

5   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

6   material fact and the moving party is entitled to judgment as a matter of law." F.R.C.P. 56(c). It pierces

7   the pleadings and puts the opponent to the test of affirmatively coming forward with sufficient evidence

8   for its claims to create a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

9   (1986). In order to meet its initial burden, "the moving party must either produce evidence negating an

10   essential element of the nonmoving party's claim or defense or show that the nonmoving party does not

11   have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan*

12   *Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

13         In opposing a motion for summary judgment, the adverse party "may not rest upon the mere

14   allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or

15   as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for

16   trial." F.R.C.P. 56(e).  In the absence of such a response, "summary judgment, if appropriate, shall be

17   entered against the adverse party." *Id.*

18         **B.     Retaliation Claims Fails Due to No Speech Motivation and Qualified Immunity**

19         Plaintiff's third cause of action is for retaliation under the First Amendment. It fails because: (1)

20   Plaintiff's arrest was not motivated by his speech; and (2) Deputy Chief Hartwig is entitled to qualified

21   immunity.

22         **1.     Hartwig Not Motivated by Plaintiff's Speech**

23         To prove his claim for First Amendment retaliation, Plaintiff must "provide evidence showing

24   that by his actions the defendant deterred or chilled the plaintiff's political speech and such deterrence

25   was a substantial or motivating factor in the defendant's conduct." *Lacey v. Maricopa Cnty.*, 693 F.3d

26   896, 916 (9th Cir. 2012) (internal quotations and citations omitted). The *Lacey* Court emphasized the

27   animus requirement: a plaintiff "must allege facts ultimately enabling him to prove the elements of

28   retaliatory animus as the cause of injury, with causation being understood to be but-for causation."

1   *Lacey*, *supra*, at 917 (internal quotations and citations omitted).

2          The Ninth Circuit has also spelled-out these requirements in its Model Jury Instructions.

3   Plaintiff must show that (1) he engaged in speech and other conduct protected under the First

4   Amendment; (2) defendants took action against him; and (3) his protected conduct was a substantial or

5   motivating favor for the defendants' action. See Ninth Circuit Model Civil Jury Instructions 9.10

6   ("Particular Rights—First Amendment—'Citizen' Plaintiff").

7          Whether it be Plaintiff's critical news articles regarding BART, his public comments against

8   BART, or his participation in the protest, there is <u>no</u> evidence that Deputy Chief Hartwig arrested

9   Plaintiff because of his speech. On the contrary, the evidence clearly shows Plaintiff was arrested

10  because Hartwig believed he had violated Penal Code 369i.

11         Hartwig first learned of Plaintiff sometime after the Oscar Grant incident (January 1, 2009).

12  Over the 33 months between that incident and the subject protest, Plaintiff enjoyed a professional,

13  cordial relationship with Hartwig, one friendly and bantering at times. He never felt threatened or

14  intimidated by Hartwig any time before September 8, 2011. Indeed, Plaintiff has never come across any

15  information that, prior to the protest, Hartwig held any personal animosity towards him.

16         At his deposition Hartwig was asked -- point-blank -- why he arrested Plaintiff. He testified that

17  he observed Plaintiff violate Penal Code § 369i (a statute frequently used by the transit police

18  department). Hartwig did not say it was because of Plaintiff's speech, or had anything to do with

19  Plaintiff's speech. Indeed, Deputy Chief Hartwig repeatedly recognized the right to free speech, never

20  felt any pressure from critical BART news coverage, and was not upset when Plaintiff's criminal

21  charges were dismissed.

22         Hartwig visited Plaintiff twice after the arrest on 9-8-11. Hartwig never verbally belittled

23  Plaintiff during these visits, or spoke derogatorily towards him. He never used profanity towards

24  Plaintiff. Hartwig never suggested or stated that Plaintiff was arrested because he wrote articles critical

25  of BART. During his entire time at the BART police substation, Plaintiff never heard any officer

26  reference the fact that he (Plaintiff) had written articles critical of BART.

27         When Plaintiff's possessions were returned to him (after his release from the Hall of Justice)

28  everything was intact. Neither of his cameras was damaged; nothing was deleted. There was no

-10-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx                                          Case No: C12-5289 JSC (DMR)

1   tampering with any of his possessions.

