# EXHIBIT A TO
# ALLEN DECLARATION

1        UNITED STATES DISTRICT COURT FOR THE

2          NORTHERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4  DAVID MORSE,

5       Plaintiff,

6  vs.                              No. C12-5289 JSC

7  SAN FRANCISCO BAY AREA RAPID
   TRANSIT DISTRICT (BART); and BART
8  Deputy Police Chief DAN HARTWIG,
   sued in his official and
9  individual capacities,

10       Defendants.
   _____/
11

12

13

14

15       DEPOSITION OF DANIEL O. HARTWIG

16          (Pages 1 to 168, inclusive)

17

18       Taken before SANDRA M. LEE

19          CSR No. 9971

20          October 15, 2013

21

22
         Aiken Welch Court Reporters
23       One Kaiser Plaza, Suite 505
         Oakland, California 94612
24       (510) 451-1580/(877) 451-1580
         Fax:  (510) 451-3797
25          www.aikenwelch.com

**2**

I N D E X

PAGE
EXAMINATION BY MR. SIEGEL                                    4

E X H I B I T S

NUMBER                                                    PAGE
Exhibit 1  BART Police Department Policy 459                14

Exhibit 2  BART Police Department Operations                29
           Order No. 11-18

Exhibit 3  Photograph                                       60

Exhibit 4  Document containing photos of                    64
           Christopher Cantor and Dave Id

Exhibit 5  No Justice Protest at Powell                     75
           timeline - 090811 Event #1109-1019

Exhibit 6  Photograph                                       80

Exhibit 7  Photograph                                       81

Exhibit 8  Photograph                                       84

Exhibit 9  Transcript of Interview                         102

Exhibit 10 BART Police Department Event Record,            133
           Event #1109-1019, 09/08/11

Exhibit 11 E-mail Exchange dated 6/21/12 between           141
           Shane Coduti and Daniel Hartwig

Exhibit 12 E-mail Exchange dated 6/21/2012                 143
           between Daniel Hartwig and Shane
           Coduti

Exhibit 13 Google Alert - BART dated 7/29/2011 to          145
           dhartwi@bart.gov

**3**

DEPOSITION OF DANIEL O. HARTWIG

BE IT REMEMBERED, that pursuant to Notice, and
on the 15th day of October 2013, commencing at the hour
of 9:13 a.m., in the offices of Siegel & Yee, 499 14th
Street, Suite 300, Oakland, California, before me,
SANDRA M. LEE, a Certified Court Reporter, personally
appeared DANIEL O. HARTWIG, produced as a witness in
said action, and being by me first duly sworn, was
thereupon examined as a witness in said cause.
                    ---oOo---
APPEARANCES:
For the Plaintiff:

        MICHAEL SIEGEL
        Siegel & Yee
        499 14th Street, Suite 300
        Oakland, California 94612
        (510) 839-1200

For the Defendants:

        DALE L. ALLEN
        Low, Ball & Lynch
        505 Montgomery Street, 7th Floor
        San Francisco, California 94111-2584
        (415) 981-6630

ALSO PRESENT:

        David Morse.

**4**

DANIEL O. HARTWIG,

sworn as a witness,

testified as follows:

EXAMINATION BY MR. SIEGEL:

Q. Good morning.

    Could you state and spell your name for the
record?

    A. Daniel O. Hartwig, H-a-r-t-w-i-g.

    Q. Mr. Hartwig, you're a retired BART police
officer; is that correct?

    A. Correct.

    Q. When did you retire?

    A. April 24th, 2013.

    Q. What was your rank when you retired?

    A. Deputy chief.

    Q. And while you were a BART police officer --
first of all, how many years did you serve BART PD?

    A. My career began Apri 24th, 1982, and ended on
April 24th, 2013.  31 years.

    Q. Have you previously been a defendant in a
lawsuit?

    A. I don't believe I have.

    Q. Have you given a sworn deposition previously?

    A. I have.

    Q. How many times?

**5**

    A. At least three.

    Q. When was the first time, approximately?

    A. 1987.

    Q. What was the subject of your testimony?

    A. That was a personal injury lawsuit that was not
involved with my career.  It was an off-duty injury that
I suffered.  The two subsequent were -- I'm drawing a
blank.  The two subsequent were duty related that I was
witness to in deposition because of my being a witness.

    Q. What was the first one of those incidents,
first one of those depositions?

    A. I believe it was late '80s.  '88, '89.

    Q. And do you remember what the case was about?

    A. I can't specifically recall.

    Q. How long was the deposition you gave in that
case, how many hours?

    A. It was less than two.

    Q. Do you recall the second deposition that you
referenced?

    A. I cannot recall.

    Q. I imagine that you've discussed this deposition
with your attorney before coming here?

    A. Yes.

    Q. And you're familiar that today you're under
oath?

**6**

1    A. Yes.
2    Q. You need to answer questions verbally --
3    A. Yes.
4    Q. -- instead of saying "uh-huh" or something of
5 that sort?
6    A. Yes.
7    Q. You know that when I ask you a question I have
8 the right to a truthful and complete answer?
9    A. Yes.
10    Q. And that if when I ask a question and I ask,
11 for example, for a list of responses, you cannot recall
12 everything at that moment but you later recall an
13 answer, you can supplement your answer at a later time;
14 are you aware of that?
15    A. I am now.
16    Q. And also we have the right to notify the court
17 that you supplemented an answer in that fashion.
18    A. Okay.
19    Q. If I ask a question that is not well framed,
20 you can always ask for clarification.
21    A. Okay.
22    Q. I guess the other issue as a preliminary is:
23 Is there any reason why you're not able to give truthful
24 testimony today?
25    A. No.

**7**

1    Q. Are you under a doctor's care?
2    A. No.
3    Q. Do you take any medications that inhibit your
4 mental abilities?
5    A. No.
6    Q. How much time did you spend preparing for the
7 deposition today?
8    A. Less than four hours.
9    Q. Did you review any documents in preparation?
10    A. One document.
11    Q. Which document was that?
12    A. I believe it was Officer Coduti's report.
13    Q. When you say "Officer Coduti's report," what do
14 you mean exactly?
15    A. Officer Shane Coduti was the officer that took
16 Mr. Morse into custody.  And the protocol for when you
17 take a subject into custody with the BART Police
18 Department is the officer is responsible to write the
19 report.
20    Q. Was Officer Coduti the arresting officer?
21    A. Yes.
22    Q. Did he make the probable cause determination
23 with regard to David Morse?
24    A. Yes.
25    Q. Did he rely on you to make that determination?

**8**

1    A. Partially --
2    MR. ALLEN:  Objection; calls for speculation,
3 lacks foundation.
4 BY MR. SIEGEL:
5    Q. Subject to those objections, your answer was
6 yes; is that correct?
7    A. It may have been partially because of my
8 involvement, yes.
9    MR. ALLEN:  And just to be clear on the record,
10 if I object -- I don't think you went through that
11 admonition -- he is to answer the question after my
12 objection unless I specifically instruct him not to do
13 so.
14    THE WITNESS:  Okay.
15 BY MR. SIEGEL:
16    Q. Other than your counsel, did you discuss this
17 deposition with anyone else?
18    A. No.  My wife knows I'm here.
19    Q. Always a good strategy.
20    Mr. Hartwig, I've had the -- I wouldn't say the
21 pleasure, but I've had the opportunity to review some of
22 your records, including your education records.
23    I understand you went to Brigham Young
24 University.
25    A. I did.

**9**

1    Q. That's where you received a Bachelor's degree?
2    A. I did not.
3    Q. Did you receive a Bachelor's degree anywhere?
4    A. I'm two units short of my Bachelor's degree
5 currently.
6    Q. After you attended BYU, did you attend any
7 further higher education?
8    A. Chabot Junior College and California Lutheran
9 University.
10    Q. While you were attending those schools, did you
11 receive any training in regards to law enforcement?
12    A. Criminal justice major.
13    Q. And you've since received training as a law
14 enforcement officer; is that correct?
15    A. Yes.
16    Q. When did you begin your training that way?
17    A. I was at the Los Medanos Police Academy in
18 1981.  I graduated from the Los Medanos Police academy I
19 want to say in April of '82 and began my career at BART
20 Police April 24th, 1982.
21    Q. At BART Police, did you receive training on use
22 of force?
23    A. Yes.
24    Q. And did you receive any training in regards to
25 respecting the First Amendment?

**10**

1     A. Yes.

2     Q. What training did you receive?

3     A. As a police officer throughout my law

4 enforcement career, not only the First Amendment, we

5 received multiple training classes on those instances as

6 well as others. They begin in the police academy. They

7 actually began as a criminal justice major in college

8 continuing to the police academy and throughout my

9 career as a law enforcement officer with BART.

10     Q. If you were asked to estimate -- don't guess --

11 how many trainings approximately have you received that

12 relate to the First Amendment?

13     A. I couldn't guess or estimate.

14     Q. More than ten trainings?

15     A. I could not guess or estimate.

16     Q. Are you familiar with BART Policy 346.3?

17     A. If you could give me the verbal title, I could

18 respond to that. The number title I am not.

19     Q. Are you familiar with the News Media Relations

20 Policy?

21     A. Yes.

22     Q. This policy refers to valid press credentials.

23     What does that mean?

24     A. Those are credentials that the press usually on

25 the scene of any incident would be in possession of to

**11**

1 allow them to be within that scene and location.

2     Q. Does it matter who issues the credential?

3     A. Doe it matter to the BART Police Department?

4     Q. Yes.

5     A. I don't believe it does.

6     Q. So if a news agency issues the credential,

7 that's sufficient?

8     A. What is required is that that person in

9 possession of that credential obeys the laws at the

10 scene of the incident. Where the credential originates

11 from is not something that we would focus on.

12     Q. Are you aware that the News Media Relations

13 Policy calls for a safe staging area for media?

14     A. Yes.

15     Q. On September 8th, 2011, was such an area

16 designated?

17     A. There is always an area that's deemed safe and

18 designated for the media. What we choose or what we did

19 in my career at BART was bend over backwards to make

20 sure those areas were available.

21     MR. SIEGEL: Read back the question, please.

22     (Record read.)

23     MR. ALLEN: I'll object that it's vague as

24 to -- if you don't mind, are we talking about the Powell

25 Street station, or are we talking about what stations

**12**

1 where there were demonstrations planned or advertised?

2     MR. SIEGEL: Okay. You don't need to testify.

3 BY MR. SIEGEL:

4     Q. At the Powell Street station, was there a media

5 staging area designated?

6     A. There's not a specific staging area, no.

7     Q. Were any directions given to media that you

8 know of where an appropriate place to stage would be?

9     A. No.

10     Q. Are you familiar with the BART policy regarding

11 dispersal orders?

