# EXHIBIT B TO
# ALLEN DECLARATION

1            UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF CALIFORNIA

3                 ---oOo---

4   DAVID MORSE,

5       Plaintiff,

6   vs.                           No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART

8   Deputy Police Chief DAN HARTWIG,
    sued in his official and

9   individual capacities,

10      Defendants.
    _____/

11

12

13

14

15           <u>DEPOSITION OF DAVID MORSE</u>

16         (Pages 1 to 131, inclusive)

17

18         Taken before SANDRA M. LEE

19            CSR No. 9971

20           October 15, 2013

21

22

23         **Aiken Welch Court Reporters**
         **One Kaiser Plaza, Suite 505**

24          **Oakland, California 94612**
       **(510) 451-1580/(877) 451-1580**

25           **Fax: (510) 451-3797**
           **www.aikenwelch.com**

**2**

1    <u>I N D E X</u>

2    <u>PAGE</u>

3    EXAMINATION BY MR. ALLEN      4

4

5    <u>E X H I B I T S</u>

6       (No Exhibits Marked)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**3**

1       DEPOSITION OF DAVID MORSE

2

3       BE IT REMEMBERED, that pursuant to Notice, and

4 on the 15th day of October 2013, commencing at the hour

5 of 2:09 p.m., in the offices of Siegel & Yee, 499 14th

6 Street, Suite 300, Oakland, California, before me,

7 SANDRA M. LEE, a Certified Court Reporter, personally

8 appeared DAVID MORSE, produced as a witness in said

9 action, and being by me first duly sworn, was thereupon

10 examined as a witness in said cause.

11            ---oOo---

12 APPEARANCES:

13 For the Plaintiff:

14     MICHAEL SIEGEL
      Siegel & Yee

15     499 14th Street, Suite 300
      Oakland, California 94612

16     (510) 839-1200

17 For the Defendants:

18     DALE L. ALLEN
      Low, Ball & Lynch

19     505 Montgomery Street, 7th Floor
      San Francisco, California 94111-2584

20     (415) 981-6630

21 ALSO PRESENT:

22     Daniel O. Hartwig.

23

24

25

**4**

1          DAVID MORSE,

2       sworn as a witness,

3       testified as follows:

4 <u>EXAMINATION BY MR. ALLEN:</u>

5    Q. Mr. Morse, my name is Dale Allen. We've met on

6 more than one occasion. I represent Bay Area Rapid

7 Transit and its police department and Mr. Hartwig here

8 in this litigation in the suit that you have filed

9 through your counsel, Mr. Siegel.

10       You just sat through the deposition of retired

11 Deputy Chief Dan Hartwig, and you heard both -- before

12 his testimony heard the admonitions and some of the

13 things that occurred during the course of the testimony,

14 did you not?

15    A. **Yes.**

16    Q. Such as objections and how they're handled?

17    A. **Yes.**

18    Q. I'm going to briefly review those rules and, as

19 we go through, if Mr. Siegel feels there's something I

20 missed, I would invite him to make sure we have a good

21 clean record. There's one unique thing about federal

22 court. If we actually have a dispute and I feel you

23 should answer a question, we can break this deposition

24 and go call a judge. They'll make themselves available.

25 They'll say, "I'll get back to you," so you reserve the

**5**

1 objection and can resume the depo."

2       I like to think that -- first of all, I've

3 never had it happen in one, and I would like to think we

4 won't make it happen here. We'll make sure it doesn't

5 happen here because we all have a good rapport. At

6 least so far we've been able to frame questions the way

7 they should be asked.

8       With that said, this is my one opportunity to

9 speak to you on the record. This is an opportunity for

10 questions to be asked and your answers to be given that

11 will be recorded by the reporter that is sitting next to

12 me. From time to time, you may recall I had to slow --

13 with Dan Hartwig, I had to slow him down. If you start

14 talking quickly or I start asking questions quickly, it

15 makes it difficult for the court reporter.

16       Do you understand that?

17    A. **Yes.**

18    Q. If you don't understand a question, you have

19 every right to ask me to rephrase it.

20       Do you understand that?

21    A. **Yes.**

22    Q. When this is completed, a transcript will be

23 prepared and provided to your counsel, who will provide

24 it to you. You can review it, you can change it, amend

25 it, correct it, delete it, whatever you feel necessary

**14**

1    Q. Were any of the courses specifically
2  journalism-related courses?

3    A. No.

4    Q. Did Virginia Westland have a degree in
5  journalism, to your knowledge?

6    A. I can't recall.

7    Q. Subsequent to graduating from Virginia
8  Westland, did you take any journalism courses?

9    A. I've currently taken a couple classes at Laney
10 related to photo journalism over the last couple of
11 years.

12   Q. When was the first -- the year of your
13 enrollment in your first photo journalism class at Laney
14 College?

15   A. It was approximately a year ago.  That would be
16 the fall of 2012.

17   Q. Before I go further, I want to make sure I'm
18 clear.

19      In the time you were at Virginia Westland
20 through this class you enrolled in at Laney in
21 approximately 2012, you had not taken a specific
22 journalism class; you'd only taken creative writing?

23   A. At Virginia Westland, yes.

24   Q. At any time between then, as I understand your
25 testimony, was there ever a time you took a journalism

**15**

1  class prior to enrolling at Laney?

2    A. No.

3    Q. No on-line courses?

4    A. I mean informal study of journalism, but not an
5  official course, no.

6    Q. With respect to your journalism background, you
7  are currently a person who writes for Indybay?

8    A. Yes.

9    Q. Other than Indybay, have you written articles
10 that have been published for other either mainstream or
11 alternative sites to journalism, internet sites or like
12 nature?

13   A. Yes.

14   Q. Besides Indybay, who have you written for or
15 been published by?

16   A. Including publishing, that would be beyond
17 articles.  My articles have been republished in the
18 Bayview, San Francisco Bayview.  I've seen them in a
19 couple of other places, but I can't recall offhand.  I
20 think the Bayview printed them.  They've used a number
21 of photos.  I've sold photos and video to corporate news
22 stations numerous times.

23   Q. Other than Indybay, have you posted or
24 published -- what's the right word to use?

25   A. It just depends.  I don't know if it really

**16**

1  matters.

2    Q. The reason I used the word "posted" is because
3  I recall in your IA interview -- by the way, did you
4  review your IA interview for this?

5    A. I actually forgot to, but then it was sitting
6  on his desk this morning, so I just glanced at the first
7  couple of pages, but not really.

8    Q. The reason I use the word "posted" is that you
9  used that word in describing how you qualified to be
10 issued a press pass, like Indybay.

11      Do you recall that information in the IA
12 interview?

13   A. Yes.

14   Q. As I remember it, it was if you post a certain
15 amount of articles to Indybay and Indybay publishes
16 them, then they'll actually write out what they consider
17 to be a press pass for you to attend on their behalf
18 events you're covering; have I got that right?

19   A. I don't think I distinguish posting and
20 publishing.  I don't recall doing that in the IA
21 interview.  If I did, it was inadvertent.

22   Q. I'm not saying you did.

23      I'm saying -- I'm using the word if you posted
24 ten times or published, is that distinguishing one from
25 the other?

**17**

1    A. No.  I wouldn't see a distinguishing...

2    Q. So if you post, it's the same as publishing?

3    A. I would think so, yes.

4    Q. In the lexicon of internet media, posting means
5  to publish something?

6      MR. SIEGEL:  Objection.

7  BY MR. ALLEN:

8    Q. If you know.

9      MR. SIEGEL:  He's not an expert in these
10 matters, but just to offer a fig leaf, if I may,
11 self-publish versus -- I think that's what you're
12 getting at.

13     MR. ALLEN:  That's exactly where I'm going.

14 BY MR. ALLEN:

15   Q. When you want to put something on Indybay, you
16 just post it to their website; is that correct?  You
17 self-post to their website?

18   A. Yes.

19   Q. Do they then -- how do they decide whether it's
20 going to go out on their website or not versus killing
21 it so it doesn't go out under their name?

22   A. Well, I am also a member of the Indybay
23 collective.  There are certain editorial judgments that
24 are made regarding the worthiness or accuracy of
25 different pieces, or relevance.

**22**

1  no.

2  Q. What rules of ethics do they have to abide by

3  in terms of what they're preparing in their articles; do

4  you know?

5  A. I would assume it has to be accurate.

6  Q. Did you take any ethics classes pertaining to

7  journalism in preparation for your writing for Indybay?

8  A. No, I did not.

9  Q. With respect to your understanding of what a

10  reporter can or can't do at a demonstration, what can a

11  reporter do at a demonstration?

12  A. Cover the event.

13  Q. Is there any phrase or particular motto they go

14  by as to what distinguishes them as journalists versus

15  participants?

16  A. As far as a motto, I'm not aware of that.

17  Q. Is there a standard?  Are you aware of any

18  particular standard they're taught in journalism school

19  to distinguish them from people that are participating

20  in a demonstration versus being a journalist in a

21  demonstration?

22  A. I mean, generally there's a difference between

23  participating and documenting.

24  Q. You ever heard the phrase "observe and report"?

25  A. Perhaps.

**23**

1  Q. Have you ever had anybody take you aside in the

2  time prior to 9/8/11 and walk you through rules of

3  protocols media personnel must abide by when reporting

4  on police activity?

5  MR. SIEGEL:  Objection; vague as to "must abide

6  by," lack of foundation.

7  THE WITNESS:  Not so much per se, but the press

8  pass policy at Indybay says that you agree not to

9  violate the law, you know, while you're under the color

10  of having the Indybay press pass.

11  BY MR. ALLEN:

12  Q. Do you know what the San Francisco Police

13  Department requires reporters to do when they apply for

14  a press pass?

15  A. No.

16  Q. Do you know what forms of applications or

17  waivers or rules they have to abide by that are provided

18  to them when they ask to obtain a San Francisco police

19  press pass?

20  A. No.  Not San Francisco.

21  Q. Do you know what Oakland requires?

22  A. Yeah.  A fellow reporter I know has an Oakland

23  press pass, and there was a form he had to fill out.  He

24  had to submit three or five articles, something like

25  that, to prove he was a reporter.

**24**

1  Q. Did you review -- did he provide you any of

2  those forms to review?

3  A. I've not seen them myself.

4  Q. Did he discuss with you any of the rules or

5  obligations you agreed to adhere by in order obtain an

6  Oakland Police Department press pass?

7  A. No.

8  Q. Have you ever applied for a press pass from any

9  public entity, whether it be a police or, generally

10  speaking, the actual employing entity of the police?

