# EXHIBIT C TO
# ALLEN DECLARATION

```
 1          UNITED STATES DISTRICT COURT FOR THE

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                       ---oOo---

 4   DAVID MORSE,

 5          Plaintiff,

 6   vs.                                    No. C12-5289 JSC

 7   SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
 8   Deputy Police Chief DAN HARTWIG,
     sued in his official and
 9   individual capacities,

10          Defendants.
                                        /
11

12

13

14

15            DEPOSITION OF KENTON W. RAINEY

16              (Pages 1 to 60, inclusive)

17

18            Taken before SANDRA M. LEE

19                   CSR No. 9971

20                 November 6, 2013

21

22
              Aiken Welch Court Reporters
23            One Kaiser Plaza, Suite 505
              Oakland, California 94612
24          (510) 451-1580/(877) 451-1580
                 Fax:  (510) 451-3797
25                www.aikenwelch.com
```

**10**

1  that's not part of the case.
2  BY MR. SIEGEL:
3     Q. Are you aware that David Morse filed an IA
4  complaint after his arrest on September 8th, 2011?
5     A. Yes.
6     Q. Are you aware that BART undertook an IA
7  investigation in response to his complaint?
8     A. Yes.
9     Q. Are you aware that numerous officers were
10 interviewed as part of this process?
11    A. Yes.
12    Q. Did you at one point ask that the investigation
13 be tolled?
14    A. Yes.
15    Q. Why did you ask the investigation to be tolled?
16    A. Because the litigation -- in order to render a
17 complete decision -- we don't know what else is going to
18 be discovered through additional testimony or if any
19 additional witnesses are going to appear, any additional
20 evidence going to be produced throughout this
21 litigation. And so it would be impossible from my
22 standpoint to give a fair assessment exactly what
23 occurred.
24    Q. Was your request that the investigation be
25 tolled consistent with the recommendations of the Noble

**11**

1  report?
2     A. I don't know if the Noble report looked into
3  tolling cases or not. I'm sure the Noble report gave
4  recommendations as far as how long you should try to --
5  an Internal Affairs report should take place, but I'm
6  sure -- let me back up. I think the gist of any
7  management is make sure if you're going to do any type
8  of Internal Affairs investigation you collect all the
9  evidence -- all the evidence before you render a
10 decision.
11    Q. Are you aware BART has a policy or more than
12 one policy -- back that up.
13       Are you aware that BART has policies that
14 concern the rights of media within BART facilities?
15    A. Yes.
16    Q. Are you aware that BART policies concerning
17 media do not distinguish between formal and informal
18 media?
19    A. I'm not understanding what you're asking me.
20       MR. ALLEN: I think the gist of what you're
21 trying to drive at, Mike, is simply whether or not the
22 new-wave media, the new media, is distinguishable from
23 the old mainstream media. He's more than happy to
24 answer that question.
25 BY MR. SIEGEL:

**12**

1     Q. Let me show you -- what you have in front of
2  you are the exhibits so far in this case, and we're
3  keeping them all in one stack partially because many of
4  the documents are confidential.
5        I'd like you to look at Exhibit 1, the page
6  marked at the bottom 19356. It's actually subpolicy
7  459.7. If you could open up to that page, please.
8     A. 356?
9     Q. Yes.
10    A. Okay.
11    Q. Do you see the second paragraph under the
12 subheader "The Media and Public Information"?
13    A. Yes.
14    Q. Could you read the first two sentences of that
15 paragraph, please?
16    A. "Those with the right to cover or photograph
17 demonstrations are not limited to representatives of
18 major newspapers, radio or television stations. Persons
19 who represent small newspapers or magazines,
20 free-lancers and other citizens are also entitled to
21 take notes or photographs."
22    Q. Have you seen this policy before?
23    A. Yes.
24    Q. Is this document consistent with your
25 understanding of media rights within BART facilities?

**13**

1     A. Yes.
2     Q. Have you seen -- you can actually put that
3  aside if you like.
4        Have you seen David Morse prior to today?
5     A. Yes.
6     Q. Do you know he's a journalist?
7     A. Yes.
8     Q. Do you dispute the fact he's a journalist?
9     A. No.
10    Q. When do you recall first learning about David
11 Morse or Dave Id as he's known?
12    A. I've interacted with him several times at --
13 I'm trying to think of the name of the committee. We
14 had a monthly committee that consisted of two or three
15 board directors that the police department gave progress
16 reports to on various changes, and he would come to
17 those public meetings. I interacted with him numerous
18 times, shook his hand. Every time he wanted to talk to
19 me or interview me or ask me questions about things
20 going on, I accommodated.
21    Q. And did some of these interactions occur before
22 the protest that is the subject of this lawsuit?
23    A. Absolutely.
24    Q. Did you have any negative interactions with
25 Mr. Morse?

