EXHIBIT E TO
ALLEN DECLARATION

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                          ---oOo---

 4   DAVID MORSE,

 5         Plaintiff,

 6   vs.                                    No. C12-5289 JSC

 7   SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
 8   Deputy Police Chief DAN HARTWIG,
     sued in his official and
 9   individual capacities,

10         Defendants.
                                         /
11

12

13

14

15             DEPOSITION OF BENSON H. FAIROW

16             (Pages 1 to 81, inclusive)

17

18             Taken before SANDRA M. LEE

19                    CSR No. 9971

20                  October 16, 2013

21

22
                    Aiken Welch Court Reporters
23                  One Kaiser Plaza, Suite 505
                    Oakland, California 94612
24              (510) 451-1580/(877) 451-1580
                      Fax:  (510) 451-3797
25                    www.aikenwelch.com
```

**6**

1  A. I didn't.
2  Q. Did you meet with your attorney?
3  A. I did.
4  Q. For approximately how long?
5  A. Approximately an hour on Monday and
6  approximately 30 to 45 minutes prior to today.
7  Q. You understand today we're here because David
8  Morse has filed a lawsuit against BART and Dan Hartwig?
9  A. I do.
10 Q. The basis for this lawsuit is Mr. Morse alleges
11 that he was arrested without probable cause on September
12 8th, 2011, and he also alleges that he was targeted for
13 arrest based on his journalistic endeavors.
14    Do you understand that?
15 A. I do.
16 Q. When did you first meet David Morse?
17 A. I don't know that we met. I saw him in a BART
18 board meeting.
19 Q. When approximately was that?
20 A. To the best of my knowledge, it was sometime
21 after July the 3rd, 2012.
22 Q. Do you remember what the subject of that
23 meeting was?
24 A. I don't remember what the agenda items were.
25 Q. Did you observe Mr. Morse after that meeting?

**7**

1  A. I do not believe so.
2  Q. So prior to today, that was the only time you
3  saw Mr. Morse in person?
4  A. I had seen him at some protests, some of the No
5  Justice No BART protests. Which ones, I can't recall.
6  I believe that's it. There may have been other times I
7  don't specifically recall.
8  Q. Approximately how many times did you see Mr.
9  Morse at a protest?
10 A. Two, three.
11 Q. What were these protests about?
12 A. Protests against -- well, there were kind of a
13 combination of protests. Initially they began as
14 protests against the officer involved in the shooting of
15 Charles Hill that occurred on the 3rd of July. Later
16 on, it became -- Anonymous became involved, and they
17 became all BART protests. I don't recall which ones,
18 but sometimes they merged together and those would have
19 been the occasions.
20 Q. These protests were approximately during the
21 summer and fall of 2011?
22 A. Yes.
23 Q. When you observed Mr. Morse at these protests,
24 what was he doing?
25 A. I don't recall. Sometimes in the crowd. That

**8**

1  would probably be the only time I would have seen him,
2  because during the protest I wasn't physically there.
3  It would have been through close-circuit TV.
4  Q. Did you have audio with that CCTV?
5  A. No.
6  Q. Were you able to recognize that Mr. Morse was
7  carrying a photo camera?
8  A. I've seen him with a camera before.
9     MR. ALLEN: Can I interrupt for a second?
10    Go off the record.
11    (Discussion off the record.)
12 BY MR. SIEGEL:
13 Q. When you were at the BART board meeting in
14 which you observed Mr. Morse, did he speak at that
15 meeting?
16 A. Yes.
17 Q. What do you recall him speaking about?
18 A. It was something about the -- I don't recall.
19 It was somehow related to the protest or the way things
20 were being handled at BART regarding the
21 officer-involved shooting. Something to that effect,
22 but I don't specifically recall.
23 Q. Did Mr. Morse speak at an appropriate time on
24 the agenda?
25 A. I would have to go back and look, but I believe

**9**

1  it was during public comment.
2  Q. He wasn't shouting out; he was speaking when it
3  was his turn?
4  A. In turn. I'm sorry. I shouldn't speak at the
5  same time. In turn.
6  Q. At what point did you become aware Mr. Morse is
7  a journalist?
8  A. I believe at that time when I saw him at the
9  board meeting.
10 Q. What do you know about Mr. Morse's journalism?
11 A. I believe he writes for Indybay on-line.
12 That's about the extent of it.
13 Q. Have you read any of his articles?
14 A. I have.
15 Q. Approximately how many?
16 A. I don't recall. Any that had to do with the
17 protest.
18 Q. How long have you been with BART?
