EXHIBIT F TO
ALLEN DECLARATION

```
 1            UNITED STATES DISTRICT COURT FOR THE

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                          ---oOo---

 4   DAVID MORSE,

 5         Plaintiff,

 6   vs.                                     No. C12-5289 JSC

 7   SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
 8   Deputy Police Chief DAN HARTWIG,
     sued in his official and
 9   individual capacities,

10         Defendants.
                                       /
11

12

13

14

15                   DEPOSITION OF KEN DAM

16               (Pages 1 to 49, inclusive)

17

18              Taken before SANDRA M. LEE

19                     CSR No. 9971

20                   October 16, 2013

21

22
                    Aiken Welch Court Reporters
23                  One Kaiser Plaza, Suite 505
                     Oakland, California 94612
24                (510) 451-1580/(877) 451-1580
                       Fax:  (510) 451-3797
25                      www.aikenwelch.com
```

## 10

1  computer.
2  Q. The radio, you're referring to the radio you're
3  wearing right now?
4  A. Correct.
5  Q. And the TV, what are you referring to?
6  A. So they have television broadcasting the
7  protest. It was affecting a lot of people in the Bay
8  Area, so it was televised. I would watch television to
9  monitor the protest.
10  Q. Did you also monitor BART close-circuit
11  television?
12  A. I did not.
13  Q. What were you looking at on the computer?
14  A. If I got information from SFPD, they would
15  relay that to me. I would relay information back to
16  SFPD, if necessary.
17  Q. Is that via e-mail?
18  A. It's done via e-mail. And we do have an
19  on-line kind of a chat where we can communicate.
20  Q. Is it fair to say you don't know much about the
21  demonstration itself?
22  A. Correct. I do not know.
23  Q. You have no firsthand knowledge of what
24  occurred there?
25  A. I have no firsthand knowledge.

## 11

1  Q. Did you produce any reports regarding the
2  demonstration afterwards?
3  A. I might have. Sure. I don't recall, but I
4  produced fliers, informational bulletin throughout.
5  Whatever was requested.
6  Q. Do you recall any specific reports?
7  A. I don't.
8  Q. What types of reports would you be asked to
9  create?
10  A. For example, reports of who has been arrested
11  for informational purposes.
12  Q. In your stack here are exhibits from the two
13  previous depositions in this case. If you would turn to
14  Exhibit 16.
15  A. (Witness complying.)
16  Q. Is this the type of report that you might
17  produce after a protest?
18  A. Yes.
19  Q. What is this document?
20  A. This is an informational document on the
21  protesters who have been arrested.
22  Q. Was this a document only for internal purposes?
23  A. Yes.
24  Q. Was it shared with the media?
25  A. No, it was not. In fact, there's a disclaimer

## 12

1  on the bottom "Not to be released to the general public
2  or media."
3  Q. How would you -- after you create a document
4  like this, how would you distribute it?
5  A. Via e-mail.
6  Q. Who would you send it to?
7  A. I would send it to law enforcement personnel.
8  Q. Do you have a list of all the BART PD, for
9  example?
10  A. I don't have a list personally, but I do send
11  it to law enforcement personnel. Yeah, BART police.
12  Q. If you would also look at Exhibit 4, it's in
13  the other stack and if you would keep that document in
14  front of you.
15     Do you recognize this document?
16  A. Yes, I do.
17  Q. What is it?
18  A. It's an informational bulletin that I produced.
19  Q. Is it true that Deputy Chief Fairow asked you
20  to produce it?
21  A. Yes.
22  Q. Have you ever produced a "Be On the Look Out"
23  document, a BOLO?
24  A. I have produced that.
25  Q. Is it the same format as this?

## 13

1  A. Different format.
2  Q. How is the format different?
3  A. I will put "BOLO" on the very top portion.
4  Q. Other than a different title, is it different
5  in any way?
6  A. Yes. A BOL would have more information on it.
7  For example, if a person was missing, there's a blurb on
8  person missing, BOL, contact information.
9     If the person has an active warrant or whatnot,
10  it says, "Please confirm all warrants, and this person
11  has a warrant for that." Everybody needs to be
12  confirmed before you take any action. Normally has "Do
13  not arrest or take action solely based on the
14  information that you have at the bottom."
15  Q. The difference is this document doesn't have
16  the same level of instructions?
17  A. Right. This is -- this is just an
18  informational bulletin.
19  Q. What information is this bulletin conveying?
20  A. Identification.
21  Q. Were you with DC Fairow on the day of the
22  protest?
23  A. You mean physically there during when the
24  protest happened?
25  Q. Were you in his presence?

