DAN SIEGEL, SBN 56400
MICHAEL SIEGEL, SBN 269439
SIEGEL & YEE
499 14th Street, Suite 300
Oakland, CA  94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
dansiegel@siegelyee.com
michael@siegelyee.com

Attorneys for Plaintiff
DAVID MORSE

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MORSE,<br><br>        Plaintiff,<br><br>   vs.<br><br>SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT (BART); and BART Deputy Police Chief DAN HARTWIG, sued in his official and individual capacities,<br><br>        Defendants. | Case No. C12-5289 JSC (DMR)<br><br>DECLARATION OF DAVID MORSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT<br><br>Hearing: February 6, 2014<br>Time: 9:00 a.m.<br>Court: F, 15th Floor<br>Judge: Hon. Jacqueline Scott Corley<br><br>Case Filed: October 12, 2012<br>Trial Date: March 31, 2014 |

I, DAVID MORSE, declare:

1.  I am the Plaintiff in this action.  I have personal knowledge of each and every fact stated in this declaration, and could competently testify thereto if called as a witness at trial.

2.  I am a journalist. I have been a member of the San Francisco Bay Area Independent Media Center, or Indybay, since May 2004.

3.  Indybay is an online newspaper, press association and wire service that generates and distributes edited audio, visual and print stories of local events for media outlets around the world and the general public. Indybay is associated with more than 150 Independent Media Center outlets worldwide, including sixty within the United States. The website receives between 20,000 and 30,000 page views on any given day. Indybay stories are syndicated by Google News. Indybay previously published a print periodical, *Fault Lines*, between June 2004 and June 2007.

4.  I began my journalism career with a monthly column in a music magazine in 1991. Since late 2002, I have focused my work on the documentation of social and political movements. I have covered hundreds of demonstrations and other public events. My reportage often requires me to attend contentious protests with large police presences.

5.  I am one of approximately one dozen members of the Indybay collective, a position I have held since May 2004. I hold a current Indybay press pass. I have consistently published stories, photographs, video, and audio to Indybay since March 2004. I variously report and edit for Indybay anywhere from twenty to forty hours a week.

6.  My reportage has been published by mass and independent media outlets alike. I have licensed footage to MSNBC, Current TV, and local television news affiliates such as ABC, NBC, and Fox, in California and elsewhere. My documentation of the demonstrations that followed the January 1, 2009, fatal shooting of Oscar Grant at the Fruitvale BART station was widely distributed.

7.  The death of Oscar Grant was an extremely impactful event for the Bay Area. Many community members were outraged. Dozens of protests were held, including

events that drew hundreds and even thousands of people. At some of these protests, riots also occurred; on two occasions, over 100 protestors were arrested. At other protests, BART services were obstructed. Numerous community organizations held related events, including town halls and other forums. Several political and high-ranking leaders lost their jobs as a result of their response (or lack thereof) to the killing. District Attorney Tom Orloff faced a recall petition and resigned his post. BART commissioned multiple investigations of its operations and decided to reorganize its police force, resulting in multiple "resignations," including the departure of Police Chief Gary Gee. BART Officer Johannes Mehserle was indicted for murder, convicted of manslaughter, and sentenced to prison.

8. As a journalist, I covered a wide array of the Oscar Grant-related protests and demonstrations that occurred at BART stations, in the streets of Oakland, and at the BART headquarters. I wrote countless reports on the "Oscar Grant movement" for Indybay. I also covered related hearings on BART police at the state capitol and attended numerous hearings on the creation of BART's new police oversight apparatus: the Civilian Review Board and Independent Auditor. Throughout the movement, I published countless photographs that demonstrated the massive public participation in both street protests and government reform efforts.

9. Many of the articles I wrote included negative facts and critical commentary concerning BART, its Board of Directors, and its police force. For example, on April 5, 2009, I published an article, "No Justice No BART Demands Accountability," that noted that, as of that time, numerous BART officials had yet to take any responsibility for the failure of its police force on January 1, 2009. Along with a written commentary,

published video footage of a protest, and included links to other information regarding the Oscar Grant movements. I also wrote:

> For a flashback on the cover-up of the murder of Oscar Grant, here's what BART was reporting to the media on January first, before video of the actual murder surfaced: "A young man allegedly involved in a fight aboard a BART train was shot to death by a BART police officer on the platform of the Fruitvale Station early New Year's Day, in the midst of a brawl . . . BART spokesman Jim Allison said the victim was not restrained when the gun discharged."

