# EXHIBIT A

1              UNITED STATES DISTRICT COURT FOR THE

2                 NORTHERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4    DAVID MORSE,

5           Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10          Defendants.
     _____/

11

12

13

14

15            DEPOSITION OF DANIEL O. HARTWIG

16              (Pages 1 to 149, inclusive)

17

18            Taken before SANDRA M. LEE

19                   CSR No. 9971

20                 October 15, 2013

21

22

23           Aiken Welch Court Reporters
              One Kaiser Plaza, Suite 505
              Oakland, California 94612
24          (510) 451-1580/(877) 451-1580
               Fax:  (510) 451-3797
25               www.aikenwelch.com

1     Q.   Are you under a doctor's care?

2     A.   No.

3     Q.   Do you take any medications that inhibit your

4  mental abilities?

5     A.   No.

6     Q.   How much time did you spend preparing for the

7  deposition today?

8     A.   Less than four hours.

9     Q.   Did you review any documents in preparation?

10     A.   One document.

11     Q.   Which document was that?

12     A.   I believe it was Officer Coduti's report.

13     Q.   When you say "Officer Coduti's report," what do

14  you mean exactly?

15     A.   Officer Shane Coduti was the officer that took

16  Mr. Morse into custody.  And the protocol for when you

17  take a subject into custody with the BART Police

18  Department is the officer is responsible to write the

19  report.

20     Q.   Was Officer Coduti the arresting officer?

21     A.   Yes.

22     Q.   Did he make the probable cause determination

23  with regard to David Morse?

24     A.   Yes.

25     Q.   Did he rely on you to make that determination?

8

1      A.  Partially --

2           MR. ALLEN:  Objection; calls for speculation,

3    lacks foundation.

4    BY MR. SIEGEL:

5      Q.  Subject to those objections, your answer was

6    yes; is that correct?

7      A.  It may have been partially because of my

8    involvement, yes.

9           MR. ALLEN:  And just to be clear on the record,

10   if I object -- I don't think you went through that

11   admonition -- he is to answer the question after my

12   objection unless I specifically instruct him not to do

13   so.

14          THE WITNESS:  Okay.

15   BY MR. SIEGEL:

16     Q.  Other than your counsel, did you discuss this

17   deposition with anyone else?

18     A.  No.  My wife knows I'm here.

19     Q.  Always a good strategy.

20          Mr. Hartwig, I've had the -- I wouldn't say the

21   pleasure, but I've had the opportunity to review some of

22   your records, including your education records.

23          I understand you went to Brigham Young

24   University.

25     A.  I did.

9

1      Q.  That's where you received a Bachelor's degree?

2      A.  I did not.

3      Q.  Did you receive a Bachelor's degree anywhere?

4      A.  I'm two units short of my Bachelor's degree

5  currently.

6      Q.  After you attended BYU, did you attend any

7  further higher education?

8      A.  Chabot Junior College and California Lutheran

9  University.

10      Q.  While you were attending those schools, did you

11  receive any training in regards to law enforcement?

12      A.  Criminal justice major.

13      Q.  And you've since received training as a law

14  enforcement officer; is that correct?

15      A.  Yes.

16      Q.  When did you begin your training that way?

17      A.  I was at the Los Medanos Police Academy in

18  1981.  I graduated from the Los Medanos Police academy I

19  want to say in April of '82 and began my career at BART

20  Police April 24th, 1982.

21      Q.  At BART Police, did you receive training on use

22  of force?

23      A.  Yes.

24      Q.  And did you receive any training in regards to

25  respecting the First Amendment?

1       A.  Yes.

2       Q.  What training did you receive?

3       A.  As a police officer throughout my law

4   enforcement career, not only the First Amendment, we

5   received multiple training classes on those instances as

6   well as others.  They begin in the police academy.  They

7   actually began as a criminal justice major in college

8   continuing to the police academy and throughout my

9   career as a law enforcement officer with BART.

10      Q.  If you were asked to estimate -- don't guess --

11  how many trainings approximately have you received that

12  relate to the First Amendment?

13      A.  I couldn't guess or estimate.

14      Q.  More than ten trainings?

15      A.  I could not guess or estimate.

16      Q.  Are you familiar with BART Policy 346.3?

17      A.  If you could give me the verbal title, I could

18  respond to that.  The number title I am not.

19      Q.  Are you familiar with the News Media Relations

20  Policy?

21      A.  Yes.

22      Q.  This policy refers to valid press credentials.

23          What does that mean?

24      A.  Those are credentials that the press usually on

25  the scene of any incident would be in possession of to

11

1   allow them to be within that scene and location.

2      Q.  Does it matter who issues the credential?

3      A.  Doe it matter to the BART Police Department?

4      Q.  Yes.

5      A.  I don't believe it does.

6      Q.  So if a news agency issues the credential,

7   that's sufficient?

8      A.  What is required is that that person in

9   possession of that credential obeys the laws at the

10  scene of the incident.  Where the credential originates

11  from is not something that we would focus on.

12     Q.  Are you aware that the News Media Relations

13  Policy calls for a safe staging area for media?

14     A.  Yes.

15     Q.  On September 8th, 2011, was such an area

16  designated?

17     A.  There is always an area that's deemed safe and

18  designated for the media.  What we choose or what we did

19  in my career at BART was bend over backwards to make

20  sure those areas were available.

21         MR. SIEGEL:  Read back the question, please.

22         (Record read.)

23         MR. ALLEN:  I'll object that it's vague as

24  to -- if you don't mind, are we talking about the Powell

25  Street station, or are we talking about what stations

Aiken Welch Court Reporters   Daniel Hartwig   10/15/2013

12

1    where there were demonstrations planned or advertised?

2            MR. SIEGEL:   Okay.   You don't need to testify.

3    BY MR. SIEGEL:

4        Q.   At the Powell Street station, was there a media

5    staging area designated?

6        A.   There's not a specific staging area, no.

7        Q.   Were any directions given to media that you

8    know of where an appropriate place to stage would be?

9        A.   No.

10       Q.   Are you familiar with the BART policy regarding

11   dispersal orders?

12       A.   Yes.

13       Q.   What is a dispersal order?

14       A.   It's an order read, announced, to a specific

15   crowd/group that their assembly has become unlawful, and

16   within a matter of a designated time frame, they are to

17   disperse.   If they fail to do so, they're subject to

18   arrest.

19       Q.   Has BART prescribed a certain format for such

20   an order?

21       A.   Within the policy, yes, there is.   It has to be

22   read within a time frame multiple times from different

23   locations.

24       Q.   At the Powell Street station on September 8th,

25   2011, were any such orders read?

13

1      A.  Yes.

2      Q.  Do you know at what time they were read?

3      A.  Specific time --

4      Q.  During the day?

5      A.  No, I do not.  I do know that they were well

6    into the event.  I do know from locations where they

7    were read.  I do know they were read more than once.

8      Q.  To your knowledge, who read any such orders?

9      A.  Sergeant Steve Coontz.

10     Q.  Where was he located?

11     A.  The first dispersal was read from the station

12   agent's booth over the public intercom.  We determined

13   because of the size of the crowd and the noise that may

14   be a better location.  The second dispersal was read

15   from the same location approximately ten minutes after

16   the first dispersal.  The following one was made on the

17   outside of the fare gates amongst the crowd.  That's

18   what I recall.

19     Q.  And your recollection is Lieutenant Coontz read

20   the full dispersal order as recommended by BART policy?

21     A.  I know in the first two incidents from the

22   station agent's booth he did.  I know that he was -- he

23   had encountered a large number of people in volume on

24   the third attempt.  I'm not sure if the full dispersal

25   at that time was completed.

14

1      Q.  Do you know what law Lieutenant Coontz cited in

2   the dispersal notice?

3      A.  What violation?  I believe 369i of the Penal

4   Code.

5      Q.  You previously testified that you're familiar

6   with the -- scratch that.

7           Are you familiar with the Tactical Team and

8   Crowd Control Policy?

9      A.  Yes.

10      Q.  Are you aware that in regards to mass

11   demonstrations, this policy recommends Penal Code 409 be

12   used for any arrests?

13      A.  I believe there may be sections other than 369i

14   stipulated in that policy, but for this event with

15   command staff within the BART Police Department based

16   upon what we encountered, 369i was the chosen section.

17      Q.  Is it your testimony that 369i is included

18   within the Tactical Team and Crowd Control Policy?

19      A.  I do not believe that the policy restricts the

20   agency from utilizing Penal Code sections.

21           MR. SIEGEL:  I'd like to introduce Exhibit 1.

22           (Plaintiff's Exhibit 1 marked for

23           identification.)

24   BY MR. SIEGEL:

25      Q.  Is Exhibit 1 the Tactical Team and Crowd

1    Control Policy that you're familiar with?

2         A.   Yes.

3         Q.   You can take a minute to verify if you'd like.

4         A.   This is the form.

5         Q.   I'd like to direct your attention to 459.4 of

6    this policy, which is subtitled "Arrests," and which is

7    located on the number stamp BART 19354.

8              I'd like to direct your attention to the third

9    paragraph in the subsection "Arrests."   The third

10   sentence of this paragraph reads, "the only proper basis

11   for a multiple simultaneous arrest of all the

12   individuals at a demonstration is failure to disperse

13   (409 PC)."

14             Do you see the section I just read?

15        A.   Yes.

16        Q.   Why was this policy not followed on September

17   8th, 2011?

18        A.   Because the crowd that was encircled failed to

19   disperse after the dispersal announcement was made.

20        Q.   Did you arrest the entire crowd?

21        A.   There were a number of arrests made.   There was

22   determination made after the fact who was taken into

23   custody.

24        Q.   But the entire crowd failed to disperse; is

25   that true?

16

1      A.   The crowd that was encircled.

2      Q.   Is that true?

3           MR. ALLEN:   Objection; vague and overbroad.

4  BY MR. SIEGEL:

5      Q.   Did anybody within the encircled crowd

6  disperse?

7      A.   No.

8           MR. ALLEN:   Objection.   That's vague.

9  BY MR. SIEGEL:

10      Q.   It's true that you only arrested some people

11  within the crowd that failed to disperse; is that

12  correct?

13      A.   Yes.

14      Q.   On what basis did you select people for arrest?

15      A.   Violation of law.

16      Q.   Which law?

17      A.   369i PC.   And I didn't write the citations.

18  And I don't specifically recall, but the law that I

19  witnessed the violation of and the law that your client

20  was arrested for was 369i.   409 may have been an

21  additional charge.   I did not see the citations.   I

22  don't recall if those were added.

23      Q.   Is it possible that your operations order for

24  September 8th, 2011, conflicted with the Tactical Team

25  and Crowd Control Policy?

1        MR. ALLEN:  Objection; calls for speculation.

2        THE WITNESS:  I don't believe it does.

3   BY MR. SIEGEL:

4        Q.  Who approves BART Police Department policy

5   manual?

6        A.  The policy manual is put together by a third

7   agency called Lexipol that is a group of former law

8   enforcement officers, current attorneys within the state

9   of California that review, authorize, approve,

10  recommend, suggest.  The ultimate approval is from the

11  chief of police.

12       Q.  The chief of police is the last person to stamp

13  the policy manual, as it were?

14       A.  I don't know that his signature is actually on

15  the manual itself, but command staff, once that comes

16  back from Lexipol, does the final review.

17       Q.  And does the BART board of directors play any

18  role?

19       A.  The BART board of directors, I believe, have

20  access to those documents.  I believe now after January

21  1 of 2009 that the BART policy is make those documents

22  available to the board as well as police review.

23       Q.  So it's your understanding that the board is

24  not the authorizing entity for the policy?

25       A.  They are not.

1        MR. ALLEN:  Objection; calls for speculation.

2    BY MR. SIEGEL:

3        Q.  So the chief of police determines the policy

4    manual?

5        A.  The chief of police along with command staff, I

6    believe, is the correct answer.  The policy in the hands

7    of the board of directors and/or the police review, I

8    believe, meets the requirement requested from police

9    review as well as the public after January 1st, 2009.

10       Q.  If an operations order conflicts with BART

11   policy, what is the protocol?

12       A.  In my career as deputy chief, I'm not aware of

13   that situation arising.  I would imagine if that did

14   occur, there would be review of said policy.

15       Q.  Is it true that Deputy Chief Fairow issued the

16   operations order for September 8th, 2011?

17       A.  Yes.

18       Q.  Do you know if anybody reviewed his order to

19   determine if it conflicted with BART policy?

20       A.  I know I did not.

21       Q.  You gave an Internal Affairs -- you gave

22   testimony to Internal Affairs regarding Mr. Morse's

23   complaint to BART regarding his arrest on September 8th,

24   2011; is that correct?

25       A.  Yes.

1  afternoon of this situation, it was at Powell Street

2  station.

3       Q.  You were operating under an order -- the

4  operations order created by Deputy Chief Fairow; is that

5  correct?

6       A.  Yes.

7       Q.  That order at page 4 called for the immediate

8  arrest of anybody, quote, unquote, "blocking fare

9  gates."

10       Do you remember that direction?

11       A.  I don't have a copy of the order present.  At

12  your word, I will take it for it, yes.

13       Q.  What would blocking fare gates mean to you?

14       A.  Blocking and impeding the flow of traffic in

15  either direction, interfering with the direction of flow

16  either into the BART station or out of the BART station.

17       Q.  How close to a fare gate do you need to be to

18  block it?

19       A.  You can block it from multiple ends of the fare

20  gates because of the limited space at that location.

21  You could be standing in front of it unknowingly or

22  willingly and blocking that access.  You could be

23  standing to the side of it unknowingly or willingly

24  blocking that access.  You could be standing straight in

25  the middle of it unknowingly or willingly blocking that

23

1    access.

2         Q.  Did you intend to arrest anybody that was

3    unknowingly blocking the fare gates?

4         A.  No.

5         Q.  How do you determine when someone is

6    intentionally blocking a fare gate?

7         A.  We ask them to move from the area, not block

8    the fare gates to create a free flow of traffic for the

9    people utilizing the fare gates.  Those who choose not

10   to do so we determine to be willingly blocking the fare

11   gates, and those people are subject to arrest.

12        Q.  You didn't arrest all the people that were

13   blocking the fare gates; is that true?

14        A.  We arrested a group of people in violation of

15   369i based upon the interference, impediment, blocking

16   of fare gates on this occasion.  At the time of arrest,

17   they were enclosed in a circle of police officers away

18   from the fare gates.  So the actual arrest, they had

19   been moved away from the fare gates, but the violation

20   they were charged with was 369i PC, blocking, impeding

21   the flow of the fare gates, interfering with the

22   operation of the transit system.

23        Q.  And the conduct that formed the basis of your

24   369i arrest, did it occur before or after the dispersal

25   orders?

24

1      A.   It occurred before and I believe maybe at the

2   very end during the dispersal notice.

3      Q.   But not after?

4      A.   They were encircled and moved away from the

5   fare gates.   Our intention was to clear the fare gate

6   area.

7      Q.   But if they were encircled, how can they

8   disperse?

9      A.   They were -- the dispersal was read before they

10  were encircled.

11     Q.   Are you sure of that?

12     A.   Yes.

13     Q.   Have you reviewed the timeline created by BART

14  police in regards to this incident?

15     A.   The specific timelines, could you clarify that,

16  please?

17     Q.   Have you reviewed any written timeline of the

18  incident created by BART police?

19     A.   I have not.

20     Q.   Are you aware that the crowd was encircled at

21  5:20 p.m.?

22     A.   I'm not aware of the specific time that the

23  crowd was encircled.

24     Q.   Are you aware that BART police said that the

25  dispersal order was given at 5:26 p.m.?

26

1        For a dispersal notice to effectively and

2   accurately and legally be enacted, there has to be an

3   avenue of escape, an avenue of freedom to walk away,

4   which we ensured occurred on the evening of the

5   situation.  I would not -- the order to close the circle

6   came from me.  I would not give an order to close a

7   circle and then read a dispersal notice.

8        Q.  Are you aware of any documentation that would

9   support your timeline?

10        A.  I cannot rely upon documentation to support

11   something that I witnessed.  I'm not aware of

12   documentation that would have accurate timelines.  I'm

13   aware that after the fact, after the dispersal notices

14   were read and after they were failed to be adhered to,

15   the crowd was encircled.

16        Q.  Did you produce a report regarding September

17   8th, 2011?

18        A.  No, I did not.

19        Q.  Why not?

20        A.  I was the on-scene commander.  I was directing

21   officers and employees.  My role was not to be an active

22   report taker or report writer regarding this incident.

23        Q.  You were choosing people for arrest; isn't that

24   true?

25        A.  No.

Aiken Welch Court Reporters   Daniel Hartwig   10/15/2013

27

1    Q.  Didn't you choose Dave Morse for arrest?

2    A.  No.

3    Q.  Officer Coduti did so on his own volition?

4    A.  I directed Officer Coduti and Officer Jacobsen

5    to remove Mr. Morse and Mr. Krystoff from the crowd.

6    Q.  On what basis?

7    A.  That I witnessed, 369i, as well did they, what

8    Officer Coduti articulated in his report.

9    Q.  Are you sure that Officer Coduti witnessed

10   David Morse violating 369i?

11   A.  Based on what I read in the report, yes, I am.

12   Q.  Didn't he ask you to come support him at trial?

13   A.  Excuse me?

14   Q.  Didn't Officer Coduti contact you and ask you

15   to appear in court to testify why David Morse was

16   arrested?

