# EXHIBIT G

1          UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                                  No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15           DEPOSITION OF STEVEN COONTZ

16            (Pages 1 to 82, inclusive)

17

18         Taken before SANDRA M. LEE

19              CSR No. 9971

20            December 2, 2013

21

22
               **Aiken Welch Court Reporters**
23             **One Kaiser Plaza, Suite 505**
               **Oakland, California 94612**
24             **(510) 451-1580/(877) 451-1580**
               **Fax:  (510) 451-3797**
25                **www.aikenwelch.com**

18

1     When?

2     BY MR. SATTERLUND:

3          Q.  If you have anything --

4          A.  I don't have anything to add, no.

5          Q.  You don't remember seeing him, for example,

6     taking photographs?

7          A.  Not particularly, no.  I can't say that he

8     wasn't, but I don't recall specifically that he was.

9          Q.  And were you aware of any of the media that

10    Mr. Morse was uploading to the internet about this

11    protest campaign?

12         A.  I saw -- had seen articles on Indybay, or

13    pieces, whatever you want to call them, that he had

14    written.

15         Q.  What sorts of --

16         A.  They were under the name of Dave Id.  I didn't

17    know who Dave Id was particularly.

18         Q.  And are you aware of other personnel at BART PD

19    following the work of Dave Id in any way?

20         A.  Not specifically, no.  They may have been.  I

21    don't know.

22         Q.  Did you have any conversations with fellow

23    officers about Dave Id or his work?

24         A.  Not specifically, no.  I mean, my -- my

25    interest in the articles was primarily as a means of

19

1   predicting when the next protest might occur, that sort
2   of thing.  It wasn't situational awareness of what was
3   going on.
4        Q.  Did you have any sense of Dave Id's position or
5   opinion or attitude towards the protests?
6        A.  Towards the protest?
7        Q.  Uh-huh.
8        A.  The pieces that I saw in Indybay were certainly
9   pro the protest message.  They supported it.  They
10  seemed to be editorializing in favor of the protest
11  groups that were there.
12       Q.  Was there any other content that you observed
13  in addition to editorialization, other print or other
14  sorts of media?
15            MR. ALLEN:  Objection; vague.
16            THE WITNESS:  I don't really understand what
17  your question is.  Other sorts of media?  What do you
18  mean?
19  BY MR. SATTERLUND:
20       Q.  Were there photos or video or audio?
21       A.  There were photos under some of the Indybay
22  stories.  I don't know specifically that they were
23  attached to his.  There were a number of articles
24  written by different people regarding the effects of
25  2011 and our department.  I couldn't attach one, whether

20

1    there was a video or a photo with one person's.  I don't

2    know who they were attached to or not.  I know they were

3    there, but I don't know what story they were attached

4    to.

5        Q.  You said you don't recall any conversations you

6    had with other officers indicating whether they were

7    following this material as well?

8        A.  Not particularly, no.

9        Q.  Was Dave Id discussed in your presence at any

10   time prior to the September 8th protest?

11       A.  I don't know.  May have been.  I don't know

12   specifically.

13       Q.  Do you recall him coming up at any meetings or

14   briefings that might have occurred?

15       A.  Again, I couldn't say specifically when.  I

16   know he was discussed, but I don't know -- I couldn't

17   tell you when exactly that occurred.

18       Q.  Understood.

19           What was the nature or subject of this

20   discussion that you do recall?

21       A.  Just that the sense was, as I said, he seemed

22   to be an active organizer of the group that seemed to be

23   behind most of the protests that we should be alert for.

24       Q.  Are you aware of the basis of that opinion on

25   the part of the people who told you that?

21

1      A.  No.  I mean, I could speak for myself.  I
2   formed that impression based on what I'd seen.  I don't
3   know what they based their impressions on.
4      Q.  You don't recall when you had that conversation
5   with other officers?
6      A.  No.  Not specifically.
7      Q.  Do you know for certain whether you had formed
8   your own belief before or after this belief was
9   expressed in this meeting you recall?
10      A.  I couldn't say whether it was before or after.
11   I could say I formed my impression fairly early on when
12   the protests began in I believe it was July.
13      Q.  Let's move to the September 8th protest more
14   specifically.
15          Were you involved in any of the planning for
16   BART PD's response to that?
17      A.  To some extent, yes.  We had formed sort of an
18   operational plan for the protest when they began in
19   July.  They were so frequent we basically modified the
20   plan slightly for each successive event that occurred.
21      Q.  Can you give me a sort of overview of that
22   plan?
23      A.  Well, as I recall -- it's been some time -- we
24   were not certain where the protests were going to occur,
25   what stations that were going to be selected by the

23

1    on what we thought was going to occur, then we would.  I

2    couldn't tell you what changes were made for each

3    protest.

4         Q.  You've said you don't remember when you got

5    involved in planning for the September 8th protest, but

6    you say you were involved in that specific round of

7    planning.

8            What were you doing?

9         A.  Well, my recollection is it was -- my role was

10   more of a logistics and operational type of assistance

11   rather than planning.  It wasn't -- I guess I'm not

12   finding the right words to describe it.  I was more of

13   an assistant to the lieutenant and people who were

14   charged to move the logistics and organize things so it

15   functioned as smoothly as possible.

16        Q.  Let's look at the plan for the protest.  This

17   has been previously produced and marked as Exhibit 2.

18            MR. ALLEN:  The court reporter needs you to

19   look at the official exhibit.

20   BY MR. SATTERLUND:

21        Q.  Did you yourself read this plan before the

22   protest?

23        A.  I'm sure I did.

24        Q.  What typically is done with an operations order

25   like this; how did it get rolled out?

24

1   A. Our practice is generally that the hard copy or

2 photocopy order would be distributed to the supervisors.

3 Sometimes there's copies enough for the officers, but

4 generally speaking not. The order is then gone over in

5 a verbal briefing with the people who are going to be

6 participating in whatever the operation is going to be

7 for that day.

8   Q. Do you know who generated this specific order?

9   A. No, I don't. Deputy Chief Fairow signed it --

10 actually, I don't know who signed it. I don't know who

11 generated it.

12   Q. Who typically would be in charge of both

13 drafting and issuing a report like this?

14   A. Well, as I said, my understanding was that the

15 basic order would just change for each succeeding

16 demonstration. This is probably an amalgamation of the

17 orders that had gone before with any adjustments that

18 the person -- the commander felt were necessary, which

19 is Deputy Chief Fairow. That would be published with

20 their signature on it.

21   Q. And do you know what role that order assigned

22 to you specifically for this specific --

23   A. I'd have to look, if that's all right.

24   Q. Please.

25   A. There's usually a schedule or roster attached.

25

1      MR. ALLEN:   Page 13.

2   BY MR. SATTERLUND:

3      Q.   Looks like you're on the bottom of the page.

4      A.   I was the operation sergeant for the tactical

5   team.

6      Q.   I see next to your name S57.

7      A.   Yeah.

8      Q.   What was -- was that a call number?

9      A.   That was my badge number.   For sergeants and

10  lieutenants, their badge number is their call sign in

11  the department.

12     Q.   So that would be consistent throughout?

13     A.   Yes.

14     Q.   And was your specific position also consistent,

15  or did you get moved to any other duty at any point

16  during this?

17     A.   I couldn't -- I don't recall exactly.   I may

18  have been doing different duties on different events.

19  It could have been.   I don't remember specifically.

20     Q.   If this says for September 8th you're tactical

21  operations sergeant, does that mean that you would be

22  reliably in that role throughout?

23     A.   For that day, yes.

24     Q.   We've sort of chipped at this before.

25          What is the duty specifically of a tactical

1      Q.  And is there any room for interpretation as to

2   what --

3           MR. ALLEN:  Vague, overbroad, calls for

4   speculation.

5   BY MR. SATTERLUND:

6      Q.  What I'm trying to get at is:  How obstructed

7   do the fare gates need to be before they're blocked?

8      A.  If people cannot access the system to get on

9   the trains, then it's blocked.  If they can't safely get

10  by whoever or whatever is in the way, then they

11  effectively prevent access to the system.

12     Q.  What about in the instance of a dense crowd; if

13  it is possible to navigate through albeit slowly and

14  with some bumping into people, are the fare gates still

15  blocked?

16     A.  That would be something I would have to see and

17  make a determination based on what I see as to whether

18  the patrons can realistically access the system.

19     Q.  So would the crowd have to be more difficult to

20  get through than the sort of 5:15 p.m. weekday rush hour

21  to constitute a blocked fare gate?

22          MR. ALLEN:  For purposes of 369i, or are you

23  just asking his opinion as to whether or not a blocked

24  fare gate is just a congested area in front of the fare

25  gates with patrons coming and going?

30

1          MR. SATTERLUND:  Right.  With regard to

2     blocking fare gates as this order is discussing it.

3          MR. ALLEN:  That's vague, calls for

4     speculation.  This order is designed for that person who

5     had the intent to block the fare gates to create a

6     disturbance and/or otherwise interfere with the

7     operation of the train system, which is different from

8     someone just simply having a rush hour congestion in

9     front of fare gates.

10    BY MR. SATTERLUND:

11         Q.  Let me get that from you, if I may.

12         A.  Well, the evening commute, having to stand in

13    line to get through the fare gates beyond other people

14    who are doing the same thing is not the same as not

15    being able to get to the fare gates because people are

16    deliberately standing in the way impeding your access to

17    the gates.  That's the distinction in my mind.

18         MR. ALLEN:  And, Mr. Sutherland, just so we're

19    clear on the record, because I always like my records to

20    be clean and not an inference of I'm trying to coach my

21    witnesses, you're referring to the fifth paragraph.  You

22    jumped down from the first sentence which states "The

23    department will take a zero tolerance approach to

24    disruptive, unsafe and unlawful activity occurring on

25    the platform or concourse during this planned protest,"

31

1   down to the fifth or sixth sentence and then asked him

2   to opine on what a blocked fare gate was.  I just wanted

3   to make sure that we were discussing it in the same

4   context of unlawful activity, which was the precedent --

5   the precedence to your question.

6                MR. SATTERLUND:  Okay.  The record is

7   clarified.

8   BY MR. SATTERLUND:

9        Q.  So what it seems to be getting at, and correct

10  me if I'm wrong, are you saying there's an intent

11  requirement?

12       A.  I think -- yeah.  I think that's fair.  The

13  intent, I believe, behind this paragraph in the order

14  was that we were not going to be allowing people to

15  block the gates, people intending to block the gates for

16  whatever purpose and they're restricting people from

17  using the transit system.

18       Q.  Does that intent have to be specific to each

19  person in order for them to be arrestable?

20                MR. ALLEN:  Objection; calls for a legal

21  conclusion.

22  BY MR. SATTERLUND:

23       Q.  In order for you to conclude you had the

24  authority to arrest somebody, would you have had to

25  believe that they personally intended to be preventing

32

1    others from entering the BART system?

2         A.  I think under 369i of the Penal Code, yeah,

3    there's an element of being a willful act to impede the

4    services of the system.

5         Q.  If hypothetically there was somebody caught up

6    in the crowd while trying to get through to use the

7    system, would it be fair to say you would not think that

8    that person was guilty of blocking the fare gates?

9         A.  If it did not appear that they intended to be

10   there and they weren't intending to block the fare

11   gates, then, no, I would not think they were breaking

12   the law.

13        Q.  How would you have gone about determining in a

14   large crowd of people who intended to be blocking the

15   fare gates?

16        MR. ALLEN:  Objection; vague and overbroad.

17   It's also an improper hypothetical and assumes facts not

18   in evidence.

