1  DAN SIEGEL, SBN 56400
2  MICHAEL SIEGEL, SBN 269439
   SIEGEL & YEE
3  499 14th Street, Suite 300
   Oakland, CA  94612
4  Telephone: (510) 839-1200
   Facsimile: (510) 444-6698
5  dansiegel@siegelyee.com
6  michael@siegelyee.com

7  Attorneys for Plaintiff
   DAVID MORSE
8

9

10              **UNITED STATES DISTRICT COURT FOR THE**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13
   DAVID MORSE,                          )   Case No. C12-5289 JSC (DMR)
14                                        )
              Plaintiff,                  )   **MEMORANDUM OF POINTS AND**
15                                        )   **AUTHORITIES IN OPPOSITION TO**
                                          )   **MOTION FOR SUMMARY**
16         vs.                            )   **JUDGMENT/ADJUDICATION**
                                          )
17  SAN FRANCISCO BAY AREA RAPID          )
    TRANSIT DISTRICT (BART); and BART     )   Hearing: February 6, 2014
18  Deputy Police Chief DAN HARTWIG, sued )   Time: 9:00 a.m.
    in his official and individual capacities, )   Court: F, 15th Floor
19                                        )   Judge: Hon. Jacqueline Scott Corley
                                          )
20            Defendants.                 )
                                          )   Case Filed: October 12, 2012
21                                        )   Trial Date: March 31, 2014
                                          )
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................1

II.  STATEMENT OF FACTS .......................................................................... 2

   A.  Following the Killing of Oscar Grant on January 1, 2009, Morse
   Published Numerous Articles About BART Police Misconduct................. 2

   B.  BART Suffered Heavy Criticism in Summer 2011, Following the
   Killing of Charles Hill and a Cell Phone Shutdown................................... 3

   C.  After Reading Morse's Articles, BART Commanders Initiated
   Surveillance and Discussed How Morse Might be Arrested ..................... 3

   D.   The BART Commanders' Focus on Morse Led Multiple Officers
   To Assume that Morse was a "Leader" of the Protests...............................5

   E.   Hartwig Ordered Coduti to Arrest Morse............................................ 6

   F.   Hartwig Personally Released Every Other Journalist..........................7

   G.   After the Protest, BART Commanders Justified the Arrest by
   Claiming that Morse Was Not a Legitimate Journalist.............................7

   H. BART Commanders Sought Morse's Prosecution, but the District
   Attorney Dismissed all Charges.................................................................. 8

   I.   BART PD Violated Multiple Policies as they Policed the Protest ........ 8

    1. Failure to permit political protest in the "free area.".......................... 8

    2. Failure to provide a safe staging area for media................................. 8

    3. Failure to communicate with protest leaders ...................................... 8

    4. Failure to provide dispersal orders ..................................................... 9

    5. Failure to cite and release .................................................................. 9

    6. Failure to treat all journalists equally................................................10

    7. Failure to file a supplemental report...................................................10

J.  Hartwig Gave Inconsistent Testimony ...................................................10

  1. Hartwig arrested Morse for failure to disperse....................................10

  2. Hartwig released only "mainline" journalists......................................10

  3. Morse was arrested for associating with a protest leader .................. 11

  4. Morse was arrested for marching, blocking fare gates....................... 11

  5. Morse "blocked fare gates" by failing to disperse ..............................12

  6. Morse was arrested for "creating a worse situation"...........................12

K.  Hartwig's Testimony Was Contradicted by Other BART Officers ......13

  1. Coduti: Hartwig ordered Morse's arrest ............................................13

  2. Coduti and Coontz: Morse was not chanting or marching.................13

  3. Coontz: "I never issued a formal dispersal order"..............................14

  4. Hayes: the police report failed to show probable cause ....................14

  5. Coontz and Schlegel: journalists who "blocked fare gates" were
  released when they displayed a press pass.................................................14

  6. Coduti and Dam: Hartwig participated in targeting Morse. ..............15

L.  Hartwig's Testimony is Contradicted by Official BART Records........15

III. STANDARD OF REVIEW.........................................................................16

IV. ARGUMENT..............................................................................................17

  A.  Morse Establishes His Fourth Amendment Claim by Showing
  (1) BART Consented to his Presence and (2) Hartwig Arrested Him
  Despite the Clear Absence of Probable Cause. ..........................................17

    1.  Consent is a perfect defense to trespass ...................................17

    2.  BART consented to the presence of journalists—including
    Morse—during the protest in question. ..........................................17

    3.  Morse did not block fare gates..................................................18

4.  Factual disputes are intertwined with the issue of qualified immunity, and preclude summary judgment. . .........................19

B.   Morse Establishes His First Amendment Claim through Evidence of Inconsistent Justifications, Deviations from Policy, and Lack of Probable Cause.........................................................................................20

1.   Retaliation may be proved by circumstantial evidence........... 20

2.   Hartwig's retaliatory animus can be inferred based upon his inconsistent testimony....................................................................21

3.   Hartwig's retaliatory animus can be inferred based upon his failure to observe relevant BART policies.. ............................ 22

4. Hartwig is not entitled to qualified immunity .......................... 23

C.   Issues of Probable Cause Support the False Arrest Claim ................ 23

D.   Punitive Damages are Supported by the Malicious Conduct of BART Commanders to Target and Arrest a Journalist. ........................... 24

V. EVIDENTIARY OBJECTIONS.................................................... 24

VI. CONCLUSION........................................................................ 24

1

2

# TABLE OF AUTHORITIES

3

**Cases**

4

*Allen v. Iranon*
    283 F.3d 1070 (9th Cir. 2002) .................................................................. 22

5

6

*Beck v. City of Upland*
    527 F.3d 853 (9th Cir. 2008) ..................................................................... 22

7

8

*Blomquist v. Town of Marana*
    501 Fed. Appx. 657 (9th Cir. 2012) ..........................................................18

