United States District Court
Northern District of California

1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10

11   DAVID MORSE,                          Case No.: 12-cv-5289 JSC

12              Plaintiff,                  **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
13        v.                                MOTION FOR SUMMARY
                                            JUDGMENT**
14
15   SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART), et al.,
16
17              Defendants.

18

19        This civil rights lawsuit concerns Defendant Bay Area Rapid Transit ("BART") Deputy

20   Police Chief Dan Hartwig's arrest of Plaintiff David Morse, a journalist and critic of BART police

21   conduct.  Plaintiff was arrested at the Powell Street BART station during a September 2011

22   demonstration that was part of a wave of afternoon rush hour protests that significantly limited BART

23   service within San Francisco.  The protestors' concerns included the killing of Oscar Grant III and

24   Charles Hill by BART police, as well as BART's decision to disable cellular service in its stations

25   during at least one August 2011 protest.  Plaintiff's journalistic activities included attending and

26   documenting the protests, and then publishing articles about the protests on the Internet.  Plaintiff

27   alleges in this lawsuit that his arrest for blocking BART fare gates was unlawful and in retaliation for

28   his First Amendment-protected conduct.

Now pending before the Court is Defendants BART and Hartwig's motion for summary judgment.  (Dkt. No. 54.)  Having carefully considered the parties' submissions, and having had the benefit of oral argument on February 6, 2014, the Court GRANTS the motion in part and DENIES the motion in part.  Because the Court concludes that a material factual dispute exists as to whether Plaintiff's arrest was motivated by retaliatory animus, summary judgment on Plaintiff's First Amendment claim is denied.  Summary judgment, however, is granted on Plaintiff's Fourth Amendment unlawful arrest and state-law false imprisonment claims since the undisputed facts establish that Plaintiff's arrest was supported by probable cause as a matter of law.  Further, even if Hartwig lacked probable cause for the arrest, qualified immunity bars Plaintiff's claim under the Fourth Amendment.

## SUMMARY JUDGMENT EVIDENCE

**A.     Events Preceding the September 8, 2011 Protest**

Plaintiff is a journalist and has been a member of the San Francisco Bay Area Independent Media Center, or Indybay, since May 2004.  IndyBay is an online newspaper, press association, and wire service that generates and distributes audio, visual, and print stories of local events for various media outlets.  Since late 2002, Plaintiff's work has focused on the documentation of social and political movements, which has included covering hundreds of demonstrations that often involve contentious protests with a large police presence.

Plaintiff's BART-related reporting, which was published under his pen name, "Dave Id," appears to have begun in the wake of the killing of Oscar Grant III in 2009 by BART Police Officer Johannes Mehserle.[1]  Grant's death set off a series of large demonstrations, including some riots, against BART and Mehserle.[2]  Plaintiff covered a "wide array" of the Oscar Grant-related protests that occurred at BART stations, in the streets of Oakland, and at BART headquarters.  (Dkt. No. 63 ¶

---

[1]  Defendants make boilerplate evidentiary objections to the portions of Plaintiff's declaration that discuss Plaintiff's journalistic activities as well as Plaintiff's published articles attached as exhibits.  Those objections are overruled.  Plaintiff's journalistic activities and the content of his speech are relevant to show that Plaintiff engaged in First Amendment-protected conduct, and that such conduct was sometimes critical of BART, which is also relevant to show motive for the alleged retaliatory arrest.  Further, the articles are not hearsay because they are not presented for the truth of their assertions; rather, the articles are submitted to merely show that Plaintiff wrote them.

[2]  Mehserle was eventually indicted for murder, convicted of manslaughter, and sentenced to prison.

United States District Court
Northern District of California

2

8.)  Plaintiff also covered the hearings at the state capitol concerning the killing and creation of a BART police oversight apparatus.

It is undisputed that many of the articles Plaintiff wrote included negative facts and critical commentary concerning BART, its Board of Directors, and its police force.  For instance, Plaintiff accused BART of attempting to "cover-up" the alleged murder of Grant.  (*Id.* at ¶ 9.)  Plaintiff's reporting also included information concerning other instances where BART police officers killed particular individuals.  According to Plaintiff, this information was embarrassing to BART "because it tended to show that the killing of Oscar Grant was part of a larger pattern of misconduct."  (*Id.* at ¶ 10.)

During Mehserle's criminal trial, Plaintiff reported on the proceedings and provided Indybay readers with access to the original court documents in the case and to the court transcripts, which were not previously available to the general public.  Plaintiff states that this reporting was embarrassing to BART police officials because it "gave Indybay readers access to details of BART police misconduct that were not otherwise accessible to the general public."  (*Id.* at ¶ 12.)

In an article in late 2009 concerning the departure of BART Police Chief Gary Gee, Plaintiff wrote that "Gee's officers were out of control—acting more like a racist, murdering gang than a professional police force—and Gary Gee failed to hold them accountable for their behavior."  (*Id.* at ¶ 13.)  Plaintiff also wrote an article in early 2010 that accused BART of "smearing" the reputations of Grant's friends who were with Grant the night he was killed and who had subsequently filed a lawsuit against BART.  (*Id.* at ¶ 16.)

Plaintiff's activities caused him to become "personally acquainted" with leaders of the BART organization, including its Board directors and police officials.  In particular, Plaintiff had a "direct relationship" with Deputy Chief Hartwig—the man who would later arrest him.  (*Id.* at ¶ 19.)  Hartwig and Plaintiff spoke "numerous times" between 2009 and 2011 to discuss "the various demonstrations that occurred in connection with the Oscar Grant movement."  (*Id.*)  Plaintiff described their relationship as cordial, professional, and friendly.  "[M]ost often," their conversations took place in the BART boardroom during Board meetings while Hartwig was head of security programs in the BART General Manager's office.  (Dkt. No. 64-1 (Hartwig Depo.) at 42:21-22.)

United States District Court
Northern District of California

1   Sometimes at these meetings, Plaintiff would speak during public comment as a "mix[]" between

2   reporter and concerned citizen.  (Dkt. No. 55-2 (Morse Depo.) at 31:22-25.)