2        Plaintiff admitted he has no evidence (eyewitnesses or documents) that he was arrested because

3   he wrote articles critical of BART.

4        Based upon these facts, Plaintiff cannot prove his arrest was motivated by his speech. Deputy

5   Chief Hartwig is entitled to summary adjudication to the third cause of action.

6              **2.    Hartwig Entitled to Qualified Immunity**

7        In the alternative, Deputy Chief Hartwig is entitled to qualified immunity for Plaintiff's arrest.

8   Under qualified immunity public officials are shielded from liability for civil damages "unless a

9   plaintiff pleads facts showing: (1) that the official violated a statutory or constitutional rights, and (2)

10  that the right was "clearly established" at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, —

11  U.S. —, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).) "A right

12  is clearly established if -- at the time of the challenged conduct -- "**every** reasonable official would have

13  understood that what he is doing violates that right." *Ashcroft*, *supra*, at 2083 (emphasis added)

14  (internal citations and quotations omitted).

15       The U.S. Supreme Court has explained that while it "does not require a case directly on point . .

16  . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*,

17  *supra*, 2083 (internal citations omitted).

18       The *al-Kidd* Court also stressed that it had repeatedly told courts, the Ninth Circuit in particular,

19  not to define clearly established law at a high level of generality. *Id.*, at 2084. "The general proposition,

20  for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in

21  determining whether the violative nature of particular conduct is clearly established." *Id.*

22       Deputy Chief Hartwig is entitled to qualified immunity for two separate and independent

23  reasons: (1) every reasonable officer would <u>not</u> have known that Hartwig's conduct constituted animus

24  towards Plaintiff's speech; and (2) every reasonable officer would <u>not</u> have known that First

25  Amendment retaliation claims may lie where probable cause exists for the arrest.

26            **a. Hartwig's Conduct is Not Retaliation**

27       Deputy Chief Hartwig is entitled to qualified immunity unless Plaintiff can show that, as of

28  September 8, 2011, every reasonable officer would have known that Hartwig's conduct equaled an

1   arrest based upon Plaintiff's speech. Plaintiff cannot make this showing. On the contrary, the law in

2   September 2011 showed the opposite: every reasonable officer would have thought Hartwig arrested

3   Plaintiff because of probable cause (not speech).

4        Since at least 1990, it has been clearly established that officers may not arrest someone because

5   of his/her speech. *Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008). It has been equally clear

6   the conduct necessary to constitute an arrest based upon someone's speech. It requires affirmative

7   act(s), either direct or circumstantial, demonstrating the officer's ill intent.

8        *Duran v. City of Douglas, Ariz.*, 904 F. 2d 1372 (9th Cir. 1990) concerned an officer who

9   conducted a traffic stop outside his jurisdiction on a car whose passenger had yelled profanities at the

10  officer and made an obscene gesture. *Duran*, *supra*, at 1374-1375. The officer admitted he initiated the

11  stop because he wanted to find out why the passenger did that. (*Id.*) When the passenger responded with

12  more profanities, the officer arrested him for disorderly conduct. *Duran*, *supra*, at 1375.

13       *Sloman v. Tadlock*, 21 F. 3d 1462 (9th Cir. 1994) concerned an arrestee campaigning for two

14  local ballot measures. *Sloman*, *supra*, at 1465-1466. The Court found evidence of retaliatory motive

15  because the arresting officer initiated a traffic stop against another member of the campaign. But

16  instead of citing her, the officer criticized her bumper sticker (which supported the two ballot

17  measures). (*Id.*, at 1469-1470). The Court also noted the arresting officer: (1) was almost always

18  present whenever the arrestee was campaigning; (2) routinely singled-out the arrestee for warning and

19  discussions; and (3) had a strong personal dislike for the arrestee's political beliefs. (*Id.*, at 1468-1470).