12     A. Yes.

13     Q. What is a dispersal order?

14     A. It's an order read, announced, to a specific

15 crowd/group that their assembly has become unlawful, and

16 within a matter of a designated time frame, they are to

17 disperse. If they fail to do so, they're subject to

18 arrest.

19     Q. Has BART prescribed a certain format for such

20 an order?

21     A. Within the policy, yes, there is. It has to be

22 read within a time frame multiple times from different

23 locations.

24     Q. At the Powell Street station on September 8th,

25 2011, were any such orders read?

**13**

1     A. Yes.

2     Q. Do you know at what time they were read?

3     A. Specific time --

4     Q. During the day?

5     A. No, I do not. I do know that they were well

6 into the event. I do know from locations where they

7 were read. I do know they were read more than once.

8     Q. To your knowledge, who read any such orders?

9     A. Sergeant Steve Coontz.

10     Q. Where was he located?

11     A. The first dispersal was read from the station

12 agent's booth over the public intercom. We determined

13 because of the size of the crowd and the noise that may

14 be a better location. The second dispersal was read

15 from the same location approximately ten minutes after

16 the first dispersal. The following one was made on the

17 outside of the fare gates amongst the crowd. That's

18 what I recall.

19     Q. And your recollection is Lieutenant Coontz read

20 the full dispersal order as recommended by BART policy?

21     A. I know in the first two incidents from the

22 station agent's booth he did. I know that he was -- he

23 had encountered a large number of people in volume on

24 the third attempt. I'm not sure if the full dispersal

25 at that time was completed.

**14**

1    Q. Do you know what law Lieutenant Coontz cited in
2    the dispersal notice?
3    A. What violation?  I believe 369i of the Penal
4    Code.
5    Q. You previously testified that you're familiar
6    with the -- scratch that.
7        Are you familiar with the Tactical Team and
8    Crowd Control Policy?
9    A. Yes.
10    Q. Are you aware that in regards to mass
11    demonstrations, this policy recommends Penal Code 409 be
12    used for any arrests?
13    A. I believe there may be sections other than 369i
14    stipulated in that policy, but for this event with
15    command staff within the BART Police Department based
16    upon what we encountered, 369i was the chosen section.
17    Q. Is it your testimony that 369i is included
18    within the Tactical Team and Crowd Control Policy?
19    A. I do not believe that the policy restricts the
20    agency from utilizing Penal Code sections.
21        MR. SIEGEL:  I'd like to introduce Exhibit 1.
22        (Plaintiff's Exhibit 1 marked for
23        identification.)
24    BY MR. SIEGEL:
25    Q. Is Exhibit 1 the Tactical Team and Crowd

**15**

1    Control Policy that you're familiar with?
2    A. Yes.
3    Q. You can take a minute to verify if you'd like.
4    A. This is the form.
5    Q. I'd like to direct your attention to 459.4 of
6    this policy, which is subtitled "Arrests," and which is
7    located on the number stamp BART 19354.
8        I'd like to direct your attention to the third
9    paragraph in the subsection "Arrests."  The third
10    sentence of this paragraph reads, "the only proper basis
11    for a multiple simultaneous arrest of all the
12    individuals at a demonstration is failure to disperse
13    (409 PC)."
14        Do you see the section I just read?
15    A. Yes.
16    Q. Why was this policy not followed on September
17    8th, 2011?
18    A. Because the crowd that was encircled failed to
19    disperse after the dispersal announcement was made.
20    Q. Did you arrest the entire crowd?
21    A. There were a number of arrests made.  There was
22    determination made after the fact who was taken into
23    custody.
24    Q. But the entire crowd failed to disperse; is
25    that true?

**16**

1    A. The crowd that was encircled.
2    Q. Is that true?
3        MR. ALLEN:  Objection; vague and overbroad.
4    BY MR. SIEGEL:
5    Q. Did anybody within the encircled crowd
6    disperse?
7    A. No.
8        MR. ALLEN:  Objection.  That's vague.
9    BY MR. SIEGEL:
10    Q. It's true that you only arrested some people
11    within the crowd that failed to disperse; is that
12    correct?
13    A. Yes.
14    Q. On what basis did you select people for arrest?
15    A. Violation of law.
16    Q. Which law?
17    A. 369i PC.  And I didn't write the citations.
18    And I don't specifically recall, but the law that I
19    witnessed the violation of and the law that your client
20    was arrested for was 369i.  409 may have been an
21    additional charge.  I did not see the citations.  I
22    don't recall if those were added.
23    Q. Is it possible that your operations order for
24    September 8th, 2011, conflicted with the Tactical Team
25    and Crowd Control Policy?

**17**

1        MR. ALLEN:  Objection; calls for speculation.
2        THE WITNESS:  I don't believe it does.
3    BY MR. SIEGEL:
4    Q. Who approves BART Police Department policy
5    manual?
6    A. The policy manual is put together by a third
7    agency called Lexipol that is a group of former law
8    enforcement officers, current attorneys within the state
9    of California that review, authorize, approve,
10    recommend, suggest.  The ultimate approval is from the
11    chief of police.
12    Q. The chief of police is the last person to stamp
13    the policy manual, as it were?
14    A. I don't know that his signature is actually on
15    the manual itself, but command staff, once that comes
16    back from Lexipol, does the final review.
17    Q. And does the BART board of directors play any
18    role?
19    A. The BART board of directors, I believe, have
20    access to those documents.  I believe now after January
21    1 of 2009 that the BART policy is make those documents
22    available to the board as well as police review.
23    Q. So it's your understanding that the board is
24    not the authorizing entity for the policy?
25    A. They are not.

**18**

1　　　　MR. ALLEN:  Objection; calls for speculation.

2　BY MR. SIEGEL:

3　　　Q. So the chief of police determines the policy

4　manual?

5　　　A. **The chief of police along with command staff, I**

6　**believe, is the correct answer.  The policy in the hands**

7　**of the board of directors and/or the police review, I**

8　**believe, meets the requirement requested from police**

9　**review as well as the public after January 1st, 2009.**

10　　　Q. If an operations order conflicts with BART

11　policy, what is the protocol?

12　　　A. **In my career as deputy chief, I'm not aware of**

13　**that situation arising.  I would imagine if that did**

14　**occur, there would be review of said policy.**

15　　　Q. Is it true that Deputy Chief Fairow issued the

16　operations order for September 8th, 2011?

17　　　A. **Yes.**

18　　　Q. Do you know if anybody reviewed his order to

19　determine if it conflicted with BART policy?

20　　　A. **I know I did not.**

21　　　Q. You gave an Internal Affairs -- you gave

22　testimony to Internal Affairs regarding Mr. Morse's

23　complaint to BART regarding his arrest on September 8th,

24　2011; is that correct?

25　　　A. **Yes.**

**19**

1　　　Q. Was that testimony under oath?

2　　　A. **I don't know that it specifically was, but as a**

3　**deputy chief of the police department, every time I'm**

4　**interviewed, whether Internal Affairs or by anybody, for**

5　**that matter, I do as being under oath.**

6　　　Q. Have you had a chance to review the transcript

7　of your IA interview?

8　　　A. **I have not.**

9　　　Q. I can represent to you that in that interview

10　you used the term "protester."

11　　　　How would you define that term?

12　　　A. **Active participant in a group of persons**

13　**gathering at a specific location.**

14　　　Q. Protester is not necessarily criminal; is that

15　correct?

16　　　A. **No.**

17　　　Q. Most are legal, in fact; is that correct?

18　　　A. **They are certainly not -- I would not classify**

19　**them as criminal.**

20　　　Q. In this country, we protect the right to

21　protest?

22　　　A. **Absolutely.**

23　　　Q. So if someone is a protester in a BART

24　facility, they are legally entitled to remain until

25　directed otherwise; is that correct?

**20**

1　　　A. **Yes.**

2　　　Q. The way that you notify a protester it's time

3　to leave is through a dispersal notice; is that correct?

4　　　　MR. ALLEN:  Objection; vague.

5　　　　THE WITNESS:  The way I do it or the way it was

6　done?

7　BY MR. SIEGEL:

8　　　Q. The way it should be done.

9　　　A. **That was one of the things we did do, yes.**

10　　　Q. Are you familiar with the Op BART campaign?

11　　　A. **Are you talking about the groups that were**

12　**gathering at BART locations that went by different --**

13　**Occupy BART, Anonymous, all those groups, am I familiar**

14　**with?**

15　　　Q. You're familiar with those groups.

16　　　　Are you familiar with Twitter?

17　　　A. **Yes.**

18　　　Q. Do you have a Twitter account?

19　　　A. **I do not.  You witnessed my technical**

20　**capabilities.**

21　　　Q. Are you familiar with the No Justice No BART

22　movement?

23　　　A. **Yes.**

24　　　Q. What is your understanding of what that

25　movement was about?

**21**

1　　　A. **It began long before this situation.  I was a**

2　**previous manager of security programs at BART working**

3　**out of the general manager's office.  To the best of my**

4　**recollection, the first time I was involved with that**

5　**group was after January 1st, 2009.**

6　　　Q. What happened on January 1st, 2009?

7　　　A. **There was a shooting death involved at the**

8　**Fruitvale BART station where a BART police officer shot**

9　**and killed an in-custody suspect on the platform.**

10　　　Q. Were you working that evening?

11　　　A. **I was not.  I was the manager of security**

12　**programs working out of the general manager's office at**

13　**the BART Police Department.**

14　　　Q. After the stroke of midnight on New Year's,

15　were you on duty?

16　　　A. **I was not.**

17　　　Q. So in the operations plan for September 8th,

18　2011, you were designated as operations chief; is that

19　correct?

20　　　A. **I believe I was the on-scene commander.**

21　　　Q. And what were your duties and responsibilities

22　that day?

23　　　A. **I was a commander in charge of the location of**

24　**the scene we were involved with.  It could change based**

25　**upon movement of involved parties.  On this evening, the**

**22**

1 afternoon of this situation, it was at Powell Street

2 station.

3    Q. You were operating under an order -- the

4 operations order created by Deputy Chief Fairow; is that

5 correct?

6    A. Yes.

7    Q. That order at page 4 called for the immediate

8 arrest of anybody, quote, unquote, "blocking fare

9 gates."

10       Do you remember that direction?

11    A. I don't have a copy of the order present.  At

12 your word, I will take it for it, yes.

13    Q. What would blocking fare gates mean to you?

14    A. Blocking and impeding the flow of traffic in

15 either direction, interfering with the direction of flow

16 either into the BART station or out of the BART station.

17    Q. How close to a fare gate do you need to be to

18 block it?

19    A. You can block it from multiple ends of the fare

20 gates because of the limited space at that location.