11  A. No, I have not.

12  Q. For a period of time -- correct me if I'm

13  wrong, but for a period of time after the Oscar Grant

14  shooting, you covered board meetings of the BART police,

15  the BART board of directors; am I correct?

16  A. Yeah.  I covered numerous governmental hearings

17  and meetings.

18  Q. I'm just focusing on BART right now.

19  Were you referring to globally a lot of

20  meetings of other entities or just BART?

21  A. I was speaking within BART, but it was more

22  than just BART board meetings.  There were other

23  meetings related to BART.

24  Q. Sometime I'm not as articulate as I think I am.

25  I appreciate you helping me out.

**25**

1  What I want to do is:  Between January 1st,

2  2009, through September 8th, 2011, can you give me an

3  estimate on how many meetings you would attend a month

4  generally -- one, two, five, if you can, a month -- at

5  BART over that period of time you were reporting on for

6  Indybay?

7  A. It wasn't a consistent amount over the entire

8  roughly two-year period that you're talking about.

9  Q. Two years, nine months actually, right?

10  A. Correct.

11  It varied.  At one point, for instance, there

12  was discussions of creating a police oversight

13  apparatus.  At that time, you know, there was more

14  frequent meetings.

15  Q. You had a great interest in police oversight,

16  right; wouldn't that be your focus?

17  A. Yes.

18  Q. And you had a great interest in the way police

19  interacted with minorities?

20  A. Yes.

21  Q. And a great interest in how police interacted

22  to people's civil rights?

23  A. Yes.

24  Q. You had a great interest in the Oscar Grant

25  shooting; am I correct?

**26**

1    A. Yes.

2    Q. During the times you were attending the

3 meetings of the BART board of directors, you were going

4 with your audio and video equipment to record and report

5 on those meetings; am I right?

6    A. Generally.

7    Q. What do you mean "generally"?

8    A. I can't say with absolute certainty I recorded

9 every last one I intended with video or audio, but

10 generally on most occasions, yes.

11    Q. And you first met Dan Hartwig at these

12 meetings; am I correct?

13    A. I've thought about it, and I'm not sure exactly

14 where it was, but it was probably likely.

15    Q. During the two years and nine months before

16 9/8/2011, did you have occasion to talk with Dan Hartwig

17 at any of these meetings?

18    A. Numerous times.

19    Q. How would you characterize the relationship?

20 Cordial?

21    A. Yes.

22    Q. Professional?

23    A. Yes.

24    Q. Sometimes friendly?

25    A. Yes.

**27**

1    Q. Sometimes banter from both of you?

2    A. Yes.

3    Q. Did you ever have an occasion where you felt

4 threatened or intimidated by Dan Hartwig in any of these

5 interactions?

6    A. At the meetings, no.

7    Q. Was there a time at any time in the two years,

8 nine months from January 1st to September 8th where you

9 felt threatened or intimated by Dan Hartwig?

10    A. At the demonstration on September 8th, I

11 certainly did.

12    Q. Prior to that?

13    A. No.

14    Q. Did you ever have any reason you can think of

15 as you sit here today -- because this is the only time I

16 get to ask you on the record -- where you felt Dan

17 Hartwig harbored an animosity toward you that caused you

18 to feel threatened by him or intimidated by him?

19       MR. SIEGEL:  Objection; compound.

20       Answer if you can.

21 BY MR. ALLEN:

22    Q. Let me break the question down.

23       At any time between January 1st, 2009, and

24 September 8th, 2011, did you ever develop a feeling that

25 Dan Hartwig harbored an animosity towards you?

**28**

1    A. "Animosity" is a strong word.  I probably

2 presumed that he wasn't happy with my reporting, but he

3 never expressed hostility towards me if we could define

4 the shades of gray in there a little more.

5    Q. Did he ever say anything to you that you took

6 as a statement that he was threatening you?

7    A. No.

8    Q. Did he ever say anything to you where you felt

9 like he wanted to harm you?

10    A. No.

11    Q. Did you ever feel that Dan Hartwig, based on

12 the interactions you had with him, was someone you

13 should be afraid of?

14    A. No.  I don't believe so, not personally.

15    Q. During the time frame that you were covering

16 meetings at the BART board of directors, at any of those

17 meetings did you also speak during the public-speaking

18 portions of the meetings?

19    A. Yes.

20    Q. And during those portions of the meetings, you

21 were now acting as a participant at those meetings to

22 express your concerns about the way things were working

23 at BART; is that correct?

24    A. I wouldn't characterize it that way.

25    Q. How would you characterize it?

**29**

1    A. I would say that I was speaking as an

2 individual citizen.  "Participant" sounds like it's

3 organized or something.

4    Q. I accept your description of it.  Let's talk

5 about your description.

6       As an ordinary citizen, when you were speaking,

7 you were no longer acting as a reporter, correct?

8    A. Well, I actually did document those, the

9 speaking engagements, as I also did whoever else

10 happened to speak.  It was a minority of the times.

11    Q. So I want to focus on this for a minute.  You'd

12 be at a meeting, and you would report on the meeting of

13 those who were speaking and the BART board members and

14 general manager, who was Dorothy Dugger at the time, and

15 their replies to the audience; is that correct?

16    A. I would cover the entire meeting and provide

17 board resource material on-line.

18    Q. During the course of it because you were a

19 concerned citizen -- you use BART; is that right?

20    A. Correct.

21    Q. Public transportation in general?

22    A. Yes.

23       MR. SIEGEL:  Can I interrupt a quick second?

24 This is emitting kind of a whining sound.

25       MR. ALLEN:  I'm sorry.

**30**

```
1              (Recess taken.)
2   BY MR. ALLEN:
3       Q.  As a concerned citizen, you had concerns about
4   the way the police department was organized and
5   operating at the time of the Oscar Grant incident; am I
6   correct?
7       A.  Yes.
8       Q.  And you had ongoing concerns regarding the
9   police -- BART Police Department during that period of
10  time from January 1st up to September 8th, 2011; am I
11  correct?
12      A.  I'm sorry.  Can you restate?
13      Q.  And those concerns continued from January 1st
14  after the tragedy up through and including September
15  8th, 2011, when you went out to the scene to observe and
16  report on that incident, on that demonstration, right?
17      A.  I can't remember the last time when I spoke at
18  a board meeting or something of that nature prior to
19  that.  I would say if I could put a number on it, maybe
20  it was four or five times out of dozens and dozens of
21  meetings I recorded.
22      Q.  You would take your reporter's hat off, put it
23  down, sign a card, sign up, express your feelings as a
24  citizen and then, sort of like an out-of-body
25  experience, would report on what you're speaking about
```

**31**

```
1   in your Indybay article as well as what other people
2   spoke about there?
3             MR. SIEGEL:  Objection; lack of foundation, the
4   whole idea of take your reporter's hat off.
5             MR. ALLEN:  I'll rephrase the question.
6   BY MR. ALLEN:
7       Q.  As I understand it -- correct me if I'm
8   wrong -- you would be reporting on what others would be
9   discussing or raising as a concern and the responses of
10  the board of directors back to those people, correct?
11      A.  Sometimes, yes.
12      Q.  Then you would also go and speak and raise your
13  own independent concerns to the board -- BART board of
14  directors, and you would also report on what they
15  responded to your citizen concerns as part of your
16  global article on that particular meeting.
17          I think that's the way I heard you say it; am I
18  right?
19      A.  Yes.  For the sake of accuracy and a complete
20  report, I included everything.  I didn't omit my part
21  from my reports.
22      Q.  But when you were making your comments to the
23  board, you were doing that as a citizen, not as a
24  reporter; am I correct?
25      A.  It was mixed.  I mentioned earlier that
```

**32**

```
1   sometimes I covered -- I probably more thoroughly
2   documented the creation of the police oversight
3   apparatus than anybody else.
4           Sometimes, for instance, because everybody
5   knew -- you know, all the BART players knew that I was
6   at all these meetings.  I was reporting everything.  I
7   was gathering transcripts.  I created a massive archive.
8   And sometimes they would solicit my feedback because
9   there would only be two people in the room.  And they
10  knew I was well-informed, so they would ask me.  So I
11  don't know if I can necessarily create a clear-cut
12  distinction.
13      Q.  You couldn't create a clear-cut distinction
14  between when you were speaking to them as a citizen as
15  opposed to being a reporter citizen speaking at or
16  offering concerns about the police department; do I
17  understand that correctly?
18          MR. SIEGEL:  Objection; vague, lack of
19  foundation.
20          THE WITNESS:  To some degree, they would seek
21  my expertise.
22  BY MR. ALLEN:
23      Q.  So you were acting in both roles when you were
24  at these BART meetings where you would report, but you
25  also were speaking to your concerns in developing
```

**33**

```
1   information that you were sharing with the BART board of
2   directors?
3       A.  Yeah.  In a sense.  I didn't turn off my
4   knowledge that I had created through my reporting in
5   order to comment, you know, or if they solicited a
6   comment from me.
7       Q.  How often did the BART board of directors ask
8   you to come up to the podium to speak to them versus you
9   signing up to go speak to them?
10      A.  No.  Not at the board of directors meetings.
11  With that, being solicited, I'm speaking more to the --
12  there was a -- there was a public safety committee and
13  there was a subcommittee from there.  I can't even
14  remember what they officially called it.  The
15  subcommittee was creating the police oversight
16  apparatus.  That was when I was being solicited.  I was
17  never solicited to speak at a BART board meeting.
18      Q.  Let's talk about that.
19          Were you subpoenaed to come before that
20  committee to offer your insights or a formal letter
21  written to you "Would you please come and offer your
22  insights on how we could do these things, Mr. Id"?
23      A.  No.
24      Q.  Were you at the meetings reporting on them and
25  they asked you to participate in the discussion as to
```

**34**

1  your views on what BART could do to better its police
2  department?
3      A. Yes.
4      Q. Was that unsolicited, or was that after you had
5  decided to speak and address issues that were being
6  discussed in the subcommittee?
7      A. It was both.
8      Q. I want to be clear on the record.
9          There were times when you were simply reporting
10 and they asked you, unsolicited, to offer your views.
11 There were times that you offered your views, and then
12 they solicited additional thoughts from you in the
13 subcommittee meetings on the BART Police Department?
14     A. As I remember it, correct.
15     Q. Did you ever review any minutes from these
16 meetings to see how those minutes characterized your
17 participation either at the BART general board meetings
18 or at the subcommittee meetings?
19     A. Not minutes, no, because I generally created my
20 own recordings that I could refer to.
21     Q. Did you attend any assembly subcommittee
22 meetings, California State Assembly, where BART's police
23 department was being discussed subsequent to the Oscar
24 Grant shooting?
25     A. Yes.  At least two that I can recall.