**14**

1  A. No.
2  Q. Did you see him speak to any of these
3  committees?
4  A. At least one time in particular, yes.
5  Q. When he spoke to the committee, do you think
6  that he put aside his status as a journalist?
7  A. I think the time that I'm thinking of was after
8  the Charles Hill shooting. In my -- next year will be
9  my 35th year in law enforcement. I've interacted with
10 journalists in three states. He did something that I've
11 never seen, where he got up and gave, I guess, public
12 testimony or public comment regarding how to disarm
13 somebody that's armed with a knife. I think he talked
14 about he was some type of group home counselor and he
15 had actually done it himself.
16 Q. Why was that statement unusual to you?
17 A. Not unusual. It was unusual in that I'd never
18 seen a journalist actually get up and become part of the
19 story.
20 Q. What do you mean when you say he became part of
21 the story?
22 A. Where they actually get up and do public
23 comment and addressing a political body or oversight
24 committee. I've never seen it. My interactions with
25 journalists, they want to interview people one on one.

**15**

1  They ask very pointed questions based on background and
2  experience. But I've never seen them get up and
3  actually give testimony.
4  Q. The difference is that he was describing his
5  first-person experiences?
6  A. Giving his first-person experiences, getting up
7  and going to the mic. I had never seen that.
8  Q. Are you familiar with editorials?
9  A. Yes.
10 Q. Isn't an editorial a similar thing in that it's
11 a journalist giving an opinion?
12 A. Absolutely. I've seen editorials in newspapers
13 and magazines, but, again, I've never seen a journalist
14 or member of an editorial board actually come to a body
15 and give that editorial to a political body or oversight
16 body. I've never seen that.
17 Q. Are you aware that before the September 8th,
18 2011, protest, that is the subject of this lawsuit that
19 BART police officers identified David Morse as somebody
20 to focus on for police officers?
21 A. To focus on?
22 Q. Yes.
23 A. What do you mean?
24 Q. Are you aware that his picture was distributed
25 among BART police officers?

**16**

1  A. Yes.
2  Q. Are you aware that an intelligence officer was
3  assigned to investigate his identity?
4  A. Yes.
5  Q. When did you become aware that David Morse was
6  being investigated in this manner?
7  A. It's not so much he was being investigated. We
8  had had numerous protests disrupting service,
9  jeopardizing public safety in our downtown San Francisco
10 stations. It was very, very burdensome for us because
11 we never knew where these individuals were going to show
12 up. But based on our experience with some of the
13 interactions, two individuals in particular, when one
14 showed up or the other showed up, that's where things
15 would occur. So through intelligence, we were trying to
16 get out to our personnel "If you see one or two of these
17 guys, make sure you call the OCC. Let the incident
18 commander know where these individuals are because
19 there's probably a good chance that's where the
20 disruption is going to occur."
21 Q. What is the OCC?
22 A. Operations communications center.
23 Q. In your experience, have you ever identified a
24 journalist in this manner previously as someone that
25 would indicate where a protest would occur?

**17**

1  A. Never this similar type of experience where you
2  had a journalist and this other individual, and one
3  showed up and the other one showed up and you would have
4  that's where the protest would occur. I've never been
5  in a situation where you have multiple protests also
6  over a long period of time.
7  Q. So this was an unusual series of events?
8  A. As for me, yes.
9  Q. And is it fair to say that the series of
10 protests that occurred in the summer and fall of 2011
11 posed a substantial obstruction to BART operations?
12 A. Not only obstruction to BART operations, in my
13 professional opinion, again, it threatened public
14 safety.
15 Q. And Homeland Security became involved in these
16 protests at a certain point; is that true?
17 A. What do you mean?
18 Q. Agents who work under the Department of
19 Homeland Security participated in policing some of these
20 protests; is that correct?
21 A. I don't know.
22 Q. Are you familiar with the VIPR officers?
23 A. Yes.
24 Q. Are they related to Homeland Security?
25 A. Yes.

**18**

Q. They were involved in policing some of these protests?

A. I don't know. I don't know. I know they do come out and patrol with our personnel sometimes. I don't recall if they actually came out and worked the protest. I don't know.