19 A. Since March 21st, 2011.
20 Q. You weren't here when Oscar Grant was killed?
21 A. No.
22 Q. Where did you work previously?
23 A. The Oakland Police Department.
24 Q. How long were you OPD?
25 A. Since March of 1990.

### 14

1 protests.
2    Q. How would you characterize the tone of his
3 articles?
4    A. Generally negative towards the police.
5    Q. Do you feel that criticism was warranted?
6       MR. ALLEN: Objection; argumentative.
7       You can answer.
8       THE WITNESS: I don't generally engage in those
9 types of things. It's my job to allow them to happen.
10 BY MR. SIEGEL:
11    Q. To allow what to happen?
12    A. If somebody has an opinion they want to express
13 about the police negative or positive, that's their
14 right.
15    Q. How did you come across Mr. Morse's articles?
16    A. I looked them up on-line.
17    Q. Through a Google search, for example?
18    A. Initially perhaps. At some point, I bookmarked
19 Indybay.
20    Q. When do you think you started following his
21 articles in that way?
22    A. More likely than not, it would have been late
23 July, early August of 2011.
24    Q. So in the context of these No Justice No BART
25 or Op BART protests?

### 15

1    A. Yes. But some of those had occurred before I
2 took over operations for BART. So early on, it wasn't
3 my area of responsibility to be worried about it.
4    Q. When you say you took over operations for BART,
5 what does that mean?
6    A. When I initially went to work for BART PD, I
7 was assigned to the professional standards and training
8 section, which is Internal Affairs training, the admin
9 staff. That was in March of 2011. By -- I don't recall
10 the exact date -- I want to say late July or early
11 August 2011, the chief made a shuffle of the deputy
12 chiefs. I jumped into the operations seat, which Dan
13 Hartwig was prior to me. He went to support services.
14 And Jan Glenn-Davis went to professional standards and
15 training.
16    Q. And what are the duties of the operations
17 deputy chief?
18    A. I have 24/7 responsibility for all the uniform
19 services in the department, responsible for security and
20 safety in the BART system. I additionally have
21 responsibility for the detectives division investigating
22 criminal charges that come as a result of what the
23 uniformed personnel do. That's essentially it.
24    Q. And as part of your duties, do you create
25 operations orders?

### 16

1    A. I do or cause them to be created. I don't
2 always write them.
3    Q. How often do you write them yourself?
4    A. Nowadays, I do very little writing. Early on,
5 I would adjust the ones that were given to me to get
6 them kind of where I wanted them, but everybody pretty
7 much knows how we want them now. I don't do much
8 writing now anymore.
9    Q. Did you write the operations order on September
10 8th, 2011?
11    A. I was certainly involved in it. I don't know
12 that I actually wrote it. One of the lieutenants might
13 have. I was involved in approving it.
14    Q. And do you recall who co-wrote the document?
15    A. I don't.
16    Q. What would be your best guess who helped?
17    A. It would probably be Lieutenant Steve Coontz,
18 who was lieutenant over the tactical team at the time.
19    Q. Even if you don't write it, the document, is it
20 issued under your name?
21    A. Yes.
22    Q. That means you have ultimate responsibility for
23 the document?
24    A. Yes.
25    Q. What was your role on September 8th, 2011?

### 17

1    A. I was the incident commander.
2    Q. Were you C2?
3    A. I was and still am. That's a permanent call
4 sign for all of us.
5    Q. What were your duties as operations commander
6 that day?
7    A. I was the incident commander.
8    Q. I'm sorry. Incident commander.
9    A. It was overall responsibility for the events
10 that day when it came to the planned protest.
11    Q. Where were you located?
12    A. At the OCC, which is operations something
13 central. I don't know what it stands for. We just call
14 it central. It's where the -- think of an airport with
15 a control tower. It's where the trains are all
16 controlled from.
17    Q. Where is that?
18    A. Lake Merritt station.
19    Q. How did you engage with the operations that
20 day -- I'm sorry -- with the tactical plan at the Powell
21 Street station?
22    A. My job as incident commander is to maintain a
23 situational awareness of what's going on with events
24 such as this because they can be fluid. While we try to
25 plan for contingencies, we can't plan for them all. So

**26**

1  provides a limited amount of information to me when I'm