## Page 14

 1   A. I was not in his presence while the protest was
 2   happening. I'm actually in my office. My office is
 3   actually separate from dispatch where they have the
 4   close circuit.
 5   Q. You didn't enter what they call the command
 6   room?
 7   A. DC Fairow is at the command post. I don't know
 8   exactly where he was that day. I'm in my office, and
 9   I'm monitoring things in my office.
10   Q. Before DC Fairow asked you to produce this
11   document, had you ever heard about Dave Id?
12   A. I have not.
13   Q. Had you heard of Christopher Cantor?
14   A. Yes, I have.
15   Q. In what context?
16   A. Well, I believe he's been arrested before
17   for -- for 369i at protests, causing disturbances.
18   Q. Do you know he was arrested under 369i?
19   A. I believe so. That's the common Penal Code
20   that we use, so I believe so.
21   Q. Might it also have been 409?
22   A. You know, to be honest with you, I'm not sure
23   which Penal Code they used.
24   Q. How did you go about acquiring these images?
25   A. The images are on websites. But for

## Page 15

 1   Christopher Cantor, this one could have been on CRIMS.
 2   Alameda County, they have people that have been arrested
 3   before database.
 4   Q. So the picture in the top left of this flier is
 5   a mugshot?
 6   A. I can't say for sure, honestly. I'm not sure.
 7   Q. What types of pictures would be in the CRIMS
 8   database?
 9   A. It would be mugshots.
10   Q. And you think you got it from there?
11   A. I can't be positive, to be honest with you.
12   Q. How did you find the picture of Dave Id?
13   A. I found that picture on Indybay, I believe.
14   Q. Did you capture an image from the video?
15   A. Going back, it appears that, yeah.
16   Q. When did DC Fairow give you the assignment of
17   creating this document?
18   A. Sometime during that day before the protest.
19   Q. It was the same day?
20   A. I believe so.
21   Q. Have you ever created a flier like this for a
22   protest before?
23   A. I don't recall.
24   Q. How about since you created this one; have you
25   created another one like it for any protest?

## Page 16

 1   A. I don't believe so. In fact, from my
 2   recollection, I believe the protests had gone down quite
 3   a bit since.
 4        MR. MORSE: Can I call time?
 5        MR. SIEGEL: No. That's fine.
 6   BY MR. SIEGEL:
 7   Q. How many copies of this document were created,
 8   do you know?
 9   A. I'm not positive. I know I made copies to
10   distribute during the briefing. I'm not exactly sure.
11   Q. What briefing do you refer to?
12   A. We generally have a briefing before a protest.
13   Q. Do you recall the briefing that day?
14   A. Not exactly.
15   Q. Where did it occur?
16   A. We have briefings, and I'm not sure exactly --
17   there were protests weekly, so to be honest with you,
18   there's so many protests week after week after week that
19   we've changed the briefing rooms. We can be in a large
20   conference room, in the auditorium. They can be
21   depending on which room was open. So there's various
22   places where the briefings can occur.
23   Q. Do you remember where this briefing occurred?
24   A. This one, I'm not -- to be honest with you, I'm
25   not sure. Again, there's weekly briefings for protests.

## Page 17

 1   Q. How many people are at a briefing?
 2   A. This would be a rough estimate. This is a
 3   guess. Because you have the CAP team, the tactical
 4   team, you have officers coming in that were called in.
 5   So roughly between 30 to 60 maybe.
 6   Q. You made dozens of copies pretty much?
 7   A. Right.
 8   Q. Do you recall what you said as you described
 9   this document?
10   A. No. I don't recall.
11   Q. Was somebody leading the briefing?
12   A. Yes. There was somebody else. The command
13   staff was leading the briefing.
14   Q. Who led the briefing that day?
15   A. I don't recall. It could be -- it could have
16   been the deputy chief. It could have been one of the
17   lieutenants. It could be -- it changed depending on who
18   was there.
19        MR. SIEGEL: I'd like to mark this as Exhibit
20   21.
21        (Plaintiff's Exhibit 21 marked for
22        identification.)
23   BY MR. SIEGEL:
24   Q. After you review this document, if you could
25   tell me whether you recognize this message.

**42**

1  what I'm talking about here.
2      A. Just the first page, okay.
3      Q. Do you see in this e-mail that you write, "The
4  KTVU camera guy had a live feed on the protesters the
5  whole time"?
6      A. Yes.
7      Q. Did you capture the footage from KTVU that day?
8      A. Did I record it? Is that what you're asking?
9      Q. Sure.
10     A. No. I did not record it. I watched it, I
11 believe.
12     Q. You don't know if BART has this video in its
13 possession?
14     A. I don't believe so.
15     Q. You didn't operate a computer program to
16 capture the live streaming?
17     A. No.
18        MR. SIEGEL: That's it.
19        Any cross-examination, Dale?
20        MR. ALLEN: No.
21        MR. SIEGEL: Thank you.
22        (Whereupon, the deposition was concluded at
23        2:35 p.m.)
24
25

**43**

1                REPORTER'S CERTIFICATE
2
3
4      I, SANDRA M. LEE, a Shorthand Reporter, State of
5  California, do hereby certify:
6         That KEN DAM, in the foregoing deposition named,
7  was present and by me sworn as a witness in the
8  above-entitled action at the time and place therein
9  specified;
10        That said deposition was taken before me at said
11 time and place, and was taken down in shorthand by me, a
12 Certified Shorthand Reporter of the State of California,
13 and was thereafter transcribed into typewriting, and
14 that the foregoing transcript constitutes a full, true
15 and correct report of said deposition and of the
16 proceedings that took place;
17        That before completion of the proceedings,
18 review of the transcript was not requested.
19        IN WITNESS WHEREOF, I have hereunder subscribed
20 my hand this 1st day of November, 2013.
21
22
23
24        _____
          SANDRA M. LEE, CSR NO. 9971
25        State of California