I have attached a true and complete copy of my April 5, 2009, article, stamped Morse 691-693, as Exhibit A to this Declaration. This article was embarrassing to BART officials, including its police officials, because it exposed how they had provided misinformation to the media in the aftermath of the Oscar Grant shooting.

10. My April 5, 2009, article also included information about other BART police killings. I referenced information that explained how, in 1992, BART police officer Fred Crabtree killed Jerrold Hall, who was unarmed, by shooting him in the back of the head with a shotgun. I also referenced information that explained how, in 2001, BART police officer David Betancourt killed Bruce Edward Seward, a mentally ill individual who was naked at the time. This information was also embarrassing to BART, because it tended to show that the killing of Oscar Grant was part of a larger pattern of misconduct.

11. When the State of California prosecuted BART officer Johannes Mehserle for murder, I reported on the proceedings and provided Indybay readers with access to the original court documents from the case. For example, on July 17, 2009, I published the full court room transcripts of the final three days of Mehserle's preliminary hearing. In particular, I highlighted the comments of Superior Court Judge C. Don Clay, who stated in open court, "There is no doubt that Mehserle intended to shoot Oscar Grant with a gun and not a taser," and then ruled that Mehserle should stand trial for murder. I have

attached as Exhibit B a true and complete copy of the article, stamped Morse 833 through 845. As Exhibit B shows, the article also provided links to the court transcripts themselves, which were not previously available to the general public.

12. My efforts to publicize the criminal prosecution of Johannes Mehserle were embarrassing to BART police officials because they gave Indybay readers access to details of BART police misconduct that were not otherwise accessible to the general public. To the best of my knowledge, the transcripts remain available for public review to this day, along with numerous other court and public documents related to the Oscar Grant killing that I published via Indybay.

13. On August 18, 2009, I published an article that highlighted the recently announced departure of BART Police Chief Gary Gee. I have attached a true and complete copy of this article, Morse 943 through 945, as Exhibit C to this Declaration. In this article, I criticized Gee's conduct (or lack thereof) in response to the Oscar Grant killing, noting that "Gee's officers were out of control—acting more like a racist, murdering gang than a professional police force—and Gary Gee failed to hold them accountable for their behavior." I also criticized BART General Manager Dorothy Dugger who, I wrote, was "just as culpable as Chief Gee for the failures of the BART police." In the same article, I also summarized efforts by the California Legislature to regulate BART police by creating a new oversight structure.

14. My article of August 18, 2009, was embarrassing to BART officials, including the general manager and chief of police, because I highlighted the responsibility of Chief Gee and General Manager Dugger for failing to control BART police, and also for failing to clean up the police force in the months following the Oscar Grant killing.

15. On October 27, 2009, I wrote an article summarizing California Legislative hearings concerning BART's police force. In this article, I noted that despite two completed investigations—one that found misconduct by individual officers and supervisors on January 1, 2009, and another that criticized the entire police department structure—"not a single person at BART has been accountable to date." In the article I summarized the questions asked by California Assembly members at a public hearing, and I also described the process for upcoming hearings on the BART police department before the Assembly Committee on Public Safety. I have attached a true and complete copy of this article, Morse 1103-1110, as Exhibit D. My article also included links to audio files documenting the Assembly hearing.

16. On February 5, 2010, I published an article, "Oscar Grant Family Attorney John Burris Confronts BART's Bad Faith Attacks," Morse 1316 to Morse 1320. I have attached a true and complete copy of this article as Exhibit E. The article began by noting that, although BART announced a $1.5 million settlement with the representative of Oscar Grant's daughter for his wrongful death, since that time BART had "busied itself smearing Oscar Grant's friends who were on the Fruitvale station platform with him when Johannes Mehsere [killed] him." I noted how BART's counsel in related litigation had accused Oscar Grant's friends of "contributing . . . to the tragic accident" and highlighting that Grant's friends had "significant police contacts" in the past. I also noted how BART attorneys or agents had apparently leaked confidential deposition testimony to the media in an effort to turn public opinion against the friends of Oscar Grant, who themselves maintained a civil suit for false arrest and infliction of emotional distress against BART based upon its officers' wrongful conduct on January 1, 2009.

17. My February 5, 2010, article was embarrassing for BART officials because it highlighted the hard-knuckled litigation tactics of its counsel, to the extent that its attorneys were apparently leaking confidential deposition testimony to the detriment of civil plaintiffs. My article also presented information that contradicted some of BART's public relations efforts, which were aimed at convincing the Bay Area community that it had responded adequately to the Oscar Grant killing by virtue of making payments to Grant's only daughter. Instead, as my article revealed, BART was still facing litigation from other individuals who were affected by police misconduct on the day of Grant's killing, and BART officials were not displaying a true intention to reform police officer misconduct.