17   A.  That's not what he asked me, no.

18   Q.  What did he ask you?

19   A.  He asked me to come to court, and I asked him

20   why.  He said because he was subpoenaed to appear before

21   the judge regarding the citation to Mr. Morse.  I said,

22   "You don't need me to be there.  Absolutely no reason

23   for me to be in court."  If I was to go to court for all

24   the arrests that occurred by BART PD, I would never be

25   at BART PD.

28

1      Q.  Did any other officer write to you and ask you

2   to appear with them to substantiate an arrest?

3      A.  No.

4      Q.  So only Officer Coduti wrote to you; is that

5   correct?

6      A.  I don't believe he wrote to me.  He came to my

7   office and we spoke.

8      Q.  You have a Blackberry; is that correct?  You

9   did have a Blackberry?

10      A.  Yes.

11      Q.  You received e-mail on that?

12      A.  On a regular basis.

13      Q.  And are you aware your attorney has turned over

14   your Blackberry records?

15      A.  I'm not aware of that, but I have no problem

16   with that.  To the best of my recollection, what I

17   recall specifically is talking to Officer Coduti in my

18   office face to face regarding this request.

19      Q.  And that's an unusual interaction between two

20   officers, is it not?

21      A.  No.

22      Q.  Why do you think he came to talk to you?

23      A.  Officer Coduti talked to me on a regular basis.

24   My policy within the BART Police Department was to have

25   my door open if I was there.  And I had occasion to

1   and signed protective order issued by Judge Corley.

2   BY MR. SIEGEL:

3       Q.  Mr. Hartwig, this document states that a press

4   conference was held on September 5th, 2011, that

5   announced the protest as the subject of this lawsuit.

6           Is that your recollection?

7       A.  What part of this document are you referring

8   to?

9       Q.  I'm sorry.  Page 2, the first sentence of the

10  first paragraph.

11      A.  Could you ask that question again?  I'm sorry.

12          (Record read.)

13          THE WITNESS:  This is Deputy Chief Fairow's

14  document.  He's the author of this.  In conversation

15  with Deputy Chief Fairow, I was aware of this, yes.

16  BY MR. SIEGEL:

17      Q.  Do you know if anyone at BART Police attempted

18  to contact the protest organizers?

19      A.  I do not know.  I know I did not.

20      Q.  Is it your understanding that BART policy is to

21  contact protest organizers in advance of the protest

22  whenever possible?

23      A.  I know that we've had -- that is the avenue

24  that we seek most often because we would like to come to

25  an agreement.  We've had conversations many times about

1    staging areas, safe areas, so on and so forth.  Yes.  I

2    do know that's part of the policy.  Did it happen on

3    this occasion, is that your question?

4         Q.  I'd have to ask her my exact question.

5             MR. ALLEN:  The question was:  Are you familiar

6    with this BART policy to meet with protest organizers?

7             THE WITNESS:  Yes.  I'm familiar with that.

8    BY MR. SIEGEL:

9         Q.  Did you meet with Christopher Cantor in advance

10   of the protest?

11        A.  Me personally?

12        Q.  Yes.

13        A.  I did not.

14        Q.  Do you know if anyone did?

15        A.  I do not.

16        Q.  Do you know who I'm referring to when I say

17   "Christopher Cantor"?

18        A.  I'm aware of Mr. Cantor.

19        Q.  Do you know if anyone met with David Morse in

20   advance of the protest?

21        A.  I do not know.

22        Q.  Do you see the paragraph on this page described

23   as "Mission"?

24        A.  Yes.

25        Q.  In the third sentence of that paragraph, it

33

1   states, "This department's policy (Policy 459) regarding

2   crowd management and crowd control is to apply the

3   appropriate level of direction and control to protect

4   life, property, system facilities and maintain public

5   peace and order and to uphold the constitutional rights

6   of free speech and assembly."

7        Do you see that?

8   A.  Yes.

9   Q.  Do you understand that that statement

10  incorporates Policy 459 into the plan for the day?

11   A.  Yes.

12   Q.  And that Policy 459 should guide police actions

13  that day?

14   A.  Yes.

15   Q.  I'd like to direct your attention to the third

16  page.  "Persons will be allowed to peacefully protest on

17  the station concourses, outside the paid area, as long

18  as they do not attempt to disrupt BART service, create a

19  safety hazard for patrons or commit other unlawful

20  acts."

21        Do you see that?

22   A.  Yes.

23   Q.  The protest that we are talking about, did that

24  occur in the paid area?

25   A.  It did not occur in the paid area.

34

1      Q.  It was in the so-called free area?

2      A.  Yes.

3      Q.  I'd like to direct your attention to the fourth

4  page, second paragraph from the bottom.

5      Just to do me a favor, would you read the first

6  three sentences of that paragraph beginning with "The

7  department will take."

8      A.  "The Department will take a 'zero tolerance'

9  approach to disruptive, unsafe and unlawful activity

10  occurring on the platform or concourse during this

11  planned protest.  Station designation signs and PA

12  systems will warn again deliberate attempts to disrupt

13  revenue service."

14      Q.  And one more, please.

15      A.  "Officers will be assigned to intervene as soon

16  as possible, making immediate arrests without prior

17  warning of protesters who block train doors, climb atop

18  trains or otherwise delay revenue service, or block fare

19  gates to prevent patron access to the system."

20      Q.  During the protest, did anyone block train

21  doors?

22      A.  No.

23      Q.  Did anyone climb atop trains?

24      A.  No.

25      Q.  Did anyone delay revenue service?

1        A.   I would say they did not.

2        Q.   Did anyone prevent patron access to the system?

3        A.   Yes.

4        Q.   Who did that?

5        A.   The protesters located in the free area

6    assembled protesting against BART willingly, knowingly

7    impeding the flow of traffic through the fare gates into

8    the system as well as exiting from the system.

9        Q.   Do you know if any patron complained about not

10   being able to access the Powell Street station?

11       A.   I know of numerous patrons standing to my

12   immediate right trying to enter into the station that

13   could not do so because of the crowd blocking the fare

14   gates.  I know of numerous patrons standing to my

15   immediate right and left at the same time when we moved

16   the people from that location thanking us for doing so.

17       Q.   BART police stood in front of the fare gates;

18   is that true?

19       A.   At one point in time, they did.

20       Q.   And that -- did that permit patrons to enter

21   and leave the system?

22       A.   There's two different manners in how they stand

23   at the fare gates.  The manner of which you're speaking,

24   they would stand in front of the structure itself

25   allowing passage through the gates.  Later when we

36

1    removed people from that location that were blocking --

2    willingly blocking that location, they covered across

3    the entire fare gate area, the structure as well as the

4    opening, blocking anybody from entering and exiting.

5         Q.  Why did you arrest the individuals in the

6    circle if BART police had already ensured egress and

7    ingress to the station?

8         A.  They were arrested for 369i PC, for interfering

9    and disrupting the BART system, blocking the passage

10   into the system.  They were arrested as well for failure

11   to disperse after the dispersal notice was read multiple

12   times.

13        Q.  How did you determine whether someone was

14   intentionally or unintentionally blocking the fare

15   gates?

16        A.  I relied upon multiple dispersal notices to

17   disperse from the area.  If you failed to do so, you

18   were subject to arrest.

19        Q.  Are you aware that San Francisco Chronicle

20   reporter Vivian Ho was detained in the circle?

21        A.  Yes.

22        Q.  Why wasn't she arrested?

23        A.  She was identified as a journalist from the San

24   Francisco Chronicle, and she was not witnessed to be an

25   active participant or a violator of law at this scene.

37

1    Q.  Mr. Morse was?

2    A.  Yes.

3    Q.  On what basis?

4    A.  He was an active participant, and he violated

5    369i PC as well as 409 PC at this scene.

6    Q.  Just to separate those two, earlier we'd

7    established that the entire crowd was blocking the fare

8    gates; is that correct?  The entire encircled crowd; is

9    that true?

10    A.  I don't know that we established the entire

11    crowd was blocking the fare gates.  I know the entire

12    crowd was actively marching in front of the fare gates

13    and failed to move from that location until the police

14    department set up a skirmish line and moved them back.

15    Q.  Including Vivian Ho, correct?

16    A.  I believe she was in that group, yes.

17    Q.  So Vivian Ho was blocking the fare gates?

18    MR. ALLEN:  Objection; argumentative, misstates

19    his testimony.

20    THE WITNESS:  I did not see Vivian Ho blocking

21    the fare gates, no.

22    BY MR. SIEGEL:

23    Q.  But she was in the crowd that was blocking the

24    fare gates?

25    A.  The area at the fare gates and the ticket

38

1    vendors at the Powell Street station is not a large

2    area, and there was a large number of people.  So when

3    we moved people back from the fare gates, that

4    included -- at that point in time, there was no lines of

5    restriction.  It was open access everywhere.  There was

6    many people that were moved back.  There was dispersal

7    notices read, and the majority of those people at that

8    time dispersed.  I believe Vivian Ho did not.

9        Q.  So why wasn't she arrested?

10       A.  She was identified as a non-active participant,

11   and she was a member -- she was a mainline journalist, I

12   believe, representing the San Francisco Chronicle, even

13   though she did not have her -- she had just gotten her

14   job and didn't have her active press pass.

15       Q.  When you say "mainline journalist," is that to

16   be distinguished from other types of journalists?

17       A.  When I say "mainline journalist," I'm referring

18   to local, state, county, sources of media, newspapers,

19   reporters, television stations, radio stations,

20   Chronicle, Contra Costa Times, KCBS, Channel 2, Channel

21   4, Channel 7.  I'm just -- that's how I designate them.

22       Q.  Are you familiar with the alternative

23   journalist?

24       A.  Yes.

25       Q.  Is an alternative journalist subject to any

1    different laws than a mainline journalist?

2        A.   No.

3        Q.   They should be treated the same?

4        A.   Sure.

5        Q.   During the protest, wasn't David Morse holding

6    a press pass?

7        A.   I believe he was.

8        Q.   He was holding one or more cameras?

9        A.   He may have been.

10       Q.   So what distinguished him from Vivian Ho?

11       A.   He was an active participant in the protest.

12   He was actively blocking fare gates, actively marching

13   with the crowd, actively interacting with Mr. Cantor,

14   who I determined through my experience with this group

15   was the active leader of the crowd.

16       Q.   So you're saying Mr. Morse associated with Mr.

17   Cantor?

18       A.   I don't know if he associated with him, but I

19   know during this event, he was an active participant

20   with Mr. Cantor.

21       Q.   When you say "active participant," specifically

22   what do you mean?

23       A.   Marching around the fare gates, around the

24   ticket vendors; blocking the fare gates; interacting

25   with police officers; interacting with Mr. Cantor.

40

1          Q.  Let's take each one of these one by one.

2              What do you mean when you say Mr. Morse was

3      marching?

4          A.  In this event, they began near the ticket

5      vendors away from the fare gates.  Met as a large group

6      most often led by Mr. Cantor.  I don't know if he had an

7      actual megaphone or if he had a magazine wrapped up, but

8      he was talking to the crowd.  And the conversation went

9      from a conversation to a chant to a mobile moving march

10     around the ticket vendor, which came around and

11     ultimately ended up in front of the fare gates and

12     continued two or three times.

13             And what would happen is as they progressively

14     marched and chanted, they would slow down at the ticket

15     vendors and at the fare gates to block and impede the

16     flow of BART patrons trying to either purchase a ticket

17     from the ticket vendor or enter or exit into the BART

18     station.

19         Q.  Is it your testimony that anybody that was

20     walking in a circle was blocking the fare gates?

21         A.  No.

22         Q.  Now, it is your testimony that Mr. Cantor is a

23     leader or one of the leaders of the protest; is that

24     correct?

25         A.  Yes.

41

1    Q.  For purposes of news gathering, isn't that the

2  person that the news agents would be most interested in?

3    A.  You would have to ask the new agents.  I would

4  assume that would be true.

5    Q.  How can you distinguish a reporter close to the

6  primary subject from a reporter that's marching?

7    A.  The reporters at the scene most often are on an

8  outer edge perimeter or in the back of the active

9  participants.  They're not usually standing side by side

10 with active leaders of the protest.  They're not usually

11 in conversation with active leaders of the protest

12 during the protest, I'm saying.  They may be afterwards.

13    They're not actively blocking fare gates as

14 what I perceived to be an active member of the protest

15 and not an active member.  Although he absolutely is a

16 journalist, but because he has a journalist pass

17 identifying himself as a journalist doesn't allow him to

18 break the law.  It allows him to be there and act as a

19 journalist.

20    What I witnessed that night, Mr. Morse did that

21 as well as block and impede the flow of patrons into the

22 station at the fare gates as well as march as well as

23 stand side by side with Mr. Cantor in the encircled

24 group.

25    Q.  You detained over ten journalist that day; is

42

1    that correct?

2         A.  I believe so.

3         Q.  Mr. Morse was the only one you arrested?

4         A.  As far as I know, correct.

5         Q.  Prior to September 8th, a "Be On the Look Out"

6    bulletin was issued that identified Mr. Morse; is that

7    correct?

8         A.  I was made aware of that fact after September

9    8th, yes.

10        Q.  Prior to September 8th, had you ever arrested

11   Mr. Morse?

12        A.  No.

13        Q.  Had you ever observed him committing any

14   unlawful conduct?

15        A.  No.

16        Q.  But you knew him?

17        A.  Yes.

18        Q.  How did you know him?

19        A.  My interaction with Mr. Morse goes back to when

20   I was manager of security programs in the general

21   manager's office.  And most often, our interaction took

22   place at the BART boardroom during board meetings.

23        Q.  You knew that Mr. Morse published articles

24   about these events he attended?

25        A.  I assumed he did.

43

1      Q.   You read some of these articles; is that

2  correct?

3      A.   When I returned to the police department, I

4  did.

5      Q.   Some of these articles were critical of BART

6  police; is that correct?

7      A.   Yes.

8      Q.   Is it true you discussed with other BART

9  officers Mr. Morse's articles?

10      A.   I specifically personally did that?

11      Q.   Did you?

12      A.   No.

13      Q.   Never?

14      A.   Maybe with Deputy Chief Fairow, Chief Rainey,

15  but with officers, I did not have that conversation, no.

16      Q.   Why was Mr. Morse identified by BART police in

17  advance of the protest?

18      A.   Mr. Morse is an information source that our

19  Intel officer and Deputy Chief Fairow relied upon

20  information they obtained from the blog that he would

21  put his information out on.  I found that site to be the

22  most accurate calendar of protest events within the BART

23  property that I felt I had an obligation and the

24  responsibility to be informed upon.  That's why I

25  utilized that site.

44

1      Q.  So you knew Mr. Morse because of his

2  news-gathering activities?

3      A.  That was one of the reasons why I knew him,

4  yes.

5      Q.  And you were able to identify him on September

6  8th because of his news-gathering activities?

7      A.  That was one of the reasons why I was able to

8  identify him, yes.

9      Q.  Did you ever know him in any other context

10  other than his conduct as a reporter?

11      A.  I've witnessed him as a reporter, as a citizen

12  within a BART board meeting.  I've noticed him in the

13  system.  We've passed walking with each other.  I've

14  noticed him in many other categories other than his

15  journalism alone.

16      Q.  But you first got to know him through his

17  journalism?

18      A.  I guess that's correct, yes.

19      Q.  Are you familiar with many reporters in the Bay

20  Area?

21      A.  Yes.

22      Q.  Could you identify Vivian Ho by sight?

23      A.  I think I could.

24      Q.  How about Rebecca Bowe?

25      A.  Rebecca?

46

1           (Recess taken.)

2      BY MR. SIEGEL:

3           Q.   Mr. Hartwig, after the break, would you like to

4      update any of your previous testimony?

5           A.   No.

6           Q.   Can you please describe all the specific facts

7      that gave you probable cause to arrest David Morse?

8           A.   I witnessed David Morse being an active

9      participant of the protest at the Powell Street BART

10      station, which included marching in a circular fashion

11      around the ticket vendors, blocking the fare gates,

12      impeding the flow of patrons entering and exiting the

13      BART station.

14           Q.   Marching in and of itself is not illegal,

15      correct?

16           A.   Correct.

17           Q.   Marching can be a legitimate expressive

18      activity?

19           A.   Correct.

20           Q.   And picketing is an expressive activity as

21      well; is that correct?

22           A.   Correct.

23           Q.   BART policy manuals state that picketing is a

24      First Amendment activity?

25           A.   Correct.

47

1    Q.  So marching in a circle is not a reason to
2  arrest David Morse?
3    A.  In and of itself?
4    Q.  Correct.
5    A.  No.  When it blocks the flow of patrons and it
6  blocks fare gates, we have a violation involved.
7    Q.  So really you're saying David Morse blocked
8  fare gates and blocked patrons?
9    A.  Yes.
10    Q.  And when you say he blocked fare gates, do you
11  mean that he stood still in front of the fare gates?
12    A.  Either in front of the fare gates, partially in
13  front of the fare gates, in front of the patrons,
14  impeded the flow of the direction of patrons into and
15  out of the station, yes.
16    Q.  You're not permitted to arrest people en masse;
17  rather you're required to make a probable cause
18  determination for each individual you would like to
19  arrest?
20    A.  The only time en masse per that policy is a
21  specific violation of 409.  Other than that, there has
22  to be a probable cause attached to that arrest, which I
23  believe we had with Mr. Morse.
24    Q.  In your mind, is there a particular moment
25  where you can remember David Morse standing in front of

48

1  the fare gates?

2       A.  No.

3       Q.  Is there any particular action you remember

4  between David Morse and any BART patron?