19   BY MR. SATTERLUND:

20        Q.  You can answer.

21        A.  How would I go about -- can you restate your

22   question?  I don't think I really understood it.

23        Q.  What evidence would lead you to conclude that a

24   given person in a crowd of people intended to be

25   blocking the fare gate?

48

BY MR. SATTERLUND:

Q.  Can you give me an idea of the frequency with which you noticed Mr. Morse?

MR. ALLEN:  Objection; vague as to time, overbroad.

THE WITNESS:  If you're asking me while they're marching around, I suppose I would have seen him every time they came around.  I don't know how many times that was.  I wasn't specifically looking for him, but I would have captured him in my field of view.

BY MR. SATTERLUND:

Q.  Was he chanting?

MR. ALLEN:  Objection; vague as to time.

THE WITNESS:  If you're asking me was he chanting during that particular protest at that particular time, I don't know.

BY MR. SATTERLUND:

Q.  During this phase while people are circling the ticket machines, you don't have any specific recollection of seeing Morse chanting?

A.  Specifically, no, I don't.

Q.  Roughly how long would you say people were circling the kiosk?

A.  Again, I have no -- I couldn't tell you an exact time.  It went on for some minutes, very slowly

51

1      A.  Well, there was a group of -- large group of

2  people that were in a mass, and then there were people

3  that were trying to make their way around the outskirts

4  of the group to get by or do whatever business they had

5  to do.

6      Q.  Where were the media that were covering the

7  group?

8      A.  Some were on the outskirts.  Some were filming

9  it from a distance.  Some were, I'm assuming, talking to

10  people, interviewing, taking recordings, et cetera.  It

11  just depended on what media person you're talking about.

12      Q.  When you say "inside," you mean inside the

13  group?

14      A.  I'm sure they were, some of them, yes.

15      Q.  And during this phase, were you still inside

16  the paid area of the concourse?

17      A.  I don't recall where -- I moved around because

18  I was making announcements to the crowd that if they

19  blocked the fare gates they were subject to arrest.  I

20  moved to different locations for everyone in the group

21  to be able to hear my announcements so everybody would

22  have the information they needed.  I moved to various

23  locations so my announcements would be heard by

24  everybody.

25      Q.  What specifically did you announce?

52

1      A.  I don't recall the exact verbiage.  Essentially

2   I was telling them that it was unlawful to block the

3   fare gates, to block access to the system, and that if

4   they did so or continued to do so, they'd be subject to

5   arrest.

6      Q.  Did you receive during this phase any orders,

7   instruction or information from the chain of command?

8      A.  While I was doing that, no, other than to

9   continue what I was doing.  I was moving around the

10  outskirts because I couldn't really get through the

11  group so everybody could hear what I was saying.

12     Q.  Were these the only fare gates into the

13  station?

14     A.  No.  There's a secondary set down roughly a

15  block away at the other end of the station.

16     Q.  Were there any obstructions that you could see

17  around the secondary set of fare gates?

18     A.  Not that I recall, no.

19     Q.  Where did you observe people going who tried to

20  get into the system and could not?

21     A.  They would walk away.  I don't know where they

22  went.  I don't know.  It's difficult to tell where they

23  went.  I wasn't focusing on the people that weren't

24  creating a problem.

25     Q.  When you were making these announcements, what

53

1  force did those announcements have?

2          MR. ALLEN:  Objection; calls for speculation.

3          THE WITNESS:  Are you talking about the volume

4  of them or what impact did they have on the people who

5  heard them?  Because I couldn't speak to them.

6  BY MR. SATTERLUND:

7      Q.  What impact did you intend them to have on the

8  people?

9      A.  My intent was that everyone who was there would

10  understand that if they broke the law that they would be

11  subject to arrest, and that if they were blocking

12  ingress and egress from the system that they were

13  breaking the law and that they were subject to arrest so

14  no one would be surprised if they were to be arrested

15  and give people the opportunity to make a choice.

16      Q.  Would it be fair to say these were on the order

17  of instructions or admonitions rather than orders?

18      A.  They were advisements as to what the possible

19  consequences were of them continuing or if they moved on

20  to do other illegal acts.

21      Q.  How did the crowd respond; did they react in

22  any way to your instruction?

23      A.  Not that I recall, no.  I got no specific

24  response from anyone that I remember.

25      Q.  What happened next?

54

1    A.  Well, again, I don't know what the timeline is,
2  but at some point, the group appeared to be stationary
3  and unwilling to move.  A decision was made that they
4  had violated 369i of the Penal Code and we were going to
5  make a mass arrest.
6    Q.  When you say "a decision was made," who made
7  the decision?
8    A.  I don't know.  I assume -- I believe it was
9  Deputy Chief Hartwig who then passed his instructions to
10  Lieutenant Conneely and to me and the other sergeants
11  who were there.
12    Q.  What makes you assume that?
13    A.  Because he was in charge at the scene and would
14  have been the one to logically make that decision.
15    Q.  What specific form did the instruction you
16  received take?
17    A.  It was -- I don't recall if he told me directly
18  or Lieutenant Conneely told me, but I was told that the
19  group that was the core protest group was going to be
20  encircled and arrested or detained at least.
21    Q.  And how was that put into effect; how were
22  officers arrayed to accomplish this?
23    A.  Officers were instructed to form a circle
24  around the group that was in front of the gates and not
25  allow anyone to enter or leave.  They were being

55

1    detained for violation of 369i of the Penal Code.  The

2    officers stayed in a circle around them, and we then

3    went with our mass arrest plan, which was to remove

4    individuals from the group, either arrest them or

5    whatever we were going to do with them depending on what

6    they had done.

7         Q.  Did you give any specific instructions as to

8    how this was to be carried out?

9         A.  I believe my recollection is I helped place

10   some of the officers in the circle, and then I assisted

11   with some of the logistics as far as who the arrest team

12   officers were going to be, but I didn't specifically, to

13   the best of my knowledge, tell anybody to go get any

14   particular individual or make a particular arrest of a

15   person.  My role at that point became more of a

16   logistics and liaison role once the arrests started.

17        Q.  Would you have given any specific instructions

18   to arrest any specific person?

19             MR. ALLEN:  Would he have or did he?

20   BY MR. SATTERLUND:

21        Q.  Did you?

22        A.  I don't believe I did, no.

23        Q.  I'm going to play you an audio file that we

24   received from the defendants.  The Bates numbering has

25   just rearranged, so I will be in touch with you as soon

1    as we figure out where it is in the record.

2         (Whereupon, an audio file was played.)

3    BY MR. SATTERLUND:

4         Q.   Do you recognize either of those two voices?

5         A.   Yeah.   That's me and one of the dispatchers.

6         Q.   So --

7              MR. ALLEN:   Are you going to play any more on

8    that audio file, or is that the exhibit?

9              MR. SATTERLUND:   That's the exhibit.

10             MR. ALLEN:   Do you have the CD you want to pop

11   out?

12             MR. SATTERLUND:   It's in the other room.

13             MR. ALLEN:   Let me take a stab at a

14   stipulation.

15             I will stipulate that the audio file that has

16   just been played and identified by Lieutenant Coontz

17   as his voice regarding words to the effect that

18   Krystoff and his sidekick would be arrested is an

19   audio file produced by defendants under a request

20   for production of documents.   Recently the Bates

21   stamping on these documents was reorganized, and I

22   will stipulate that rather than have the need to

23   mark and produce it as an exhibit for this deposition,

24   that, in fact, it's a document in the form of that

25   audio file that's in our possession, has been produced

57

1    to plaintiffs.   Thus there shouldn't be any dispute at
2    trial over its use.
3              Are you satisfied with that?
4              (Discussion off the record.)
5              MR. ALLEN:   What I suggest, then, if you want
6    that exact language, you're going to need to burn a
7    copy of that so we can attach it as an exhibit if
8    my stipulation isn't good enough at this point in
9    time.
10             MR. SATTERLUND:   It's just in case we wind up
11   needing the language before trial and before
12   moving exhibits into the record.
13             MR. ALLEN:   Obviously if you need the language
14   in that transmission to oppose our summary judgment
15   motion, I'm not objecting to the use of it.   He has
16   identified his voice.   What we don't have, because we
17   don't have an exhibit specific at this point in time, is
18   the exact portion you played.   So I think to be on the
19   safe side, would you burn a copy of that and we'll
20   attach it as an exhibit to the record?
21             MR. SATTERLUND:   Sounds good.   We have copies
22   here, so I can bring it back here.
23             MR. ALLEN:   Is it just going to be that one
24   isolated portion?
25             MR. SATTERLUND:   Yes.

58

1          (Plaintiff's Exhibit 35 marked for

2          identification.)

3    BY MR. SATTERLUND:

4          Q.  Do you recall now having issued that

5    instruction?

6          A.  I did.  I passed it on.  It wasn't my -- I

7    didn't originate that.  I was told -- my recollection --

8    we had a circle of officers around a group of people.

9    We had to start somewhere, and that was where we

10   started.

11         Q.  So to whom were you issuing that order?

12         A.  To everybody on the radio who heard it

13   essentially.  That was the plan of how we were going to

14   begin removing people from that group as individuals as

15   opposed to the group and process them.

16         Q.  You said you didn't originate that.

17         Who did?

18         A.  To the best of my recollection, Chief Hartwig

19   made the decision on who was going to be first to be

20   removed from the circle.

21         Q.  Was Chief Hartwig present at the scene?

22         A.  Yes.

23         Q.  He passed that instruction along to you over

24   the radio?

25         MR. ALLEN:  I'm going to object; calls for

59

1    speculation.  It's been asked and answered.

2          THE WITNESS:  My recollection is that it was

3    verbal instruction.  I don't know if it was directly to

4    me or through Lieutenant Conneely to me, but that was

5    the plan.

6    BY MR. SATTERLUND:

7        Q.  What did you understand to be the reason for

8    starting with who were identified as Krystoff and his

9    sidekick?

10       A.  Because Cantor and, as I said, my impression

11   was, Mr. Morse, although I didn't know his name at the

12   time, were the organizers of the group.  And my

13   understanding was the hope was by removing the

14   organizers of the group, we would remove the potential

15   for violence or any further agitation as people were

16   removed from the circle.

17       Q.  You've told me everything that you know that

18   formed the basis for your impression that Mr. Morse was

19   one of the organizers?

20       A.  My personal impression, yes.

21       Q.  I'm sorry.

22          Who ordered the encirclement in the first

23   place?

24       A.  As I said, I believe it was Deputy Chief

25   Hartwig who made the decision that we were going to make

Aiken Welch Court Reporters   Steven Coontz   12/02/2013

60

1    a mass arrest and that our standard practice would be to

2    encircle the crowd and detain them and then remove them

3    individually for the processing and investigation,

4    whatever needed to be done.

5         Q.  Was it your understanding that all the officers

6    who heard your order would understand what was meant by

7    "Krystoff's sidekick"?

8         A.  It was a term that I used.  I think everybody

9    understood the two were very close together and that

10   they were working together and that everyone there would

11   have understood what I meant, yes.

12        Q.  Had that specific term been used before in

13   connection with Mr. Morse?

14        A.  I don't know.

15        Q.  So can you think of a specific reason why you

16   would have believed everyone would understand who

17   Morse -- who Krystoff's sidekick was?

18        A.  As I said, my impression was they were working

19   together.  I believe the impressions of the other

20   officers were they were working together.  The term

21   "sidekick" is a brevity term to be used on the radio

22   that people would understand that the person with Cantor

23   was -- who was with him was his, quote, "sidekick" and

24   that they were the first two to be removed from the

25   circle.