9

10

*Celotex Corp. v. Catretts*
    477 U.S. 317 (1986) ....................................................................................18

11

12

*Civic Western Corp. v. Zila Industries*
    66 Cal.App.3d 1 (App. 2 Dist. 1977) ........................................................18

13

14

*Hartman v. Moore*
    547 U.S. 250 (2006) ................................................................................... 22

15

16

*Larez v. City of Los Angeles*
    946 F.2d 630 (9th Cir. 1991) .....................................................................19

17

18

*Malley v. Briggs*
    475 U.S. 335 (1986) ............................................................................. 20-21

19

20

*Perez-Morciglio v. Las Vegas Metropolitan Police Dept.*
    820 F.Supp.2d 1111 (D. Nev. 2011) ......................................................... 20

21

*Reeves v. Sanderson Plumbing Products, Inc.*
    530 U.S. 133 (2000) ....................................................................................21

22

23

*Saucier v. Katz*
    533 U.S. 194 (2001) ....................................................................................21

24

25

*Skoog v. County of Clackamas*
    469 F.3d 1221 (9th Cir. 2006) .................................................................. 24

26

*Smith v. Wade*
    461 U.S. 30 (1983) ..................................................................................... 23

27

28

*Sorrels v. McKee*
    290 F.3d 965 (9th Cir. 2002) .....................................................................21

**Statutes and Regulations**

California Civil Code

    § 3294 ......................................................................................... 23

California Penal Code

    § 369i .................................................................................*passim*

    § 602(m) ...................................................................................18

    § 847(b)(1) ............................................................................... 23

Federal Rules of Civil Procedure, Rule 56 ...............................................17-18

**Treatises**

Restatement (Second) of Torts, § 892(2) ......................................................18

## I.      INTRODUCTION

On September 8, 2011, BART Deputy Police Chief Dan Hartwig selected David Morse for arrest during a political protest at the Powell Street BART Station, a culminating act in BART's response to a series of escalating, embarrassing demonstrations. Morse is a well-known journalist who had exposed widespread misconduct within the BART police force. As Morse's Indybay online postings successively described the BART police killings of Oscar Grant and Charles Hill, the shutdown of cell phone service in BART facilities, and the public furor around BART in general, BART police commanders commissioned an intelligence officer to profile Morse, publish his photograph, and prepare officers to make his arrest. At the September 8, 2011, demonstration itself, Morse continued his usual journalistic activities, only to find himself singled out for arrest, handcuffed, held in a police substation, and ultimately transported to San Francisco County Jail.

Defendants Hartwig and BART have filed for summary judgment, but Morse's evidence establishes triable issues of fact, and he is entitled to his day in court.

In regards to Morse's claim for violations of his Fourth Amendment right to be free from arbitrary arrest, Morse produces evidence that BART failed to possess probable cause for his arrest, and that any reasonable officer would have seen that Morse was conducting himself as a journalist on the day in question. Defendant Hartwig testified that he ordered Morse's arrest because Morse failed to respond to a dispersal order issued by Lieutenant Steven Coontz. Hartwig's testimony is directly contradicted by Coontz, however, who denies giving any dispersal orders. Furthermore, Morse conducted himself appropriately as a journalist, and BART consented to the presence of journalists during the protest. Although other journalists acted in an identical fashion to

Morse during the protest, Hartwig permitted the other journalists to escape arrest.

Because Morse creates a triable issue as to probable cause, the motion should be denied

as to both Morse's 4th Amendment claim and his common law claim for false arrest.

Furthermore, in regards to Morse's claim for retaliation in violation of his First

Amendment rights, Morse produces ample evidence that he was uniquely targeted by

BART police commanders in advance of the protest question. The police chief, deputy

chief, and numerous other officers admitted to following Morse's publications through

the Indybay website. These same commanders then—at a time of rising embarrassment

for their organization—decided to plan for Morse's arrest. To justify the arrest,

defendant Hartwig has given inconsistent explanations. These facts permit an inference

of retaliation. Summary judgment should be denied.

## II.    STATEMENT OF FACTS

### A.  Following the Death of Oscar Grant on January 1, 2009, Morse Published Numerous Articles about BART Police Misconduct

David Morse is a veteran journalist, with a particular focus on photojournalism.

Through the Indybay media collective, he has reported on political protests in the Bay

Area and beyond since May 2004. (Morse Dec. ¶¶ 2-5.)

On January 1, 2009, a BART police officer shot and killed Oscar Grant III at the

Fruitvale BART Station in Oakland. The event was captured on videotape. Many

members of the Bay Area community were outraged, and mass demonstrations ensued.

David Morse became intensely involved in documenting the public response, publishing

numerous articles about demonstrations, court dates, and local and state legislative

hearings. (Morse Dec. ¶¶ 7-27.) Morse's work was often critical of the BART police force,

but his tone did not diminish his reach. His documentation of the Oscar Grant movement was licensed to numerous local and national media agencies. (*Id.* at ¶ 6.)

### B. BART PD Suffered Heavy Criticism in Summer 2011, Following the Death of Charles Hill and a Cell Phone Shutdown

On July 3, 2011, a BART police officer shot and killed Charles Hill. In response to the shooting, BART facilities were hit by a new round of protests by various community groups, including "No Justice No BART." (Morse Dec. ¶¶ 20-21.) Morse worked to document the protests and the BART response. He publicized facts concerning the killing of Hill, including facts that indicated the shooting was unjustified. (*Id.* at ¶ 22.)

Then, when BART police turned off cell phone service at an August 2011 protest, "many members of the media and the Bay Area were critical of BART police," as Deputy Chief Hartwig testified. Siegel Dec., Ex. A., at 59. The online activist group "Anonymous" became involved to protest the cell phone shutdown. At that point, the protests about Charles Hill's killing, and the protests about the cell phone shutdown "merged together" into a broader, anti-BART protest. Siegel Dec., Ex E, at 7.