3            On July 3, 2011 a BART police officer shot and killed Charles Hill at the Civic Center BART

4   station in San Francisco, setting off a new wave of anti-BART protests.  The protests "posed a

5   substantial obstruction to BART operations and threatened public safety."  (Dkt. No. 55-3 (Rainey

6   Depo.) at 17:12-14.)  On more than once occasion, "BART was forced to slow the operation of its

7   trains in response to the protests" and even "chose . . . to temporarily close stations in response to

8   protest."  (Dkt. No. 63 ¶ 21.)  Plaintiff documented these protests, posting one article on July 18,

9   2011 that described the killing of Hill and BART's response as follows:

10              On the evening of July 3rd, two as of yet unidentified BART police officers responded
                to a report of an intoxicated man who could barely stand with an open container at the
11              Civic Center BART station in San Francisco.  Less than one minute after arriving on
                the Civic Center platform, the BART cops, armed with pistols, at least one taser, and
12              who knows what other weapons, shot and killed 5' 8", 150-pound Charles Hill with
                three rounds to his chest. While refusing to release BART's closed-circuit video of the
13              incident and withholding numerous key details, purportedly to avoid biasing witnesses
                who have not yet been interviewed, BART's police chief Kenton Rainey has publicly
14              rationalized the shooting, repeatedly defended his officers, and declared that he is
15              "comfortable" with his officers having killed Charles Hill.

16

17   (Dkt. No. 63-1, Ex. F.)  Plaintiff also wrote in that article that BART, while "utilizing every last bit of

18   riot control gear and weaponry owned by the agency" to combat the protest, "deliberately left its

19   passengers in the dark about what to expect from [the protest]" despite the "demonstrators best efforts

20   to announce the action as widely as possible ahead of time."  (*Id.*)  At the end of the article, Plaintiff

21   directs his readers to see, "[f]or background," "How to Slow BART Trains for Social Justice - BART

22   Action April 8th, 2010: video" and includes a link to another Indybay webpage.  (*Id.*)

23            At an August 11, 2011 protest, BART shut down cellular phone service in one or more BART

24   stations, which prompted Plaintiff to write an Indybay article the next day where he stated: "Without

25   even realizing how premature it was to smirk and brag to the corporate media about having disabled

26   the antennas after service was cut, BART appears to have stepped in another big pile of shit as it so

27   often tends to do."  (*Id.* at Ex. G.)  Plaintiff described "BART police Lt. Andy Alkire" as

28   "bragg[ing]" about disabling cellular service, stated that BART's spokesperson was "smirking" on

television newscasts, and surmised that "it's not likely BART officials think their decision to disable the phone antennas is so cute and funny any more."  (*Id.*)  Several times in the article Plaintiff accused BART of lying.  Plaintiff also directed statements at BART Deputy Police Chief Benson Fairow concerning the "disingenuous" claim that BART shut down cellular for the safety of passengers:

> Trying to personalize the sense of sheer terror demonstrators create, BART police deputy chief Benson Fairow played his role by telling the media, "It was a recipe for disaster. . . . The fact that they started to conspire to commit illegal actions on the station platform was our concern.  I asked myself: If my wife, mother or daughter was on that platform, would I want them to be in that situation?"  In another news outlet, Fairow made use of his family in a more gruesome manner: "would I want my wife or daughter to get kicked (onto BART tracks) in a protest that we could have avoided?" It is unclear how protesters with working mobile phones would be more likely to cause his wife to be shoved onto train tracks than protesters without phones.

(*Id.*)  Plaintiff went on to mock Fairow:

> Deputy Chief Benson Fairow, who eventually took credit for owning the decision to cut phone service, stretched it even further by claiming that "I am 99% certain (the protest) was going to happen. We saw people who were clearly ready to take action, with backpacks and tools."  They saw people with backpacks on trains?  Scary.

(*Id.*)  Plaintiff concluded his article by noting "[w]hether and when the agency or any individuals within it will be taken to task for the misdeeds and lies of its officials and police officers remains to be seen," and included information letting his readers know how they can tell BART "how you feel about the lack of accountability within their police department or the agency's attempted silencing of dissent."  (*Id.*)  Plaintiff further stated that "[y]ou can also confront the BART board of directors in person at their bi-weekly board meetings."  (*Id.*)

After the shutdown of cellular service, criticism of BART increased, with the Internet activist group Anonymous, among other groups such as "No Justice No BART," staging three protests in the final two weeks of August.  Plaintiff wrote more articles about BART's response to these protests, with titles such as "BART Hates Free Speech" and "The Real Safety Threat?  BART Encouraging Violence Against Protestors."  (*Id.* at ¶ 27.)  In the latter article, Plaintiff again quoted Fairow, stating that he had a "faux concern for protestor well being" and that he was being "incredibly ironic and

1  hypocritical." (*Id.* at Ex. H.)  Plaintiff also accused BART of at least tacitly approving violence

2  against protestors:

> It's becoming apparent that BART and its police not only approve of physical assaults
> against demonstrators but the agency is actively using the media to carry the message
> to the potentially violent authoritarians amongst us that BART has little interest in
> stopping them and most likely will continue to look the other way—while their police
> instead busy themselves dragging away anyone who dares to chant "no justice, no
> peace, disband the BART police" inside a train station.

7  (*Id.*)  Plaintiff went on to compare BART to deposed Egyptian leader Hosni Mubarak.

8          Hartwig read "some" of these articles, and "[m]aybe" discussed them with Fairow and Chief

9  Kenton Rainey. (Dkt. No. 64-1, Ex. A at 43:1-15.)  Fairow testified that he read "[a]ny [of Plaintiff's

10  articles] that had to do with the protests." (*Id.* at Ex. E, 9:13-17.)  Other officers also read Plaintiff's

11  articles. (*See id.* at Ex. C (Conduti Depo.), 17:15-18:4); Ex. G (Coontz Depo.), 18:9-19:11; Ex. N

12  (Schlegel Depo.), 8:10-13.)  Officer Coontz testified that, prior to the September 8 protest, the nature

13  of the discussions at BART concerning Plaintiff was "[j]ust that the sense was, as I said, he seemed to

14  be an active organizer of the group that seemed to be behind most of the protests that we should be

15  alert for." (*Id.* at Ex. G, 20:19-23.)

16  **B.     The September 8, 2011 Protest**

17          The day of the planned protest, Fairow ordered Officer Ken Dam to prepare an informational

18  flyer that identified a leader of the No Justice No BART movement, Christopher Cantor aka Krystof,

19  along with Plaintiff. (*See id.* at Ex. K (Dam Depo.), 12:17-21; 15:16-20.)  Fairow does not recall

20  creating a similar flyer before or since September 8.  Fairow said the flyer was necessary because:

> We knew that if either Mr. Cantor or Mr. Morse appeared on a day when there was a
> protest scheduled to occur that it was more likely than not that the protest would occur
> where they showed up.  So having early intelligence that they were present was helpful
> in determining where we were going to send resources.  As I recall, this particular day
> there was some confusion as to whether they would actually be at Powell or another
> station.  It's difficult for us as a law enforcement agency to mobilize enough resources
> to cover every contingency.  We try to cover them as best we can and try to minimize
> surprises whenever possible.  In this case, it was going to be to our advantage to know
> where either Mr. Cantor or Mr. Morse showed up because we would be able to put our
> resources in that location and not play catchup by having to move to another station
> we weren't aware of.