20       *Beck v. City of Upland*, 527 F. 3d 853 (9th Cir. 2008) concerned the arrest of a person who had

21  a long running dispute with his city over a contract. *Beck*, *supra*, at 857-860. The Court found evidence

22  of personal retaliatory motive by the Chief of Police. (*Id.*, at 868). The arrestee had had a heated

23  conversation with the Chief of Police and another officer, during which the Chief told him "we should

24  have taken care of you a long time ago." (*Id.*) The Chief had also been agitated by the plaintiff's

25  comments at a Chamber of Commerce meeting, and the Chief threatened to take action against

26  Chamber members who interfered with the issues surrounding plaintiff. (*Id.*)

27       Since September 2011, the Ninth Circuit case law has been no different. It has merely confirmed

28  the type of affirmative conduct necessary for an act to be considered an arrest motivated by someone's

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx                                     Case No: C12-5289 JSC (DMR)

1  speech. The unwavering nature of the Circuit's position only solidifies that -- as of September 8, 2011 –

2  every reasonable officer would <u>not</u> have known that Hartwig's conduct constituted an arrest based upon

3  Plaintiff's speech.

4  *Lacey v. Maricopa County*, 693 F. 3d 896 (9th Cir. 2012) involved a criminal investigation into

5  owners of a newspaper that ran wrote news articles critical of a local sheriff and special prosecutor.

6  *Lacey*, *supra*, at 907-910. The plaintiffs alleged First Amendment retaliation against the prosecutor.

7  (*Id.*, at 916-917). The Court found that plaintiffs' adequately alleged retaliatory animus. (*Id.*, at 917).

8  Among other things, they alleged: (1) the prosecutor issued grand jury subpoenas for the paper's

9  confidential sources and reporters' notebooks and memorandums; (2) the prosecutor issued the

10  subpoenas without appearing before the grand jury or obtaining approval from it; and (3) attempted to

11  have the newspaper owners arrested the same day their newspaper ran an article critical of the

12  prosecutor's investigation.  (*Id.*, at 909, 917).

13  *Ford v. Yakima*, 706 F. 3d 1188 (9th Cir. 2013) concerned an officer who arrested someone

14  because he was critical of the police; who did not act politely and respectfully towards the police when

15  he was pulled over. (*Ford*, *supra*, at 1194). The Court cited numerous statements from the arresting

16  officer to this effect. (*Id.*, at 1190-1191).

17  None of these cases (pre-or-post September 2011) remotely resemble the facts here. None

18  concerned an absolute lack of evidence (direct or circumstantial) that the arrest was based upon the

19  arrestee's speech. Here, unlike in those cases: (1) the officer and arrestee had an existing relationship

20  that was cordial, professional, and sometimes friendly; (2) the arrestee never felt threatened or

21  intimidated by the officer prior to the arrest (or believed the officer held any animosity towards him);

22  (3) the officer never suggested or stated that arrestee was arrested because of his speech; (4) the officer

23  received pre-incident intelligence about a given crime, everyone (including arrestee) then received the

24  same warning about not committing that crime, and then the officer witnessed arrestee commit that

25  crime; (5) post-arrest, the officer never belittled or spoke derogatorily towards the arrestee, or used

26  profanity; (6) post-arrest, the arrestee never heard any officer say he was arrested because of his speech;

27  (7) the arrestee had his speech tools (his cameras) returned undamaged and intact, with nothing deleted;

28  and (8) the arresting officer never felt pressure from negative news coverage, nor was he upset when

-13-

1   the arrestee's criminal charges were dismissed. Tellingly, the arrestee openly admitted he had no

2   evidence (eyewitnesses or documents) that his arrest was speech-based.

3   Based upon the state of law in September 2011, every reasonable officer would <u>not</u> have known

4   that Hartwig's conduct was unconstitutional (i.e. that it was a speech-based arrest). Accordingly, he is

5   entitled to qualified immunity and summary adjudication as to the third cause of action.

6   **b. <u>Law Unclear That Retaliation Claims Lies Where Probable Cause Exists</u>**

7   Deputy Chief Hartwig is also entitled to qualified immunity because, as of September 8, 2011, it

8   was not clearly established that a First Amendment retaliation claim could lie where probable cause

9   existed for the arrest.