21 You could be standing in front of it unknowingly or

22 willingly and blocking that access.  You could be

23 standing to the side of it unknowingly or willingly

24 blocking that access.  You could be standing straight in

25 the middle of it unknowingly or willingly blocking that

**23**

1 access.

2    Q. Did you intend to arrest anybody that was

3 unknowingly blocking the fare gates?

4    A. No.

5    Q. How do you determine when someone is

6 intentionally blocking a fare gate?

7    A. We ask them to move from the area, not block

8 the fare gates to create a free flow of traffic for the

9 people utilizing the fare gates.  Those who choose not

10 to do so we determine to be willingly blocking the fare

11 gates, and those people are subject to arrest.

12    Q. You didn't arrest all the people that were

13 blocking the fare gates; is that true?

14    A. We arrested a group of people in violation of

15 369i based upon the interference, impediment, blocking

16 of fare gates on this occasion.  At the time of arrest,

17 they were enclosed in a circle of police officers away

18 from the fare gates.  So the actual arrest, they had

19 been moved away from the fare gates, but the violation

20 they were charged with was 369i PC, blocking, impeding

21 the flow of the fare gates, interfering with the

22 operation of the transit system.

23    Q. And the conduct that formed the basis of your

24 369i arrest, did it occur before or after the dispersal

25 orders?

**24**

1    A. It occurred before and I believe maybe at the

2 very end during the dispersal notice.

3    Q. But not after?

4    A. They were encircled and moved away from the

5 fare gates.  Our intention was to clear the fare gate

6 area.

7    Q. But if they were encircled, how can they

8 disperse?

9    A. They were -- the dispersal was read before they

10 were encircled.

11    Q. Are you sure of that?

12    A. Yes.

13    Q. Have you reviewed the timeline created by BART

14 police in regards to this incident?

15    A. The specific timelines, could you clarify that,

16 please?

17    Q. Have you reviewed any written timeline of the

18 incident created by BART police?

19    A. I have not.

20    Q. Are you aware that the crowd was encircled at

21 5:20 p.m.?

22    A. I'm not aware of the specific time that the

23 crowd was encircled.

24    Q. Are you aware that BART police said that the

25 dispersal order was given at 5:26 p.m.?

**25**

1    A. I'm not aware of any timeline regarding what

2 you're referring to.  If you're referring to

3 interpretation of a CAD form and what you may read and

4 what I may read from that form, I have not seen that

5 form so I cannot answer that question.

6    Q. BART police were using radio to communicate

7 that day; is that correct?

8    A. Yes.

9    Q. Are you aware that someone stated over the

10 radio that the dispersal order occurred at 5:26?

11    A. As the on-scene commander of an active

12 situation, there's a lot of radio traffic.  As the

13 person in charge, I may or may not copy that radio

14 traffic on a regular basis what occurs as the on-scene

15 commander.  An officer or supervisor will come to me

16 directly and say, "Deputy Chief, did you hear that on

17 the radio?  They're trying to get a hold of you.  They

18 have a question for you."  There's a lot of traffic on

19 the radio.

20       And did I specifically hear times of when the

21 crowd was encircled and when the dispersal notice was

22 read, I did not.  But I was at the scene, and I know it

23 would make no sense to me or you or anybody sitting in

24 this room to encircle a group and read a dispersal

25 notice.

**26**

1     For a dispersal notice to effectively and
2  accurately and legally be enacted, there has to be an
3  avenue of escape, an avenue of freedom to walk away,
4  which we ensured occurred on the evening of the
5  situation.  I would not -- the order to close the circle
6  came from me.  I would not give an order to close a
7  circle and then read a dispersal notice.
8     Q. Are you aware of any documentation that would
9  support your timeline?
10    A. I cannot rely upon documentation to support
11 something that I witnessed.  I'm not aware of
12 documentation that would have accurate timelines.  I'm
13 aware that after the fact, after the dispersal notices
14 were read and after they were failed to be adhered to,
15 the crowd was encircled.
16    Q. Did you produce a report regarding September
17 8th, 2011?
18    A. No, I did not.
19    Q. Why not?
20    A. I was the on-scene commander.  I was directing
21 officers and employees.  My role was not to be an active
22 report taker or report writer regarding this incident.
23    Q. You were choosing people for arrest; isn't that
24 true?
25    A. No.

**27**

1     Q. Didn't you choose Dave Morse for arrest?
2     A. No.
3     Q. Officer Coduti did so on his own volition?
4     A. I directed Officer Coduti and Officer Jacobsen
5  to remove Mr. Morse and Mr. Krystoff from the crowd.
6     Q. On what basis?
7     A. That I witnessed, 369i, as well did they, what
8  Officer Coduti articulated in his report.
9     Q. Are you sure that Officer Coduti witnessed
10 David Morse violating 369i?
11    A. Based on what I read in the report, yes, I am.
12    Q. Didn't he ask you to come support him at trial?
13    A. Excuse me?
14    Q. Didn't Officer Coduti contact you and ask you
15 to appear in court to testify why David Morse was
16 arrested?
17    A. That's not what he asked me, no.
18    Q. What did he ask you?
19    A. He asked me to come to court, and I asked him
20 why.  He said because he was subpoenaed to appear before
21 the judge regarding the citation to Mr. Morse.  I said,
22 "You don't need me to be there.  Absolutely no reason
23 for me to be in court."  If I was to go to court for all
24 the arrests that occurred by BART PD, I would never be
25 at BART PD.

**28**

1     Q. Did any other officer write to you and ask you
2  to appear with them to substantiate an arrest?
3     A. No.
4     Q. So only Officer Coduti wrote to you; is that
5  correct?
6     A. I don't believe he wrote to me.  He came to my
7  office and we spoke.
8     Q. You have a Blackberry; is that correct?  You
9  did have a Blackberry?
10    A. Yes.
11    Q. You received e-mail on that?
12    A. On a regular basis.
13    Q. And are you aware your attorney has turned over
14 your Blackberry records?
15    A. I'm not aware of that, but I have no problem
16 with that.  To the best of my recollection, what I
17 recall specifically is talking to Officer Coduti in my
18 office face to face regarding this request.
19    Q. And that's an unusual interaction between two
20 officers, is it not?
21    A. No.
22    Q. Why do you think he came to talk to you?
23    A. Officer Coduti talked to me on a regular basis.
24 My policy within the BART Police Department was to have
25 my door open if I was there.  And I had occasion to

**29**

1  speak to not only Officer Coduti but many officers on a
2  regular basis.  And he took the advantage to come to my
3  office to ask me a question, to which I responded.
4     Q. Referring to the protest in general, and so I
5  don't have to say September 8th, 2011, let's just call
6  it the protest for today.
7     Prior to the protest, was it your understanding
8  that BART operations would be disrupted?
9     MR. ALLEN:  Can you repeat that question?  Read
10 the question back, please.
11    (Record read.)
12    MR. ALLEN:  I thought you said destructed.  I
13 couldn't catch the word.
14    You're free to answer.
15    THE WITNESS:  Yes.  Deputy Chief Fairow had
16 provided me with information that he had come across, I
17 believe, through our Intel officer Ken Dam regarding the
18 threat of blocking fare gates to force BART station
19 agents to open up the gates to allow people for free
20 access to the BART system.
21    MR. SIEGEL:  I'd like to introduce Exhibit 2.
22    (Plaintiff's Exhibit 2 marked for
23    identification.)
24 BY MR. SIEGEL:
25    Q. Mr. Hartwig, are you familiar with this

**34**

1    Q. It was in the so-called free area?

2    A. Yes.

3    Q. I'd like to direct your attention to the fourth

4  page, second paragraph from the bottom.

5        Just to do me a favor, would you read the first

6  three sentences of that paragraph beginning with "The

7  department will take."

8    A. "The Department will take a 'zero tolerance'

9  approach to disruptive, unsafe and unlawful activity

10  occurring on the platform or concourse during this

11  planned protest.  Station designation signs and PA

12  systems will warn again deliberate attempts to disrupt

13  revenue service."

14    Q. And one more, please.

15    A. "Officers will be assigned to intervene as soon

16  as possible, making immediate arrests without prior

17  warning of protesters who block train doors, climb atop

18  trains or otherwise delay revenue service, or block fare

19  gates to prevent patron access to the system."

20    Q. During the protest, did anyone block train

21  doors?

22    A. No.

23    Q. Did anyone climb atop trains?

24    A. No.

25    Q. Did anyone delay revenue service?

**35**

1    A. I would say they did not.

2    Q. Did anyone prevent patron access to the system?

3    A. Yes.

4    Q. Who did that?

5    A. The protesters located in the free area

6  assembled protesting against BART willingly, knowingly

7  impeding the flow of traffic through the fare gates into

8  the system as well as exiting from the system.

9    Q. Do you know if any patron complained about not

10  being able to access the Powell Street station?

11    A. I know of numerous patrons standing to my

12  immediate right trying to enter into the station that

13  could not do so because of the crowd blocking the fare

14  gates.  I know of numerous patrons standing to my

15  immediate right and left at the same time when we moved

16  the people from that location thanking us for doing so.

17    Q. BART police stood in front of the fare gates;

18  is that true?

19    A. At one point in time, they did.

20    Q. And that -- did that permit patrons to enter

21  and leave the system?

22    A. There's two different manners in how they stand

23  at the fare gates.  The manner of which you're speaking,

24  they would stand in front of the structure itself

25  allowing passage through the gates.  Later when we

**36**

1  removed people from that location that were blocking --

2  willingly blocking that location, they covered across

3  the entire fare gate area, the structure as well as the

4  opening, blocking anybody from entering and exiting.

5    Q. Why did you arrest the individuals in the

6  circle if BART police had already ensured egress and

7  ingress to the station?

8    A. They were arrested for 369i PC, for interfering

9  and disrupting the BART system, blocking the passage

10  into the system.  They were arrested as well for failure

11  to disperse after the dispersal notice was read multiple

12  times.

13    Q. How did you determine whether someone was

14  intentionally or unintentionally blocking the fare

15  gates?

16    A. I relied upon multiple dispersal notices to

17  disperse from the area.  If you failed to do so, you

18  were subject to arrest.

19    Q. Are you aware that San Francisco Chronicle

20  reporter Vivian Ho was detained in the circle?

21    A. Yes.

22    Q. Why wasn't she arrested?

23    A. She was identified as a journalist from the San

24  Francisco Chronicle, and she was not witnessed to be an

25  active participant or a violator of law at this scene.

**37**

1    Q. Mr. Morse was?

2    A. Yes.

3    Q. On what basis?

4    A. He was an active participant, and he violated

5  369i PC as well as 409 PC at this scene.

6    Q. Just to separate those two, earlier we'd

7  established that the entire crowd was blocking the fare

8  gates; is that correct?  The entire encircled crowd; is

9  that true?