**35**

1      Q. Did you speak at those meetings or just report
2  on those meetings?
3      A. I did not speak until after I was arrested at
4  the September 8th demonstration, and then I wanted to
5  raise awareness of what I thought was abuse of
6  journalists.
7      Q. At any time prior to September 8th, 2011, and
8  that arrest, did you ever lobby any assembly or state
9  senator -- assemblymen or one of the state senators
10 regarding how you felt about how the BART police
11 department should be managed or run?
12     A. No, I did not.
13     Q. Did you speak with any elected representatives
14 of the BART board of directors or the state assembly or
15 the state senators regarding your views and concerns
16 about the BART Police Department independently, pick the
17 phone up and call somebody?
18     A. No.  We did have conversations sometimes around
19 a meeting because I was also there.  Like I said, the
20 would solicit my opinions.
21     Q. Did you ever go to Tom Radulovich individually
22 and say, "Mr. Radulovich, I'd like to complain about the
23 police department.  I think you should address this
24 issue or that issue"?
25     A. Not apart from some normal meeting procedure

**36**

1  that I can recall.
2      Q. I'm not sure I understand what you mean by
3  "normal meeting procedure."
4          Where you volunteered a comment or where they
5  elicited or solicited a comment from you?
6      A. You had asked earlier if I picked up the phone
7  and called somebody, and I never initiated individual
8  contact.
9      Q. Did you ever initiate individual contact of any
10 of the members of the BART police subcommittee or any
11 BART director, Allen, Radulovich, any of them, where you
12 went up to them and you complained to them about the
13 BART Police Department?
14     A. Not that I can recall.
15     MR. SIEGEL:  Off the record one second.
16     (Recess taken.)
17 BY MR. ALLEN:
18     Q. Moving this back a little bit, you had been
19 reporting on the BART Police Department, covering
20 meetings, covering subcommittee meetings.
21         So far so good, correct?
22     A. True.
23     Q. You were speaking at these meetings, correct?
24     A. Half a dozen or less, yes.
25     Q. Then the -- throughout all this, we get to the

**37**

1  Charles Hill shooting in July of 2011.
2          Did you cover that shooting for Indybay?
3      A. Yes.
4      Q. Did you write articles critical of the BART
5  Police Department?
6      A. Probably.
7      Q. And did you do any investigation into the
8  shooting to establish its propriety?
9      A. Well, I covered a press conference on it.
10 Video was provided by BART.  And I probably wrote
11 something about the video, but I can't remember
12 specifically.
13     Q. So let me ask you:  Do you consider yourself a
14 columnist/opinion writer or a reporter of facts in your
15 role as a reporter?
16     A. Primarily I try to stick to what I believe are
17 facts.
18     Q. In the Charles Hill case, did you write any
19 articles where you did an analysis of the facts without
20 offering an opinion of what occurred?
21     A. I'm sorry.  Can you restate that?
22     Q. I will.  Thank you.
23         In the Charles Hill case, you said you covered
24 it and you believe you covered it at a press conference
25 where a video was shown.

**46**

1   assert that privilege.  It's for you to assert that

2   privilege.

3           Would you just let me know when you're going to

4   assert that privilege so I have it on the record?  And

5   after this deposition, I can take it up with Judge

6   Corley?  All right?

7   A.  Sure.

8   Q.  How did you get to meet Christopher Cantor?

9   A.  I was introduced to him by a former girlfriend

10  of mine.

11  Q.  Approximately when did this occur?

12  A.  I dated her between January 2007 and 2008, so

13  it must have been in that period sometime.

14  Q.  So you had known him for a period of two or

15  three years prior to the September 8th, 2011,

16  demonstration?

17  A.  Yes.

18  Q.  Approximately.

19  A.  To clarify, I never saw him again after that

20  dinner I shared with him until after Oscar Grant was

21  killed.

22  Q.  Which would only have been a year or two later,

23  right?

24  A.  A year, year and a half.

25  Q.  When you saw him again, did you establish a

**47**

1   relationship with him in the form of an

2   acquaintanceship, a friendship or as a confidential

3   source or all of the above or some of the above?

4   A.  I would say it was friendly but generally

5   centered around me covering whatever activism he was

6   involved in.

7   Q.  Was he a known participant in any identifiable

8   groups, protest groups, during the period of time from

9   Oscar Grant's death to the September 8th, 2011,

10  demonstration that was under the auspices of No Justice

11  No BART?

12  A.  That was a long question.

13  Q.  Let me phrase it a different way.

14  Did you associate him with No Justice No BART?

15  A.  Yes.

16  Q.  Do you know any other groups you would have

17  associated him with?

18  A.  I know that he was involved with student

19  activism at UC Berkeley as well.

20  Q.  At the same time during this period of time or

21  in a prior -- prior to your getting to know him?

22  A.  In the same period after January 1st, 2009.

23  Q.  In his -- as you got to know him when the

24  protest started after the Oscar Grant tragedy, what was

25  your relationship with him?

**48**

1   A.  I was mostly documenting him.  I don't think we

2   even spoke the first several times.

3   Q.  Did he call you to tell you when demonstrations

4   would occur?

5   A.  Sometimes, yes.

6   Q.  Did you ever call him?  Did you have his phone

7   number to call him to ask him where a demonstration may

8   be occurring?

9   A.  Not that I can recall.

10  Q.  Did you then post to your website, either the

11  Indybay website or any personal blog that you had,

12  information obtained from Christopher Cantor as to where

13  protests would occur?

14  A.  I'm going to break that up into a couple of

15  pieces.

16  Q.  Sure.

17  A.  I don't have a blog.  I only publish in

18  Indybay, and then it filters out from there either

19  through syndication or people asking to reviews thing.

20      MR. SIEGEL:  Well, why don't we stop there.  He

21  can rebuild the question.

22      MR. ALLEN:  I was going to try to do that.

23  Thank you for helping.

24  BY MR. ALLEN:

25  Q.  Do you have a blog?

**49**

1   A.  No, I do not.

2   Q.  Did you have a blog at any time between January

3   1st, 2009, and September 8th, 2011?

4   A.  No.

5   Q.  During the time frame January 1st, 2009, to

6   September 8th, 2011, were you posting to Indybay?

7   A.  Yes.

8   Q.  During that time, did Christopher Cantor call

9   you at any time to tell you there's going to be a

10  protest at a certain place at a certain time and you

11  then wrote that to your post on Indybay?

12  A.  Here's another part I want to break into two

13  things, just to be clear.  Indybay has a calendar of

14  events, non-profits, activist groups, whoever, speakers

15  that are speaking, people that are premiering

16  documentaries and so forth.  I never posted anything to

17  the calendar regarding an upcoming demonstration, but I

18  may have written about an upcoming demonstration in one

19  of my poster articles.  I can't specifically recall.

20  Q.  So focusing on that, it's fair to say that you

21  would say you may have written at least one article

22  regarding an upcoming demonstration?

23  A.  I would say it's possible, yes.

24  Q.  If it causes you to speculate, please say so.

25  But can you estimate whether or not you wrote

**54**

1　platform was being closed off by people in green and you
2　went up the escalator to the Powell side.  Maybe I
3　didn't make myself clear.  Let me rephrase it.
4　　　　When you took BART in, you got off on the
5　platform level, which is where BART discharges patrons;
6　is that correct?
7　　　A. Yes.
8　　　Q. At that level, were there two escalators to
9　take people up to the concourse level where the paid and
10　free area exists to go out into San Francisco?
11　　　A. I can recall seeing two.
12　　　Q. Work with me on this.
13　　　　If there are two, the far eastern one would
14　bring you up to 4th Street and Stockton, and the far
15　western one would take you up to Hallidie Plaza and
16　Westfield Mall.
17　　　　The Powell -- Hallidie Plaza/Westfield Mall is
18　where the incident and demonstration took place; is that
19　correct?
20　　　A. Yes.
21　　　Q. Do you recall which part of the -- when you
22　described the people in green vests closing things off,
23　where did you first see them acting in that manner?
24　　　A. On the platform.  As soon as I stepped off the
25　train, there were a number of people in green vests,

**55**

1　maybe a couple of police officers.  As I was in the
2　process of documenting them, some were directing people
3　towards Hallidie Plaza.  Police in green vests blocked
4　one of the escalators, so I had no option but to go
5　towards Hallidie Plaza.
6　　　Q. You say you were documenting them.
7　　　　How were you documenting this?
8　　　A. With a still camera.
9　　　Q. Is the still digital?
10　　　A. Yes.
11　　　Q. Does it take video as well?
12　　　A. It does, but I didn't use it for that.
13　　　Q. How does your camera work?  For example, what
14　kind of camera is it?
15　　　A. At that point, I had a Sony.  I think it's
16　called an MVC500.  Something like that.  Actually it's a
17　weird little camera.  It burns to little mini CD disks.
18　　　Q. MPC?
19　　　A. I think it was MPC500, maybe.
20　　　Q. So this is not like a 35 millimeter, or did you
21　have one of those as well?
22　　　A. I think it qualifies as -- well, 35 millimeter
23　generally is a type of film.  I'm not sure what you're
24　getting at.
25　　　<mark>Q. You're the photo journalist and I'm a lawyer,</mark>

**56**

1　<mark>and I don't know what I'm getting at.</mark>
2　　　　<mark>You were carrying a camera with you?</mark>
3　　　<mark>A. Yes.</mark>
4　　　<mark>Q. More than one?</mark>
5　　　<mark>A. Yes.</mark>
6　　　<mark>Q. What were the types of cameras you were</mark>
7　<mark>carrying?  If you could describe them as a photo</mark>
8　<mark>journalist would, a professional with a similar camera.</mark>
9　　　<mark>A. I had a still camera and a video camera.</mark>
10　　　Q. What were the makes and models of the two?
11　　　A. The make of the still camera I just told you.
12　To the best of my recollection -- I don't use that
13　camera anymore -- I believe it was an MPC500.  I believe
14　it shoots at five megapixels.
15　　　　MR. SIEGEL:  Slow down a little bit there.
16　　　　THE WITNESS:  The other camera is a
17　standard-definition video camera.  I believe it was a
18　JVC.  Sort of a small one.  Almost like a pocket camera.
19　BY MR. ALLEN:
20　　　Q. You were carrying that with you?
21　　　A. Yes.
22　　　Q. Did you ever use it that day?
23　　　A. I did when I first got up to the -- I guess Dan
24　always referred to it as the concourse area.  I did not
25　use it when I first arrived on the platform area.