Q. Prior to the protest in question, did you have any information that David Morse had violated any laws?

A. No.

Q. Did you consider him to be a protester prior to the event in question?

A. No.

Q. Did you authorize the production of an informational flier that had David Morse's picture on it?

A. Do you have something that I can look at? It sounds like you're referring to something in particular.

Q. Sure. I believe it's Exhibit 4 in your stack.

A. This is 1.

Q. Here's 4.

A. Okay.

Q. Have you seen Exhibit 4 before?

A. Yes.

Q. Did you authorize the production of this document?

**19**

MR. ALLEN: Production?

BY MR. SIEGEL:

Q. Creation.

A. I'm aware of the document. I don't know if I specifically told my personnel to produce it or if it was a deputy chief who was my incident commander over these incidents. I'm aware of it.

Q. You're aware of this document.

When you say "Deputy Chief," do you mean DC Fairow?

A. Yes.

Q. Do you believe that this document criminalized David Morse?

A. No.

Q. How do you believe BART police officers perceived this document?

MR. ALLEN: Objection; calls for speculation, lacks foundation, vague.

BY MR. SIEGEL:

Q. Are you familiar with a BOLO?

A. Yes.

Q. Do you think this document is similar to a BOLO?

A. Is it similar to a BOLO?

Q. (Attorney nods head.)

**20**

A. Our BOLOs actually say "BOLO" on it.

Q. Other than the title of the document, would you say this is similar to a BOLO?

A. It probably has the same look of a BOLO. All our bulletins do.

Q. You have many categories of intelligence bulletins?

A. And we get many intelligence bulletins as well. BOLOs -- you want to know -- they specifically say "BOLO" on it. It's usually issued when you're looking to identify certain individuals or a person because you have a photo of somebody. And based on my experience, even if you have the person's identity, you're looking for those individuals because they're involved in some kind of serious crime. This is an intelligence bulletin. Specifically because, again, as these protests went on, what we were finding is that one or two of these guys -- wherever these guys showed up on a date that a protest was supposed to take place, if one or two of these guys showed up at a station, there was a good likelihood that's where this disruption was going to occur. We wanted our personnel to know what they looked like so they could call in to our incident commander and let them know so we could shift resources.

Q. I've alluded to it in my questions.

**21**

It's true there were a series of protests in the summer and fall of 2011; is that right?

A. Yes.

Q. Some of these were called No Justice No BART; is that your understanding?

A. Yes.

Q. Some were also called Op BART or something to that effect?

A. Yes.

Q. The protest on September 8th of that year, was that the final protest in the series of protests?

A. I don't know. I don't remember.

Q. Do you recall any discussions where BART police sought to stop the series of protests?

A. Discussions with?

MR. ALLEN: I'll object as vague and overbroad.

BY MR. SIEGEL:

Q. Prior to the protest in question, did you develop a strategy that would discourage protesters from coming out again?

A. My whole position regarding what was going on, this was, in my opinion, threatening public safety, so what we were trying to do -- my direction is, one, make sure they're aware of why it threatens public safety. Not only did I -- I instructed my personnel to make sure

**22**

1  specifically Christopher Cantor was aware of the
2  activity rules because it basically spells out what
3  Penal Code laws are being violated if certain things
4  occur. I actually -- I contacted the Department of
5  Justice community relation services, and they reached
6  out on my behalf because I didn't want to have to arrest
7  anybody.
8      Q. Before September 8th, did you communicate to
9  your staff that you would like to minimize arrests?
10     A. To my staff, what I always tell everybody, a
11  good day when nobody gets hurt, we don't have to make
12  any arrests and we uphold everybody's rights. However,
13  if somebody is breaking the law, we're not supposed to
14  shy away from that.
15     Q. Do you know if a particular BART commander
16  decided to use Penal Code 369i to police the protest in
17  question?
18     A. Yes.
19     Q. Who made that decision?
20     A. Definitely a command decision, and I'm
21  responsible for that. That is the correct section to
22  use for these incidents because of what was occurring.
23  Again, that's why I was trying to reach out to the
24  individuals to let them know or try to get them to
25  understand the threat to public safety that they were

**23**

1  causing based on that behavior.
2      Q. Before this protest, had you used 369i
3  previously for demonstrations?
4         MR. ALLEN: I want to object it's overbroad.
5  BY MR. SIEGEL:
6      Q. We can focus on the summer and fall of 2011.
7         MR. ALLEN: Just for definition, what you're
8  talking about are those demonstrations that started to
9  take place midsummer of 2011 moving forward and whether
10  or not the decision was made to use 369i as the
11  violation at these protests?
12        MR. SIEGEL: Yes.
13        MR. ALLEN: Within that context.
14        THE WITNESS: Repeat the question.
15        MR. SIEGEL: Could you repeat Dale's version of
16  the question? He'll answer that one.
17        (Record read.)
18        THE WITNESS: Depending on what they were
19  doing, any applicable Penal Code section could be used.
20  369 was just one of them.
21  BY MR. SIEGEL:
22     Q. Do you know if 369i was used as the basis for
23  an arrest at any protest in the series of protests prior
24  to September 8th?
25     A. Prior, I don't know.