2  sitting there remotely in Oakland.
3      Q. Is it fair to say when you wrote this report,
4  you were not necessarily relying on direct knowledge?
5      A. That's true.
6      Q. You were relying on what other people told you?
7      A. True.
8      Q. I have caught up with my earlier question. I'd
9  like you to look at Exhibit 1, which has already been
10 introduced which your counsel has a copy of. From my
11 understanding of what BART has told me, this is the
12 tactical team and crowd control policy.
13     Do you recognize this policy?
14     A. Yes.
15     Q. I'd like to direct your attention to 459.7,
16 which is on the page numbered 411 by the policy number
17 or 19356 by the Bates stamp. It's entitled "The Media &
18 Public Information."
19     A. 459.7?
20     Q. Yes.
21     A. Got it.
22     Q. Would you please read the first two sentences
23 of the second paragraph of that section?
24     A. "Those with a right to cover photograph
25 demonstrations are not limited to representatives of

**27**

1  major newspapers, radio or television stations. Persons
2  who represent small newspapers or magazines,
3  free-lancers and other citizens are also entitled to
4  take notes or photographs."
5      Q. Is it fair to say that the second sentence of
6  that paragraph covers non-bona fide members of the
7  press?
8      A. Absolutely.
9      Q. Whether you're bona fide or not, you have the
10 right to report on protests occurring on BART
11 facilities?
12     A. As long as you don't break the law, yes.
13     Q. I'd like to direct your attention to the fourth
14 paragraph of that same section. It states, "Officer
15 should recognize media credentials issued by police
16 agencies or the media representative's employer as valid
17 identification."
18     Does that refresh your recollection about what
19 proper credentials would be?
20     A. It does.
21     Q. So if the credentials are issued by the media
22 organization, that's sufficient; is that correct?
23     A. Yes.
24     Q. Do you have any independent knowledge of how
25 David Morse might have blocked fare gates?

**28**

1      A. Not specific, no.
2      Q. Do you remember noticing on the close-circuit
3  TV David Morse was blocking fare gates?
4      A. Not specifically. I saw a large group
5  traveling in a circular motion. That was about it.
6      Q. Did Chief Rainey ask you to acquire video of
7  David Morse speaking at BART board of directors
8  meetings?
9      A. Not that I recall.
10     Q. Prior to September 8th, 2011, do you remember
11 having any conversation with any BART officer regarding
12 Dave Id or David Morse?
13     A. I don't have specific recollection, but I'm
14 certain that some conversations did occur.
15     Q. Who did you speak with regarding Dave Id?
16     A. I don't have specific recollections. I can
17 tell you that we were aware because of the past
18 demonstrations that where he showed up usually
19 Christopher Cantor did, too. We had an interest in
20 knowing when he arrived because he would arrive early.
21 It was a fair predictor where the protest would be.
22     Q. Who is Christopher Cantor?
23     A. He was one of the people from No Justice No
24 BART that would frequently speak out in public or give
25 press announcements, that type of thing. He was the

**29**

1  visible face of No Justice No BART.
2      Q. Did you consider him to be a leader of this
3  movement?
4      A. Perhaps. I know from my experience with
5  protests and these times that frequently there's a claim
6  of no leadership, but what is often the case is there
7  are certain individuals that will stand out. He could
8  have been. I don't have independent knowledge of it,
9  though.
10     Q. Other than the fact Mr. Morse seemed to arrive
11 around the same time as Mr. Cantor, did you have any
12 other information that Mr. Morse was a part of this
13 movement?
14     A. No.
15     Q. Did you have any knowledge that he should be
16 considered a dangerous person?
17     A. No.
18     Q. A threat to BART facilities?
19     A. No.
20     Q. Was a scribe designated for the September 8th,
21 2011, protest?
22     A. I don't specifically recall. It was a new
23 thing for BART PD, so although I always wanted one, I
24 didn't always get one because of staffing needs.
25     Q. What's the function of a scribe?

**34**

1  did this work, and if it didn't work well, what could we
2  do better next time. That's ideal.
3      Q. So what actually happened?
4      A. I don't believe there was an after-action
5  completed with this one for a couple of reasons. Again,
6  keep in mind I'm new to BART. They aren't used to