18. In the course of my journalistic endeavors, I became personally acquainted with leaders of the BART organization, including its Board directors, Auditor, and police officials. On one occasion, BART Board President Bob Franklin told me that he read every report that I wrote about BART, which I published under my pen name, "Dave Id." BART's public relations team and several administrators knew me on a first name basis.

19. In particular, I had a direct relationship with BART deputy chief Dan Hartwig. Hartwig and I spoke numerous times between 2009 and 2011, to discuss the various demonstrations that occurred in connection with the Oscar Grant movement.

20. On July 3, 2011, a BART officer shot and killed Charles Hill at the Civic Center station in San Francisco. Although BART police claimed alternatively that Hill was mentally ill, intoxicated, and aggressive, agency records later showed that a BART officer killed Hill only 25 seconds after arriving on the scene.

21. In response to the Charles Hill shooting, BART facilities were hit by a new round of protests by various community groups, including a group calling itself "No Justice No BART." On multiple occasions in July and August of 2011, these groups held protests at BART facilities. On one or more occasions, BART was forced to slow the operation of its trains in response to the protests. BART also chose on one or more occasions to temporarily close stations in response to protest.

22. On July 11, 2011, I wrote an article describing pending protests in response to the Charles Hill shooting. On July 18, 2011, I wrote another article describing protests in response to the Hill shooting. In my article of July 18, 2011, I shared numerous details of how Hill was killed, including facts that indicate that the shooting was unjustified. I also noted how, "Charles Hill is the third person killed by BART police in less than three years." I have attached a true and complete copy of the July 18, 2011, article, Morse 1739 through Morse 1760, as Exhibit F to this Declaration. Included in the article were numerous photographs demonstrating the public outrage at BART police misconduct. Some of the pictures also documented the massive police response to the protests.

23. I continued to document the Charles Hill protests as they proceeded. On July 21, 2011, after BART released video footage of the shooting, I posted the video to the Indybay website. On July 29, 2011, I reported on a BART press conference concerning the Hill video footage.

24. On August 11, 2011, BART officials responded to a potential protest by shutting down the cellular phone service in one or more BART stations.

25. I reported on the BART cell phone shut down in an article published August 12, 2011. In the article, I wrote:

> The San Francisco Bay Area, historic birthplace of the Free Speech Movement and a pioneer in the digital age, is now apparently the first place in the United States to have had its electronic communications deliberately disabled in order to pre-empt a political protest. As an act of prior restraint against potential protestor free expression, the Bay Area Rapid Transit agency cut power to the underground mobile phone antennas within the BART system for several hours on August 11th, thereby denying tens of thousands of evening commuters access to broadband internet networks, telephone service, and even 911 calls.

I have attached a true and complete copy of my August 12, 2011, article, stamped Morse 1879 through Morse 1882, as Exhibit G to this Declaration.

26. In response to this cell phone shutdown, various groups called for additional protests. Among the protesters were members of a notorious Internet organization, "Anonymous," who helped organize additional protests including actions conducted on August 15, August 22, and August 29, 2011. I photographed and published articles about all of these actions.

27. On August 23, 2011, I wrote an article, "BART Hates Free Speech," Morse 1959-1961. On August 26, 2011, I wrote an article, "The Real Safety Threat? BART Encouraging Violence Against Protestors," Morse 1974-1976. Both of these articles criticized BART's response to the ongoing protests. I have attached true and complete copies these articles as Exhibit H to this Declaration.

28. Prior to the September 8, 2011, protest—in response to several disruptions of BART services due to protest activities—BART announced that protest would not be permitted in the "paid area" of its BART stations, but permitted First Amendment activity in the "free area" of its stations.

29. I arrived at the Powell Street Station on September 8, 2011, via a BART train from Oakland. As I headed towards the "free area" of the station, I learned that BART officials had closed a large portion of the station in advance of the scheduled 5:00 p.m.

protest. This forced a dense crowd of protesters, police, passengers, and media, including myself, into a relatively small section of the station.

30. I began to document the protest, including the conduct of BART police, protestors, media, and assorted bystanders, using primarily a camera that takes still photographs. I brought a video camera with me as well, but mistakenly failed to activate the camera during the majority of the action.

31. I took a total of 56 photographs over the course of one hour, from approximately thirty minutes before the demonstration formally began until a short time before I was pulled from the circle of protestors and arrested. In those 56 photos, timestamps range from 4:34 p.m. to 5:27 p.m.