5       A.  I remember Mr. Morse being an active

6  participant in the protest that marched around the

7  ticket vendors, that blocked the fare gates at the

8  Powell Street station repeatedly.  During dispersal

9  announcements, after dispersal announcements, the

10  activity continued.

11       Q.  Is it your testimony that no other journalist

12  walked with the protesters?

13       A.  I think many walked with them.  Did I witness

14  them being active participants, blocking fare gates, no,

15  I did not.

16       Q.  Everybody that was walking in the circle was

17  blocking fare gates; is that true?

18       A.  No.

19       Q.  Explain what you mean.

20       A.  You can walk in a circle and stay totally away

21  from the fare gates and the ticket vendors and impede

22  nobody.  That's not what happened.

23       Q.  Approximately how many people were within the

24  circle?

25       A.  50, 60.

49

1      Q.  And out of those, how many, approximately,

2   blocked the fare gates?

3      A.  I don't know.

4      Q.  Was every person that blocked the fare gates

5   arrested?

6      A.  As far as I know, yes, they were.

7      Q.  How many officers were making observations to

8   determine who should be arrested?

9      A.  I believe there were arrest teams on the outer

10  perimeter of the fare gate/ticket vendor area.  Specific

11  numbers, I'd have to refer to the operations order.

12     Q.  From your recollection today, how many officers

13  selected individuals for arrest?

14     A.  Specific numbers, I'd have to refer to the

15  order.  I couldn't guess.

16     Q.  Who arrested Christopher Cantor?

17     A.  I believe it was Arthur Jacobsen, to the best

18  of my recollection.

19     Q.  You're aware that a BART police officer killed

20  Charles Hill in 2011?

21     A.  Yes.

22     Q.  You're aware that the protest on September 8th,

23  2011, came out of that killing in part?

24     A.  I was involved with so many protests on BART

25  property, I didn't -- specifically what it was attached

50

1    to, I didn't know at the time.

2        Q.  This might test your memory, but how many

3    protests on BART property have you been involved in?

4        A.  In 31 years?

5        Q.  Yes.

6        A.  Many.

7        Q.  Maybe over a hundred?

8        A.  Over a hundred?  I don't know if it's over a

9    hundred, but it's a lot.

10       Q.  How many times can you remember an operations

11   order governing an anticipated protest?

12       A.  Those orders originated after 9/1/2009.  So

13   anytime we had a demonstration, protest, gathering where

14   there was going to be police involvement on BART

15   property, there was an operations order that was put

16   out.

17       Q.  Prior to that, how would you prepare for a

18   protest?

19       A.  We had what was recognized as an operations

20   order but was not as thorough or as developed as the

21   current process, which evolved from events after January

22   1st of 2009.

23       Q.  Was it your practice as BART police to identify

24   protest leaders in advance?

25       A.  To the best we could, yes.

57

1          Q.  Who would know such information?

2          A.  I would refer to the incident commander.

3          Q.  Did BART police meet prior to September 8th to

4     discuss the operations order?

5          A.  Prior to the 8th, I believe it was issued by

6     Deputy Chief Fairow via e-mail.  I believe he dropped a

7     hard copy off at my desk.  It was reviewed.  And

8     actually on the day of the event, there was a meeting

9     with the involved officers prior to the event in which

10    it is reviewed by all involved.

11         Q.  Who is expected to read the order?

12         A.  I was not at that meeting.  Most often it is

13    the incident commander that reads it or his designee.  I

14    don't know who read it that day.  I was not at the

15    meeting.

16         Q.  Is every officer working that day expected to

17    be familiar with the contents of this order?

18         A.  Yes.

19         Q.  How do they become familiar?

20         A.  It's issued to them at that meeting.

21         Q.  In paper form?

22         A.  Yes.

23         Q.  They're given time to read it?

24         A.  Yes, sir.

25         Q.  You recall only one meeting to prepare for the

63

1      Q.  What is a BOLO?

2      A.  Be on the look out for.

3      Q.  What is it used for?

4      A.  Information.

5      Q.  When is a BOLO issued?

6      A.  Specifically issued?

7      Q.  (Attorney nods head.)

8      A.  Patrol officers, officers trying to

9   locate/identify somebody.

10     Q.  A criminal?

11     A.  Could be.

12     Q.  Usually?

13     A.  Could be.  Could be an at-risk citizen,

14   juvenile, adult.  Could be a person of interest.  And it

15   could be a criminal.

16     Q.  During your tenure at BART, how often were

17   BOLOs issued?

18     A.  Weekly.  Most often through the detective

19   bureau.

20     Q.  How many BOLOs would be issued a week on

21   average?

22     A.  I couldn't begin to imagine.

23     Q.  One to ten, one to a hundred?

24     A.  One to ten.

25          MR. SIEGEL:  Exhibit 4, please.

64

1          (Plaintiff's Exhibit 4 marked for

2          identification.)

3    BY MR. SIEGEL:

4          Q.  Have you seen this document before?

5          A.  I have.

6          Q.  When did you see it?

7          A.  I believe it was in the latter weeks of

8    September after the event.  I believe it was part of an

9    e-mail that was initially distributed from Deputy Chief

10   Fairow.  I did not open this portion.  Deputy Chief

11   Fairow provided me a hard copy of the ops order.  I

12   believe this was in the e-mail, but I did not open it at

13   the time.

14         Q.  Were you involved in any way in the creation of

15   this BOLO?

16         A.  I was not.

17         Q.  This is a BOLO, correct?

18         A.  This is not what I would determine as a BOLO.

19   The BOLOs that I'm familiar with specifically say that,

20   "Be on the look out for."  I don't see that here,

21   anywhere here.  I think the admonition at the bottom of

22   this document describes what it is.  It's informational

23   use for law enforcement.  I don't know -- this is not

24   what I would determine to be a BOLO that I would be

25   familiar with.

66

1       Q.  So do you think if a person is described by

2  their PFN, that's indicating they're suspected of

3  criminal activity?

4       A.  That means to me he was arrested at one time

5  and issued a PFN through Alameda County.

6       Q.  Why do you think that information was included

7  in this document?

8       A.  I do not know.

9       Q.  Did you speak with Deputy Chief Fairow about

10  David Morse prior to September 8th?

11       A.  Prior to September 8th, I didn't know David

12  Morse.  I knew Dave Id.

13       Q.  Did you speak with Fairow about Dave Id?

14       A.  I'm sure I did, yes.

15       Q.  What do you recall about those conversations?

16       A.  Deputy Chief Fairow came to our agency after

17  I'd been there for a substantial amount of time.  It was

18  informational.  He would ask me stuff like "Who is this

19  person?  How do you know this person?"  And I believe

20  the context of the conversation regarding Mr. Id was

21  just that.  I gave him the information I shared with

22  you.

23       My initial contact with Mr. Morse was through

24  my position as manager of security programs in the board

25  room.

71

1   A. I do not specifically recall.  Late afternoon

2 between 4:30 and 5:00.

3   Q. Do you recall that the demonstration was

4 scheduled to begin at 5:00?

5   A. I don't specifically recall the time.

6   Q. Was it your decision to deploy officers to the

7 fare gates that day?

8   A. Yes.

9   Q. To create a line of officers in front of the

10 fare gates?

11   A. Yes.

12   Q. It was your decision to close the circle?

13   A. Yes.

14   Q. Why did you close the circle?

15   A. The dispersal notices had been read multiple

16 times.  Avenues to leave the location had been provided.

17 And I'd come to the determination that the people that

18 were within the circle had made a willful choice to stay

19 there and we had run our course.  We had partially

20 closed that station and it was time to take people into

21 custody.

22   Q. You later determined that you were wrong in the

23 sense that some of the people had not willingly decided

24 to stay?

25     MR. ALLEN:  Objection.  That's argumentative,

72

1    misstates his testimony.

2          THE WITNESS:  I never determined that.

3    BY MR. SIEGEL:

4        Q.  You determined that some people should be

5    released?

6        A.  Yes.  I determined -- go ahead.

7        Q.  How do you reconcile that with your

8    determination that the crowd was willfully remaining?

9        A.  There were people within that circle that were

10   represented as journalists that had not violated the

11   law.  Once we were able to determine who those people

12   were and not involved with those violations, they were

13   identified and released.

14       Q.  You selected David Morse for arrest; is that

15   true?

16       A.  I selected --

17          MR. ALLEN:  Objection; asked and answered.

18          THE WITNESS:  I selected David Morse to be

19   removed from the inner circle.

20   BY MR. SIEGEL:

21       Q.  At that point, he was already detained?

22       A.  Yes.

23       Q.  And what was your intention by removing him

24   from the circle?

25       A.  To have him removed and taken to the backroom

73

1    at the Powell Street station and processed.

2        Q.   For arrest?

3        A.   That determination I did not make.

4        Q.   What processing did you intend to happen?

5        A.   They have to be identified, cited and/or

6    arrested and transported.  I made the determination to

7    have him removed from the circle.

8        Q.   Who made the determination to cite him?

9        A.   Officer Coduti did, and I absolutely support

10   the reasons he did so.

11       Q.   What was he cited for, do you recall?

12       A.   I believe 369i, and 409 may have been a part of

13   369i PC.

14       Q.   And he was cited for an infraction; is that

15   correct?

16       A.   I don't recall the citation.

17       Q.   Is it normally the policy of BART to cite and

18   release people who are cited for an infraction?

19       A.   It can be.

20       Q.   Can you recall an incident when someone was

21   cited for an infraction and taken to jail?

22       A.   I can't specifically recall.

23       Q.   Is it your testimony that Officer Coduti

24   decided to arrest David Morse?

25       A.   The arrest of David Morse occurred when he was

74

1    being processed.

2         Q.  And Officer Coduti processed Dave Id?

3         A.  He was part of that process.  There were

4    supervisors back there as well.

5         Q.  Who were the supervisors?

6         A.  I would have to refer to the ops order.  You

7    understand that the location of the scene and the

8    backroom was quite some distance at the Powell Street

9    station.

10        Q.  Is charging a separate event from arrest?

11        A.  Absolutely.

12        Q.  So charging occurs before or after arrest?

13        A.  After.

14        Q.  So am I right that Mr. Morse was detained,

15   processed, cited, arrested and then charged; is that the

16   sequence?

17        A.  Arrested, transported.  Ultimate charges go

18   through the DA's office.

19        Q.  An officer doesn't charge Mr. Morse?

20        A.  No.  Cites.

21        Q.  Cites.

22        A.  Based upon his probable cause.

23        Q.  You visited Mr. Morse while he was detained at

24   the Powell Street substation; is that correct?

25        A.  I responded to the office location where Mr.

1    Morse was being detained, yes.

2         Q.  Why did you respond to the office?

3         A.  They were formulating a group to be transported

4    to San Francisco jail for booking.  There was an

5    identification issue with one of those people in that

6    group.

7         Q.  Not Mr. Morse?

8         A.  He was not the person in question, no.

9         Q.  Did you come back to see Mr. Morse again while

10   he was at Powell Street substation?

11        A.  I walked through the same office location after

12   determining -- dealing with the first issue and seeing

13   Mr. Morse sitting in a chair in the office.

14             MR. SIEGEL:  I'd like to mark the next one.

15             (Plaintiff's Exhibit 5 marked for

16             identification.)

17   BY MR. SIEGEL:

18        Q.  Mr. Hartwig, are you familiar with this

19   document?

20        A.  I am not.  I'm taking it for what it is.

21        Q.  Is a timeline a typical document prepared by

22   BART PD?

23        A.  It can be.

24        Q.  Under what circumstances is a timeline created?

25        A.  After the fact for investigation purposes,

76

1   verification, information, all of the above.

2       Q.  Do you know who prepared this timeline?

3       A.  I do not.

4       Q.  Who ordinarily would prepare a timeline?

5       A.  It would come from the communications -- the

6   communications supervisor within the BART Police

7   Department.

8       Q.  Who was the communications supervisor during

9   the protest?

10      A.  Jason DeVera, D-e-V-e-r-a.

11      Q.  How does the communications officer create the

12  timeline?

13      A.  He pulls the tapes of the event and types in

14  his interpretation of what he hears.

15      Q.  When you say "tapes," are you referring to

16  audiotapes?

17      A.  Yes.

18      Q.  Any other tapes?

19      A.  No.  The audiotapes come from the CAD system

20  which provides a timeline.

21      Q.  What does CAD stand for?  I believe you might

22  have already told me.

23      A.  I knew for 31 years.  Right now,

24  communication...

25          MR. ALLEN:  Computer-assisted dispatch.

1       THE WITNESS:   Computer-assisted dispatch.

2    BY MR. SIEGEL:

3       Q.  Is there any process to correct a timeline if

4    it contains erroneous information?

5            MR. ALLEN:   Objection; calls for speculation,

6    lacks foundation.

7            THE WITNESS:   I would imagine there is.   It

8    would go back to those same --

9            MR. ALLEN:   Don't guess.   Do you know or don't

10   you know?

11           THE WITNESS:   You would refer to the

12   audiotapes.

13   BY MR. SIEGEL:

14       Q.  Have you ever participated in revising a

15   timeline?

16       A.  No.

17       Q.  I'd like to direct your attention to the first

18   page of this document.   The third line reads "1645,"

19   which I assume is 4:45 military time.

20       A.  Correct.

21       Q.  S56 reports.   Is S56 Sergeant 56?

22       A.  Yes.

23       Q.  Do you know who that is?

24       A.  I would have to refer to the order.

25       Q.  To the best of your knowledge, why is S56

1      Q.  If Mr. Morse has a critical view of BART

2    management, he can nevertheless be a journalist,

3    correct?

4      A.  He can absolutely be a journalist with a

5    critical view of BART management.

6      Q.  And if he spoke at a public hearing about BART,

7    that wouldn't prevent him from being a journalist, would

8    it?

9      A.  No.

10      Q.  What information does an officer need to make

11    an arrest under 369i?

12      A.  That 369i was violated and the party involved

13    was the violator.

14          MR. SIEGEL:  Next in order.

15          (Plaintiff's Exhibit 8 marked for

16          identification.)

17    BY MR. SIEGEL:

18      Q.  I'll represent to you this is a photograph that

19    was taken by the San Francisco Chronicle.

20          Do you recall at what point in the protest this

21    picture was taken?

22      A.  This is when we moved the crowd from the direct

23    area of the fare gates, which is located behind the

24    officers.

25      Q.  And on what side of the officers is the crowd

85

1    that you're referring to?

2        A.  The officers were standing in front of the fare

3    gates in the free area.

4        Q.  The crowd is to the left of the officers?

5        A.  Correct.  And it looks like media and other

6    persons behind the officers.

7        Q.  At this point in the protest, nobody is

8    marching, correct?

9        A.  Correct.

10       Q.  And at this point in the protest, there are

11   numerous media interspersed in the crowd; is that

12   correct?

13       A.  I would assume so, yes.

14       Q.  Including numerous media that are standing

15   directly next to Mr. Cantor; is that correct?

16       A.  I would have no way of identifying who those

17   people are standing next to Mr. Cantor.

18       Q.  Do you see Dave Id in this picture or David

19   Morse?

20       A.  I do not.

21       Q.  Is it your contention that Mr. Morse was with

22   Mr. Cantor during the entire protest?

23       A.  No.

24       Q.  Just at some moments?

25       A.  Yes.

86

1     Q.   That other people were with Mr. Cantor at other

2   moments?

3     A.   Yes.

4     Q.   Did you arrest everyone who stood next to Mr.

5   Cantor?

6     A.   No.   I do not believe so.

7     Q.   How did you distinguish Mr. Morse from the

8   other people?

9     A.   Active participants in the protest blocking and

10   violating 369i PC.

11     Q.   In this picture, BART police officers are

12   blocking the fare gates; is that correct?

13     A.   Correct.

14     Q.   A protest is not required to take out a permit,

15   is it?

16     A.   At BART?

17     Q.   (Attorney nods head.)

18     A.   I believe there's a media section at BART that

19   requires any event that occurs on BART property be

20   directed through them for permission for safety

21   purposes.   And I do not believe it was an enforced

22   section by the BART Police Department.

23     Q.   A protest can continue without a permit; is

24   that correct?

25     A.   Based upon determination of who is in charge at

1   a one-word answer, that he did not communicate to

2   Mr. Cantor.  You want him to explain why he violated the

3   policy.  It's argumentative --

4           MR. SIEGEL:  Let's try again.

5           MR. ALLEN:  -- and he's saying he didn't

6   violate the policy.

7   BY MR. SIEGEL:

8       Q.  As simply as I can ask it, how is it possible

9   that you followed policy but did not attempt to

10  establish communication with Mr. Cantor?

11          MR. ALLEN:  Object.  That's overbroad and

12  vague.

13          You can answer the question if you understand

14  it.

15          THE WITNESS:  I never recognized Mr. Cantor as

16  the organizer or planner.  I knew he was a

17  self-proclaimed leader of this group.  I've never had,

18  to the best of my recollection, a conversation with Mr.

19  Cantor in over probably 20 protests that he and I were

20  standing next to each other side by side.

21  BY MR. SIEGEL:

22      Q.  Isn't it true that BART police identified Mr.

23  Cantor as the protest organizer?

24      A.  No.

25      Q.  Isn't it true that BART police identified David

1    Morse as Mr. Cantor's sidekick?

2         A.  Yes.

3         Q.  Isn't it true that BART police identified

4    Mr. Morse as the secondary subject?

5         A.  I'm not sure.  Secondary subject, what are you

6    referring to?

7              MR. SIEGEL:  What time do you want to take

8    lunch?