1      Q.  Can you give me the definition of the brevity
2   term "sidekick"?
3      A.  No particular definition.  It's just a term
4   that came to me at the time to describe the person who
5   was with Cantor.  I think people there understood what I
6   meant.  That was my only intent behind using that term,
7   was it was a quick description that I think everybody
8   there would probably understand.
9      Q.  After the group was encircled -- first of all,
10   what happened outside of the encirclement; what was the
11   conduct of the rest of the protest at that time after
12   the encirclement was solidified?
13      A.  Well, the encirclement contained, to my belief,
14   the people who were involved in the protest.  The people
15   who were outside were either media or people that
16   happened to be passing by or patrons who were trying to
17   get around or uninvolved in the protest itself.
18      Q.  There were no significant developments in the
19   conduct of what was going on outside the circle while
20   you were processing?
21          MR. ALLEN:  Objection; vague and overbroad.
22          THE WITNESS:  If you're asking me if there were
23   other people who attempted to get involved or were
24   creating a disturbance as we were processing, yes, there
25   were.  We closed the station down because there was a

1   number of angry people who were yelling and screaming

2   and creating a disturbance.  It was decided to close the

3   station so we could safely process people.  The people

4   who were moved out of the station remained in Hallidie

5   Plaza.  You could see through the roll-up gates what was

6   going on, and they continued to yell and scream from

7   outside and photograph whatever.

8   BY MR. SATTERLUND:

9       Q.  When you say "it was decided," who made that

10  decision?

11      A.  Again, I believe it was Deputy Chief Hartwig.

12  He may have collaborated with some of the transportation

13  supervisors who were there at the time, because it

14  became an issue as to whether the station could safely

15  remain open or not.  I don't know if that occurred or

16  not.

17      Q.  How was the closure of the station effected?

18      A.  I began making announcements over the megaphone

19  that the station was closed and that trains would not be

20  stopping and that everyone who was in the station had to

21  leave.  To the best of my knowledge, the station agent

22  also used the PA system in the booth to make similar

23  announcements because we also had to clear people off

24  the platforms and the other parts of the station so that

25  we could roll down the gates and truly close the

1    station, which takes a little bit of time.

2         Q.  What was the -- what was the force or effect of

3    those announcements; were those also in the way of being

4    information or instructions?

5         A.  Well, they were instructions.  Some people

6    began to leave of their own accord once they realized

7    the station was closing and the trains weren't going to

8    stop.  There was some people who didn't want to leave,

9    and they had to be told the station was now closed and

10   they no longer had the right to be there.

11        Q.  At that stage, were there formal dispersal

12   orders issued?

13        A.  No.  I never issued a formal dispersal order.

14   They were told that the station was closed and that they

15   would have to leave.  It was not a dispersal order under

16   the law.  It was just an advisement that the station was

17   closed.  It was no longer open for business.

18        Q.  So no dispersal orders were issued throughout

19   the entire day?

20        A.  No.  Not by me.

21        Q.  So we have the circle.  The entire crowd is

22   eventually cleared out of the station.

23            During that time, is the circle actively being

24   processed, or do they stay there until everybody is

25   gone?

64

1      A.  The circle of officers around the group

2  remained in place.  People that were inside the group

3  were moved individually.  They were identified.  If they

4  were subject to arrest, they were arrested.  If they

5  were not, then they were released under 849b of the

6  Penal Code, and then they were escorted out one of the

7  exits so they could go about their business.

8      Q.  Who was making that determination?

9      A.  The determination as to whether someone would

10 be arrested or not?

11     Q.  Yes.

12     A.  If an officer had seen a person actively

13 involved in the 369i violation of blocking the gates,

14 then they were arrested and taken into the office to be

15 processed.  If they were not -- there were a number of

16 media people that were involved -- that became involved.

17 Inside the circle, there was, I believe, a patron who

18 just happened to be involved, gotten encircled.  Once

19 that was established, they were released as soon as they

20 could be done so.

21     Q.  How did you determine who was media?

22     A.  I don't -- I didn't determine any of it.  My

23 sense of -- my recollection of what was done was people

24 who had a press pass issued by the San Francisco or

25 Oakland Police Departments, anyone with an ID from, you

65

1   know, TV, radio, whatever station, those were taken at

2   face value.  And they were -- as long as they hadn't

3   been doing anything otherwise illegal, they were

4   released.

5        Q.  You said earlier that there were some

6   journalists within the group who were blocking the fare

7   gates.

8        A.  Yes.

9        Q.  Is it fair to characterize your testimony as

10  saying that it was the group as a whole that was

11  blocking the fare gates?

12       A.  Yeah.  I mean, there were people -- there were

13  protesters and media that were there that got encircled.

14  Chief Hartwig at one point made several announcements to

15  the group that was inside the arrest circle that anyone

16  who was media should come forward, identify themselves

17  and they would be released from the circle.  Several

18  took advantage of that.

19       Q.  To the best of your understanding, why were the

20  journalists being released?

21       A.  Because they had been covering the story and

22  were not involved in the actual protest.  They had not

23  committed any violations of the law.  They were allowed

24  to leave.

25       Q.  Even those who had been while covering the

66

1    story incidentally in front of the fare gates?

2        A.  I assume yes -- yes.

3        Q.  Were all of the people released as journalists

4    displaying press credentials?

5        A.  I wasn't involved in that process.  I can only

6    assume they had some sort of credential that identified

7    them as media.

8        Q.  Did you make any observations of Mr. Morse

9    during the processing of the arrestees?

10       A.  Not that I recall, no.  He and Mr. Cantor were

11   moved from the circle early on.  I stayed outside, so I

12   didn't have any contact, to my recollection, after that.

13           MR. SATTERLUND:  Let's go through this now so I

14   can clear up any -- if you could mark that as Exhibit

15   36.

16           (Plaintiff's Exhibit 36 marked for

17           identification.)

18   BY MR. SATTERLUND:

19       Q.  Have you seen this document before?

20       A.  No.

21       Q.  Could you take a minute to look over the first

22   page and see if you can tell me what it is.

23       A.  It appears to be a transcript of my Internal

24   Affairs interview with our IA investigator.

25       Q.  When was that interview conducted?

1                    REPORTER'S CERTIFICATE

2

3        I, SANDRA M. LEE, a Shorthand Reporter, State of

4    California, do hereby certify:

5        That STEVEN COONTZ, in the foregoing deposition

6    named, was present and by me sworn as a witness in the

7    above-entitled action at the time and place therein

8    specified;

9        That said deposition was taken before me at said

10   time and place, and was taken down in shorthand by me, a

11   Certified Shorthand Reporter of the State of California,

12   and was thereafter transcribed into typewriting, and

13   that the foregoing transcript constitutes a full, true

14   and correct report of said deposition and of the

15   proceedings that took place;

16        That before completion of the proceedings,

17   review of the transcript was not requested.

18        IN WITNESS WHEREOF, I have hereunder subscribed

19   my hand this 20th day of December, 2013.

20

21

22

23        _____
          SANDRA M. LEE, CSR NO. 9971
24        State of California

25

*(Confidential Audio Recording Marked as Exhibit 35 to the Deposition of Steven Coontz, Filed Under Seal)*



# EXHIBIT I

1              UNITED STATES DISTRICT COURT FOR THE

2                NORTHERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4    DAVID MORSE,

5           Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10          Defendants.
     _____/

11

12

13

14

15            DEPOSITION OF MICHAEL D. HAYES

16              (Pages 1 to 39, inclusive)

17

18           Taken before SANDRA M. LEE

19                  CSR No. 9971

20               October 16, 2013

21

22

23            Aiken Welch Court Reporters
              One Kaiser Plaza, Suite 505
              Oakland, California 94612
24          (510) 451-1580/(877) 451-1580
               Fax:  (510) 451-3797
25              www.aikenwelch.com

1      Q.  During that interview, IA asked you about David

2  Morse as well; is that correct?

3      A.  You know, it's been a year since then.  I'm not

4  a hundred percent positive.

5      Q.  When a police officer is asked to speak with

6  IA, what are the expectations of that police officer?

7      A.  Same as today.  You will tell the truth.

8      Q.  There's nobody swearing you to tell the truth;

9  is that correct?

10      A.  You're ordered to tell the truth.

11      Q.  By the IA officer?

12      A.  By the Internal Affairs officer, yes.

13      MR. SIEGEL:  I'd like to introduce the next

14  exhibit in order.

15      (Plaintiff's Exhibit 24 marked for

16      identification.)

17  BY MR. SIEGEL:

18      Q.  This is a pretty thick document.

19      Have you ever seen this before, this document?

20      MR. ALLEN:  Do you have a copy for me?

21      MR. SIEGEL:  Good idea.  Sorry.

22      THE WITNESS:  Generally as the officer that was

23  interviewed, you don't see this documentation.  After

24  when I was interviewed, I was never allowed access to

25  this.

1    was involved in unlawful activity?

2        A.  It just says that he's an Indybay reporter

3    based on this document.

4        Q.  Is it unusual to identify a reporter in a

5    document like this?

6            MR. ALLEN:  Objection; calls for speculation,

7    lacks foundation.

8    BY MR. SIEGEL:

9        Q.  In your experience.

10           MR. ALLEN:  Calls for speculation.

11   BY MR. SIEGEL:

12       Q.  You can answer.

13           MR. ALLEN:  You can answer a question unless I

14   tell you not to.  I object for the record.

15           THE WITNESS:  Answer the question?

16           MR. ALLEN:  Please.  You want the question read

17   back?

18           THE WITNESS:  Yes, please.

19           (Record read.)

20   BY MR. SIEGEL:

21       Q.  Referring to Exhibit 4.

22       A.  This is the first time in my experience that

23   I've seen this.

24       Q.  This is the first time you've seen a journalist

25   identified like this?

18

1     A.  In my history.

2     Q.  I'd like to direct your attention to page 31 of

3  the transcript.  Read this page to yourself, and I'll

4  have a few questions.

5     A.  Okay.

6     Q.  Is it true that Office Coduti asked you to look

7  at his report regarding the arrest of David Morse?

8     A.  It's true.

9     Q.  And it's true that he asked you to improve his

10  in-custody report?

11     A.  You said improve or approve?

12     Q.  Improve.

13     A.  "Improve" would not be the correct term.  He

14  asked me to approve.

15     Q.  I'm working from lines 5, 6 and 7.  Here it

16  states, "Officer Coduti asked me to look at his report

17  and to improve his in-custody report, and that's how I

18  know that he arrested Dave Id."

19     A.  It should be "approve," not "improve."

20     Q.  Were you asked to approve the investigative

21  report?

22     A.  Yes, I was.

23     Q.  Did you approve it?

24     A.  No, I did not.

25     Q.  Why not?

19

1          A.   There were certain details that I felt were

2     lacking in his report, and based on the fact I was not

3     there, I was not his direct supervisor and I didn't know

4     what those details were, I did not approve the report.

5          Q.   Did anybody order you to approve the report?

6          A.   No.

7          Q.   Why were you having the conversation with

8     Officer Coduti?

9          A.   Again, he came to me to -- because I was the

10    sergeant on duty, he asked me to approve his report

11    before going home.

12         Q.   So at what point were you the sergeant on duty?

13         A.   When I started at 1355 hours that day in Powell

14    Street, San Francisco.

15         Q.   Where was this conversation occurring?

16         A.   This happened in the Powell Street office.

17         Q.   If could you look at lines 13 and 14 on this

18    page, it reads, "I know I had issues when I read the

19    report."