### C. After Reading Morse's Articles, BART Commanders Initiated Surveillance and Discussed How Morse Might be Arrested

Various BART police officers read Morse's publications, including Chief Kenton Rainey, Deputy Chief Benson Fairow, Hartwig, and other commanders and officers. Siegel Dec., Ex. B, at 43; Siegel Dec., Ex. E, at 9; Siegel Dec., Ex. G, at 18-19; Siegel Dec., Ex. N, at 8. The commanders discussed these articles amongst themselves. *Id.* at 43, 66. Fairow testified that even though Morse's journalism was "generally negative towards the police," he nevertheless read "any" article Morse wrote concerning the ongoing protests. Siegel Dec., Ex. E, at 14. Officer Schlegel considered Morse's pieces to be "a good form of information gathering as to what events were coming up and what people

felt about what was going on." Siegel Dec., Ex. N, at 8. Hartwig set up a "Google Alert" that sent him articles that Morse had written. *Id.* at 145-146; Siegel Dec., Ex. B(13).

Yet prior to the September 8, 2011, protest, Fairow ordered intelligence officer Ken Dam to prepare an informational flyer that identified a leader of the No Justice, No BART movement, Christopher Cantor, along with Mr. Morse. Siegel Dec., Ex. B(4); Siegel Dec., Ex. E, at 39-41:3; Siegel Dec., Ex. J, at 12.

The flyer identified Cantor by a mugshot and a prisoner locator number. Siegel Dec., Ex. E, at 40-41; Siegel Dec., Ex. K, at 14-15. Fairow stated that the prison information would be useful because, "if we did come in contact with them and they were taken into custody again[1] [*sic*], it would speed the process." *Id.* The document did not contain instructions on how it could be used. *Id.* at 41. When asked if he was hoping to arrest David Morse, Fairow testified, "Not necessarily." *Id.* at 43.

Lieutenant Hayes later testified that it was the first time in his decades of experience as a law enforcement officer that he had seen a journalist identified in a flyer such as the one that Fairow and Dam created. Siegel Dec., Ex. I, at 17-18.

Dam sent the informational flyer to BART command staff and to sergeants who would be working the protest. Siegel Dec., Ex K, at 17-19; Siegel Dec., Ex. L.

Chief Rainey was aware of the surveillance of Morse. Siegel Dec., Ex. M, at 16.

At a briefing on September 8, 2011, for BART officers who would be policing the protest, the commanders discussed two individuals of interest: Christopher Cantor (aka "Krystof") and David Morse. Siegel Dec., Ex. C, at 26-27. Commanders distributed the

---

[1] Up until September 8, 2011, David Morse did not have any negative interaction with BART police. He had not been arrested and was not suspected of criminal conduct. Siegel Dec., Ex. A, at 42; Siegel Dec., Ex. E, at 43-44; Siegel Dec., Ex. M, at 18.

flyer that showed Cantor and Morse. Siegel Dec., Ex. C, at 28. The two were identified as "subjects." Siegel Dec., Ex. K, at 20. In fact, commanders specifically discussed how Morse and Cantor might be subject to arrest. As Dam testified, "the order was we have to see what they're doing . . . if they're inciting a riot or acting in a criminal manner, they were to be arrested." Siegel Dec., Ex. K, at 36; Siegel Dec., Ex. L, at 10-12.

BART utilized undercover police officers to monitor David Morse during the September 8, 2011, protest. Siegel Dec., Ex. E, at 44; Siegel Dec., Ex. K, at 30.

During the protest, Officer Dam sent out multiple "Intel Updates" that described the location and conduct of Morse. Siegel Dec., Ex. K, at 40-41; Siegel Dec., Ex. L(23).

### D. The BART Commanders' Focus on Morse Led Multiple Officers to Assume that Morse was a "Leader" of the Protests

When Fairow wrote to Dam regarding his surveillance of Morse, he identified Morse as "the Indybay 'reporter' who collaborates with Cantor." *Id.* at 68. Fairow also referred to Morse as a "scout" on behalf of the protestors, and claimed that Morse was "posing" as a possible reporter. Siegel Dec., Ex K, at 24-25, 27; Siegel Dec, Ex. L, at 2-3. Based on the information he received from Fairow, Dam assumed that Morse was a "leader" of the protests. Siegel Dec., Ex. J, at 27-28; Siegel Dec., Ex. L, at 15.

In reality, Cantor was widely known as a protest leader, but Morse did not have that reputation. Siegel Dec., Ex. N, at 13.

During the protest on September 8, 2011, BART officers referred to Morse as a "subject" or "secondary subject." Siegel Dec, Ex. E, at 54-55. Fairow later admitted that Dam's informational flyer may have led to officers characterizing Morse as a "subject" because "he's the second person on that document." *Id.* at 55; Siegel Dec., Ex. B(4).

---

Later, when BART police prepared to make arrests, Coontz passed along the message that Morse should be among the first arrested, referring to Morse as the "sidekick" of Mr. Cantor. Coontz testified that the BART officers would know that Morse was the "sidekick" he was referring to, because "everybody understood the two were very close together and that they were working together." Siegel Dec., Ex. G, at 60.

**E.  Hartwig Ordered Coduti to Arrest Morse**

On September 8, 2011, BART police permitted the protest to continue for approximately fifteen minutes. (Morse Dec. ¶¶ 29-41.) Then, at defendant Hartwig's direction, a line of police encircled the main group of protestors, thus detaining several dozen individuals. Officer Shane Coduti, who was eventually assigned to write the police report concerning Morse, described the events leading up to Morse's arrest as follows:

> Q: Do you remember what led to the encirclement?
> A: Again, I remember a lot of screaming, a bunch of people yelling "Don't block the fare gates. You'll be arrested." I heard that numerous times. Then someone gave an order; the crowd was encircled. That's all I remember.
> Q: Then after the encirclement, you became involved; is that correct?
> A: That's correct.
> Q: What happened?
> A: At that point, I was standing still at my location by the hallway. Deputy Chief Hartwig approached me, and he pointed at David Morse and he said, "Go arrest him." I said, "Okay, sir."
> Q: And prior to that order, had you been observing David Morse?
> A: I had seen him as part of the crowd, yes.
> Q: Had you been paying special attention to him?
> A: No. (Siegel Dec., Ex. C, at 37.)