United States District Court
Northern District of California

1  (*Id.* at Ex. E, 42:11-43:4.)  In an email to Dam regarding the preparation of the flyer, Fairow wrote

2  "Dave Id hasn't been identified yet.  He's the Indybay 'reporter' who collaborates with Cantor."  (*Id.*

3  at 68:5-10.)  When asked at his deposition if he was "hoping to arrest [Plaintiff]," Fairow testified:

4  "Not necessarily.  I was hoping the protest would be just that, a protest, that there wouldn't be any

5  law-breaking."  (*Id.* at 43:19-22.)

6      Dam sent the flyer to BART command staff and to sergeants who would be working the

7  protest.  The flyer was also distributed at a briefing that same day for BART officers who would be

8  policing the protest.  At the briefing, Cantor and Plaintiff were referred to as "subjects."  (*Id.* at Ex. K,

9  20:20-21.)  The officers were given an order that if Cantor or Plaintiff were "inciting a riot or acting

10  in a criminal manner, they were to be arrested."  (*Id.* at 36:13-19.)  Although Hartwig denies being at

11  this briefing, Dam and Conduti both testified that Hartwig was present.

12      Plaintiff arrived at the Powell Street Station, the site of the protest, via BART sometime

13  before 5:00 p.m. and headed towards the "free area" of the station—the part of the station outside the

14  "paid area" and where BART had announced that First Amendment activity could occur.  Because

15  BART had closed "a large portion" of the station in advance of the protest, a "dense crowd of

16  protestors, police, passengers, and media, including [Plaintiff]," were "forced" into a relatively small

17  section of the West side of the station.  (Dkt. No. 63 ¶ 29.)  Plaintiff began documenting the protest

18  with one of two cameras he brought with him, taking a total of 56 photographs over the course of one

19  hour from around 4:30 to 5:27 p.m.  Plaintiff's photos appear to show that BART suspended

20  passenger and protestor access to the East side of the station, including access to fare gates on that

21  side of the station.  According to Plaintiff, the West end of the station was the only place that

22  passengers could enter and exit the system and that the protest could occur, resulting in a congested

23  situation.

24      Plaintiff asserts that approximately two minutes before the protest was scheduled to begin,

25  BART Officer Coontz used a bullhorn to announce: "Please do not block the ticket vending machines

26  or the fare gates.  Thank you very much."  (*Id.* at ¶ 35.)[3]  Plaintiff understood this as "[a]n

27

28  ³ Citing the "sham affidavit" rule, Defendants object to Plaintiff's testimony as to what Coontz said
because it differs from what Plaintiff testified to at his deposition.  Specifically, Defendants contend
that Plaintiff testified that Coontz warned the group they would be arrested if they blocked the fare

1   announcement, a warning . . . [b]ecause the action had been announced as spare the fare, and there

2   was talk of potentially blocking the gates as if it was going to be some civil disobedience action."

3   (Dkt. No. 55-2 at 83:13-16.)  Shortly after 5:00 p.m. Cantor commenced the protest by making an

4   announcement to the assembled media, and then beginning to walk around the "free area" with

5   several dozen demonstrators while chanting slogans.  While the protestors generally stayed in a "solid

6   clump or blob" in the middle of the free area, "some of the group made nearly one complete circle

7   around a ticket vending machine located on an island in the middle of the free area . . . .  Others

8   among those present did not march, and simply stood in the free area."  (*Id.* at ¶ 37.)

9       Plaintiff "followed the group around, taking photographs and making observations."  (*Id.*)

10  Plaintiff states that the "protest itself was minimally disruptive of the BART station free area."  (*Id.* at

11  ¶ 39.)  "Although the group was in the middle of the free area, and comprised approximately 50

12  protestors and two dozen journalists, there was room in front of the two different sets of fare gates in

13  the West end of the Powell Street Station for passengers to enter and leave the train station."  (*Id.*)

14  According to Plaintiff, BART police created a line of officers in front of the South set of fare gates in

15  the West end of the station, "with room behind them for train passengers to enter and exit the

16  facility."  (*Id.*)  Around this time, Officer Coontz was issuing "advisements" to let everyone in the

17  group know that "if they blocked the fare gates they were subject to arrest."  (Dkt. No. 64-2, Ex. G at

18  51:18-19, 53:18-20.)[4]

19      After the group had completed one circle around the ticket vending machines, "BART police

20  formed a line that prevented the protest group from advancing further."  (Dkt. No. 63 ¶ 40.)  Around

21  this same time, BART police "formed a new line, this time in front of the North set of fare gates in

22  the West end of the station."  One of Plaintiff's photographs appears to show passengers passing

23  behind the line of police officers on their way to the North set of fare gates.

24

25

26  gates.  Because the Court does not rely on either the giving of any warning or the content of any
    warning, the Court need not rule on the objection.

27  [4]  While Hartwig appears to believe these advisements were formal dispersal orders, Coontz testified
    that he "never issued a formal dispersal order."  (*Id.* at 63:13.)  BART's official timeline of the protest

28  shows that the only dispersal order was given at 5:26, a minute after everyone in the middle of the
    circle was detained.  (Dkt. No. 64-1, Ex. B.)

United States District Court
Northern District of California

United States District Court
Northern District of California

No later than 5:20 p.m., BART police moved in "on all sides" of the protestors, forming a circle that enclosed between 40 and 50 people, including both protestors and journalists.  (*Id.* at ¶ 42.) "BART police present stated that they were 'investigating' the entire group for violation of California Penal Code § 369(i)."  (*Id.* at ¶ 43.)  Shortly after the encirclement, "BART police issued an order, declaring that anyone in Powell Street station should leave or risk arrest."  (*Id.* at ¶¶ 45-46.)  The station was then closed.

Plaintiff testified that he:

did not participate in the protest at any time during the events of September 8, 2011.  I did not issue any chants.  I did not march or walk in formation with any protestor.  I did not obstruct any BART facilities, such as the ticket machines or fare gates.

(*Id.* at ¶ 44; *see also id.* at ¶ 63 ("I did not march, chant, or block fare gates during the protest in question.").)[5]

Hartwig next began selecting individuals for arrest, and selected Plaintiff as the first arrestee. Officer Coontz communicated Hartwig's order to arrest Plaintiff over the radio, instructing officers to "take Krystof and his sidekick . . . first."  (Dkt. No. 64-2, Ex. H (audio file); Ex. G at 60:5-25.)  At the time of his arrest, Plaintiff was wearing his Indybay press pass around his neck and was holding a camera in each hand.

During his deposition, Hartwig was asked to "describe all the specific facts that gave you probable cause to arrest [Plaintiff]," and Hartwig responded:

I witnessed David Morse being an active participant of the protest at the Powell Street BART station, which included marching in a circular fashion around the ticket vendors, blocking the fare gates, impeding the flow of patrons entering and exiting the BART station.