10   In 2006, the U.S. Supreme Court issued *Hartman v. Moore*, 126 S. Ct. 1695 (2006). The Court

11   ruled that, to succeed on a retaliatory prosecution, a plaintiff must show no probable cause for the

12   underlying charges. (*Hartman*, *supra*, at 1701-1702; 1707). Post-*Hartman*, there was a split amongst

13   the Courts of Appeal. The Sixth, Eighth, and Eleventh Circuits held that the no-probable cause

14   requirement also applied to retaliatory arrests. *Reichle v. Howards*, 132 S. Ct. 2088, 2096 (2012). The

15   Ninth and Tenth Circuits disagreed. *Skoog v. County of Clackamas*, 469 F. 3d 1221 (9th Cir. 2006);

16   *Howards v. McLaughlin*, 634 F. 3d 1131, 1147-1148 (rev'd and remanded sub nom. *Reichle*, *supra*).[3]

17   *Skoog* was published in November 2006.

18   In 2012, the Supreme Court issued *Reichle v. Howards*, 132 S. Ct. 2088 (2012). The opinion

19   concerned an arrest from June 2006. *Reichle, supra*, at 2091. The Court had granted certiorari on two

20   questions: (1) whether a First Amendment retaliatory arrest claim may lie despite the presence of

21   probable cause to support the arrest; and (2) whether clearly established law at the time of plaintiff's

22   arrest so held. (*Id.*, at 2093)  The Court only addressed the second question: it explicitly declined to

23   answer the first. (*Id.*)  The Court made plain that no such right had ever been established. "This Court

24   has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by

25

26       [3] Contrary to *Howards*, the law in the 10th Circuit was unsettled. As explained by the Supreme Court in reversing the opinion: "[w]e disagree. At the time of Howards' arrest, *Hartman*'s impact on the

27   Tenth Circuit's precedent governing retaliatory arrests was far from clear. Although the facts of Hartman involved only a retaliatory prosecution, reasonable officers could have questioned whether the

28   rule of Hartman also applied to arrests." *Reichle*, *supra*, at 2095.

1    probable cause; nor was such a right otherwise clearly established at the time of Howards' arrest." (*Id.*)

2    It further emphasized that "[h]ere, the right in question is not the general right to be free from retaliation

3    for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise

4    supported by probable cause. This Court has never held that there is such a right." (*Id.*, at 2094).

5      Per *Reichle*, it cannot be said that -- as of September 8, 2011 -- it was clearly established that

6    retaliatory arrest claims could lie even where probable cause existed. On the contrary, the Supreme

7    Court has plainly stated that no such right was clearly established as of June 2006, and that it has never

8    recognized such a right (regardless of time period). Defendants appreciate that *Skoog* holds differently,

9    but respectfully submit that *Skoog* is inapposite in light of *Reichle*. The highest court in the land has

10   spoken. If the Supreme Court has not found a right to be clearly established, a contrary opinion by an

11   inferior court does not make it established. This is all the more so when the contrary opinion pre-dates

12   the Supreme Court opinion, and where the contrary opinion is itself up for dispute amongst the various

13   Circuit courts. "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to

14   money damages for picking the losing side of the controversy." *Reichle*, *supra*, at 2096.

15      Moreover, the Ninth Circuit has moved on from *Skoog* -- it has now aligned with *Reichle*. In

16   May 2013, the Circuit issued *Acosta v. City of Costa Mesa*, 718 F. 3d 800 (9th Cir. May 3, 2013). The

17   Ninth Circuit panel recognized *Reichle* and the fact that "the Supreme Court held that it had never

18   recognized, nor was there a clearly established First Amendment right to be free from a retaliatory

19   arrest that is otherwise supported by probable cause. " *Acosta, supra*, at 824-825. The *Acosta* Court

20   found probable cause existed for the arrest there and granted qualified immunity to the officers for the

21   First Amendment retaliation claim (assuming, *arguendo*, a retaliatory arrest). (*Id.*, at 825-826). Then, in

22   August 2013, the Circuit issued *Adkins v. Limtiaco*, 11-17543, 2013 WL 4046720 (9th Cir. Aug. 12,

23   2013).[4] The Court found the plaintiff there adequately pled a First Amendment retaliation claim

24

25        [4] *Adkins* is an unpublished opinion. Defendants cite it pursuant to Federal Rule of Appellate
Procedure 32.1(a), which states "[a] court may not prohibit or restrict the citation of federal judicial

26   opinions, orders, judgments, or other written dispositions that have been: (i) designated as unpublished,
not for publication, nonprecedential, not precedent, or the like; and (ii) issued on or after January 1,

27   2007."