10    A. I don't know that we established the entire

11  crowd was blocking the fare gates.  I know the entire

12  crowd was actively marching in front of the fare gates

13  and failed to move from that location until the police

14  department set up a skirmish line and moved them back.

15    Q. Including Vivian Ho, correct?

16    A. I believe she was in that group, yes.

17    Q. So Vivian Ho was blocking the fare gates?

18        MR. ALLEN:  Objection; argumentative, misstates

19  his testimony.

20        THE WITNESS:  I did not see Vivian Ho blocking

21  the fare gates, no.

22  BY MR. SIEGEL:

23    Q. But she was in the crowd that was blocking the

24  fare gates?

25    A. The area at the fare gates and the ticket

**38**

1 vendors at the Powell Street station is not a large
2 area, and there was a large number of people. So when
3 we moved people back from the fare gates, that
4 included -- at that point in time, there was no lines of
5 restriction. It was open access everywhere. There was
6 many people that were moved back. There was dispersal
7 notices read, and the majority of those people at that
8 time dispersed. I believe Vivian Ho did not.
9     Q. So why wasn't she arrested?
10     A. She was identified as a non-active participant,
11 and she was a member -- she was a mainline journalist, I
12 believe, representing the San Francisco Chronicle, even
13 though she did not have her -- she had just gotten her
14 job and didn't have her active press pass.
15     Q. When you say "mainline journalist," is that to
16 be distinguished from other types of journalists?
17     A. When I say "mainline journalist," I'm referring
18 to local, state, county, sources of media, newspapers,
19 reporters, television stations, radio stations,
20 Chronicle, Contra Costa Times, KCBS, Channel 2, Channel
21 4, Channel 7. I'm just -- that's how I designate them.
22     Q. Are you familiar with the alternative
23 journalist?
24     A. Yes.
25     Q. Is an alternative journalist subject to any

**39**

1 different laws than a mainline journalist?
2     A. No.
3     Q. They should be treated the same?
4     A. Sure.
5     Q. During the protest, wasn't David Morse holding
6 a press pass?
7     A. I believe he was.
8     Q. He was holding one or more cameras?
9     A. He may have been.
10     Q. So what distinguished him from Vivian Ho?
11     A. He was an active participant in the protest.
12 He was actively blocking fare gates, actively marching
13 with the crowd, actively interacting with Mr. Cantor,
14 who I determined through my experience with this group
15 was the active leader of the crowd.
16     Q. So you're saying Mr. Morse associated with Mr.
17 Cantor?
18     A. I don't know if he associated with him, but I
19 know during this event, he was an active participant
20 with Mr. Cantor.
21     Q. When you say "active participant," specifically
22 what do you mean?
23     A. Marching around the fare gates, around the
24 ticket vendors; blocking the fare gates; interacting
25 with police officers; interacting with Mr. Cantor.

**40**

1     Q. Let's take each one of these one by one.
2      What do you mean when you say Mr. Morse was
3 marching?
4     A. In this event, they began near the ticket
5 vendors away from the fare gates. Met as a large group
6 most often led by Mr. Cantor. I don't know if he had an
7 actual megaphone or if he had a magazine wrapped up, but
8 he was talking to the crowd. And the conversation went
9 from a conversation to a chant to a mobile moving march
10 around the ticket vendor, which came around and
11 ultimately ended up in front of the fare gates and
12 continued two or three times.
13      And what would happen is as they progressively
14 marched and chanted, they would slow down at the ticket
15 vendors and at the fare gates to block and impede the
16 flow of BART patrons trying to either purchase a ticket
17 from the ticket vendor or enter or exit into the BART
18 station.
19     Q. Is it your testimony that anybody that was
20 walking in a circle was blocking the fare gates?
21     A. No.
22     Q. Now, it is your testimony that Mr. Cantor is a
23 leader or one of the leaders of the protest; is that
24 correct?
25     A. Yes.

**41**

1     Q. For purposes of news gathering, isn't that the
2 person that the news agents would be most interested in?
3     A. You would have to ask the new agents. I would
4 assume that would be true.
5     Q. How can you distinguish a reporter close to the
6 primary subject from a reporter that's marching?
7     A. The reporters at the scene most often are on an
8 outer edge perimeter or in the back of the active
9 participants. They're not usually standing side by side
10 with active leaders of the protest. They're not usually
11 in conversation with active leaders of the protest
12 during the protest, I'm saying. They may be afterwards.
13      They're not actively blocking fare gates as
14 what I perceived to be an active member of the protest
15 and not an active member. Although he absolutely is a
16 journalist, but because he has a journalist pass
17 identifying himself as a journalist doesn't allow him to
18 break the law. It allows him to be there and act as a
19 journalist.
20      What I witnessed that night, Mr. Morse did that
21 as well as block and impede the flow of patrons into the
22 station at the fare gates as well as march as well as
23 stand side by side with Mr. Cantor in the encircled
24 group.
25     Q. You detained over ten journalist that day; is

**42**

1    that correct?

2        A. I believe so.

3        Q. Mr. Morse was the only one you arrested?

4        A. As far as I know, correct.

5        Q. Prior to September 8th, a "Be On the Look Out"

6    bulletin was issued that identified Mr. Morse; is that

7    correct?

8        A. I was made aware of that fact after September

9    8th, yes.

10        Q. Prior to September 8th, had you ever arrested

11    Mr. Morse?

12        A. No.

13        Q. Had you ever observed him committing any

14    unlawful conduct?

15        A. No.

16        Q. But you knew him?

17        A. Yes.

18        Q. How did you know him?

19        A. My interaction with Mr. Morse goes back to when

20    I was manager of security programs in the general

21    manager's office.  And most often, our interaction took

22    place at the BART boardroom during board meetings.

23        Q. You knew that Mr. Morse published articles

24    about these events he attended?

25        A. I assumed he did.

**43**

1        Q. You read some of these articles; is that

2    correct?

3        A. When I returned to the police department, I

4    did.

5        Q. Some of these articles were critical of BART

6    police; is that correct?

7        A. Yes.

8        Q. Is it true you discussed with other BART

9    officers Mr. Morse's articles?

10        A. I specifically personally did that?

11        Q. Did you?

12        A. No.

13        Q. Never?

14        A. Maybe with Deputy Chief Fairow, Chief Rainey,

15    but with officers, I did not have that conversation, no.

16        Q. Why was Mr. Morse identified by BART police in

17    advance of the protest?

18        A. Mr. Morse is an information source that our

19    Intel officer and Deputy Chief Fairow relied upon

20    information they obtained from the blog that he would

21    put his information out on.  I found that site to be the

22    most accurate calendar of protest events within the BART

23    property that I felt I had an obligation and the

24    responsibility to be informed upon.  That's why I

25    utilized that site.

**44**

1        Q. So you knew Mr. Morse because of his

2    news-gathering activities?

3        A. That was one of the reasons why I knew him,

4    yes.

5        Q. And you were able to identify him on September

6    8th because of his news-gathering activities?

7        A. That was one of the reasons why I was able to

8    identify him, yes.

9        Q. Did you ever know him in any other context

10    other than his conduct as a reporter?

11        A. I've witnessed him as a reporter, as a citizen

12    within a BART board meeting.  I've noticed him in the

13    system.  We've passed walking with each other.  I've

14    noticed him in many other categories other than his

15    journalism alone.

16        Q. But you first got to know him through his

17    journalism?

18        A. I guess that's correct, yes.

19        Q. Are you familiar with many reporters in the Bay

20    Area?

21        A. Yes.

22        Q. Could you identify Vivian Ho by sight?

23        A. I think I could.

24        Q. How about Rebecca Bowe?

25        A. Rebecca?

**45**

1        Q. B-o-w-e?

2        A. I do not believe I know Rebecca Bowe.

3        Q. Are you aware that Rebecca Bowe is a journalist

4    for the SF Bay Guardian?

5        A. I am not.

6        Q. Are you aware she was detained on September

7    8th?

8        A. Specifically I'm not, no.

9        Q. Are you aware that eight journalist students

10    were detained on September 8th?

11        A. I don't know what the specific number was, but

12    I know there were journalism students that were

13    detained, yes.

14        Q. Do you know whether these journalism students

15    were walking in the circle or not?

16        A. I believe they were -- my contact with them was

17    when they were inside the circle area and failed to

18    disperse.  Do I know if they specifically marched

19    around -- did I witness them violate law, I did not.

20        Q. You wouldn't have known them by sight; isn't

21    that true?

22        A. Correct.

23        MR. ALLEN:  Mike, we've been going about an

24    hour.  If there's a place you can take a break to

25    stretch our legs.

**46**

1          (Recess taken.)

2   BY MR. SIEGEL:

3       Q. Mr. Hartwig, after the break, would you like to

4   update any of your previous testimony?

5       A. No.

6       Q. Can you please describe all the specific facts

7   that gave you probable cause to arrest David Morse?

8       A. I witnessed David Morse being an active

9   participant of the protest at the Powell Street BART

10  station, which included marching in a circular fashion

11  around the ticket vendors, blocking the fare gates,

12  impeding the flow of patrons entering and exiting the

13  BART station.

14      Q. Marching in and of itself is not illegal,

15  correct?

16      A. Correct.

17      Q. Marching can be a legitimate expressive

18  activity?

19      A. Correct.

20      Q. And picketing is an expressive activity as

21  well; is that correct?

22      A. Correct.

23      Q. BART policy manuals state that picketing is a

24  First Amendment activity?

25      A. Correct.

**47**

1       Q. So marching in a circle is not a reason to

2   arrest David Morse?

3       A. In and of itself?

4       Q. Correct.

5       A. No.  When it blocks the flow of patrons and it

6   blocks fare gates, we have a violation involved.

7       Q. So really you're saying David Morse blocked

8   fare gates and blocked patrons?

9       A. Yes.

10      Q. And when you say he blocked fare gates, do you

11  mean that he stood still in front of the fare gates?

12      A. Either in front of the fare gates, partially in

13  front of the fare gates, in front of the patrons,

14  impeded the flow of the direction of patrons into and

15  out of the station, yes.

16      Q. You're not permitted to arrest people en masse;

17  rather you're required to make a probable cause

18  determination for each individual you would like to

19  arrest?

20      A. The only time en masse per that policy is a

21  specific violation of 409.  Other than that, there has

22  to be a probable cause attached to that arrest, which I

23  believe we had with Mr. Morse.

24      Q. In your mind, is there a particular moment

25  where you can remember David Morse standing in front of

**48**

1   the fare gates?

2       A. No.

3       Q. Is there any particular action you remember

4   between David Morse and any BART patron?