**57**

1　　　Q. The still, does it look -- as a lay person,
2　does it look like a regular camera where you put it up
3　to your eye and it has a lens on it and you would take
4　pictures with it?
5　　　A. Yeah.  It's black.  It's got a lens that sticks
6　out like this (indicating).  It's not, like, you know, a
7　little instamatic camera.  You could shoot a manual with
8　it.
9　　　Q. And does it have a lens that you could put a
10　telephoto lens on it?
11　　　A. Yes.  You could adapt it to other lenses.
12　　　Q. Did you that day use it and adapt it with other
13　lenses?
14　　　A. No.  It has a built-in zoom, but I did not
15　attach any external lenses.
16　　　Q. To distinguish between the two cameras here for
17　a minute, when you turn on the still, how do you know
18　your still camera is on?
19　　　A. It has a view finder that illuminates.
20　　　Q. When you were using the JVC video camera
21　initially before you put it away, how do you know it's
22　on?
23　　　A. In a similar manner -- well, it can be on
24　without recording.  Both can.  So the view finder is the
25　general way.

**66**

1  other officers, speak to you?

2      A. Not that I can recall.

3      Q. Christopher Cantor arrives; what did you do

4  next?

5      A. I think I was basically still standing around

6  until he started speaking and making announcements.

7      Q. What did you do?

8      A. Well, two things. I thought I was video

9  recording, but apparently when I stepped outside I

10  closed the camera -- the video camera to put it in my

11  pocket. When I pulled it back out, I opened up the view

12  finder and forgot to hit record. So I'm carrying it

13  around the entire demonstration and not recording, much

14  to my professional chagrin. I thought I was video

15  recording them, but I was not. But I was taking still

16  photographs.

17      Q. You were following him around; what was he

18  doing?

19      MR. SIEGEL:  Objection; lack of foundation.

20  BY MR. ALLEN:

21      Q. I'm going to go back to what I believe you just

22  testified to, which is that after he arrived, you were

23  videoing him or thought you were and you discovered you

24  weren't.

25      During that period of time that you thought you

**67**

1  were videoing him, what was he doing?

2      A. A variety of things.

3      Q. Can you tell us, please?

4      A. At the beginning, he rolled up a piece of paper

5  and was speaking loudly. There was a huge crowd of

6  people around him. At some point, probably not even

7  five minutes, I'm guessing, he started moving and there

8  were chants. I can't remember if he was leading the

9  chants or if other people were. The group moved around

10  in one circle around the ticket machines.

11      Q. Did you do any chanting?

12      A. I did not.

13      Q. How close were you to him as you were walking

14  with him -- were you walking with him in that circle?

15      A. I was following the group around. I can't

16  recall specifically how close I was. Sometimes maybe I

17  would turn to take a photo of something else besides

18  him. I can't really put up a post of 20 photos of

19  Krystoff.

20      Q. Did you talk to him at all while you were

21  walking with him?

22      A. No. Because at that point it was just loud

23  chanting. I don't think anybody could have a

24  conversation.

25      Q. I'm asking specifically to you.

**68**

1      Did you ever say anything to him during the

2  time that -- from the time he arrived when you started

3  videoing him until the time you realized your video

4  wasn't working, did you speak to him during any of that

5  period of time?

6      A. Yeah. I think we probably spoke a couple of

7  times.

8      Q. Was this while the crowd was walking in a

9  circle chanting?

10      A. No.

11      Q. When was this?

12      A. It probably was before he started his

13  announcement, I think.

14      MR. SIEGEL:  Make sure you're not guessing.

15      THE WITNESS:  Okay. To the best of my

16  recollection, it was probably before the demonstration

17  commenced.

18  BY MR. ALLEN:

19      Q. So he arrived and you had a conversation with

20  him, and the demonstration started right after that?

21      A. I wouldn't characterize it like that, no. I

22  think, you know, we may have exchanged words. He's a

23  busy person at these things. He's checking in with all

24  kinds of people. He was handing out fliers. I believe

25  I was actually one of the last ones to get in line to

**69**

1  document him speaking.

2      Q. Did you see any other reporters speak to him

3  during that time?

4      A. Yes.

5      Q. Who?

6      A. I know he spoke with Rebecca Bowe. I saw him

7  speaking with other reporters that had -- some of them

8  don't do photographs or video. They carry around little

9  notebooks. I saw him speaking to several people with

10  notebooks.

11      Q. In the articles you wrote subsequent to this

12  incident, did you report on the conversation you had

13  with Christopher Cantor up to the point in time you

14  realized your video camera wasn't working?

15      A. I want to interject one thing here, and that's

16  I actually didn't realize my video camera didn't work

17  until hours later when I was home, that I had recorded

18  nothing. I carried it around with me the whole time

19  thinking I had, and then -- can you actually repeat the

20  question?

21      Q. What I'm going off of -- maybe I misunderstood

22  your earlier response by you.

23      I understood the response to be that after a

24  few minutes you realized your video camera wasn't

25  working and then you started taking still photos.

**70**

1    A. No. That's not accurate. I thought I was

2  recording both.

3    Q. So what I want to do -- I was trying to use

4  that as a time frame.

5      So from the time that Christopher Cantor

6  arrived, you did have some conversation with him of some

7  limited duration; am I correct?

8    A. Yes.

9    Q. Then he started -- this is before he started

10  walking and chanting with the group; is that correct?

11    A. I believe so.

12    Q. And during the time that he was walking and

13  chanting with the crowd, he rolled up a piece of paper

14  and he was shouting out at the crowd with that piece of

15  paper; am I right?

16    A. That was before the chanting and the marching

17  in the circle.

18    Q. Let me make sure I understand the timeline.

19      Cantor arrives. Did you speak with him before

20  he took out the piece of paper and started speaking to

21  the people, or did you talk to him as he was doing that

22  or after he finished that before the chanting started?

23    A. I believe it was before he spoke with the

24  rolled-up piece of paper.

25    Q. Then he takes out the rolled-up piece of paper

**71**

1  and starts speaking through the rolled-up piece of

2  paper; am I correct?

3    A. At some point after, yes. Not directly after.

4    Q. Then he started leading the crowd in a chant

5  and was working in a circle; do I have that right, to

6  your memory?

7    A. I remember people chanting. I'm sure that he

8  led some of those chants. I don't think he was the only

9  one.

10    Q. And you walked in that circle as well?

11    A. I was documenting the circle as it proceeded,

12  yes.

13    Q. You were walking with him, though; you didn't

14  stay in one place and let him come around back to him?

15    A. No. Because on the other side of the ticket

16  machine, they would have been out of my view.

17    Q. During the time that you were walking with him,

18  did you walk in one particular place the entire time?

19  For example, on the inner perimeter of the circle, the

20  middle of the circle, the outside part of the circle.

21  Did you have any one place you walked?

22    A. I can't recall specifically.

23    Q. Is it fair to say that you were moving in and

24  around the circle from the inside to the outside as you

25  were documenting things?

**72**

1    A. It's kind of an amorphous blob. It's hard to

2  say specifically what is the outside. But in general, I

3  tried not to get trampled. I don't think I was ever

4  directly in the middle of it.

5    Q. And this circle took itself in front of the

6  fare gates at various times, right?

7    A. In a broad sense. Never closed it, though.

8    Q. I mean, that was your perception that they

9  never got close to them, but they walked in front of the

10  fare gates to some degree; am I right?

11      MR. SIEGEL: Objection; vague as to "the

12  front."

13  BY MR. ALLEN:

14    Q. Let me rephrase.

15      The circle took a path that would put people in

16  the circle in front of the fare gates for people walking

17  toward the fare gates; would that be fair to say?

18    A. It's still the "in front of" thing. I think

19  it's not specific enough, because you could say the muni

20  station was in front of the fare gates.

21      MR. ALLEN: Could you read the question back,

22  please?

23      (Record read.)

24  BY MR. ALLEN:

25    Q. I'm going to rephrase that.

**73**

1      Would it be fair to say that the circle took a

2  path that someone walking toward the fare gates would

3  have to walk through or around that circle to reach the

4  fare gates?

5      MR. SIEGEL: Objection to the extent it calls

6  for speculation.

7  BY MR. ALLEN:

8    Q. Based on your memory.

9    A. I didn't perceive the people moving around,

10  journalists and protesters, as having blocked fare

11  gates.

12    Q. That's not the question.

13      Want the question read back again?

14    A. Sure.

15      MR. ALLEN: Would you please read the question

16  back again?

17      (Record read.)

18      THE WITNESS: Depending on what direction they

19  were coming from, perhaps.

20  BY MR. ALLEN:

21    Q. So someone coming from the Hallidie Plaza

22  walking toward the fare gates from the north side to the

23  south side, would they have to walk around or through

24  the circle of demonstrators to reach the fare gates?

25      MR. SIEGEL: Objection to the extent it calls

**74**

1 for speculation.
2 BY MR. ALLEN:
3    Q. While you were walking in that circle?
4    A. I would object to the characterization that I
5 was walking in the circle, but while I was documenting
6 the circle for the moment of time if somebody
7 was maybe -- I don't know.  It would be easier to
8 physically illustrate, but if somebody was, say, trying
9 to walk from the ticket machine straight to the fare
10 gates right when the group was passing through, then,
11 yes, they would have to walk around the group.  But the
12 group was moving, though, so that would be momentary.
13 BY MR. ALLEN:
14    Q. During this time, did you have any
15 conversations with Christopher Cantor --
16    A. No.
17    Q. -- while the group was circling in the free
18 area of the BART station?
19    A. Not that I can recall.
20    Q. During this time while this group was circling
21 and you were walking with the circle documenting this,
22 did you see the BART police officers that were stationed
23 in the platform area, the concourse area?
24    A. Yeah.  There were numerous officers from a
25 couple different departments, I believe.