**24**

1         MR. ALLEN: Whether he personally knows if 369i
2  was ever used prior to September 8th, 2011?
3         MR. SIEGEL: (Attorney nods head.)
4         MR. ALLEN: Your personal knowledge.
5         THE WITNESS: I don't know.
6  BY MR. SIEGEL:
7      Q. Are you aware of Penal Code 409?
8      A. Yes.
9      Q. Are you aware that BART policies specify that
10  Penal Code 409 should be used in certain unlawful
11  assembly situations?
12     A. Yes.
13     Q. Are you aware that on September 8th
14  approximately 30 people were encircled at the same time?
15     A. Yes.
16     Q. Do you have any knowledge of why 409 was not
17  used in that circumstance?
18     A. Based on my knowledge of what occurred, 369i is
19  the correct applicable section for what happened on
20  September 8th. Yes, that would have been the correct
21  applicable section.
22     Q. Is it your understanding that some sort of
23  warning to disperse was issued prior to the arrest on
24  September 8th?
25     A. Yes.

**25**

1      Q. Are dispersal orders usually given in the
2  context of an unlawful assembly?
3         MR. ALLEN: Objection; overbroad, vague.
4  BY MR. SIEGEL:
5      Q. You can answer, to the best of your memory.
6      A. If you're talking about an unlawful assembly,
7  yes, you want to give a dispersal order. That's not
8  what was -- the section that was being used. Based on
9  individuals' behavior, they were interfering and
10  disrupting our operations, public safety by blocking the
11  fare gates. And, again, under the expressive
12  activities, and I don't know if you have that in here,
13  if you can give it to me, I can actually show you where
14  it talks about 369i.
15     Q. Okay.
16     A. Not to mention, again, something you already
17  asked me, several warnings, is my understanding, was
18  given to the individuals who were engaged in this
19  behavior.
20     Q. Did you attend the briefing for BART police
21  officers on the day of September 8th?
22     A. I don't recall.
23     Q. It's my understanding that a briefing was held
24  at the Lake Merritt police station.
25     A. Yes. A briefing would have been held. I don't

**26**

1  know if I actually popped in or not.
2      Q. Do you ordinarily attend briefings of that
3  nature?
4      A. Sometimes.
5      Q. Did you approve the operations order for that
6  day?
7      A. Do you have it?
8      Q. I believe it's Exhibit 2.
9      A. I read it, but the person who approved it is
10  the incident commander, Deputy Chief Fairow. I
11  definitely would have read it.
12     Q. Did you monitor the protest that day?
13     A. I was in and out of OCC where the command
14  center was. I didn't monitor continuously, but I would
15  come in and out and check on the progress of what was
16  going on.
17     Q. Did you give any recommendations that day to DC
18  Fairow or other command staff?
19         MR. ALLEN: Objection; vague.
20         THE WITNESS: I can't think of anything
21  specific that I told them. I would have, again,
22  reemphasized that we can't have any type of blockage of
23  the fare gates, especially during rush hours. That's
24  going to jeopardize public safety.
25  BY MR. SIEGEL:

**27**

1      Q. Did you recommend that any individuals be
2  arrested?
3      A. Any particular individuals?
4      Q. Yes.
5      A. No.
6      Q. Did you recommend that the station be closed in
7  part or in whole?
8      A. No, no, no.
9      Q. Did you recommend that demonstrators be
10  encircled at any point?
11     A. No.
12     Q. Did you monitor the police radio?
13     A. No.
14     Q. After the protest, do you recall stating that
15  David Morse is not a bona fide member of the press?
16         MR. ALLEN: Objection; vague as to time.
17  Between then and now?
18  BY MR. SIEGEL:
19     Q. Do you recall writing to DC Fairow in the days
20  after the protest that David Morse is not a bona fide
21  member of the press?
22         MR. ALLEN: Objection. That mischaracterizes
23  that e-mail.
24  BY MR. SIEGEL:
25     Q. I stand corrected.