7  having maybe as in-depth an ops order as this. I'm also
8  introducing some maybe new ideas. So they weren't in
9  the mode of doing after-action plans yet. Also at this
10 time, we had back-to-back protests. I believe this was
11 the fifth, if not sixth, at this point. Kind of on a
12 weekly basis. We didn't have time. It didn't get done.
13     Q. Were you creating ops orders for each of these
14 protests?
15     A. Yes.
16     Q. How did you distribute the ops orders? If you
17 recall.
18     A. I don't do the distribution. I turn it in to
19 one of the admin staff, and it gets distributed to
20 personnel. I believe it goes to all personnel, but I
21 don't know that for a fact.
22     Q. When you say "personnel," what do you mean?
23     A. Police personnel. The department.
24     Q. Every officer in the department?
25     A. I believe so. I don't know that for a fact.

**35**

1      Q. Do you know if officers were given sufficient
2  time to review this document?
3      A. It depends when it's actually distributed, but
4  yes, I always try to make sure they have enough time to
5  review it. There's also lineups where it's discussed
6  with the command personnel there in charge.
7      Q. Who did you meet with in command staff to
8  prepare for September 8th, 2011?
9      A. I don't specifically recall. More likely than
10 not Lieutenant Steve Coontz; may have been John
11 Conneeley, another lieutenant; both commanders of the
12 tactical team.
13     Q. You didn't meet with Deputy Chief Hartwig?
14     A. I don't specifically recall, but I may have.
15     Q. Is there a regular command staff meeting?
16     A. Yes. Every Tuesday.
17     Q. Every Tuesday.
18        On the face of the ops orders we're looking at
19 here, it states date of issue 9/8/11.
20        Is that a reliable indicator of when this
21 document was issued?
22     A. I don't know.
23     Q. Is it possible it was issued before?
24     A. It is.
25     Q. I'd like to direct your attention to the last

**36**

1  page of this document -- it's the second-to-the-last
2  page, page 17.
3      A. Okay.
4      Q. The second chart here is under the heading
5  "Criminal Codes Related to Protest Activities."
6        Why is that included here?
7      A. I include that in the operations order so
8  officers when faced with crime have some idea what it
9  might be. It's an easy reference for them. It's
10 similar to a traffic officer carrying around an abridged
11 version of the Vehicle Code. It's common statutes that
12 are used in those circumstances.
13     Q. Are you aware that the tactical team and crowd
14 control policy states that mass arrests should only be
15 conducted pursuant to Penal Code 409?
16     A. I'm not aware of that.
17     Q. I'd like to direct your attention back to
18 Exhibit 1, and the page I'm looking at is under the
19 title "Arrests," 459.4, and it's on BART 19354.
20     A. Bates?
21     Q. The Bates stamp is 19354. The smaller page
22 number is 409.
23     A. Okay.
24     Q. In the third paragraph here, one of the middle
25 sentences, it states, "the only proper basis for a

**37**

1  multiple simultaneous arrest of all the individuals at a
2  demonstration is failure to disperse (409 PC)."
3        Do you see that?
4      A. I do.
5      Q. On September 8th, was a simultaneous --
6  multiple simultaneous arrest conducted?
7      A. That is not my recall. I believe multiple 369i
8  arrests were made.
9      Q. Is it your contention they were not conducted
10 simultaneously?
11     A. The detention of the group was simultaneous,
12 but then one at a time they were identified as to who
13 had actually violated the statute and taken into
14 custody. It's my understanding -- I wasn't personally
15 there -- I know it wasn't a riot.
16     Q. If there was a multiple simultaneous arrest,
17 that doesn't mean that each arrest ticket or arrest card
18 is written at the same exact time?
19     A. No. But by multiple simultaneous arrests, I
20 believe this infers that it's 409 PC, the riot, and just
21 merely the presence, being there. What we're talking
22 about here in this situation was 369i, elements of the
23 events that each individual was, as far as I know,
24 identified as having committed. The fact that they were
25 all detained at the same time, taken into custody

## Page 38

following that, I don't think fits the multiple simultaneous arrest statement that's made here regarding 409 PC.

Q. So are you distinguishing between a temporary detention and an arrest?

A. Yeah.

Q. What's the definition of "an arrest"?