32. I can determine the timestamp for each photograph by examining the metadata embedded within each JPEG file. Each photograph contains "Date Created" metadata, which is a record of the time any particular photograph is initially made, according to the internal clock in the camera. As part of my practice as a photographer, I regularly check the camera clock to verify that the timestamps are accurate. After reviewing the timestamps for the 56 photos I took during the protest, I can confirm that the timestamps correspond with my best recollection of the events that day. Also, because I regularly confirm that the clock mechanism of my camera is functioning properly, the timestamps of the photos I took accurately reflect the time elapsed between each photograph.

33. My earliest photographs that day show how BART closed part of the Powell Street Station. My photograph stamped Morse 2229, taken at 4:36 p.m., shows a BART employee who is directing passengers toward the West end of Powell Street Station. Another photo, Morse 2231, taken at 4:37 p.m., shows BART employees and police on

the train platform blocking passenger access to stairs and escalators leading toward the East side of Powell Street Station. A third photo, Morse 2237, taken at 4:42 p.m., shows BART employees blocking fare gates that lead to the East side of the station. I have attached true and complete copies of these three photos as Exhibit I to this Declaration.

34. The result of BART's actions to shut access to the East side of the Powell Street Station was that congestion was increased in the free area at the West end of the station. With the partial station closure, the West end of the station became the only accessible "free area," where BART had previously permitted protests to occur.

35. Approximately two minutes before the protest was scheduled to begin, BART Officer Coontz used a bullhorn to make an announcement. Coontz announced, "Please do not block the ticket vending machines or the fare gates. Thank you very much." My photograph, Morse 2250, taken at 4:58 p.m., documents Coontz making his announcement. I have attached a true and complete copy of this photograph as Exhibit J.

36. The actual protest began shortly after 5:00 p.m. Christopher Cantor (who goes by "Krystof"), a leader in the "No Justice, No BART" campaign, made an announcement to the assembled media. Then, after a few minutes, Cantor and several dozen demonstrators began participating in a concerted activity, chanting certain slogans and beginning to walk around the "free area" of the Powell Street Station, by Hallidie Plaza. My photograph, Morse 2254, taken at 5:09 p.m., documents Krystof and the numerous media present. I have attached a true and complete copy of this photograph as Exhibit K.

37. As the protest continued, I followed the group around, taking photographs and making observations. The protestors generally stayed in a solid clump or blob in the

middle of the free area of the Powell Street Station, Hallidie Plaza. Some of the group made nearly one complete circle around a ticket vending machine located on an island in the middle of the free area, before BART police intervened. Others among those present did not march, and simply stood in the free area.

38. I photographed Christopher Cantor walking in front of the protest at 5:14 p.m., after the group had completed approximately one half revolution around the ticket vending machine island. A true and complete copy of this photograph, Morse 2263, is attached as Exhibit L.

39. The protest itself was minimally disruptive of the BART station free area. Although the group was in the middle of the area, and comprised approximately 50 protestors and two dozen journalists, there was room in front of two different sets of fare gates in the West end of the Powell Street Station for passengers to enter and leave the train station. A substantial number of the protestors did not march, and simply stood in the free area. In addition, after the protest continued for a few minutes, BART police created a line of officers in front of the South set of fare gates in the West end of the station, with room behind them for train passengers to enter and exit the facility.

40. After the protest group had completed one circle around the ticket vending machines, BART police formed a line that prevented the protest group from advancing further. My photographs, Morse 2264 and 2265, both taken at 5:15 p.m., document the BART PD line. The photographs also show how, even though BART police had begun the process of encircling the protesters, numerous media were still present, visible in the top right of the photographs. Morse 2264 also shows some BART passengers leaving through an open fare gate. I have attached a true and complete copy of these photographs as Exhibit M.

41. At this same time or immediately thereafter, BART police formed a new line, this time in front of the North set of fare gates in the West end of the station. My photograph, Morse 2268, taken at 5:16 p.m., shows BART passengers entering the "paid area" through fare gates behind this new police line, with members of the media in the background. I have attached a true and complete copy of this photograph as Exhibit N.

42. No later than 5:20 p.m., BART police moved in on all sides of the protestors, forming a circle that enclosed between 40 and 50 people, including protestors and journalists. My photograph, Morse 2273, taken at 5:20 p.m., shows this process, including the conduct of Deputy Chief Dan Hartwig to direct the officers from behind the police line. I have attached a true and complete copy of this photograph as Exhibit O.

43. As a justification for its detention of myself and the others, BART police present stated that they were "investigating" the entire group for a violation of California Penal Code §369(i).

44. I did not participate in the protest at any time during the events of September 8, 2011. I did not issue any chants. I did not march or walk in formation with any protestor. I did not obstruct any BART facilities, such as the ticket machines or fare gates.