9              MR. ALLEN:  Go off the record.

10             (Recess taken.)

11   BY MR SIEGEL:

12        Q.  Mr. Hartwig, I'd like to go back to a previous

13   exhibit, the timeline which is marked as Exhibit 5 in

14   your stack there.  At this point, because you've

15   testified you did not previously review this document, I

16   would like you to take a little bit of time to silently

17   review the first two pages.  Let me know after you've

18   reviewed those first two pages.

19        A.  Okay.

20        Q.  Earlier you testified that you did not create

21   this document, that it may have been created by a

22   communications officer.

23             With that said, is this timeline an accurate

24   rendition of the events at the protest?

25        A.  I would have no idea.  You would have to talk

1    to the communications supervisor Jason DeVera, who, I

2    believe, and I'm absolutely not sure, is the author.

3         Q.   Is it true that sergeants were reporting over

4    the radio when plaintiff David Morse arrived at the

5    protest?

6         A.   According to this document, that was stated,

7    yes.

8         Q.   And do you recall anything that would

9    contradict this document?

10         A.   No.

11         Q.   Is it true that you as S4 made an announcement

12    to the crowd at approximately 5:23?

13         A.   No.

14         Q.   That part is false?

15         A.   That did not happen.

16         Q.   And is it true that at 5:25 everyone in the

17    middle of the circle was legally detained?

18         A.   You would have to ask the interpretation of the

19    author.  I don't know what is meant by that

20    interpretation.

21         Q.   Do you know anything at this time that would

22    contradict that assessment?

23         A.   You would have to talk to the author.  At 1725

24    per that lieutenant, I don't know what he said and how

25    it was interpreted.  You would have to talk to the

94

1    involved parties.

2         Q.   Do you remember anything right now that would

3    contradict the idea at 5:25 p.m. the circle closed?

4         A.   I can't -- I would have to look at the actual

5    CAD readout itself.   I can't say specifically what

6    happened at that time based on this document.

7         Q.   Or based on your current recollection?

8         A.   Correct.

9         Q.   This document says that at 1726 a sergeant

10   reported that the station was being closed and the

11   dispersal order was being given.

12             Is that an accurate statement given your

13   recollection?

14        A.   No.

15        Q.   What is your recollection?

16        A.   Again, referring back to my previous testimony,

17   it would make no sense to close the station and then

18   read a dispersal order.   So, in fact, what actually

19   happened, the dispersal order was read multiple times,

20   the station was partially closed and ultimately totally

21   closed.

22        Q.   Do you recall that the protest began at

23   approximately 5:00 p.m.?

24        A.   That's probably correct.   In that neighborhood.

25        Q.   At what point did the protest become an

95

1   unlawful assembly?

2       A.  At what time?

3       Q.  At what point in the protest?  Immediately?

4       A.  No.  My determination is based upon the safety

5   and the security of the employees and the patrons and

6   property at that location.  Specifically what time that

7   was, I don't recall.

8       Q.  How long did it take you to make that

9   determination?

10      A.  Well into half an hour, 40 minutes.

11      Q.  You let the protesters march around a little

12  bit?

13      A.  Yes.  I tried to be as flexible as I could

14  until it became unsafe.

15      Q.  When you say "unsafe," what do you mean?

16      A.  When the flow of the patrons is blocked,

17  impeded by people in front of the fare gates and ticket

18  vendors.

19      Q.  Did BART police create the line in front of the

20  fare gates before or after protesters impeded the fare

21  gates?

22      A.  There were officers standing at the structures

23  of the fare gates before, and then once the marching --

24  the protesters got too close and slowed down and stopped

25  at the fare gates, they moved in front to move them

96

1    away.

2        Q.  When you say in front of the fare gates, really

3    what you mean is in front of the officers who were in

4    front of the fare gates?

5        A.  No.  The fare gates are open.  Between each

6    fare gate there's a structure, a gate, a structure, a

7    gate, a structure, a gate.  Officers were standing at

8    the front of those structures.  The gates were open to

9    pass through.  The protesters marched and would come

10   closer and closer and then would stop ultimately in

11   front of the fare gates, at which time everything backs

12   up in both directions, inside the station, outside the

13   station, which becomes unsafe.

14       Q.  To your recollection, the first dispersal order

15   was given after that occurred?

16       A.  I believe the first dispersal order occurred at

17   the time that the gates were being blocked.

18       Q.  And under BART policy, after a dispersal order

19   is given, the crowd needs to be given a reasonable time

20   to disperse?

21       A.  Correct.

22       Q.  What is a reasonable time?

23       A.  I think we used 15 to 20 minutes, because we

24   read that dispersal order at least three times.  We were

25   very generous.  And ultimately the circle was enclosed.

97

1      Q.  How much time elapsed between each dispersal

2  order?

3      A.  I think between the first one and the last one

4  we were at least 30 minutes.

5      Q.  So you recall approximately every 15 minutes a

6  dispersal order was read until the third one was read?

7          MR. ALLEN:  Objection; misstates his testimony,

8  argumentative.

9          THE WITNESS:  It was a 30-, 40-minute time

10  frame between the first and the last one.

11  BY MR. SIEGEL:

12      Q.  Do you understand that the timeline you're

13  testifying to right now contradicts the timeline in the

14  documents provided by BART?

15      A.  Again, this document provided is an

16  interpretation of a person of a tape.  I know that I was

17  at the scene.  And I know when the dispersal orders --

18  the order that came out and when the circle was closed

19  based upon being at the scene.  So if I'm in conflict

20  with it, it's because the interpretation based upon this

21  document is not correct.

22      Q.  Do you know that BART keeps records of audio

23  transmissions?

24      A.  Sure.

25      Q.  Do you know that those transmissions have been

1    provided to us?

2         A.   Sure.

3         Q.   And those records that have been provided to us

4    should be reliable; isn't that correct?

5         A.   I would believe they would be reliable.

6         Q.   If your testimony today is in contradiction to

7    both the timeline and the audio transmissions, is it

8    possible you're incorrect?

9         A.   I believe the interpretation of what you're

10   reading is being incorrectly interpreted.  I was at the

11   scene.  I know the order of what occurred.

12         I know the dispersal came out before the circle

13   was closed.  I know that the station and avenue to leave

14   was created during that entire time.  I know that I was

15   walking around and verbally telling reporters and people

16   that I knew that were there that they need to leave,

17   that we're going to close the station.  "If you refuse

18   to obey the dispersal order, you're subject to arrest."

19   I was at the scene.

20        Q.   Why didn't you tell David Morse to leave?

21        A.   I walked around and told everybody.  I wasn't

22   singling out anybody.  I made it very clear.  I'm easy

23   to see in this crowd.

24        Q.   Did you talk directly to David Morse?

25        A.   I don't believe I did.

1       Q.  A lot of noise?

2       A.  Yes.

3       Q.  A lot of people, a lot of photo cameras, video

4  cameras, all sorts of things going on?

5       A.  Yes.

6       Q.  Almost like a circus?

7       A.  A circus is much more organized than this

8  event.  Yes.

9       Q.  Have you reviewed any of the videos of the

10  event?

11       A.  I have seen very limited videos of the event.

12       Q.  Have you ever experienced the phenomenon in an

13  intense situation where time slows down, as they say?

14       A.  I don't know if I actually consciously stopped

15  to wonder if I was experiencing that during the event or

16  after.

17       Q.  Is it possible that so many things were going

18  on that it felt like a lot of time was passing but only

19  a little time was passing?

20       A.  Anything is possible.  I'm going based upon

21  what I remember after the fact.  And based upon that is

22  the result of my statement, what I recall at this point

23  in time.

24       Q.  Sure.  You weren't keeping written records,

25  though?

101

1     A.  Of this event?

2     Q.  Yes.

3     A.  I was not.

4     Q.  You weren't making time notations of dispersal

5  notices?

6     A.  I relied upon the CAD system.

7     Q.  At this point, the records of the CAD system

8  are more reliable than your memory; is that correct?

9         MR. ALLEN:  I'll object that it calls for

10  speculation, argumentative.

11         You can answer if you understand.

12         THE WITNESS:  At this point, the records of the

13  CAD system have been erroneously interpreted in this

14  documentation.

15  BY MR. SIEGEL:

16     Q.  But you can't recall exactly how many minutes

17  elapsed between each dispersal order?

18     A.  I cannot.

19     Q.  You don't know when exactly each dispersal

20  order was given?

21     A.  Specifically, I do not.

22     Q.  You have no records to verify your current

23  recollection; is that correct?

24     A.  The records I would rely upon would be the CAD

25  information.

102

1      Q.   When you say "CAD," you mean the raw audio
2   files?
3      A.   The audio files along with the interpretation
4   that turns into an actual document.  Audio from the
5   officer to the dispatcher through the system.
6      Q.   Is it true that the main reason you arrested
7   David Morse is because he was close to Krystoff?
8      A.   No.
9         MR. SIEGEL:  I'd like to mark the next exhibit.
10        (Plaintiff's Exhibit 9 marked for
11        identification.)
12   BY MR. SIEGEL:
13      Q.   Is it true you've never seen this document
14   before?
15      A.   Yes.
16        MR. ALLEN:  This is 9?
17        MR. SIEGEL:  This is Exhibit 9.
18        MR. ALLEN:  Thank you.
19        MR. SIEGEL:  Mr. Hartwig, I'll represent to you
20   that this was a document provided by BART during the
21   course of discovery in this lawsuit.
22   BY MR. SIEGEL:
23      Q.   If you could summarize for me, what is the
24   Internal Affairs process to investigate a complaint?
25      A.   The actions of the subject of a complaint.

1    They investigate those actions based upon witnesses,

2    involved subjects in the complaint.

3         Q.  Does BART police have its own internal

4    investigation department?

5         A.  Yes.

6         Q.  How many officers in that department?

7         A.  At the time, there was a lieutenant, a sergeant

8    and two officers.

9         Q.  So Lieutenant Lance Haight was the

10   highest-ranking officer in IA; is that correct?

11        A.  The highest-ranking officer in IA at the time

12   was Deputy Chief Jan Glenn-Davis.  He worked directly

13   under her.

14        Q.  You were interviewed by IA in response to a

15   complaint by Mr. Morse; is that correct?

16        A.  Yes.

17        Q.  You were interviewed by Lieutenant Haight and

18   Sergeant Kwon?

19        A.  Correct.

20        Q.  Do you remember giving truthful testimony that

21   day?

22        A.  Yes, sir.

23        Q.  I'd like to direct your attention to the 24th

24   and 25th pages of this document.  I retract that.  The

25   pages I'm referring to are pages 19 and 20.  They're

1   stamped BART 24 and 25.

2        A.   Yes.

3        Q.   At the bottom of page 20, the very last line of

4   page 20, which is marked BART 25, and continuing onto

5   the following page, I read, quote, "My concern was the

6   presence of Mr. Cantor and Mr. Id in the circle was

7   creating a worse situation and...they needed to be

8   removed immediately."

9        Do you see where I read that from?

10       A.   Yes.

11       Q.   Do you stand by that statement?

12       A.   Yes.

13       Q.   How was Mr. Morse or Mr. Id -- how was he

14   creating a worse situation?

15       A.   Inside the inner circle once it was closed

16   became very emotional and very passionate and very

17   involved.  It was all around Mr. Morse and Mr. Cantor.

18       Q.   What did you see Mr. Morse doing?

19       A.   They were all talking.  Mr. Cantor was yelling.

20   Mr. Morse was standing right next to him.

21       Q.   Mr. Morse was creating a worse situation by

22   standing next to somebody who was yelling?

23       A.   I determined Mr. Morse and Mr. Cantor was the

24   reason for the emotion and the passion, and I wanted to

25   remove it.  I had PC to make the arrest and to have them

1    cited and arrested.  I wanted them removed from the
2    heart of the storm, which I believe they were creating.
3    And I believe I was right, because when they were
4    removed, the center of that inner circle went silent to
5    the point I stepped inside and they all sat down.
6         Q.  These were the first two people you arrested;
7    isn't that correct?
8         A.  These were the first two people removed from
9    the circle, yes.
10        Q.  Is it possible that if you'd removed any two
11   people, it would have the same effect?
12        A.  Anything is possible.  That's the determination
13   I made at the time.
14        Q.  Why did you consider Mr. Morse to be, for lack
15   of a better word, a co-conspirator of Mr. Cantor?
16        A.  Because when I witnessed him involved and
17   participating in the blocking of the fare gates and the
18   marching and the chanting, I witnessed him speaking with
19   Mr. Cantor on occasion on this night and multiple
20   occasions.  I believed that he and Mr. Cantor were
21   working side by side, and I believed that based upon
22   what I saw by removing them I could calm the situation,
23   which was exactly what happened.
24        Q.  You thought they were working side by side
25   because they were talking and walking together?

106

1        A.   No.   Because they were marching and blocking

2    fare gates and ticket vendors and failing to abide by

3    the dispersal order.   Once the circle was closed, they

4    were side by side.   And right where they were was the

5    most active, most passionate location of the circle.

6        Q.   Have you ever heard of an embedded journalist?

7        A.   No.

8        Q.   Do you know that when the United States went to

9    war with Iraq, journalists traveled with military?

10        A.   I know what you're referring to now.   Did I

11    determine Mr. Morse to be an embedded journalist?   No, I

12    did not.

13        Q.   Is it possible that he was?

14             MR. ALLEN:   Objection; speculation.

15    BY MR. SIEGEL:

16        Q.   When you said Mr. Morse was speaking to

17    Mr. Cantor, isn't it possible he was asking Mr. Cantor

18    questions?

19             MR. ALLEN:   Objection; calls for speculation.

20             THE WITNESS:   Anything is possible.

21    BY MR. SIEGEL:

22        Q.   You didn't hear the contents of the

23    conversation?

24        A.   No.

25        Q.   When you say "marching," do you mean that Mr.

1    Morse was raising his knees in a high fashion?

2        A.  No.  Following a path led by Mr. Cantor in a

3    circular fashion around ticket vendors and fare gates.

4        Q.  Approximately 50 people were, quote, unquote,

5    following Mr. Cantor; is that correct?

6        A.  Yes.

7            MR. ALLEN:  Asked and answered.

8    BY MR. SIEGEL:

9        Q.  At the end of your IA interview, the

10   investigating officers asked you to summarize all the

11   reasons you had for arresting Mr. Morse.

12           Do you remember that?

13       A.  What page are you referring to?

14       Q.  No page in particular.  I'm asking if you

15   remember that.

16       A.  No.

17       Q.  Did you contact IA after your interview to give

18   additional reasons why you arrested Mr. Morse?

19       A.  I do not recall contacting them.  Do you mean a

20   day after, ten minutes after, two weeks after?  What are

21   you referring?

22       Q.  At any time after this interview concluded on

23   the record, so to speak, did you later follow up with

24   Haight or Kwon to say, "Hey, I remembered something

25   else"?

1          A.  I don't recall that.

2          Q.  Is it fair to say that you told IA everything

3    you remembered?

4          A.  At the time of the interview I had?

5          Q.  Yes.

6          A.  Yes.

7          Q.  Have you remembered anything new since then

8    that would incriminate Mr. Morse?

9          A.  Since the IA interview, I have not thought

10   about this situation or any other situation that I

11   previously was responsible for as deputy chief.

12         Q.  Similar to this deposition, I admonished you if

13   you remember something later, you can tell me.

14         A.  Yeah.

15         Q.  That didn't occur with IA?

16         A.  Did they make that statement to me?

17         Q.  You didn't follow up with them?

18         A.  I don't recall following up with them.

19         Q.  I'd like to direct your attention to the page

20   that is stamped BART 26, page 21.  My notes are

21   imperfect.  The next page, page 22, BART 27.

22              Towards the bottom of the page where you see

23   "Haight" for the first time, it says, "outside of the

24   conversation that you saw take place between Cantor and

25   Morse, could you identify any other actions on behalf

1   of...either party as far as actively engaging the

2   protesting or leading the protest?"

3           It states your answer, "Yeah...they were at the

4   front of line as they marched around the fare gate...the

5   ticket vendors and the fare gates and they were at the

6   heart of the fare gates when they stopped to impede and

7   deny access to those patrons who were trying to come in

8   and exit the BART station?"

9           Your testimony today is the same; is that

10  correct?

11      A.  Yes.

12      Q.  Your testimony is Mr. Morse was at the front of

13  the line of the march?

14      A.  There's no --

15          MR. ALLEN:   I'll object as vague as to time.

16  BY MR SIEGEL:

17      Q.  During the period that, in your opinion, there

18  was an unlawful protest, was Mr. Morse at the front of

19  the line?

20      A.  What I witnessed was Mr. Morse blocking fare

21  gates and denying access to patrons as well as Mr.

22  Cantor.  Whether there was a front of the line or back

23  of the line or middle of the line, it was more circular,

24  but what I witnessed was violations of 369i PC.

25      Q.  For purposes of today, let's call Mr. Cantor

1    BY MR. SIEGEL:

2        Q.  Is it your testimony today that Mr. Morse was

3    at the front of the line with Mr. Cantor?

4            MR. ALLEN:  Objection; vague as to time.

5            THE WITNESS:  I witnessed Mr. Cantor and

6    Mr. Morse blocking the fare gates, impeding the flow of

7    patrons into the station and out of the station.

8    BY MR. SIEGEL:

9        Q.  I understand that's your line, but you do have

10   to answer my questions.  You can't just give your stock

11   answers.