20              Do you see that statement?

21         A.   Yes, I do.

22         Q.   What issues did you have with the report?

23         A.   Lack of detail.

24         Q.   How much detail is required in an arrest report

25    or an in-custody report?

22

1    BY MR. SIEGEL:

2        Q.  Lieutenant, I can represent to you that this

3    report was provided to us by BART in the course of this

4    lawsuit.  I don't know if there were earlier versions of

5    the report that were not finalized.

6            Did you help Officer Coduti edit his report?

7        A.  No.

8        Q.  Did you suggest he should edit it?

9        A.  As I recall from our conversation, I brought up

10   the fact that, in my opinion, there were details missing

11   from this report, and I did have concerns regarding

12   those details.  I wanted more specifics from him

13   regarding the violation of 369.

14       Q.  In this type of report, is the detail that

15   you're referencing, is that provided in the narrative

16   section?

17       A.  It would be provided in the narrative section,

18   correct.

19       Q.  If you could review page 4 of this document,

20   and I'll ask you a couple of questions.

21       A.  Page 4?

22       Q.  Yes, please.

23       A.  You're referring to the narrative?

24       Q.  Yes, please.

25       A.  On this copy, it says page 7.

23

1      Q.  The page number I'm referring to is on the

2  bottom of the document to the right.

3      A.  Got it.

4      Q.  Does this report have enough detail?

5      A.  For the violation of 369i?

6      Q.  Yes.  For a report of this nature, does it

7  explain in adequate detail the basis for the arrest?

8      A.  When you say "in adequate detail," this has

9  very basic minimal amount of information regarding the

10  violation of 369.

11      Q.  To have a better report, what information would

12  you like to see?

13      A.  Well, there's several areas, again, if I was to

14  approve this I would want.  Referring to this, when it

15  says, "I was standing in the free area near the fare

16  gates."  What's the distance?  I don't know what the

17  distance is.  I wasn't there.  I can't picture where

18  Officer Coduti was standing.

19          "When I heard a dispersal order given to the

20  protesters," what means or what information was that

21  disposal order given?  Again, I don't know.  I wasn't

22  there.

23          "The protesters were standing in between the

24  fare gates and the ticket machines."  Specifically

25  where?  What was the distance from the fare gates?  What

1   was the distance from the ticket machines?

2           "After a couple of minutes," again,

3   approximately how long?

4           "BART police officers," which BART police

5   officers?

6           "Moved in and surrounded the remaining

7   protesters that did not comply with the lawful dispersal

8   order."  Again, remaining protesters, approximately how

9   many protesters did they surround?  How many officers

10  were used to surround them?

11          "Deputy Chief Hartwig approached me and said he

12  wanted me to start arresting protesters that were not

13  complying with the dispersal order."  That's pretty

14  simple.  It's basic.

15          "Deputy Chief Hartwig pointed at a man," I

16  would like a description of the individual.  Which man?

17  Give me a basic description of who that individual was.

18          "Later identified as Arrestee Morse."  I would

19  have put his name after "Arrestee Morse," first name,

20  last name, date of birth.

21          "Who was standing in a group of protesters,"

22  again, how large was the group?

23          "Near the edge of the circle," what does near

24  the edge of the circle mean?  How big was the circle?

25  Where was that circle located?

25

1    "Deputy Chief ordered me to arrest Morse for

2    trespassing on railroad property."  I would have asked

3    "In detail, what was the actions of that individual that

4    you were arresting at that time?"

5        He says, "I walked up to Morse and told him he

6    was under arrest."  For what?  I would have added what

7    he was under arrest for.

8        "I placed Morse in handcuffs, double locked

9    them, and checked them for proper fit."  That's

10   standard.  That's fine.

11       "I escorted Morse back to the Powell Street

12   BART Police Facility.  When you say "escort," what do

13   you mean?  Did you walk him?  Did you transport him on a

14   train, car?  What is escort?

15       "Morse's handcuffs were removed and replaced

16   with zip ties."  Why?  What was the reasoning behind it?

17       Morse was later taken to County Jail 1 in San

18   Francisco where he was cited and released on 369i PC,

19   trespassing on railroad property."  Who cited him, who

20   released him and what time did that occur?

21       Q.  Is it fair to say that this report is in

22   similar condition to the report you reviewed on the date

23   in question?

24       A.  I cannot testify that this report was the exact

25   report that I reviewed that day verbatim.

26

1    Q.  But it has similar problems to those you
2    identified in your IA investigation?
3        A.  Well, again, not problems but details.  It's
4    lacking details.
5        Q.  Were you trained on how to write a report such
6    as this?
7        A.  I was trained to write reports, yes.
8        Q.  What training have you received regarding
9    report writing?
10       A.  In the Alameda County Sheriff's Department,
11   basic academy.  Also through BART, a report-writing
12   class that they had.
13       Q.  Returning to the transcript, at line let's
14   start with line 15.
15       A.  On what page?
16       Q.  Page 31.  Sergeant Kwon asks "And what issues
17   did you have when you read his report?"
18           You respond, "That I remember in Officer
19   Coduti's report is that he was instructed by," and then
20   later you say "he was instructed by Deputy Chief Hartwig
21   to place Dave Id under arrest?"
22           MR. ALLEN:  May I ask you to read the
23   entire comment and not just a portion of it, so we have
24   clear context?
25           MR. SIEGEL:  Okay.

29

1   was enough details in this report for me to sign off on

2   arrest for 369i.  However, I'm not saying that the

3   minimum amount of information is not appropriate for an

4   arrest for 369i.

5   BY MR. SIEGEL:

6        Q.  And is that what you meant when you stated "he

7   didn't have probable cause in the arrest report"?

8        A.  The details to my standard for approving the

9   report.

10       Q.  Are your standards higher than BART PD

11   standards?

12       A.  I'm BART PD, sir.  I'm a supervisor.  And as

13   far as the officer writing the report, I would say my

14   standards are higher than the officer that wrote this

15   report as far as the detail.

16       Q.  I'd like to direct your attention to page 33 of

17   this transcript beginning at line 5.  If you could read

18   all the way down to line 26, please.

19       A.  Okay.

20       Q.  Did you suggest to Officer Coduti that the

21   deputy chief write a supplement?

22       A.  I did.

23       Q.  What did he say?

24       A.  He was reluctant, and rightfully so.

25       Q.  Why do you say that?

1    A.  You have to follow the chain of command.

2    Q.  So it wouldn't be typical practice for a

3    lower-ranking officer to ask a higher-ranking officer to

4    help write a report?

5    A.  It wouldn't be typical for an officer to

6    recommend or suggest to a deputy chief that he write a

7    supplement.  No, that is correct.

8    Q.  Further down between 20 and 26, you state,

9    "I -- what I remember is -- is he was following the

10   orders of Deputy Chief Hartwig and he felt confident

11   that the probable cause for the arrest and the

12   observations of the violations were made by Deputy Chief

13   Hartwig and because Dave Id was in the immediate area

14   where the violations were occurring that it -- that

15   they'd had -- somehow interfered with running --"

16          Sergeant Kwon says, "Okay.  So --"

17          And you say "of the railroad."

18          Did Officer Coduti communicate to you that he

19   was basing his arrest report on the observations of

20   Deputy Chief Hartwig?

21   A.  No.

22   Q.  Again, I'm looking between 21 and 23 in

23   particular.  You state, "he was following the orders of

24   Deputy Chief Hartwig and he felt confident that the

25   probable cause for the arrest and the observations of

1    that point.  You posed the question at the end of line

2    23 where he says "Deputy Chief Hartwig" and then you

3    don't continue on.

4             MR. SIEGEL:  I posed the follow-up question

5    previously, and I already read the entire response.

6             MR. ALLEN:  You want to reframe the question

7    and take it out of context, that's why I'm posing it

8    now, this objection retroactively.  I'm asking you to

9    put it in context.  Or alternatively, I've made my

10   record and you can pursue the question based on stopping

11   in mid-sentence and asking the question.

12   BY MR. SIEGEL:

13        Q.  Let's look at page 34 between lines 1 and 11.

14   I believe this is a complete question and response.

15            Sergeant Kwon asks, "So just for clarification

16   did he give you -- did Officer Coduti give the

17   impression that he did feel there was probable cause or

18   did not feel there was probable cause?"

19            Response by Hayes, "I -- I believe he did feel

20   there was probable cause.  It's just that he could --

21   Coduti could not document what the observations were or

22   what the violations were because he had not viewed them

23   directly.  It was my impression that Deputy Chief

24   Hartwig had on-viewed the violations and it was a -- a

25   general thing that -- uh -- you know, his -- he was in

33

1    the area, he was standing near the fare gates, he was

2    blocking the -- the -- his participation was interfering

3    with running the railroad, he was blocking the fare

4    gates."

5         My question:  Is it still your impression that

6    Deputy Chief Hartwig viewed the violations that were

7    then the basis of Officer Coduti's report?

8         A.  Yes.

9         Q.  And Officer Coduti did not view directly the

10   violations?

11        MR. ALLEN:  Is that a question as to his

12   impressions, or is that asking his opinion?  You're

13   asking an opinion.  It calls for speculation.  I'm

14   objecting to the form of the question.

15        Could you read the question, please?

16        (Record read.)

17        MR. ALLEN:  I'll object; calls for speculation

18   and it's been asked and answered.

19   BY MR. SIEGEL:

20        Q.  Let's break this down.

21        Did you believe that Coduti could not document

22   what the observations were or what the violations were?

23        A.  Did I believe that Coduti could not document?

24        Q.  (Attorney nods head.)

25        A.  No.  I did not believe that.

1          You can answer the question.

2          THE WITNESS:  I'm sorry?

3          MR. ALLEN:  You may answer the question.

4          THE WITNESS:  No.

5   BY MR. SIEGEL:

6      Q.  You stand by the testimony you gave to IA?

7      A.  Yes.

8          MR. ALLEN:  Retroactively, this is as to pages

9   33 or 34 or the entirety of the transcript?

10          MR. SIEGEL:  Actually, we probably have the

11   time.  I'd like to give you the chance to read the

12   entire transcript.

13          If you don't mind, Counsel, could we do that

14   off the record?

15          MR. ALLEN:  That's fine.

16          (Recess taken.)

17   BY MR. SIEGEL:

18      Q.  Thank you, Lieutenant, for taking the time.

19   We've given you a pretty small window of time to read a

20   49-page transcript.  I appreciate you making the attempt

21   to read it in a deliberate fashion.

22          After reviewing the entire transcript, do you

23   have any modifications to the testimony you gave?

24      A.  On the transcript?

25      Q.  The testimony --

36

1      A.   The Internal Affairs transcript?

2      Q.   Yes.

3      A.   No.

4      Q.   Just like to direct your attention to the

5  second-to-the-last page, 48, throughout this page and

6  the following page, there's a kind of ongoing question

7  and follow-up.  Feel free to refer to this page.

8           Is it true, to the best of your recollection,

9  that Officer Coduti felt that the group on September 8th

10  was violating 369i?

11     A.   Well, in his report, it states that "when

12  deputy chief pointed out a man identified as Rusty Morse

13  who was standing in a group of protesters near the edge

14  of the circle, he ordered me to arrest Morse for

15  trespassing on the road or property."  So if Morse was

16  standing in the middle or in the group and Deputy Chief

17  Hartwig ordered him to arrest Morse, it would be

18  reasonable to believe that the group was in violation of

19  369i.

20     Q.   Again, there's kind of an ongoing question and

21  answer, but if you could look at the statement you make

22  at line 28 of page 48 and then the first two or three

23  lines of page 49, is it true that Officer Coduti did not

24  see individual actions, but the individual was partaking

25  in the group movement?