Lieutenant Coontz confirmed that Hartwig gave the order to arrest Morse. Siegel Dec., Ex. G, at 53-54, 58-59. After receiving the order, Coontz called via police radio for officers to "arrest Krystof and his sidekick first." *Id.* at 55-58; Siegel Dec., Ex. H.

At the time of his arrest, Morse was holding two cameras and was displaying a press pass. Siegel Dec. ¶¶ 16-21 and Exhs. O, P, and Q (BART station closed circuit

---

television footage (CCTV) showing Morse's conduct during the protest). He was not acting as a protestor; rather, he was working as a journalist. Morse Dec. ¶¶ 29-44.

Coduti roughly pulled Morse from the crowd and placed handcuffs tightly around Morse's wrists. Coduti took Morse to a small office within a BART police substation at the Powell Street station. He asked Morse if he was "Dave Id." "Dave Id" is the nom de plume that David Morse has used as a journalist at Indybay.org. *Id.* at ¶¶ 49-52.

Morse was forced to spend several hours in custody. BART police transferred him from the Powell Street substation to San Francisco County Jail at 850 Bryant Street. There, Morse was presented with a citation and given back his property. *Id.* at ¶¶ 53-59.

### F.  Hartwig Personally Released Every Other Journalist

Other than Morse, BART did not arrest any other journalist on September 8, 2011. Siegel Dec., Ex. M, at 43-44. Numerous media were within the protest group. Many of these media stayed close to Christopher Cantor, one of the protest leaders. Siegel Dec., Ex. A, at 84-86; Siegel Dec., Ex. B(8); Siegel Dec. ¶¶ 16-21, Exhs. O, P, Q.

Officer Schlegel witnessed Hartwig releasing journalists from the encirclement. Hartwig simply asked journalists to step forward and present their credentials, and then they were released. Siegel Dec., Ex. N, at 22.

### G. After the Protest, BART Commanders Justified the Arrest By Claiming Morse Was Not a Legitimate Journalist

Hartwig told media after the September 8, 2011, protest, that "legitimate members of the media were identified and released." Siegel Dec., Ex. A, at 132.

Hartwig's statement regarding "legitimate" media was echoed by Deputy Chief Fairow, who wrote, after the protest on September 8, 2011, that BART officers had "sort[ed] through the group of detainees, releasing bonified [*sic*] members of the press

and taking those protesters participating in blocking gates into custody." Siegel Dec., Ex. E, at 22; Siegel Dec., Ex. F(13).

### H. BART Commanders Sought Morse's Prosecution, but the District Attorney Dismissed All Charges

After Morse's arrest, Chief Rainey contacted the San Francisco District Attorney and expressed his desire that he be prosecuted for "illegal behavior as far as disrupting our operations and threatening public safety." Siegel Dec., Ex. M, at 40-41.

The District Attorney dismissed all charges against Morse. Morse Dec. ¶ 62.

### I. BART PD Violated Multiple Policies as they Policed the Protest

#### a. Failure to permit protest in the "free area."

Prior to September 8, 2011, BART announced that protestors could demonstrate, march, or protest in the free area of the BART stations, so long as they did not block access or the operations of the transit system. Siegel Dec., Ex. N, at 14. Hartwig admits that Morse was in the "free area" at the time of his arrest. Siegel Dec., Ex. A, at 33-34.

#### b. Failure to provide a safe staging area for media.

BART policy requires that at political protests BART police should designate a safe staging area for media. Hartwig first testified that, "There is always an area that's deemed safe and designated for the media." When asked again, he admitted there was not a specific staging area for the media on September 8, 2011. Siegel Dec, Ex. A, 11-12.

#### c. Failure to communicate with protest leaders.

BART Policy is to contact protest organizers in advance of the protest whenever possible. Hartwig made no attempt to meet with Cantor or Morse, even though both were discussed as "leaders." Siegel Dec., Ex. A, at 31-32. When pressed about his failure

to attempt communication with protest leaders, Hartwig justified his decision, stating, "I never recognized Mr. Cantor as the organizer or planner." Siegel Dec., Ex. A, 91

### d. Failure to provide dispersal orders.

BART policy states that, "the only proper basis for a multiple simultaneous arrest of all the individuals at a demonstration is failure to disperse." Hartwig admitted that this policy was not followed on September 8, 2011. In explanation for why the policy was not followed, he testified, "the crowd that was encircled failed to disperse after the dispersal announcement was made." Siegel Dec., Ex. A, at 14-15. Hartwig also testified that he believed that a proper dispersal order was given. *Id.* at 138.

Officer Schlegel described a proper dispersal order. Siegel Dec., Ex. N, at 19-20. He told Internal Affairs that he did not hear any such formal order. *Id.* at 21. Schlegel, who policed many of the BART protests during the summer and fall of 2011, testified that the September 8, 2011, protest was unique, in terms of BART utilizing the tactic of encircling dozens of protestors. Siegel Dec., Ex. N, at 11.

Lieutenant Coontz, who Hartwig identified as the one who gave up to three "dispersal orders," only remembers telling those present that, "it was unlawful to block the fare gates, to block access to the system, and that if they did so or continued to do so, they'd be subject to arrest." Siegel Dec., Ex. G, at 51-52. Coontz did not describe these announcements as "dispersal orders," however. He only considered his messages to be "advisements as to what the possible consequences were." *Id.* at 53.