---

[5]  Defendants object to Plaintiff's testimony as to his conduct at the protest under the "sham affidavit" rule and relevance.  The objection is overruled.  The "sham affidavit" rule provides that a "party cannot create an issue of fact by an affidavit contradicting . . . prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  What Defendants argue is a contradiction in Plaintiff's testimony is actually a reasonable dispute as to what it means to "obstruct" fare gates; thus, there is no contradiction and the "sham affidavit" rule does not apply.  Further, the testimony is relevant to show Plaintiff's conduct at the protest that led to his arrest.

United States District Court
Northern District of California

(Dkt. No. 64-1, Ex. A at 46:6-13.)  Hartwig was also asked if there was "any particular action" he remembered between Plaintiff and any BART patron: "I remember Mr. Morse being an active participant in the protest that marched around the ticket vendors, that blocked the fare gates at the Powell Street station repeatedly.  During dispersal announcements, after dispersal announcements, the activity continued." (*Id.* at 48:3-10.)  Hartwig, however, could not recall "a particular moment" where Plaintiff stood in front of the fare gates.  (*Id.* at 47:24-48:2.)  When asked to distinguish Plaintiff's conduct from that of Vivian Ho, a reporter for the *San Francisco Chronicle* that was in the group of protestors but was not arrested, Hartwig stated: "He was an active participant in the protest. He was actively blocking fare gates, actively marching with the crowd, actively interacting with Mr. Cantor, who I determined through my experience with this group was the active leader of the crowd." (*Id.* at 39:10-15.)

Hartwig further testified that he had Cantor and Plaintiff arrested first because they were creating a "worse situation." (*Id.* at 104:3-12.)  When asked what Plaintiff was doing to create a worse situation, Hartwig stated that "[t]hey were all talking.  Mr. Cantor was yelling.  [Plaintiff] was right next to him." (*Id.* at 104:18-20.)  Hartwig then stated that he "determined that [Plaintiff] and Mr. Cantor was [sic] the reason for the emotion and the passion, and I wanted to remove it." (*Id.* at 104:23-25.)  Hartwig believes his determination was right because "when they were removed, the center of that inner circle went silent." (*Id.* at 105:3-5.)

Officer Conduti placed Plaintiff in handcuffs and led him to the BART police substation within the Powell Street station.  Plaintiff was detained at the substation for more than two hours, with his hands handcuffed behind his back the entire time.  Plaintiff was eventually taken to San Francisco County Jail where he was cited with an alleged violation of Section 369(i), and released.

Other than Plaintiff, no other journalist was arrested on September 8, 2011.  Officer Schlegel testified that he witnessed Hartwig, after the group had been detained and Plaintiff arrested, "asking members of the media to come forward . . . checking credentials and then inviting members out of the line to leave the station." (Dkt. No. 64-2, Ex. N at 21:25-22:12.)  Hartwig testified that while he witnessed other journalists walking in the circle with the protestors, he did not witness other journalists "being active participants, blocking fare gates." (*Id.* at Ex. A, 48:11-15.)  However, when

Hartwig was asked if "[o]ther journalists blocked the fare gates" he answered "[v]ery possibly, yes." (*Id.* at 115:22-23.)  Officer Coontz testified that within the group blocking the fare gates there were journalists, who were "talking to people, interviewing, taking recordings, et cetera."  (*Id.* at Ex. G, 51:6-14, 65:5-8.)  Coontz further testified that the "group as a whole" was blocking the fare gates. (*Id.* at 65:9-12.)  When asked why the journalists within the circle that was blocking the fare gates were released, Coontz stated: "Because they had been covering the story and were not involved in the actual protest.  They had not committed any violations of the law."  (*Id.* at 65:19-23.)

Conduti also testified that he witnessed Plaintiff taking pictures, conversing with others, and "being part of the circle that was blocking the fare gates."  (*Id.* at Ex. C, 44:7-10.)  Conduti further testified that he could not recall "any conduct by Plaintiff that distinguished him from anyone else in the crowd."  (*Id.* at Ex. C, 55:11-13.)

**C.    Events Following the September 8, 2011 Protest**

Hartwig told members of the media reporting on the protest and its aftermath that "legitimate members of the media were identified and released."  (*Id.* at Ex. A, 132:7-10.)  Hartwig testified that "a legitimate member of the media" is person that "we could identify" as a member of the media.  (*Id.* at 132:11-13.)  In a report concerning BART police activities at the September 8 protest, Fairow wrote: "The station was closed at this point and officers began to sort through the group of detainees, releasing bonified [sic] members of the press and taking those protestors participating in blocking gates into custody."  (*Id.* at Ex. E, 22:13-19.)  Fairow testified that bonafide members of the press are journalists that have been issued press credentials.

Nearly nine months after Plaintiff's arrest, the San Francisco County Superior Court sustained a demurrer and dismissed all charges against Plaintiff.  The District Attorney did not file amended charges.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A moving party without the ultimate burden of persuasion at trial—usually, but not

1   always, a defendant—has both the initial burden of production and the ultimate burden of persuasion

2   on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210

3   F.3d 1099, 1102 (9th Cir. 2000). "[T]he moving party must either produce evidence negating an

4   essential element of the nonmoving party's claim or defense or show that the nonmoving party does

5   not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial . .

6   . and persuade the court that there is no genuine issue of material fact." *Id.*

7          If the "moving party carries its burden of production, the nonmoving party must produce

8   evidence to support its claim or defense." *Id.* at 1103. If the nonmoving party fails to do so, "the

9   moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party produces

10  enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."

11  *Id.* In deciding whether there exist genuine issues of material fact, the court draws all reasonable

12  factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255

13  (1986).

14                                    **DISCUSSION**

15         Qualified immunity protects officers from liability for civil damages where their alleged

16  unconstitutional conduct does not violate a clearly established right. *Hope v. Pelzer*, 536 U.S. 730,

17  739 (2002). "Qualified immunity balances two important interests—the need to hold public officials

18  accountable when they exercise power irresponsibly and the need to shield officials from harassment,

19  distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S.

20  223, 231 (2009).

21         "An officer is entitled to qualified immunity unless (1) facts viewed in the light most

22  favorable to the injured party show that the officer violated a constitutional right and (2) the right was

23  clearly established at the time of the alleged misconduct." *Ford v. City of Yakima*, 706 F.3d 1188,

24  1192 (9th Cir. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

25  **A.     First Amendment Retaliatory Arrest**

26         **1.      Constitutional violation**

27         "In this Circuit, an individual has a right 'to be free from police action motivated by retaliatory

28  animus but for which there was probable cause.'" *Ford*, 706 F.3d at 1193 (quoting *Skoog v. Cnty. of*

United States District Court
Northern District of California

1   *Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006)).  To establish a claim of retaliation in violation of

2   the First Amendment, a plaintiff must demonstrate that the officer's conduct "would chill a person of

3   ordinary firmness from future First Amendment activity."  *Id.*  In addition, the evidence must enable a

4   plaintiff ultimately to prove that the officer's desire to chill his speech was a but-for cause of the

5   officer's allegedly unlawful conduct.  *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916–17 (9th Cir.