28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx                               Case No: C12-5289 JSC (DMR)

1  because, among other things, he alleged arrest without probable cause. *Adkins*, *supra*, at * 1. The Court

2  cited *Reichle*. (*Id.*)

3    For these reasons -- and because probable cause existed for Plaintiff's arrest -- Deputy Chief

4  Hartwig is entitled to qualified immunity and summary adjudication to the third cause of action.

5     **C.** **Federal Arrest Claim Fails Due to Probable Cause and Qualified Immunity**

6    Plaintiff's second cause of action is for Fourth Amendment unlawful arrest. It fails because: (1)

7  Deputy Chief Hartwig possessed probable cause to arrest; and (2) he is entitled to qualified immunity.

8      **1.** **Probable Cause to Arrest**

9    A warrantless arrest is valid if supported by probable cause. As explained by the U.S. Supreme

10  Court, "[t]he probable-cause standard is incapable of precise definition or quantification into

11  percentages because it deals with probabilities and depends on the totality of the circumstances."

12  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citations omitted). Still, the Court has provided a

13  definition. "We have stated . . . that the substance of all the definitions of probable cause is a reasonable

14  ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to

15  be searched or seized. (*Id.*) (citations and internal quotation omitted).

16    In determining probable cause, defendants entitled to their fellow officers' knowledge, as well

17  as their own, pursuant to the "collective knowledge" doctrine. Under the doctrine, "courts look to the

18  collective knowledge of all the officers involved in the criminal investigation." *Harper v. City of Los*

19  *Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (internal quotations and citations omitted).

20    Plaintiff was arrested for Penal Code § 369i (trespass on railroad or rail transit-related property).

21  As of September 8, 2011, Section 369i stated, in full:

22

23    (a) Any person who enters or remains upon the property of any railroad without the permission of the owner of the land, the owner's agent, or the person in lawful possession and whose entry,

24  presence, or conduct upon the property interferes with, interrupts, or hinders, or which, if allowed to continue, would interfere with, interrupt, or hinder the safe and efficient operation of any locomotive, railway car, or train is guilty of a misdemeanor.

25

26    As used in this subdivision, "property of any railroad" means any land owned, leased, or possessed by a railroad upon which is placed a railroad track and the land immediately adjacent

27  thereto, to the distance of 20 feet on either side of the track, which is owned, leased, or possessed by a railroad.

28    **(b) Any person who enters or remains upon any rail transit related property owned or**

-16-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

**operated by a county transportation commission or transportation authority without permission or whose entry, presence, or conduct upon the property interferes with, interrupts, or hinders the safe and efficient operation of the railline or rail-related facility is guilty of a misdemeanor.**

**As used in this subdivision, "rail transit related property" means any land or facilities owned, leased, or possessed by a county transportation commission or transportation authority.**

(c) This section does not prohibit picketing in the immediately adjacent area of the property of any railroad or rail transit related property or any lawful activity by which the public is informed of the existence of an alleged labor dispute.

Cal. Penal Code § 369i (West) (emphasis added). This statute was subsequently amended, effective 2012. Because the subject incident occurred in September 2011, Defendants utilize the earlier version for purposes of this motion.

Penal Code § 369i(b) provides two separate and independent basis for arrest: (1)  someone who enters or remains on transit-related property without permission; or (2) someone who entry, presence, or conduct upon the property interferes with, interrupts, or hinders the safe and efficient operation of the rail-line or rail-related facility.

In statutory interpretation, California courts give statutory language "a plain and commonsense meaning." *Sierra Club v. Superior Court* (2013) 57 Cal. 4th 157, 165. "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." *Sierra Club*, *supra*, at 165-166.  The language of Section 369i(b) is plain. It bars persons from impeding a transit line or transit-related facility (like BART). That impediment can take various forms: interference, interruption, or hindrance.