5       A. I remember Mr. Morse being an active

6   participant in the protest that marched around the

7   ticket vendors, that blocked the fare gates at the

8   Powell Street station repeatedly.  During dispersal

9   announcements, after dispersal announcements, the

10  activity continued.

11      Q. Is it your testimony that no other journalist

12  walked with the protesters?

13      A. I think many walked with them.  Did I witness

14  them being active participants, blocking fare gates, no,

15  I did not.

16      Q. Everybody that was walking in the circle was

17  blocking fare gates; is that true?

18      A. No.

19      Q. Explain what you mean.

20      A. You can walk in a circle and stay totally away

21  from the fare gates and the ticket vendors and impede

22  nobody.  That's not what happened.

23      Q. Approximately how many people were within the

24  circle?

25      A. 50, 60.

**49**

1       Q. And out of those, how many, approximately,

2   blocked the fare gates?

3       A. I don't know.

4       Q. Was every person that blocked the fare gates

5   arrested?

6       A. As far as I know, yes, they were.

7       Q. How many officers were making observations to

8   determine who should be arrested?

9       A. I believe there were arrest teams on the outer

10  perimeter of the fare gate/ticket vendor area.  Specific

11  numbers, I'd have to refer to the operations order.

12      Q. From your recollection today, how many officers

13  selected individuals for arrest?

14      A. Specific numbers, I'd have to refer to the

15  order.  I couldn't guess.

16      Q. Who arrested Christopher Cantor?

17      A. I believe it was Arthur Jacobsen, to the best

18  of my recollection.

19      Q. You're aware that a BART police officer killed

20  Charles Hill in 2011?

21      A. Yes.

22      Q. You're aware that the protest on September 8th,

23  2011, came out of that killing in part?

24      A. I was involved with so many protests on BART

25  property, I didn't -- specifically what it was attached

**54**

1  officers from San Francisco PD that were looking at
2  press passes, yes.
3      Q. Under your direction?
4      A. Yes.
5      Q. What if a person claiming to be a journalist
6  didn't have a press pass; what would you do then?
7      A. I had to utilize other avenues to identify
8  those people, and I had to set those people aside until
9  I could -- I divided people by press passes and
10  identifications and people without. There was a large
11  number of people in the circle that didn't have
12  either/or. So we went to the people with the press
13  passes and identified them.
14      Q. Some people claiming to be journalists didn't
15  have press passes; is that correct?
16      A. Yes.
17      Q. But you, nevertheless, released them, correct?
18      A. After determining that they had an adequate
19  reason for being there, were not violators of law, yes,
20  they were released.
21      Q. Are you familiar with Officer Lee?
22      A. Officer Lee?
23      Q. Yes.
24      A. You'd have to be more specific than Officer
25  Lee.

**55**

1      Q. Designated as the scribe for the incident
2  commander.
3      A. I'm -- is it Officer Myron Lee?
4      Q. Officer M. Lee, No. 182.
5      A. Yes. I know who Myron Lee is, yes.
6      Q. What is a scribe?
7      A. It's a note-taker for the person he's assigned
8  to.
9      Q. Were you the incident commander?
10      A. At the scene.
11      Q. Were you working with Officer Myron Lee?
12      A. No. I believe Officer Myron Lee was assigned
13  to Deputy Chief Benson Fairow.
14      Q. Did you review -- did you review any notes
15  created by Officer Lee?
16      A. I did not.
17      Q. Did you have plain clothes duty officers on
18  September 8th?
19      A. I would have to refer to the order. I don't
20  recall.
21      Q. Did you have any confidential informants on
22  Septembers 8th?
23      A. Not that I'm aware of.
24      Q. Does BART police utilize confidential
25  informants?

**56**

1      MR. ALLEN: I'm going to object and instruct
2  him not to answer if it's not specific to this
3  particular subject and incident.
4  BY MR. SIEGEL:
5      Q. Does BART police utilize confidential
6  informants during mass protest situations?
7      MR. ALLEN: I'm going to object and instruct
8  him not to answer on that particular question. I'll
9  allow him to answer specific to this incident.
10  BY MR. SIEGEL:
11      Q. You may answer, Mr. Hartwig.
12      MR. ALLEN: Just so we're clear, this is a
13  matter of BART policy and safety as to public as to how
14  they perform and do their duties with regard to the
15  transit system. Specific to this incident, I'll allow
16  him to answer. But in the absence of that, I'm going to
17  need to get a ruling from the judge whether you can go
18  broader than that. I believe it does impact on issues
19  pertaining to the safety of the train system.
20  BY MR. SIEGEL:
21      Q. Subject to that objection, within the narrow
22  scope described by your attorney, is your testimony
23  you're not aware of any?
24      A. For this incident, I'm not aware of any that
25  were utilized.

**57**

1      Q. Who would know such information?
2      A. I would refer to the incident commander.
3      Q. Did BART police meet prior to September 8th to
4  discuss the operations order?
5      A. Prior to the 8th, I believe it was issued by
6  Deputy Chief Fairow via e-mail. I believe he dropped a
7  hard copy off at my desk. It was reviewed. And
8  actually on the day of the event, there was a meeting
9  with the involved officers prior to the event in which
10  it is reviewed by all involved.
11      Q. Who is expected to read the order?
12      A. I was not at that meeting. Most often it is
13  the incident commander that reads it or his designee. I
14  don't know who read it that day. I was not at the
15  meeting.
16      Q. Is every officer working that day expected to
17  be familiar with the contents of this order?
18      A. Yes.
19      Q. How do they become familiar?
20      A. It's issued to them at that meeting.
21      Q. In paper form?
22      A. Yes.
23      Q. They're given time to read it?
24      A. Yes, sir.
25      Q. You recall only one meeting to prepare for the

**58**

1  protest?

2     A. There were multiple meetings to prepare for

3  the protest, but for the operations order, that takes

4  place as a daily event prior to the event.  But I'm

5  sure prior to that meeting, within command staff we had

6  many meetings regarding this situation as well as

7  others.

8     Q. This protest was, in essence, one in a series

9  of protests; is that correct?

10    A. Yes.

11    Q. Prior to this protest, BART police shut down

12  cell phone service in a station on at least one

13  occasion?

14    A. I believe that's correct.

15    Q. Were you present during that protest?

16    A. I was not.  It was the only protest I was not

17  present at.

18    Q. Do you recall that Bay Area media reported

19  critically on BART for the decision to shut down cell

20  phone service in the station?

21    A. I recall all media was critical of it, yes.

22    Q. Is it fair to say that BART police was under

23  fire at the time of this protest?

24       MR. ALLEN:  Objection.  It's vague, overbroad,

25  argumentative.

**59**

1  BY MR. SIEGEL:

2     Q. Do you understand the term "under fire"?

3     A. I believe many members of the media and the Bay

4  Area were critical of BART police at this time.

5     Q. Did you feel pressure as a result of that

6  critical media coverage?

7     A. No.  Me personally?

8     Q. Yes.

9     A. No.

10    Q. Do you think the chief felt under pressure?

11    A. I couldn't answer for the chief.

12    Q. Did he tell you he felt under pressure?

13    A. No.  He did not tell me that.

14    Q. Did you meet with the chief with regards to

15  this protest beforehand?

16    A. I'm sure the chief was part of the command

17  staff in discussion with this protest, yes.

18    Q. Is there a regular command staff meeting?

19    A. Yes.

20    Q. When does that occur?

21    A. Multiple.  There's multiple command staff

22  meetings during the week, most often Monday through

23  Friday.  If not every day, every other day.

24    Q. Does it occur in the morning?

25    A. Most often, yes.  Most often it goes well into

**60**

1  the afternoon.

2     Q. During this time period, who was on the command

3  staff?

4     A. Chief Kenton Rainey, Deputy Chief Ben Fairow,

5  Deputy Chief Jan Glenn-Davis, myself.  The next level

6  below that are lieutenants.

7     Q. How many people, approximately, at these

8  meetings?

9     A. Most often the command staff, specifically

10  deputy chiefs and chiefs.

11       MR. SIEGEL:  I'd like to mark this next in

12  order.

13       (Plaintiff's Exhibit 3 marked for

14       identification.)

15  BY MR. SIEGEL:

16    Q. Mr. Hartwig, have you seen this picture before?

17    A. I may have.

18    Q. Who is the subject of this picture?

19    A. I believe that is retired police officer

20  Christopher Shipley.  It's not a good photo.  I believe

21  that's who it is.  I can't see his...

22    Q. I'll represent that this is a picture taken by

23  Mr. Morse.  It is a good photo.  It's a bad printing of

24  the photo, to protect his honor.

25       Officer Shipley, was he under your command on

**61**

1  September 8th?

2     A. I would have to refer to the operations order.

3     Q. You don't recall right now?

4     A. There was many officers there.  If he was one

5  of them, if he was there, I would not be surprised.  I

6  can't specifically say.

7     Q. Looking at this picture, can you determine at

8  what point in the protest this was?

9     A. I cannot.

10    Q. What is Officer Shipley holding?

11    A. I believe that's a SIMS weapon.

12    Q. Was he the grenadier that day?

13    A. I believe he was.  I believe that would be the

14  purpose of that weapon.

15    Q. What is in the pouches on his chest?

16    A. The rounds that are utilized with that

17  weapon.

18    Q. What rounds were utilized that day?

19    A. I do not know.  There were no rounds utilized

20  that day.  The weapon was not discharged.

21    Q. What rounds might he be holding?

22    A. I don't know.  I would have to refer to his --

23  I don't know what he used -- it's a crowd control --

24  it's like a non-lethal bag, sack.  I can't recall the

25  specific name.

**62**

1   Q. In Oakland, we call them beanbags.
2   A. It could be that very well.
3   Q. Could it also be chemical weapons?
4   A. It is not chemical weapons.
5   Q. And how can you determine that?
6   A. I do not believe we utilize chemical weapons
7   inside the BART stations.
8   Q. At what point is it permissible for BART police
9   to brandish a weapon during a protest?
10   A. Clarification on "brandish a weapon."
11   Q. Are you familiar with the term "brandish"?
12   A. Yes.
13   Q. What does it mean to you?
14   A. He is not brandishing a weapon in this
15   position.
16   Q. What does "brandish" mean?
17   A. That means to point the weapon in a threatening
18   manner.
19   Q. So if he's just holding it pointing it
20   downwards, that's not brandishing?
21   A. It is not.
22   Q. Were you prepared to use non-lethal ammunition
23   on September 8th?
24   A. I was prepared to use any force necessary
25   within the guidelines of the operations order.