**75**

1    Q. At some point in time before -- while you're
2 still doing this documenting of the circle that's
3 walking around, where were the officers stationed?
4    A. Everywhere.  I remember there was a line of
5 police officers towards the Westfield Mall.  There was a
6 group of police officers in the paid area.  There were
7 some police officers over towards Hallidie Plaza.  As
8 the group was about to complete its first circle of the
9 ticket machines, a line of BART police had formed in
10 between the station agent booth and the ticket machines,
11 which basically prevented the group from making a second
12 circumference around the ticket machines.
13    Q. In other words, the officers had come out in
14 front of the ticket machines so that the people who were
15 walking in a circle couldn't walk in front of the ticket
16 machines?
17    A. They formed a line in between the ticket
18 machines and the station agent booth.  There's no
19 machines on this side in between the booth.  The
20 machines are on, as you identified it, the north and the
21 south side.  There's no machines here.  But there's a
22 wall because it's essentially an island that the
23 machines are embedded into.  The line was here between
24 the station agent booth and the ticket machines.
25    Q. Just so we're clear, there's the ticket

**76**

1 machines and there's the fare gates, right?
2    A. Right.
3    Q. And you're describing a circle that was walking
4 in front of the fare gates as well as the ticket
5 machines in order to go around this island; is that
6 correct?
7    MR. SIEGEL:  Objection; misstates the
8 testimony.
9    MR. ALLEN:  I'm asking him the question.
10    MR. SIEGEL:  Okay.
11    THE WITNESS:  They passed -- the group passed
12 in between the fare gates and the ticket machines to
13 make that one loop.
14 BY MR. ALLEN:
15    Q. They're going in a circle, so in order to go in
16 a circle, they're going in a circle that's basically
17 going clockwise --
18    A. Yes.
19    Q. -- correct?
20    And that clockwise circle would take them in
21 front of the fare machines as well as -- the ticket
22 machines as well as the fare gates to complete the loop
23 of the circle, right?
24    A. Sure.
25    Q. You've described the police officers after the

**77**

1 first circle roundabout have come out now, and they are
2 standing in front of the ticket machines but not the
3 fare gates; did I understand that correctly?
4    A. No.  I'm trying to express that they were
5 standing in between the ticket machine island and the
6 station booth.
7    Q. Okay.
8    A. And it prevented anybody from passing north or
9 south on that side of the ticket machine.
10    Q. But it didn't stop the protesters at that point
11 in time from continuing their circle?
12    A. No, It did.  There was one circle of
13 protesters.
14    Q. What did they do when they stopped that circle?
15    Q. What did they do?
16    Q. What did the demonstrators do once the circle
17 was stopped?
18    A. They just kind of bunched up, sort of.
19    Q. At that point in time, had there been any order
20 by the police department to alert people that they were
21 blocking the fare gates and that they would be arrested
22 if they didn't disperse?
23    A. I didn't personally hear any announcements
24 about not blocking the fare gates until I reviewed
25 evidence related to this case, but I do recall before

**78**

1 the demonstration commenced, and I would say it was when
2 Krystoff rolled up the paper and began speaking, that
3 was when it more or less commenced. There was an
4 officer with a red bullhorn who said, you know, if
5 there's any blocking -- this may not be verbatim
6 testimony -- if there's an blocking of fare gates, you
7 know, that's arrestable or something to that effect. I
8 didn't hear the later announcements.
9        Q. A couple of things. We got offtrack very early
10 on in that I asked you what you had reviewed as I was
11 focusing on the articles you've written.
12        What else did you review in preparation for
13 this deposition?
14        A. To clarify, I did not review those videos in
15 preparation for this deposition.
16        Q. When did you review them?
17        A. Just as a matter of this case as a part of
18 videos that you provided, videos that we're gathering to
19 provide, so as part of the disclosure process.
20        Q. When did you review them?
21        A. In the last couple of months.
22        Q. And anything else beside the videos that were
23 provided and the other discovery in this case?
24        A. I'm sorry. What was the question?
25        Q. Anything else that you reviewed before this

**79**

1 deposition as part of this case besides the videos in
2 discovery I have produced to your counsel?
3        A. Well, besides the video?
4        MR. SIEGEL: And discovery.
5 BY MR. ALLEN:
6        Q. It's global.
7        MR. SIEGEL: Discovery includes everything --
8        THE WITNESS: Discovery includes all the
9 documents. Not that I can recall.
10 BY MR. ALLEN:
11        Q. For example, have you ever reviewed video that
12 someone took from another news agency that's in your
13 possession or been provided to you by somebody to
14 review?
15        A. Yes.
16        Q. Who provided that to you?
17        A. Nobody has provided me video. They're just
18 things I found on the internet.
19        Q. Other than your own research on the internet,
20 has anybody provided anything to you to say, "Hey,
21 Mr. Morse, I've got some information you might find
22 useful in your case. Here it is"?
23        A. No.
24        Q. Besides the video, besides the discovery
25 that's been produced, besides the articles that you've

**80**

1 written and any articles you read from the Chronicle,
2 did you review anything else in preparation for this
3 deposition?
4        A. No.
5        Q. Did you review anything over the course of this
6 litigation that has been provided to you by others?
7        MR. SIEGEL: Objection to the extent it calls
8 for attorney-client communication.
9 BY MR. ALLEN:
10        Q. Other than what your attorney has provided.
11        A. Uh-uh -- no.
12        Q. Going back to what we've agreed to, Sergeant
13 Coontz had a megaphone, according to Deputy Chief
14 Hartwig.
15        You did hear him say something over the
16 megaphone to the effect "Don't block the fare gates"?
17        A. Right.
18        Q. And you understand from looking at video that
19 there was an order given as well either before that or
20 after then regarding don't block the fare gates?
21        MR. SIEGEL: Objection; vague and lack of
22 foundation as to "order," what the order was.
23        THE WITNESS: Can I get a little more water,
24 please?
25        MR. SIEGEL: Sure.

**81**

1 BY MR. ALLEN:
2        Q. Do you understand my question?
3        A. Yes -- I'm sorry. Actually, can you reread it?
4 I want to make sure I'm specific enough.
5        Q. I'm going to rephrase it. Now we have a little
6 bit more information.
7        So you heard some form of an order given at
8 some point in time about not blocking the fare gates.
9 Do I understand your testimony correctly?
10        A. My understanding of it was more that it was an
11 announcement than an order. I don't know if that's a
12 legal distinction.
13        Q. You can call it whatever you want.
14        Did you hear somebody say something about don't
15 block the fare gates?
16        A. Right. I brought that to your attention.
17        Q. That was somebody with a red megaphone?
18        A. Correct.
19        Q. Prior to that occurring, had you heard anybody
20 make any announcements or hear any announcement over
21 loud speakers regarding don't block the fare gates or
22 words to that effects?
23        A. Prior to that, no, because that was -- the
24 first one I heard was prior to the demonstration
25 commencing.

**82**

1    Q. And the one that you heard by the officer with
2    the megaphone was before Krystoff took out his piece of
3    paper and started yelling through it?
4    A. Correct.
5    Q. And you then mentioned, and I got a little
6    confused and offtrack here, in reviewing video, you
7    understood that there was another announcement or might
8    have been other announcements; did I understand that
9    correctly?
10    A. Yes.
11    Q. And what did you understand in reviewing the
12    video about other announcements?
13    A. There was a couple more of the same nature that
14    were hard to hear because of the noise in the station,
15    so whoever was recording that, their video camera must
16    have been closer to the speaker than I was at the time.
17    Q. It's your understanding from video that
18    independent of what you personally heard there were at
19    least, perhaps, two other announcements made regarding
20    not blocking the fare gates?
21    A. Yes. I think so.
22    Q. In any of those, the one you heard that day or
23    learned of later, did you understand those were
24    dispersal orders?
25    A. No. I don't understand --

**83**

1         MR. SIEGEL: Let me just have a slow objection
2    here. These documents -- the documents speak for
3    themselves, so to the extent you're asking David to
4    interpret documents that you've provided to us, we don't
5    have the documents present.
6         MR. ALLEN: I'll rephrase.
7    BY MR. ALLEN:
8    Q. With regard to the one you heard from the
9    officer with the megaphone, did you understand that to
10    be a dispersal order?
11    A. No, I did not.
12    Q. What did you understand that to be?
13    A. An announcement, a warning. Because the action
14    had been announced as spare the fare, and there was talk
15    of potentially blocking the gates as if it was going to
16    be some civil disobedience action.
17    Q. And this is before Krystoff had started the
18    circle and the chanting had started?
19    A. Correct.
20    Q. You didn't hear anything else after that?
21    A. I did hear what I would qualify as an actual
22    dispersal order after the kettle was closed.
23    Q. And prior to -- the kettle you're referring to
24    is when the police moved in --
25    A. Police encircled --

**84**

1    Q. -- and encircled the group.
2         And so we're clear, and Counsel is correct, the
3    audio and video will speak for itself, you do understand
4    that that video that you have reviewed indicates or you
5    hear two commands over that video that have something to
6    do with the event, without characterizing what it is?
7    A. Correct.
8    Q. So you see the circle go around, and it comes
9    to a stop.
10         What did you do when it came to a stop?
11    A. I documented the police line that had formed
12    between the ticket gates and the station booth. I just
13    continued to document whatever happened.
14    Q. You were documenting it how?
15    A. With my still camera.
16    Q. Were you taking any notes in a notebook?
17    A. No. I can't manage two cameras and a notebook.
18    Q. And if I understood you correctly, before you
19    weren't digitally recording or offering your commentary
20    into any kind of digital recorder?
21    A. No.
22    Q. So the crowd stops.
23         Did you at that point in time see Deputy Chief
24    Hartwig?
25    A. He was in and out. I can't remember at that

**85**

1    particular moment.
2    Q. Did you ever see him out in and amongst the
3    crowd?
4    A. I remember seeing him cut through the crowd at
5    one point.
6    Q. You heard his testimony? He said he walked
7    into the crowd and was telling people "If you don't
8    leave, you're going to be arrested." Do you remember
9    hearing that?
10    A. I never witnessed that, no.
11    Q. We need a foundation.
12         Do you recall that he testified to that effect?
13    A. Yes.
14    Q. Did you ever personally hear him say, "You're
15    going to be arrested if you don't leave? Either
16    directed to you or other people in the vicinity of where
17    you were standing.
18    A. No, I did not.
19    Q. Did he ever speak to you directly until that
20    point in time when he ordered you removed from the
21    crowd?
22    A. We didn't speak personally then.
23    Q. Again, some of these questions are meant to be
24    foundational. I have to get the answer to my question
25    before I can get to the next one.

**86**

1    A. No.

2    Q. I'm going to rephrase it.

3       In the amount of time prior to when he directed

4 Officer Coduti to remove you from the crowd, did you

5 have any interaction, verbal or non-verbal, with Deputy

6 Chief Hartwig?

7    A. Definitely not verbal.  Maybe we made eye

8 contact.  I can't recall.