**28**

1      Q. Would you look at Exhibit 14, please?
2      A. Marked 14?
3      Q. I'll help you find it.
4      A. Something is out of order now.
5      Q. Would you review Exhibit 14, please? In
6  particular, I'm referring to the second message in this
7  e-mail thread, which is an e-mail message sent by Benson
8  Fairow that appears to copy you.
9      A. Read the whole thing?
10         MR. ALLEN: You should read all of it.
11         THE WITNESS: Okay.
12  BY MR. SIEGEL:
13     Q. Do you recall receiving this e-mail from DC
14  Fairow?
15     A. I have a vague recollection of it.
16     Q. On the second page, DC Fairow writes at the end
17  of the paragraph at the top, quote, "To my knowledge,
18  David Id is the only person claiming to be a member of
19  the press who was taken into custody, but he was clearly
20  participating in blocking the gates and is not a
21  bonified member of the press."
22         Did you share DC Fairow's opinion that David
23  Morse was not a bona fide member of the press?
24         MR. ALLEN: At the time of this e-mail or now?
25  BY MR. SIEGEL:

**29**

1      Q. At the time.
2      A. I didn't consider him a mainstream member of
3  the press. I considered him -- I think he's a blogger.
4  But I treated him just like I treat any other member of
5  the press whenever I interacted with him.
6      Q. Are you -- I think we've already established
7  it, but you're aware that Mr. Morse filed an IA
8  complaint after his arrest?
9      A. Yes.
10     Q. And do you recall taking action to look for
11  evidence in response to his complaint?
12         MR. ALLEN: Chief Rainey specifically looked
13  for evidence?
14         MR. SIEGEL: Yes.
15         THE WITNESS: Can you, I guess, clarify? Do
16  you mean did I physically go out and seek out evidence.
17  BY MR. SIEGEL:
18     Q. Do you recall asking BART police to look for
19  video evidence of David Morse?
20     A. In regards to an IA complaint?
21     Q. Yes.
22         MR. ALLEN: Don't guess or speculate. If you
23  don't remember, you don't remember.
24         THE WITNESS: Yeah.
25  BY MR. SIEGEL:

**50**

1  asked him whether or not he directed his staff to
2  contact the District Attorney specifically in regards to
3  David Morse?
4      MR. ALLEN: Let me ask him that.
5      (Recess taken from 10:45 a.m. to 10:48 a.m.)
6      MR. ALLEN: With respect to Exhibit 33, we will
7  ask that it be sealed regardless along with Exhibit 28
8  in a separate sealed folder because it contains
9  attorney-client. But for purposes of refreshing his
10 memory to that specific question, I will allow him
11 within the limited structure of if he had any contact or
12 directed anybody to contact the DA's office regarding
13 Mr. Morse's prosecution.
14 BY MR. SIEGEL:
15     Q. Would you please answer that question?
16     A. Yes. This does refresh my memory, but it's
17 regarding whether we can interview him over this IA.
18 I'm telling my staff we need to know because he's been
19 arrested. We're going to interview him on the IA. Does
20 it pose any First Amendment issues? Because if he makes
21 any statements -- can he make any statements during the
22 IA? Is it going to jeopardize the prosecution or
23 anything like that? That's what I recall. I wanted to
24 know does this jeopardize the case.
25     Q. Did you or any of your agents encourage the DA

**51**

1  to prosecute David Morse?
2      A. No, I didn't.
3      MR. SIEGEL: I have no further questions.
4      Dale, do you have any cross?
5      MR. ALLEN: No, I don't.
6      MR. SIEGEL: While we're on the record, we will
7  agree to the separate sealing of the two exhibits in
8  question.
9      (Whereupon, the deposition was concluded at
10     10:50 a.m.)

**52**

1  REPORTER'S CERTIFICATE
2
3
4      I, SANDRA M. LEE, a Shorthand Reporter, State of
5  California, do hereby certify:
6      That KENTON W. RAINEY, in the foregoing
7  deposition named, was present and by me sworn as a
8  witness in the above-entitled action at the time and
9  place therein specified;
10     That said deposition was taken before me at said
11 time and place, and was taken down in shorthand by me, a
12 Certified Shorthand Reporter of the State of California,
13 and was thereafter transcribed into typewriting, and
14 that the foregoing transcript constitutes a full, true
15 and correct report of said deposition and of the
16 proceedings that took place;
17     That before completion of the proceedings,
18 review of the transcript was not requested.
19     IN WITNESS WHEREOF, I have hereunder subscribed
20 my hand this 19th day of November 2013.
21
22
23
24     _____
        SANDRA M. LEE, CSR NO. 9971
25     State of California