A. Taking someone into custody physically or giving them a citation for a misdemeanor if they qualify for committing an offense based on the elements of that offense.

Q. How long can you be detained without being arrested?

A. A reasonable amount of time.

Q. Where do you see 449 PC in this policy; is it fair to say that it's not here?

A. I don't know.

Q. Would you consider yourself the author of the operation orders?

A. I would consider myself the approver.

Q. How many meetings did you participate in to plan for the September 8th protest?

A. I don't recall. At that point, we had been meeting fairly regularly just because the protests had been occurring so often. We would discuss it during the

## Page 39

command staff. It would be with our operations counterparts within the BART system, those who patrol the trains and the stations, that type of thing.

Q. Do you recall at one of those meetings a "Be On the Look Out" document was distributed?

A. No.

Q. I'd like to direct your attention to -- I thought we had it here -- Exhibit 4.

A. Got it.

Q. Do you recall this document?

A. I do.

Q. What is it?

A. It's pictures of Christopher Cantor and Mr. Morse. At that point, we had identified Mr. Cantor. We didn't know Mr. Morse's actual name. He was identified by his moniker, Dave Id.

Q. Is this a BOLO?

A. No. It's a document that was handed out to officers who were out there that day. Again, as you recall earlier, I mentioned that if Mr. Morse showed up, it was highly likely that that's where the protest would be, So actually if either one of them showed up. What this was created for was to allow field personnel to know what both of them looked like and to advise us when they showed up so we knew whether we would have the

## Page 40

resources in the right place or not.

Q. How is this distinguishable from a BOLO?

A. BOLOs usually have some kind of action requested, either arrest, identify, missing people if it's a missing person, a BOL for a missing person. I'm sure there's a couple I'm missing. But this was solely to provide field personnel with an idea what these two individuals looked like.

Q. Did you use a mugshot of Christopher Cantor in this BOLO?

A. I would be guessing, but it appears as though the one on the left -- upper left-hand corner is a mugshot. It could be a driver's license, though.

Q. Why was the PFN included?

A. Because he had been arrested before.

Q. How did that help to identify him?

A. I didn't need to identify him. He had already been identified.

Q. I'm saying: This document was issued to help people visually identify Cantor and Dave Id; is that correct?

A. Yes.

Q. So why is the PFN included?

A. I don't have specific knowledge of why. I can think of a variety of reasons, one being if we did come

## Page 41

in contact with them and they were taken into custody again, it would speed the process. We wouldn't have to do a record-check to know what his PFN is.

Q. So in certain ways this document is anticipating the arrest of Cantor?

MR. ALLEN: Objection. It's argumentative, calls for speculation.

THE WITNESS: No. Not at all.

BY MR. SIEGEL:

Q. Is it fair to say this document stigmatizes Cantor?

MR. ALLEN: Objection; argumentative.

THE WITNESS: No. It's for police use only.

BY MR. SIEGEL:

Q. There aren't any specific instructions on how to use this document on the document, are there?

A. No.

Q. It doesn't say use this document to identify these two people, does it?

A. No.

Q. How often does BART create a BOLO, an official BOLO?

A. Once or twice a week.

Q. And how often -- let me take that back.

Does BART create BOLOs for protests?

## 42

1    A. Not unless someone is wanted.
2    Q. What would you call this document?
3    A. I don't know that I would give it a label. I
4  don't know.
5    Q. Have you ever created something like this
6  before?
7    A. Not that I recall.
8    Q. Since this document was created, have you
9  created another like it?
10   A. No. There hasn't been a need.
11   Q. What was the need for September 8th to create
12  this document?
13   A. We knew that if either Mr. Cantor or Mr. Morse
14  appeared on a day when there was a protest scheduled to
15  occur that it was more likely than not that the protest
16  would occur where they showed up. So having early
17  intelligence that they were present was helpful in
18  determining where we were going to send resources. As I
19  recall, this particular day there was some confusion as
20  to whether they would actually be at Powell or another
21  station. It's difficult for us as a law enforcement
22  agency to mobilize enough resources to cover every
23  contingency. We try to cover them as best we can and
24  try to minimize surprises whenever possible. In this