45. Shortly after the encirclement of myself and others, BART police issued an order, declaring that anyone in Powell Street station should leave or risk arrest.

46. Despite the dispersal order, however, I was not permitted to exit. My photograph, Morse 2276, taken at 5:23 p.m., shows that the station gates had already been closed at that time. I have attached a true and complete copy of this photograph as Exhibit P.

47. Inside of BART PD encirclement, a detained reporter from the San Francisco Bay Guardian, Rebecca Bowe, asked for a show of hands to see who among the detained individuals worked as a journalist. At least a dozens hands went up, if not more. Among those detained along with myself and Bowe was Vivian Ho, a reporter from the San Francisco Chronicle.

48. At 5:27 p.m., I held up my camera above my head to take two more photos. My photographs, Morse 2279 and 2280, were taken from inside the police encirclement, and demonstrate the presence of other photojournalists include a TV station videographer among the detainees. I have attached true and complete copies of these photographs as Exhibit Q.

49. After the dispersal order and without giving the detainees an opportunity to leave, BART deputy police chief Dan Hartwig assembled a line of police in riot gear, and began selecting individuals for arrest. Hartwig selected me as the first arrestee.

50. At the time of my arrest, I was wearing my Indybay press pass around my neck. I was holding a camera in each hand.

51. BART officer Coduti roughly grabbed me from the crowd of detainees. He placed handcuffs tightly around my wrists, and took me to the BART police substation within the Powell Street station.

52. Immediately upon placing me in a small office within the police substation, Officer Coduti asked me if I was "Dave Id." By asking this question, Coduti revealed his knowledge that I use the nom de plum "Dave Id" as a byline for articles I publish on Indybay.

53. BART detained me at the Powell Street substation for more than two hours, refusing to remove my handcuffs. My hands were handcuffed behind my back the entire time.

54. While I was detained at the substation, deputy chief Hartwig visited the location where I was held on two separate occasions. Hartwig denied that I had been singled out for arrest.

55. During my first in-custody conversation with Hartwig, he claimed that BART did not have to issue a dispersal order before making arrests. He told me something to the effect of, "Even journalists can be arrested if they break the law." I asked him how I had broken the law, but he did not elaborate.

56. During the second in-custody conversation with Hartwig, he changed his story. He now claimed that BART had issued dispersal orders. He also claimed that other journalists, in addition to myself, had been arrested.

57. While I was detained at the Powell Street Station, BART Officer Emery Knudtson subjected me to a physical search. Knudtson was a BART officer who was at the Fruitvale BART Station when Oscar Grant was killed by Johannes Mehserle. He forced me to spread my legs repeatedly. He spoke to me with a hostile attitude. When I questioned his treatment of me, he said, "Oh, you like to fight, huh?"

58. During my detention at the station, in addition to Hartwig, Rudi, and Knudtson, additional officers came in to look at me. Several picked up my driver's license, which was sitting on a desk in the room I was held. Other than to look at me and examine my driver's license, these officers did not seem to have any purpose for visiting me.

59. From Powell Street, BART police took me to San Francisco County Jail. There, I was cited with an alleged violation of Penal Code §369(i), and released.

60. BART police arrested over 20 individuals on September 8, 2011. I was the only credentialed journalist arrested.

61. As a result of BART's decision to arrest me, I was physically prevented from covering and being an eyewitness to further arrests and events that occurred at the Powell Street station following my arrest. I later learned that BART police had handcuffed at least one other journalist (who was later released at the scene without arrest or citation) and encouraged San Francisco police, on false pretense, to confiscate the City-issued press passes belonging to arrested media members.

62. On June 4, 2012, nearly nine months after my arrest, the San Francisco County Superior Court sustained a demurrer filed by my legal representative, and dismissed all charges against me. The District Attorney did not file amended charges.

63. On October 15, 2013, Deputy Chief Hartwig gave sworn testimony in regards to this case. During his deposition, I heard Hartwig state, for the first time, that I had been "marching," "chanting," and "blocking fare gates." All three of these assertions are false. I did not march, chant, or block fare gates during the protest in question.

64. I was not the only journalist present that day, and many of us stood in the Powell Street Station free area as the protest developed. Many of the other journalists, like myself, stayed close to the group of protestors, taking photographs and documenting the scene.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct to the best of my knowledge.

Dated: January 6, 2014

_____
David Morse

---

*Morse v. BART, et al.*, Case No. C12-5289 JSC (DMR)
David Morse Declaration in Opposition to Summary Judgment                    17