12           MR. ALLEN:  Counsel, he can give whatever

13   answer he wants.  If you don't like it and feel that's

14   not responsive, you're certainly entitled to go for a

15   ruling by the judge in chambers.  I will reassert it's

16   still vague as to time in the context of your question.

17           MR. SIEGEL:  So the record is clear, the time

18   we're talking about is the period of unlawful assembly

19   your client has identified.  The line we're talking

20   about is the line that he told IA about.

21   BY MR. SIEGEL:

22       Q.  Is it your testimony, Mr. Hartwig, that Mr.

23   Morse was at the front of the line during the period of

24   unlawful assembly?

25           MR. ALLEN:  Objection; vague as to time.

112

1          At what point during the unlawful assembly.

2          MR. SIEGEL:  At any time.

3          MR. ALLEN:  Thank you.

4          THE WITNESS:  Just as my statement states, they

5  were at the heart of the fare gates when they slowed to

6  impede and deny access to those patrons who were trying

7  to come and exit the BART station.

8  BY MR. SIEGEL:

9      Q.  We've established that the march was moving in

10  a circle.

11          MR. ALLEN:  Let's take a break.  I think I know

12  where you're going.  I don't think he does.  Let's see

13  if I can work it out.

14          MR. SIEGEL:  We have a question pending, don't

15  we?

16          MR. ALLEN:  We'll go back on the record and

17  I'll acknowledge there's a question pending.  I'm trying

18  to get him to answer your question.

19          (Recess taken.)

20  BY MR. SIEGEL:

21      Q.  Mr. Hartwig, we've established the protest was

22  moving in a circular fashion; is that correct?

23      A.  Yes.

24      Q.  That means that each piece of the circle would

25  come in front of the fare gate and leave the front of

1      the fare gate; is that correct?

2          A.  Correct.

3          Q.  Each person that was in the circle at some

4      point or another was blocking the fare gates; is that

5      correct?

6          A.  Partial -- part of the circle wouldn't stop;

7      they would keep going.  A specific part of the circle

8      was stopped directly in front of the fare gates and

9      denied access.

10         Q.  Is it fair to say what you really mean is that

11     some people blocked the fare gates more than others?

12         A.  I would -- what I witnessed was some people

13     violated 369i and others did not.

14         Q.  How many seconds do you have to block the fare

15     gates to violate 369i?

16         A.  I think it's a deliberate act where you stop

17     and there's people either in front of you or behind you

18     trying to enter the station and you're not doing

19     anything other than standing there.  I don't know a

20     specific time.  It could be five seconds, 20 seconds, it

21     could be two minutes.  But I know in the transit

22     environment watching people exit, you can tell when

23     someone is blocking and impeding the flow, and that's

24     what I witnessed.

25         Q.  Some people might have blocked the fare gates

114

1   for a split second, other people blocked the fare gates

2   for 20 seconds; is that substantially what you're

3   saying?

4        A.  I don't know that there's a specific time frame

5   attached to the Penal Code section.  I know that when I

6   see people blocking and impeding the flow of traffic

7   through the fare gates, I can recognize it.

8        Q.  People are walking in a circle and the person

9   in front stops, everyone behind that person has to stop

10  as well; isn't that correct?

11       A.  Not necessarily.

12       Q.  But that's --

13       A.  There's people jostling for position, because

14  some are taking pictures for whatever reason, they're

15  moving to the side, they're moving past the front,

16  They're moving to the rear.  That all occurred.

17       Q.  You told IA that Mr. Morse was at the front of

18  line; is that correct?

19       A.  Based upon Mr. Morse's and Mr. Cantor's

20  location, what I stated is they stopped at the heart of

21  the fare gates and blocked the fare gates.  And then

22  they would continue to march around, and when they got

23  back to the fare gates, they would stop again and delay

24  and continue to block the flow of traffic.

25            MR. SIEGEL:  Could you read back the question?

1              (Record read.)

2              THE WITNESS:  I stated they were at the front

3      of the line, yes.

4      BY MR. SIEGEL:

5          Q.  Is that still your testimony now?

6          A.  Yes.

7          Q.  For how long approximately was Mr. Morse at the

8      front of the line?

9          A.  I was not timing Mr. Morse or anybody else.  I

10     have no idea.  Mr. Morse moved about.  He wasn't in one

11     location for any one period of time.

12         Q.  He didn't block the fare gates the whole time?

13         A.  No.

14         Q.  He didn't stand with Mr. Cantor the whole time?

15         A.  No.

16         Q.  Other people stood with Mr. Cantor?

17         A.  Yes.

18         Q.  Other people blocked the fare gates?

19         A.  Yes.

20         Q.  Other journalists stood with Mr. Cantor?

21         A.  Very possibly, yes.

22         Q.  Other journalists blocked the fare gates?

23         A.  Very possibly, yes.

24         Q.  You didn't arrest any other journalists?

25         A.  I didn't witness others what I witnessed

1    Mr. Morse doing.

2        Q.  Did you ask the other officers if they

3    witnessed any such thing?

4        A.  I did not.  They had the authority to take

5    action based upon what they witnessed.

6        Q.  Isn't the reason you focused on Mr. Morse that

7    you received a BOLO that identified him to you?

8            MR. ALLEN:  Objection; misstates his testimony,

9    it's argumentative.

10           THE WITNESS:  I stated I received -- I didn't

11   see that BOLO until after the event.

12   BY MR. SIEGEL:

13       Q.  You had a Blackberry at the time, did you not?

14       A.  I stated I received an e-mail from Deputy Chief

15   Fairow which may include that BOLO.  I did not open it

16   up.  I received a hard copy of the operations order,

17   which I referred to for this event.  If I even knew

18   there was a BOLO, I knew Mr. Id and Mr. Cantor.  I was

19   with them at every protest, excluding one that I'm aware

20   of.  I didn't need to look at any identifying

21   information.

22       Q.  You've already testified that Mr. Morse didn't

23   break any law prior to this protest; isn't that right?

24       A.  Not that I'm aware.

25       Q.  Why do you associate the two, Mr. Morse and

1    Mr. Cantor?

2         A.  In multiple events, I would see them

3    interacting verbally, conversation, walking together,

4    moving from one station to another station together.

5    All the things that protesters do that fall within the

6    legal ramifications of protest, I witnessed it multiple

7    times.

8              MR. SIEGEL:  Sorry, Dale.  Am I boring you?

9              MR. ALLEN:  I think you're taking a great

10   deposition.

11             MR. SIEGEL:  Just giving you a hard time.

12   BY MR. SIEGEL:

13        Q.  You told IA Mr. Morse looks like a protester.

14             Do you recall that?

15        A.  I would have to see the context, because we all

16   look like protesters.  I found it.

17        Q.  We're looking at page 23, stamped BART 28 in

18   the middle of the page.

19        A.  Right.

20        Q.  You stated, "that's the conundrum with Mr. Id."

21             I just want to clarify for the record that I

22   had it wrong.  Dave Id, he was a psychology student.

23   It's a witty nom de pen.

24             MR. ALLEN:  Give us a line number, too.

25             MR. SIEGEL:  That was my aside.

Aiken Welch Court Reporters   Daniel Hartwig   10/15/2013

1    Q.  Do you remember hearing his voice that day over

2  the radio?

3    A.  I can't specifically recall that, no.  It's a

4  rare occasion when a deputy chief gets on the radio.

5    Q.  After the circle closed, did you release any

6  non-journalists?

7         MR. ALLEN:  Do we refer to the students as

8  journalists or not journalists?  Point of clarification.

9  I'll let your question stand.  I'm curious.

10         MR. SIEGEL:  I would include student

11  journalists within journalists.

12         THE WITNESS:  To my knowledge, nobody was

13  released other than journalists.

14  BY MR. SIEGEL:

15    Q.  Essentially at that point if you had a press

16  pass, it was a get-out-of-jail-free card?

17    A.  No.

18         MR. ALLEN:  Objection; mischaracterizes his

19  testimony and it's argumentative.

20  BY MR SIEGEL:

21    Q.  You released journalists after closing the

22  circle, correct?

23         MR. ALLEN:  Objection; asked and answered.

24         THE WITNESS:  Journalists were released after

25  they were identified and verified by officers at the

1   scene.

2   BY MR. SIEGEL:

3       Q.   Were the officers polled to ask if any of them

4   had probable cause against the journalists who were

5   being released?

6       A.   Not to my knowledge.

7       Q.   And you conducted the survey, so to speak, for

8   journalists after Mr. Morse was removed; is that

9   correct?

10      A.   Yes.   The inner circle was too active when

11  Mr. Morse and Mr. Cantor were present.

12      Q.   Do you know if Mr. Coduti -- Officer Coduti

13  offered David Morse the opportunity to present his press

14  pass as an excuse, so to speak, for being in the circle?

15      A.   I would have to refer you to Officer Coduti.   I

16  wasn't present.

17      Q.   Did you give a press conference on September

18  8th, 2011?

19      A.   I believe we had a brief press conference at

20  the Powell Street primary end.

21      Q.   And you remember speaking to the media?

22      A.   Multiple, yes.

23      Q.   Do you recall telling the media that police

24  created safe passage through the fare gates?

25      A.   Doesn't sound like a statement I would make.   I

1    would need to hear the statement I made.

2         Q.  At one point after you stopped the circling

3    march, to use your language, the police created a line

4    that provided some space of separation for people to

5    enter and leave the station?

6         A.  The purpose of the skirmish line was to move

7    the crowd away from the fare gates.  I believe once that

8    was done, then access was regained, yes, to the fare

9    gates.

10        Q.  At that time, once access was regained, did you

11   consider simply letting people go?

12        A.  At that time, we read the dispersal notice.

13        Q.  So after the line in front of the fare gates

14   and before the circle --

15        A.  Yes.

16        Q.  -- you read a dispersal notice?

17        A.  To the best of my recollection, that's when it

18   was read, yes.

19        Q.  Did you tell the media that some journalists

20   were offered a chance to leave the kettle and refused?

21        A.  I think I did state that, yes.

22        Q.  Which journalists refused to leave the kettle?

23        A.  I think there was a specific journalist

24   representative from Channel 2 that was in the circle

25   that was advised of the dispersal notice multiple times

132

1     and chose to remain in the circle.

2         Q.  Do you remember why or what the person said?

3         A.  I know she was advised directly that she would

4     be arrested if she remained in the circle, and I was not

5     present after that.  I came back, and she was still in

6     the circle.

7         Q.  Do you recall telling the media that, quote,

8     unquote, legitimate members of the media were identified

9     and released?

10        A.  I think I did say that.

11        Q.  What is a legitimate member of the media?

12        A.  People that we could identify as members of the

13    media.  Their identification and/or job representative

14    ID card, press pass.  I've -- go ahead.

15        Q.  What would be an illegitimate member of the

16    media?

17        A.  Somebody professing to be a journalist or a

18    member of the media that, in fact, is not.  I did not --

19    to my recollection, we didn't have that situation.

20        Q.  You weren't thinking of David Morse when you

21    said legitimate versus illegitimate?

22        A.  No.  I was going to refer to Vivian Ho and how

23    I identified her.  It was brought to my attention by

24    BART media that she was in custody, and they knew for a

25    fact her to be a reporter from the Chronicle.  So I

133

1    directed the officers to have her identified and

2    released.

3         Q.  Do you know who this person is?

4         A.  I do not.

5              MR. ALLEN:  Are you going to mark it as an

6    exhibit?

7    BY MR. SIEGEL:

8         Q.  Have you heard the name Christopher Ream

9    before?

10        A.  Christopher Ream?

11             MR. ALLEN:  I'm going to ask you to mark that

12   as an exhibit when you show a photo to my client and ask

13   him questions about it.

14   BY MR. SIEGEL:

15        Q.  Putting aside the photograph, do you know

16   anybody in the Bay Area named Christopher Ream, R-e-a-m?

17        A.  R-e-a-m, I do not.

18             MR. SIEGEL:  I'd like to mark this as the next

19   in order.

20             (Plaintiff's Exhibit 10 marked for

21             identification.)

22   BY MR SIEGEL:

23        Q.  What is this document?

24        A.  It's an event record.

25        Q.  What is an event record?

1          A.   Deputy Chief Jan Glenn-Davis.

2          Q.   And does this refresh your recollection

3    regarding your earlier testimony, or do you still

4    believe you did not make any orders at that time?

5          A.   I never said I didn't make orders.

6          Q.   Do you recall making any orders at about that

7    point in the protest?

8          A.   That is -- that is very likely, that I gave

9    orders.

10         Q.   What orders do you remember giving, if any?

11         A.   I directed the team to close the circle.

12         Q.   At 1726, two entries down, it reads, "S57:

13   Closing station" -- I assume -- "and reading dispersal

14   order."

15              Does this refresh your recollection that the

16   dispersal order was read after the circle was closed?

17         A.   I think that's just an interpretation of the

18   way the dispatcher logged it in.  Based upon my

19   recollection, what I recall is before the circle was

20   closed, the last dispersal order was read.

21         Q.   Was the protest declared an unlawful assembly?

22         A.   I do not recall the specific language utilized

23   for the dispersal notice.  I believe in the admonishment

24   that is inclusive.

25         Q.   I'm looking at Exhibit 2, the operations order,

141

1          MR. SIEGEL:  I'd like to introduce the next

2      exhibit, please.

3          (Plaintiff's Exhibit 11 marked for

4          identification.)

5      BY MR SIEGEL:

6      Q.  Mr. Hartwig, this document was given to us by

7      BART in the course of discovery.  It appears to be an

8      e-mail exchange between Shane Coduti and yourself.  If

9      you have complaints about the formatting of this

10      document, you'll have to complain to your attorneys, I

11      think.

12          But I would like to direct your attention

13      two-thirds of the way down, and in between the

14      formatting there is a statement in there.  And I will

15      read for you what I think the statement is if you take

16      out the unnecessary formatting symbols.

17          The way I read it is:  "I just wanted to inform

18      you I was subpoenaed for a 369i case from the September

19      8th, 2011, protest.  This protest was conducted by the

20      No Justice No BART group at the Powell Street BART

21      station.  The defendant in the case is David Morse.

22      This involves the case where you witnessed a violation

23      and ordered me to arrest Morse.  I wanted to see if you

24      could come to court so you could explain what you saw to

25      the judge, to make this violation stick."

142

1          Do you see those words?

2     A.  Yes.

3     Q.  Does this refresh your recollection about

4  receiving an e-mail from Shane Coduti?

5     A.  Yes.

6     Q.  Is Mr. Coduti telling the truth in this

7  message?

8     A.  No.  I don't think he's lying.  We had a

9  conversation where I met with him afterwards and asked

10 him to come to my open office where we discussed this

11 matter.

12    Q.  If he's not telling the truth and he's not

13 lying, how would you describe this statement?

14    A.  As I spoke with Officer Coduti, his citation

15 and his probable cause were all included in his report,

16 and that was all that was needed for this event.  Then

17 if he wanted to tell the judge that I was there, he can

18 certainly do so, but I wasn't going to court with him.

19 I don't have time to go to court with each officer.

20    Q.  Is it true when he writes you witnessed a

21 violation?

22    A.  Yes, I did.

23    Q.  Is it true when he writes, "you ordered me to

24 arrest Morse"?

25    A.  I did not.

1      Q.  He was wrong?

2      A.  I directed him to remove Mr. Morse from the

3  circle and take him to the backroom.

4      Q.  Was anybody removed from the circle but not

5  arrested?  That's a bad question.

6          Other than the journalists who were removed

7  from the circle and allowed to be free, was anyone

8  removed from the circle taken to the backroom and then

9  released?

10     A.  Cited and released, yes.

11     Q.  How many?

12     A.  I don't know.  But I know there were.

13     Q.  To the best of your knowledge, what was the

14  distinction between Mr. Morse and those other

15  individuals?

16     A.  I was not in the backroom --

17         MR. ALLEN:  Go ahead.

18         THE WITNESS:  -- when that was determined, so I

19  couldn't tell you why.

20         MR. SIEGEL:  Exhibit 12.

21         (Plaintiff's Exhibit 12 marked for

22         identification.)

23  BY MR SIEGEL:

24     Q.  Now, tell me if I'm wrong, but my understanding

25  of this document is that it is a later e-mail exchange

1    attending?"

2        A.  Sandra is an administrative assistant in admin

3    handling subpoenas and court cases.  She apparently told

4    him the case was still active.  I thought she was wrong.

5        Q.  And then at the top of the e-mail, which I

6    guess was the message you actually sent at 1:23 p.m. on

7    July 21st, 2012, it states, "call me at" and lists the

8    phone number.

9        A.  That's my office.  That was my office.  I

10   believe that's when I invited him to come speak with me

11   face to face.

12           (Plaintiff's Exhibit 13 marked for

13           identification.)

14   BY MR SIEGEL:

15       Q.  Mr. Hartwig, when you were still working with

16   BART PD, did you have a Google alert set up?

17       A.  Yes.

18       Q.  This alert basically sent you articles about

19   BART as they came on the internet?

20       A.  Yes.

21       Q.  Am I right that through this Google alert you

22   sometimes received articles written by Mr. Morse?

23       A.  I do not recall specifically receiving articles

24   from Mr. Morse through this alert.

25       Q.  When you received one of these alerts, what was

146

1    your practice?

2        A.  I would usually check it out, see what it was

3    referring to and/or delete it.

4        Q.  Exhibit 13 shows that you received an

5    alert about an article that Dave Id wrote; is that

6    correct?

7        A.  Yes.

8        Q.  It was an article that announced a press

9    conference on the release of a shooting Charles Hill

10   video.