1          MR. ALLEN:  I'm going to object that it

2   mischaracterizes his testimony, it's overbroad as to the

3   entire context of this 49-page interview.  It's also

4   been asked and answered.

5   BY MR. SIEGEL:

6          Q.  Do I understand your IA statement correctly?

7          MR. ALLEN:  I'm going to object that it's vague

8   and overbroad, that question you just asked.

9   BY MR. SIEGEL:

10         Q.  In the context of my previous question, am I

11  interpreting your statement correctly, that Officer

12  Coduti didn't see individual actions but the individual

13  was partaking in the group movement?

14         MR. ALLEN:  I'm going to object that it's

15  vague, overbroad, calls for speculation.

16         THE WITNESS:  Am I to answer that?

17         MR. ALLEN:  If you understand what he's asking

18  you.

19         THE WITNESS:  I'm kind of confused.  What I

20  said is what I said here.  It's based on...

21  BY MR. SIEGEL:

22         Q.  In lines 28 of page 48 and 1, 2, 3 of page 49,

23  when you use the word "individual," are you referring to

24  David Morse?

25         A.  When you say "that individual" --

38

1      Q.  Yes.

2      A.  -- that individual's actions?

3      Q.  Yes.

4      A.  That's who I was referring to.

5           MR. SIEGEL:  Thank you.  I have no further

6    questions.

7           Mr. Allen?

8           MR. ALLEN:  No questions.

9           (Whereupon, the deposition was concluded at

10          4:55 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

<u>REPORTER'S CERTIFICATE</u>

1

2

3

4       I, SANDRA M. LEE, a Shorthand Reporter, State of

5  California, do hereby certify:

6       That MICHAEL D. HAYES, in the foregoing

7  deposition named, was present and by me sworn as a

8  witness in the above-entitled action at the time and

9  place therein specified;

10       That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17       That before completion of the proceedings,

18  review of the transcript was not requested.

19       IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 1st day of November, 2013.

21

22

23

24       _____

25       SANDRA M. LEE, CSR NO. 9971
         State of California

*(Pages 1 and 46-49 of Confidential Document  Marked as Exhibit 24 to the Deposition of Michael Hayes, Filed Under Seal)*

# EXHIBIT J

# EXHIBIT K

1          UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4   DAVID MORSE,

5          Plaintiff,

6   vs.                              No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART
8   Deputy Police Chief DAN HARTWIG,
    sued in his official and
9   individual capacities,

10         Defendants.
    _____/

11

12

13

14

15            DEPOSITION OF KEN DAM

16         (Pages 1 to 43, inclusive)

17

18       Taken before SANDRA M. LEE

19            CSR No. 9971

20          October 16, 2013

21

22
         **Aiken Welch Court Reporters**
23       **One Kaiser Plaza, Suite 505**
         **Oakland, California 94612**
24       **(510) 451-1580/(877) 451-1580**
           **Fax:  (510) 451-3797**
25            **www.aikenwelch.com**

12

1   on the bottom "Not to be released to the general public

2   or media."

3      Q.  How would you -- after you create a document

4   like this, how would you distribute it?

5      A.  Via e-mail.

6      Q.  Who would you send it to?

7      A.  I would send it to law enforcement personnel.

8      Q.  Do you have a list of all the BART PD, for

9   example?

10      A.  I don't have a list personally, but I do send

11   it to law enforcement personnel.  Yeah, BART police.

12      Q.  If you would also look at Exhibit 4, it's in

13   the other stack and if you would keep that document in

14   front of you.

15      Do you recognize this document?

16      A.  Yes, I do.

17      Q.  What is it?

18      A.  It's an informational bulletin that I produced.

19      Q.  Is it true that Deputy Chief Fairow asked you

20   to produce it?

21      A.  Yes.

22      Q.  Have you ever produced a "Be On the Look Out"

23   document, a BOLO?

24      A.  I have produced that.

25      Q.  Is it the same format as this?

14

1       A.  I was not in his presence while the protest was

2   happening.  I'm actually in my office.  My office is

3   actually separate from dispatch where they have the

4   close circuit.

5       Q.  You didn't enter what they call the command

6   room?

7       A.  DC Fairow is at the command post.  I don't know

8   exactly where he was that day.  I'm in my office, and

9   I'm monitoring things in my office.

10      Q.  Before DC Fairow asked you to produce this

11  document, had you ever heard about Dave Id?

12      A.  I have not.

13      Q.  Had you heard of Christopher Cantor?

14      A.  Yes, I have.

15      Q.  In what context?

16      A.  Well, I believe he's been arrested before

17  for -- for 369i at protests, causing disturbances.

18      Q.  Do you know he was arrested under 369i?

19      A.  I believe so.  That's the common Penal Code

20  that we use, so I believe so.

21      Q.  Might it also have been 409?

22      A.  You know, to be honest with you, I'm not sure

23  which Penal Code they used.

24      Q.  How did you go about acquiring these images?

25      A.  The images are on websites.  But for

1    Christopher Cantor, this one could have been on CRIMS.

2    Alameda County, they have people that have been arrested

3    before database.

4        Q.   So the picture in the top left of this flier is

5    a mugshot?

6        A.   I can't say for sure, honestly.  I'm not sure.

7        Q.   What types of pictures would be in the CRIMS

8    database?

9        A.   It would be mugshots.

10       Q.   And you think you got it from there?

11       A.   I can't be positive, to be honest with you.

12       Q.   How did you find the picture of Dave Id?

13       A.   I found that picture on Indybay, I believe.

14       Q.   Did you capture an image from the video?

15       A.   Going back, it appears that, yeah.

16       Q.   When did DC Fairow give you the assignment of

17   creating this document?

18       A.   Sometime during that day before the protest.

19       Q.   It was the same day?

20       A.   I believe so.

21       Q.   Have you ever created a flier like this for a

22   protest before?

23       A.   I don't recall.

24       Q.   How about since you created this one; have you

25   created another one like it for any protest?

1      Q.  How many people are at a briefing?

2      A.  This would be a rough estimate.  This is a

3  guess.  Because you have the CAP team, the tactical

4  team, you have officers coming in that were called in.

5  So roughly between 30 to 60 maybe.

6      Q.  You made dozens of copies pretty much?

7      A.  Right.

8      Q.  Do you recall what you said as you described

9  this document?

10     A.  No.  I don't recall.

11     Q.  Was somebody leading the briefing?

12     A.  Yes.  There was somebody else.  The command

13  staff was leading the briefing.

14     Q.  Who led the briefing that day?

15     A.  I don't recall.  It could be -- it could have

16  been the deputy chief.  It could have been one of the

17  lieutenants.  It could be -- it changed depending on who

18  was there.

19         MR. SIEGEL:  I'd like to mark this as Exhibit

20  21.

21         (Plaintiff's Exhibit 21 marked for

22         identification.)

23  BY MR. SIEGEL:

24     Q.  After you review this document, if you could

25  tell me whether you recognize this message.

18

1          A.  Uh-huh.

2              MR. ALLEN:  You have to reply audibly.

3              THE WITNESS:  Yes.

4      BY MR. SIEGEL:

5          Q.  Is this when you distributed Exhibit 4 to other

6      BART police?

7          A.  Yes.

8          Q.  How did you select the names to add to the cc

9      column of this e-mail?

10         A.  They're members of the tactical team, people

11     that work in the protest.

12         Q.  Do you think you added them one by one to the

13     e-mail, or do you have a group that you select that adds

14     multiple names?

15         A.  This looks like I added a group.  This looks

16     like I added all the command staff.  This one looks like

17     I included the command chief, lieutenants and sergeants

18     at the time.

19         Q.  And all of those ranks are included within

20     command staff?

21         A.  Yes -- well, command staff is primarily deputy

22     chiefs, lieutenants.  But for something like this, I

23     would probably put down sergeants as well.  This is what

24     I have in my address book, which is groups, so command

25     and then I have sergeants.

1          MR. SIEGEL:  Off the record for a second.

2          (Discussion off the record.)

3     BY MR. SIEGEL:

4          Q.  Do you recall that after you created -- let me

5     back up.

6          Do you notice that Exhibit 21 mentions it has

7     two attachments to the e-mail?

8          A.  Yes.

9          Q.  To the best of your recollection, are those

10    attachments represented by Exhibits 4 and 16?

11         A.  Yes.

12         Q.  Do you recall that at a certain point DC Fairow

13    asked you to produce updated versions of this document?

14         A.  Yes.  I believe so.  In fact, it's just this

15    one right here, I believe.

16         Q.  You're referring to Exhibit 16?

17         A.  Yes.  It's just whoever was additionally

18    arrested.  He wanted me to update this.

19         Q.  And do you recall if you did that?

20         A.  I honestly don't recall, because -- you have

21    all the e-mails we gave.  I don't recall.

22         Q.  Do you recall adding Mr. Morse to such a

23    document?

24         A.  Again, I don't recall, but you do have all the

25    e-mails.

20

1      Q.  You don't know that; you assume that, right?

2          MR. ALLEN:  We're in a delicate area here.

3      Part of that is attorney-client privilege, but you could

4      say you assume.

5          THE WITNESS:  I assume.

6          MR. ALLEN:  You don't know one way or the other

7      if he has them or not.

8          THE WITNESS:  That's correct.  I don't know.

9      BY MR. SIEGEL:

10     Q.  How was Exhibit 4 explained to the other BART

11     police staff?

12     A.  As I recall, it was only for informational

13     purposes only, and it was when -- that day we didn't

14     know where the protest was going to be, what station.

15     Again, for public safety and to run smoothly, we wanted

16     to know where the protest was going to be.  The way I

17     recall, it was being explained generally if they're

18     there, the demonstration tended to come to those

19     stations.

20         Q.  Were Cantor and Dave Id identified as subjects?

21         A.  Correct.  Subjects.

22     Q.  Were they identified as potential wrongdoers?

23     A.  I don't recall exactly that verbiage.

24     Q.  Was it inferred in any way that these two

25     individuals were likely to commit criminal activities?

22

1        A.  About the protest.  The day of September 8th

2    was the topic.

3        Q.  Did you ever get to see the transcript of your

4    Internal Affairs interview?

5        A.  I've only seen little bits.

6        Q.  What little bits did you see?

7        A.  The one about the radio.  That's all I

8    remember.  What else?  I know they referred to the

9    radio.  I didn't look at much of it, to be honest with

10   you.

11       Q.  Do you remember telling IA that Christopher

12   Cantor was a known instigator?

13       A.  I might have.  I might have.

14       Q.  Do you remember telling IA that Cantor was an

15   inciter of what would be the soon riots?

16       A.  I might have said that.

17       Q.  Do you remember why you might have said that?

18            MR. ALLEN:  Objection; calls for speculation.

19            MR. SIEGEL:  Sure.  Let's just cut to the

20   chase.

21            Exhibit 22, please.

22            (Plaintiff's Exhibit 22 marked for

23            identification.)

24   BY MR. SIEGEL:

25       Q.  I can represent to you that this is a

1    transcript that was provided to me by BART, what appears
2    to be a record of your IA interview.
3            You've not seen this complete document before;
4    is that correct?
5        A.  Correct.  I have not.
6        Q.  I'd like to direct your attention first to page
7    2.
8        A.  Okay.
9        Q.  I believe during the IA interview you were
10   interviewed by Sergeant Kwon; is that your recollection?
11       A.  Yes.
12       Q.  In the middle of this page beginning at line
13   13, Kwon asks you a question that ends with why these
14   two people were placed on the BOLO, and your answer --
15   it's apparent on the document here, but it refers to
16   Cantor having a history of being a visual leader for the
17   protest, a known instigator, inciter of what would soon
18   be riots.
19           Do you wish to change the testimony you gave to
20   IA?
21       A.  No.  That's what I said at the time.
22       Q.  And on what basis did you describe Cantor as an
23   instigator or inciter of riots; what information did you
24   rely upon when making that statement?
25       A.  Previous arrest history.