### e. Failure to cite and release.

Morse was arrested for an infraction of Penal Code 369i. Siegel Dec., Ex. C, at 53; Siegel Dec., Ex. D. Ordinarily, a person arrested for an infraction would be cited and released, but BART PD refused to do so. Siegel Dec., Ex. C, at 53.

---

### f.   Failure to treat all journalists equally.

BART policies require that BART police provide alternative journalists with the same access to report on events in BART facilities as would be accorded to a mainstream journalist. Siegel Dec., Ex. A, at 38-39. When BART commanders sought to justify Morse's arrest, however, they repeated referred to the fact that he was not a "mainstream" or "legitimate" journalist.

### g.   Failure to file a supplemental report.

Hartwig admits that Coduti relied upon him in arresting Morse. Siegel Dec., Ex. A, at 7-8. Ordinarily, an officer who witnesses conduct that forms the basis of probable cause should submit a report. Siegel Dec., Ex. C, at 10.But Hartwig refused to file a supplemental report. Siegel Dec., Ex. A, at 26.

### J.   Hartwig Gave Inconsistent Testimony

### a.   Hartwig arrested Morse for failure to disperse.

Hartwig testified that Morse was arrested for failure to disperse. Hartwig claimed that Morse and the other protestors were given the opportunity to disperse before the police encircled them. Siegel Dec., Ex. A, at 23-24. Hartwig testified that he detained the entire mass of protestors, including journalists, because "I'd come to the determination that the people that were within the circle had made a willful choice to stay and we had run our course." *Id.* at 71. But Hartwig admitted that he subsequently determined that some people should be released. The only people released were journalists. *Id.* at 72.

### b.   Hartwig released only "mainline" journalists.

Hartwig admitted that San Francisco Chronicle reporter Vivan Ho was in the same group as Morse, but was not arrested.  *Id.* He states that, "There was dispersal notices read, and the majority of . . . people at that time dispersed. I believe Vivian Ho

did not." *Id.* at 37. When asked at his deposition to distinguish the conduct of Vivian Ho from the conduct of Morse, Hartwig stated, "she was a mainline journalist." *Id.* at 38. Hartwig's deposition testimony was consistent with his statement to media after the September 8, 2011, protest, when he declared, "legitimate members of the media were identified and released." *Id.* at 132.

Deputy Chief Fairow made nearly identical comments as Hartwig, also on September 8, 2011. Siegel Dec., Ex. E, at 23, 24. Years later, Chief Rainey would continue to state that Morse was "supposedly" a journalist. Siegel Dec., Ex. M, at 41-42.

### c.  Morse was arrested for associating with a protest leader.

Hartwig also testified that Morse was distinguishable from Vivian Ho, because he "interacted" with Christopher Cantor, a leader of the September 8, 2011 protest. *Id.* at 39. He testified that Morse committed an actionable crime because he was "stand[ing] side by side with Mr. Cantor in the encircled group." *Id.* at 42.

### d.  Morse was arrested for marching, blocking fare gates.

Hartwig's also testified that he "witnessed David Morse being an active participant of the protest at the Powell Street BART station, which included marching in a circular fashion around the ticket vendors, blocking the fare gates, impeding the flow of patrons entering and exiting the BART station." *Id.* at 46.  Pressed for detail, Hartwig asserted that Morse "blocked fare gates and blocked patrons," and that Morse did this "[e]ither in front of the fare gates [or] in front of the patrons." *Id.* at 47.  Then Hartwig admitted that he could not remember a specific instance of Morse standing in front of the fare gates. *Id.* at 47-48.

///

---

*Morse v. BART, et al.,* Case No. C12-5289 JSC (DMR)
MPA in Opposition to Summary Judgment                                                    11

### e.  Morse "blocked fare gates" by failing to disperse.

Hartwig claimed that "every person" that blocked fare gates was arrested. Siegel Dec., Ex. A, at 49. But as his deposition testimony makes clear, his only evidence that anyone blocked fare gates was that they disregarded the alleged dispersal orders:

> Q: How did you determine whether someone was intentionally or unintentionally blocking the fare gates?
> A: I relied upon multiple dispersal notices to disperse from the area. If you failed to do so, you were subject to arrest. Siegel Dec., Ex. A, at 36.

### f.  Morse was arrested for "creating a worse situation."

Prior to this litigation, Hartwig gave sworn testimony to Internal Affairs,as part of an investigation initiated in response to a complaint that Morse filed with BART concerning his unlawful arrest on September 8, 2011. In the IA interview, Hartwig was asked directly what "separated" Morse from the other journalists who had been detained by BART. Hartwig responded: "[M]y concern was the presence of Mr. Cantor and Mr. Id in the circle was creating a worse situation and . . . they needed to be removed immediately from the circle." Siegel Dec., Ex. B(9), at 20.

Hartwig also told Internal Affairs that Morse had been marching at "the front of the line" of protestors. Siegel Dec., Ex. A, at 109; Siegel Dec., Ex. B(9) at 21-22. In his deposition, Hartwig briefly abandoned this allegation, instead testifying that "Whether there was affront of the line or back of the line or middle of the line, it was more circular, but what I witnessed was violations of 369i." Siegel Dec., Ex. A, at 109. Then, finally, after consulting with counsel off the record, Hartwig re-asserted that Morse had marched at the front of the line. *Id.* at 111-115.

### K. Hartwig's Testimony Was Contradicted by Other BART Officers

#### a. Coduti: Hartwig ordered Morse's arrest.

Hartwig testified that Officer Coduti made the probable cause determination with respect to David Morse. Siegel Dec., Ex. A, at 7-8.Hartwig denied that he chose Morse for arrest. *Id*. at 26-27, 141-143. Hartwig also denied that Coduti asked him to testify at Morse's criminal trial regarding the probable cause for Morse's arrest. *Id*. at 27-28.

Coduti testified that Hartwig ordered the arrest. In fact, when Morse was facing criminal prosecution for alleged violation of Penal Code 369i, Coduti wrote to Hartwig, "I wanted to see if you could com e to court so you could explain what you saw to the judge, to make this violation stick." Siegel Dec., Ex. A, at 141; Siegel Dec., Ex. B(11).