6   2012) (en banc).

7                            **a.       Chilled speech**

8           Plaintiff has set forth sufficient evidence to demonstrate that Hartwig's arrest would "chill or

9   silence a person of ordinary firmness from future First Amendment activities."  *Mendocino Envtl. Ctr.*

10  *v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).  "[The Ninth Circuit] has recognized that a

11  retaliatory police action such as an arrest or search and seizure would chill a person of ordinary

12  firmness from engaging in future First Amendment activity."  *Ford*, 706 F.3d at 1193 (collecting

13  cases).  Therefore, a rational jury could find that the officers deterred or chilled the future exercise of

14  Plaintiff's First Amendment rights.

15                           **b.       Motive and causation**

16          "To satisfy the second requirement, the evidence must be sufficient to establish that

17  [Hartwig's] desire to chill [Plaintiff's] speech was a but-for cause of [Hartwig's] conduct."  *Id.* at

18  1194.  In other words, would Hartwig have arrested Plaintiff but for Hartwig's desire to punish

19  Plaintiff for his speech?

20          Plaintiff has provided sufficient evidence for a jury to find that Hartwig's retaliatory motive

21  was a but-for cause of his action.  While Defendants correctly assert that there is a lack of direct

22  evidence showing that Hartwig's arrest of Plaintiff was motivated by retaliation for his speech, such

23  motive can also be shown using circumstantial evidence.  *See Mendocino*, 192 F.3d at 1300-01.  The

24  *Mendocino* court provided *Hines v. Gomez*, 108 F.3d 265 (9th Cir. 1997) as an example: "[In *Hines*,]

25  we held that circumstantial evidence that an inmate had a reputation for filing grievances and had told

26  a guard that he planned to file a grievance, combined with the jury's rejection of the guard's

27  purported reason for punishing the inmate, 'warrants the jury's finding that [the guard] filed the

28

                                        13

1    disciplinary report in retaliation for [the prisoner's] use of the grievance system.'"  *Mendocino*, 192

2    F.3d at 1301 (quoting *Hines*, 108, F.3d at 268).

3           It is undisputed that Plaintiff published numerous stories that were, at best, critical of BART

4    and BART police officers, in particular.  Plaintiff openly mocked and ridiculed the agency and its

5    officers.  These declarations did not go unnoticed at BART.  For instance, Hartwig testified that he

6    "maybe" discussed Plaintiff's articles with Fairow and Chief Rainey.  (Dkt. No. 64-1, Ex. A at 43:1-

7    15.)  Four other officers also testified they read at least some of Plaintiff's articles, including Fairow

8    who testified that he read any of Plaintiff's articles that had to do with the protests.  Further,

9    Fairow—who was personally criticized and mocked in at least two of Plaintiff's articles—ordered the

10   creation of a flyer depicting Plaintiff and Cantor as the primary subjects of the day's protest.  The

11   flyer was discussed and handed out to officers at a briefing the day of the protest.  While Hartwig

12   denies he was at the briefing, two other officers testified that he was in attendance.  The officers were

13   told that if either Plaintiff or Cantor was witnessed violating the law, he was to be arrested.  In other

14   words, Plaintiff was singled out, possibly to retaliate against him for his inflammatory articles.

15   Although the evidence could also support Defendants' assertion that the focus on Plaintiff was simply

16   intelligence gathering as to the location of the protest, "[t]he possibility that other inferences could be

17   drawn that would provide an alternate explanation for the [Defendants'] actions does not entitle them

18   to summary judgment."  *Mendocino*, 192 F.3d at 1303.

19          The nature of Plaintiff's arrest reasonably suggests a retaliatory motive.  It is undisputed that

20   although a dozen or so other journalists were also detained in the protest group "blocking" the fare

21   gates, every journalist except Plaintiff was released without even a citation.  While Defendants insist

22   that this discrepancy can be explained by Plaintiff's "active participation" in the protest, a reasonable

23   jury could find otherwise.  Plaintiff testified that he documented the protest as a journalist,

24   "follow[ing] the group around, taking photographs[,] and making observations."  (Dkt. No. 63 ¶ 37.)

25   He further testified that he:

26          did not participate in the protest at any time during the events of September 8, 2011.  I
             did not issue any chants. I did not march or walk in formation with any protestor.  I did
27          not obstruct any BART facilities, such as the ticket machines or fare gates.

28

United States District Court
Northern District of California

(*Id.* at ¶ 44; *see also id.* at ¶ 63 ("I did not march, chant, or block fare gates during the protest in question.").)  A trier of fact could find Plaintiff's description of his activities consistent with the testimony of other BART officers and video footage of the protest.  Officer Conduti testified that he witnessed Plaintiff taking pictures, conversing with others, and "being part of the circle that was blocking the fare gates."  (Dkt. No. 64-1, Ex. C at 44:7-10.)  Conduti further testified that he could not recall "any conduct by Plaintiff that distinguished him from anyone else in the crowd."  (*Id.* at 55:11-13.)  Officer Coontz testified that the "group as a whole" was blocking the fare gates, (*id.* at Ex. G, 65:9-12), and within that group were journalists "talking to people, interviewing, taking recordings, et cetera," (*id.* at 51:6-14, 65:5-8).  Video footage of the protest shows Plaintiff taking pictures and observing the protest from within the group supposedly blocking the fare gates, but at no point is Plaintiff chanting, yelling, or doing anything to distinguish himself from the numerous other journalists also present.  (*See* Dkt. No. 64-2, Exs. O, P, Q.)[6]

While Hartwig's testimony is mostly to the contrary—he saw Plaintiff, but not any other journalist, blocking fair gates and he saw Plaintiff marching—Hartwig's testimony is not dispositive given Plaintiff's evidence described above.  Further, Hartwig's assertion that Plaintiff differentiated himself from other journalists because he "actively interact[ed] with Mr. Cantor" is vague and fails to distinguish Plaintiff's conduct from that of a typical journalist, let alone the conduct of the other journalists at the scene.  (*See* Dkt. No. 64-1, Ex. G at 51:6-14, 65:5-8 (Coontz testifying that other journalists within the group were "talking to people, interviewing, taking recordings, et cetera").