Probable cause existed to arrest Plaintiff for Penal Code § 369i(b). Deputy Chief Hartwig observed Plaintiff walk with the crowd in the protest and block the fare gates and block patrons. Plaintiff himself admitted to walking in the protest, that he walked in a circle that traveled in front of the fare gates, and that persons attempting to reach the fare gates at the time the protestors walked-by would have had to walk around the protestors (i.e. they were blocked). Hartwig further observed that Plaintiff's conduct occurred after police had warned everyone (including Plaintiff) not to block the fare gates (or there would be arrests).

Blocking fare gates and/or patrons falls squarely within Section 369i(b)'s ban on impeding the transit line. By slowing, delaying, or outright preventing people from accessing the fare gates, the safe

-17-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx                                                                 Case No: C12-5289 JSC (DMR)

1   and efficient use of BART is impacted. Plaintiff has the unquestioned right to protest BART or cover an

2   event protesting BART -- he does not right the right to hinder or prevent the use of BART. Even if

3   Plaintiff never intended to block BART, that is irrelevant. Section 369i is not a specific-intent crime.

4   All that's required to violate Section 369i is a physical act (e.g. blocking the fare gates). That occurred

5   here.

6        Under the totality of the circumstances, there was reasonable ground for Deputy Chief Hartwig

7   to believe that Plaintiff blocked the fare gate(s) or patron(s) at Powell station on September 8, 2011. He

8   possessed probable cause to believe Plaintiff violated Penal Code § 369i(b).

9        It is important to note that probable cause is a test of reasonableness, not one of beyond a

10  reasonable doubt. "Finely tuned standards such as proof beyond a reasonable doubt or by a

11  preponderance of the evidence ... have no place in the [probable-cause] decision. All we have required

12  is the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act."

13  *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal citations and quotations omitted). The U.S.

14  Supreme Court has emphasized that "[e]vidence required to establish guilt is not necessary" to make a

15  warrantless arrest. *Henry v. United States*, 361 U.S. 98, 102 (1959).

16       In other words, any assertion of innocence by Plaintiff is irrelevant for Section 1983 liability.

17  "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would

18  provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Baker v.*

19  *McCollan*, 443 U.S. 137, 145 (1979).

20       For these reasons, Deputy Chief Hartwig possessed probable cause to arrest Plaintiff. The

21  second cause of action for unlawful arrest should be dismissed.

22              **2.    Qualified Immunity**

23       Deputy Chief Hartwig is entitled to qualified immunity because -- as of September 8, 2011 --

24  not every reasonable officer would have known that Hartwig lacked probable cause to arrest Plaintiff

25  for Penal Code § 369i. In other words, not every reasonable officer would have known that inhibiting

26  access to fare gates is insufficient grounds for a Section 369i arrest.

27       There is a dearth of case authority on Penal Code § 369i. As explained by the Contra Costa

28  District Attorney, "there are no cases shedding light on what constitutes an interruption in efficient

-18-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx                                    Case No: C12-5289 JSC (DMR)

1  operation of the rail facility." Indeed, Westlaw reveals a total of only seven cased citing Section 369i.

2  Just one of these is published: *Vidal v. Yates*, CV 09-3795-DSF PLA, 2010 WL 4180042 (C.D. Cal.

3  Sept. 17, 2010) report and recommendation adopted sub nom. *Vidal v. Warden*, CV 09-3795-DSF PLA,

4  2010 WL 4181268 (C.D. Cal. Oct. 18, 2010). *Vidal* did not discuss the statutory construction of Section

5  369i, nor what constituted interfering, interrupting, or hindering the safe and efficient operation of a

6  rail-line (or rail-related facility). (*Id.*, at * 6, fn. 9). It did not involve protests or blocking gates. (*Id.*)

7  *Vidal* simply listed Section 369i as part of its petitioner's criminal history. (*Id.*)

8    The Ninth Circuit has been very clear that, where little to no authority exists, qualified immunity

9  governs. *Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010) (en banc) (granting qualified

10  immunity for dart-mode tasing where "there was no Supreme Court decision or decision of our court