**63**

1   Q. What is a BOLO?
2   A. Be on the look out for.
3   Q. What is it used for?
4   A. Information.
5   Q. When is a BOLO issued?
6   A. Specifically issued?
7   Q. (Attorney nods head.)
8   A. Patrol officers, officers trying to
9   locate/identify somebody.
10   Q. A criminal?
11   A. Could be.
12   Q. Usually?
13   A. Could be.  Could be an at-risk citizen,
14   juvenile, adult.  Could be a person of interest.  And it
15   could be a criminal.
16   Q. During your tenure at BART, how often were
17   BOLOs issued?
18   A. Weekly.  Most often through the detective
19   bureau.
20   Q. How many BOLOs would be issued a week on
21   average?
22   A. I couldn't begin to imagine.
23   Q. One to ten, one to a hundred?
24   A. One to ten.
25   MR. SIEGEL:  Exhibit 4, please.

**64**

1   (Plaintiff's Exhibit 4 marked for
2   identification.)
3   BY MR. SIEGEL:
4   Q. Have you seen this document before?
5   A. I have.
6   Q. When did you see it?
7   A. I believe it was in the latter weeks of
8   September after the event.  I believe it was part of an
9   e-mail that was initially distributed from Deputy Chief
10   Fairow.  I did not open this portion.  Deputy Chief
11   Fairow provided me a hard copy of the ops order.  I
12   believe this was in the e-mail, but I did not open it at
13   the time.
14   Q. Were you involved in any way in the creation of
15   this BOLO?
16   A. I was not.
17   Q. This is a BOLO, correct?
18   A. This is not what I would determine as a BOLO.
19   The BOLOs that I'm familiar with specifically say that,
20   "Be on the look out for."  I don't see that here,
21   anywhere here.  I think the admonition at the bottom of
22   this document describes what it is.  It's informational
23   use for law enforcement.  I don't know -- this is not
24   what I would determine to be a BOLO that I would be
25   familiar with.

**65**

1   Q. Do you know why Mr. Morse was selected to
2   appear in this document?
3   A. I do not.
4   Q. Did you speak with Deputy Chief Fairow about
5   this document?
6   A. I did not.
7   Q. After the fact?
8   A. I may have.  I do not specifically recall.
9   Q. Do you think a BOLO or this document, which is
10   comparable to a BOLO -- do you think it stigmatizes the
11   people who are represented in the document?
12   A. No.
13   Q. Does the first picture at the top left of this
14   page look like a mugshot you?
15   A. It could be.
16   Q. And do you see where it says "Christopher
17   Cantor" or "Cantor, Christopher"?
18   A. Yes.
19   Q. And under that "DOB," meaning date of
20   birth?
21   A. Yes.
22   Q. Under that "PFN"?
23   A. Yes.
24   Q. What does "PFN" stand for?
25   A. That's an Alameda County booking number.

**66**

1    Q. So do you think if a person is described by
2  their PFN, that's indicating they're suspected of
3  criminal activity?
4    A. That means to me he was arrested at one time
5  and issued a PFN through Alameda County.
6    Q. Why do you think that information was included
7  in this document?
8    A. I do not know.
9    Q. Did you speak with Deputy Chief Fairow about
10  David Morse prior to September 8th?
11    A. Prior to September 8th, I didn't know David
12  Morse. I knew Dave Id.
13    Q. Did you speak with Fairow about Dave Id?
14    A. I'm sure I did, yes.
15    Q. What do you recall about those conversations?
16    A. Deputy Chief Fairow came to our agency after
17  I'd been there for a substantial amount of time. It was
18  informational. He would ask me stuff like "Who is this
19  person? How do you know this person?" And I believe
20  the context of the conversation regarding Mr. Id was
21  just that. I gave him the information I shared with
22  you.
23      My initial contact with Mr. Morse was through
24  my position as manager of security programs in the board
25  room.

**67**

1      MR. ALLEN: Slow down.
2  BY MR. SIEGEL:
3    Q. You told Fairow that Dave Id is a journalist?
4    A. I don't know that I used that specific term. I
5  think I said he was a writer for Indybay. He
6  represented Indybay.
7    Q. Do you understand that Indybay is a
8  news-gathering website?
9    A. Yes.
10    Q. Did you identify Dave Id as a protester in your
11  conversations with Fairow?
12    A. I don't know that I used that term. I
13  identified him as being present most often with
14  Christopher Cantor at the main location of a designated
15  protest site on BART properties.
16    Q. So you identified Dave Id as an associate of
17  Cantor?
18      MR. ALLEN: Objection; misstates his testimony,
19  argumentative.
20  BY MR. SIEGEL:
21    Q. Did you identify Dave Id as an associate of
22  Cantor?
23    A. I identified him as being in close contact with
24  Christopher Cantor at those sites at the BART property.
25    Q. What do you know about Christopher Cantor?

**68**

1    A. I know that he was the known/unknown
2  self-designated leader of No Justice No BART, most often
3  the only spokesperson for that group. Very difficult
4  person to get a hold of. I know that we tried to reach
5  out to him and couldn't locate him.
6    Q. How did you try to locate him?
7    A. I believe it was done through the detective
8  bureau during known protests that he was going to be a
9  part of to try to interact with him prior to.
10    Q. Prior to September 8th, did you have a way of
11  contacting David Morse or Dave Id?
12    A. No. Other than a boardroom meeting or passing
13  each other in the BART system, no.
14    Q. So on September 8th, just to summarize, you
15  were the on-site commander?
16    A. Correct.
17    Q. And Fairow was the overall commander?
18    A. Correct.
19    Q. And he was stationed in Oakland, you say?
20    A. Yes.
21    Q. And he was participating via radio?
22    A. Primarily, yes.
23    Q. How else?
24    A. They have a video source.
25    Q. What do you mean by "video source"?

**69**

1    A. Cameras throughout the BART system that are
2  located at a media room within BART headquarters in
3  Oakland.
4    Q. So Fairow had access to the video feed?
5    A. Available video feeds, yes.
6    Q. Did Fairow tell you to arrest David Morse?
7    A. No.
8    Q. During the action, did he tell you anything
9  about David Morse?
10    A. The action of September?
11    Q. 8th.
12    A. Not that I recall.
13    Q. Who is Officer Hayes?
14    A. It was then Sergeant Michael Hayes. It is now
15  Lieutenant Michael Hayes with the BART Police
16  Department.
17    Q. Do you remember what his role was on September
18  8th?
19    A. I do not.
20    Q. How about Lieutenant Dam; do you remember what
21  his role was?
22    A. Officer Dam.
23    Q. Officer Dam.
24      He was not a lieutenant?
25    A. Never has been.

**70**

1   Officer Dam is the Intel officer for BART
2   police.  He was then and I believe currently now.
3       Q. What are the duties of Intel?
4       A. Gathering intel information based on the
5   activities occurring in the BART station.
6       Q. Was he the only Intel officer that day?
7       A. To the best of my knowledge.
8       Q. And Officer Coduti, what was his role?
9       A. Patrol officer, part of the CAP team that was
10  referred to as markers, arrest team, within the
11  operations order.
12      Q. What time do you normally wake up -- when you
13  were a deputy police chief, what time did you normally
14  wake up?
15      A. Between 5:30 and 6:00.
16      Q. Do you remember what time you started work on
17  September 8th, 2011?
18      A. I do not remember.  I spent more hours at the
19  BART Police Department and BART properties than I did at
20  my home.
21      Q. Ordinarily what time would you start your
22  workday?
23      A. Between 7:00 and 8:00 a.m.
24      Q. That day, when did you arrive at the Powell
25  Street station?

**71**

1       A. I do not specifically recall.  Late afternoon
2   between 4:30 and 5:00.
3       Q. Do you recall that the demonstration was
4   scheduled to begin at 5:00?
5       A. I don't specifically recall the time.
6       Q. Was it your decision to deploy officers to the
7   fare gates that day?
8       A. Yes.
9       Q. To create a line of officers in front of the
10  fare gates?
11      A. Yes.
12      Q. It was your decision to close the circle?
13      A. Yes.
14      Q. Why did you close the circle?
15      A. The dispersal notices had been read multiple
16  times.  Avenues to leave the location had been provided.
17  And I'd come to the determination that the people that
18  were within the circle had made a willful choice to stay
19  there and we had run our course.  We had partially
20  closed that station and it was time to take people into
21  custody.
22      Q. You later determined that you were wrong in the
23  sense that some of the people had not willingly decided
24  to stay?
25      MR. ALLEN:  Objection.  That's argumentative,

**72**

1   misstates his testimony.
2       THE WITNESS:  I never determined that.
3   BY MR. SIEGEL:
4       Q. You determined that some people should be
5   released?
6       A. Yes.  I determined -- go ahead.
7       Q. How do you reconcile that with your
8   determination that the crowd was willfully remaining?
9       A. There were people within that circle that were
10  represented as journalists that had not violated the
11  law.  Once we were able to determine who those people
12  were and not involved with those violations, they were
13  identified and released.
14      Q. You selected David Morse for arrest; is that
15  true?
16      A. I selected --
17      MR. ALLEN:  Objection; asked and answered.
18      THE WITNESS:  I selected David Morse to be
19  removed from the inner circle.
20  BY MR. SIEGEL:
21      Q. At that point, he was already detained?
22      A. Yes.
23      Q. And what was your intention by removing him
24  from the circle?
25      A. To have him removed and taken to the backroom

**73**

1   at the Powell Street station and processed.
2       Q. For arrest?
3       A. That determination I did not make.
4       Q. What processing did you intend to happen?
5       A. They have to be identified, cited and/or
6   arrested and transported.  I made the determination to
7   have him removed from the circle.
8       Q. Who made the determination to cite him?
9       A. Officer Coduti did, and I absolutely support
10  the reasons he did so.
11      Q. What was he cited for, do you recall?
12      A. I believe 369i, and 409 may have been a part of
13  369i PC.
14      Q. And he was cited for an infraction; is that
15  correct?
16      A. I don't recall the citation.
17      Q. Is it normally the policy of BART to cite and
18  release people who are cited for an infraction?
19      A. It can be.
20      Q. Can you recall an incident when someone was
21  cited for an infraction and taken to jail?
22      A. I can't specifically recall.
23      Q. Is it your testimony that Officer Coduti
24  decided to arrest David Morse?
25      A. The arrest of David Morse occurred when he was

**82**

1  time in the protest it occurred?

2  　A. I do not.

3  　Q. Is the station closed at this point?

4  　A. The Hallidie Plaza area is closed.

5  　Q. Do you remember when you closed that portion of

6  the station?

7  　A. After or just prior to the encircling of the

8  entire group.

9  　Q. Why did you close that portion of the station?

10  　A. The station is a large station.  On the

11  opposite side is the Westfield Mall.  I was concerned

12  about the patrons from the Westfield Mall and the access

13  they would not have if we closed that side.  This was

14  the easier side to close.