9    Q. So is it fair for me to characterize that maybe

10 you had eye contact, but it was not such that even if

11 you had eye contact, it was anything that registers on

12 you today relevant to this lawsuit as to his intent to

13 arrest you for an animosity he carried towards you?

14    A. No.

15    Q. No, you had no feelings that that was going to

16 occur?

17    A. I did not see that coming.

18    Q. While the crowd is now stopped and everybody is

19 there and the police have come out, what happens next?

20    A. I remember seeing there was another police line

21 in front of the fare gates.  I think I can recall

22 passengers moving behind them because they couldn't get

23 through this way because of the police line.  They were

24 moving behind them into the fare gates.  I'm not sure

25 what was happening with the other set of fare gates

**87**

1 towards the mall.

2       At some point, an officer moved through the

3 crowd, and then Krystoff and this other guy, who is

4 Christian Ream who was arrested twice at BART protests,

5 they followed that officer and were, like, yelling at

6 him.

7       It sounded from the -- what they were saying to

8 him, that that officer had grabbed Krystoff in some

9 manner, like grabbed his backpack or something like that

10 as he was passing him, so they were both, you know,

11 basically confronting.  I don't know if "yelling" is the

12 right phrase.  They were confronting him.

13    Q. Do you know who that officer was?

14    A. If memory serves, I believe it was Cryst.

15    Q. As this is occurring, had you had any

16 conversations with Krystoff from the moment in time when

17 you last spoke with him before he rolled up that piece

18 of paper and started his marching chant until this point

19 in time when you see Ream and Krystoff in some form of a

20 confrontation with Officer Cryst?

21    A. Not that I can recall.

22    Q. So you may have had a --

23    A. No.  I probably did not, because everything was

24 loud and there was chanting, and you don't really talk

25 to people who are chanting.

**88**

1    Q. You just don't know?

2    A. I mean, I could say with 95 -- 99 percent

3 certainty no.  It doesn't sit with my understanding of

4 what happened.

5    Q. Did you get closer -- during the time you were

6 walking with Krystoff around the circle, and even then

7 when it stopped, did you get closer to Krystoff to hear

8 if he was saying things?

9    A. I was standing -- when he and Christian Ream

10 were confronting Officer Cryst, I was standing behind

11 them documenting it.  I believe I shot one or two

12 photos, and I had my video camera.  I thought I was

13 capturing video of the incident.

14    Q. And did you say anything during that time?

15    A. No.

16    Q. Did you make any comment to the officer or to

17 Krystoff or Ream?

18    A. Uh-uh.

19    Q. You have to answer verbally.

20    A. I'm sorry.  No.  Not that I can recall.

21    Q. Did you hear any reporter asking Krystoff

22 questions?

23    A. At that point, no.

24    Q. Did you see any reporters as close to Krystoff

25 and Ream as you were?

**89**

1    A. Yeah.  Numerous times throughout the

2 demonstration.  It was pretty crowded.

3    Q. And I'm focusing now completely on the point in

4 time when Ream and Krystoff were in this confrontation

5 with Cryst.

6       Did you see any other reporter as close as you

7 were, as I understood your testimony just now, that you

8 were right behind them?  Did you see any other reporter

9 that close?

10    A. Yes.

11    Q. Who?

12    A. I don't know them by name.

13    Q. Did you see Vivian Ho?

14    A. They had cameras.  I can remember specifically

15 there was a guy with a huge camera almost on Officer

16 Cryst's shoulder.  Seemed like he was less than two

17 feet.  I try not to get that close to police.

18    Q. Did you see anybody speaking to Krystoff or

19 asking any questions?

20    A. No.  It was too heated for an interview.

21    Q. You've seen reporters yelling out questions to

22 people in the middle of something heated, haven't you?

23    A. It's usually at a press conference, you know.

24 If somebody's standing before a group of people, they'll

25 shout out questions.

**90**

1    Q. So this confrontation takes place. You're up
2  there getting photos. You think your video is running.
3     What happens next?
4    A. Then -- I don't really remember how that
5  incident, if you can call it that, defused. Somehow, I
6  don't know, they were tired of confronting him. I don't
7  think he said anything back.
8     Then I started walking to document the police
9  line towards -- that was in front of the fare gates.
10  And then at that point, I noticed another line of police
11  had come in. I don't know if it was one or two lines,
12  but basically that was when the circle enclosed, within
13  probably a couple minutes of that.
14    Q. Did you hear any order given at that time to
15  the people who were inside the circle?
16    A. No.
17    Q. What happened then?
18    A. People started trying to inquire what the
19  officers -- as to what was going on for being detained.
20  Were we free to go? I remember at one point I was
21  standing next to Rebecca Bowe. She asked for a show of
22  hands of how many people were journalists, and Probably
23  15 hands went up or so.
24    Q. This was before the officers started making
25  arrests?

**91**

1    A. Yes.
2    Q. Did you hear anything from anybody from the
3  police department instructing you where you could go to
4  leave the circle prior to that circle closing?
5    A. No.
6    Q. When that circle first closed, did you hear
7  anything from the police instructing people who were not
8  part of the demonstration to leave the circle?
9    A. To clarify, I'm defining the circle as the
10  police, the circle the police created around people.
11    Q. Prior to that, did you ever hear the police
12  instruct people that while the lines were around you,
13  the police lines were forming up around you, that those
14  people not part of the demonstration should leave the
15  circle?
16    A. I wasn't aware of police lines forming around
17  us, and I did not hear any announcements other than the
18  initial red bullhorn one that I already spoke about.
19    Q. You were aware that people who were press were
20  moving outside the line of the police prior to the
21  circle closing, weren't you?
22    A. No. Where I was standing, it seemed just as
23  thick with journalists as it had been the entire time.
24    Q. So the circle closes, and you're all standing
25  there, and the situation between Cryst and Krystoff and

**92**

1  Ream defused.
2     What happens next?
3    A. I'm sorry. I don't understand what you're
4  getting at.
5    Q. I'm going back now to when the situation
6  defuses slightly, and you're standing there documenting
7  this.
8     What happens next?
9    A. I walked away and was heading towards the
10  police line that was blocking the fare gates.
11    MR. SIEGEL: Dale, before the next question, if
12  you could -- how much longer do you have?
13    MR. ALLEN: 20 minutes, at most.
14    MR. SIEGEL: Let's take a quick break.
15    (Recess taken.)
16  BY MR. ALLEN:
17    Q. The situation defuses between Krystoff, Cryst
18  and Ream, and you move over to the side away from them
19  as the circle closes on all of you have; have I got the
20  timing right?
21    A. Can you state that one more time? I was
22  thinking about the sunlight in my face.
23    Q. As the situation defuses between Ream, Cryst
24  and Krystoff, you move way from them over to the edge as
25  the circle is completed around you by the BART police;

**93**

1  do I have the timing right?
2    A. Yes.
3    Q. At this point, if I understood you correctly,
4  Rebecca Bowe asks for a show of hands of everybody there
5  who was a reporter?
6    A. Within a few minutes.
7    Q. Why did she ask for that show of hands?
8    MR. SIEGEL: Objection; calls for speculation.
9  BY MR. ALLEN:
10    Q. Let me rephrase.
11     At this point in time, was the dispersal order
12  read?
13    A. No.
14    Q. Did you hear a dispersal order read after the
15  officers had encircled you?
16    A. Yes.
17    Q. And when you heard the dispersal order read,
18  what did you understand it to mean?
19    A. That those who were not inside of what I call a
20  kettle or a police encirclement needed to leave the
21  station. "Leave the station or you will be arrested."
22    Q. Those that were already encircled or those in
23  the circle?
24    A. Those outside of the circle, because those
25  inside of the circle were encircled and were told we

**94**

1    were not free to leave.

2        Q. Let me drill down on this.

3            You hear an order and understand it to mean it

4    applied only to those outside the circle; do I

5    understand correctly?

6        A. Correct.

7        Q. Why did you believe you were not free to leave

8    within the circle?

9        A. Because there was a line of police around us

10   that weren't letting anybody move.

11       Q. Did you attempt to walk out of the circle?

12       A. No.

13       Q. Did you see others attempting to walk out of

14   the circle?

15       A. I saw people confronting police officers on the

16   perimeter of the kettle and, you know, confronting them

17   about "Why are we here?  Why can't we go?"

18       Q. Was that something you remember, or is that

19   something you saw in the videos?

20       A. I remember that.  Both.

21       Q. Do you remember what the officer said back to

22   them?

23       A. I think most of the officers didn't say

24   anything.  I couldn't -- there was chanting going on.  I

25   couldn't -- I couldn't hear individual conversations.

**95**

1    There was probably a bunch of -- several conversations

2    going on at once.

3        Q. As this was going on, was there a point in time

4    where Rebecca Bowe asked for a show of hands?

5        A. Yes.

6        Q. What did she say?

7        A. She said -- it's not verbatim -- something to

8    the effect "Raise your hand if you're a journalist."

9        Q. And were you part of the group who raised their

10   hands?

11       A. Yes.

12       Q. And when she did so, were there any BART police

13   officers near you at the time?

14       A. Yes.

15       Q. Did you know any of them?

16       A. No.

17       Q. Did any of them speak to you at that point in

18   time?

19       A. I never communicated with any officers on the

20   edge of the perimeter.

21       Q. So we're clear, you were -- had moved from

22   the -- where Krystoff was over to where a group of

23   reporters were or just to an edge of the circle?  Is

24   that clear?

25       A. Well, again, when I refer to the circle, I'm

**96**

1    talking about the kettle, the police circle.  And before

2    that was closed, I was walking towards the police line

3    at the fare gates.

4        Q. As you were out by the edge of the circle,

5    where was Hannah Brown?

6        A. I had lost track of her.  She was somewhere

7    inside of the group that was kettled, but I can't

8    recall.

9        Q. You're standing out there.  Rebecca Bowe asked

10   for a show of hands.

11           What happens next?

12       A. After people raised their hands?

13       A. Yes.

14       A. People are just standing around, I guess.

15   There was some chanting going on inside of the circle

16   and outside of the circle.

17       Q. How far away were you from Krystoff?

18       A. I can't recall.  I don't recall being next to

19   him.