25  case, it was going to be to our advantage to know where

## 43

1  either Mr. Cantor or Mr. Morse showed up because we
2  would be able to put our resources in that location and
3  not play catchup by having to move to another station we
4  weren't aware of.
5    Q. Did you work with Officer Dam in preparing this
6  document?
7    A. I don't know that I worked with him. I knew he
8  was preparing it.
9    Q. Did you order him to prepare it?
10   A. I may have.
11   Q. If you had to do it over again, would you
12  prepare this document in the same manner?
13   A. Yes.
14   Q. Other than this document, did you highlight
15  David Morse in any other way in advance of the protest?
16   A. Not that I recall other than maybe at briefings
17  talking about if either one of them were seen, they need
18  to alert us as soon as they were seen.
19   Q. Were you hoping to arrest Mr. Morse?
20   A. Not necessarily. I was hoping the protest
21  would be just that, a protest, that there wouldn't be
22  any law-breaking.
23   Q. Were you hoping to learn his true name?
24   A. I don't know that I gave that any consideration
25  at the time. He hadn't committed any criminal acts, so

## 44

1  I really wouldn't be interested in that.
2    Q. Who is Christopher Vogan?
3    A. That's one of our officers.
4    Q. What is his title?
5    A. Just an officer.
6    Q. Do you remember working with him with regards
7  to the protest in question?
8    A. I may have.
9    Q. What role would he play in the protest?
10   A. He and another officer -- I don't have specific
11  recall to this protest. He and another officer at that
12  time had assignments that were undercover type of
13  assignments, so I know I used them on occasion to do
14  undercover work. Basically surveillance.
15   Q. Do you remember if any undercover officer was
16  used on September 8th?
17   A. I don't specifically recall, but I may have.
18   Q. Did you utilize any confidential informants
19  that day?
20   A. I do not believe so.
21   Q. Would there be a record of such a thing?
22   A. If -- if the information that a confidential
23  informant gave were to be used in that person's arrest,
24  I would assume there would be some kind of record. I
25  don't have any recall of confidential informants being

## 45

1  used.
2    Q. During the No Justice No BART and Op BART
3  protests, you did utilize undercover officers?
4      MR. ALLEN: Objection; argumentative, lacks
5  foundation.
6      And if we're going outside of the scope of
7  September 8th, this is invading the public safety of the
8  BART patrons and the public safety obligations of the
9  BART Police Department as to how they monitor protests.
10 I'm going to instruct him not to answer short of a court
11 order in front of Judge Corley when I can discuss this
12 with her.
13     MR. SIEGEL: His testimony is that he may have
14 utilized such an officer.
15     MR. ALLEN: No. He started to answer the
16 question before I could complete my objection, and now
17 I'm telling you we can't move to strike because it's
18 there, but I'm not going to let him answer any other
19 questions regarding this.
20 BY MR. SIEGEL:
21   Q. Is there a document that would state which
22 officers worked undercover on September 8th?
23   A. Should be in the ops order.
24   Q. Can you review the ops order and point out that
25 section to me?

**70**

1  not been found as of right now. We will make due
2  diligence efforts to produce everything we said we
3  would produce.
4      MR. SIEGEL: Thank you.
5      MR. ALLEN: You're welcome.
6      (Whereupon, the deposition was concluded at
7      12:17 p.m.)

**71**

1                REPORTER'S CERTIFICATE
2
3
4      I, SANDRA M. LEE, a Shorthand Reporter, State of
5  California, do hereby certify:
6      That BENSON H. FAIROW, in the foregoing
7  deposition named, was present and by me sworn as a
8  witness in the above-entitled action at the time and
9  place therein specified;
10     That said deposition was taken before me at said
11 time and place, and was taken down in shorthand by me, a
12 Certified Shorthand Reporter of the State of California,
13 and was thereafter transcribed into typewriting, and
14 that the foregoing transcript constitutes a full, true
15 and correct report of said deposition and of the
16 proceedings that took place;
17     That before completion of the proceedings,
18 review of the transcript was not requested.
19     IN WITNESS WHEREOF, I have hereunder subscribed
20 my hand this 1st day of November, 2013.
21
22
23
24     _____
       SANDRA M. LEE, CSR NO. 9971
25     State of California