11       A.  Yes.

12       Q.  Ken Dam was your Intel officer on September

13   8th?

14       A.  Yes.

15       Q.  Why was he focusing on Mr. Morse as a

16   subject?

17       A.  You would have to ask Officer Dam.  His purpose

18   was to gather intelligence information regarding

19   activities that occurred within the BART properties.

20       Q.  Do you consider or did you consider Mr. Morse

21   to be a dangerous individual?

22       A.  No.

23       Q.  Did you consider him to be a threat to the

24   operation of BART?

25       A.  No.

149

<u>REPORTER'S CERTIFICATE</u>

1

2

3

4      I, SANDRA M. LEE, a Shorthand Reporter, State of

5   California, do hereby certify:

6      That DANIEL O. HARTWIG, in the foregoing

7   deposition named, was present and by me sworn as a

8   witness in the above-entitled action at the time and

9   place therein specified;

10      That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and

14   that the foregoing transcript constitutes a full, true

15   and correct report of said deposition and of the

16   proceedings that took place;

17      That before completion of the proceedings,

18   review of the transcript was not requested.

19      IN WITNESS WHEREOF, I have hereunder subscribed

20   my hand this 1st day of November, 2013.

21

22

23

24      _____

25      SANDRA M. LEE, CSR NO. 9971
       State of California

*(Confidential Documents Marked as Exhibits 1, 4, 5, 8, 10, 11,
and 13 to the Deposition of Daniel Hartwig;
pages 1 and 19-25 only of a Confidential Document
Marked as Exhibit 9 to the Deposition of Daniel Hartwig,
Filed Under Seal)*

# EXHIBIT B

# EXHIBIT C

1          UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4   DAVID MORSE,

5          Plaintiff,

6   vs.                              No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART
8   Deputy Police Chief DAN HARTWIG,
    sued in his official and
9   individual capacities,

10         Defendants.
    _____/

11

12

13

14

15            DEPOSITION OF SHANE R. CODUTI

16            (Pages 1 to 61, inclusive)

17

18          Taken before SANDRA M. LEE

19                CSR No. 9971

20              November 5, 2013

21

22
              **Aiken Welch Court Reporters**
23            **One Kaiser Plaza, Suite 505**
              **Oakland, California 94612**
24            **(510) 451-1580/(877) 451-1580**
              **Fax:  (510) 451-3797**
25               **www.aikenwelch.com**

10

1        A.   No.

2        Q.   Have you been given training in regards to

3     arrests?

4        A.   As in what type?

5        Q.   In how you make a probable-cause determination.

6        A.   Yeah.   That's general academy knowledge.

7        Q.   So when you make an arrest, is it the duty of

8     the arresting officer to make a finding of probable

9     cause?

10       A.   Yes.

11       Q.   Are you allowed to rely on other officers when

12    you make that determination?

13       A.   If other officers are taking participation in

14    the report, yes, if they are writing a report on it.

15       Q.   If you rely on another officer and you produce

16    the primary report, other officers need to supply a

17    supplemental report?

18       A.   That's usually how it goes, yes.

19       Q.   And when you say "usually," how does it go the

20    other times?

21       A.   The ones that I've always written where I've

22    not had probable cause and another officer has, they've

23    always written a report.

24       Q.   And that's called a supplemental usually?

25       A.   Usually.

1      Q.  You know this lawsuit concerns a particular

2   protest --

3      A.  Yes.

4      Q.  -- on September 8th, 2011?

5      A.  Uh-huh.

6      Q.  "Yes"?

7      A.  Yes.

8      Q.  Prior to that event, had you participated as an

9   officer in policing protests of BART facilities?

10     A.  If I recall correctly, I believe there was one

11  or two more before that particular incident I was

12  involved in.

13     Q.  So the series of protests that occurred in the

14  summer/fall of 2011 is what you're referring to?

15     A.  Yes.

16     Q.  Prior to that, had you been involved in

17  policing protests?

18     A.  No.

19     Q.  What do you recall about that series of

20  protests?

21     A.  Mainly general.  I believe there was a -- one

22  of the groups Occupy was doing a bunch of protests

23  Downtown San Francisco, Downtown Oakland.  That's pretty

24  much what I remember.

25     Q.  Do you remember that the protest began around

12

1    the time of the killing of Charles Hill?

2        A.  Yes.  There was some during that time, yes.

3        Q.  Do you remember the term "Op BART"?

4        A.  Yeah.  I believe there was a term "Op BART."

5    I've heard that before.

6        Q.  Do you know what it means?

7        A.  No.

8        Q.  Do you remember No Justice No BART?

9        A.  Yeah.  I've heard that term before, but I don't

10   know what that means either.

11       Q.  Did you understand the protesters were upset

12   about BART policing practices?

13       A.  You know, I think it was explained to us, yeah.

14   I think there was somebody -- somebody did explain to us

15   that that's one of the reasons they were upset.

16       Q.  Do you recall a protest when BART turned off

17   cell phone service in the station?

18       A.  Yes.

19       Q.  Were you present that day?

20       A.  Yes, I was.

21       Q.  Do you remember that BART police were

22   criticized in the media following that action?

23       A.  Yes.

24       Q.  After that criticism, did you receive any

25   communications from command staff about BART policing

15

1       A.  Actually, a couple days after -- after I

2   arrested him.  Someone told me he wrote an article about

3   me on some website.

4       Q.  That was the first time you knew he was a

5   journalist?

6       A.  Yes.

7       Q.  Do you recall that when you arrested David

8   Morse on September 8th that you made a comment to him

9   about articles he had written?

10      A.  No.  I don't recall that.

11      Q.  Do you recall giving an interview with Internal

12  Affairs about the arrest of David Morse?

13      A.  Yeah, I do.  It was many years ago.  I don't

14  recall things discussed in that.  I do remember giving

15  an interview.

16      Q.  When you gave that interview with IA, were you

17  ordered to tell the truth?

18      A.  Yes.

19      Q.  Theoretically you were subject to discipline if

20  you did not tell the truth?

21      A.  Of course.

22      Q.  Giving an interview with IA is similar to an

23  interview here in the sense that you're ordered to tell

24  the truth.

25      A.  Right.

16

1       Q.  Do you think that what you told IA was true?

2       A.  From what I remember, yes.  I have no reason to

3    lie.

4       Q.  I'm going to introduce an exhibit here.  You

5    may or may not be aware, this is the fifth deposition in

6    a series of depositions.

7       A.  Okay.

8          MR. SIEGEL:  We have a stack of exhibits from

9    all of the depositions, so what I'm going to introduce,

10   I believe, is Exhibit 26, so I'll give a copy to the

11   court reporter and she'll share it with you.

12          (Plaintiff's Exhibit 26 marked for

13          identification.)

14   BY MR. SIEGEL:

15      Q.  So you haven't had a chance to see this

16   document before today?

17      A.  No.  Never have.

18      Q.  Officer Coduti, you already have maybe, but if

19   you could read the first three pages of this interview

20   transcript, and I'm going to follow up with some

21   questions.

22      A.  All three pages?

23      Q.  Please.

24      A.  All my responses or everything?

25      Q.  You can read them to yourself, actually.

17

1    A.   Three pages.

2    Q.   Thank you.

3         Does this refresh your recollection that you

4    may have seen some of Mr. Morse's articles prior to the

5    protest?

6    A.   Yes, it does.

7    Q.   What do you recall now?

8    A.   I don't remember when I saw the articles, but

9    apparently from what I told him and I told IA, I must

10   have seen a couple of his articles, and it must have

11   reminded me when we started talking.

12   Q.   Do you recall what the articles concerned?

13   A.   No, I don't.

14   Q.   Do you know they were about BART police?

15   A.   They may have been.  Again, I do not recall

16   specific articles, but if I talked to him about it and I

17   said it in IA, I must have talked to him about an

18   article.

19   Q.   Do you know how you were able to access his

20   articles?

21   A.   I believe they were on the internet.

22   Q.   You went on the internet to find them?

23   A.   Yes.

24   Q.   And were you directed to do so?

25   A.   No.

1      Q.  That was on your own time?

2      A.  Yeah.  I believe that was something I was

3  looking on Google and typed it in and came up under a

4  web search, and I pulled it up.

5      Q.  You don't remember what the articles discussed?

6      A.  No.

7      Q.  Do you recall that Mr. Morse was with a media

8  organization called Indybay?

9      A.  Apparently I asked him or he told me when I

10  arrested him, according to IA.

11      Q.  Do you know what Indybay is?

12      A.  Now I do, yes.

13      Q.  But that day you did not?

14      A.  I didn't know exactly.  I didn't know if it was

15  an article site, a blogger site, what it was.  He told

16  me it was a media organization, according to the IA.

17      Q.  I'd like you to -- you can put that aside for

18  now, and I'd like you to look at the first exhibit here,

19  Exhibit 1, and if you could locate Policy 459.7, please.

20          Before you read it, do you think you've

21  reviewed this policy previously?

22          MR. ALLEN:  At any time?

23  BY MR. SIEGEL:

24      Q.  Before today.

25      A.  Maybe at any time, yes, but I don't recall

1        Let's focus on the day in question.  I

2    recognize it was a little while ago.

3        A.  Yes.

4        Q.  How do you recall that day began?

5        A.  I recall we had a briefing at Lake Merritt

6    regarding a possible protest that was going to take

7    place that day.

8        Q.  Who led the briefing?

9        A.  If I recall correctly, Deputy Chief Hartwig was

10   there.  There was a couple of lieutenants and a few

11   other sergeants.

12       Q.  Was Deputy Chief Fairow there?

13       A.  I don't recall off the top of my head.

14       Q.  How about Chief Rainey?

15       A.  There were so -- there was a couple of other

16   ones that I was at before, so I don't -- I know he came

17   to one of them, but I don't know if that was the

18   particular one.

19       Q.  You're saying that in the series of protests --

20       A.  Yes.  The couple more -- because I told you

21   before I'd been to a couple of these, so I don't

22   remember which one he came to because we had meetings

23   before each one of these protests.

24       Q.  Do you recall that Deputy Chief Hartwig was the

25   on-site commander on September 8th, 2011?

26

1      A.  In both circumstances, yes, from my
2  understanding.
3      Q.  Does someone need to be blocked for a certain
4  amount of time?
5      A.  I don't think -- that's something that would
6  have to be determined by the courts.
7      Q.  Do you remember any particular instructions you
8  received about how blocking the fare gates would be
9  interpreted during the protest?
10      A.  From my --
11          MR. ALLEN:  Objection; vague.
12          THE WITNESS:  From my understanding, no.
13  It's -- if we see that people cannot access the fare
14  gates without having to go around people that are
15  blocking it, that's considered blocking fare gates.
16  BY MR. SIEGEL:
17      Q.  Did you understand that during the protest
18  there were media that were in the crowd?
19      A.  I -- well, I understood because I saw certain
20  media symbols when I was standing there, yes.
21      Q.  And I'll get back to that.
22          Going to the briefing, do you recall that
23  particular protesters were discussed at the briefing
24  that day?
25      A.  I believe there was.  There was something

1    talked about where there was protesters discussed,

2    regular protesters.

3        Q.  Do you recall that someone named Christopher

4    Cantor was discussed?

5        A.  I believe his name came up, yes.

6        Q.  He's known as Krystoff?

7        A.  Yes.  I've heard that name before.

8        Q.  Do you recall that Dave Id was discussed?

9        A.  May have, yes.

10       Q.  You do recall?

11       A.  Yes.

12       Q.  And do you know that Dave Id refers to David

13   Morse?

14       A.  I do now, yes.

15       Q.  In what context were Krystoff and Dave Id

16   discussed?

17       A.  From my understanding, they were said -- if my

18   recollection serves me right, they were discussing that,

19   because they said wherever those two show up is where

20   the protest is going to take place.

21       Q.  They were identified as regular protesters?

22       A.  I don't know if they were identified as that

23   term, "regular protesters," but they were saying that

24   they've seen them before where every protest takes

25   place, so we will know when the protest is going to take

1    place because those people will be there.

2         Q.  Do you recall that Krystoff was identified as

3    an agitator?

4         A.  I don't recall directly that he was.  He may

5    have been, but I don't remember that term being used

6    when I was sitting there.

7         Q.  In your stack if you could look at Exhibit 4,

8    please.

9         A.  Yes.

10        Q.  Officer, do you recognize this document?

11        A.  Yeah.  I believe I do.  This was something that

12   was handed out to us.

13        Q.  This was handed out to you during the briefings

14   that day?

15        A.  It was passed around or shown.  I've seen this

16   before.

17        Q.  Do you remember who gave it to you?

18        A.  Uh-uh.  No.

19        Q.  Is this a BOLO?

20        A.  No.  It's not a BOLO.

21        Q.  How is a BOLO different from this document?

22        A.  A BOLO is usually people that are wanted.

23   Usually have some criminal tie that they're going to be

24   wanted.  You need to contact them for a specific reason

25   because they're going to be wanted for a crime.  There's

36

1      A.  No, I have not.

2      Q.  That day, do you know who gave any dispersal

3  order?

4      A.  I don't remember directly who did it.  It might

5  be in my report.  Like I said, I haven't looked at it in

6  a long time.  I heard numerous people saying, "Stop

7  blocking the fare gates.  You're going to be arrested.

8  Stop blocking the fare gates."  That was it.  Something

9  to that recollection.

10     Q.  Do you think that an order to the effect of

11 what you just said, "Stop blocking the fare gates or

12 you'll be arrested" is a dispersal order?

13     A.  If I put it in the report that it was, that's

14 what I believed it was.

15     Q.  Putting aside whatever is in the report,

16 dispersal order, is that a term of art; is that a

17 specialized term?

18     A.  I don't know.

19     Q.  Is there a difference between an officer

20 directing an individual not to do something and an

21 official dispersal order?

22     A.  There may be.  I don't know.

23     Q.  You earlier mentioned at some point BART police

24 encircled some of the protesters.

25     A.  Correct.

1    Q.  Do you remember what led to the encirclement?

2    A.  Again, I remember a lot of screaming, a bunch

3  of people yelling "Don't block the fare gates.  You'll

4  be arrested."  I heard that numerous times.  Then

5  someone gave an order; the crowd was encircled.  That's

6  all I remember.

7    Q.  Then after the encirclement, you became

8  involved; is that correct?

9    A.  That's correct.

10   Q.  What happened?

11   A.  At that point, I was standing still at my

12  location by the hallway.  Deputy Chief Hartwig

13  approached me, and he pointed at David Morse and he

14  said, "Go arrest him."  I said, "Okay, sir."

15   Q.  And prior to that order, had you been observing

16  David Morse?

17   A.  I had seen him as part of the crowd, yes.

18   Q.  Had you been paying special attention to him?

19   A.  No.

20   Q.  You were observing him as you were observing

21  the rest of the crowd?

22   A.  That's correct.

23   Q.  After Hartwig gave you this order, what did you

24  do?

25   A.  I walked up to Mr. Morse, who was still part of

38

1    the circle. I told him he was under arrest. I told him

2    to put his hands behind his back. I handcuffed him. He

3    was cooperative. I walked him to the back where the

4    police facility was at.

5        Q. What did you do then?

6        A. I placed him down in a seat. I asked him to

7    identify himself. He told me his name and -- that's

8    according to the IA document -- his affiliation. I said

9    okay. I told him what he was under arrest for. I asked

10   for his identification. He provided -- he told me where

11   it was at because he was handcuffed. I got his

12   identification and I left the room.

13       Q. Did you have further contact with him after

14   that?

15       MR. ALLEN: That day?

16       MR. SIEGEL: Sure.

17       THE WITNESS: I don't recall any direct

18   contact. Maybe when we walked outside when he was

19   placed with everybody else in the line to go off to the

20   jail, but that was it. I don't remember any other

21   contact.

22   BY MR. SIEGEL:

23       Q. Did you observe David Morse holding a sign that

24   day?

25       A. Not to my recollection, no.

39

1    Q.  Do you recall him chanting?

2    A.  I don't remember any chanting, no.

3    Q.  Do you recall him marching?

4    A.  I don't think I recall anybody marching.

5    Q.  Now, I'd like to direct your attention back to

6   the IA transcript, Exhibit 26.

7        I'm going to ask you some questions, but I'm

8   going to give you a chance to read this section first.

9   I'd like you to start at page 12, line 10.  And from

10  there, I'd like you to read all the way through page 16,

11  so it's four pages.

12   A.  You said go to what page?

13   Q.  End of page 16.  Read to yourself.

14   A.  Okay.

15   Q.  I'm going to start on page 12.

16   A.  Okay.

17   Q.  I'm going to read the last question and answer

18  on that page.  The question from IA Officer Haight is:

19            "Did you have any conversation with

20            Deputy Chief Hartwig or any other

21            supervisor as to whether Morse was a

22            protester versus a member of the media?"

23        The answer:  "Not at that time, no.

24            We -- we -- I never really had a

25            discussion.  That wasn't for my -- that

40

1         wasn't for me to figure out.  Like I

2         said, I was ordered to arrest the people

3         that remained after the failure to

4         disperse order.  And then somebody else

5         above my level was supposed to figure

6         out what they want to do with each

7         individual."

8         My question today is:  Is that your

9 recollection, that it was up to the higher-ranking

10 officers to determine what to do with each detained

11 individual?

12     A.  Well, they can always overrule me if they feel

13 I don't have probable cause to arrest somebody.  That's

14 with any crime.  So my job for that particular protest

15 was to arrest people that were committing crimes.  If

16 they want to do something with them at a later time,

17 that was up to them just like with anything else.