24

1    Q.  So other officers informed you of his previous

2  acts?

3    A.  There was also -- yes.  Other officers have

4  informed me.  There was also an incident.  I believe it

5  was the board of directors were -- paint was thrown at

6  one of the board of directors, and Cantor was visibly

7  present.

8    Q.  He was visibly present at that time?

9    A.  At that time.

10    Q.  Do you have any information that would

11  suggest that David Morse was an instigator or inciter of

12  riots?

13    A.  No.

14    Q.  I'd like to direct your attention to the next

15  page, page 3, beginning at about line 11.  Here you

16  mention that Dave Id was scouting the area -- actually,

17  I should probably back up.

18       Beginning at the last line of page 28 -- I'm

19  sorry -- page 2, line 28, leading onto the next page,

20  you state that Deputy Chief Benson Fairow gave you the

21  information that you were relying upon.

22       Do you see that?

23    A.  Uh-huh.

24    Q.  "Yes"?

25    A.  Yes.

1          MR. ALLEN:  You have to say "yes."

2          THE WITNESS:  Yes.

3    BY MR. SIEGEL:

4          Q.  Is that true?

5          A.  Yes.

6          Q.  Then I believe it is DC Fairow who mentioned,

7    quote, unquote, "Dave Id was scouting the area," as it

8    says on line 11.

9          A.  Yes.

10         Q.  What does that mean, "Dave Id was scouting the

11   area"?

12         MR. ALLEN:  Objection; calls for speculation.

13   BY MR. SIEGEL:

14         Q.  What did you mean when you relayed that

15   information to IA?

16         A.  I just was -- relayed that.  Again, as Intel

17   officer, I just take what was given and I take it for

18   what it is, face value, what I was told.

19         Q.  You don't do any fact-checking?

20         MR. ALLEN:  Objection; argumentative.

21   BY MR. SIEGEL:

22         Q.  Is that correct?

23         MR. ALLEN:  Mischaracterizes his testimony.  Is

24   that a question?  If it's a question, it's vague and

25   overbroad.

27

1    BY MR. SIEGEL:

2        Q.  The next line of this same section, it states,

3    quote, "posing quote/unquote as a -- a possible

4    reporter."

5            This is also something that DC Fairow related

6    to you?

7        A.  I believe so.

8        Q.  Did you learn from anybody else that Dave Id or

9    David Morse was reporting as a reporter?

10       A.  Not that I -- I don't know.  I don't believe

11   so.

12       Q.  I'd like to direct your attention to page 15 of

13   this transcript.  Actually, your testimony on page 15 is

14   prompted by a question that begins on page 14, line 28.

15   And I'll read it without some of the in-between

16   punctuation.

17                Sergeant Kwon stated, "At any of

18                these protests or these events, did you

19                ever hear someone stating on radio

20                something to the effect that Krystoff

21                a.k.a. Christopher Cantor and his

22                quote/unquote sidekick were to be

23                arrested first?  Did you ever hear that

24                on the radio?  Does that ring any bells

25                or jog your memory?"

28

1       And your answer at line 9 is, "I

2       know they were to be watched closely

3       because they were the leaders of the

4       group, according to the Intel we got."

5       So is that statement true?

6       MR. ALLEN:  Which statement?

7   BY MR. SIEGEL:

8       Q.  That "they were the leaders of the group,

9   according to the Intel that we got."

10      A.  I believed that at the time.  That was the

11  Intel that I got.

12      Q.  You received Intel that Dave Id was a leader of

13  the protest group?

14      A.  Well, "leaders" meaning that if they were

15  there, that was possibly where the protest was going to

16  occur.

17      Q.  Did you mean "leader" in any other way other

18  than that they were going to be at the protest?

19      A.  No.

20      Q.  Did you have any information that my client was

21  directing other protesters in any way?

22      A.  No.  Not that I recall.

23      Q.  Looking at page 17, halfway down starting at

24  line 14, you described Christopher Cantor as very vocal,

25  and later you say, "he speaks in front of several

30

1       Q.  Did you have any information that Dave Id

2    engaged in marching?

3       A.  I don't believe so.

4       Q.  On page 18 at line 7, you appear to state that

5    Christopher Vogan also provided you with Intel regarding

6    Cantor and Mr. Morse.

7           Is that true?

8       A.  Yes.

9       Q.  What did Christopher Vogan tell you about those

10   two individuals?

11      A.  Well, at that time I was just following

12   directions.

13           MR. ALLEN:  That's not the question.  Listen to

14   the question.

15           Can you repeat the question, please?

16           (Record read.)

17           THE WITNESS:  You know, I don't recall exactly

18   what he told me, but he might have, in essence, said the

19   same thing that Deputy Chief Fairow said.  When one is

20   at the protest, one or both are at that particular

21   location, that's where the demonstration could possibly

22   occur.

23   BY MR. SIEGEL:

24      Q.  And who is Christopher Vogan?

25      A.  He was an officer at the time.

1      Q.  Was he working as an undercover officer?

2          MR. ALLEN:  Objection; vague as to time.

3  BY MR. SIEGEL:

4      Q.  During the summer and fall of 2011, was he

5  working as an undercover officer?

6          MR. ALLEN:  Objection.  That invades the safety

7  rights of public transit people using BART and gets into

8  tactical and safety issues involving BART.  I'm not

9  going to let him answer the question.

10  BY MR. SIEGEL:

11      Q.  Do you know if Christopher Vogan was working

12  undercover on September 8th?

13      A.  I don't -- you know, no.  I don't believe so.

14          MR. ALLEN:  Do you know or don't you know?

15  That's the question.

16          THE WITNESS:  I don't know.  Actually, I don't

17  know.

18  BY MR. SIEGEL:

19      Q.  Prior to the actual protest on September 8th,

20  did you anticipate that David Morse would be arrested?

21      A.  No.

22      Q.  Would you look at page 12 of this transcript?

23      A.  (Witness complying.)

24      Q.  Beginning at line 24, Sergeant Kwon asked you

25  "what was the order?"  And his question -- well, let's

1    back up.  At line 17, Kwon states, "During these

2    briefings, was it ever implied in any way that

3    Christopher Cantor and/or particularly Mr. Dave Id --

4    was the impression ever given they were to be arrested

5    on-site?"

6            And you state no.

7            Then later Kwon asked "What was the order?"

8    You state, "the order was we have to see what they're

9    doing, if they're inciting a riot or acting in a

10   criminal manner, they were to be arrested?"

11           Does this refresh your recollection that there

12   was discussion of arresting David Morse prior to the

13   protest?

14           MR. ALLEN:  I'm going to object to the form of

15   your question.  You're suggesting by that question he

16   has changed his answer.  Your previous question was

17   whether there were discussions to arrest him, not

18   whether there were discussions whether they would be

19   arrested and for what reasons.  I'm objecting to the

20   form of your question and mischaracterizes his testimony

21   by the form of your question.

22           MR. SIEGEL:  Let's try again.

23   BY MR. SIEGEL:

24       Q.  On September 8th, was there specific discussion

25   of David Morse and Christopher Cantor?

33

1      A.  Specific?

2      Q.  During the briefing or at any time prior to the

3  protest itself, did you discuss with other BART police

4  officers Cantor and Morse?

5          MR. ALLEN:  Objection; asked and answered.

6          Go ahead.

7          THE WITNESS:  Again, was I the one presenting?

8          MR. ALLEN:  No.  That's not his question.

9          THE WITNESS:  I don't understand the question.

10          MR. SIEGEL:  Maybe read it to see if it's a

11  good one.

12          (Record read.)

13          MR. ALLEN:  Listen to the question.  There's no

14  trick to it.  If there was, I'd pose an objection.

15  There's no trick to his question.

16          (Record read.)

17          THE WITNESS:  During the briefing, did I

18  discuss?  I may have.

19  BY MR. SIEGEL:

20      Q.  You don't recall specifically?

21      A.  I don't recall specifically.

22      Q.  Was there discussion that if Morse or Cantor

23  were inciting a riot or acting in a criminal manner,

24  they were to be arrested?

25      A.  There might have.

34

1      Q.  Do you remember that?

2      A.  Do I recall that for sure?  I'm not a hundred

3  percent sure.

4      Q.  How sure are you?

5      A.  It goes on to anybody commits a criminal act,

6  they are to be arrested.  Every week we had a briefing

7  on protests, and so it was mentioned that if people

8  commit criminal acts, they're to be arrested following

9  policies and procedures.

10      Q.  Sure.

11          But was that comment made specifically in

12  connection with Cantor or Morse?

13      A.  You know, I don't -- I don't -- I don't recall.

14          MR. ALLEN:  Could I take a one-minute break

15  with my client?

16          MR. SIEGEL:  That's fine.

17          (Recess taken.)

18  BY MR. SIEGEL:

19      Q.  Officer Dam, if you could look at page 10

20  starting at line 20, if you could read from there and

21  read through all the way to the end of page 12.  Take a

22  minute.  I really want to get clear on a few things.

23      A.  Okay.

24          MR. ALLEN:  I'm going to ask him to read from

25  that page, line 11, to get context for the question.

35

1          MR. SIEGEL:  Sounds good.

2          MR. ALLEN:  While he's reading that, off the

3     record.

4          (Discussion off the record.)

5     BY MR. SIEGEL:

6        Q.  Officer, did you read that section I asked you

7     to read?

8        A.  From 10 to page 12, correct?

9        Q.  Yes.

10       A.  Yes.

11       Q.  Correct if I'm wrong, on these pages Sergeant

12    Kwon was asking you specifically about what discussion

13    there was of Cantor and Morse; is that correct?

14       A.  Uh-huh -- yes.

15       Q.  Then on page 11 at line 24 -- actually we'll go

16    to the question at line 20.  Sergeant Kwon states, "was

17    there ever any discussion during that briefing in

18    regards to who was to be arrested first during these

19    protests, or are there any game plan or strategies, or

20    thoughts about that?"

21          And you respond, "I don't know about arrested

22    first, but we did say that if they break the law, they

23    will be arrested?"

24          In your statement, "they," does it refer to

25    Morse and Cantor?

36

1      A.  Yes.

2      Q.  Does this refresh your recollection that there

3  was specific discussion of Morse and Cantor prior to the

4  protest in regards to making arrests?

5      A.  It refreshes my memory.

6      Q.  On the following page, page 12, the question

7  from Kwon beginning at line 17 states, "during these

8  briefings, was it ever implied in any way that

9  Christopher Cantor and/or particularly Mr. Dave Id --

10  was the impression ever given that they were to be

11  arrested on sight?

12          You say, "No."

13          Kwon asks, "What was the order?"

14          You state, "the order was we have to see what

15  they're doing, again, if they're inciting a riot or

16  acting in a criminal manner, they were to be arrested."

17          The "they" in your statement is referring to

18  Morse and Cantor; is that correct?

19      A.  Yes.

20      Q.  Officer, do you conduct surveillance?

21      A.  I personally do not.

22      Q.  Do you supervise any officers who conduct

23  surveillance?

24      A.  I'm not a supervisor.

25          MR. ALLEN:  That's not the question.  The

40

1          A.   Not a hundred percent.

2               MR. SIEGEL:   Could we take one minute off the

3      record.   I think we're close.   We'll be right back.