#### b. Coduti and Coontz: Morse was not chanting or marching.

Hartwig testified that Morse was chanting and marching. But Coduti did not see David Morse chanting or marching on September 8, 2011. Siegel Dec., Ex. C, at 39. Lieutenant Coontz did not see Morse chanting, either. Siegel Dec., Ex. G, at 48.

Coduti told Internal Affairs that Morse "was taking pictures of protestors" and was in the larger group that was allegedly blocking the fare gates. Siegel Dec., Ex. C, at 41-43. IA specifically asked Coduti if he thought Morse was "an agitator," and Coduti responded: "I don't know – this is my only interaction with him. I just know that he was taking pictures. He was, you know, getting in there and taking pictures of the other people that were in charge of this demonstration." *Id*. at 43.

Coduti testified that there was not any conduct by David Morse that distinguished him from anyone else in the protest crowd. *Id*. at 55.

///

### c.  Coontz: "I never issued a formal dispersal order."

During the protest, Coontz gave announcements, over a megaphone, advising customers and protestors to leave the Powell Street Station.  He directly contradicted Hartwig's claim that he had given dispersal orders, however. Siegel Dec., Ex. G, at 63.

> Q:    At that stage, were there formal dispersal orders issued?
> A:    No. **I never issued a formal dispersal order.** They were told that the station was closed and they would have to leave. It was not a dispersal order under the law. It was just an advisement that the station was closed. Siegel Dec., Ex. G, at 63 (emphasis added).

### d.  Hayes: the police report failed to show probable cause.

Lieutenant Hayes was assigned to review Coduti's police report. Hayes reviewed the police report and found that it lacked a sufficient description of probable cause. Siegel Dec., Ex. I, at 22-26. Hayes refused to approve the report.

Hayes described in detail how the report was lacking, For example, the report failed to show the details of any "dispersal order" that was given prior to Morse's arrest, and it failed to demonstrate how close to the fare gates Morse stood. *Id*. at 23-25. Hayes concluded that Coduti "did not observe [Morse's] exact participation" in the protest. Instead, Coduti had expressed that the entire group was in violation of the law, and therefore Morse could be arrested. *Id*. at 35-38; Siegel Dec., Ex. J, at 46-49.Hayes recommended that Hartwig write a supplemental report. *Id*. at 29-30. Coduti was uncomfortable asking the Deputy Chief for a report, however. Siegel Dec., Ex. C, at 56.

### e.  Coontz and Schlegel: journalists who "blocked fare gates" were released when they displayed a press pass.

Hartwig claimed that an individual probable cause determination was made as to each journalist who was encircled by BART police. Siegel Dec., Ex. A, at 72.

---

Coontz testified that, after BART police encircled the main group of protestors, defendant Hartwig invited journalists to "come forward, identify themselves and they would be released from the circle." Siegel Dec., Ex. G, at 65. Multiple journalists were then released, even if they had been "incidentally in front of the fare gates" while covering the story.  *Id.* at 65-66.

Schlegel testified that he observed how journalists were released. They only factor considered was whether or not a journalist could provide press credentials. If the individual had press credentials, they were released. Siegel Dec., Ex. N, at 22.

### f.  Coduti and Dam: Hartwig participated in targeting Morse.

At a pre-protest meeting at BART headquarters on September 8, 2011, Officer Dam passed out the flyer showing Cantor and Morse, and officers discussed how Morse might be legally arrested. Siegel Dec., Ex. K, at 36; Siegel Dec., Ex. L, at 10-12.

Hartwig denied being present at the meeting. Siegel Dec., Ex. A, at 57. He also denied seeing the information flyer that pictured Morse and Cantor. *Id.* at 64, 65.

But Officer Dam remembered seeing Hartwig at the same meeting. Siegel Dec., Ex. K, at 17. Coduti also remembered that Hartwig was there. Siegel Dec., Ex. C, at 20.

### L.  Hartwig's Testimony is Contradicted by Official BART Records

Hartwig testified that Lieutenant Coontz gave as many as three dispersal orders. Siegel Dec., Ex. A, at 12-14. Hartwig claims that these dispersal orders were given before the order was given to arrest David Morse.

The CAD timeline contradicted this. Siegel Dec., Ex. A, at 75-77; Ex. B(5). According to the CAD timeline, only one dispersal order was given, and this was given at 5:26 p.m., several minutes after BART PD had encircled Morse and the larger group of protestors and journalists. *Id.*

Hartwig explained that, pursuant to BART custom and practice, a CAD report is prepared by the communications director by reviewing the audio tapes during a police action. Hartwig testified that recorded timeline oft the CAD record was unreliable, particularly in regard to the reported time of 5:26 p.m. as being the time that a dispersal order was given. Siegel Dec., Ex. A, at 25, 93-94. But then he testified that the way to verify the CAD is to review the original audio records. Ex. A., at 77.

The original audio records were produced by BART during discovery. They substantiate the CAD log, and discredit Hartwig's account. Siegel Dec. ¶ 22 and Ex. R (audio file revealing that an officer announced, via CAD, that the "dispersal order" had been given at 5:26 p.m.).

Hartwig did not make written records during the September 8, 2011. In order to keep track of the time notations, Hartwig stated, "I relied upon the CAD system." *Id.* at 101. By CAD system, Hartwig meant: "The audio files along with the interpretation that turns into an actual document." *Id.* at 102.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendants here have not carried that burden.

## IV.   ARGUMENT

### A. Morse Establishes his Fourth Amendment Claim By Showing (1) BART Consented to His Presence and (2) Hartwig Arrested Him Despite the Absence of Probable Cause

#### 1.   Consent is a perfect defense to trespass.

"It is well established that an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." *Blomquist v. Town of Marana*, 501 Fed.Appx. 657, 659 (9th Cir. 2012). Morse can prove his claim by showing that there was no probable cause for Hartwig to arrest him under Penal Code § 369i, a statute that prohibits "trespass on railroad or transit-related property." Cal. Pen. § 369i.