---

[6]  Defendants object to the video footage on the ground that Plaintiff's submission of only part of the video violates Federal Rule of Evidence 106.  The objection is overruled.  Rule 106 provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  "Rule 106 does not authorize the Court to exclude evidence; instead, it permits the adverse party to include evidence."  *Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F. Supp. 2d 1189, 1197 n.6 (C.D. Cal. 2005).  While Defendants assert that "[e]ither the entirety of the CCTV footage showing the protest is admitted into evidence, or none at all," Defendants have not actually sought to include the full footage into the record.  (Dkt. No. 67 at 15.)  In any event, Plaintiff has subsequently submitted the entire video footage.  (Dkt. No. 68.)

Further, a reasonable trier of fact could find that Hartwig's comment to the media following the protest that no "legitimate" members of the press were arrested, suggests animosity towards Plaintiff and Plaintiff's reporting. While Hartwig testified that "legitimate" members of the media were journalists "we could identify" as a member of the media (Dkt. No. 64-1, Ex. A at 132:11-13), Plaintiff would have presumably fallen into this category since Plaintiff testified that he was wearing his press credentials around his neck during the protest and while he was being arrested. Moreover, it is undisputed that Hartwig knew Plaintiff was a journalist, and, as discussed above, there is evidence that Plaintiff's conduct at the protest did not go beyond that of other journalists at the protest who were not arrested. A rational jury could thus infer that Hartwig did not consider Plaintiff a "legitimate" member of the media because of the content of Plaintiff's speech. A rational jury could further infer that this animosity carried over into Hartwig's arrest of Plaintiff, which occurred only shortly before Hartwig made his comment.

A reasonable trier of fact could also call into question the motivations underlying the arrest given that Plaintiff was subject to a custodial arrest, rather than the cite-and-release procedure used for other arrestees at the protest. (*See* Dkt. No. 64-1, Ex. A at 143:6-12 (Hartwig testifying that some non-journalists were cited and released).) Further, BART procedures for crowd control include a "cite & release procedure" whereby the default for a misdemeanor arrest is cite and release. BART argues that Hartwig's decision to not cite and release Plaintiff was nevertheless consistent with this policy because Plaintiff fell within an exception to that policy; namely, "[t]here was a reasonable likelihood that the offense(s) would continue or resume." (*Id.* at Ex. B at "BART 019355.") Hartwig testified that such a custodial arrest was necessary because Plaintiff and Cantor were "the reason for the emotion and passion" and once they were removed, "the center of that inner circle went silent to the point I stepped inside and they all sat down." (*Id.* at Ex. A, 104:23-105:5.) However, once again, there is evidence that disputes Hartwig's description of Plaintiff's conduct. As noted above, other officers described Plaintiff's conduct as indistinguishable from other journalists who were not even cited and released, let alone subject to a custodial arrest. Further, Hartwig's own testimony is vague as to what led him to believe that Plaintiff was creating a "storm." When asked what Plaintiff was doing once the group was encircled, Hartwig responded "[t]hey were all talking. Mr. Cantor was

United States District Court
Northern District of California

United States District Court
Northern District of California

1  yelling.  Mr. Morse was standing next to him." (*Id.* at 104:18-20.)  A reasonable trier of fact could

2  find that because Plaintiff was talking, yet presumably not yelling, and simply standing next to

3  Cantor, Plaintiff's conduct does not justify Hartwig's deviation from BART policy in subjecting

4  Plaintiff to a custodial arrest.

5         Further, while, as discussed further below, Hartwig had probable cause to arrest Plaintiff, the

6  existence of probable cause is not determinative.  Rather, "[p]robable cause for the initial arrest can be

7  evidence of a police officer's lack of retaliatory animus for subsequently booking and jailing an

8  individual.  However, that determination should be left to the trier of fact once a plaintiff has

9  produced evidence that the officer's conduct was motivated by retaliatory animus." *Ford*, 706 F.3d at

10 1194 n.2 (citation omitted).

11        In reaching its conclusion the Court does not rely on Plaintiff's additional arguments

12 regarding Hartwig's supposedly contradicted deposition testimony and failure to observe relevant

13 BART policies.  Regarding Hartwig's deposition testimony, Plaintiff's cited authority does not stand

14 for the proposition that summary judgment is defeated simply because a defendant's testimony is

15 contradicted by other evidence; rather, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

16 147 (2000), held that when weighing all the evidence a trier of fact can take into account "a party's

17 dishonesty about a material fact as 'affirmative evidence of guilt.'"  While Hartwig's testimony that

18 is in conflict with other evidence in the record may create a material factual dispute precluding

19 summary judgment—as discussed above, it does—the bare fact that there is a conflict is not enough.

20        The Court is also not persuaded that the alleged failure to follow particular BART policies,

21 beyond the cite-and-release process discussed above, reasonably infers that Plaintiff's arrest was

22 retaliatory.  For instance, Plaintiff argues that BART's failure to provide a safe staging area for the

23 media is evidence of retaliatory animus.  The Court is unpersuaded that the failure to provide such an

24 area, which affected other journalists just as much as Plaintiff, is connected with the decision to arrest

25 Plaintiff.  Further, Plaintiff's argument that BART failed to provide dispersal orders is irrelevant

26 since Plaintiff was not arrested for failure to disperse and such orders are not a prerequisite to an

27 arrest under Section 369i.

28 //

United States District Court
Northern District of California

### 2.      Clearly established right

Whether a right is clearly established for the purposes of qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  The right must not be stated as a broad general proposition, but rather must be defined with enough specificity to put a reasonable officer on notice that his conduct is unlawful.  *Reichle v. Howards*, —— U.S. ——, 132 S. Ct. 2088, 2093–94 (2012). A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances.  *See Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1073 (9th Cir. 2012).  "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional."  *Ford*, 706 F.3d at 1195.  We must assess the legal rule "in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.

In this Circuit, "[p]olice officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech."  *Ford*, 706 F.3d at 1195.  "Moreover, [the Ninth Circuit's] 2006 decision in *Skoog* established that an individual has a right to be free from retaliatory police action, *even if probable cause existed for that action*."  *Id.* at 1195-96 (emphasis added).  Thus, because whether Hartwig retaliated against Plaintiff for his protected speech is a question of disputed fact, qualified immunity is inapplicable, even if probable cause existed for Plaintiff's arrest.