11  addressing whether the use of a taser, such as the Taser X26, in dart mode constituted an intermediate

12  level of force."); *Mattos v. Agarano*, 661 F.3d 433, 448 (9th Cir. 2011) (en banc) (qualified immunity

13  granted for drive-stun tasing where "there were three circuit courts of appeals cases rejecting claims

14  that the use of a taser constituted excessive force; there were no circuit taser cases finding a Fourth

15  Amendment violation."). The *Bryan* Court emphasized its rationale qualified immunity: "because of the

16  "dearth of prior authority, we must conclude that a reasonable officer in Officer MacPherson's position

17  could have made a reasonable mistake of law regarding the constitutionality of the taser use in the

18  circumstances Officer MacPherson confronted in July 2005." *Bryan*, *supra*, at 833.

19    There was no case authority as of September 2011 specifying the proper (or improper) grounds

20  for a 369i arrest. There was no case authority discussing whether walking in front of a fare gate

21  constituted hindering, interrupting, or interfering with the safe and efficient operation of a transit line.

22  Nor was there case authority concerning this particular situation: walking in front of a fare gate during a

23  protest where blocking the fare gates had been threatened and where the crowd had been warned not to

24  block the fare gates. In such an environment, Deputy Chief Hartwig is entitled to qualified immunity.

25    *Crowe v. Cnty. of San Diego*, 608 F.3d 406 (9th Cir. 2010) is instructive. The Ninth Circuit

26  panel noted that qualified immunity is afforded when officers "reasonably believe that probable cause

27  existed, even though it is subsequently concluded that it did not, because they cannot be expected to

28  predict what federal judges frequently have considerable difficulty in deciding and about which they

-19-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT/ADJUDICATION;
MEMORANDUM OF POINTS AND AUTHORITIES (F.R.C.P. 56)

J:\1752\SF0232\MSJ\MSJ-MPA (Updated).docx              Case No: C12-5289 JSC (DMR)

1  frequently differ among themselves." *Crowe, supra*, at 433. This "cannot be expected to predict"

2  rationale applies even more so to the situation at-hand, where there is no case authority for either judges

3  or Deputy Chief Hartwig to interpret. Not even a local prosecutor's officer -- whose responsibility

4  includes prosecuting crimes like Section 369i(b) -- could provide authority defining the statute.

5      For these reasons, Deputy Chief Hartwig is entitled to qualified immunity and summary

6  adjudication to the second cause of action.

7      **D.    State-Law False Arrest/Imprisonment Fails Due to State-Law Immunity**

8      Plaintiff's first cause of action, for state-law false arrest/imprisonment, fails because Deputy

9  Chief Hartwig possessed state-law immunity.

10      "False arrest and false imprisonment are not separate torts. False arrest is but one way of

11  committing a false imprisonment, and they are distinguishable only in terminology." *Collins v. City and*

12  *County of San Francisco* (1975) 50 Cal. App. 3d 671, 673.

13      Pursuant to Penal Code § 847 (b)(1),  a police officer is immune from civil liability from false

14  arrest/imprisonment where -- acting within the course and scope of his or her duty -- the officer makes a

15  lawful arrest, or an arrest that the officer had reasonable cause to believe was reasonable (at the time of

16  the arrest). Cal. Pen. Code § 847 (b)(1). See also *O'Toole v. Superior Court* (2006) 140 Cal. App. 4th

17  488, 510-511. "State and federal law are consistent with respect to the standard for probable cause to

18  arrest." *Sorgen v. City & Cnty. of San Francisco*, C 05-03172 TEH, 2006 WL 2583683 (N.D. Cal. Sept.

19  7, 2006).

20      Because probable cause existed to arrest Plaintiff, Section 847 immunity attaches. Please see

21  Section III(C)(1), above.  For judicial economy, the argument will not be restated here.

22      For these reasons, Deputy Chief Hartwig is entitled to summary adjudication to the first cause of

23  action.  BART is also entitled to adjudication, as it is only liable pursuant to Government Code §

24  815.2(a) (statutory vicarious liability). Where the employee is not liable, there is no liability against the

25  entity.