15  　Q. Why did you close any side?

16  　A. We wanted to restrict movement of involved

17  parties.  And the outside people -- there was a large

18  crowd from the outside who, I believe, at one time were

19  part of the crowd and during dispersal left.  And you

20  can see them gathering in the Hallidie Plaza area.

21  　Q. Didn't it make it harder for patrons to enter

22  or leave the BART station by closing that portion of the

23  station?

24  　A. There's multiple entries and exits to this

25  station, and this is just one of them.

**83**

1  　Q. Do you know that charges were dismissed against

2  David Morse as a result of this incident?

3  　A. I believe I heard that.

4  　Q. Were you upset when you heard that?

5  　A. No.

6  　Q. Do you believe that the District Attorney made

7  the right decision?

8  　MR. ALLEN:  Objection; calls for speculation.

9  　MR. SIEGEL:  I'm asking for his belief.

10  　MR. ALLEN:  I'm objecting that it calls for

11  speculation and it's argumentative.  I'm not telling him

12  he can't answer.

13  　THE WITNESS:  I believe when the District

14  Attorney made the decision, he believed it.

15  BY MR. SIEGEL:

16  　Q. Did you protest?

17  　A. No.

18  　Q. Do you believe that if Mr. Morse has an opinion

19  about BART that he cannot be a legitimate journalist

20  covering BART?

21  　A. I'm not sure I understand.

22  　Q. Do you believe that a journalist has to be

23  completely impartial?

24  　A. I believe it's tough to do that humanly --

25  based upon human nature.

**84**

1  　Q. If Mr. Morse has a critical view of BART

2  management, he can nevertheless be a journalist,

3  correct?

4  　A. He can absolutely be a journalist with a

5  critical view of BART management.

6  　Q. And if he spoke at a public hearing about BART,

7  that wouldn't prevent him from being a journalist, would

8  it?

9  　A. No.

10  　Q. What information does an officer need to make

11  an arrest under 369i?

12  　A. That 369i was violated and the party involved

13  was the violator.

14  　MR. SIEGEL:  Next in order.

15  　(Plaintiff's Exhibit 8 marked for

16  　identification.)

17  BY MR. SIEGEL:

18  　Q. I'll represent to you this is a photograph that

19  was taken by the San Francisco Chronicle.

20  　Do you recall at what point in the protest this

21  picture was taken?

22  　A. This is when we moved the crowd from the direct

23  area of the fare gates, which is located behind the

24  officers.

25  　Q. And on what side of the officers is the crowd

**85**

1  that you're referring to?

2  　A. The officers were standing in front of the fare

3  gates in the free area.

4  　Q. The crowd is to the left of the officers?

5  　A. Correct.  And it looks like media and other

6  persons behind the officers.

7  　Q. At this point in the protest, nobody is

8  marching, correct?

9  　A. Correct.

10  　Q. And at this point in the protest, there are

11  numerous media interspersed in the crowd; is that

12  correct?

13  　A. I would assume so, yes.

14  　Q. Including numerous media that are standing

15  directly next to Mr. Cantor; is that correct?

16  　A. I would have no way of identifying who those

17  people are standing next to Mr. Cantor.

18  　Q. Do you see Dave Id in this picture or David

19  Morse?

20  　A. I do not.

21  　Q. Is it your contention that Mr. Morse was with

22  Mr. Cantor during the entire protest?

23  　A. No.

24  　Q. Just at some moments?

25  　A. Yes.

**94**

1   involved parties.

2       Q. Do you remember anything right now that would

3   contradict the idea at 5:25 p.m. the circle closed?

4       A. I can't -- I would have to look at the actual

5   CAD readout itself. I can't say specifically what

6   happened at that time based on this document.

7       Q. Or based on your current recollection?

8       A. Correct.

9       Q. This document says that at 1726 a sergeant

10  reported that the station was being closed and the

11  dispersal order was being given.

12          Is that an accurate statement given your

13  recollection?

14      A. No.

15      Q. What is your recollection?

16      A. Again, referring back to my previous testimony,

17  it would make no sense to close the station and then

18  read a dispersal order. So, in fact, what actually

19  happened, the dispersal order was read multiple times,

20  the station was partially closed and ultimately totally

21  closed.

22      **Q. Do you recall that the protest began at**

23  **approximately 5:00 p.m.?**

24      **A. That's probably correct. In that neighborhood.**

25      Q. At what point did the protest become an

**95**

1   unlawful assembly?

2       A. At what time?

3       Q. At what point in the protest? Immediately?

4       A. No. My determination is based upon the safety

5   and the security of the employees and the patrons and

6   property at that location. Specifically what time that

7   was, I don't recall.

8       Q. How long did it take you to make that

9   determination?

10      A. Well into half an hour, 40 minutes.

11      Q. You let the protesters march around a little

12  bit?

13      A. Yes. I tried to be as flexible as I could

14  until it became unsafe.

15      Q. When you say "unsafe," what do you mean?

16      A. When the flow of the patrons is blocked,

17  impeded by people in front of the fare gates and ticket

18  vendors.

19      Q. Did BART police create the line in front of the

20  fare gates before or after protesters impeded the fare

21  gates?

22      A. There were officers standing at the structures

23  of the fare gates before, and then once the marching --

24  the protesters got too close and slowed down and stopped

25  at the fare gates, they moved in front to move them

**96**

1   away.

2       Q. When you say in front of the fare gates, really

3   what you mean is in front of the officers who were in

4   front of the fare gates?

5       A. No. The fare gates are open. Between each

6   fare gate there's a structure, a gate, a structure, a

7   gate, a structure, a gate. Officers were standing at

8   the front of those structures. The gates were open to

9   pass through. The protesters marched and would come

10  closer and closer and then would stop ultimately in

11  front of the fare gates, at which time everything backs

12  up in both directions, inside the station, outside the

13  station, which becomes unsafe.

14      Q. To your recollection, the first dispersal order

15  was given after that occurred?

16      A. I believe the first dispersal order occurred at

17  the time that the gates were being blocked.

18      Q. And under BART policy, after a dispersal order

19  is given, the crowd needs to be given a reasonable time

20  to disperse?

21      A. Correct.

22      Q. What is a reasonable time?

23      A. I think we used 15 to 20 minutes, because we

24  read that dispersal order at least three times. We were

25  very generous. And ultimately the circle was enclosed.

**97**

1       Q. How much time elapsed between each dispersal

2   order?

3       A. I think between the first one and the last one

4   we were at least 30 minutes.

5       Q. So you recall approximately every 15 minutes a

6   dispersal order was read until the third one was read?

7          MR. ALLEN: Objection; misstates his testimony,

8   argumentative.

9          THE WITNESS: It was a 30-, 40-minute time

10  frame between the first and the last one.

11  BY MR. SIEGEL:

12      Q. Do you understand that the timeline you're

13  testifying to right now contradicts the timeline in the

14  documents provided by BART?

15      A. Again, this document provided is an

16  interpretation of a person of a tape. I know that I was

17  at the scene. And I know when the dispersal orders --

18  the order that came out and when the circle was closed

19  based upon being at the scene. So if I'm in conflict

20  with it, it's because the interpretation based upon this

21  document is not correct.

22      Q. Do you know that BART keeps records of audio

23  transmissions?

24      A. Sure.

25      Q. Do you know that those transmissions have been

**98**

1  provided to us?

2      A. Sure.

3      Q. And those records that have been provided to us

4  should be reliable; isn't that correct?

5      A. I would believe they would be reliable.

6      Q. If your testimony today is in contradiction to

7  both the timeline and the audio transmissions, is it

8  possible you're incorrect?

9      A. I believe the interpretation of what you're

10  reading is being incorrectly interpreted. I was at the

11  scene. I know the order of what occurred.

12          I know the dispersal came out before the circle

13  was closed. I know that the station and avenue to leave

14  was created during that entire time. I know that I was

15  walking around and verbally telling reporters and people

16  that I knew that were there that they need to leave,

17  that we're going to close the station. "If you refuse

18  to obey the dispersal order, you're subject to arrest."

19  I was at the scene.

20      Q. Why didn't you tell David Morse to leave?

21      A. I walked around and told everybody. I wasn't

22  singling out anybody. I made it very clear. I'm easy

23  to see in this crowd.

24      Q. Did you talk directly to David Morse?

25      A. I don't believe I did.

**99**

1      Q. Did you talk directly to anybody?

2      A. I was walking throughout the crowd, and I said,

3  "Dispersal orders have been read. You need to leave.

4  You will be subject to arrest if you choose not to

5  leave." The majority of the people that I spoke with I

6  witnessed leave the station.

7      Q. Ordinarily you rely on the officers you

8  supervise; is that correct?

9      A. Yes.

10      Q. You trust them?

11      A. Yes.

12      Q. Now, if multiple officers had a rendition that

13  contradicted your rendition, is it possible that your

14  rendition is erroneous?

15      MR. ALLEN: His memory, you mean? Contradict

16  his memory?

17  BY MR SIEGEL:

18      Q. Your testimony.

19      MR. ALLEN: His testimony is his memory of the

20  events taken two years after the incident. I'm going to

21  object. "Rendition" is argumentative.

22  BY MR. SIEGEL:

23      Q. Let's try a new question.

24          This was a hectic event, wasn't it?

25      A. Yes.

**100**

1      Q. A lot of noise?

2      A. Yes.

3      Q. A lot of people, a lot of photo cameras, video

4  cameras, all sorts of things going on?

5      A. Yes.

6      Q. Almost like a circus?

7      A. A circus is much more organized than this

8  event. Yes.

9      Q. Have you reviewed any of the videos of the

10  event?

11      A. I have seen very limited videos of the event.

12      Q. Have you ever experienced the phenomenon in an

13  intense situation where time slows down, as they say?

14      A. I don't know if I actually consciously stopped

15  to wonder if I was experiencing that during the event or

16  after.

17      Q. Is it possible that so many things were going

18  on that it felt like a lot of time was passing but only

19  a little time was passing?

20      A. Anything is possible. I'm going based upon

21  what I remember after the fact. And based upon that is

22  the result of my statement, what I recall at this point

23  in time.

24      Q. Sure. You weren't keeping written records,

25  though?

**101**

1      A. Of this event?

2      Q. Yes.

3      A. I was not.

4      Q. You weren't making time notations of dispersal

5  notices?

6      A. I relied upon the CAD system.

7      Q. At this point, the records of the CAD system

8  are more reliable than your memory; is that correct?

9      MR. ALLEN: I'll object that it calls for

10  speculation, argumentative.

11          You can answer if you understand.

12      THE WITNESS: At this point, the records of the

13  CAD system have been erroneously interpreted in this

14  documentation.

15  BY MR. SIEGEL:

16      Q. But you can't recall exactly how many minutes

17  elapsed between each dispersal order?