20       Q. Was it more than an arm's length?

21       A. Probably.

22       Q. More than two arm's length?

23       A. I can't recall where he was, so I can't say,

24   But that means he wasn't right next to me.

25       Q. Could you hear him?

**97**

1        A. Oh, you know, actually I'll clarify that.  I do

2    remember where he was at one point, because he was one

3    of the people who was speaking to an officer on the

4    perimeter.  Two, maybe three arm's lengths from me.  I

5    would say it was me, Rebecca Bowe, one or two other

6    people and then Krystoff.  He had -- he had somehow

7    walked across the group that was encircled, and he spoke

8    with an officer.  Then he was starting to make an

9    announcement about the detainment, but it was kind of

10   drowned out by other people chanting.

11       Q. And then what happened?

12       A. Other than people chanting, nothing really

13   happened until Hartwig forming an arrest team on the

14   outside of the perimeter.

15       Q. Was that the first time you saw Hartwig?

16       A. No, no.  I'd seen him repeatedly, because he

17   was moving through the station speaking with different

18   officers.

19       Q. When you saw Hartwig, was he in the free area

20   or was he in the pay area when he was forming the arrest

21   teams?

22       A. He was in the free area.

23       Q. Could you hear anything he was saying?

24       A. No.

25       Q. As you watched this, were you attempting to

**98**

1  document it?

2  A. I don't think I shot a photograph of him

3  forming the arrest line, no. I wasn't fast enough. It

4  happened real fast.

5  Q. Where was Krystoff as you observed Hartwig

6  outside the line forming arrest teams?

7  A. Somewhere behind me.

8  Q. Within an arm's length?

9  A. No.

10  Q. You don't know?

11  A. No. He was not within an arm's length.

12  Q. You knew where he was, but you don't know how

13  far away he was?

14  A. Right. I just knew he was behind me, because I

15  was pretty close to what you might call your north-south

16  thing. I would say I was at sort of the northeast

17  corner of the circle, if there is such a thing.

18  Q. How much time transpired before you were

19  arrested or grabbed by an officer?

20  A. To the best of my memory, perhaps ten minutes.

21  Q. So would it be fair to say using the most

22  substantial thing I could think if, that is, Rebecca

23  Bowe asking for a show of hands, to when you were taken

24  into custody, more than ten minutes or about ten

25  minutes?

**99**

1  A. Oh, I'm giving ten minutes as my total time

2  within the kettle or the police encirclement.

3  Q. And I'm trying to define it further now.

4  Did you see -- Hartwig is outside starting to

5  form an arrest group. How long after Rebecca Bowe asked

6  for a show of hands were you taken into custody by

7  Officer Coduti?

8  A. I can't recall specifically.

9  Q. Within a couple of minutes?

10  A. It was less than ten. I could say five. I

11  could say three. I could say seven. I can't recall.

12  Q. Fair enough.

13  What happened to draw your attention to the

14  fact you were going to be arrested?

15  A. I didn't know I was going to be arrested until

16  it happened.

17  Q. What happened?

18  A. I watched Hartwig -- I know Hartwig. We've

19  spoken. He's one of the few officers that I actually

20  knew by name. I saw him forming a line of police behind

21  him really quick and hurried. Everybody sort of snapped

22  into line. It seemed a little chaotic. I'm thinking to

23  myself "What's going on? Something is getting ready to

24  happen."

25  And so I was watching this, and within a matter

**100**

1  of seconds, Hartwig marches through two of the officers

2  that were holding the perimeter. This line of police

3  officers, they're marching together. And then Hartwig

4  just turns to me and says, "Him." And Officer Coduti

5  grabs me. I just kind of turned toward Hartwig. It was

6  kind of like "What?" By that point, Coduti was removing

7  me.

8  Q. If I understand what you just described, as

9  Hartwig forms an arrest team, he walks through the

10  skirmish line of officers into the circle and says,

11  "Him" and points to you. Then the next thing you know,

12  Coduti is putting hands on with you.

13  A. Yes.

14  Q. Let's talk about the hands on for a moment.

15  What did Coduti do when he -- did he say

16  anything to you before he put hands on?

17  A. No.

18  Q. What did he do when he puts hand on?

19  A. He grabbed me and pulled me rather forcefully,

20  which was somewhat shocking to me. First it was the

21  shock of Hartwig pointing me out. Secondly, it was the

22  shock of just being manhandled and, you know, pulled

23  probably ten feet from where I had been standing. He

24  pulled my arms behind my back kind of high. I sort of

25  felt like "What I have done to deserve this?"

**101**

1  Q. Did he say anything to you?

2  A. Not at that point, no. He didn't say anything

3  to me.

4  Q. Did you say anything to him?

5  A. I did say to him -- because he grabbed my video

6  camera out of my hand that had that open view and the

7  way he was being so rough with me and pulling my arms

8  behind my back, I was afraid he was going to break the

9  view finder off. I was pleading with him, "Please close

10  the camera properly. Don't break the view finder."

11  He ignored me for a couple of seconds. Then he

12  heard me, and he did close the view finder and he stuck

13  it in my backpack at some point in the process when he

14  was handcuffing me.

15  Q. Did he put you in an arm bar or a wrist lock or

16  anything like that when he was escorting you back?

17  A. I don't know what an arm bar is.

18  Q. How long before he put you in any kind of

19  handcuffs or restraints?

20  A. It was a matter of seconds. Less than a minute

21  for sure.

22  Q. Plastic cuffs or metal cuffs?

23  A. Metal handcuffs.

24  Q. What did he do with you?

25  A. Then he kind of -- once I was in the handcuffs,

**102**

1  he relaxed, because he had my arms pulled up real high
2  when he was putting on the handcuffs.  Then he put them
3  on rather tightly.  Then I said, "These handcuffs are
4  hurting me.  You put them on too tightly."  He didn't
5  respond.
6          Then he escorted me through I think it's one of
7  those little access doors, it's not a fare gate, and he
8  took me into the paid area and he brought me back to
9  what I understand now is a police substation.  There was
10 a small office in the back he put me in.
11 BY MR. ALLEN:
12     Q.  Did he unhandcuff or loosen up the handcuffs at
13 any point in time?
14     A.  No, he did not.
15     Q.  Did someone?
16     A.  Yes.  The officer who stood watch over me for a
17 few hours, Officer Rudy, he did.  As soon as Coduti was
18 gone, he loosened the handcuffs.
19     Q.  Coduti brings you back.
20         Does he turn you over to Officer Rudy and
21 leave?
22     A.  Pretty much, yes.
23     Q.  So this all happened -- how much time would you
24 say transpired between the time you were first
25 physically taken into custody by Officer Coduti to

**103**

1  before Coduti turned you over to Rudy?  One minute, two
2  minutes, 30 seconds?
3      A.  Probably around two minutes, maybe.  However
4  long it takes to walk from that part of the station to
5  the other part of the station.
6      Q.  At that point, Rudy then loosened the cuffs for
7  you?
8      A.  Yes.
9      Q.  Did he take them off and handcuff you to
10 something or keep you handcuffed behind your back while
11 you sat in the substation?
12     A.  It just my hands cuffed together.  I was never
13 cuffed to anything.
14     Q.  Were your hands cuffed behind you or in front
15 of you?
16     A.  Behind me.
17     Q.  Did they remain handcuffed -- did you remain
18 handcuffed behind you for the entirety of the two hours?
19     A.  Yes.
20     Q.  Were they metal cuffs that were taken off and
21 plastic cuffs put on?
22     A.  Yes.  Before I was transported.
23     Q.  But that was approximately two hours later?
24     A.  Yes.
25     Q.  During the time you were in the substation, did

**104**

1  Coduti have any other conversations with you?
2      A.  No.
3      Q.  Did Rudy have any conversations with you?
4      A.  Probably, but I can't remember the nature of
5  them.  The only thing that stands out is me speaking
6  with Hartwig.
7      Q.  Did Hartwig speak to you when you were at the
8  substation?
9      A.  Yes.  He came to visit me twice.
10     Q.  As best you can, recount the two conversations.
11     A.  I was objecting to my arrest.  He told me that
12 even journalists could be arrested if they broke the
13 law.  I told him, "You know I didn't break any laws.
14 What are you talking about?"
15         He told me that -- in the first conversation
16 that I could be arrested without a
17 dispersal order, because I had said there was no
18 dispersal order ever to clear out the area.  "Leave or
19 you will be arrested.  This is an unlawful assembly."
20 Whatever you normally hear with a dispersal order.
21         He left.  We probably spoke for a good four or
22 five minutes the first time.  The second time it was
23 probably about four or five minutes.  The second time he
24 came back, he told me that there had been dispersal
25 orders.  I can't remember offhand now, memory fades, but

**105**

1  he told me that other journalists had been arrested.
2  That's basically the nature of it.
3          I did mention to him at one point -- I was,
4  like -- "I believe what you're doing is illegal and
5  unjustified.  You know, I can understand a temporary
6  detainment if you felt like you needed to control the
7  situation, but, you know, if you don't let me go and you
8  keep me in these handcuffs, I'm going to try to sue
9  you."
10     Q.  Did he ever speak derogatorily toward you with
11 any profanity toward you?
12     A.  Profanity, no.
13     Q.  Derogatorily?
14     A.  Well, other than he was saying that I had
15 broken the law.  He didn't specify which law I'd broken.
16 He said journalists could be arrested if they broke the
17 law.  I don't know that that qualifies as derogatory.
18     Q.  Did he belittle you in any way while he was
19 talking to you?
20     A.  I just felt like the entire arrest was
21 belittling.
22     Q.  What I'm trying to get at is something
23 substantive in the form of words as opposed to your
24 feelings.  You're absolutely entitled to your feelings.
25 You can describe them to a jury.  What I'm trying to

**106**

1  establish is whether or not there's any subset.

2      Did he verbally belittle you or demean you or

3  in some way make fun of you, that type of language, that

4  you can recount today outside of that he told you that

5  journalists can be arrested?  I'm looking for anything

6  in your best memory.

7      A. No.

8      Q. To the best of your memory, then, the extent of

9  the two conversations were first -- in the first five

10  minutes were his commentary about journalists can be

11  arrested if they break the law, your rebuttal that there

12  was never any dispersal orders, but he said there was.

13  Even if there wasn't, he could arrest you anyway.

14      Did that capture the substance of the first

15  conversation?  I'm sure there was other things said, but

16  anything more specific?

17      A. I was speaking to both conversations.  I

18  believe it was the second conversation when he came in

19  and said that there had been dispersal orders.

20      Q. But there was no language -- there was no

21  profanity, there was no verbal harangue or belittling or

22  trying to make fun of you in front of other people

23  present?