18     Q.  And here DC Hartwig ordered you to arrest

19 Morse?

20     A.  Correct.

21     Q.  In this instance, he was the higher-level

22 person?

23     A.  He is one of the higher-level people, yes.

24     Q.  It wasn't your job to question his order?

25     A.  No.

1    particular paragraph.

2         THE WITNESS:  Would you like me to read the

3    whole one in?

4         MR. ALLEN:  Lines 19 to 24, and then you can

5    answer his question.

6         THE WITNESS:  "From what I saw, he was taking

7    pictures of protesters.  I don't know if, you know, a

8    person that's affiliated with the media could be doing

9    that, a -- another protester could be doing that, you

10   know.  I don't know what constitutes a person taking

11   pictures.  That's what I saw.  But he was in that group

12   of people that was blocking the fare gate."

13        MR. ALLEN:  Read his question back to him, and

14   he can answer the question.

15        (Record read.)

16   BY MR. SIEGEL:

17        Q.  I want to ask you about your recollection

18   today.

19             Do you recall that David Morse was taking

20   pictures that day?

21        A.  I do recall that, yes.

22        Q.  You recall he was in the group of people that

23   was blocking the fare gates?

24        A.  Correct.

25        Q.  If you look at page 14, the question and answer

43

1    between lines 3 and line 7 --

2         A.   Uh-huh.

3         Q.   -- if you could read Haight's question and your

4    answer, please, into the record?

5         A.   The question:

6              "Would you consider him to be an

7         agitator?"

8              "I don't know -- personally,

9         from -- this is my only interaction with

10        him.  I just know that he was taking

11        pictures.  He was, you know, getting in

12        there and taking pictures of the other

13        people that were in charge of this

14        demonstration."

15        Q.   Today as we sit here, is your recollection any

16   different than you gave to IA?

17        A.   No.

18        Q.   You don't remember David Morse being, quote,

19   unquote, in charge of the demonstration?

20        A.   Not to my knowledge, no.

21        Q.   You recall he was getting in there and taking

22   pictures?

23        A.   Yes.

24        Q.   And what does "getting in there" mean?

25        A.   He was part of the circle.

44

1    Q.  Instead of outside the circle?

2    A.  No.  He was part of the circle inside that was

3    blocking the fare gates.

4    Q.  Now, other than being a part of the group and

5    taking pictures, do you recall any other conduct by

6    David Morse that day?

7    A.  No.  The only -- my only recollection of Mr.

8    Morse was taking pictures, conversating with other

9    people in the group and being part of the circle that

10   was blocking the fare gates.

11   Q.  Thank you.

12        When you placed Mr. Morse in handcuffs, do you

13   recall that he complained they were too tight?

14   A.  I believe I did when we were back in the

15   office.  He said something about them being tight, yes.

16   Q.  Do you recall that Officer Rudy loosened the

17   handcuffs?

18   A.  He may have.  I think he told it to me.  I

19   don't remember witnessing it.  I think he said he

20   loosened them for me.

21   Q.  I'd like you to look at Exhibit 8 in your

22   stack, please.

23   A.  Okay.

24   Q.  I can represent to you this is a photograph

25   that was published by the San Francisco Chronicle on the

1    approximately 1730 hours, I was assigned to an arrest

2    team at the Powell Street BART station."

3            Do you recall who assigned you to the arrest

4    team?

5        A.  I do not recall.

6        Q.  I'm going to skip to the third sentence.  "I

7    was standing in the free area near the fare gates when I

8    heard a dispersal order given to the protesters."

9            Is your recollection today that a dispersal

10   order was given?

11       A.  My recollection is an order was given which I

12   took as a dispersal order, that the people needed to

13   stop blocking the fare gates or they were going to be

14   arrested.  That's what I heard.

15       Q.  You do not recall who gave that order?

16       A.  No.

17       Q.  The order you're referring to now to not block

18   the fare gates, was that given more than once?

19       A.  Yes.

20       Q.  Approximately how many times was it given?

21       A.  I heard numerous times, but I can't tell you by

22   who.  I also heard the station agents come over the air

23   and told people to not block the fare gates, so I heard

24   that, too.  There was a lot of yelling going on.

25       Q.  That was over the intercom you heard that?

1      A.  Yes.

2      Q.  So maybe station agents.  Somebody over the

3   intercom gave that order.

4          And then the other people giving that order, do

5   you remember who they were?

6      A.  No.

7      Q.  Do you remember if they were using amplified

8   sound?

9      A.  I don't recall if they were.

10     Q.  I don't recall anybody using a bullhorn?

11     A.  They could have.  I don't recall.

12     Q.  The next sentence reads, "The protesters were

13  standing in between the fare gates and the ticket

14  machines."

15     A.  Yes.

16     Q.  To the best of your recollection, how much

17  space is between the fare gates and the ticket machines?

18     A.  The total distance between the two?

19     Q.  Yes.  Approximately.

20     A.  Approximately 20, 25 feet.

21     Q.  And so the protesters, are they standing still

22  or moving?

23     A.  At this time after they've been encircled or

24  before, sir?

25     Q.  I guess that's a good question.

1          A.  No.  I'm sure I wrote a report about it.  If I

2     saw a report, it would refresh my memory.  I don't

3     recall any details about that arrest.

4          Q.  I'm looking at the final page of Exhibit 25,

5     the police report.  It appears to be the ticket that you

6     issued that day.

7              What do you call this document?

8          A.  A citation.

9          Q.  And it appears to read that Mr. Morse was

10     charged with 369i.

11             Do you see that?

12         A.  Yes, sir.

13         Q.  Then circled is "I" for infraction.

14         A.  Correct.

15         Q.  That means that Morse was charged with an

16     infraction?

17         A.  Correct.

18         Q.  Is it a BART policy to cite and release

19     individuals who are cited with an infraction?

20         A.  Most of the time, yes.

21         Q.  But on this day, Mr. Morse was not cited and

22     released; is that correct?

23         A.  From my understanding, no.

24         Q.  Do you know why he was not immediately cited

25     and released?

54

1        A.  I do not know why.  My guess --

2            MR. ALLEN:  Don't guess.

3            THE WITNESS:  Okay.  I would not know why.

4    BY MR. SIEGEL:

5        Q.  In terms of Mr. Morse specifically, do you have

6    any recollection as to how long he may have blocked a

7    fare gate?

8        A.  Not with him personally.  The group was there

9    for many minutes.

10       Q.  So he's indistinguishable from the group?

11           MR. ALLEN:  Vague as to time.

12   BY MR. SIEGEL:

13       Q.  In terms of the time we're talking about, the

14   time of the trespass, the alleged trespass.

15           MR. ALLEN:  It's still vague as to time and

16   overbroad.  He testified he saw him in the crowd and

17   blocking the fare gates.

18   BY MR. SIEGEL:

19       Q.  For how long did the crowd block the fare

20   gates?

21       A.  I couldn't -- approximately multiple minutes.

22   I couldn't give you an exact minute count.

23       Q.  And do you have any information that would

24   distinguish Mr. Morse from anyone else in the crowd?

25           MR. ALLEN:  Objection; vague.

55

1          What do you mean "information"?  The way he

2     looked?  The fact that he recognized him from a

3     photograph?

4     BY MR. SIEGEL:

5          Q.  How about this?

6               MR. ALLEN:  He's talking to Cantor at the time?

7     What?

8               MR. SIEGEL:  I understand what you're getting

9     at, Dale.

10    BY MR. SIEGEL:

11         Q.  Was there any conduct by Mr. Morse that

12    distinguished him from anyone else in the crowd?

13         A.  Not to my recollection.

14         Q.  Other than DC Hartwig's order, did you rely

15    upon any other officer before arresting Mr. Morse?

16         A.  No.

17         Q.  Do you recall that there was a criminal

18    proceeding against Mr. Morse?

19         A.  I don't recall.  I was never -- I never

20    attended one if there was.

21         Q.  Do you recall that you were notified that there

22    was a hearing date approaching?

23         A.  I do recall that, yes.

24         Q.  Do you recall that you contacted DC Hartwig

25    about your pending appearance?

1       A.  Yes.  I believe I did talk to him about it.

2       Q.  Do you recall that you asked him to appear with

3   you?

4       A.  I recall me asking something to the effect,

5   "Hey, are you going to come as a witness to what I saw?"

6   And he said, "No.  Your report stands on its own.  You

7   saw everything.  Just go do it" or something to that

8   effect.

9       Q.  Did you ever ask DC Hartwig to produce a

10  supplemental report?

11      A.  No.

12      Q.  Why not?

13      A.  Because it's not my job to ask a deputy chief

14  to write a report.

15      Q.  Outside of the chain of command?

16      A.  Pretty much, yes.

17      Q.  I'd like you to look at Exhibit 11 from the

18  stack.  I will represent to you this is a document that

19  BART gave us in the course of this case, and what I

20  understand it to be is a somewhat garbled transcript of

21  an e-mail exchange.

22      A.  Uh-huh.

23      Q.  In 2012, were you issued a Blackberry by BART?

24      A.  No.

25      Q.  But did you have a BART e-mail account?

<u>REPORTER'S CERTIFICATE</u>

1

2

3

4        I, SANDRA M. LEE, a Shorthand Reporter, State of

5    California, do hereby certify:

6        That SHANE R. CODUTI, in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time and

9    place therein specified;

10        That said deposition was taken before me at said

11    time and place, and was taken down in shorthand by me, a

12    Certified Shorthand Reporter of the State of California,

13    and was thereafter transcribed into typewriting, and

14    that the foregoing transcript constitutes a full, true

15    and correct report of said deposition and of the

16    proceedings that took place;

17        That before completion of the proceedings,

18    review of the transcript was not requested.

19        IN WITNESS WHEREOF, I have hereunder subscribed

20    my hand this 19th day of November 2013.

21

22

23

24        _____

          SANDRA M. LEE, CSR NO. 9971

25        State of California

*(Confidential Document Marked as Exhibit 25 to the Deposition
of Michael Hayes, Filed Under Seal)*

# EXHIBIT D

# EXHIBIT E

1                UNITED STATES DISTRICT COURT FOR THE

2                  NORTHERN DISTRICT OF CALIFORNIA

3                           ---oOo---

4    DAVID MORSE,

5           Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10          Defendants.
     _____/

11

12

13

14

15            DEPOSITION OF BENSON H. FAIROW

16              (Pages 1 to 71, inclusive)

17

18            Taken before SANDRA M. LEE

19                  CSR No. 9971

20                October 16, 2013

21

22
                      **Aiken Welch Court Reporters**
23                    **One Kaiser Plaza, Suite 505**
                      **Oakland, California 94612**
24              **(510) 451-1580/(877) 451-1580**
                      **Fax:  (510) 451-3797**
25                     **www.aikenwelch.com**

1     A.  I do not believe so.

2     Q.  So prior to today, that was the only time you

3  saw Mr. Morse in person?

4     A.  I had seen him at some protests, some of the No

5  Justice No BART protests.  Which ones, I can't recall.

6  I believe that's it.  There may have been other times I

7  don't specifically recall.

8     Q.  Approximately how many times did you see Mr.

9  Morse at a protest?

10     A.  Two, three.

11     Q.  What were these protests about?

12     A.  Protests against -- well, there were kind of a

13  combination of protests.  Initially they began as

14  protests against the officer involved in the shooting of

15  Charles Hill that occurred on the 3rd of July.  Later

16  on, it became -- Anonymous became involved, and they

17  became all BART protests.  I don't recall which ones,

18  but sometimes they merged together and those would have

19  been the occasions.

20     Q.  These protests were approximately during the

21  summer and fall of 2011?

22     A.  Yes.

23     Q.  When you observed Mr. Morse at these protests,

24  what was he doing?

25     A.  I don't recall.  Sometimes in the crowd.  That

8

1    would probably be the only time I would have seen him,

2    because during the protest I wasn't physically there.

3    It would have been through close-circuit TV.

4        Q.  Did you have audio with that CCTV?

5        A.  No.

6        Q.  Were you able to recognize that Mr. Morse was

7    carrying a photo camera?

8        A.  I've seen him with a camera before.

9            MR. ALLEN:  Can I interrupt for a second?

10           Go off the record.

11           (Discussion off the record.)

12   BY MR. SIEGEL:

13       Q.  When you were at the BART board meeting in

14   which you observed Mr. Morse, did he speak at that

15   meeting?

16       A.  Yes.

17       Q.  What do you recall him speaking about?

18       A.  It was something about the -- I don't recall.

19   It was somehow related to the protest or the way things

20   were being handled at BART regarding the

21   officer-involved shooting.  Something to that effect,

22   but I don't specifically recall.

23       Q.  Did Mr. Morse speak at an appropriate time on

24   the agenda?

25       A.  I would have to go back and look, but I believe

9

1    it was during public comment.

2         Q.  He wasn't shouting out; he was speaking when it

3    was his turn?

4         A.  In turn.  I'm sorry.  I shouldn't speak at the

5    same time.  In turn.

6         Q.  At what point did you become aware Mr. Morse is

7    a journalist?

8         A.  I believe at that time when I saw him at the

9    board meeting.

10        Q.  What do you know about Mr. Morse's journalism?

11        A.  I believe he writes for Indybay on-line.

12   That's about the extent of it.

13        Q.  Have you read any of his articles?

14        A.  I have.

15        Q.  Approximately how many?

16        A.  I don't recall.  Any that had to do with the

17   protest.

18        Q.  How long have you been with BART?

19        A.  Since March 21st, 2011.

20        Q.  You weren't here when Oscar Grant was killed?

21        A.  No.

22        Q.  Where did you work previously?

23        A.  The Oakland Police Department.

24        Q.  How long were you OPD?

25        A.  Since March of 1990.

1    qualify you as a commander?

2         A.  You're considered a commander in Oakland when

3    you're a lieutenant or above.  As a lieutenant and

4    captain, I was a commander.

5         Q.  For how long have you held such high-ranking

6    positions?

7         A.  I do not specifically recall when I was

8    promoted to lieutenant.  I believe it was sometime in

9    2001.

10        Q.  Do you recall that the City of Oakland was sued

11   for its mass demonstration or crowd control policies?

12        A.  I do.

13        Q.  Do you know that there's a consent degree of a

14   certain sort that now regulates Oakland crowd control

15   policy?

16        A.  I don't have specific knowledge of it.  I

17   believe I may have read something of it in the press.

18        Q.  What topics did David Morse write about in your

19   experience?

20        A.  Again, I don't specifically recall, but they

21   were usually about how the BART Police Department was

22   handling -- at least the ones I read, I'm sure he wrote

23   other articles not related to the BART police, but they

24   were usually about how the BART police were handling

25   something, the officer-involved shooting or the

1     protests.

2        Q.  How would you characterize the tone of his

3     articles?

4        A.  Generally negative towards the police.

5        Q.  Do you feel that criticism was warranted?

6           MR. ALLEN:  Objection; argumentative.

7           You can answer.

8           THE WITNESS:  I don't generally engage in those

9     types of things.  It's my job to allow them to happen.

10    BY MR. SIEGEL:

11       Q.  To allow what to happen?

12       A.  If somebody has an opinion they want to express

13    about the police negative or positive, that's their

14    right.

15       Q.  How did you come across Mr. Morse's articles?

16       A.  I looked them up on-line.

17       Q.  Through a Google search, for example?

18       A.  Initially perhaps.  At some point, I bookmarked

19    Indybay.

20       Q.  When do you think you started following his

21    articles in that way?

22       A.  More likely than not, it would have been late

23    July, early August of 2011.

24       Q.  So in the context of these No Justice No BART

25    or Op BART protests?

1      Q.  Do you recall ordering any arrests that

2  day?

3      A.  I do not.

4      Q.  You produced a summary e-mail of the events of

5  September 8th.

6          Do you remember that?

7      A.  Not specifically.

8          MR. SIEGEL:  I'd like to introduce Exhibit 1 to

9  this deposition.

10          MR. ALLEN:  I might want to make a suggestion.

11  If you want to make this exhibit next in order for all

12  of the depositions, then you have a continuity to them.

13  Otherwise we'll be crossing back and forth when you make

14  reference to the earlier one.

15          MR. SIEGEL:  Let's call this Exhibit 14.

16          MR. ALLEN:  Just for the record, what we're

17  doing is beginning with the depositions that have --

18  Mr. Siegel's depositions of BART and parties related to

19  BART, he will be using his deposition exhibits in

20  seriatim from the first depo beginning with Deputy Chief

21  Hartwig.

22          MR. SIEGEL:  Could we go off the record?

23          (Discussion off the record.)

24          (Plaintiff's Exhibit 14 marked for

25          identification.)

20

1    BY MR. SIEGEL:

2         Q.   Do you see the document in front of you?

3         A.   I do.

4         Q.   Do you recognize it?

5         A.   It appears to be an e-mail I sent to Marcia

6    deVaughn and Chief Rainey.

7         Q.   Who is Marcia?

8         A.   I don't know her exact title.  It's like

9    assistant general manager.  She's the chief's boss.

10        Q.   Is this a report of BART PD's activities during

11   the September 8th, 2011, protest?

12        A.   I need to review it real quick if that's okay.

13             Yes.  It appears to be an e-mail report I sent

14   to Marcia deVaughn.

15        Q.   How did you create this report?

16        A.   I would have typed it up.

17        Q.   What information did you rely upon?

18        A.   I don't specifically recall, but it would have

19   been my experience from the night before.  I don't know

20   that I had any documents at that point to review.  It

21   might have been just information I received by phone or

22   a report when dealing with specific numbers, people

23   detained or arrested.