4               (Recess taken.)

5               MR. SIEGEL:   I'd like to introduce the next

6      exhibit in order.

7               (Plaintiff's Exhibit 23 marked for

8               identification.)

9      BY MR. SIEGEL:

10          Q.   Officer Dam, please take a minute to review

11      this document, and after you do so, tell me if you

12      recognize it.

13          A.   Yes.   I recognize this.

14          Q.   Is this a document that you prepared?

15          A.   Yes.   An e-mail.

16          Q.   How did you prepare this document?

17          A.   This is a quick informational blurb for the

18      command staff basically of what's going on.   And I just

19      take sections from either what SFPD has given me, social

20      media network.   It's just, like, for informational

21      purposes.

22          Q.   Do you see the section where it states "Crowd

23      Numbers"?

24          A.   Yes.

25          Q.   And the second sentence of that section states,

41

1    "Indybay reporter Dave Id is at primary Powell near the

2    entrance to the police office."

3         A.  Yes.

4         Q.  You wrote that?

5         A.  Yes.

6         Q.  Why did you mention Dave Id?

7         A.  Again, our report was that if we see Dave Id or

8    Christopher Cantor, there's a possibility the

9    demonstration could possibly be there.

10        Q.  Essentially based on the same information that

11   you produced, Exhibit 4, you also decided to include

12   Dave Id in your update?

13        A.  Right.  This update, I just listen on the

14   police radio, and I pretty much repeat what was there.

15   Possibly went on the radio and it said 50-plus

16   demonstrations at Powell Street.

17        Q.  You may have gathered that information from

18   another officer on the radio?

19        A.  Correct.

20        Q.  If you could look at Exhibit 17, please.

21        A.  (Witness complying.)

22        Q.  I believe there is an e-mail from DC Fairow to

23   yourself.

24             After reviewing it, if you could tell me if you

25   remember this document.  Actually, the first page is

43

<u>REPORTER'S CERTIFICATE</u>

I, SANDRA M. LEE, a Shorthand Reporter, State of California, do hereby certify:

That KEN DAM, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 1st day of November, 2013.


_____
SANDRA M. LEE, CSR NO. 9971
State of California

*(Confidential Documents Marked Exhibits 21 and 23
to the Deposition of Ken Dam; pages 1-3, 10-12,
and 15 only of Confidential Document Marked
Exhibit 22 to the Deposition of Ken Dam,
Filed Under Seal)*

# EXHIBIT L

**EXHIBIT M**

1            UNITED STATES DISTRICT COURT FOR THE

2               NORTHERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15            DEPOSITION OF KENTON W. RAINEY

16              (Pages 1 to 52, inclusive)

17

18           Taken before SANDRA M. LEE

19                 CSR No. 9971

20               November 6, 2013

21

22

23          **Aiken Welch Court Reporters**
            **One Kaiser Plaza, Suite 505**
            **Oakland, California 94612**
24          **(510) 451-1580/(877) 451-1580**
            **Fax:  (510) 451-3797**
25              **www.aikenwelch.com**

15

1    They ask very pointed questions based on background and

2    experience.  But I've never seen them get up and

3    actually give testimony.

4         Q.  The difference is that he was describing his

5    first-person experiences?

6         A.  Giving his first-person experiences, getting up

7    and going to the mic.  I had never seen that.

8         Q.  Are you familiar with editorials?

9         A.  Yes.

10        Q.  Isn't an editorial a similar thing in that it's

11   a journalist giving an opinion?

12        A.  Absolutely.  I've seen editorials in newspapers

13   and magazines, but, again, I've never seen a journalist

14   or member of an editorial board actually come to a body

15   and give that editorial to a political body or oversight

16   body.  I've never seen that.

17        Q.  Are you aware that before the September 8th,

18   2011, protest, that is the subject of this lawsuit that

19   BART police officers identified David Morse as somebody

20   to focus on for police officers?

21        A.  To focus on?

22        Q.  Yes.

23        A.  What do you mean?

24        Q.  Are you aware that his picture was distributed

25   among BART police officers?

16

1    A.  Yes.

2    Q.  Are you aware that an intelligence officer was

3  assigned to investigate his identity?

4    A.  Yes.

5    Q.  When did you become aware that David Morse was

6  being investigated in this manner?

7    A.  It's not so much he was being investigated.  We

8  had had numerous protests disrupting service,

9  jeopardizing public safety in our downtown San Francisco

10  stations.  It was very, very burdensome for us because

11  we never knew where these individuals were going to show

12  up.  But based on our experience with some of the

13  interactions, two individuals in particular, when one

14  showed up or the other showed up, that's where things

15  would occur.  So through intelligence, we were trying to

16  get out to our personnel "If you see one or two of these

17  guys, make sure you call the OCC.  Let the incident

18  commander know where these individuals are because

19  there's probably a good chance that's where the

20  disruption is going to occur."

21    Q.  What is the OCC?

22    A.  Operations communications center.

23    Q.  In your experience, have you ever identified a

24  journalist in this manner previously as someone that

25  would indicate where a protest would occur?

18

1    Q.  They were involved in policing some of these

2  protests?

3    A.  I don't know.  I don't know.  I know they do

4  come out and patrol with our personnel sometimes.  I

5  don't recall if they actually came out and worked the

6  protest.  I don't know.

7    Q.  Prior to the protest in question, did you have

8  any information that David Morse had violated any laws?

9    A.  No.

10   Q.  Did you consider him to be a protester prior to

11 the event in question?

12   A.  No.

13   Q.  Did you authorize the production of an

14 informational flier that had David Morse's picture on

15 it?

16   A.  Do you have something that I can look at?  It

17 sounds like you're referring to something in particular.

18   Q.  Sure.  I believe it's Exhibit 4 in your stack.

19   A.  This is 1.

20   Q.  Here's 4.

21   A.  Okay.

22   Q.  Have you seen Exhibit 4 before?

23   A.  Yes.

24   Q.  Did you authorize the production of this

25 document?

40

1      A.  About him, no.

2      Q.  Do you recall directing any of your officers to

3  contact the District Attorney with regards to

4  prosecution of David Morse?

5          MR. ALLEN:  I'd like to clarify something.

6  Would you look at the bottom of page 31?  Is that the

7  contact you're referring to?

8          I don't want him misstating testimony when he

9  has a document in front of him that George Gascon got

10  cc'd on.

11          MR. SIEGEL:  That's not what I'm referring to.

12  BY MR. SIEGEL:

13      Q.  Do you recall asking any of your officers to

14  contact the District Attorney to encourage the DA to

15  press charges against David Morse?

16      A.  Specifically against him, I don't recall that.

17  Did I contact them regarding prosecuting individuals who

18  were engaged in what I considered illegal behavior as

19  far as disrupting our operations and threatening public

20  safety?  Yes.  I wanted these individuals -- anybody we

21  ultimately arrested prosecuted, yes.

22      Q.  So you did make that contact?

23          MR. ALLEN:  But not to a specific person.

24          THE WITNESS:  Definitely not to a specific

25  person.

41

1   BY MR. SIEGEL:

2       Q.  Did you contact the DA directly?

3       A.  No.  Not to a specific person.  Went through my

4   personnel.

5       Q.  Who did you use to contact the DA?

6       A.  It went through my criminal investigation

7   sergeant, Tom Smith.

8       Q.  Do you know if any criminal proceedings went

9   forward against any of the arrestees that day?

10      A.  I don't recall what exactly transpired.  We

11  definitely would have filed cases.  I don't know what

12  the ultimate outcome was.

13          MR. ALLEN:  Take a break?  A good spot?

14          MR. SIEGEL:  Let's do it.  Could we take ten?

15          MR. ALLEN:  Sure.

16          (Recess taken from 10:17 a.m. to 10:29 a.m.)

17  BY MR. SIEGEL:

18      Q.  Chief, I'd like to refer back to Exhibit 31,

19  please, which    s the response to the journalists'

20  concern.

21      A.  Okay.

22      Q.  At the end of this letter, you remark that

23  you'd be happy to meet with Rebecca Bowe and Jeffrey

24  King in regards to their issues.

25          Did that meeting ever occur?

43

1       Q.  Is it your belief that David Morse did not have

2   a press credential displayed during the protest in

3   question?

4       A.  No.  That's not my point.  Again, as I said, I

5   worked 35 years in law enforcement, three different

6   states, three different jurisdictions and California.

7   Most people have their press credentials.  I'm just

8   putting that out there.  I wasn't there.  I don't know

9   what he had, what he did there.

10      Q.  What were you responding to with this sentence?

11      A.  What I just said.  It helps to have your -- if

12  there's any confusion or anything like that, it helps

13  law enforcement to have -- if you have press credentials

14  displayed.  Like, if we had -- when different things

15  happen and if I just showed up to a law enforcement

16  event, if I don't put something out that readily

17  identifies me as a law enforcement official, I would be

18  shooed away or wouldn't be allowed to get involved.  I

19  have to identify myself.

20      Q.  Do you know if journalists were arrested on

21  September 8th who did not display press credentials?

22      A.  The only person that I know that was arrested

23  on September 8th supposedly as a journalist was your

24  client.

25      Q.  You say "supposedly," but you acknowledge he's

Aiken Welch Court Reporters    Kenton Rainey    11/06/2013

44

1    a journalist?

2         A.   Yes.

3         Q.   Did you ever recover video evidence of David

4    Morse speaking at a BART board of directors meeting?

5         A.   I didn't, no.

6              MR. ALLEN:   If there is, we will produce it.

7              MR. SIEGEL:   Okay.

8              MR. ALLEN:   I'll supplement our Rule 26.   You

9    did not ask for the document.   We'll supplement it as a

10   Rule 26.   We're looking for it now as well.

11             MR. SIEGEL:   Thank you, Dale.

12   BY MR. SIEGEL:

13        Q.   Did you speak with anyone at the UC Police

14   Department in regards to a previous prosecution of David

15   Morse?

16        A.   I know I had some interactions with their

17   former chief of police.

18        Q.   Did you recover any evidence from UC police?

19        A.   Any evidence?

20        Q.   Yes.

21        A.   No.

22        Q.   Did you recover --

23             MR. ALLEN:   Objection; vague and overbroad.

24   Evidence as to what?   To this incident or something

25   else?   So we're clear.   I want to make sure.

52

<u>REPORTER'S CERTIFICATE</u>

I, SANDRA M. LEE, a Shorthand Reporter, State of California, do hereby certify:

That KENTON W. RAINEY, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 19th day of November 2013.

_____
SANDRA M. LEE, CSR NO. 9971
State of California

Aiken Welch Court Reporters    Kenton Rainey    11/06/2013

**EXHIBIT N**

1              UNITED STATES DISTRICT COURT FOR THE

2                NORTHERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15            DEPOSITION OF EDWARD SCHLEGEL

16              (Pages 1 to 23, inclusive)

17

18           Taken before SANDRA M. LEE

19                  CSR No. 9971

20               November 6, 2013

21

22

23            Aiken Welch Court Reporters
              One Kaiser Plaza, Suite 505
              Oakland, California 94612
24           (510) 451-1580/(877) 451-1580
                Fax:  (510) 451-3797
25                www.aikenwelch.com

8

1    Morse writes articles under the name Dave Id?

2        A.  I do.

3        Q.  When did you learn that David Id was writing

4    articles about BART police?

5        A.  I had seen articles on the Indybay website and

6    I've seen his name on the byline.  I came to recognize

7    seeing names, but I don't recall who wrote what article

8    about what.  I know I've seen his name on the website.