Consent is a perfect defense to a trespassing claim, since "lack of consent is an element of the wrong." *Civic Western Corp. v. Zila Industries*, 66 Cal.App.3d 1, 16 (App. 2 Dist. 1977). "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are effective as consent in fact." Rest. 2d Torts § 892(2). Penal Code § 369i, like other trespassing statutes, possesses a consent exception. *Cf.* Cal. Pen. §§ 369i(a) (restricting offenses to those who enter "without permission"), 602(m) (prohibiting occupation "without the consent of the owner").[2]

#### 2.   BART consented to the presence of journalists—including Morse—during the protest in question.

Here, Morse establishes a triable issue of fact as to consent. He shows that, prior to the protest in question, BART told protestors that First Amendment activity would be

---

[2] Defendants argue that "[t]here was no case authority as of September 2011 specifying the proper (or improper) grounds for a 369i arrest." (Dkt. 54 at 24, 25.) This argument ignores the plain language of the law. Penal Code § 369i is a trespass statute.

1   permitted in the "free area" of BART stations, and that the September 8, 2011, protest
2   took place in the "free area" of the Powell Street Station.

3       Morse shows that, by virtue of BART's published policies, media are entitled to
4   cover public demonstrations, and that BART PD are expected to provide a safe area in
5   which media can document such protests. Morse also shows that, on September 8, 2011,
6   BART failed to provide a safe area for media.

7       Morse shows that, even though media were trapped by the encirclement of BART
8   officers, every journalist except for Morse was permitted to leave without facing arrest,
9   simply by presenting a press pass. Morse was carrying a press pass that day.

10      Morse also demonstrates that, from the point of view of several on-scene officers,
11  his conduct that day was indistinguishable from other journalists. Morse further
12  corroborates this fact through BART's closed circuit television (CCTV) footage, which
13  shows Morse documenting the protest in the same manner as various other journalists.

14      Hartwig admitted that dispersal orders were needed before any of the protestors
15  could be arrested for protesting. And Coontz, who Hartwig claimed gave three dispersal
16  orders, testified that he gave no such order.

17      Because Morse has presented evidence that BART consented to the presence of
18  journalists at the protest, and because Morse has established an issue of fact as to
19  whether BART gave fair notice to journalists that their presence was unlawful prior to
20  subjecting him to arrest, summary judgment should be denied.

21              **3.  Morse did not block fare gates.**

22      Defendants argue that probable cause existed to arrest Morse because Hartwig
23  "observed Plaintiff walk with the crowd in the protest and block the fare gates and block
24  patrons." (Dkt. 54 at 17.) This account is contradicted by the evidence, however.

---

Hartwig himself states that he determined that Morse "blocked fare gates" because Morse failed to heed "multiple dispersal orders." Siegel Dec., Ex. A, at 36. Morse denies hearing dispersal orders, however, and his time-stamped photographs corroborate that no dispersal order was issued until after he was trapped by a circle of BART PD officers. Morse Dec. ¶¶ 40-46. Furthermore, Coontz—the person identified by Hartwig as giving the dispersal orders—denies that he gave them. Because Hartwig's purported probable cause regarding "blocking fare gates" comes down to the issue of dispersal orders, and because there are discrepancies in the evidence as to whether any such orders were given, summary judgment should be denied.

### 4.  Factual disputes are intertwined with the issue of qualified immunity, and preclude summary judgment.

Qualified immunity may not be granted if disputed factual issues relating to the existence of probable cause are intertwines with the qualified immunity inquiry. *Perez-Morciglio v. Las Vegas Metropolitan Police Dept.*, 820 F.Supp.2d 1111, 1122 (D. Nev. 2011). Furthermore, qualified immunity may not be invoked by those who knowingly violate the law. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). In making the qualified immunity determination, the Court views the facts alleged in the light most favorable to the party asserting the injury. *Sorrels v. McKee*, 290 F.3d 965, 696 (9th Cir. 2002).

To defeat qualified immunity, Morse must show that defendants violated a constitutional right, and that this right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Here, defendant Hartwig testified that he only intended to arrest someone who knowingly blocked fare gates during the protest. Siegel Dec., Ex. A, at 22-23.Lieutenant

---

Coontz agreed that, in order for BART police to arrest somebody, they would have to "willful[ly] act to impede the services of the system." Siegel Dec., Ex. G, at 31-32. Any reasonable police officer would know that, in order to arrest an individual at a BART station for the crime of "trespass on transit-related property" under Penal Code 369i, the individual would need to be intentionally interfering with the fare gates.

Hartwig testified that he arrested Morse because he blocked fare gates. He testified that he knew Morse had blocked fare gates because Morse failed to disperse following dispersal orders. Hartwig admitted that BART PD needed to give proper dispersal orders before arresting anyone for failure to disperse. Hartwig pointed to Coontz as the person that gave the dispersal orders. Siegel Dec., Ex. A, at 12-13.

Yet, Coontz denied that he gave any dispersal orders. Because there are diverging accounts as to the issue of dispersal orders, it is reasonable for a jury to find that Hartwig's credibility is at issue, and thus infer that he intentionally violated Morse's constitutional rights. Because there is a triable issue of fact as to whether Hartwig knowingly arrested Morse in violation of the law, qualified immunity should be denied.