Defendants' argument that *Skoog* no longer governs in light of the Supreme Court's *Reichle* decision is unpersuasive.  In *Ford*, the Ninth Circuit specifically applied *Skoog*'s holding to a post-*Reichle* case in confirming that since 2006 it has been clearly established in this Circuit that retaliatory police conduct is actionable even if the officer's conduct was supported by probable cause. Further, Defendants fail to explain how *Reichle* overruled *Skoog*.  In *Reichle*, the Court found that there was not a clearly established right to be free from a retaliatory arrest supported by probable cause under either Supreme Court precedent or Tenth Circuit precedent.  The Court did not address the question of whether the absence of probable cause is necessary to state a claim for retaliatory arrest.  *See Reichle*, 132 S. Ct. at 2093.  Although not supported by any authority, Defendants'

argument appears to be that the Supreme Court's conclusion that there is no clearly established right under its precedent precludes the Ninth Circuit from looking to its own precedent to see if the right was clearly established there. That is not the law. Although "[t]he Supreme Court has provided little guidance as to where courts should look to determine whether a particular right was clearly established at the time of the injury," in the Ninth Circuit, the inquiry begins by looking to see "[i]f the right is clearly established by decisional authority of the Supreme Court *or* this Circuit." *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (emphasis added). If it is, "[the] inquiry should come to an end." *Id.* Thus, while the particular right at issue here has not been clearly established by the Supreme Court, it has been clearly established by the Ninth Circuit in *Skoog*, which ends the inquiry. Even in *Reichle*, the Supreme Court—"[a]ssuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law in the circumstances of this case"— separately considered Tenth Circuit precedent to see if the right was clearly established under its precedent. 132 S. Ct. at 2094.

Further, to the extent Defendants argue that *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013) (per curiam) overruled *Skoog*, the Court is unpersuaded. Without explanation, the *Acosta* court cited *Reichle* for the proposition that "if Acosta's seizure and arrest were supported by probable cause, the officers are entitled to qualified immunity." 718 F.3d at 825. As explained above, *Skoog* is binding precedent that since 2006 it has been clearly established in this Circuit that a person has a right to be free from a retaliatory arrest even if supported by probable cause. Generally, "[o]nly the en banc court can overturn a prior panel precedent." *United States v. Parker*, 651 F.3d 1180, 1184 (9th Cir. 2011). And while a three judge panel "may reexamine normally controlling circuit precedent" where "the reasoning or theory of [] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority," *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003), nothing in *Reichle* is "clearly irreconcilable" with *Skoog* or the rule in this Circuit that the primary source for determining whether a right is clearly established is "decisional authority of the Supreme Court or this Circuit," *Boyd*, 374 F.3d at 781. The *Acosta* court provides no analysis as to why *Skoog* would not still apply. Further, the Ninth Circuit's decision in *Ford*—which included a dissent heavily reliant on *Reichle*—explicitly recognized *Skoog* as having clearly established the right at issue in this

United States District Court
Northern District of California

1    case.  Even after *Acosta*, the Ninth Circuit has continued to cite *Skoog*'s holding as good law.  *Martin*

2    *v. Naval Criminal Investigative Serv.*, --- Fed. Appx. ----, 2013 WL 4757224, at *1 (9th Cir. Sept. 5,

3    2013) (unpublished) ("Our precedent has long provided notice to law enforcement officers 'that it is

4    unlawful to use their authority to retaliate against individuals for their protected speech,' *Ford*, 706

5    F.3d at 1195, 'even if probable cause exists for' the challenged law enforcement conduct, *Skoog*, 469

6    F.3d at 1235.").

7           At oral argument, Defendants argued that *Acosta* and the Ninth Circuit's unpublished opinion

8    in *Adkins v. Limtiaco*, 537 Fed. Appx. 721 (9th Cir. 2013),[7] would at least cause a reasonable officer

9    to doubt that *Skoog* was still the law.  In other words, even if *Acosta* was wrongly decided, an officer

10   could nevertheless rely on its holding to reasonably believe that probable cause negated a retaliatory

11   arrest claim.  Defendants' argument is unpersuasive because Hartwig's conduct occurred in 2011—

12   before *Acosta*, *Adkins*, and even *Reichle*.  *See Ford*, 706 F.3d at 1195 ("The relevant inquiry is

13   whether, *at the time of the officers' action*, the state of the law gave the officers fair warning that their

14   conduct was unconstitutional." (emphasis added)).  At the time of the arrest, it was indisputable that

15   *Skoog* was the law in the Ninth Circuit and thus Hartwig was given fair warning that his alleged

16   conduct was unconstitutional.

17          Finally, Defendants' argument that Hartwig would not have known his conduct was retaliatory

18   is simply derivative of their contention that Hartwig did not act with a retaliatory motive.  For the

19   reasons stated above, whether Plaintiff's arrest was caused by an improper motive is a question for the

20   trier of fact.

21   **B.     Unlawful Arrest/False Imprisonment**

22          Defendants also move for summary judgment on Plaintiff's Fourth Amendment unlawful

23   arrest claim as well as Plaintiff's state-law false imprisonment claim.

24          "A claim for unlawful arrest is cognizable under [42 U.S.C.] § 1983 as a violation of the

25   Fourth Amendment, provided the arrest was without probable cause or other justification."  *Dubner v.*

26   *City and Cnty of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).  "Probable cause exists when,

27

28   [7]  The *Adkins* court, in affirming the district court's denial of a motion to dismiss, cited *Reichle* in
     recounting the plaintiff's allegation that the officer lacked probable cause to arrest him, but did not
     otherwise discuss the case.  *See* 537 Fed. Appx. at 722.

United States District Court
Northern District of California

under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Id.* at 966.  In the context of an unlawful arrest, "the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (per curiam).

Under California law, an officer cannot be held civilly liable for false imprisonment where the officer, "acting within the scope of his or her authority," made a "lawful" arrest or "had reasonable cause to believe the arrest was lawful."  Cal. Penal Code § 847(b); *see also Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004).  A California police officer is authorized by statute to make a warrantless arrest on probable cause that a person has committed a "public offense" in the officer's presence. Cal. Penal Code § 836(a)(1).  "State and federal law are consistent with respect to the standard for probable cause to arrest." *Sorgen v. City and Cnty. of San Francisco*, 2006 WL 2583683, at *9 (N.D. Cal. Sept. 7, 2006).

The police report and officer testimony shows that Plaintiff was arrested for violating California Penal Code Section 369(i).  The version of Section 369i in effect at the time of Plaintiff's arrest provided, in full:

> (a) Any person who enters or remains upon the property of any railroad without the permission of the owner of the land, the owner's agent, or the person in lawful possession and whose entry, presence, or conduct upon the property interferes with, interrupts, or hinders, or which, if allowed to continue, would interfere with, interrupt, or hinder the safe and efficient operation of any locomotive, railway car, or train is guilty of a misdemeanor.
>
> As used in this subdivision, "property of any railroad" means any land owned, leased, or possessed by a railroad upon which is placed a railroad track and the land immediately adjacent thereto, to the distance of 20 feet on either side of the track, which is owned, leased, or possessed by a railroad.
>
> (b) Any person who enters or remains upon any rail transit related property owned or operated by a county transportation commission or transportation authority without permission **or** whose entry, presence, or conduct upon the property interferes with,

interrupts, or hinders the safe and efficient operation of the railline or rail-related facility is guilty of a misdemeanor.