26      **E.    No Punitive Damages**

27      The Complaint seeks punitive damages against Deputy Chief Hartwig, under both state and

28  federal law. There is no evidence to support these claims -- they should be dismissed.

1          **1.      No Punitive Damages Under Federal Law**

2          A plaintiff is allowed to recover punitive damage in a Section 1983 case, where the defendant's

3   conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous

4   indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625

5   (1983).

6          There is no evidence that Deputy Chief Hartwig arrested Plaintiff with evil intent or motive, or

7   reckless or callous indifference to his civil rights. Plaintiff acknowledged he enjoyed a professional,

8   cordial relationship with Hartwig (even friendly and bantering at times) leading up to the incident. He

9   never felt threatened or intimidated by Hartwig any time before the date of the incident; he has never

10  come across any information that Hartwig held any personal animosity towards him. Plaintiff admitted

11  that, when Hartwig visited him post-arrest, Hartwig never suggested or stated that Plaintiff was arrested

12  because he wrote articles critical of BART. Plaintiff never heard any officer, post-arrest, reference that

13  he (Plaintiff) had written articles critical of BART.  Plaintiff admitted he has no evidence (eyewitnesses

14  or documents) that he was arrested because he wrote articles critical of BART.

15         Hartwig himself stated he only ordered Plaintiff's arrest because he observed Plaintiff violating

16  Penal Code § 369i. He repeatedly recognized Plaintiff's right to free speech, never felt any pressure

17  from critical BART news coverage, and was not upset when Plaintiff's criminal charges were

18  dismissed.  During his post-arrest visit with Plaintiff, Hartwig never verbally belittled Plaintiff during

19  these visits, or spoke derogatorily towards him. He never used profanity towards Plaintiff.

20         When Plaintiff's possessions were returned to him (after his release from the Hall of Justice)

21  everything was intact. Neither of his cameras was damaged; nothing was deleted. There was no

22  tampering with any of his possessions.

23         Rather than evil intent or callous indifference, Deputy Chief Hartwig's conduct demonstrates

24  what an officer is supposed to do: uphold the laws by arresting person(s) who break them. The conduct

25  shows an officer conscientiously doing his duty and ensuring public safety (e.g. safe and efficient

26  access to BART).

27         There is no evidentiary basis for federal punitive damages against Deputy Chief Hartwig. This

28  claim for relief should be dismissed.

1

### 2.   No Punitive Damages Under State Law

2   Pursuant to Civil Code § 3294(a), a plaintiff may only recover punitive damages where it is

3   proven "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or

4   malice." Cal. Civil Code § 3294 (West 1997.)  Section 3294(c)(1) defines malice as conduct which is

5   intended to cause injury to the plaintiff or despicable conduct carried on with a willful and conscious

6   disregard of the rights or safety of others. (*Id.*) Section 3294(c)(2) defines oppression as "despicable

7   conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's

8   rights." (*Id.*)

9   Punitive damages are disfavored under California law and such damages "should be viewed

10   with the greatest caution." *Beck v. State Farm Mutual Automobile Insurance Co.* (1976) 54 Cal.App.3d

11   347, 355.

12   Just as there is no evidentiary basis for punitive damages under federal law, there is no

13   evidentiary basis under state law. This is even more so given the higher evidentiary threshold under

14   state-law: clear and convincing evidence. As explained above, there is no simply no support for the

15   notion that Deputy Chief Hartwig acted with malice, oppression, or fraud.

16   For these reasons, Plaintiff's prayer for state-law punitive damages against Deputy Chief

17   Hartwig should be dismissed.

18   ### IV.   CONCLUSION

19   For these reasons, Defendants respectfully request the Court grant their Motion for Summary

20   Judgment/Summary Adjudication.

21

22   Dated:  December 23, 2013

23                                        LOW, BALL & LYNCH

24

25                               By____/s/____Kevin P. Allen_____
                                      DALE L. ALLEN, JR.
26                                     KEVIN P. ALLEN
                                      Attorneys for Defendants
27                                     SAN FRANCISCO BAY AREA RAPID TRANSIT
                                      DISTRICT AND BART DEPUTY POLICE CHIEF
28                                     DAN HARTWIG