18      A. I cannot.

19      Q. You don't know when exactly each dispersal

20  order was given?

21      A. Specifically, I do not.

22      Q. You have no records to verify your current

23  recollection; is that correct?

24      A. The records I would rely upon would be the CAD

25  information.

**122**

1    Q. Do you recall that BART police apologized to
2  journalists stating they regretted journalists had been
3  detained?
4    A. That didn't come from me.  I don't recall that
5  happening.
6    Q. I can represent to you that Chief -- Rainey?
7    A. Yes.
8    Q. -- wrote such a letter.
9    A. Yes.
10   Q. He did not consult you regarding such a letter?
11   A. No.
12   Q. Prior to the protest that's the subject of this
13 lawsuit, do you recall BART PD ever using 369i to manage
14 a protest?
15   A. I do not recall.
16   Q. Do you think this was the first time that BART
17 police arrested people under that statute?
18   A. It was not the first time we arrested people
19 under that statute.
20   Q. What prior arrests do you recall using that
21 statute?
22   A. 369i encompasses a broad spectrum.  Essentially
23 interfering with the operation of a transit district or
24 transit property.  Most commonly it's used when we have
25 people in the trackway.

**123**

1    Q. It's something used pretty frequently?
2    A. Yes.
3    Q. On September 8th, BART police made the decision
4  to close part of the Powell station; is that correct?
5    A. Yes.
6    Q. Why was that decision made?
7    A. We wanted to control the in-and-out traffic
8  flow -- the station is large.  Once we had the situation
9  that we were involved in, we wanted to make sure that we
10 didn't have people coming up from behind us, the side of
11 us.  We determine usually prior to this event that if we
12 have to close these areas, we'll close down -- that area
13 is very significant because of the Westfield Mall.
14   Q. Why is it significant?
15   A. It increases the number of people that are in
16 and out of that station.
17   Q. I may be mistaken, but I don't see the
18 possibility of closing the station included in the
19 operations order for that day.  This is Exhibit 2 that
20 I'm referring to.
21      Do you know if the possibility of closing the
22 station was considered in San Francisco?
23   A. It definitely was considered.  Most often it is
24 part of the discussion, and I believe it may be in here
25 somewhere.

**124**

1    Q. I'm seeing it on page 4.
2    A. Yes.
3    Q. I'm looking at the second full paragraph on
4  that page, third sentence, "If the incident commander
5  determines that Powell Street station should be
6  closed..."
7      You determined that the Powell Street station
8  should be closed; is that correct?
9    A. Yes.
10   Q. At what point did you make that determination?
11   A. It happens in stages.  At Powell Street, it was
12 a partial closure.  When the circle was closed and the
13 arrests were made, it was totally closed.  My concern
14 about that is when you have a police activity going on
15 at the primary ends of the station, I didn't want
16 outside influences involved.  By closing the station, we
17 could control who came in and who went out.  It's a last
18 resort.  They hate -- the BART district does not enjoy
19 closing stations, partial or full.
20   Q. Did you close the station before the protest
21 began?
22   A. That's my recollection.  Not at my direction.
23 Line supervisors and BART operations outside of the
24 police department also had the authority to do so.  Not
25 to my recollection from the BART Police Department prior

**125**

1  to the protest.
2    Q. In your capacity as part of the I guess you
3  called it the commander's meeting --
4    A. Command staff.
5    Q. -- did you analyze this protest as part of a
6  series of protests?
7    A. Yes.  Ongoing.
8    Q. Prior to this protest, there were actions that
9  were conducted on the train platform; is that correct?
10   A. Yes.
11   Q. On one or more occasions, individuals
12 interfered with actual BART trains?
13   A. Yes.
14   Q. Climbing on top of the trains?
15   A. Yes.
16   Q. Was that in your mind as you planned for
17 September 8th?
18   A. Yes.
19   Q. Now, the result of closing part of the station
20 was that the platform where the protest was occurring
21 was more crowded; isn't that true?
22   A. The platform?
23   Q. I'm sorry.  The free area where the protest
24 occurred.
25   A. The concourse?

**126**

1    Q. (Attorney nods head.)

2    A. **Powell Street station stretches about three**
3    **blocks. We have a primary end and a secondary end. A**
4    **partial closure to the level that we utilized does not**
5    **increase the numbers or should not increase, and I**
6    **didn't witness it increasing the numbers. It actually**
7    **decreases the numbers.**

8    Q. It decreases the number of people entering the
9    BART station?

10    A. **Inside the BART station and entering the BART**
11    **station, yes. It directs people from one side of the**
12    **street to the opposite side of the street to enter or**
13    **exit.**

14    Q. But for those people who were planning on using
15    the Powell Street station, the partial closures meant
16    that everybody had to enter the same space?

17    A. **No.**

18    Q. The remaining concourse space.

19    A. **No. As I said, it stretches three blocks. I**
20    **believe there's, I think, eight entry points to the**
21    **station from street level. We were at the primary end,**
22    **so there was the entire rest of the station to enter and**
23    **exit from.**

24    Q. But the protest -- is that what you called the
25    primary --

**127**

1    A. **Correct.**

2    Q. -- entrance?

3    A. **Right.**

4    Q. And why is it the primary entrance?

5    A. **Because it feeds directly from Hallidie Plaza**
6    **and Westfield Mall, which is the hub of that station.**

7    Q. So is it your testimony the closures did not
8    increase the congestion within the station?

9    A. **Correct.**

10    Q. Today we've referenced three dispersal orders
11    given.

12    Is it your testimony that each of those
13    dispersal orders was complete according to BART policy?

14    A. **I think that was previously asked, but my**
15    **answer was I think two were completed. I think the**
16    **third there was an interference from the involved crowd**
17    **that the completion of the dispersal order may have been**
18    **limited.**

19    Q. <mark>Do you recall that BART police told</mark>
20    <mark>demonstrators, quote, "Do not block the fare gates" or</mark>
21    <mark>something to that effect?</mark>

22    A. <mark>**Yes.**</mark>

23    Q. Now, statements such as that are not in the
24    dispersal order; is that correct?

25    A. **That's not in the dispersal order.**

**128**

1    Q. So your testimony is that there were many
2    announcements given, three of which were dispersal
3    orders?

4    A. **Yes.**

5    Q. Who made the announcement to not block?

6    A. **The officers, including myself, within the**
7    **station area.**

8    Q. Were they using amplified sound?

9    A. **That was most often directly from an officer**
10    **directed toward a person.**

11    Q. Just one to one?

12    A. **Yes. Most often the person directly in the**
13    **fare gate.**

14    Q. Did Deputy Chief Fairow request that Mr. Morse
15    be arrested?

16    MR. ALLEN: Objection as to time. Anytime?
17    Specific time?

18    BY MR. SIEGEL:

19    Q. At any time on September 8th.

20    A. **No. Not that I'm aware of.**

21    Q. Do you recall Deputy Chief Fairow utilizing the
22    BART PD radio that day?

23    A. **As I stated earlier, the radio was used by many**
24    **officers and command staff. Do I recall a specific**
25    **statement by Dr. Chief Fairow on the radio, no.**

**129**

1    Q. Do you remember hearing his voice that day over
2    the radio?

3    A. **I can't specifically recall that, no. It's a**
4    **rare occasion when a deputy chief gets on the radio.**

5    Q. After the circle closed, did you release any
6    non-journalists?

7    MR. ALLEN: Do we refer to the students as
8    journalists or not journalists? Point of clarification.
9    I'll let your question stand. I'm curious.

10    MR. SIEGEL: I would include student
11    journalists within journalists.

12    THE WITNESS: To my knowledge, nobody was
13    released other than journalists.

14    BY MR. SIEGEL:

15    Q. Essentially at that point if you had a press
16    pass, it was a get-out-of-jail-free card?

17    A. **No.**

18    MR. ALLEN: Objection; mischaracterizes his
19    testimony and it's argumentative.

20    BY MR SIEGEL:

21    Q. You released journalists after closing the
22    circle, correct?

23    MR. ALLEN: Objection; asked and answered.

24    THE WITNESS: Journalists were released after
25    they were identified and verified by officers at the

**146**

1  your practice?

2      A. I would usually check it out, see what it was

3  referring to and/or delete it.

4      Q. Exhibit 13 shows that you received an

5  alert about an article that Dave Id wrote; is that

6  correct?

7      A. Yes.

8      Q. It was an article that announced a press

9  conference on the release of a shooting Charles Hill

10  video.

11      A. Yes.

12      Q. Ken Dam was your Intel officer on September

13  8th?

14      A. Yes.

15      Q. Why was he focusing on Mr. Morse as a

16  subject?

17      A. You would have to ask Officer Dam. His purpose

18  was to gather intelligence information regarding

19  activities that occurred within the BART properties.

20      Q. Do you consider or did you consider Mr. Morse

21  to be a dangerous individual?

22      A. No.

23      Q. Did you consider him to be a threat to the

24  operation of BART?

25      A. No.

**147**

1      Q. How about Mr. Cantor?

2      A. I don't believe I thought he was a threat or a

3  danger. He was certainly more aggressive than Mr.

4  Morse, more vocal.

5      Q. They played very different roles; is that

6  correct?

7      A. I don't know what roles they played, but I

8  witnessed, as I stated, Mr. Cantor was the

9  self-appointed leader of that group.

10      Q. When you say "self-appointed," people actually

11  followed Mr. Cantor on the day of the protest; is that

12  correct?

13      A. I witnessed that, yes, in trying to track down

14  Mr. Cantor. We couldn't find him via media source,

15  telephone. We had no contact with him, so we never

16  received notification from anybody that this group was

17  organized, there was a plan, whether there was a leader.

18  That was our determination based upon his actions at

19  these events.

20      Q. Among those actions were he made statements to

21  the media?

22      A. Yes.

23      Q. And he was at the front of the line?

24      A. Sometimes.

25      Q. He used a piece of paper to create a

**148**

1  bullhorn?

2      A. Sometimes.

3      MR. SIEGEL: Mr. Allen, do you have any

4  cross-examination?

5      MR. ALLEN: I do not.

6      MR. SIEGEL: We'll close.

7      (Whereupon, the deposition was concluded at

8      1:49 p.m.)

**149**

1          REPORTER'S CERTIFICATE

2

3

4      I, SANDRA M. LEE, a Shorthand Reporter, State of

5  California, do hereby certify:

6      That DANIEL O. HARTWIG, in the foregoing

7  deposition named, was present and by me sworn as a

8  witness in the above-entitled action at the time and

9  place therein specified;

10      That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17      That before completion of the proceedings,

18  review of the transcript was not requested.

19      IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 1st day of November, 2013.

21

22

23

24      _____

25      SANDRA M. LEE, CSR NO. 9971
        State of California