24      A. Not from Hartwig, but from another officer

25  there was.

**107**

1      Q. That was Officer Knudsen?

2      A. Correct.

3      Q. Did Dan Hartwig make any references during this

4  time you were in the substation to the fact that you had

5  written articles of BART?

6      A. I believe, you know, when I was speaking to him

7  I said, "You know my reporting.  You know I'm reporting

8  on this."  I would go into BART board meetings, and they

9  would have Indybay articles on their phones, so I knew

10  everybody there was reading my stuff.

11      Q. Did he say anything to you that suggested or

12  outright made reference to "I arrested you, and we know

13  all about your Indybay articles and the criticism you

14  have of the BART Police Department"?

15      A. He did not say that, no.

16      Q. What did Knudsen do?

17      A. He was -- he was the officer who, I suppose,

18  was assigned to take off my metal handcuffs and put on

19  the plastic cuffs, and he was just unnecessarily rough

20  and hostile towards me.  It was a real

21  passive-aggressive kind of hostility, I suppose.  Do you

22  want me to elaborate, or do you have another question?

23      Q. Feel free to elaborate.

24      A. He came into the office -- This was

25  approximately two hours later -- and said, you know

**108**

1  "Stand up," so I stood up.  He said, "Turn around."  I

2  turned around.  He said, "Spread your legs," so I spread

3  my legs.  And then he said, "Spread your legs more."  I

4  spread my legs more.  He said, "Spread your legs more."

5  I spread my legs more.

6      And then I asked him, "Can you just tell me how

7  much you want me to spread my legs so there's not any

8  confusion and I can comply with your orders?"

9      He said, "Oh, you like to fight, huh?"

10      And I was, you know, just really concerned.  He

11  had this hostile attitude towards me.  I didn't realize

12  who he was because he was behind me.  I couldn't see his

13  number.  But he came back in to gawk at me later, as a

14  number of others officers did, and that's when I saw his

15  badge and knew who he was.

16      Q. Was anyone else represent when Knudsen was

17  speaking to you in this way?

18      A. Rudy.

19      Q. Anybody else besides Rudy?

20      A. No.

21      Q. Any other subjects that were detained or

22  arrested from the demonstration?

23      A. I was in my own private office.

24      Q. Anybody else, in your view, mistreat you while

25  you were in the substation?

**109**

1      A. I felt like officers were unnecessarily coming

2  in to gawk at me.  My driver's license was set out on

3  the desk.  The desk was between Rudy and I.  I'd say at

4  least three or four officers came in, you know, looked

5  at me and walked over, picked up my driver's license,

6  looked at it, put it down.

7      It's a little bit scary.  I don't know who

8  these cops are.  They're all coming in.  They're looking

9  at my home address.  Why?  They had nothing to do with

10  arresting me.  At least Knudsen had an excuse to be in

11  there because he was the one that was transferring me to

12  the plastic cuffs.

13      When I was -- I was lined up -- after the

14  plastic cuffs, a few minutes after that, I was lined up

15  in the hallway that does lead up to the, I guess,

16  Stockton exit.  We were all just lined up there with our

17  possessions set in front of us in handcuffs.  Two

18  different officers pulled my ID that was loose in a

19  plastic bag out.  "Oh, you don't look this old."  I

20  don't know.

21      I would attribute some of that later to the

22  BOLO that I later found out about.  I was put up as

23  public enemy No. 2 to these officers, so they wanted to

24  know who I was.  They thought it was free season to come

25  in and look at my ID.

**110**

1   Q. Did you ever hear any officer say that you were
2   arrested because you had been writing critical articles
3   on BART?
4      A. No.
5      Q. Did you ever hear any officers make reference
6   to the critical articles on BART that you had been
7   writing?
8      A. No. But I don't think it was a coincidence how
9   Knudsen treated me.
10     Q. Did you ever obtain information subsequent to
11  that arrest through people you talked to who were also
12  arrested or in your investigation independent of your
13  counsel providing you information where you were the
14  target of the police department because of your critical
15  articles of BART?
16     A. Not directly, but I believe it can be inferred.
17     Q. I understand that. I'm only entitled to what
18  you have -- actually completely entitled to what you
19  have in the way of independent evidence about the
20  officers of BART targeting you because of your reporting
21  against BART over the last two and a half years.
22        Do you have anything that we haven't talked
23  about today where you have obtained information either
24  from a witness or by documents that officers of the BART
25  Police Department had targeted you for your reporting

**111**

1   and criticism of the BART Police Department?
2      A. Not directly, no.
3      Q. Do you have any indirectly?
4      A. I could say it can be inferred.
5         MR. SIEGEL: He's asking for a "yes" or "no"
6   answer.
7   BY MR. ALLEN:
8      Q. I get the inferred. I've tried to do due
9   diligence on behalf of my client.
10        I want to know if there's any evidence you have
11  that is in the form of documents or eyewitnesses that
12  will be brought forward to testify that they heard or
13  learned of a desire to arrest you because you had been
14  writing critical articles.
15     A. No. I did not have any documents where an
16  officer confessed that.
17     Q. How long were you -- were you ever told why you
18  were arrested?
19     A. No. Actually, I wasn't. I was never read my
20  Miranda rights either.
21        MR. SIEGEL: Yes or no questions.
22        THE WITNESS: I'm sorry.
23  BY MR. ALLEN:
24     Q. Did Dan Hartwig in the conversation you were
25  having with him articulate why you were arrested?

**112**

1      A. No.
2      Q. He did mention that journalists could be
3   arrested?
4      A. Correct.
5      Q. Did he mention that you were arrested because
6   you were not dispersing under a lawful -- under his
7   belief that there was a lawful dispersal order given?
8      A. No.
9      Q. Did he ever mention that a dispersal order was
10  given?
11     A. He said the second time he visited me that
12  there had been several dispersal orders.
13     Q. So he told you that within a short period of
14  time of your arrest?
15     A. Right. But he didn't connect it to my arrest,
16  no.
17     Q. You were transported down to the Hall of
18  Justice.
19        Were you cited and released at the Hall of
20  Justice?
21     A. Yes. And then -- I'm sorry.
22     Q. Go ahead.
23     A. They returned my possessions.
24     Q. Did you find a -- did you find your cameras to
25  be in working order or damaged?

**113**

1      A. They were okay.
2      Q. Was there anything taken from them and not
3   returned to you?
4      A. Not that I'm aware of.
5      Q. Did you check your cameras that evening --
6      A. Yes.
7      Q. -- or the next day to make sure that all your
8   photos were --
9      A. Everything was in working order, and nothing
10  had been deleted.
11     Q. I just want to close the door on this.
12        There was no indication any way, shape or form
13  that any tampering occurring to your cameras?
14     A. No.
15     Q. And all your personal belongings were returned
16  intact, and there was no tampering with any of them; is
17  that right?
18     A. Yes.
19     Q. Why do you understand your case was dismissed?
20  What's your understanding of why your case was
21  dismissed? And I don't mean your attorney-client
22  privilege in this case.
23        MR. SIEGEL: Don't speculate.
24  BY MR. ALLEN:
25     Q. Did you receive anything in writing that your

**114**

1  case was dismissed?

2      A. **Not in writing, no.**

3      Q. You learned of it from your attorney?

4      A. **Yes.**

5      Q. You didn't get a notice in the mail?

6      A. **Not that I can recall.**

7      Q. And I understand you filed an Internal Affairs

8  complaint in this case; is that correct?

9      A. **Correct.**

10     Q. You gave an interview in this case?

11     A. **Yes.**

12     Q. Did you provide the BART Police Department as

13 part of this Internal Affairs investigation any

14 documentary evidence in the form of your photo

15 journalism or other writings pertaining to this

16 incident?

17     A. **I directed them towards the article I wrote**

18 **about my arrest, but I don't think I actually provided**

19 **them with a copy of it.  They did ask to photocopy my**

20 **Indybay press pass, which I allowed them to do.**

21     Q. So I'm going to go through my notes.  I'm

22 pretty much at the conclusion.  I just want to check my

23 notes before we wrap this up.

24     Have you come across anything in writing by Dan

25 Hartwig, via an e-mail, a Twitter account or otherwise,

**115**

1  any blogging that indicates that he was -- carried a

2  personal animosity toward you prior to this incident?

3      A. No.

4      Q. You saw the exhibit that was used in this

5  deposition which is an e-mail exchange with Officer

6  Coduti, but other than that particular e-mail, have you

7  seen anything else, FaceBook, LinkedIn, any blogging,

8  where he has made comments on -- about you or Indybay?

9      A. **I'm not familiar with any personal on-line**

10 **presence that he has.**

11     Q. Have you looked?

12     A. **No, I have not.  That's outside the scope of**

13 **his professional behavior.**

14     Q. Have you ever spoken with Deputy Chief Fairow

15 at any time?

16     A. **No.**

17     Q. Have you ever attempted to interview him?

18     A. **I wasn't even aware he existed until this case.**

19     Q. You don't even know what he looks like?

20     A. **No.**

21     Q. In other demonstrations or protests you have

22 covered prior to this incident, had you used your video

23 camera and audio to review -- your audio in conjunction

24 with the video in order to fact-check your reporting?

25     A. **Definitely.**

**116**

1      Q. The audio is just as important as the video

2  because you can get contemporaneous statements of people

3  captured by the audio that could assist you in making

4  sure you're accurate in your reporting, right?

5      A. **Yeah.  I'm a big believer in, like, raw source**

6  **material.**

7          MR. ALLEN:  I don't have any further questions.

8          (Whereupon, the deposition was concluded at

9          4:46 p.m.)

**117**

REPORTER'S CERTIFICATE

4      I, SANDRA M. LEE, a Shorthand Reporter, State of

5  California, do hereby certify:

6      That DAVID MORSE, in the foregoing deposition

7  named, was present and by me sworn as a witness in the

8  above-entitled action at the time and place therein

9  specified;

10     That said deposition was taken before me at said

11 time and place, and was taken down in shorthand by me, a

12 Certified Shorthand Reporter of the State of California,

13 and was thereafter transcribed into typewriting, and

14 that the foregoing transcript constitutes a full, true

15 and correct report of said deposition and of the

16 proceedings that took place;

17     That before completion of the proceedings,

18 review of the transcript was not requested.

19     IN WITNESS WHEREOF, I have hereunder subscribed

20 my hand this 1st day of November, 2013.

21

22

23

24  _____

    SANDRA M. LEE, CSR NO. 9971

25  State of California