24        Q.   Is it fair to say that you included reliable

25   information in your report?

21

1     A.  It was as reliable as I would have been able to

2  give at that time.

3     Q.  This was a report that you gave to the chief?

4     A.  He was cc'd in it.  I may have been in an

5  acting capacity at the time this was written, because

6  that's usually the only time I would be sending a report

7  directly to Marcia deVaughn.

8     Q.  Did you ever update this report?

9     A.  I don't recall.

10     Q.  Ordinarily if you made a report and learned

11  information that contradicted the report, would you

12  create an update?

13     A.  I might.  Probably wouldn't have caused an

14  update to go to Marcia deVaughn, though.  When you're

15  acting chief, you report to that person during the time

16  span that you're actually acting.  So if something were

17  to come up -- and I don't recall that anything did, but

18  if something were to, I would give it to the chief and

19  let him tell her if he felt it was important for her to

20  know.

21     Q.  What is Marcia's status within BART?

22     A.  She's -- I might have said acting assistant

23  general manager.

24     Q.  Is that who the chief of police reports to?

25     A.  Yes.

22

1     Q.   In this e-mail document, you write that the

2   protest began around 5:00 p.m.

3          Is that your recollection?

4     A.   I don't have an independent recollection of it.

5   That would have been my recollection at the time.

6     Q.   You write several warnings were given to

7   individuals in the group to not block the gates.

8          What did you base that statement upon?   I'm

9   looking at the second paragraph of your e-mail.   Second

10  large paragraph.

11    A.   I see it.   I don't specifically recall.

12  Probably reports from people in the field.

13    Q.   At the bottom of this page and the beginning of

14  the next, you write, "The station was closed at this

15  point and officers began to sort through the group of

16  detainees, releasing bonified members of the press and

17  taking those protesters participating in blocking gates

18  into custody."

19    A.   Yes.

20    Q.   What did you mean by "releasing bonified

21  members of the press"?

22    A.   Generally speaking, like, members of the press

23  with press credentials, that had been issued press

24  credentials.   In today's world, there's a lot of

25  bloggers and a lot of people that report on things and

23

1   aren't necessarily considered bona fide press.  It was

2   basically that.

3       Q.  Are you familiar with the BART policy regarding

4   media?

5       A.  Not off the top of my head.

6           MR. SIEGEL:  Let's try Exhibit 15, please.

7           (Plaintiff's Exhibit 15 marked for

8           identification.)

9   BY MR. SIEGEL:

10      Q.  Have you reviewed this policy previously?

11      A.  Not recently.

12      Q.  I'd like to direct your attention to the second

13  page of this document under the heading of "Media

14  Access."  Under item (a), it states, "The media

15  representative shall produce valid press credentials

16  that shall be prominently displayed at all times while

17  in areas otherwise closed to the public."

18          Do you know what valid press credentials is?

19      A.  I would consider those to be credentials issued

20  by the police department.  I know Oakland does.  I know

21  San Francisco does.

22      Q.  Are you aware that a journalist does not have

23  to have such credentials in order to practice

24  journalism?

25      A.  I think that's a common-sense approach to it,

1    yes.

2        Q.  When you wrote -- when you refer to "bonified

3    members of the press," were you referring to David Morse

4    as a non-bona fide member of the press?

5        A.  Apparently I was in that e-mail.

6        Q.  And why did you consider Mr. David Morse not to

7    be bona fide?

8        A.  I don't specifically recall.  I think what I

9    was referring to -- I don't have independent

10   recollection.

11       Q.  Do you know whether Mr. Morse had press

12   credentials that day?

13       A.  I don't believe he did, but I don't recall.

14       Q.  Is it true that other self-proclaimed

15   journalists were primarily detained on that day?

16       A.  I don't specifically recall.  I do recall there

17   were some journalism students.  I would probably lump

18   them into that category.  They were released.

19       Q.  And were they bona fide members of the press?

20       A.  Not with press credentials, no.

21       Q.  They weren't included in your statement of

22   "releasing bonified members of the press"; is that fair

23   to say?

24           MR. ALLEN:  I'm going to object it's vague,

25   it's argumentative, calls for speculation.

1    provides a limited amount of information to me when I'm

2    sitting there remotely in Oakland.

3          Q.  Is it fair to say when you wrote this report,

4    you were not necessarily relying on direct knowledge?

5          A.  That's true.

6          Q.  You were relying on what other people told you?

7          A.  True.

8          Q.  I have caught up with my earlier question.  I'd

9    like you to look at Exhibit 1, which has already been

10   introduced which your counsel has a copy of.  From my

11   understanding of what BART has told me, this is the

12   tactical team and crowd control policy.

13          Do you recognize this policy?

14          A.  Yes.

15          Q.  I'd like to direct your attention to 459.7,

16   which is on the page numbered 411 by the policy number

17   or 19356 by the Bates stamp.  It's entitled "The Media &

18   Public Information."

19          A.  459.7?

20          Q.  Yes.

21          A.  Got it.

22          Q.  Would you please read the first two sentences

23   of the second paragraph of that section?

24          A.  "Those with a right to cover photograph

25   demonstrations are not limited to representatives of

27

1   major newspapers, radio or television stations.  Persons

2   who represent small newspapers or magazines,

3   free-lancers and other citizens are also entitled to

4   take notes or photographs."

5        Q.  Is it fair to say that the second sentence of

6   that paragraph covers non-bona fide members of the

7   press?

8        A.  Absolutely.

9        Q.  Whether you're bona fide or not, you have the

10  right to report on protests occurring on BART

11  facilities?

12       A.  As long as you don't break the law, yes.

13       Q.  I'd like to direct your attention to the fourth

14  paragraph of that same section.  It states, "Officer

15  should recognize media credentials issued by police

16  agencies or the media representative's employer as valid

17  identification."

18            Does that refresh your recollection about what

19  proper credentials would be?

20       A.  It does.

21       Q.  So if the credentials are issued by the media

22  organization, that's sufficient; is that correct?

23       A.  Yes.

24       Q.  Do you have any independent knowledge of how

25  David Morse might have blocked fare gates?

1    command staff.  It would be with our operations

2    counterparts within the BART system, those who patrol

3    the trains and the stations, that type of thing.

4        Q.  Do you recall at one of those meetings a "Be On

5    the Look Out" document was distributed?

6        A.  No.

7        Q.  I'd like to direct your attention to -- I

8    thought we had it here -- Exhibit 4.

9        A.  Got it.

10       Q.  Do you recall this document?

11       A.  I do.

12       Q.  What is it?

13       A.  It's pictures of Christopher Cantor and Mr.

14   Morse.  At that point, we had identified Mr. Cantor.  We

15   didn't know Mr. Morse's actual name.  He was identified

16   by his moniker, Dave Id.

17       Q.  Is this a BOLO?

18       A.  No.  It's a document that was handed out to

19   officers who were out there that day.  Again, as you

20   recall earlier, I mentioned that if Mr. Morse showed up,

21   it was highly likely that that's where the protest would

22   be, So actually if either one of them showed up.  What

23   this was created for was to allow field personnel to

24   know what both of them looked like and to advise us when

25   they showed up so we knew whether we would have the

40

1    resources in the right place or not.

2         Q.   How is this distinguishable from a BOLO?

3         A.   BOLOs usually have some kind of action

4    requested, either arrest, identify, missing people if

5    it's a missing person, a BOL for a missing person.  I'm

6    sure there's a couple I'm missing.  But this was solely

7    to provide field personnel with an idea what these two

8    individuals looked like.

9         Q.   Did you use a mugshot of Christopher Cantor in

10   this BOLO?

11        A.   I would be guessing, but it appears as though

12   the one on the left -- upper left-hand corner is a

13   mugshot.  It could be a driver's license, though.

14        Q.   Why was the PFN included?

15        A.   Because he had been arrested before.

16        Q.   How did that help to identify him?

17        A.   I didn't need to identify him.  He had already

18   been identified.

19        Q.   I'm saying:  This document was issued to help

20   people visually identify Cantor and Dave Id; is that

21   correct?

22        A.   Yes.

23        Q.   So why is the PFN included?

24        A.   I don't have specific knowledge of why.  I can

25   think of a variety of reasons, one being if we did come

1    in contact with them and they were taken into custody

2    again, it would speed the process.   We wouldn't have to

3    do a record-check to know what his PFN is.

4         Q.   So in certain ways this document is

5    anticipating the arrest of Cantor?

6              MR. ALLEN:   Objection.   It's argumentative,

7    calls for speculation.

8              THE WITNESS:   No.   Not at all.

9    BY MR. SIEGEL:

10        Q.   Is it fair to say this document stigmatizes

11   Cantor?

12             MR. ALLEN:   Objection; argumentative.

13             THE WITNESS:   No.   It's for police use only.

14   BY MR. SIEGEL:

15        Q.   There aren't any specific instructions on how

16   to use this document on the document, are there?

17        A.   No.

18        Q.   It doesn't say use this document to identify

19   these two people, does it?

20        A.   No.

21        Q.   How often does BART create a BOLO, an official

22   BOLO?

23        A.   Once or twice a week.

24        Q.   And how often -- let me take that back.

25             Does BART create BOLOs for protests?

42

1    A.   Not unless someone is wanted.

2    Q.   What would you call this document?

3    A.   I don't know that I would give it a label.   I

4  don't know.

5    Q.   Have you ever created something like this

6  before?

7    A.   Not that I recall.

8    Q.   Since this document was created, have you

9  created another like it?

10    A.   No.   There hasn't been a need.

11    Q.   What was the need for September 8th to create

12  this document?

13    A.   We knew that if either Mr. Cantor or Mr. Morse

14  appeared on a day when there was a protest scheduled to

15  occur that it was more likely than not that the protest

16  would occur where they showed up.   So having early

17  intelligence that they were present was helpful in

18  determining where we were going to send resources.   As I

19  recall, this particular day there was some confusion as

20  to whether they would actually be at Powell or another

21  station.   It's difficult for us as a law enforcement

22  agency to mobilize enough resources to cover every

23  contingency.   We try to cover them as best we can and

24  try to minimize surprises whenever possible.   In this

25  case, it was going to be to our advantage to know where

43

1    either Mr. Cantor or Mr. Morse showed up because we

2    would be able to put our resources in that location and

3    not play catchup by having to move to another station we

4    weren't aware of.

5         Q.  Did you work with Officer Dam in preparing this

6    document?

7         A.  I don't know that I worked with him.  I knew he

8    was preparing it.

9         Q.  Did you order him to prepare it?

10        A.  I may have.

11        Q.  If you had to do it over again, would you

12   prepare this document in the same manner?

13        A.  Yes.

14        Q.  Other than this document, did you highlight

15   David Morse in any other way in advance of the protest?

16        A.  Not that I recall other than maybe at briefings

17   talking about if either one of them were seen, they need

18   to alert us as soon as they were seen.

19        Q.  Were you hoping to arrest Mr. Morse?

20        A.  Not necessarily.  I was hoping the protest

21   would be just that, a protest, that there wouldn't be

22   any law-breaking.

23        Q.  Were you hoping to learn his true name?

24        A.  I don't know that I gave that any consideration

25   at the time.  He hadn't committed any criminal acts, so

44

1    I really wouldn't be interested in that.

2        Q.   Who is Christopher Vogan?

3        A.   That's one of our officers.

4        Q.   What is his title?

5        A.   Just an officer.

6        Q.   Do you remember working with him with regards

7    to the protest in question?

8        A.   I may have.

9        Q.   What role would he play in the protest?

10        A.   He and another officer -- I don't have specific

11    recall to this protest.   He and another officer at that

12    time had assignments that were undercover type of

13    assignments, so I know I used them on occasion to do

14    undercover work.   Basically surveillance.

15        Q.   Do you remember if any undercover officer was

16    used on September 8th?

17        A.   I don't specifically recall, but I may have.

18        Q.   Did you utilize any confidential informants

19    that day?

20        A.   I do not believe so.

21        Q.   Would there be a record of such a thing?

22        A.   If -- if the information that a confidential

23    informant gave were to be used in that person's arrest,

24    I would assume there would be some kind of record.   I

25    don't have any recall of confidential informants being

1    contain every possible action or thought, it would be

2    much thicker and take a long time to read through.

3              MR. SIEGEL:  Take a break.

4              (Recess taken.)

5    BY MR. SIEGEL:

6        Q.  Other than September 8th, 2011, during your

7    tenure as a BART commander, have you utilized 369i to

8    make arrests?

9        A.  Not personally.  But during other -- I believe

10   during other protests that followed.  I'd have to check.

11       Q.  You don't know for sure?

12       A.  No, I don't.

13       Q.  Do you know why 369i was used on the protest in

14   question?

15       A.  Not specifically because I didn't witness it.

16   I believe it was because they were blocking the fare

17   gates.

18       Q.  I'd like to show you an exhibit we looked at

19   yesterday.  It's Exhibit 10.

20       A.  Okay.

21       Q.  What is this document?

22       A.  This is an event record printed from our CAD

23   system or Alliance.  I believe it's called the Alliance

24   Reporting System.

25       Q.  Do you know how this record is created

1    specifically?

2        A.   It is based off of dispatchers in our dispatch

3    center.

4        Q.   Is it reliable in terms of the times?

5        A.   To the extent that what is typed is typed at

6    that time.

7        Q.   Is there a process to review an event record

8    for accuracy?

9        A.   Not that I'm aware of, but communications

10   doesn't come under my area of responsibility.

11       Q.   On the first two pages of this record, do you

12   see yourself referenced through some of the entries?

13       A.   Yes.

14       Q.   You're C2?

15       A.   I am.

16       Q.   On the first page, the last entry refers to C2.

17            Can you decipher what that means?

18       A.   Not a hundred percent.

19       Q.   What's your best guess?

20       A.   There's a male at one end of the station, black

21   and white checkered jacket, so that's a clothing

22   description, jumping and interfering with train traffic.

23       Q.   A few lines above that, do you see where it

24   says "S56"?

25       A.   Yes.

1    Q.  Seems to state "Secondary subject Dave Id is in

2    paid area."

3    A.  Yes.

4    Q.  What does "secondary subject" mean?

5    A.  Probably have to ask S56.  That would be the

6    supervisor at the time.  Perhaps he's the second person

7    on the list of photos.

8    Q.  So the BOLO made Mr. Morse a subject; is that

9    fair to say?

10       MR. ALLEN:  Objection.  That mischaracterizes

11   the testimony of Deputy Chief Fairow as to what that

12   document is.  You're characterizing it as a BOLO and he

13   did not.

14   BY MR. SIEGEL:

15   Q.  With that caveat, did the document lead to

16   David Morse being characterized as a subject?

17   A.  It may have.  He's the second person on that

18   document.

19   Q.  And right below S56, it says, "226:  subject is

20   by entrance to police office."

21       Do you see that?

22   A.  I see that.

23   Q.  Do you think that refers to Christopher Cantor?

24   A.  I don't know.  Doesn't say.

25   Q.  How were you participating in the protest

1    Q.  Do you remember taking any efforts to obtain

2    video footage of BART meetings regarding Mr. Morse?

3    A.  It would appear based on this that -- which is

4    what I would normally do -- I asked Tom Smith to pull

5    the footage.  They're the ones with control over that.

6    He says he's checking on it.

7    Q.  Do you know for what purpose the footage was

8    pulled?

9    A.  I could only speculate based on what the chief

10   wrote to me.

11       MR. SIEGEL:  I'd like to mark Exhibit 19,

12   please.

13       (Plaintiff's Exhibit 19 marked for

14       identification.)

15   BY MR. SIEGEL:

16   Q.  Is this an e-mail message you sent to Ken Dam?

17   A.  Yes.

18   Q.  Did you tell Officer Dam to create the

19   BOLO-like flier that we've discussed earlier?

20       MR. ALLEN:  Objection; mischaracterization of

21   the question, the form of the question.

22   BY MR. SIEGEL:

23   Q.  Did you direct Officer Dam to create Exhibit 4?

24   A.  Yes.

25   Q.  How were you able to recognize David Morse in

1    the picture?

2         A.   I'd seen him before.   I'm not sure exactly

3    where.   Perhaps this e-mail gives me a clue.   I'd seen

4    him in board meetings.

5         Q.   Directing your attention to the second page of

6    this document, the top paragraph, it states, "Dave Id

7    hasn't been identified yet.   He's the Indybay 'reporter'

8    who collaborates with Cantor."

9         Did you write that?

10        A.   Yes.

11        Q.   What did you mean David Morse collaborates with

12   Christopher Cantor?

13        A.   Because he had been with Cantor and engaged in

14   conversations and appeared to be participatory in the

15   activity that was going on.

16        Q.   Prior to September 8th?

17        A.   Yes.

18        Q.   What do you mean by "participatory"?

19        A.   Just most reporters will report on what they

20   see, observe, report what happens in the interviews.

21   They aren't usually engaged in a personal exchange or

22   writing and leading at the same time with their

23   subjects.   It's based on observation.

24        Q.   Based on the style of reporting, essentially?

25             MR. ALLEN:   Objection; calls for speculation.

### REPORTER'S CERTIFICATE

I, SANDRA M. LEE, a Shorthand Reporter, State of California, do hereby certify:

That BENSON H. FAIROW, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 1st day of November, 2013.

_____
SANDRA M. LEE, CSR NO. 9971
State of California

*(Confidential Document Marked as Exhibit 2 to the Deposition of Benson Fairow, Filed Under Seal)*

# EXHIBIT F