9        Q.  Why did you go to the website?

10       A.  There was a lot being written about all the

11   issues with BART PD.  It was a good form of information

12   gathering as to what events were coming up and what

13   people felt about what was going on.

14       Q.  To the best of your recollection, at how many

15   of these protests in 2011 in terms of -- let me back

16   that up.

17           Do you recall the killing of Charles Hill?

18       A.  Yes.

19       Q.  Do you understand that one series of protests

20   started after that killing?

21       A.  Well, I know -- there were protests, like I

22   said, the whole period of time starting January 1st of

23   2009 until just recently.  There were different issues

24   that reenergized those protests.  Sometimes they were

25   stated to be about one thing or another, but I saw the

1   same core group appearing with the same banners with the

2   same chants.  I don't know ultimately what their

3   motivation was for any of the particular protests.  I

4   know as new issues came up, they added that to their

5   list of grievances.

6          Q.  Do you recall the use of the term "No Justice

7   No BART"?

8          A.  I've heard that.

9          Q.  That was used to describe some of the protests

10  after the Charles Hill death.

11         A.  That chant I heard a lot starting January of

12  2009 straight through -- through the Charles Hill

13  protest up until the last one I went to.

14         Q.  In your mind, are you able to isolate the 2011

15  protest as a distinct series of events as compared to

16  the earlier 2009, 2010 events?

17         A.  I'm not sure.  How do you mean?

18         Q.  Do they all mix together in your head, or do

19  you have recollection of those protests in 2011?

20         A.  Again, there were a series in 2011, and I was

21  at most of them, if not all of them.  There was one or

22  two centered at Civic Center, one at Powell.  There was

23  some that roved the area.  So I have recollection of a

24  lot of different instances, but I don't remember every

25  briefing before every one or taking the train ride from

10

1  Oakland to the protest.  I remember arrests that I made,

2  other notable events, but I can't say that I remember

3  every one of those events from beginning to end.

4      Q.  Sure.

5          Do you recall how many arrests were made in

6  2011?

7          MR. ALLEN:  Objection; vague.

8  BY MR. SIEGEL:

9      Q.  I guess what I mean is:  At how many different

10  protests were people arrested?  Were arrests made at

11  every protest?

12     A.  No.

13     Q.  It is my understanding at the protest that is

14  the subject of this lawsuit, approximately 30 people

15  were detained in an encirclement.

16         Were you there when that occurred?

17     A.  Yes.

18     Q.  At any protest prior to that, had a large

19  number of people been encircled in that fashion?

20     A.  I don't believe so.

21     Q.  This protest is unique in terms of that tactic;

22  is that right?

23     A.  Yes.

24     Q.  Prior to the protest in question, were there

25  ever more than ten people arrested?  2011 is what I'm

11

1   focusing on.

2           MR. ALLEN:  Thank you.

3           THE WITNESS:  I don't believe there were that

4   many arrests at any other protest, but probably not as

5   many as 11 or 12.  What did you say, as many as 30?

6   BY MR. SIEGEL:

7       Q.  I'm saying more than ten.

8       A.  Probably not.  I know there was one protest at

9   Civic Center where we had a few arrests.  I don't know

10  if it added up to ten or not.

11      Q.  Do you recall if any protests occurred after

12  the protest in question?

13      A.  I don't recall.

14      Q.  Do you recall that this was the final protest

15  in a series?

16      A.  No.  I just don't recall if that was the last

17  one I went to or not.

18          MR. ALLEN:  Just so we clear, he's only

19  entitled to what you can remember, not to what you guess

20  or speculate on.  You're doing fine with that.  Just so

21  you're clear on that concept.

22  BY MR. SIEGEL:

23      Q.  In front of you are the exhibits so far in this

24  case from the prior depositions.  I'm going to ask you

25  to look at what is Exhibit 4.

Aiken Welch Court Reporters   Edward Schlegel   11/06/2013

1      A.   This top sheet here?

2      Q.   Yes, please.

3           Officer, have you seen this document before?

4      A.   I believe I have.

5      Q.   When do you recall seeing it?

6      A.   Before one of the protests I was at in 2011.

7      Q.   What is this document?

8      A.   This is an informational flier relating to Mr.

9      Cantor and Mr. Morse, although he's identified here as

10     Dave Id.

11     Q.   What does that document tell you?

12     A.   It puts names with the faces.

13     Q.   Do you recognize Mr. Cantor?

14     A.   Yes, I do.

15     Q.   And what do you know him from?

16     A.   Various protests.   Most of the ones in question

17     in San Francisco and earlier from 2009 all the way

18     through.

19     Q.   How would you characterize his participation in

20     those protests?

21     A.   He was -- I don't know what the correct term

22     would be -- organizer or leader of the group.   He

23     usually had a megaphone.   He was usually leading the

24     chants.   He was the one that -- he was the one that led

25     the protests or the demonstrations.

13

1     Q.  He was a very prominent figure?

2     A.  Yes.

3     Q.  Perhaps notorious among BART police officers?

4        MR. ALLEN:  Objection; argumentative.

5        THE WITNESS:  He was known.

6  BY MR. SIEGEL:

7     Q.  Did you have a particular feeling about Mr.

8  Cantor one way or the other?

9        MR. ALLEN:  Particular fearing?

10       MR. SIEGEL:  Feeling.

11       THE WITNESS:  He was the leader of the group

12  with their protest.  I kept an eye on him, because while

13  generally most of the protesters were happy to walk

14  their picket line and shout the slogans, he would try to

15  push through lines and see how far he could go with or

16  without getting arrested.  He was one to keep an eye on

17  because he would walk a fine line between expressing

18  himself constitutionally and violating the law.  As to

19  his point of view, he's welcome to it.

20  BY MR. SIEGEL:

21     Q.  Did you know Dave Id as he was known in that

22  flier as a similar protest leader?

23     A.  I didn't know him as a leader of the protest.

24     Q.  Did you know him at all?

25     A.  Again, I recognize the name.

14

1        Q.  You hadn't seen him at previous protests?

2        A.  I may have.  I just recognize Mr. Cantor.  And

3    there was another gentleman that was with him a lot that

4    I haven't seen lately.  That was the prime people I

5    recognize.

6        Q.  Do you recall that prior to this protest that

7    BART designated a free speech zone?

8           MR. ALLEN:  Objection; vague as to time and

9    place.

10   BY MR. SIEGEL:

11       Q.  BART designated that on September 8th, 2011,

12   there would be a free speech zone?

13          MR. ALLEN:  You're asking him if he knew that?

14   BY MR. SIEGEL:

15       Q.  Do you recall?

16       A.  I don't -- what do I know?  I know that the

17   protesters were told "You can't march on the platforms

18   and in the paid area, that you're welcome to

19   demonstrate, march, protest in the free area as long as

20   you don't block access."  I don't recall how that

21   information came to me, but I know that was, if you want

22   to call it that, the free speech zone.  They were told

23   that they're welcome to do that anywhere in the free

24   area as long as it didn't block access or the operations

25   of the transit system.

19

1   they circled around in between this area here, which is

2   between the fair gates and the ticket machines.  Then

3   they got closer and closer to the fair gates and just

4   became a blocked group of people blocking the gates.

5        Q.  Did a particular commander order this line of

6   officers?

7        A.  I don't recall who ordered that.

8        Q.  Who were you reporting to that day?

9        A.  My sergeant was Sergeant Kreitzer.  She was

10  sergeant on my arrest team, although later on, things

11  became a little more chaotic and I was actually

12  receiving direction from Officer Dominguez.

13       Q.  Do you recall after that line formed, a circle

14  was created around the block of protesters?

15       A.  Yes.

16       Q.  Were you part of that circle?

17       A.  Yes.

18       Q.  Do you recall if a formal dispersal order was

19  given before that circle was created?

20            MR. ALLEN:  I'm going to object; vague.

21  BY MR. SIEGEL:

22       Q.  Let's back up.

23            Do you know what a formal dispersal order is?

24       A.  Yes.

25       Q.  What is a formal dispersal order?

20

1      A.   In a riot or riot situation under Penal Code

2    409, I believe, a representative of the agency will give

3    an announcement "This is an unlawful assembly.   You have

4    X amount of time to disperse.   Here are your available

5    means of exit.   Then you'll be subject to arrest."

6    That's given usually, if possible, by some kind of PA.

7      Q.   Is it correct that during this protest that

8    kind of order was not given?

9      A.   I don't recall if it was given.   I didn't hear

10   it if it was, which isn't unusual.

11     Q.   Which is not unusual?

12     A.   No.   Because some of these protests when

13   dispersal orders have been given, the crowd rises to

14   shout it down either because they don't want to hear it

15   or so that they can claim they didn't hear it.

16     Q.   Do you recall that happening during this

17   protest?

18     A.   I don't recall.   There was a lot of noise.   I

19   did not hear a dispersal order.

20          MR. SIEGEL:   I'd like to introduce Exhibit 34.

21          (Plaintiff's Exhibit 34 marked for

22          identification.)

23   BY MR. SIEGEL:

24     Q.   Officer Schlegel, I'll represent to you this is

25   a transcript of the interview you gave with IA in

21

1    regards to the complaints of Hannah Brown.  I'd like to

2    cut to the chase and direct your attention to page 24

3    and if you would read to yourself line 10 through line

4    17.

5         A.  Okay.

6         Q.  So is it true that you told IA that you did not

7    hear a formal dispersal order?

8         A.  I said I don't remember any such as a formal

9    dispersal order for lawful assembly.

10        Q.  You did hear other announcements?

11        A.  Yes.

12        Q.  Sitting here today, do you have any new

13   recollection of a formal dispersal order?

14        A.  No.  The answer I gave you before was almost

15   word for word what I answered it two years ago.

16        Q.  That's impressive.

17             During the protest in question, you arrested

18   Miss Brown?

19        A.  Yes.

20        Q.  Did you arrest anybody else?

21        A.  No.

22        Q.  Did you observe any members of the media being

23   detained by officers?

24        A.  Yes.

25        Q.  Did you observe any officers subsequently

22

1    releasing members of the media?

2         A.   I believe so.

3         Q.   What did you observe in that regard?

4         A.   I saw Deputy Chief or Commander -- I don't

5    remember what the title was at the time -- Hartwig.  He

6    was asking members of the media to come towards him.

7    Then he was checking their credentials.  He asked some

8    other officers assisting.  There may even have been a

9    San Francisco officer or sergeant there.  What procedure

10   they used, I don't know, but they were checking

11   credentials and then inviting members out of the line to

12   leave the station.

13             MR. SIEGEL:  I have nothing further.

14             Do you have any cross?

15             MR. ALLEN:  No.

16             (Whereupon, the deposition was concluded at

17             11:45 a.m.)

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3

4          I, SANDRA M. LEE, a Shorthand Reporter, State of

5     California, do hereby certify:

6          That EDWARD SCHLEGEL, in the foregoing

7     deposition named, was present and by me sworn as a

8     witness in the above-entitled action at the time and

9     place therein specified;

10          That said deposition was taken before me at said

11     time and place, and was taken down in shorthand by me, a

12     Certified Shorthand Reporter of the State of California,

13     and was thereafter transcribed into typewriting, and

14     that the foregoing transcript constitutes a full, true

15     and correct report of said deposition and of the

16     proceedings that took place;

17          That before completion of the proceedings,

18     review of the transcript was not requested.

19          IN WITNESS WHEREOF, I have hereunder subscribed

20     my hand this 19th day of November 2013.

21

22

23

24          _____

25          SANDRA M. LEE, CSR NO. 9971
          State of California

# EXHIBITS O-R

# *FILED UNDER SEAL*