### B. Morse Establishes his First Amendment Claim through Evidence of Inconsistent Justifications, Deviations from Policy, Motive to Retaliate, and Lack of Probable Cause

#### 1. Retaliation may be proved by circumstantial evidence.

Retaliatory motive is a question of fact, and can be inferred from a number of signs, including a history of conflict between the parties, unjustifiably and uncommonly harsh treatment, and defendants' past statements. *Beck v. City of Upland*, 527 F.3d 853, 868 (9th Cir. 2008). A § 1983 First Amendment plaintiff may also present a party's misrepresentations and its failure to follow standard procedures as evidence of

retaliatory animus. *See Allen v. Iranon*, 283 F.3d 1070 (9th Cir. 2002) 283 F.3d 1070 (looking at a § 1983 First Amendment retaliation claim in the employment context).

The Supreme Court describes a "principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 174 (2000).

Additionally, in cases involving retaliatory police action, "Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution." *Hartman v. Moore* (2006) 547 U.S. 250, 261. "[A] retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision." *Id.* at 265.

### 2. Hartwig's retaliatory animus can be inferred based upon his inconsistent testimony.

As discussed above, Hartwig gave inconsistent testimony concerning several material issues, including (1) who made the decision to arrest David Morse, (2) whether Hartwig himself participated in the pre-protest efforts to target Morse for arrest, and (3) what probable cause existed for arrest. Because defendant Hartwig's credibility is called into question by sworn testimony of BART officers, Morse's sworn declaration, and official BART records, it is reasonable for a jury to infer his retaliatory motive.

### 3. Hartwig's retaliatory animus can be inferred based upon his departure from relevant BART policies.

Hartwig also failed to abide by BART policies that are critically relevant to the protection of First Amendment rights. Specifically, Hartwig (1) failed to provide a safe staging area for media, (2) failed to issue proper dispersal orders, thus depriving Morse

of fair notice before facing arrest, (3) failed to treat Morse, an independent journalist, in the same fashion as mainstream journalists, and (4) failed to cite and release Morse, despite his arrest for an infraction. Additionally, BART commanders including Hartwig engaged in highly unusual conduct to perform surveillance on a known journalist, refer to the journalist as a "subject," discuss how the journalist might be legally arrested, and then conduct the arrest in an arbitrary and unjust manner.

Even though Hartwig may not have ordered the creation of the intelligence flyer concerning Morse, and even though Hartwig may have delegated the task of arresting Morse to a lower ranking officer, Hartwig himself can be held liable for this concerted action. *See Hartman v. Moore*, *supra*, 547 U.S. at 264. Coduti's conduct can be attributed to Hartwig because Coduti was a mere "rubber stamp" for Hartwig's order to arrest Morse. *See Hartman*, *supra*, 547 at 264. Fairow's conduct also can be attributed to Hartwig because Fairow gave Hartwig full responsibility for policing the protest in question, and Hartwig in turn incorporated Fairow's intelligence-gathering activities into his command of BART PD's efforts to police the protest.

Because Hartwig failed to abide by policies designed to protect the First Amendment rights of journalists, and because Hartwig participated in a conspiracy to surveil Morse and ultimately seek his arrest, a jury may infer his retaliatory motive.

### 4.  Hartwig is not entitled to qualified immunity.

Qualified immunity is not appropriate, because material issues of fact exist as to whether Hartwig and the other BART commanders intentionally targeted Morse based upon his journalistic activities.

Even if this Court finds that BART should prevail on the issue of probable cause, Morse can state a First Amendment claim. Morse's arrest occurred on September 8, 2011, nearly two years after the Ninth Circuit established "a right exists to be free of police action for which retaliation is a but-for cause even if probable cause exists for that action." *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006).

BART acknowledges that multiple journalists were detained subsequent to the alleged "dispersal orders," but only Morse was subject to formal arrest. If failure to comply with dispersal orders was the reason for Morse's arrest, then the other journalists detained within the kettle would have received the same punishment. Because BART did not apply the law uniformly to journalists, it cannot claim qualified immunity. *See Skoog*, *surpa*, 469 F.3d at 1235.

### C.  Issues of Probable Cause Support the False Arrest Claim

As defendants admit, Hartwig may be held liable for a false arrest claim if he failed to possess probable cause, or if he failed to act reasonably in ordering Morse's arrest. Cal. Pen. § 847(b)(1) (cited at Dkt. 54 at 26.) As argued above, Morse establishes a triable issue of fact as to the probable cause for his arrest, and presents evidence that Hartwig gave unreliable testimony. Therefore, summary judgment should be denied.

### D.  Punitive Damages are Supported by the Malicious Conduct of BART Commanders to Target and Arrest a Journalist

Morse is entitled to punitive damages under federal law if he shows that Hartwig acted with reckless indifference to his rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). He is entitled to punitive damages under state law if Hartwig acted with malice. Cal. Civ. § 3294. Here, Morse has established that BART commanders including Hartwig engaged

in a conspiracy to subject him to surveillance and ultimately target him for arrest. Such allegations, if proven true, would justify the imposition of punitive damages.

## V.     EVIDENTIARY OBJECTIONS

Morse objects to and moves to strike portions of the Declaration of Kenton W. Rainey (Dkt. 56) including the attached exhibit that defendants submitted in support of defendants' motion for summary judgment/adjudication. Specifically, Morse objects to paragraphs 3 and 4 of Rainey's Declaration, including the attached Exhibit A, which constitute information and documentation that were not disclosed pursuant to Rule 26 disclosures or the discovery process. Because Morse was denied the opportunity to conduct reasonable discovery concerning the attached Exhibit A, he has been prejudiced by its late introduction into the case, and the evidence should be stricken.

## VI.    CONCLUSION

For the aforementioned reasons, Morse has established triable issues of fact as to probable cause and BART's retaliatory animus. Furthermore, Morse has introduced evidence that permits the inference that defendants acted willfully, maliciously, and with retaliatory intent. Thus, Morse is entitled to proceed with his claims, qualified immunity should not apply, and the motion for summary judgment should be denied.


Dated: January 8, 2014                              SIEGEL & YEE

                                                    By: /s/ Michael Siegel
                                                         Michael Siegel

                                                    Attorneys for Plaintiff
                                                    DAVID MORSE