As used in this subdivision, "rail transit related property" means any land or facilities owned, leased, or possessed by a county transportation commission or transportation authority.

(c) This section does not prohibit picketing in the immediately adjacent area of the property of any railroad or rail transit related property or any lawful activity by which the public is informed of the existence of an alleged labor dispute.

Cal. Penal Code § 369i (emphasis added).  Defendants contend that Plaintiff was arrested under subsection (b), which can be violated by either trespassing on transit-related property *or* interfering with, interrupting, or hindering the safe and efficient operation of the rail line or rail-related facility.  The parties appear to agree that "blocking" either fare gates or patrons constitutes conduct that falls within the subsection's latter prohibitions.  Plaintiff does not challenge Defendants' further interpretation that a person is "blocked" if the person "attempting to reach the fare gates at the time the protestors walked-by would have had to walk around the protestors."  (Dkt. No. 54 at 17.)  And as Defendants note, there is no specific intent requirement necessary for a violation of Section 369i.[8]

Plaintiff's only arguments concerning the lack of probable cause are that 1) BART consented to Plaintiff's presence at the protest, and such consent is a defense to trespass, and 2) probable cause is dependent upon a finding that dispersal orders were given.  Neither argument is persuasive.  As quoted above, the plain language of Section 369i(b) provides that a person may violate the statute by trespassing on rail transit property *or* interfering with, interrupting, or hindering the safe and efficient operation of the rail line or rail-related facility.  Because Plaintiff was not arrested for trespassing, and was instead arrested for interfering with BART operations, it is irrelevant that BART consented to his presence at the station.  Nor is it relevant that there is a dispute as to the dispersal orders.

---

[8]  The lack of a specific intent requirement coupled with Defendants' interpretation of Section 369i would appear to make much of the innocent conduct one witnesses at a public transit station a crime under the Penal Code.  Consider the absent-minded tourists or the street performers that require a deviation in a commuter's direct pathway to the fare gates.  Or, more relevant here, a journalist standing in a station to document the government's response to a public demonstration.  Nevertheless, because Plaintiff does not challenge the constitutionality of Section 369i, the question has not been presented to the Court.

1    While Hartwig appears to have believed that a violation of Section 369i requires an intent to interfere

2    with transit operations, the plain language of the statute reveals that no such intent is actually

3    required.  Thus, Hartwig cannot be faulted for lacking probable cause on a statutory element that does

4    not exist.  Nor is Hartwig's motivation for the arrest relevant to the probable cause inquiry.  *See*

5    *Whitaker v. Alameda Cnty.*, 2013 WL 5442200, at \*5 (N.D. Cal. Sept. 30, 2013) ("Probable cause is

6    measured by an objective standard that would not take into account the arresting officer's specific

7    subjective motivations or beliefs.").  Finally, nothing in the statute predicates a violation on the

8    failure to comply with a dispersal order.

9        Plaintiff fails to provide an analysis of the totality of the circumstances and whether the record

10   supports a finding that Hartwig lacked probable cause to arrest Plaintiff.  Given Plaintiff's limited

11   exploration of the issue, it suffices to say that the undisputed fact that Plaintiff was in the group of

12   protestors that caused BART patrons to be diverted on their way to the fare gates supports Hartwig's

13   probable cause determination that Plaintiff "blocked" the fare gates.  As already noted, BART's

14   unchallenged interpretation of the statute is sweeping, encompassing the conduct of protestors and

15   journalists alike.  Further, while Hartwig's decision to not arrest other journalists whose conduct may

16   have been virtually indistinguishable from Plaintiff's is relevant to show retaliatory animus, that

17   decision has no role in determining whether Hartwig had probable cause to arrest Plaintiff.  *See id.*

18       Finally, to the extent Plaintiff does challenge Defendants' interpretation of Section 369i,

19   Hartwig's belief that Plaintiff's undisputed conduct—standing in a group of people who were forcing

20   BART patrons to walk around them—violated the statute was reasonable given the broad statutory

21   language and the complete lack of caselaw interpreting the statute.  *See Rosenbaum*, 663 F.3d at 1078

22   ("Even if the arrest was made without a warrant and without probable cause, however, the officer

23   may still be immune from suit if it was objectively reasonable for him *to believe* that he had probable

24   cause."); *see also Saucier*, 533 U.S. at 202 (holding that the law must be clearly established such that

25   it would "be clear to a reasonable officer that his conduct was unlawful in the situation he

26   confronted").  Thus, Hartwig is entitled to qualified immunity even if there was no probable cause to

27   arrest.

28

Because Plaintiff has failed to demonstrate a material factual dispute as to whether Hartwig had probable cause to arrest Plaintiff, Defendants' motion for summary judgment on Plaintiff's unlawful arrest and false imprisonment claims are GRANTED.  Defendants' motion for summary judgment on Plaintiff's Fourth Amendment unlawful arrest claim is granted for the additional reason that Hartwig is entitled to qualified immunity even if there were a dispute as to probable cause.

## C.    Punitive Damages

To recover punitive damages against an individual officer in a Section 1983 case, a plaintiff must show that the officer's conduct is "motivated by evil motive or intent" or "involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  The Ninth Circuit has further explained that "[t]he standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases," which extends to "malicious, wanton, or oppressive acts or omissions."  *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).  Punitive damages may be available in a Section 1983 suit "even in the absence of a compensable injury;" indeed, "[i]n such situations 'punitive damages may be the only significant remedy available.'"  *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1122 (9th Cir. 2008) (quoting *Wade*, 461 U.S. at 55 n.21).

The standard for awarding punitive damages under California law is similar.  Under California law, punitive damages may be appropriate "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  Malice may be shown where the defendant exhibits "the motive and willingness to vex, harass, annoy, or injure," *Nolin v. Nat'l Convenience Stores, Inc.*, 95 Cal. App. 3d 279, 285 (1979) (internal quotation marks omitted), or a "conscious disregard of the rights and safety of others," *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1000 (1993).  A plaintiff may establish malice "by indirect evidence from which the jury may draw inferences."  *Taylor v. Superior Court*, 24 Cal. 3d 890, 894 (1979).

Defendants' argument regarding punitive damages is conclusory and largely derivative of their argument concerning the lack of retaliatory animus.  Given that the Court has already concluded that a factual dispute exists as to whether Hartwig acted with a retaliatory intent in arresting Plaintiff, the

United States District Court

Northern District of California

Court cannot say that no rational jury could find that Hartwig also acted with "oppression, fraud, or malice" in arresting Plaintiff.  Accordingly, the Court denies Defendants' motion for summary judgment on the issue of punitive damages.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated:  February 11, 2014

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California