# EXHIBIT A

1          UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                              No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15         DEPOSITION OF DANIEL O. HARTWIG

16           (Pages 1 to 149, inclusive)

17

18         Taken before SANDRA M. LEE

19              CSR No. 9971

20            October 15, 2013

21

22

23         Aiken Welch Court Reporters
           One Kaiser Plaza, Suite 505
           Oakland, California 94612
24       (510) 451-1580/(877) 451-1580
             Fax:  (510) 451-3797
25            www.aikenwelch.com

1        Q.   Are you under a doctor's care?

2        A.   No.

3        Q.   Do you take any medications that inhibit your

4    mental abilities?

5        A.   No.

6        Q.   How much time did you spend preparing for the

7    deposition today?

8        A.   Less than four hours.

9        Q.   Did you review any documents in preparation?

10        A.   One document.

11        Q.   Which document was that?

12        A.   I believe it was Officer Coduti's report.

13        Q.   When you say "Officer Coduti's report," what do

14    you mean exactly?

15        A.   Officer Shane Coduti was the officer that took

16    Mr. Morse into custody.  And the protocol for when you

17    take a subject into custody with the BART Police

18    Department is the officer is responsible to write the

19    report.

20        Q.   Was Officer Coduti the arresting officer?

21        A.   Yes.

22        Q.   Did he make the probable cause determination

23    with regard to David Morse?

24        A.   Yes.

25        Q.   Did he rely on you to make that determination?

8

1      A.  Partially --

2          MR. ALLEN:  Objection; calls for speculation,

3   lacks foundation.

4   BY MR. SIEGEL:

5      Q.  Subject to those objections, your answer was

6   yes; is that correct?

7      A.  It may have been partially because of my

8   involvement, yes.

9          MR. ALLEN:  And just to be clear on the record,

10  if I object -- I don't think you went through that

11  admonition -- he is to answer the question after my

12  objection unless I specifically instruct him not to do

13  so.

14         THE WITNESS:  Okay.

15  BY MR. SIEGEL:

16     Q.  Other than your counsel, did you discuss this

17  deposition with anyone else?

18     A.  No.  My wife knows I'm here.

19     Q.  Always a good strategy.

20         Mr. Hartwig, I've had the -- I wouldn't say the

21  pleasure, but I've had the opportunity to review some of

22  your records, including your education records.

23         I understand you went to Brigham Young

24  University.

25     A.  I did.

1    Q.   That's where you received a Bachelor's degree?

2    A.   I did not.

3    Q.   Did you receive a Bachelor's degree anywhere?

4    A.   I'm two units short of my Bachelor's degree

5    currently.

6    Q.   After you attended BYU, did you attend any

7    further higher education?

8    A.   Chabot Junior College and California Lutheran

9    University.

10    Q.   While you were attending those schools, did you

11    receive any training in regards to law enforcement?

12    A.   Criminal justice major.

13    Q.   And you've since received training as a law

14    enforcement officer; is that correct?

15    A.   Yes.

16    Q.   When did you begin your training that way?

17    A.   I was at the Los Medanos Police Academy in

18    1981.  I graduated from the Los Medanos Police academy I

19    want to say in April of '82 and began my career at BART

20    Police April 24th, 1982.

21    Q.   At BART Police, did you receive training on use

22    of force?

23    A.   Yes.

24    Q.   And did you receive any training in regards to

25    respecting the First Amendment?

10

1     A.  Yes.

2     Q.  What training did you receive?

3     A.  As a police officer throughout my law

4  enforcement career, not only the First Amendment, we

5  received multiple training classes on those instances as

6  well as others.  They begin in the police academy.  They

7  actually began as a criminal justice major in college

8  continuing to the police academy and throughout my

9  career as a law enforcement officer with BART.

10    Q.  If you were asked to estimate -- don't guess --

11  how many trainings approximately have you received that

12  relate to the First Amendment?

13    A.  I couldn't guess or estimate.

14    Q.  More than ten trainings?

15    A.  I could not guess or estimate.

16    Q.  Are you familiar with BART Policy 346.3?

17    A.  If you could give me the verbal title, I could

18  respond to that.  The number title I am not.

19    Q.  Are you familiar with the News Media Relations

20  Policy?

21    A.  Yes.

22    Q.  This policy refers to valid press credentials.

23        What does that mean?

24    A.  Those are credentials that the press usually on

25  the scene of any incident would be in possession of to

1   allow them to be within that scene and location.

2       Q.  Does it matter who issues the credential?

3       A.  Doe it matter to the BART Police Department?

4       Q.  Yes.

5       A.  I don't believe it does.

6       Q.  So if a news agency issues the credential,

7   that's sufficient?

8       A.  What is required is that that person in

9   possession of that credential obeys the laws at the

10  scene of the incident.  Where the credential originates

11  from is not something that we would focus on.

12      Q.  Are you aware that the News Media Relations

13  Policy calls for a safe staging area for media?

14      A.  Yes.

15      Q.  On September 8th, 2011, was such an area

16  designated?

17      A.  There is always an area that's deemed safe and

18  designated for the media.  What we choose or what we did

19  in my career at BART was bend over backwards to make

20  sure those areas were available.

21          MR. SIEGEL:  Read back the question, please.

22          (Record read.)

23          MR. ALLEN:  I'll object that it's vague as

24  to -- if you don't mind, are we talking about the Powell

25  Street station, or are we talking about what stations

12

1   where there were demonstrations planned or advertised?

2           MR. SIEGEL:   Okay.   You don't need to testify.

3   BY MR. SIEGEL:

4       Q.   At the Powell Street station, was there a media

5   staging area designated?

6       A.   There's not a specific staging area, no.

7       Q.   Were any directions given to media that you

8   know of where an appropriate place to stage would be?

9       A.   No.

10      Q.   Are you familiar with the BART policy regarding

11  dispersal orders?

12      A.   Yes.

13      Q.   What is a dispersal order?

14      A.   It's an order read, announced, to a specific

15  crowd/group that their assembly has become unlawful, and

16  within a matter of a designated time frame, they are to

17  disperse.   If they fail to do so, they're subject to

18  arrest.

19      Q.   Has BART prescribed a certain format for such

20  an order?

21      A.   Within the policy, yes, there is.   It has to be

22  read within a time frame multiple times from different

23  locations.

24      Q.   At the Powell Street station on September 8th,

25  2011, were any such orders read?

13

1       A.  Yes.

2       Q.  Do you know at what time they were read?

3       A.  Specific time --

4       Q.  During the day?

5       A.  No, I do not.  I do know that they were well

6  into the event.  I do know from locations where they

7  were read.  I do know they were read more than once.

8       Q.  To your knowledge, who read any such orders?

9       A.  Sergeant Steve Coontz.

10      Q.  Where was he located?

11      A.  The first dispersal was read from the station

12  agent's booth over the public intercom.  We determined

13  because of the size of the crowd and the noise that may

14  be a better location.  The second dispersal was read

15  from the same location approximately ten minutes after

16  the first dispersal.  The following one was made on the

17  outside of the fare gates amongst the crowd.  That's

18  what I recall.

19      Q.  And your recollection is Lieutenant Coontz read

20  the full dispersal order as recommended by BART policy?

21      A.  I know in the first two incidents from the

22  station agent's booth he did.  I know that he was -- he

23  had encountered a large number of people in volume on

24  the third attempt.  I'm not sure if the full dispersal

25  at that time was completed.

14

1    Q.  Do you know what law Lieutenant Coontz cited in

2    the dispersal notice?

3    A.  What violation?  I believe 369i of the Penal

4    Code.

5    Q.  You previously testified that you're familiar

6    with the -- scratch that.

7         Are you familiar with the Tactical Team and

8    Crowd Control Policy?

9    A.  Yes.

10   Q.  Are you aware that in regards to mass

11   demonstrations, this policy recommends Penal Code 409 be

12   used for any arrests?

13   A.  I believe there may be sections other than 369i

14   stipulated in that policy, but for this event with

15   command staff within the BART Police Department based

16   upon what we encountered, 369i was the chosen section.

17   Q.  Is it your testimony that 369i is included

18   within the Tactical Team and Crowd Control Policy?

19   A.  I do not believe that the policy restricts the

20   agency from utilizing Penal Code sections.

21        MR. SIEGEL:  I'd like to introduce Exhibit 1.

22        (Plaintiff's Exhibit 1 marked for

23        identification.)

24   BY MR. SIEGEL:

25   Q.  Is Exhibit 1 the Tactical Team and Crowd

15

1   Control Policy that you're familiar with?

2       A.   Yes.

3       Q.   You can take a minute to verify if you'd like.

4       A.   This is the form.

5       Q.   I'd like to direct your attention to 459.4 of

6   this policy, which is subtitled "Arrests," and which is

7   located on the number stamp BART 19354.

8            I'd like to direct your attention to the third

9   paragraph in the subsection "Arrests."  The third

10  sentence of this paragraph reads, "the only proper basis

11  for a multiple simultaneous arrest of all the

12  individuals at a demonstration is failure to disperse

13  (409 PC)."

14           Do you see the section I just read?

15      A.   Yes.

16      Q.   Why was this policy not followed on September

17  8th, 2011?

18      A.   Because the crowd that was encircled failed to

19  disperse after the dispersal announcement was made.

20      Q.   Did you arrest the entire crowd?

21      A.   There were a number of arrests made.  There was

22  determination made after the fact who was taken into

23  custody.

24      Q.   But the entire crowd failed to disperse; is

25  that true?

16

1    A.  The crowd that was encircled.

2    Q.  Is that true?

3         MR. ALLEN:  Objection; vague and overbroad.

4    BY MR. SIEGEL:

5    Q.  Did anybody within the encircled crowd

6    disperse?

7    A.  No.

8         MR. ALLEN:  Objection.  That's vague.

9    BY MR. SIEGEL:

10    Q.  It's true that you only arrested some people

11    within the crowd that failed to disperse; is that

12    correct?

13    A.  Yes.

14    Q.  On what basis did you select people for arrest?

15    A.  Violation of law.

16    Q.  Which law?

17    A.  369i PC.  And I didn't write the citations.

18    And I don't specifically recall, but the law that I

19    witnessed the violation of and the law that your client

20    was arrested for was 369i.  409 may have been an

21    additional charge.  I did not see the citations.  I

22    don't recall if those were added.

23    Q.  Is it possible that your operations order for

24    September 8th, 2011, conflicted with the Tactical Team

25    and Crowd Control Policy?

1          MR. ALLEN:  Objection; calls for speculation.

2          THE WITNESS:  I don't believe it does.

3     BY MR. SIEGEL:

4          Q.  Who approves BART Police Department policy

5     manual?

6          A.  The policy manual is put together by a third

7     agency called Lexipol that is a group of former law

8     enforcement officers, current attorneys within the state

9     of California that review, authorize, approve,

10    recommend, suggest.  The ultimate approval is from the

11    chief of police.

12         Q.  The chief of police is the last person to stamp

13    the policy manual, as it were?

14         A.  I don't know that his signature is actually on

15    the manual itself, but command staff, once that comes

16    back from Lexipol, does the final review.

17         Q.  And does the BART board of directors play any

18    role?

19         A.  The BART board of directors, I believe, have

20    access to those documents.  I believe now after January

21    1 of 2009 that the BART policy is make those documents

22    available to the board as well as police review.

23         Q.  So it's your understanding that the board is

24    not the authorizing entity for the policy?

25         A.  They are not.

18

1          MR. ALLEN:  Objection; calls for speculation.

2     BY MR. SIEGEL:

3          Q.  So the chief of police determines the policy

4     manual?

5          A.  The chief of police along with command staff, I

6     believe, is the correct answer.  The policy in the hands

7     of the board of directors and/or the police review, I

8     believe, meets the requirement requested from police

9     review as well as the public after January 1st, 2009.

10         Q.  If an operations order conflicts with BART

11    policy, what is the protocol?

12         A.  In my career as deputy chief, I'm not aware of

13    that situation arising.  I would imagine if that did

14    occur, there would be review of said policy.

15         Q.  Is it true that Deputy Chief Fairow issued the

16    operations order for September 8th, 2011?

17         A.  Yes.

18         Q.  Do you know if anybody reviewed his order to

19    determine if it conflicted with BART policy?

20         A.  I know I did not.

21         Q.  You gave an Internal Affairs -- you gave

22    testimony to Internal Affairs regarding Mr. Morse's

23    complaint to BART regarding his arrest on September 8th,

24    2011; is that correct?

25         A.  Yes.

1    afternoon of this situation, it was at Powell Street

2    station.

3         Q.   You were operating under an order -- the

4    operations order created by Deputy Chief Fairow; is that

5    correct?

6         A.   Yes.

7         Q.   That order at page 4 called for the immediate

8    arrest of anybody, quote, unquote, "blocking fare

9    gates."

10             Do you remember that direction?

11        A.   I don't have a copy of the order present.   At

12   your word, I will take it for it, yes.

13        Q.   What would blocking fare gates mean to you?

14        A.   Blocking and impeding the flow of traffic in

15   either direction, interfering with the direction of flow

16   either into the BART station or out of the BART station.

17        Q.   How close to a fare gate do you need to be to

18   block it?

19        A.   You can block it from multiple ends of the fare

20   gates because of the limited space at that location.

21   You could be standing in front of it unknowingly or

22   willingly and blocking that access.   You could be

23   standing to the side of it unknowingly or willingly

24   blocking that access.   You could be standing straight in

25   the middle of it unknowingly or willingly blocking that

23

1    access.

2        Q.  Did you intend to arrest anybody that was

3    unknowingly blocking the fare gates?

4        A.  No.

5        Q.  How do you determine when someone is

6    intentionally blocking a fare gate?

7        A.  We ask them to move from the area, not block

8    the fare gates to create a free flow of traffic for the

9    people utilizing the fare gates.  Those who choose not

10   to do so we determine to be willingly blocking the fare

11   gates, and those people are subject to arrest.

12       Q.  You didn't arrest all the people that were

13   blocking the fare gates; is that true?

14       A.  We arrested a group of people in violation of

15   369i based upon the interference, impediment, blocking

16   of fare gates on this occasion.  At the time of arrest,

17   they were enclosed in a circle of police officers away

18   from the fare gates.  So the actual arrest, they had

19   been moved away from the fare gates, but the violation

20   they were charged with was 369i PC, blocking, impeding

21   the flow of the fare gates, interfering with the

22   operation of the transit system.

23       Q.  And the conduct that formed the basis of your

24   369i arrest, did it occur before or after the dispersal

25   orders?

24

1      A.  It occurred before and I believe maybe at the
2  very end during the dispersal notice.
3      Q.  But not after?
4      A.  They were encircled and moved away from the
5  fare gates.  Our intention was to clear the fare gate
6  area.
7      Q.  But if they were encircled, how can they
8  disperse?
9      A.  They were -- the dispersal was read before they
10  were encircled.
11      Q.  Are you sure of that?
12      A.  Yes.
13      Q.  Have you reviewed the timeline created by BART
14  police in regards to this incident?
15      A.  The specific timelines, could you clarify that,
16  please?
17      Q.  Have you reviewed any written timeline of the
18  incident created by BART police?
19      A.  I have not.
20      Q.  Are you aware that the crowd was encircled at
21  5:20 p.m.?
22      A.  I'm not aware of the specific time that the
23  crowd was encircled.
24      Q.  Are you aware that BART police said that the
25  dispersal order was given at 5:26 p.m.?

26

1          For a dispersal notice to effectively and

2     accurately and legally be enacted, there has to be an

3     avenue of escape, an avenue of freedom to walk away,

4     which we ensured occurred on the evening of the

5     situation.   I would not -- the order to close the circle

6     came from me.   I would not give an order to close a

7     circle and then read a dispersal notice.

8          Q.   Are you aware of any documentation that would

9     support your timeline?

10         A.   I cannot rely upon documentation to support

11    something that I witnessed.   I'm not aware of

12    documentation that would have accurate timelines.   I'm

13    aware that after the fact, after the dispersal notices

14    were read and after they were failed to be adhered to,

15    the crowd was encircled.

16         Q.   Did you produce a report regarding September

17    8th, 2011?

18         A.   No, I did not.

19         Q.   Why not?

20         A.   I was the on-scene commander.   I was directing

21    officers and employees.   My role was not to be an active

22    report taker or report writer regarding this incident.

23         Q.   You were choosing people for arrest; isn't that

24    true?

25         A.   No.

1    Q.  Didn't you choose Dave Morse for arrest?

2    A.  No.

3    Q.  Officer Coduti did so on his own volition?

4    A.  I directed Officer Coduti and Officer Jacobsen

5    to remove Mr. Morse and Mr. Krystoff from the crowd.

6    Q.  On what basis?

7    A.  That I witnessed, 369i, as well did they, what

8    Officer Coduti articulated in his report.

9    Q.  Are you sure that Officer Coduti witnessed

10   David Morse violating 369i?

11   A.  Based on what I read in the report, yes, I am.

12   Q.  Didn't he ask you to come support him at trial?

13   A.  Excuse me?

14   Q.  Didn't Officer Coduti contact you and ask you

15   to appear in court to testify why David Morse was

16   arrested?

17   A.  That's not what he asked me, no.

18   Q.  What did he ask you?

19   A.  He asked me to come to court, and I asked him

20   why.  He said because he was subpoenaed to appear before

21   the judge regarding the citation to Mr. Morse.  I said,

22   "You don't need me to be there.  Absolutely no reason

23   for me to be in court."  If I was to go to court for all

24   the arrests that occurred by BART PD, I would never be

25   at BART PD.

28

1    Q.  Did any other officer write to you and ask you

2    to appear with them to substantiate an arrest?

3    A.  No.

4    Q.  So only Officer Coduti wrote to you; is that

5    correct?

6    A.  I don't believe he wrote to me.  He came to my

7    office and we spoke.

8    Q.  You have a Blackberry; is that correct?  You

9    did have a Blackberry?

10   A.  Yes.

11   Q.  You received e-mail on that?

12   A.  On a regular basis.

13   Q.  And are you aware your attorney has turned over

14   your Blackberry records?

15   A.  I'm not aware of that, but I have no problem

16   with that.  To the best of my recollection, what I

17   recall specifically is talking to Officer Coduti in my

18   office face to face regarding this request.

19   Q.  And that's an unusual interaction between two

20   officers, is it not?

21   A.  No.

22   Q.  Why do you think he came to talk to you?

23   A.  Officer Coduti talked to me on a regular basis.

24   My policy within the BART Police Department was to have

25   my door open if I was there.  And I had occasion to

1    and signed protective order issued by Judge Corley.

2    BY MR. SIEGEL:

3        Q.  Mr. Hartwig, this document states that a press

4    conference was held on September 5th, 2011, that

5    announced the protest as the subject of this lawsuit.

6            Is that your recollection?

7        A.  What part of this document are you referring

8    to?

9        Q.  I'm sorry.  Page 2, the first sentence of the

10   first paragraph.

11       A.  Could you ask that question again?  I'm sorry.

12           (Record read.)

13           THE WITNESS:  This is Deputy Chief Fairow's

14   document.  He's the author of this.  In conversation

15   with Deputy Chief Fairow, I was aware of this, yes.

16   BY MR. SIEGEL:

17       Q.  Do you know if anyone at BART Police attempted

18   to contact the protest organizers?

19       A.  I do not know.  I know I did not.

20       Q.  Is it your understanding that BART policy is to

21   contact protest organizers in advance of the protest

22   whenever possible?

23       A.  I know that we've had -- that is the avenue

24   that we seek most often because we would like to come to

25   an agreement.  We've had conversations many times about

32

1    staging areas, safe areas, so on and so forth.  Yes.  I

2    do know that's part of the policy.  Did it happen on

3    this occasion, is that your question?

4         Q.  I'd have to ask her my exact question.

5              MR. ALLEN:  The question was:  Are you familiar

6    with this BART policy to meet with protest organizers?

7              THE WITNESS:  Yes.  I'm familiar with that.

8    BY MR. SIEGEL:

9         Q.  Did you meet with Christopher Cantor in advance

10   of the protest?

11        A.  Me personally?

12        Q.  Yes.

13        A.  I did not.

14        Q.  Do you know if anyone did?

15        A.  I do not.

16        Q.  Do you know who I'm referring to when I say

17   "Christopher Cantor"?

18        A.  I'm aware of Mr. Cantor.

19        Q.  Do you know if anyone met with David Morse in

20   advance of the protest?

21        A.  I do not know.

22        Q.  Do you see the paragraph on this page described

23   as "Mission"?

24        A.  Yes.

25        Q.  In the third sentence of that paragraph, it

1   states, "This department's policy (Policy 459) regarding

2   crowd management and crowd control is to apply the

3   appropriate level of direction and control to protect

4   life, property, system facilities and maintain public

5   peace and order and to uphold the constitutional rights

6   of free speech and assembly."

7        Do you see that?

8   A.   Yes.

9   Q.   Do you understand that that statement

10  incorporates Policy 459 into the plan for the day?

11  A.   Yes.

12  Q.   And that Policy 459 should guide police actions

13  that day?

14  A.   Yes.

15  Q.   I'd like to direct your attention to the third

16  page.  "Persons will be allowed to peacefully protest on

17  the station concourses, outside the paid area, as long

18  as they do not attempt to disrupt BART service, create a

19  safety hazard for patrons or commit other unlawful

20  acts."

21       Do you see that?

22  A.   Yes.

23  Q.   The protest that we are talking about, did that

24  occur in the paid area?

25  A.   It did not occur in the paid area.

34

1    Q.  It was in the so-called free area?

2    A.  Yes.

3    Q.  I'd like to direct your attention to the fourth

4    page, second paragraph from the bottom.

5        Just to do me a favor, would you read the first

6    three sentences of that paragraph beginning with "The

7    department will take."

8    A.  "The Department will take a 'zero tolerance'

9    approach to disruptive, unsafe and unlawful activity

10   occurring on the platform or concourse during this

11   planned protest.  Station designation signs and PA

12   systems will warn again deliberate attempts to disrupt

13   revenue service."

14   Q.  And one more, please.

15   A.  "Officers will be assigned to intervene as soon

16   as possible, making immediate arrests without prior

17   warning of protesters who block train doors, climb atop

18   trains or otherwise delay revenue service, or block fare

19   gates to prevent patron access to the system."

20   Q.  During the protest, did anyone block train

21   doors?

22   A.  No.

23   Q.  Did anyone climb atop trains?

24   A.  No.

25   Q.  Did anyone delay revenue service?

1      A.  I would say they did not.

2      Q.  Did anyone prevent patron access to the system?

3      A.  Yes.

4      Q.  Who did that?

5      A.  The protesters located in the free area

6  assembled protesting against BART willingly, knowingly

7  impeding the flow of traffic through the fare gates into

8  the system as well as exiting from the system.

9      Q.  Do you know if any patron complained about not

10  being able to access the Powell Street station?

11      A.  I know of numerous patrons standing to my

12  immediate right trying to enter into the station that

13  could not do so because of the crowd blocking the fare

14  gates.  I know of numerous patrons standing to my

15  immediate right and left at the same time when we moved

16  the people from that location thanking us for doing so.

17      Q.  BART police stood in front of the fare gates;

18  is that true?

19      A.  At one point in time, they did.

20      Q.  And that -- did that permit patrons to enter

21  and leave the system?

22      A.  There's two different manners in how they stand

23  at the fare gates.  The manner of which you're speaking,

24  they would stand in front of the structure itself

25  allowing passage through the gates.  Later when we

1    removed people from that location that were blocking --

2    willingly blocking that location, they covered across

3    the entire fare gate area, the structure as well as the

4    opening, blocking anybody from entering and exiting.

5        Q.  Why did you arrest the individuals in the

6    circle if BART police had already ensured egress and

7    ingress to the station?

8        A.  They were arrested for 369i PC, for interfering

9    and disrupting the BART system, blocking the passage

10   into the system.  They were arrested as well for failure

11   to disperse after the dispersal notice was read multiple

12   times.

13       Q.  How did you determine whether someone was

14   intentionally or unintentionally blocking the fare

15   gates?

16       A.  I relied upon multiple dispersal notices to

17   disperse from the area.  If you failed to do so, you

18   were subject to arrest.

19       Q.  Are you aware that San Francisco Chronicle

20   reporter Vivian Ho was detained in the circle?

21       A.  Yes.

22       Q.  Why wasn't she arrested?

23       A.  She was identified as a journalist from the San

24   Francisco Chronicle, and she was not witnessed to be an

25   active participant or a violator of law at this scene.

37

1    Q.  Mr. Morse was?

2    A.  Yes.

3    Q.  On what basis?

4    A.  He was an active participant, and he violated

5  369i PC as well as 409 PC at this scene.

6    Q.  Just to separate those two, earlier we'd

7  established that the entire crowd was blocking the fare

8  gates; is that correct?  The entire encircled crowd; is

9  that true?

10    A.  I don't know that we established the entire

11  crowd was blocking the fare gates.  I know the entire

12  crowd was actively marching in front of the fare gates

13  and failed to move from that location until the police

14  department set up a skirmish line and moved them back.

15    Q.  Including Vivian Ho, correct?

16    A.  I believe she was in that group, yes.

17    Q.  So Vivian Ho was blocking the fare gates?

18        MR. ALLEN:  Objection; argumentative, misstates

19  his testimony.

20        THE WITNESS:  I did not see Vivian Ho blocking

21  the fare gates, no.

22  BY MR. SIEGEL:

23    Q.  But she was in the crowd that was blocking the

24  fare gates?

25    A.  The area at the fare gates and the ticket

38

1    vendors at the Powell Street station is not a large

2    area, and there was a large number of people.  So when

3    we moved people back from the fare gates, that

4    included -- at that point in time, there was no lines of

5    restriction.  It was open access everywhere.  There was

6    many people that were moved back.  There was dispersal

7    notices read, and the majority of those people at that

8    time dispersed.  I believe Vivian Ho did not.

9         Q.  So why wasn't she arrested?

10        A.  She was identified as a non-active participant,

11   and she was a member -- she was a mainline journalist, I

12   believe, representing the San Francisco Chronicle, even

13   though she did not have her -- she had just gotten her

14   job and didn't have her active press pass.

15        Q.  When you say "mainline journalist," is that to

16   be distinguished from other types of journalists?

17        A.  When I say "mainline journalist," I'm referring

18   to local, state, county, sources of media, newspapers,

19   reporters, television stations, radio stations,

20   Chronicle, Contra Costa Times, KCBS, Channel 2, Channel

21   4, Channel 7.  I'm just -- that's how I designate them.

22        Q.  Are you familiar with the alternative

23   journalist?

24        A.  Yes.

25        Q.  Is an alternative journalist subject to any

1    different laws than a mainline journalist?

2         A.   No.

3         Q.   They should be treated the same?

4         A.   Sure.

5         Q.   During the protest, wasn't David Morse holding

6    a press pass?

7         A.   I believe he was.

8         Q.   He was holding one or more cameras?

9         A.   He may have been.

10        Q.   So what distinguished him from Vivian Ho?

11        A.   He was an active participant in the protest.

12   He was actively blocking fare gates, actively marching

13   with the crowd, actively interacting with Mr. Cantor,

14   who I determined through my experience with this group

15   was the active leader of the crowd.

16        Q.   So you're saying Mr. Morse associated with Mr.

17   Cantor?

18        A.   I don't know if he associated with him, but I

19   know during this event, he was an active participant

20   with Mr. Cantor.

21        Q.   When you say "active participant," specifically

22   what do you mean?

23        A.   Marching around the fare gates, around the

24   ticket vendors; blocking the fare gates; interacting

25   with police officers; interacting with Mr. Cantor.

40

1      Q.  Let's take each one of these one by one.

2          What do you mean when you say Mr. Morse was

3   marching?

4      A.  In this event, they began near the ticket

5   vendors away from the fare gates.  Met as a large group

6   most often led by Mr. Cantor.  I don't know if he had an

7   actual megaphone or if he had a magazine wrapped up, but

8   he was talking to the crowd.  And the conversation went

9   from a conversation to a chant to a mobile moving march

10  around the ticket vendor, which came around and

11  ultimately ended up in front of the fare gates and

12  continued two or three times.

13         And what would happen is as they progressively

14  marched and chanted, they would slow down at the ticket

15  vendors and at the fare gates to block and impede the

16  flow of BART patrons trying to either purchase a ticket

17  from the ticket vendor or enter or exit into the BART

18  station.

19     Q.  Is it your testimony that anybody that was

20  walking in a circle was blocking the fare gates?

21     A.  No.

22     Q.  Now, it is your testimony that Mr. Cantor is a

23  leader or one of the leaders of the protest; is that

24  correct?

25     A.  Yes.

1    Q.  For purposes of news gathering, isn't that the

2  person that the news agents would be most interested in?

3    A.  You would have to ask the new agents.  I would

4  assume that would be true.

5    Q.  How can you distinguish a reporter close to the

6  primary subject from a reporter that's marching?

7    A.  The reporters at the scene most often are on an

8  outer edge perimeter or in the back of the active

9  participants.  They're not usually standing side by side

10  with active leaders of the protest.  They're not usually

11  in conversation with active leaders of the protest

12  during the protest, I'm saying.  They may be afterwards.

13       They're not actively blocking fare gates as

14  what I perceived to be an active member of the protest

15  and not an active member.  Although he absolutely is a

16  journalist, but because he has a journalist pass

17  identifying himself as a journalist doesn't allow him to

18  break the law.  It allows him to be there and act as a

19  journalist.

20       What I witnessed that night, Mr. Morse did that

21  as well as block and impede the flow of patrons into the

22  station at the fare gates as well as march as well as

23  stand side by side with Mr. Cantor in the encircled

24  group.

25    Q.  You detained over ten journalist that day; is

42

1    that correct?

2         A.  I believe so.

3         Q.  Mr. Morse was the only one you arrested?

4         A.  As far as I know, correct.

5         Q.  Prior to September 8th, a "Be On the Look Out"

6    bulletin was issued that identified Mr. Morse; is that

7    correct?

8         A.  I was made aware of that fact after September

9    8th, yes.

10        Q.  Prior to September 8th, had you ever arrested

11   Mr. Morse?

12        A.  No.

13        Q.  Had you ever observed him committing any

14   unlawful conduct?

15        A.  No.

16        Q.  But you knew him?

17        A.  Yes.

18        Q.  How did you know him?

19        A.  My interaction with Mr. Morse goes back to when

20   I was manager of security programs in the general

21   manager's office.  And most often, our interaction took

22   place at the BART boardroom during board meetings.

23        Q.  You knew that Mr. Morse published articles

24   about these events he attended?

25        A.  I assumed he did.

43

1      Q.  You read some of these articles; is that
2   correct?
3      A.  When I returned to the police department, I
4   did.
5      Q.  Some of these articles were critical of BART
6   police; is that correct?
7      A.  Yes.
8      Q.  Is it true you discussed with other BART
9   officers Mr. Morse's articles?
10      A.  I specifically personally did that?
11      Q.  Did you?
12      A.  No.
13      Q.  Never?
14      A.  Maybe with Deputy Chief Fairow, Chief Rainey,
15   but with officers, I did not have that conversation, no.
16      Q.  Why was Mr. Morse identified by BART police in
17   advance of the protest?
18      A.  Mr. Morse is an information source that our
19   Intel officer and Deputy Chief Fairow relied upon
20   information they obtained from the blog that he would
21   put his information out on.  I found that site to be the
22   most accurate calendar of protest events within the BART
23   property that I felt I had an obligation and the
24   responsibility to be informed upon.  That's why I
25   utilized that site.

44

1      Q.   So you knew Mr. Morse because of his
2  news-gathering activities?
3      A.   That was one of the reasons why I knew him,
4  yes.
5      Q.   And you were able to identify him on September
6  8th because of his news-gathering activities?
7      A.   That was one of the reasons why I was able to
8  identify him, yes.
9      Q.   Did you ever know him in any other context
10  other than his conduct as a reporter?
11      A.   I've witnessed him as a reporter, as a citizen
12  within a BART board meeting.  I've noticed him in the
13  system.  We've passed walking with each other.  I've
14  noticed him in many other categories other than his
15  journalism alone.
16      Q.   But you first got to know him through his
17  journalism?
18      A.   I guess that's correct, yes.
19      Q.   Are you familiar with many reporters in the Bay
20  Area?
21      A.   Yes.
22      Q.   Could you identify Vivian Ho by sight?
23      A.   I think I could.
24      Q.   How about Rebecca Bowe?
25      A.   Rebecca?

46

1           (Recess taken.)

2    BY MR. SIEGEL:

3        Q.   Mr. Hartwig, after the break, would you like to

4    update any of your previous testimony?

5        A.   No.

6        Q.   Can you please describe all the specific facts

7    that gave you probable cause to arrest David Morse?

8        A.   I witnessed David Morse being an active

9    participant of the protest at the Powell Street BART

10   station, which included marching in a circular fashion

11   around the ticket vendors, blocking the fare gates,

12   impeding the flow of patrons entering and exiting the

13   BART station.

14       Q.   Marching in and of itself is not illegal,

15   correct?

16       A.   Correct.

17       Q.   Marching can be a legitimate expressive

18   activity?

19       A.   Correct.

20       Q.   And picketing is an expressive activity as

21   well; is that correct?

22       A.   Correct.

23       Q.   BART policy manuals state that picketing is a

24   First Amendment activity?

25       A.   Correct.

47

1    Q.  So marching in a circle is not a reason to
2    arrest David Morse?
3    A.  In and of itself?
4    Q.  Correct.
5    A.  No.  When it blocks the flow of patrons and it
6    blocks fare gates, we have a violation involved.
7    Q.  So really you're saying David Morse blocked
8    fare gates and blocked patrons?
9    A.  Yes.
10   Q.  And when you say he blocked fare gates, do you
11   mean that he stood still in front of the fare gates?
12   A.  Either in front of the fare gates, partially in
13   front of the fare gates, in front of the patrons,
14   impeded the flow of the direction of patrons into and
15   out of the station, yes.
16   Q.  You're not permitted to arrest people en masse;
17   rather you're required to make a probable cause
18   determination for each individual you would like to
19   arrest?
20   A.  The only time en masse per that policy is a
21   specific violation of 409.  Other than that, there has
22   to be a probable cause attached to that arrest, which I
23   believe we had with Mr. Morse.
24   Q.  In your mind, is there a particular moment
25   where you can remember David Morse standing in front of

48

1    the fare gates?

2        A.  No.

3        Q.  Is there any particular action you remember

4    between David Morse and any BART patron?

5        A.  I remember Mr. Morse being an active

6    participant in the protest that marched around the

7    ticket vendors, that blocked the fare gates at the

8    Powell Street station repeatedly.  During dispersal

9    announcements, after dispersal announcements, the

10   activity continued.

11       Q.  Is it your testimony that no other journalist

12   walked with the protesters?

13       A.  I think many walked with them.  Did I witness

14   them being active participants, blocking fare gates, no,

15   I did not.

16       Q.  Everybody that was walking in the circle was

17   blocking fare gates; is that true?

18       A.  No.

19       Q.  Explain what you mean.

20       A.  You can walk in a circle and stay totally away

21   from the fare gates and the ticket vendors and impede

22   nobody.  That's not what happened.

23       Q.  Approximately how many people were within the

24   circle?

25       A.  50, 60.

49

1     Q.  And out of those, how many, approximately,

2     blocked the fare gates?

3     A.  I don't know.

4     Q.  Was every person that blocked the fare gates

5     arrested?

6     A.  As far as I know, yes, they were.

7     Q.  How many officers were making observations to

8     determine who should be arrested?

9     A.  I believe there were arrest teams on the outer

10    perimeter of the fare gate/ticket vendor area.  Specific

11    numbers, I'd have to refer to the operations order.

12    Q.  From your recollection today, how many officers

13    selected individuals for arrest?

14    A.  Specific numbers, I'd have to refer to the

15    order.  I couldn't guess.

16    Q.  Who arrested Christopher Cantor?

17    A.  I believe it was Arthur Jacobsen, to the best

18    of my recollection.

19    Q.  You're aware that a BART police officer killed

20    Charles Hill in 2011?

21    A.  Yes.

22    Q.  You're aware that the protest on September 8th,

23    2011, came out of that killing in part?

24    A.  I was involved with so many protests on BART

25    property, I didn't -- specifically what it was attached

50

1    to, I didn't know at the time.

2         Q.  This might test your memory, but how many

3    protests on BART property have you been involved in?

4         A.  In 31 years?

5         Q.  Yes.

6         A.  Many.

7         Q.  Maybe over a hundred?

8         A.  Over a hundred?  I don't know if it's over a

9    hundred, but it's a lot.

10        Q.  How many times can you remember an operations

11   order governing an anticipated protest?

12        A.  Those orders originated after 9/1/2009.  So

13   anytime we had a demonstration, protest, gathering where

14   there was going to be police involvement on BART

15   property, there was an operations order that was put

16   out.

17        Q.  Prior to that, how would you prepare for a

18   protest?

19        A.  We had what was recognized as an operations

20   order but was not as thorough or as developed as the

21   current process, which evolved from events after January

22   1st of 2009.

23        Q.  Was it your practice as BART police to identify

24   protest leaders in advance?

25        A.  To the best we could, yes.

57

1      Q.   Who would know such information?

2      A.   I would refer to the incident commander.

3      Q.   Did BART police meet prior to September 8th to

4    discuss the operations order?

5      A.   Prior to the 8th, I believe it was issued by

6    Deputy Chief Fairow via e-mail.   I believe he dropped a

7    hard copy off at my desk.   It was reviewed.   And

8    actually on the day of the event, there was a meeting

9    with the involved officers prior to the event in which

10   it is reviewed by all involved.

11     Q.   Who is expected to read the order?

12     A.   I was not at that meeting.   Most often it is

13   the incident commander that reads it or his designee.   I

14   don't know who read it that day.   I was not at the

15   meeting.

16     Q.   Is every officer working that day expected to

17   be familiar with the contents of this order?

18     A.   Yes.

19     Q.   How do they become familiar?

20     A.   It's issued to them at that meeting.

21     Q.   In paper form?

22     A.   Yes.

23     Q.   They're given time to read it?

24     A.   Yes, sir.

25     Q.   You recall only one meeting to prepare for the

1      Q.  What is a BOLO?

2      A.  Be on the look out for.

3      Q.  What is it used for?

4      A.  Information.

5      Q.  When is a BOLO issued?

6      A.  Specifically issued?

7      Q.  (Attorney nods head.)

8      A.  Patrol officers, officers trying to

9  locate/identify somebody.

10     Q.  A criminal?

11     A.  Could be.

12     Q.  Usually?

13     A.  Could be.  Could be an at-risk citizen,

14  juvenile, adult.  Could be a person of interest.  And it

15  could be a criminal.

16     Q.  During your tenure at BART, how often were

17  BOLOs issued?

18     A.  Weekly.  Most often through the detective

19  bureau.

20     Q.  How many BOLOs would be issued a week on

21  average?

22     A.  I couldn't begin to imagine.

23     Q.  One to ten, one to a hundred?

24     A.  One to ten.

25         MR. SIEGEL:  Exhibit 4, please.

64

1          (Plaintiff's Exhibit 4 marked for

2          identification.)

3    BY MR. SIEGEL:

4          Q.  Have you seen this document before?

5          A.  I have.

6          Q.  When did you see it?

7          A.  I believe it was in the latter weeks of

8    September after the event.  I believe it was part of an

9    e-mail that was initially distributed from Deputy Chief

10   Fairow.  I did not open this portion.  Deputy Chief

11   Fairow provided me a hard copy of the ops order.  I

12   believe this was in the e-mail, but I did not open it at

13   the time.

14         Q.  Were you involved in any way in the creation of

15   this BOLO?

16         A.  I was not.

17         Q.  This is a BOLO, correct?

18         A.  This is not what I would determine as a BOLO.

19   The BOLOs that I'm familiar with specifically say that,

20   "Be on the look out for."  I don't see that here,

21   anywhere here.  I think the admonition at the bottom of

22   this document describes what it is.  It's informational

23   use for law enforcement.  I don't know -- this is not

24   what I would determine to be a BOLO that I would be

25   familiar with.

66

1        Q.  So do you think if a person is described by

2    their PFN, that's indicating they're suspected of

3    criminal activity?

4        A.  That means to me he was arrested at one time

5    and issued a PFN through Alameda County.

6        Q.  Why do you think that information was included

7    in this document?

8        A.  I do not know.

9        Q.  Did you speak with Deputy Chief Fairow about

10   David Morse prior to September 8th?

11       A.  Prior to September 8th, I didn't know David

12   Morse.  I knew Dave Id.

13       Q.  Did you speak with Fairow about Dave Id?

14       A.  I'm sure I did, yes.

15       Q.  What do you recall about those conversations?

16       A.  Deputy Chief Fairow came to our agency after

17   I'd been there for a substantial amount of time.  It was

18   informational.  He would ask me stuff like "Who is this

19   person?  How do you know this person?"  And I believe

20   the context of the conversation regarding Mr. Id was

21   just that.  I gave him the information I shared with

22   you.

23           My initial contact with Mr. Morse was through

24   my position as manager of security programs in the board

25   room.

1        A.  I do not specifically recall.  Late afternoon

2    between 4:30 and 5:00.

3        Q.  Do you recall that the demonstration was

4    scheduled to begin at 5:00?

5        A.  I don't specifically recall the time.

6        Q.  Was it your decision to deploy officers to the

7    fare gates that day?

8        A.  Yes.

9        Q.  To create a line of officers in front of the

10   fare gates?

11       A.  Yes.

12       Q.  It was your decision to close the circle?

13       A.  Yes.

14       Q.  Why did you close the circle?

15       A.  The dispersal notices had been read multiple

16   times.  Avenues to leave the location had been provided.

17   And I'd come to the determination that the people that

18   were within the circle had made a willful choice to stay

19   there and we had run our course.  We had partially

20   closed that station and it was time to take people into

21   custody.

22       Q.  You later determined that you were wrong in the

23   sense that some of the people had not willingly decided

24   to stay?

25            MR. ALLEN:  Objection.  That's argumentative,

72

1    misstates his testimony.

2            THE WITNESS:  I never determined that.

3    BY MR. SIEGEL:

4        Q.  You determined that some people should be

5    released?

6        A.  Yes.  I determined -- go ahead.

7        Q.  How do you reconcile that with your

8    determination that the crowd was willfully remaining?

9        A.  There were people within that circle that were

10   represented as journalists that had not violated the

11   law.  Once we were able to determine who those people

12   were and not involved with those violations, they were

13   identified and released.

14       Q.  You selected David Morse for arrest; is that

15   true?

16       A.  I selected --

17           MR. ALLEN:  Objection; asked and answered.

18           THE WITNESS:  I selected David Morse to be

19   removed from the inner circle.

20   BY MR. SIEGEL:

21       Q.  At that point, he was already detained?

22       A.  Yes.

23       Q.  And what was your intention by removing him

24   from the circle?

25       A.  To have him removed and taken to the backroom

73

1    at the Powell Street station and processed.

2         Q.  For arrest?

3         A.  That determination I did not make.

4         Q.  What processing did you intend to happen?

5         A.  They have to be identified, cited and/or

6    arrested and transported.  I made the determination to

7    have him removed from the circle.

8         Q.  Who made the determination to cite him?

9         A.  Officer Coduti did, and I absolutely support

10   the reasons he did so.

11        Q.  What was he cited for, do you recall?

12        A.  I believe 369i, and 409 may have been a part of

13   369i PC.

14        Q.  And he was cited for an infraction; is that

15   correct?

16        A.  I don't recall the citation.

17        Q.  Is it normally the policy of BART to cite and

18   release people who are cited for an infraction?

19        A.  It can be.

20        Q.  Can you recall an incident when someone was

21   cited for an infraction and taken to jail?

22        A.  I can't specifically recall.

23        Q.  Is it your testimony that Officer Coduti

24   decided to arrest David Morse?

25        A.  The arrest of David Morse occurred when he was

74

1    being processed.

2        Q.  And Officer Coduti processed Dave Id?

3        A.  He was part of that process.  There were

4    supervisors back there as well.

5        Q.  Who were the supervisors?

6        A.  I would have to refer to the ops order.  You

7    understand that the location of the scene and the

8    backroom was quite some distance at the Powell Street

9    station.

10       Q.  Is charging a separate event from arrest?

11       A.  Absolutely.

12       Q.  So charging occurs before or after arrest?

13       A.  After.

14       Q.  So am I right that Mr. Morse was detained,

15   processed, cited, arrested and then charged; is that the

16   sequence?

17       A.  Arrested, transported.  Ultimate charges go

18   through the DA's office.

19       Q.  An officer doesn't charge Mr. Morse?

20       A.  No.  Cites.

21       Q.  Cites.

22       A.  Based upon his probable cause.

23       Q.  You visited Mr. Morse while he was detained at

24   the Powell Street substation; is that correct?

25       A.  I responded to the office location where Mr.

1    Morse was being detained, yes.

2         Q.  Why did you respond to the office?

3         A.  They were formulating a group to be transported

4    to San Francisco jail for booking.  There was an

5    identification issue with one of those people in that

6    group.

7         Q.  Not Mr. Morse?

8         A.  He was not the person in question, no.

9         Q.  Did you come back to see Mr. Morse again while

10   he was at Powell Street substation?

11        A.  I walked through the same office location after

12   determining -- dealing with the first issue and seeing

13   Mr. Morse sitting in a chair in the office.

14             MR. SIEGEL:  I'd like to mark the next one.

15             (Plaintiff's Exhibit 5 marked for

16             identification.)

17   BY MR. SIEGEL:

18        Q.  Mr. Hartwig, are you familiar with this

19   document?

20        A.  I am not.  I'm taking it for what it is.

21        Q.  Is a timeline a typical document prepared by

22   BART PD?

23        A.  It can be.

24        Q.  Under what circumstances is a timeline created?

25        A.  After the fact for investigation purposes,

76

1    verification, information, all of the above.

2         Q.   Do you know who prepared this timeline?

3         A.   I do not.

4         Q.   Who ordinarily would prepare a timeline?

5         A.   It would come from the communications -- the

6    communications supervisor within the BART Police

7    Department.

8         Q.   Who was the communications supervisor during

9    the protest?

10        A.   Jason DeVera, D-e-V-e-r-a.

11        Q.   How does the communications officer create the

12   timeline?

13        A.   He pulls the tapes of the event and types in

14   his interpretation of what he hears.

15        Q.   When you say "tapes," are you referring to

16   audiotapes?

17        A.   Yes.

18        Q.   Any other tapes?

19        A.   No.  The audiotapes come from the CAD system

20   which provides a timeline.

21        Q.   What does CAD stand for?  I believe you might

22   have already told me.

23        A.   I knew for 31 years.  Right now,

24   communication...

25             MR. ALLEN:  Computer-assisted dispatch.

1          THE WITNESS:   Computer-assisted dispatch.

2     BY MR. SIEGEL:

3          Q.  Is there any process to correct a timeline if

4     it contains erroneous information?

5          MR. ALLEN:   Objection; calls for speculation,

6     lacks foundation.

7          THE WITNESS:   I would imagine there is.   It

8     would go back to those same --

9          MR. ALLEN:   Don't guess.   Do you know or don't

10    you know?

11         THE WITNESS:   You would refer to the

12    audiotapes.

13    BY MR. SIEGEL:

14         Q.  Have you ever participated in revising a

15    timeline?

16         A.  No.

17         Q.  I'd like to direct your attention to the first

18    page of this document.   The third line reads "1645,"

19    which I assume is 4:45 military time.

20         A.  Correct.

21         Q.  S56 reports.   Is S56 Sergeant 56?

22         A.  Yes.

23         Q.  Do you know who that is?

24         A.  I would have to refer to the order.

25         Q.  To the best of your knowledge, why is S56

84

1      Q.  If Mr. Morse has a critical view of BART

2  management, he can nevertheless be a journalist,

3  correct?

4      A.  He can absolutely be a journalist with a

5  critical view of BART management.

6      Q.  And if he spoke at a public hearing about BART,

7  that wouldn't prevent him from being a journalist, would

8  it?

9      A.  No.

10      Q.  What information does an officer need to make

11  an arrest under 369i?

12      A.  That 369i was violated and the party involved

13  was the violator.

14          MR. SIEGEL:  Next in order.

15          (Plaintiff's Exhibit 8 marked for

16          identification.)

17  BY MR. SIEGEL:

18      Q.  I'll represent to you this is a photograph that

19  was taken by the San Francisco Chronicle.

20          Do you recall at what point in the protest this

21  picture was taken?

22      A.  This is when we moved the crowd from the direct

23  area of the fare gates, which is located behind the

24  officers.

25      Q.  And on what side of the officers is the crowd

85

1   that you're referring to?

2       A.  The officers were standing in front of the fare

3   gates in the free area.

4       Q.  The crowd is to the left of the officers?

5       A.  Correct.  And it looks like media and other

6   persons behind the officers.

7       Q.  At this point in the protest, nobody is

8   marching, correct?

9       A.  Correct.

10      Q.  And at this point in the protest, there are

11  numerous media interspersed in the crowd; is that

12  correct?

13      A.  I would assume so, yes.

14      Q.  Including numerous media that are standing

15  directly next to Mr. Cantor; is that correct?

16      A.  I would have no way of identifying who those

17  people are standing next to Mr. Cantor.

18      Q.  Do you see Dave Id in this picture or David

19  Morse?

20      A.  I do not.

21      Q.  Is it your contention that Mr. Morse was with

22  Mr. Cantor during the entire protest?

23      A.  No.

24      Q.  Just at some moments?

25      A.  Yes.

86

1      Q.  That other people were with Mr. Cantor at other

2   moments?

3      A.  Yes.

4      Q.  Did you arrest everyone who stood next to Mr.

5   Cantor?

6      A.  No.  I do not believe so.

7      Q.  How did you distinguish Mr. Morse from the

8   other people?

9      A.  Active participants in the protest blocking and

10  violating 369i PC.

11     Q.  In this picture, BART police officers are

12  blocking the fare gates; is that correct?

13     A.  Correct.

14     Q.  A protest is not required to take out a permit,

15  is it?

16     A.  At BART?

17     Q.  (Attorney nods head.)

18     A.  I believe there's a media section at BART that

19  requires any event that occurs on BART property be

20  directed through them for permission for safety

21  purposes.  And I do not believe it was an enforced

22  section by the BART Police Department.

23     Q.  A protest can continue without a permit; is

24  that correct?

25     A.  Based upon determination of who is in charge at

91

1    a one-word answer, that he did not communicate to

2    Mr. Cantor.  You want him to explain why he violated the

3    policy.  It's argumentative --

4            MR. SIEGEL:  Let's try again.

5            MR. ALLEN:  -- and he's saying he didn't

6    violate the policy.

7    BY MR. SIEGEL:

8        Q.  As simply as I can ask it, how is it possible

9    that you followed policy but did not attempt to

10   establish communication with Mr. Cantor?

11           MR. ALLEN:  Object.  That's overbroad and

12   vague.

13           You can answer the question if you understand

14   it.

15           THE WITNESS:  I never recognized Mr. Cantor as

16   the organizer or planner.  I knew he was a

17   self-proclaimed leader of this group.  I've never had,

18   to the best of my recollection, a conversation with Mr.

19   Cantor in over probably 20 protests that he and I were

20   standing next to each other side by side.

21   BY MR. SIEGEL:

22       Q.  Isn't it true that BART police identified Mr.

23   Cantor as the protest organizer?

24       A.  No.

25       Q.  Isn't it true that BART police identified David

92

1    Morse as Mr. Cantor's sidekick?

2        A.  Yes.

3        Q.  Isn't it true that BART police identified

4    Mr. Morse as the secondary subject?

5        A.  I'm not sure.  Secondary subject, what are you

6    referring to?

7            MR. SIEGEL:  What time do you want to take

8    lunch?

9            MR. ALLEN:  Go off the record.

10           (Recess taken.)

11   BY MR SIEGEL:

12       Q.  Mr. Hartwig, I'd like to go back to a previous

13   exhibit, the timeline which is marked as Exhibit 5 in

14   your stack there.  At this point, because you've

15   testified you did not previously review this document, I

16   would like you to take a little bit of time to silently

17   review the first two pages.  Let me know after you've

18   reviewed those first two pages.

19       A.  Okay.

20       Q.  Earlier you testified that you did not create

21   this document, that it may have been created by a

22   communications officer.

23           With that said, is this timeline an accurate

24   rendition of the events at the protest?

25       A.  I would have no idea.  You would have to talk

Aiken Welch Court Reporters   Daniel Hartwig   10/15/2013

1    to the communications supervisor Jason DeVera, who, I

2    believe, and I'm absolutely not sure, is the author.

3         Q.  Is it true that sergeants were reporting over

4    the radio when plaintiff David Morse arrived at the

5    protest?

6         A.  According to this document, that was stated,

7    yes.

8         Q.  And do you recall anything that would

9    contradict this document?

10        A.  No.

11        Q.  Is it true that you as S4 made an announcement

12   to the crowd at approximately 5:23?

13        A.  No.

14        Q.  That part is false?

15        A.  That did not happen.

16        Q.  And is it true that at 5:25 everyone in the

17   middle of the circle was legally detained?

18        A.  You would have to ask the interpretation of the

19   author.  I don't know what is meant by that

20   interpretation.

21        Q.  Do you know anything at this time that would

22   contradict that assessment?

23        A.  You would have to talk to the author.  At 1725

24   per that lieutenant, I don't know what he said and how

25   it was interpreted.  You would have to talk to the

94

1    involved parties.

2        Q.   Do you remember anything right now that would

3    contradict the idea at 5:25 p.m. the circle closed?

4        A.   I can't -- I would have to look at the actual

5    CAD readout itself.   I can't say specifically what

6    happened at that time based on this document.

7        Q.   Or based on your current recollection?

8        A.   Correct.

9        Q.   This document says that at 1726 a sergeant

10   reported that the station was being closed and the

11   dispersal order was being given.

12            Is that an accurate statement given your

13   recollection?

14       A.   No.

15       Q.   What is your recollection?

16       A.   Again, referring back to my previous testimony,

17   it would make no sense to close the station and then

18   read a dispersal order.   So, in fact, what actually

19   happened, the dispersal order was read multiple times,

20   the station was partially closed and ultimately totally

21   closed.

22       Q.   Do you recall that the protest began at

23   approximately 5:00 p.m.?

24       A.   That's probably correct.   In that neighborhood.

25       Q.   At what point did the protest become an

95

1    unlawful assembly?

2        A.  At what time?

3        Q.  At what point in the protest?  Immediately?

4        A.  No.  My determination is based upon the safety

5    and the security of the employees and the patrons and

6    property at that location.  Specifically what time that

7    was, I don't recall.

8        Q.  How long did it take you to make that

9    determination?

10       A.  Well into half an hour, 40 minutes.

11       Q.  You let the protesters march around a little

12   bit?

13       A.  Yes.  I tried to be as flexible as I could

14   until it became unsafe.

15       Q.  When you say "unsafe," what do you mean?

16       A.  When the flow of the patrons is blocked,

17   impeded by people in front of the fare gates and ticket

18   vendors.

19       Q.  Did BART police create the line in front of the

20   fare gates before or after protesters impeded the fare

21   gates?

22       A.  There were officers standing at the structures

23   of the fare gates before, and then once the marching --

24   the protesters got too close and slowed down and stopped

25   at the fare gates, they moved in front to move them

96

1    away.

2         Q.  When you say in front of the fare gates, really

3    what you mean is in front of the officers who were in

4    front of the fare gates?

5         A.  No.  The fare gates are open.  Between each

6    fare gate there's a structure, a gate, a structure, a

7    gate, a structure, a gate.  Officers were standing at

8    the front of those structures.  The gates were open to

9    pass through.  The protesters marched and would come

10   closer and closer and then would stop ultimately in

11   front of the fare gates, at which time everything backs

12   up in both directions, inside the station, outside the

13   station, which becomes unsafe.

14        Q.  To your recollection, the first dispersal order

15   was given after that occurred?

16        A.  I believe the first dispersal order occurred at

17   the time that the gates were being blocked.

18        Q.  And under BART policy, after a dispersal order

19   is given, the crowd needs to be given a reasonable time

20   to disperse?

21        A.  Correct.

22        Q.  What is a reasonable time?

23        A.  I think we used 15 to 20 minutes, because we

24   read that dispersal order at least three times.  We were

25   very generous.  And ultimately the circle was enclosed.

1     Q.  How much time elapsed between each dispersal

2  order?

3     A.  I think between the first one and the last one

4  we were at least 30 minutes.

5     Q.  So you recall approximately every 15 minutes a

6  dispersal order was read until the third one was read?

7        MR. ALLEN:  Objection; misstates his testimony,

8  argumentative.

9        THE WITNESS:  It was a 30-, 40-minute time

10  frame between the first and the last one.

11  BY MR. SIEGEL:

12     Q.  Do you understand that the timeline you're

13  testifying to right now contradicts the timeline in the

14  documents provided by BART?

15     A.  Again, this document provided is an

16  interpretation of a person of a tape.  I know that I was

17  at the scene.  And I know when the dispersal orders --

18  the order that came out and when the circle was closed

19  based upon being at the scene.  So if I'm in conflict

20  with it, it's because the interpretation based upon this

21  document is not correct.

22     Q.  Do you know that BART keeps records of audio

23  transmissions?

24     A.  Sure.

25     Q.  Do you know that those transmissions have been

1   provided to us?

2        A.  Sure.

3        Q.  And those records that have been provided to us

4   should be reliable; isn't that correct?

5        A.  I would believe they would be reliable.

6        Q.  If your testimony today is in contradiction to

7   both the timeline and the audio transmissions, is it

8   possible you're incorrect?

9        A.  I believe the interpretation of what you're

10   reading is being incorrectly interpreted.  I was at the

11   scene.  I know the order of what occurred.

12           I know the dispersal came out before the circle

13   was closed.  I know that the station and avenue to leave

14   was created during that entire time.  I know that I was

15   walking around and verbally telling reporters and people

16   that I knew that were there that they need to leave,

17   that we're going to close the station.  "If you refuse

18   to obey the dispersal order, you're subject to arrest."

19   I was at the scene.

20        Q.  Why didn't you tell David Morse to leave?

21        A.  I walked around and told everybody.  I wasn't

22   singling out anybody.  I made it very clear.  I'm easy

23   to see in this crowd.

24        Q.  Did you talk directly to David Morse?

25        A.  I don't believe I did.

100

1      Q.  A lot of noise?

2      A.  Yes.

3      Q.  A lot of people, a lot of photo cameras, video

4  cameras, all sorts of things going on?

5      A.  Yes.

6      Q.  Almost like a circus?

7      A.  A circus is much more organized than this

8  event.  Yes.

9      Q.  Have you reviewed any of the videos of the

10  event?

11      A.  I have seen very limited videos of the event.

12      Q.  Have you ever experienced the phenomenon in an

13  intense situation where time slows down, as they say?

14      A.  I don't know if I actually consciously stopped

15  to wonder if I was experiencing that during the event or

16  after.

17      Q.  Is it possible that so many things were going

18  on that it felt like a lot of time was passing but only

19  a little time was passing?

20      A.  Anything is possible.  I'm going based upon

21  what I remember after the fact.  And based upon that is

22  the result of my statement, what I recall at this point

23  in time.

24      Q.  Sure.  You weren't keeping written records,

25  though?

1        A.   Of this event?

2        Q.   Yes.

3        A.   I was not.

4        Q.   You weren't making time notations of dispersal

5    notices?

6        A.   I relied upon the CAD system.

7        Q.   At this point, the records of the CAD system

8    are more reliable than your memory; is that correct?

9            MR. ALLEN:  I'll object that it calls for

10   speculation, argumentative.

11           You can answer if you understand.

12           THE WITNESS:  At this point, the records of the

13   CAD system have been erroneously interpreted in this

14   documentation.

15   BY MR. SIEGEL:

16       Q.   But you can't recall exactly how many minutes

17   elapsed between each dispersal order?

18       A.   I cannot.

19       Q.   You don't know when exactly each dispersal

20   order was given?

21       A.   Specifically, I do not.

22       Q.   You have no records to verify your current

23   recollection; is that correct?

24       A.   The records I would rely upon would be the CAD

25   information.

1      Q.  When you say "CAD," you mean the raw audio
2  files?
3      A.  The audio files along with the interpretation
4  that turns into an actual document.  Audio from the
5  officer to the dispatcher through the system.
6      Q.  Is it true that the main reason you arrested
7  David Morse is because he was close to Krystoff?
8      A.  No.
9          MR. SIEGEL:  I'd like to mark the next exhibit.
10         (Plaintiff's Exhibit 9 marked for
11         identification.)
12  BY MR. SIEGEL:
13     Q.  Is it true you've never seen this document
14  before?
15     A.  Yes.
16         MR. ALLEN:  This is 9?
17         MR. SIEGEL:  This is Exhibit 9.
18         MR. ALLEN:  Thank you.
19         MR. SIEGEL:  Mr. Hartwig, I'll represent to you
20  that this was a document provided by BART during the
21  course of discovery in this lawsuit.
22  BY MR. SIEGEL:
23     Q.  If you could summarize for me, what is the
24  Internal Affairs process to investigate a complaint?
25     A.  The actions of the subject of a complaint.

1    They investigate those actions based upon witnesses,

2    involved subjects in the complaint.

3         Q.   Does BART police have its own internal

4    investigation department?

5         A.   Yes.

6         Q.   How many officers in that department?

7         A.   At the time, there was a lieutenant, a sergeant

8    and two officers.

9         Q.   So Lieutenant Lance Haight was the

10   highest-ranking officer in IA; is that correct?

11        A.   The highest-ranking officer in IA at the time

12   was Deputy Chief Jan Glenn-Davis.  He worked directly

13   under her.

14        Q.   You were interviewed by IA in response to a

15   complaint by Mr. Morse; is that correct?

16        A.   Yes.

17        Q.   You were interviewed by Lieutenant Haight and

18   Sergeant Kwon?

19        A.   Correct.

20        Q.   Do you remember giving truthful testimony that

21   day?

22        A.   Yes, sir.

23        Q.   I'd like to direct your attention to the 24th

24   and 25th pages of this document.  I retract that.  The

25   pages I'm referring to are pages 19 and 20.  They're

1    stamped BART 24 and 25.

2         A.   Yes.

3         Q.   At the bottom of page 20, the very last line of

4    page 20, which is marked BART 25, and continuing onto

5    the following page, I read, quote, "My concern was the

6    presence of Mr. Cantor and Mr. Id in the circle was

7    creating a worse situation and...they needed to be

8    removed immediately."

9              Do you see where I read that from?

10        A.   Yes.

11        Q.   Do you stand by that statement?

12        A.   Yes.

13        Q.   How was Mr. Morse or Mr. Id -- how was he

14   creating a worse situation?

15        A.   Inside the inner circle once it was closed

16   became very emotional and very passionate and very

17   involved.  It was all around Mr. Morse and Mr. Cantor.

18        Q.   What did you see Mr. Morse doing?

19        A.   They were all talking.  Mr. Cantor was yelling.

20   Mr. Morse was standing right next to him.

21        Q.   Mr. Morse was creating a worse situation by

22   standing next to somebody who was yelling?

23        A.   I determined Mr. Morse and Mr. Cantor was the

24   reason for the emotion and the passion, and I wanted to

25   remove it.  I had PC to make the arrest and to have them

1   cited and arrested.  I wanted them removed from the

2   heart of the storm, which I believe they were creating.

3   And I believe I was right, because when they were

4   removed, the center of that inner circle went silent to

5   the point I stepped inside and they all sat down.

6        Q.  These were the first two people you arrested;

7   isn't that correct?

8        A.  These were the first two people removed from

9   the circle, yes.

10        Q.  Is it possible that if you'd removed any two

11   people, it would have the same effect?

12        A.  Anything is possible.  That's the determination

13   I made at the time.

14        Q.  Why did you consider Mr. Morse to be, for lack

15   of a better word, a co-conspirator of Mr. Cantor?

16        A.  Because when I witnessed him involved and

17   participating in the blocking of the fare gates and the

18   marching and the chanting, I witnessed him speaking with

19   Mr. Cantor on occasion on this night and multiple

20   occasions.  I believed that he and Mr. Cantor were

21   working side by side, and I believed that based upon

22   what I saw by removing them I could calm the situation,

23   which was exactly what happened.

24        Q.  You thought they were working side by side

25   because they were talking and walking together?

106

1          A.  No.   Because they were marching and blocking

2     fare gates and ticket vendors and failing to abide by

3     the dispersal order.   Once the circle was closed, they

4     were side by side.   And right where they were was the

5     most active, most passionate location of the circle.

6          Q.  Have you ever heard of an embedded journalist?

7          A.  No.

8          Q.  Do you know that when the United States went to

9     war with Iraq, journalists traveled with military?

10          A.  I know what you're referring to now.   Did I

11     determine Mr. Morse to be an embedded journalist?   No, I

12     did not.

13          Q.  Is it possible that he was?

14              MR. ALLEN:   Objection; speculation.

15     BY MR. SIEGEL:

16          Q.  When you said Mr. Morse was speaking to

17     Mr. Cantor, isn't it possible he was asking Mr. Cantor

18     questions?

19              MR. ALLEN:   Objection; calls for speculation.

20              THE WITNESS:   Anything is possible.

21     BY MR. SIEGEL:

22          Q.  You didn't hear the contents of the

23     conversation?

24          A.  No.

25          Q.  When you say "marching," do you mean that Mr.

1   Morse was raising his knees in a high fashion?

2       A.  No.  Following a path led by Mr. Cantor in a

3   circular fashion around ticket vendors and fare gates.

4       Q.  Approximately 50 people were, quote, unquote,

5   following Mr. Cantor; is that correct?

6       A.  Yes.

7           MR. ALLEN:  Asked and answered.

8   BY MR. SIEGEL:

9       Q.  At the end of your IA interview, the

10  investigating officers asked you to summarize all the

11  reasons you had for arresting Mr. Morse.

12          Do you remember that?

13      A.  What page are you referring to?

14      Q.  No page in particular.  I'm asking if you

15  remember that.

16      A.  No.

17      Q.  Did you contact IA after your interview to give

18  additional reasons why you arrested Mr. Morse?

19      A.  I do not recall contacting them.  Do you mean a

20  day after, ten minutes after, two weeks after?  What are

21  you referring?

22      Q.  At any time after this interview concluded on

23  the record, so to speak, did you later follow up with

24  Haight or Kwon to say, "Hey, I remembered something

25  else"?

1          A.  I don't recall that.

2          Q.  Is it fair to say that you told IA everything

3     you remembered?

4          A.  At the time of the interview I had?

5          Q.  Yes.

6          A.  Yes.

7          Q.  Have you remembered anything new since then

8     that would incriminate Mr. Morse?

9          A.  Since the IA interview, I have not thought

10    about this situation or any other situation that I

11    previously was responsible for as deputy chief.

12         Q.  Similar to this deposition, I admonished you if

13    you remember something later, you can tell me.

14         A.  Yeah.

15         Q.  That didn't occur with IA?

16         A.  Did they make that statement to me?

17         Q.  You didn't follow up with them?

18         A.  I don't recall following up with them.

19         Q.  I'd like to direct your attention to the page

20    that is stamped BART 26, page 21.  My notes are

21    imperfect.  The next page, page 22, BART 27.

22            Towards the bottom of the page where you see

23    "Haight" for the first time, it says, "outside of the

24    conversation that you saw take place between Cantor and

25    Morse, could you identify any other actions on behalf

1    of...either party as far as actively engaging the

2    protesting or leading the protest?"

3            It states your answer, "Yeah...they were at the

4    front of line as they marched around the fare gate...the

5    ticket vendors and the fare gates and they were at the

6    heart of the fare gates when they stopped to impede and

7    deny access to those patrons who were trying to come in

8    and exit the BART station?"

9            Your testimony today is the same; is that

10   correct?

11       A.  Yes.

12       Q.  Your testimony is Mr. Morse was at the front of

13   the line of the march?

14       A.  There's no --

15           MR. ALLEN:  I'll object as vague as to time.

16   BY MR SIEGEL:

17       Q.  During the period that, in your opinion, there

18   was an unlawful protest, was Mr. Morse at the front of

19   the line?

20       A.  What I witnessed was Mr. Morse blocking fare

21   gates and denying access to patrons as well as Mr.

22   Cantor.  Whether there was a front of the line or back

23   of the line or middle of the line, it was more circular,

24   but what I witnessed was violations of 369i PC.

25       Q.  For purposes of today, let's call Mr. Cantor

1    BY MR. SIEGEL:

2         Q.  Is it your testimony today that Mr. Morse was

3    at the front of the line with Mr. Cantor?

4              MR. ALLEN:  Objection; vague as to time.

5              THE WITNESS:  I witnessed Mr. Cantor and

6    Mr. Morse blocking the fare gates, impeding the flow of

7    patrons into the station and out of the station.

8    BY MR. SIEGEL:

9         Q.  I understand that's your line, but you do have

10   to answer my questions.  You can't just give your stock

11   answers.

12             MR. ALLEN:  Counsel, he can give whatever

13   answer he wants.  If you don't like it and feel that's

14   not responsive, you're certainly entitled to go for a

15   ruling by the judge in chambers.  I will reassert it's

16   still vague as to time in the context of your question.

17             MR. SIEGEL:  So the record is clear, the time

18   we're talking about is the period of unlawful assembly

19   your client has identified.  The line we're talking

20   about is the line that he told IA about.

21   BY MR. SIEGEL:

22        Q.  Is it your testimony, Mr. Hartwig, that Mr.

23   Morse was at the front of the line during the period of

24   unlawful assembly?

25             MR. ALLEN:  Objection; vague as to time.

112

1       At what point during the unlawful assembly.

2       MR. SIEGEL:  At any time.

3       MR. ALLEN:  Thank you.

4       THE WITNESS:  Just as my statement states, they

5   were at the heart of the fare gates when they slowed to

6   impede and deny access to those patrons who were trying

7   to come and exit the BART station.

8   BY MR. SIEGEL:

9       Q.  We've established that the march was moving in

10  a circle.

11      MR. ALLEN:  Let's take a break.  I think I know

12  where you're going.  I don't think he does.  Let's see

13  if I can work it out.

14      MR. SIEGEL:  We have a question pending, don't

15  we?

16      MR. ALLEN:  We'll go back on the record and

17  I'll acknowledge there's a question pending.  I'm trying

18  to get him to answer your question.

19      (Recess taken.)

20  BY MR. SIEGEL:

21      Q.  Mr. Hartwig, we've established the protest was

22  moving in a circular fashion; is that correct?

23      A.  Yes.

24      Q.  That means that each piece of the circle would

25  come in front of the fare gate and leave the front of

1    the fare gate; is that correct?

2         A.  Correct.

3         Q.  Each person that was in the circle at some

4    point or another was blocking the fare gates; is that

5    correct?

6         A.  Partial -- part of the circle wouldn't stop;

7    they would keep going.  A specific part of the circle

8    was stopped directly in front of the fare gates and

9    denied access.

10        Q.  Is it fair to say what you really mean is that

11   some people blocked the fare gates more than others?

12        A.  I would -- what I witnessed was some people

13   violated 369i and others did not.

14        Q.  How many seconds do you have to block the fare

15   gates to violate 369i?

16        A.  I think it's a deliberate act where you stop

17   and there's people either in front of you or behind you

18   trying to enter the station and you're not doing

19   anything other than standing there.  I don't know a

20   specific time.  It could be five seconds, 20 seconds, it

21   could be two minutes.  But I know in the transit

22   environment watching people exit, you can tell when

23   someone is blocking and impeding the flow, and that's

24   what I witnessed.

25        Q.  Some people might have blocked the fare gates

114

1    for a split second, other people blocked the fare gates

2    for 20 seconds; is that substantially what you're

3    saying?

4         A.  I don't know that there's a specific time frame

5    attached to the Penal Code section.  I know that when I

6    see people blocking and impeding the flow of traffic

7    through the fare gates, I can recognize it.

8         Q.  People are walking in a circle and the person

9    in front stops, everyone behind that person has to stop

10   as well; isn't that correct?

11        A.  Not necessarily.

12        Q.  But that's --

13        A.  There's people jostling for position, because

14   some are taking pictures for whatever reason, they're

15   moving to the side, they're moving past the front,

16   They're moving to the rear.  That all occurred.

17        Q.  You told IA that Mr. Morse was at the front of

18   line; is that correct?

19        A.  Based upon Mr. Morse's and Mr. Cantor's

20   location, what I stated is they stopped at the heart of

21   the fare gates and blocked the fare gates.  And then

22   they would continue to march around, and when they got

23   back to the fare gates, they would stop again and delay

24   and continue to block the flow of traffic.

25             MR. SIEGEL:  Could you read back the question?

1           (Record read.)

2           THE WITNESS:  I stated they were at the front

3    of the line, yes.

4    BY MR. SIEGEL:

5           Q.  Is that still your testimony now?

6           A.  Yes.

7           Q.  For how long approximately was Mr. Morse at the

8    front of the line?

9           A.  I was not timing Mr. Morse or anybody else.  I

10   have no idea.  Mr. Morse moved about.  He wasn't in one

11   location for any one period of time.

12          Q.  He didn't block the fare gates the whole time?

13          A.  No.

14          Q.  He didn't stand with Mr. Cantor the whole time?

15          A.  No.

16          Q.  Other people stood with Mr. Cantor?

17          A.  Yes.

18          Q.  Other people blocked the fare gates?

19          A.  Yes.

20          Q.  Other journalists stood with Mr. Cantor?

21          A.  Very possibly, yes.

22          Q.  Other journalists blocked the fare gates?

23          A.  Very possibly, yes.

24          Q.  You didn't arrest any other journalists?

25          A.  I didn't witness others what I witnessed

116

1    Mr. Morse doing.

2        Q.  Did you ask the other officers if they

3    witnessed any such thing?

4        A.  I did not.  They had the authority to take

5    action based upon what they witnessed.

6        Q.  Isn't the reason you focused on Mr. Morse that

7    you received a BOLO that identified him to you?

8            MR. ALLEN:  Objection; misstates his testimony,

9    it's argumentative.

10           THE WITNESS:  I stated I received -- I didn't

11   see that BOLO until after the event.

12   BY MR. SIEGEL:

13       Q.  You had a Blackberry at the time, did you not?

14       A.  I stated I received an e-mail from Deputy Chief

15   Fairow which may include that BOLO.  I did not open it

16   up.  I received a hard copy of the operations order,

17   which I referred to for this event.  If I even knew

18   there was a BOLO, I knew Mr. Id and Mr. Cantor.  I was

19   with them at every protest, excluding one that I'm aware

20   of.  I didn't need to look at any identifying

21   information.

22       Q.  You've already testified that Mr. Morse didn't

23   break any law prior to this protest; isn't that right?

24       A.  Not that I'm aware.

25       Q.  Why do you associate the two, Mr. Morse and

1    Mr. Cantor?

2         A.   In multiple events, I would see them

3    interacting verbally, conversation, walking together,

4    moving from one station to another station together.

5    All the things that protesters do that fall within the

6    legal ramifications of protest, I witnessed it multiple

7    times.

8              MR. SIEGEL:   Sorry, Dale.  Am I boring you?

9              MR. ALLEN:   I think you're taking a great

10   deposition.

11             MR. SIEGEL:   Just giving you a hard time.

12   BY MR. SIEGEL:

13        Q.   You told IA Mr. Morse looks like a protester.

14             Do you recall that?

15        A.   I would have to see the context, because we all

16   look like protesters.  I found it.

17        Q.   We're looking at page 23, stamped BART 28 in

18   the middle of the page.

19        A.   Right.

20        Q.   You stated, "that's the conundrum with Mr. Id."

21             I just want to clarify for the record that I

22   had it wrong.  Dave Id, he was a psychology student.

23   It's a witty nom de pen.

24             MR. ALLEN:   Give us a line number, too.

25             MR. SIEGEL:   That was my aside.

129

1      Q.  Do you remember hearing his voice that day over

2  the radio?

3      A.  I can't specifically recall that, no.  It's a

4  rare occasion when a deputy chief gets on the radio.

5      Q.  After the circle closed, did you release any

6  non-journalists?

7           MR. ALLEN:  Do we refer to the students as

8  journalists or not journalists?  Point of clarification.

9  I'll let your question stand.  I'm curious.

10          MR. SIEGEL:  I would include student

11  journalists within journalists.

12          THE WITNESS:  To my knowledge, nobody was

13  released other than journalists.

14 BY MR. SIEGEL:

15     Q.  Essentially at that point if you had a press

16 pass, it was a get-out-of-jail-free card?

17     A.  No.

18          MR. ALLEN:  Objection; mischaracterizes his

19 testimony and it's argumentative.

20 BY MR SIEGEL:

21     Q.  You released journalists after closing the

22 circle, correct?

23          MR. ALLEN:  Objection; asked and answered.

24          THE WITNESS:  Journalists were released after

25 they were identified and verified by officers at the

1    scene.

2    BY MR. SIEGEL:

3        Q.   Were the officers polled to ask if any of them

4    had probable cause against the journalists who were

5    being released?

6        A.   Not to my knowledge.

7        Q.   And you conducted the survey, so to speak, for

8    journalists after Mr. Morse was removed; is that

9    correct?

10       A.   Yes.   The inner circle was too active when

11   Mr. Morse and Mr. Cantor were present.

12       Q.   Do you know if Mr. Coduti -- Officer Coduti

13   offered David Morse the opportunity to present his press

14   pass as an excuse, so to speak, for being in the circle?

15       A.   I would have to refer you to Officer Coduti.   I

16   wasn't present.

17       Q.   Did you give a press conference on September

18   8th, 2011?

19       A.   I believe we had a brief press conference at

20   the Powell Street primary end.

21       Q.   And you remember speaking to the media?

22       A.   Multiple, yes.

23       Q.   Do you recall telling the media that police

24   created safe passage through the fare gates?

25       A.   Doesn't sound like a statement I would make.   I

1    would need to hear the statement I made.

2        Q.  At one point after you stopped the circling

3    march, to use your language, the police created a line

4    that provided some space of separation for people to

5    enter and leave the station?

6        A.  The purpose of the skirmish line was to move

7    the crowd away from the fare gates.  I believe once that

8    was done, then access was regained, yes, to the fare

9    gates.

10       Q.  At that time, once access was regained, did you

11   consider simply letting people go?

12       A.  At that time, we read the dispersal notice.

13       Q.  So after the line in front of the fare gates

14   and before the circle --

15       A.  Yes.

16       Q.  -- you read a dispersal notice?

17       A.  To the best of my recollection, that's when it

18   was read, yes.

19       Q.  Did you tell the media that some journalists

20   were offered a chance to leave the kettle and refused?

21       A.  I think I did state that, yes.

22       Q.  Which journalists refused to leave the kettle?

23       A.  I think there was a specific journalist

24   representative from Channel 2 that was in the circle

25   that was advised of the dispersal notice multiple times

1    and chose to remain in the circle.

2         Q.  Do you remember why or what the person said?

3         A.  I know she was advised directly that she would

4    be arrested if she remained in the circle, and I was not

5    present after that.  I came back, and she was still in

6    the circle.

7         Q.  Do you recall telling the media that, quote,

8    unquote, legitimate members of the media were identified

9    and released?

10        A.  I think I did say that.

11        Q.  What is a legitimate member of the media?

12        A.  People that we could identify as members of the

13   media.  Their identification and/or job representative

14   ID card, press pass.  I've -- go ahead.

15        Q.  What would be an illegitimate member of the

16   media?

17        A.  Somebody professing to be a journalist or a

18   member of the media that, in fact, is not.  I did not --

19   to my recollection, we didn't have that situation.

20        Q.  You weren't thinking of David Morse when you

21   said legitimate versus illegitimate?

22        A.  No.  I was going to refer to Vivian Ho and how

23   I identified her.  It was brought to my attention by

24   BART media that she was in custody, and they knew for a

25   fact her to be a reporter from the Chronicle.  So I

1    directed the officers to have her identified and

2    released.

3         Q.  Do you know who this person is?

4         A.  I do not.

5              MR. ALLEN:  Are you going to mark it as an

6    exhibit?

7    BY MR. SIEGEL:

8         Q.  Have you heard the name Christopher Ream

9    before?

10        A.  Christopher Ream?

11             MR. ALLEN:  I'm going to ask you to mark that

12   as an exhibit when you show a photo to my client and ask

13   him questions about it.

14   BY MR. SIEGEL:

15        Q.  Putting aside the photograph, do you know

16   anybody in the Bay Area named Christopher Ream, R-e-a-m?

17        A.  R-e-a-m, I do not.

18             MR. SIEGEL:  I'd like to mark this as the next

19   in order.

20             (Plaintiff's Exhibit 10 marked for

21             identification.)

22   BY MR SIEGEL:

23        Q.  What is this document?

24        A.  It's an event record.

25        Q.  What is an event record?

138

1      A.   Deputy Chief Jan Glenn-Davis.

2      Q.   And does this refresh your recollection

3   regarding your earlier testimony, or do you still

4   believe you did not make any orders at that time?

5      A.   I never said I didn't make orders.

6      Q.   Do you recall making any orders at about that

7   point in the protest?

8      A.   That is -- that is very likely, that I gave

9   orders.

10      Q.   What orders do you remember giving, if any?

11      A.   I directed the team to close the circle.

12      Q.   At 1726, two entries down, it reads, "S57:

13   Closing station" -- I assume -- "and reading dispersal

14   order."

15           Does this refresh your recollection that the

16   dispersal order was read after the circle was closed?

17      A.   I think that's just an interpretation of the

18   way the dispatcher logged it in.  Based upon my

19   recollection, what I recall is before the circle was

20   closed, the last dispersal order was read.

21      Q.   Was the protest declared an unlawful assembly?

22      A.   I do not recall the specific language utilized

23   for the dispersal notice.  I believe in the admonishment

24   that is inclusive.

25      Q.   I'm looking at Exhibit 2, the operations order,

141

1          MR. SIEGEL:  I'd like to introduce the next

2     exhibit, please.

3          (Plaintiff's Exhibit 11 marked for

4          identification.)

5     BY MR SIEGEL:

6       Q.  Mr. Hartwig, this document was given to us by

7     BART in the course of discovery.  It appears to be an

8     e-mail exchange between Shane Coduti and yourself.  If

9     you have complaints about the formatting of this

10    document, you'll have to complain to your attorneys, I

11    think.

12          But I would like to direct your attention

13    two-thirds of the way down, and in between the

14    formatting there is a statement in there.  And I will

15    read for you what I think the statement is if you take

16    out the unnecessary formatting symbols.

17          The way I read it is:  "I just wanted to inform

18    you I was subpoenaed for a 369i case from the September

19    8th, 2011, protest.  This protest was conducted by the

20    No Justice No BART group at the Powell Street BART

21    station.  The defendant in the case is David Morse.

22    This involves the case where you witnessed a violation

23    and ordered me to arrest Morse.  I wanted to see if you

24    could come to court so you could explain what you saw to

25    the judge, to make this violation stick."

1          Do you see those words?

2     A.   Yes.

3     Q.   Does this refresh your recollection about

4 receiving an e-mail from Shane Coduti?

5     A.   Yes.

6     Q.   Is Mr. Coduti telling the truth in this

7 message?

8     A.   No.   I don't think he's lying.   We had a

9 conversation where I met with him afterwards and asked

10 him to come to my open office where we discussed this

11 matter.

12     Q.   If he's not telling the truth and he's not

13 lying, how would you describe this statement?

14     A.   As I spoke with Officer Coduti, his citation

15 and his probable cause were all included in his report,

16 and that was all that was needed for this event.   Then

17 if he wanted to tell the judge that I was there, he can

18 certainly do so, but I wasn't going to court with him.

19 I don't have time to go to court with each officer.

20     Q.   Is it true when he writes you witnessed a

21 violation?

22     A.   Yes, I did.

23     Q.   Is it true when he writes, "you ordered me to

24 arrest Morse"?

25     A.   I did not.

1      Q.  He was wrong?

2      A.  I directed him to remove Mr. Morse from the

3   circle and take him to the backroom.

4      Q.  Was anybody removed from the circle but not

5   arrested?  That's a bad question.

6          Other than the journalists who were removed

7   from the circle and allowed to be free, was anyone

8   removed from the circle taken to the backroom and then

9   released?

10      A.  Cited and released, yes.

11      Q.  How many?

12      A.  I don't know.  But I know there were.

13      Q.  To the best of your knowledge, what was the

14   distinction between Mr. Morse and those other

15   individuals?

16      A.  I was not in the backroom --

17          MR. ALLEN:  Go ahead.

18          THE WITNESS:  -- when that was determined, so I

19   couldn't tell you why.

20          MR. SIEGEL:  Exhibit 12.

21          (Plaintiff's Exhibit 12 marked for

22          identification.)

23   BY MR SIEGEL:

24      Q.  Now, tell me if I'm wrong, but my understanding

25   of this document is that it is a later e-mail exchange

1    attending?"

2        A.  Sandra is an administrative assistant in admin

3    handling subpoenas and court cases.  She apparently told

4    him the case was still active.  I thought she was wrong.

5        Q.  And then at the top of the e-mail, which I

6    guess was the message you actually sent at 1:23 p.m. on

7    July 21st, 2012, it states, "call me at" and lists the

8    phone number.

9        A.  That's my office.  That was my office.  I

10   believe that's when I invited him to come speak with me

11   face to face.

12           (Plaintiff's Exhibit 13 marked for

13           identification.)

14   BY MR SIEGEL:

15       Q.  Mr. Hartwig, when you were still working with

16   BART PD, did you have a Google alert set up?

17       A.  Yes.

18       Q.  This alert basically sent you articles about

19   BART as they came on the internet?

20       A.  Yes.

21       Q.  Am I right that through this Google alert you

22   sometimes received articles written by Mr. Morse?

23       A.  I do not recall specifically receiving articles

24   from Mr. Morse through this alert.

25       Q.  When you received one of these alerts, what was

1  your practice?

2        A.  I would usually check it out, see what it was

3  referring to and/or delete it.

4        Q.  Exhibit 13 shows that you received an

5  alert about an article that Dave Id wrote; is that

6  correct?

7        A.  Yes.

8        Q.  It was an article that announced a press

9  conference on the release of a shooting Charles Hill

10 video.

11       A.  Yes.

12       Q.  Ken Dam was your Intel officer on September

13 8th?

14       A.  Yes.

15       Q.  Why was he focusing on Mr. Morse as a

16 subject?

17       A.  You would have to ask Officer Dam.  His purpose

18 was to gather intelligence information regarding

19 activities that occurred within the BART properties.

20       Q.  Do you consider or did you consider Mr. Morse

21 to be a dangerous individual?

22       A.  No.

23       Q.  Did you consider him to be a threat to the

24 operation of BART?

25       A.  No.

1              REPORTER'S CERTIFICATE

2

3

4          I, SANDRA M. LEE, a Shorthand Reporter, State of

5     California, do hereby certify:

6          That DANIEL O. HARTWIG, in the foregoing

7     deposition named, was present and by me sworn as a

8     witness in the above-entitled action at the time and

9     place therein specified;

10          That said deposition was taken before me at said

11     time and place, and was taken down in shorthand by me, a

12     Certified Shorthand Reporter of the State of California,

13     and was thereafter transcribed into typewriting, and

14     that the foregoing transcript constitutes a full, true

15     and correct report of said deposition and of the

16     proceedings that took place;

17          That before completion of the proceedings,

18     review of the transcript was not requested.

19          IN WITNESS WHEREOF, I have hereunder subscribed

20     my hand this 1st day of November, 2013.

21

22

23

24          _____
           SANDRA M. LEE, CSR NO. 9971
25          State of California

# EXHIBIT B

# EXHIBIT 1
# to the Deposition of Daniel Hartwig

CONFIDENTIAL



Bay Area Rapid Transit Police Department
Policy Manual

PLAINTIFF'S
Exhibit No. 1
D. HARTWIG
10-15-13

# Tactical Team & Crowd Control

### 459.1   PURPOSE AND SCOPE
The primary unit within the department responsible for crowd management and crowd control operations is the Tactical Team.  The Tactical Team will be commanded by a lieutenant and will be made up of sufficient supervisors and officers to enable the team to effectively respond to crowd events that impact the BART system. Team members will receive regular training in crowd management and crowd control techniques, legal issues and integrated team operations.

This department's policy regarding crowd management and crowd control is to apply the appropriate level of direction and control to protect life, property, system facilities and maintain public peace and order and to uphold the constitutional rights of free speech and assembly.  This should be accomplished using the minimal amount of physical force and authority reasonably required to address crowd management and crowd control issues.

### 459.2   DEFINITIONS
**Crowd Management:** Is defined as techniques used to manage lawful public assemblies before, during and after the event for the purpose of maintaining the event's lawful status and assisting in the efficient movement of patrons through the system.  This can be accomplished in part through coordination with event planners and group leaders, coordination with allied agencies and by consulting after-action reports from prior events.

**Crowd Control:** Is defined as techniques used to address unlawful public assemblies, including a highly visible police presence, crowd containment, dispersal tactics and arrest procedures.

**Expressive Activities:** Include all forms of speech and expressive conduct used to convey ideas and/or information, to express grievances or to otherwise communicate with others, and includes both verbal and non-verbal expression. Common expressive activities include, but are not limited to: speeches, demonstrations, vigils, picketing, distribution of literature, holding of banners or signs, use of puppets to convey a message, street theater and other artistic forms of expression. These activities involve the freedoms of speech, association and assembly and the right to petition the government as guaranteed by the First Amendment of the United States Constitution and Article 1, Sections 2 & 3 of the California Constitution.

**Demonstration/Civil Disturbance/Protest/March:** Are generic terms which include a wide range of expressive activities which require, or may require, a police response. They include, but are not limited to: marches, protests, student walk-outs, assemblies and sit-ins.  Such events and activities generally attract a crowd of persons, including participants, onlookers, observers, media and other persons who may disagree with the point of view being expressed.

**Crowd Event:** Includes all crowd situations that impact the District, including sporting events, festivals, concerts, celebratory crowds and other large gatherings that are unrelated to the expression of a political, social or ideological point of view.

**Grenadier:** Is a sworn officer trained in the use of the SIMS launcher and the deployment of crowd control chemical agents.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019342

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

**Squad/Team:** Are terms used to describe a tactical unit, usually comprised of 4 - 6 officers and a sergeant.

**Platoon:** Is a term used to describe a tactical unit comprised of multiple squads, normally commanded by a lieutenant.

## 459.2.1   GENERAL PRINCIPLES

- All persons have the right to march, demonstrate, protest, rally or perform other activities protected by the First Amendment of the United States Constitution and California Constitution. The right to carry out First Amendment activities comes with the responsibility to **not** abuse or violate the civil and property rights of others. The responsibility of law enforcement is to protect the lives and property of all people. The government may impose reasonable and narrowly tailored restrictions on the time, place and manner of conducting these First Amendment activities. However, any limitations or restrictions placed on demonstrations or other First Amendment activities must be justified by the requirements of maintaining public safety, public health or safe access/egress, and should restrict no more speech than necessary to further these substantial government interests. Officers must not allow themselves to be affected by the content of the opinions being expressed, nor by the race, gender, sexual orientation, physical disabilities, appearance or affiliation of anyone exercising his/her lawful rights.

- The District will, upon application to the Department of Media and Public Affairs, consider issuing permits to groups wishing to conduct expressive activities. These permits contain provisions to maintain public safety and safe access to the system. Expressive activity must be conducted in the free areas of the BART system and may not impede access to station entrances/exits, ticket machines, fare gates or patron/customer walkways. Groups are permitted to pass out informational material, display signs, banners and like materials, engage patrons in conversation, solicit signatures, accept monetary donations and sell ideological materials such as books, clothing and other materials relating to the group's message/beliefs. Those engaged in expressive activity may not use amplified sound equipment, nor may they sell materials unrelated to their cause.

- The primary purpose of the San Francisco Bay Area Rapid Transit District (BART) is to provide, safe, secure, efficient, reliable, and clean transportation services to its passengers. In furtherance of its function as a provider of public transportation, the District intends that its property and facilities be used for public transit related activities.  The District's transportation interests include maintaining and ensuring safe and secure transit properties consistent with its security readiness policies and procedures; preventing delays and inconvenience to passengers by minimizing congestion and expediting their entering and exiting BART Stations and their boarding, transferring, and de-boarding of BART trains; and reducing litter pick-up and other maintenance and administrative expenses so as to maximize public transit services.  To prevent interference and obstruction with the District's primary transportation responsibilities and to protect its facilities, while at the same time accommodating expressive activities that are constitutionally protected by the First Amendment to the United States Constitution and the Liberty of Speech Clause of the California Constitution (expressive activity), the District has made available certain areas of its property for expressive activity and has instituted the following Rules.  The rules of the San Francisco Bay Area Rapid Transit District Pertaining to the use of District facilities for expressive activities can be located at: http://www.bart.gov/about/business/permits/eapermits.aspx

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019343

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

- Despite the District's desire that groups obtain an expressive activity permit prior to conducting their activity, there is no legal remedy available to officers if groups do not, or will not, obtain such permits. Absent a violation of a criminal code (e.g. Penal, Vehicle or Municipal Codes), groups and individuals will be allowed to conduct expressive, or First Amendment, activities within the free areas of the system whether or not they possess a permit issued by the District. Expressive Activity permit rules and applications may be obtained for last minute, non-permitted events through the BART Police Department's Watch Commander office at 510-464-7020. Organizers should contact this number and have an available fax number or email account where the permit rules and application can be sent. A return fax and email will be provided by the on-duty Watch Commander.

- The Incident Command System will be used for managing crowds and acts of civil disobedience.

- Ideally, the Incident Commander at a crowd event will be the Tactical Team commander or a patrol lieutenant.  However, there may be situations where a sergeant is designated as Incident Commander, particularly at spontaneous events. Decisions about crowd dispersal, general strategy for crowd containment or redirection, multiple simultaneous arrests, planned individual arrests or planned use of force should be made at the level of the Incident Commander or above. If such decisions are made by higher ranking off-site BPD officials (e.g., watch commander, Patrol Bureau commander or the Chief), the Incident Commander should first be consulted about the situation in the field and the potential impact of these decisions before they are implemented. All such decisions should be documented in writing, noting the time, identity of the official making the decision and the precise decision and directions given.  The Incident Commander, or his/her designee should make field notes of such decisions as soon as possible.  Such decisions and orders should then be documented in a supplemental police report. This does not preclude actions consistent with the orders of the Incident Commander taken by individual commanders, supervisors or officers in order to defend themselves or others from imminent danger.

- The on-duty watch commander and Patrol Bureau commander should be notified as soon as possible of large or potentially disruptive demonstrations or crowd events.

- Officers should, whenever possible, follow the principle of establishing and maintaining communications with the demonstration planners.  Incident commanders assigned to these incidents should facilitate the involvement of event planners/organizers and attempt to gain their cooperation regarding the activities planned, without regard to whether a permit has been applied for or issued. When communication is established, the Incident Commander should attempt to maintain regular contact with the group's representative in order to reduce potential disruptions.

- Some groups may refuse to cooperate with this department and may refuse to communicate.  Other groups may not have any defined leaders.  However, the Incident Commander should attempt to establish liaison with each protest group as early in the event as possible, continuing until the event terminates, even if enforcement actions commence.

- Spontaneous demonstrations or crowd events, which occur without prior planning and/or without prior notice to the police, present less opportunity for police planning and prevention efforts.  Nonetheless, the same principles concerning crowd management, crowd control, crowd dispersal and police responses to violence and disorder apply to spontaneous events as to planned demonstrations. Incident Commanders should involve representatives of demonstration groups during

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019344

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

planning and responding to both planned and spontaneous events, whenever possible.

- Officers should maintain a professional demeanor, and remain neutral in word and deed, despite unlawful or anti-social behavior on the part of crowd members. Unprofessional police behavior can inflame a tense situation and make control efforts more difficult and dangerous. Strong supervision and command are essential to maintaining a unified, measured and effective police response. A response incorporating strong leadership and based on teamwork is crucial to maintaining control and safety for officers and the public. Impulsive or independent actions by officers should be avoided.

- When possible, before and during crowd events, some officers should be deployed to the best available vantage points in order to observe and report crowd actions and movements.

- Lines of containment/control, using physical or visual barriers (interlocking metal barricades, cones, yellow tape, etc...), should be established, especially in events that involve protesters with opposing views. Whenever possible, hostile factions should be separated by physical barriers.

- Considering the type of crowd expected to be involved is an important factor in responding properly to the crowd's behavior. Crowds may vary from cooperative or celebratory, to non-compliant and hostile or combative. Organized demonstrations in which some engage in coordinated non-violent civil disobedience should be distinguished from crowds in which substantial numbers of people are engaged in other types of unlawful acts.

- Tactics employed by demonstrators involved in civil disturbances frequently include efforts to draw the police and other public officials into responses likely to produce violence and injury to participants and thus garner support for their cause. It is therefore incumbent upon officers to resolve disruptive situations in a manner which will minimize the potential for violent confrontations by performing their assigned tasks within the framework of this policy.

## 459.2.2   POLICING THE CROWD

Sufficient resources to make multiple, simultaneous arrests should be available at demonstrations where such arrests are a reasonable possibility. However, this must be balanced against the fact that a large and visible police presence may have a chilling effect on the lawful exercise of free speech rights, or may inflame the crowd. Where additional resources are needed, consideration should be given to staging a mobile reserve force of officers in a location that is nearby but not readily visible to the crowd. When possible, officers should be at their posts well in advance of arriving participants. Officers should be positioned at a distance that allows a timely response, but avoids the perception of intimidation.

Officer should work in squads or platoons when policing a demonstration, and should not enter or engage the crowd alone. Officers should wear their designated Tactical Team uniform when performing crowd duties. The uniform should bear the officer's name or identification number, as required by 830.10 PC. Tactical Team officers should also affix their identification numbers to the outside of their helmets.

Crowd control and crowd dispersal, as well as a show of force in crowd control situations, should be accomplished whenever possible using Tactical Team personnel, rather than on-duty patrol officers.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019345

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

It is important to recognize that all members of a crowd of demonstrators are not the same. Not all crowd situations involve civil disobedience or violence. Law enforcement's responsibility is to objectively discern at what point a demonstration leaves the realm of legal protest and becomes an abridgment of the rights of others. Even when some members of a crowd engage in violence or destruction of property, there will be other members of the crowd who neither condone nor participate in such acts. However, once some members of a crowd become violent, the situation often becomes chaotic and many individuals in the crowd who do not want to participate in the violent or destructive acts may be blocked from leaving the scene by the sheer size of the crowd, or because they are afraid they will move into a position of increased danger. This does not mean that officers cannot take enforcement action against the crowd as permitted under this policy, but officers should seek to minimize the risk that force and arrests may be directed at innocent persons.

Officers should avoid negative verbal engagement with members of the crowd. Officers should not argue or otherwise engage members of the crowd in a debate regarding the political, ideological or social views being expressed by the crowd. Verbal abuse against officers, by itself, does not constitute a reason for detention or arrest, or for any use of force against any individual member of the crowd. Crowd members whose behavior escalates from simple verbal abuse or insults to behavior which meets the elements of criminal threats against an officer or other person (69 or 422 PC) should be identified and detained/arrested for the criminal violation as soon as that can be accomplished safely and in a coordinated fashion, at the direction of a supervisor.

Officers in non-violent crowd situations should not display or brandish weapons (firearm, SIMS, TASER, baton) before a dispersal order is given or other enforcement action is being implemented, except as delineated in this policy.

Officers should not be sent into an obviously hostile crowd solely for the purpose of communication. Officers should not penetrate a crowd for an individual arrest unless the targeted individual is involved in serious criminal conduct and the decision to move into the crowd is made by a supervisor and adequately coordinated with the rest of the team.

The Incident Commander and supervisors should make every effort to ensure that the police mission is accomplished as safely, effectively and unobtrusively as possible, with the highest regard for the human dignity and liberty of all persons, and with minimal reliance on the use of physical force and authority. The use of force shall be restricted to circumstances authorized by law and to the degree reasonably necessary in light of the circumstances confronting officers. This does not preclude police officers from taking appropriate action to direct crowd and vehicular movement, enforce ordinances and statutes and employ the physical force necessary to maintain the safety of the crowd, the general public, law enforcement personnel and other emergency personnel.

## 459.2.3   RESPONSES TO CROWD SITUATIONS

(a)   **Spontaneous Event or Incident:**

1.   The first officer or other police employee at the scene of a civil disturbance should observe the situation from a distance and evaluate it carefully before taking action. The employee should notify a supervisor as soon as possible.

2.   A supervisor and, if practicable, the watch commander, should respond to the scene of spontaneous events and take command of the incident as Incident Commander, until relieved by a ranking officer. The Incident Commander should

---

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019346

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

declare over the police radio that he/she has assumed command of the incident. A command post should be established as soon as possible.

3. An immediate assessment of the situation is essential for effective police response. The Incident Commander must ascertain the following information as quickly as possible:

   (a) The location and type of event.

   (b) Are a significant number of the crowd participants behaving unlawfully?

   (c) First Amendment activities will be evaluated by the Incident Commander to determine the lawfulness of the actions taking place. Specifically, actions and speech protected by the First Amendment include such things as rallies, protests, picketing, marches, parades and leafleting. Actions or behavior involving trespass, destruction of property, disruption of transportation, unlawful use of amplification devices, assaults and disturbances of the peace are not protected by the First Amendment.

   (d) Are there a limited number of specific individuals engaged in unlawful behavior?

   (e) Is there a likelihood that the unlawful conduct will spread to other crowd participants (mimicking)?

   (f) Are there immediate threats to the safety of the public and/or police officers?

   (g) Structures or vehicle(s) involved.

   (h) The size of the involved area.

   (i) The potential for disruption to normal revenue train service.

   (j) The number of additional officers and police resources needed as well as requirements for specialized units (Tactical Team, Special Weapons and Tactics, Hostage Negotiation Team).

   (k) The manner of response for additional units (Code 2 or 3).

   (l) Identification of a staging area for arriving resources and the location of the command post.

   (m) Ingress and egress routes.

   (n) Potential need for additional outside resources (paramedic, fire department, Power and Way, mutual aid requests, etc.).

(b) **Planned Event Involving Potentially Large Crowds:**

1. Upon notification of a large, planned event, the Tactical Team commander or designee should develop an operations plan. Operations plans for large events requiring the redeployment of personnel from regular assignments should be approved by the Patrol Bureau commander. The Incident Commander of planned events is responsible for the overall coordination of the event, as well as crowd control and management.

2. The following factors should be considered in developing the operations plan for a large crowd event, including, but not limited to:

   (a) What type of event is to occur (protest, sporting event, concert, etc.)

   (b) Who is organizing the event? What is their past record of conduct (peaceful, cooperative, violent, etc.)? If the event is recurring, past operations orders and after-action reports should be reviewed to assist in developing a response.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019347

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

---

      (c)    What is the potential for counter-demonstrations?

      (d)    Will the event involve the use or sales of alcohol at the hosting venue, or the potential for abuse of other intoxicants?

      (e)    Where is the event going to occur? Consider size, location, ingress and egress routes.

      (f)    What are the optimal sites for a command post, staging area, rest area, etc.?

      (g)    Has the group requested, or been granted an Expressive Activity Permit?

      (h)    Have other agencies/departments been notified and included in the planning process (Transportation, Operations, allied police agencies)?

      (i)    Will the Emergency Operations Center or mutual aid be required?

      (j)    Is it possible or appropriate to coordinate with the group organizers and explain the department's mission, preparation and potential responses? Information considered sensitive should not be released to group organizers if it will jeopardize the safety or effectiveness of police personnel.

      (k)    Have the proper number of officers been scheduled to safely handle the event? Should a reserve or on-call contingent be made available?

      (l)    Has an enforcement strategy been formulated and communicated to affected personnel?

3.    The Tactical Team commander is responsible to:

      (a)    Coordinate with affected specialized units, departments and allied agencies to prepare and coordinate the development of an operational plan that details assignments, traffic and crowd flow, communications and tactics.

      (b)    Prepare the written operations order, using the five section SMEAC format (Situation, Mission, Execution, Administration, Command & Control).

      (c)    Coordinate inspection of the protest/event site prior the event, to locate any pre-positioned equipment staged by demonstrators. All available intelligence information relating to the group's identity, history and purpose should also be gathered to assist in the planning process.

      (d)    Ensure that appropriate equipment and supplies are available.

      (e)    Ensure that a video operator and required equipment are available.

      (f)    Establish protocols for and procedures for processing of arrestees and the collection of evidence.

      (g)    Personnel should be briefed on the operations plan and their particular assignments before deployment. Specific instructions covering topics such as applicable laws, community concerns, appropriate enforcement actions, chain of command, tactics, traffic patterns, intelligence, etc., should be clearly presented to all personnel and all questions and concerns answered.

(c)    **Special Events at Coliseum Complex:**

1.    The Oakland Coliseum Station is frequently impacted by special events being held at the Coliseum Complex (the Stadium and Arena). During events at the Coliseum Complex, the department's primary responsibility is to ensure the safe and expeditious movement of people arriving and departing these events,

---

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019348

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

as well as to deter lawlessness. By mutual agreement between involved agencies (BART PD, Oakland PD and the Alameda County Sheriff's Office), this department is responsible for policing the BART station, station parking lots, the sidewalk adjacent to the station on the north side of San Leandro Street and the pedestrian bridge connecting the station and the Coliseum Complex, to the south pedestrian gate where the walkway connects to the stadium itself.

2.  Depending on the size of the anticipated crowd and the type of event being held, the Patrol Bureau commander, or his/her designee, will determine whether the Tactical Team will be assigned to provide crowd control, or whether the event will be staffed by patrol and/or special event officers. The following staffing guidelines may apply:

    (a)  Projected crowd events of 10,000 to 20,000 recommended staffing of a minimum of two officers.

    (b)  Projected crowd events of 20,000 to 40,000 recommended staffing of a minimum of four officers and one sergeant.

    (c)  Projected crowd events exceeding 40,000 recommended staffing of six to eight officers and one or two sergeants.

3.  For special events with a heightened potential for disruptive behavior, the Patrol Bureau commander may determine whether to staff the event with the Tactical Team or with the number of special event officers deemed appropriate, regardless of the expected crowd size.

4.  Unless authorized by a supervisor assigned to the special event, officers working special event overtime for Coliseum events will report to the Zone 1 squad room on the date and time posted to receive their assignments prior to reporting to the Coliseum or other location. Upon completion of the event and dispersal of the crowd, only a supervisor assigned to the event may release officers from their fixed-post assignments and authorize their return to Lake Merritt or another location.

5.  While performing crowd management/crowd control duties at Coliseum events, if staffing permits, at least two officers should be assigned to the platform as patrons arrive for the event. Once the platform clears and large numbers of patrons are no longer arriving, these officers may be reassigned to other locations in the interior or perimeter of the station. The supervisor(s) responsible for the event should assign available officers to cover as many of the following locations as possible, in descending priority order:

    - Fare gates

    - Free area

    - Pedestrian tunnel

    - Pedestrian walkway

    - Mobile patrol of station parking lots

6.  All rest breaks, including meals, if applicable, should be coordinated by the supervisor(s) in charge of the event. During major events, at least two officers should remain at the station at all times.

7.  Unless assigned, or handling a call for service or detaining multiple suspects, officers should not congregate in public view in groups of three or more. Roving patrols should be maintained on the walkway, in the pedestrian tunnel and in the parking lots when staffing permits. Any personnel assigned to a Coliseum event

*Tactical Team & Crowd Control - 404*

B.A.R.T. - 019349

# Bay Area Rapid Transit Police Department
Policy Manual

detail may be reassigned to other duties, including beat coverage, prisoner transport, or train patrol.

8.  As post-event crowds return to the station, officers should patrol platforms, monitor escalators, elevators and other areas of the station as assigned. If available, officers should be assigned to the top and bottom of operating escalators in order to regulate crowd movement and prevent mishaps. If necessary, officers should stop ascending riders until the platform clears sufficiently to allow more patrons to safely disembark the escalator at platform level.

9.  If available, a mobile officer or beat officer should be assigned to patrol the parking lots. A supervisor may assist with any of the aforementioned duties and will coordinate with Transportation supervisors throughout the event.

(d)  **Special Event Sergeant's Duties:**

1.  Ensure all personnel are given assignments and perform their assigned duties.

2.  Ensure officers are at their posts at least one hour prior to the start of the event and at least thirty minutes before the anticipated end of the event, or when significant crowds begin returning to the station.

3.  Coordinate with Transportation personnel to monitor escalator usage and platform crowding to ensure patron safety.

4.  Coordinate movement of patrons through fare gates to the platform.

5.  Prevent intoxicated or unruly patrons from entering the paid area.

6.  Supervise officers assigned to the event and direct law enforcement efforts.

7.  Assign officers to handle calls for service at the Coliseum Station during the event.

## 459.2.4   USE OF FORCE IN CROWD CONTROL/MANAGEMENT SITUATIONS

When dealing with crowds and civil disobedience situations, law enforcement must be a disciplined and well-organized control force. The decisions to use force and the force options that may be applied in response to these incidents range from officer presence to deadly force. Peace officers need not use the least intrusive force option, but only that force which is objectively reasonable under the totality of the circumstances.

All uses of force by sworn officers are governed by the department's use of force policies (300, 304, 308 & 309) and applicable federal and state laws. Nothing about a crowd control situation eliminates or changes any of the constraints or policies governing the use of lethal or less-lethal force. Officers must be able to provide clear, detailed, articulable facts that would reasonably justify any use of force against a particular individual. Uses of force during a crowd control situation shall be treated as any other use of force and reported using the normal reporting procedures. Officers are required to provide appropriate first aid following any use of force.

(a)  **Canines:** Police canines shall not be used for crowd control, crowd containment or crowd dispersal.

(b)  **Fire Hoses:** Fire hoses shall not be used for crowd control, crowd containment or crowd dispersal.

(c)  **Lethal Force:** Lethal force may only be used against an individual to protect an officer or another person from the imminent threat of death or great bodily injury, or to stop a violent fleeing felon who presents the imminent threat of death or great bodily

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019350

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

injury to an officer or other person if allowed to escape. Officers must be particularly mindful of the potential hazards inherent in using lethal force, particularly firearms, in a crowd control situation. The proximity of other persons to the suspect presenting the threat, as well as the movement of the suspect and onlookers, greatly increases the possibility that uninvolved persons may be injured or killed in any use of lethal force during a crowd control event. See Policy 300 for further details regarding the use of lethal force.

(d)   **Less-lethal Force:**

1.   **SIMS:** The 40mm Specialty Impact Munitions System (SIMS) launcher is capable of firing a number of less-lethal projectiles which are applicable to crowd control incidents.

(a)   Impact (foam baton & marking round) projectiles: SIMS impact rounds are direct-fire projectiles that should only be used to control or subdue a specific individual who is engaging in conduct that poses an imminent threat of injury to officers or a member of the public, through the use of pain compliance. Impact projectiles shall not be used in a non-directional, non-target specific manner, or simply in an attempt to control or disperse a crowd. Impact projectiles should not be used if they can not be targeted without unduly endangering other crowd members or bystanders. Impact projectiles shall not be used indiscriminately against a crowd or group of persons, even if some members of the crowd are violent or disruptive.

(b)   Only those sworn officers who have received approved training may use SIMS. Impact rounds should never be used against a restrained person. Officers should avoid targeting the suspect's head, neck, spine and groin when possible. Officers should only deploy the SIMS during a crowd event at the direction of a supervisor. If practicable, an audible warning should be given before deployment of SIMS. See Policy 308 for further details regarding the use of SIMS.

(c)   .60 Sting Ball Cartridge:   The .60 caliber sting ball cartridge fires approximately twenty-four .60 caliber rubber balls and is designed to be fired into the ground in front of a crowd in order to move or stop large numbers of violent or disruptive people. The balls ricochet off the ground and are intended to strike members of the crowd in the lower extremities, in a non-target specific manner. This projectile may only be employed at the direction of the Incident Commander.

2.   **TASER:** The TASER electronic control device should only be used against a specific individual who is engaging in violent or disruptive conduct that presents an imminent threat of injury to officers or a member of the public. Use of the TASER is governed by Policy 309. The TASER should not be used indiscriminately for crowd management, crowd control or crowd dispersal. Only sworn officers trained in the use of the TASER shall employ the weapon.

3.   **Impact Weapons:** The use of impact weapons is governed by Policy 308. Officers may deploy authorized police impact weapons (long baton, standard baton, short baton) in order to control or arrest a specific individual who is engaging in violent or disruptive conduct that presents an imminent threat of injury to officers or a member of the public. Batons should not be used for crowd control, crowd containment or crowd dispersal, except as specified below:

(a)   Batons may be visibly displayed and held in a ready position during squad or platoon formations.  When reasonably necessary for the protection of the officers or to disperse individuals in the crowd who are engaging

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019351

CONFIDENTIAL

## Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

in conduct that poses a clear and present danger of imminent violence, batons may be used in a pushing or jabbing motion. Baton jabs should not be used indiscriminately against a crowd or group of persons, but only against individuals who are physically aggressive or actively resisting arrest. Baton jabs should not be used in a crowd control situation against an individual who is physically unable to disperse or move because of the press of the crowd or some other fixed obstacle. Officers should not intentionally strike a person with a baton to the head, neck, throat, kidneys, spine or groin, except when a person's conduct is creating an imminent threat of serious bodily injury or death to an officer or other person and the application of lethal force would be reasonable. Batons should not be used against a person who is handcuffed.

4. **Chemical Agents:** Crowd control agents are those chemical agents designed and intended to move or stop large numbers of individuals engaged in serious unlawful activity. Crowd control agents, properly deployed by trained officers, are intended to cause temporary discomfort. The application of crowd control agents, including oleoresin capsicum (OC), has proven effective in a wide variety of civil disobedience situations. Use of crowd control chemical agents during a crowd event may be reasonable depending on the totality of the circumstances. Chemical agents can produce serious injuries through inhalation of the chemical or by exposure to hot projectiles. Thus, crowd control chemical agents should only be used when other means, such as multiple simultaneous arrests have failed or are impractical. Authorized chemical agents (OC and CS gas) are delivered in several ways and may be utilized when reasonably necessary, at the direction of the Incident Commander, in crowd control situations, as follows:

   (a) Hand held OC spray or foggers (individual OC spray or MK-9 aerosol projector) may be used to overcome active resistance and take criminal suspects into custody. They should not be used indiscriminately against a crowd or group of persons, but only against specific individuals who are engaged in serious unlawful conduct or who are actively resisting arrest. The use of OC spray is governed by Policy 308.

   (b) CS gas may be delivered by grenadier officers by means of hand thrown grenades or projectiles launched from the SIMS launcher. These delivery systems emit the chemical agent diffusely, without targeting a specific individual or individuals. Authorized CS delivery systems are the hand grenade and the 40 mm SKAT shell. These delivery systems are pyrotechnic in nature and a spotter should be available to ensure no grenades or canisters land on roof tops or others areas of fire concern.

   (c) Officers should use the minimum amount of chemical agent necessary to obtain compliance. Indirect delivery (grenade and/or SKAT shell) shall not be used in demonstrations or crowd events without the approval of the Incident Commander or command-level officer.

   (d) Chemical agents should not be used for crowd control or dispersal without first giving an audible warning of their imminent use, and reasonable time to disperse, to the crowd, media and other observers, as well as all law enforcement personnel present at the scene.

   (e) If the use of chemical agents is contemplated, medical personnel should be called as near to the scene as possible prior to its use and provision

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019352

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

should be made for decontamination and medical screening for those persons affected by the chemical agent.

(f) Factors that need to be considered in the deployment of crowd control chemical agents include:

1. The type of crowd and crowd actions
2. What violations of the law have been committed
3. Delivery methods available
4. Wind direction
5. Physical location/terrain consideration
6. Cross-contamination problems
7. Mobility of protesters (suspects)
8. Types of agents available
9. Availability of protective devices for involved officers
10. Decontamination
11. The potential exposure to children, elderly and disabled members of the crowd

(g) Because of the confined spaces and the likelihood of affecting persons uninvolved in criminal activity, CS should only be used outdoors and should not be deployed inside stations or on board trains. OC may be used inside stations or on board trains.

(h) This policy does not apply to the tactical use of chemical agents by members of the SWAT team engaged in SWAT missions.

5. **Smoke:** Saf-Smoke white smoke grenades may be deployed at the direction of the Incident Commander. Smoke may be used to screen the movement of officers, or as a distraction to focus the crowd's attention away from law enforcement activities. Smoke may also be used as a carrying agent multiplier for smaller CS munitions.

(a) Smoke grenades should not be used indoors, inside stations or on trains, due to their fire-producing capabilities.

## 459.3   CIVIL DISOBEDIENCE

Arrests will sometimes have to be made because of a demonstrator's non-violent but nevertheless illegal conduct; for example, illegal obstruction of a street or a building entrance or right of way. In such situations the supervisor of the event will decide if such arrests are to be made. Before any such arrest is made, demonstrators will be warned that they must move or risk arrest and they must be given a reasonable amount of time to comply. Those who deliberately remain in violation of the law should be arrested when it can be accomplished safely. To the greatest extent possible, demonstrators in civil disobedience situations should be talked into compliance, rather than forcibly arrested.

Passively resisting arrestees (i.e., those who go limp) should be arrested by handcuffing and then moved by either verbal persuasion, control holds, pain compliance, lifting/carrying, the use of wheelchairs, etc., depending on the circumstances and the direction of the on-scene supervisor. Control holds and pain compliance should only be used if verbal persuasion fails. Pain compliance techniques must be reasonable and should cease once the arrestee complies with the officer's lawful orders. Planning for demonstrations where

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019353

CONFIDENTIAL

## Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

civil disobedience and/or passive resistance are a possibility should take into account the various arrest techniques for passive resisters.

In some cases, demonstrators may lock arms or use mechanical locks, metal sleeves, etc., to slow down the arrest process. Where such demonstrators have been advised that they will be subject to arrest if they choose to remain, and refuse to disperse, a member of the arrest team will individually inform each demonstrator that he or she is under arrest, prior to the application of any force to remove locking devices or to move the demonstrators. The officer should continue to give verbal directions to give the arrestee a chance to comply before force is used to unlock arms, or implements are used to remove lock boxes. Arrestees should also be informed that the removal of locking devices may cause them injury.

### 459.4   ARRESTS

When arrests are necessary, the Incident Commander should attempt to ensure that sufficient numbers of police officers are present to safely effect the arrests. When mass arrests are contemplated in advance, and it is impractical for arrestees to be cited at the scene, pre-arrangement of transportation should be made.

The Incident Commander should make the decision to engage in selective individual arrests or multiple simultaneous arrests as a crowd control technique, with consideration given to the likelihood that police action will improve the situation relative to taking no action; the seriousness of the offense(s) as opposed to the potential for the arrest to escalate violence or unlawful activity by demonstrators; whether individual or mass arrests will be more effective in ending the criminal activity at issue; whether clear and secure escape routes have been established for the crowd and the police; whether communication has been established with crowd representatives; what contingency plans are available; and what types of force can be used in effecting the arrests if necessary.

Each individual must be arrested based on probable cause. Individuals may not be arrested based solely on their association with a crowd in which unlawful activity has occurred. This means that the arresting officer must have objective facts, based on his/her own knowledge, or information given to him/her by other officers, sufficient to believe that the individual to be arrested committed the offense. Thus, the only proper basis for a multiple simultaneous arrest of all the individuals at a demonstration is failure to disperse (409 PC), where the dispersal was properly ordered based on the existence of an unlawful assembly and where adequate notice and opportunity to disperse had been given. Any evidence items at the scene should be recovered and preserved when possible.

Officers should restrain arrestees using either handcuffs or plastic flex-cuffs. A sufficient number of flex-cuff cutters should be available to remove these restraints when necessary. Officers should be aware that flex-cuffs may tighten on an arrestee's arms if the arrestee's hands swell or move, or simply in reaction to pain from the cuffs themselves. The officer applying the flex-cuffs should write his/her badge number on the cuffs in indelible marker when they are used. If an arrestee complains of pain from overly tight flex-cuffs, the officer receiving the complaint should examine the cuffs to ensure a proper fit.

A photograph or video recording of each arrestee, together with the officer making the arrest, should be made to assist in accurately documenting the arrest in a police report. This image will memorialize the identity and condition of the arrestee at the time of the arrest, as well as the identity of the arresting officer.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019354

CONFIDENTIAL

## Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

It is imperative that officers maintain continuity and accountability of arrestees from the arrest site (crime scene) through the booking process. Many cases are lost due to the inability to match up the arresting officer to the arrestee. The arrest report should articulate each arrestee's specific criminal act(s). This will aid in criminal prosecution and the reduction of civil liability.

### 459.5   CITE & RELEASE PROCEDURE

Individuals arrested for misdemeanor offenses should be cited and released in compliance with 853.6 PC and existing department policy. Where it is impractical to cite arrestees at or near the site of the demonstration because of substantial risk that this would allow the unlawful activity to continue, arrestees should be transported to the nearest police facility for the duration of the cite and release process.

The only reasons for not releasing a person arrested for a misdemeanor are as follows:

- The arrestee was so intoxicated that he/she posed a danger to himself/herself or others
- The arrestee required medical examination or care or was otherwise unable to care for his/her own safety
- The arrestee was arrested under one or more of the circumstances listed in 40302 and 40303 VC
- There were one or more outstanding warrants for the arrestee
- The arrestee could not provide satisfactory identification
- The prosecution of the offense for which the person was arrested, or the prosecution of other offenses, would be jeopardized by immediate release
- There was a reasonable likelihood that the offense(s) would continue or resume, or that the safety of persons or property would be imminently endangered by release of the arrestee
- The arrestee demanded to be taken before a magistrate or refused to sign the notice to appear
- There was reason to believe the arrestee would not appear at the time and place specified on the notice to appear. The basis for this determination must be specifically stated.

An officer seeking to book a misdemeanor arrestee into jail must have an articulable basis to believe that one or more of the specified statutory exceptions to mandatory cite and release applies to that individual. This basis must be documented in the police report. The mere fact that further demonstrations are likely to be held in the near future is not a proper basis to conclude that the offense is likely to continue or resume. There must be an articulable objective basis to believe that if cited out, those specific arrestees would continue the same illegal activity for which they were arrested.

### 459.6   DOCUMENTATION

At the direction of the Incident Commander, crowd events may be videotaped or photographed. Individuals should not be singled out for photographing or recording simply because they appear to be leaders, organizers or speakers. Unless they provide evidence of criminal activity, videos or photographs of demonstrations should not be disseminated outside the department. If videos or photographs are shared with another law enforcement agency, a record should be created and maintained noting the date and recipient of the information.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019355

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
Policy Manual

*Tactical Team & Crowd Control*

If there are no pending criminal prosecutions arising from the demonstration, or if the video recording or photographing is not relevant to an internal affairs or citizen complaint investigation or proceedings, or to civil litigation arising from police conduct at the demonstration, the video recording and/or photographs may be destroyed in accordance with department procedures. This shall not prohibit the department from retaining such images and recordings for training purposes.

Any arrests or citations arising from a crowd event should be documented using the normal department reporting methods. In the event that the Incident Commander determines a crowd event has become an unlawful assembly, and a dispersal order is given, this should be documented on a CR-1 crime report, using 409 PC as the violation, even if no other violations or arrests result from the event. This report should include the following: the circumstances leading the Incident Commander to determine the assembly was unlawful, the time, method and contents of the dispersal order and who gave it, the amount of time given for the crowd to disperse and the results of the order.

## 459.7   THE MEDIA & PUBLIC INFORMATION
Department members assigned to the scene of a demonstration will cooperate with the media, whether writer, photographer, radio or television personnel. News media representatives have a constitutional right to cover demonstrations, as long as they do not violate the law.

Those with a right to cover or photograph demonstrations are not limited to representatives of major newspapers, radio or television stations. Persons who represent small newspapers or magazines, free-lancers and other citizens are also entitled to take notes or photographs. Although the press has no special right as a matter of law to be present if an unlawful assembly is declared, officers should attempt to discriminate between non-obstructing members of the press and voluntary participants in the unlawful assembly.

Section 409.5 PC authorizes officers to close disaster scenes such as earthquakes or fires to the public. Subsection (d) however, allows duly authorized representatives of any news service, newspaper, or radio or television station or network to enter closed areas. Areas determined to be part of a crime scene shall be closed to both the public and the press.

Officer should recognize media credentials issued by police agencies or the media representative's employer as valid identification establishing the person as a member of the press.

Self-identified legal observers and crowd monitors do not have the same legal status as the professional media and are therefore subject to the same laws and orders as any other person or citizen. These persons must comply with all dispersal orders. A supervisor may allow a person who self-identifies as a legal observer or crowd monitor to remain in an area after a dispersal order if circumstances permit and the person's presence would not unduly interfere with enforcement action.

Upon request, the Incident Commander or a supervisor may inform the media, legal observers, crowd monitors, police liaison or organizers with information as to the nature of any criminal charges, the location where arrestees are being taken and whether they will be cited out or booked at a custodial facility. Legal observers, crowd monitors, police liaison and organizers should not be targeted for dispersal or enforcement action because of their status.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019356

CONFIDENTIAL

## Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

### 459.8   ONLOOKERS AT THE SCENE OF A DEMONSTRATION

Onlookers should be permitted to observe and overhear conversations in detention or arrest situations in public areas when it is reasonable to do so. Onlookers may remain in the vicinity as long as the presence of these persons does not interfere with the officers' duties or create a safety concern for the officer, the person detained or onlookers.

Onlookers have the right to record the incident, and the recording device (camera, video camera, tape recorder, cellular phone, and any tape, film or other storage media) cannot be seized by an officer except under the authority of a search warrant. If the immediate circumstances lead the officer to believe that the recording contains crucial evidence, the officer may ask the citizen to voluntarily surrender the recording material. If the citizen refuses to give consent for the seizing of the recording material and there is a possibility of criminal prosecution or civil liability for the District or its employees arising out of the incident, the officer should ask for the name, address and telephone number of the onlooker who records the incident. If the onlooker refuses to provide identification, the officer should obtain any available information at the time that will allow investigators to identify the onlooker and obtain a search warrant for the recorded materials.

Onlookers must maintain a reasonable distance when monitoring police activities, depending on the circumstances. Onlookers are allowed to approach within hearing distance provided that control of the situation can be maintained by the officer. Onlookers who are clearly at a reasonable distance will not be subject to a "move-on" order or threatened with arrest.

The sensitive nature of these situations requires that officers make every attempt to diplomatically resolve conflicts involving onlookers. Depending on the stability of the situation, officers will advise onlookers of their legal rights and limitations under this policy. If an onlooker continues to create a disturbance, a supervisor should be called to resolve the conflict. All highly sensitive incidents will be reported as soon as possible to a supervisor and documented on a police report.

Nothing in this section is meant to restrict an officer from arresting any person who willfully resists, delays or obstructs any peace officer from discharging his or her duties according to the provisions of 148 PC. Nor does this section restrict an officer from arresting any person who willfully commits a trespass as defined in 602 PC.

### 459.9   ORDER TO DISPERSE

The definition of an unlawful assembly has been set forth in 407 PC and interpreted by court decisions. The terms "boisterous" and "tumultuous" as written in 407 PC have been interpreted by the courts as conduct that poses a clear and present danger of imminent violence, or when the demonstration or crowd event is for the purpose of committing a criminal act. The police may not disperse a demonstration or crowd event before demonstrators have acted illegally or before the demonstrators pose a clear and present danger of imminent violence.

The mere failure to obtain a permit is not a sufficient basis to declare an assembly unlawful. The fact that some of the demonstrators or organizing groups have engaged in violent or unlawful acts in the past is not grounds for declaring an assembly unlawful. The police may not disperse a demonstration or crowd event without first validly declaring it an unlawful assembly under state law.

Once a determination has been made that an assembly is unlawful, the crowd should be given an opportunity to disperse rather than face arrest. The intent of a dispersal order is to

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019357

CONFIDENTIAL

# Bay Area Rapid Transit Police Department
### Policy Manual

*Tactical Team & Crowd Control*

permanently disperse a crowd, not to merely relocate the problem. It should be made clear that the crowd is expected to immediately leave the area and include a warning that force may be used which could result in serious injury. A dispersal order must be given before a person can be guilty of remaining at a place of a riot, rout or unlawful assembly. In order to give a valid dispersal order, a supervisor should go as near as the crowd as is safe, and using adequate amplification devices, make an audible statement in the following form:

"I am (rank/name), a peace officer for the Bay Area Rapid Transit District. I hereby declare this to be an unlawful assembly, and in the name of the people of the State of California, command all those assembled at (place) to immediately disperse. If you do not do so, you may be arrested or subject to other police action. Section 409 of the Penal Code prohibits remaining present at an unlawful assembly. The following routes of dispersal are available (routes). You have (a reasonable time) minutes to disperse. If you refuse to move, you will be arrested."

The dispersal order should be given at least three times, from multiple locations. If possible, officers should be posted at the outside edge of the crowd to ensure that the order can be clearly heard by those on the outskirts of the crowd. If necessary, the order should also be given in other languages to ensure that demonstrators understand the order. If possible, the dispersal orders should be recorded by audio/video recorders from locations on the outer edge of the crowd in order to document that the dispersal order was audible to crowd members.

Dispersal orders should not be given until control forces are in position to support crowd movement and sufficient officers are available to make multiple simultaneous arrests, if necessary.

## 459.10   TRAINING
All Tactical Team members and supervisors should train as a group at least twice a year, in order to maintain proficiency in crowd control techniques, crowd management principles, defensive tactics, less-lethal weapons, team operations and legal issues. The Tactical Team commander is responsible for ensuring that team members receive adequate initial and refresher training while members are assigned to the Tactical Team.

The below listed training is from the Departments Training Plan. The Training Plan can be located in the G/drive.

Essential Tactical Team training - Tactical team training, crowd management update.

## 459.11   TEAM MEMBERS
The department should ensure that enough officers are assigned to the Tactical Team to provide a sufficient reserve of trained officers to respond to any reasonably foreseeable crowd situation. Additional members will be selected from interested officers in the event that a larger team is required. Members will be selected by means of an interview panel, composed of a supervisor and at least two current team members.

Officers completing at least one year of satisfactory service with the Tactical Team will receive credit for a patrol special assignment toward Master Officer.

2011/08/19 © 1995-2011 Lexipol, LLC

B.A.R.T. - 019358

# EXHIBIT 4
# to the Deposition of Daniel Hartwig



Exhibit No. 4
D. HARTWIG
10-15-13



# BART POLICE

## BART PD PROTEST







**Cantor, Christopher**
**DOB: 5-25-1976**
**PFN: BHU307**
**Leader of the group–"No Justice No BART"**



**Indybay Reporter Calls himself–**
**"Dave Id"–Unknown true name**



Warning: This document contains confidential information. It is intended for law enforcement personnel only. The information shall not be released to the media or the general public. Further dissemination of this document should be done on a need to know basis. If you are not the intended recipient you are hereby notified that any use, review, dissemination, or copying of this document is strictly prohibited.
THIS INFORMATION IS PROTECTED AS CONFIDENTIAL LAW ENFORCEMENT INVESTIGATION MATERIAL UNDER EVIDENCE CODE
SECTION 1040, ET SEQ, AND IS NOT SUBJECT TO DISCOVERY

1

Prepared by Crime Analyst Officer K. Dam 163

**EXHIBIT 5
to the Deposition of Daniel Hartwig**

CONFIDENTIAL

## No Justice Protest at Powell timeline - 090811 Event #1109-1019

1623 – Power Support reports that the north end of Powell is closed

1642 – S22 reports secondary is secure, a patrol team may need to respond to free up tac squad 1

1645 – S56 reports that subject Dave Id has arrived and is in the paid area primary end

1646 - Subject Dave Id is by the entrance to the police office.

1654 - S28 reports code 4 secondary

1654 – S22 reports group is between the machines and fare gates along with the media

1658 – C2, per SFPD there are 50 demonstrators at Powell

1702 – C2, reports that subject Christopher Cantor is on scene

1706 – C2, reporting subject on platform at Powell, jumping around interfering with trains

1708 – subject boarded train and was contacted at civic Center

1709 – Large congregation next to the ticket vendors now chanting, they are away from the fare gates

1709 – C4, If group moves toward fare gates, units to move into place, have SFPD be on standby above Powell.

1716 - C2, per SFPD, 40-60 at Powell

1716 – C4, Move units into place at Powell, request station to be closed, request SFPD to move downstairs

1717 – C2 having SFPD units responding to Hallidie Plaza entrance

1718 – C4, requests SFPD move in to station

1719 – C4, crowd numbers at 75-100, they are creating a blockage at the fare gates

    Have BART units encircle, have SFPD come in for back-up

1720 – S57, a lot of the subjects are using tickets to enter the station

1721 – S57 requests CAP Team to primary

1723 – C2, are we going to be making arrests now?

1723 – C3, sounds like C4 is making an announcement to the crown at this time.

PLAINTIFF'S
Exhibit No. 5
D. HARTWIG
10-15-13

CONFIDENTIAL

1724 – C4 go to main entrance to contact SFPD commander

1725 – Per L23, everyone in the middle of the circle is being legally detained

1726 – S57 in process of closing station and in the process of making the dispersal order

1726 – L23 confirm that CAP team is on scene. Patrol team 1 also on scene

1727 – S57 confirm that trains are running through at Powell?

1728 – C4, currently have large group encircled by BART and SFPD, station is closed,

> Everyone inside the circle will be placed under arrest

1729 – S28, trains still dropping off people

1730 – Once SFPD takes over their portion of line, BART arrest teams move in to arrest Krystoph and

> Sidekick.

1732 – S57, Muni still dropping off passengers

1734 – C2, subjects Cantor and Dave Id have been removed from the group

1735 – S57, have Tac supervisors respond to the station agents booth

1736 – S57, have SWAT team move in to help out, SFPD not taking over part of our line

1737 – S22, squad 1 report to the front of the booth

1739 – S57, now making individual arrests

1740 - Per C3/SFPD topside Powell is clear

1741 – C2 requesting K9 unit to 4th-Market elevator, Operations personnel have a package

1742 – BART K9 unit responding from the airport, SFPD K9 unit now enroute from Embarcadero

1747 – SWAT Team on-scene, responding down to primary, assist in pulling people out of the circle

1750 – SWAT Team to relieve Tac units in the circle, Tac units to make arrests

1751 – S57, Once tac officers are relieve, step back by the booth

1753 – S28, reports SFPD on scene at the suspicious package

1753 – 121, reporting one protestor going down to the platform

1756 – Tac 208 asks for circle of detention time (1726 – dispersal order)

B.A.R.T. - 019418

CONFIDENTIAL

1757 – S28 reports that the package is clear

1802 – 121, Operations supervisor reports 15-20 forming upstairs

1806 – S44 reports New Montgomery & Market, no groups forming, S54 - also no activity at Embarcadero

1807 – S21, Code 4 at Civic Center

1809 – Detective Power responding to Powell

1811 - S57,  prepare to start using concourse bench for arrestees, all the rooms are nearly full, 8-10 subjects in the rooms now.

1841 – Info, bottles being thrown at SFPD topside

1856 – Embarcadero Code 4, Montgomery no protest activity

1910 – S57, Have S21 and his team  respond to 850 Bryant, prisoners are going to be transported and the team will be needed to assist.

1913 – S57, Requesting number of subjects in custody. Per SFPD, 20 males and 8 females, 28 total

1920 – C4, within next 60 seconds, opening the Market/Nordstrom entrance and station will reopen for service.

1923 – S22, First group of prisoners being led upstairs

1928 – C2 asks if he can start demobilizing other stations

1928 – S21 and his team arrives at jail waiting for prisoners. S57 reports the first group is being loaded up in the vans now.

1930 -  S47, last two female prisoners now headed up to the van

1934 – Patrol team 1 & 2 are clear to return to their B platoon beats

1938 – Last female arrestee enroute upstairs to van

1940 – L16, the Admin team is released

1941 – S57, 5 additional males still being processed in station.

1943 – S47, final 5 males are enroute upstairs to the van

1950 – all 369i arrestees are now in the vans, principle subjects still in the office

1955 – S57, last transport van just departed

CONFIDENTIAL

1957- S57, Tac team will use Powell vehicles to transport the two principle arrestees

2001 – C2, C3 is securing the command post, C2 is demobilizing as well, C4 has the command

2002 – CAP and SWAT Team 1 members not tied up with the arrests are released, SWAT team 2 released as well

2003 – Powell is clear of all arrestees, except the two principles

2012 – C4, clear to open secondary end at Powell, as well as mall entrance at secondary

CONFIDENTIAL

B.A.R.T. - 019421

**EXHIBIT 8
to the Deposition of Daniel Hartwig**



PLAINTIFF'S
Exhibit No. 8
D. HARTWIG
10-15-13

**pages 1, 19-25 only of EXHIBIT 9
to the Deposition of Daniel Hartwig**

PLAINTIFF'S
Exhibit No. _____ 4
D. HARTWIG
10-15-13

|   |   |   |
|---|---|---|
| 1 |  | **- INTERVIEW -** |
| 2 | Hartwig: | -- the interview.  The date of this interview is May 15th, 2012.  The |
| 3 |  | time is approximately 1306 hours.  I am Lieutenant Lance Haight. |
| 4 |  | With me is Sergeant Paul Kwon.  We are interviewing Deputy Chief |
| 5 |  | Dan Hartwig who is a subject of this investigation.  Um -- you were |
| 6 |  | notified prior to this interview that you -- uh -- were a subject and |
| 7 |  | afforded representation.  We notice that you do not have |
| 8 |  | representation with you and you're willing to proceed without |
| 9 |  | representation.  Is that your choice? |
| 10 | Hartwig: | Yes. |
| 11 | Haight: | Uh -- this infence [sic] -- interview is in reference to allegations -- uh |
| 12 |  | -- of misconduct -- uh -- potentially including illegal or improper |
| 13 |  | arrest or detention and -- uh -- supervision.  This incident occurred |
| 14 |  | on September 8th, 2011 -- uh -- over in -- over -- uh -- multiple |
| 15 |  | hours, but the general timeframe is 1744 hours at the Powell Street |
| 16 |  | BART Station.  So, now I'm going to read you your -- uh -- Miranda. |
| 17 |  | You have the right to remain silent.  Anything you say can be used |
| 18 |  | against you in a court of law.  You have the right to talk to a lawyer |
| 19 |  | and have him or her present with you while you are being |
| 20 |  | questioned.  If you cannot afford a lawyer, one will be appointed to |
| 21 |  | represent you before any questioning if you wish one.  Do you |
| 22 |  | understand each of these rights I have explained to you? |
| 23 | Hartwig: | Yes. |
| 24 | Haight: | Having these rights in mind, do you wish to talk to us now? |
| 25 | Hartwig: | Yes. |
| 26 | Haight: | Uh -- I'm going to go ahead and read you your Lybarger Admonition |
| 27 |  | as well.  Um -- this is an administrative investigation and you are |
| 28 |  | being ordered by the Office of the Chief of Police to provide a |

B.A.R.T.D.-000006

1    -- uh -- came to me and said hey, one of the guys you were talking
2    to is in our class.  They're going to ta -- uh -- so I walk to the back --
3    uh -- and I identified this guy because I specifically remember -- uh
4    -- he had a red, I believe -- uh -- Montreal Canadians hockey
5    sweater on.  He and I had a discussion about hockey when I first
6    encountered the circle after Mr. Id and Mr. Cantor were -- uh --
7    removed from the circle.  Uh -- I -- I identified him as being part of
8    their group.  He was released and turned over to his other -- uh --
9    group of peers and they left ultimately with their supervisor or their
10   class -- uh -- instructor.  Uh -- while I was back doing that -- um -- I
11   don't know which officer, one of the officers in the back -- um --
12   asked that I come to the back.  So I went to the back room and as I
13   went back, I noticed Mr. Id sitting in one of the interview rooms and
14   I stopped to talk to him.   And he was -- uh -- not happy but he was
15   not talkative -- uh -- and he kept -- he made a statement you know
16   who I am.  I'm going to sue you for this.  Um -- you have no right to
17   arrest me.  And I did respond to him and I said David -- uh -- I didn't
18   know who you were until tonight.  I've always known you as David
19   Id.  Uh -- uh -- and that was not my intent.  But when you come
20   here -- uh -- professing yourself to be a journalist and you partake
21   in demonstrator type activities, you can't live on both sides of the
22   fence.  You have to be one or the other.  My officers do not have
23   the ability to determine when you're in your journalistic mode as to
24   your protester mode.  But when you're obviously protesting and
25   involved in disrupting after we had made dispersal notices, you're
26   going to be detained.  Uh -- he disputed -- uh -- the reasons why I
27   was doing it -- um -- and again, I responded to him.  I -- I've known
28   him for a couple years and I've had many conversations with him.

B.A.R.T.D.-000024

| | | |
|---|---|---|
| 1 | | Uh -- I find him to be an intelligent -- uh -- guy.  I don't agree with all |
| 2 | | of his opinions, but I've had -- uh -- I've had conversations with him. |
| 3 | Kwon: | Okay.  And -- um -- then you were here talking about -- uh -- your -- |
| 4 | | you discussing -- uh -- what happened with Mr. Id and you |
| 5 | | mentioned that -- uh -- he -- uh -- you believed his actions were not |
| 6 | | consistent -- uh -- uh -- as what you would expect a journalist.  Is |
| 7 | | that correct, Chief? |
| 8 | Hartwig: | Correct. |
| 9 | Kwon: | Or for that -- for that particular incident. |
| 10 | Hartwig: | Correct. |
| 11 | Kwon: | What exactly was he during -- doing during the -- uh -- incident that |
| 12 | | -- that in your mind separated him or -- or made him go on that side |
| 13 | | of the fence as far as you believing that he was part of the protest? |
| 14 | Hartwig: | When I was walking from the West Field side of the circle to the |
| 15 | | Holiday Plaza side of the circle -- um -- I was looking for Lieutenant |
| 16 | | Coontz to make some -- uh -- decisions about moving people out -- |
| 17 | | uh -- of the circle.  And when I was doing that, I stopped and looked |
| 18 | | at the circle and I witnessed Mr. Cantor and Mr. Id in conversation, |
| 19 | | as I've seen them many times over these demonstrations.  Um -- |
| 20 | | when their conversations stopped, I stepped back and I looked and |
| 21 | | the people in the inner circle around them after this conversation |
| 22 | | completed suddenly became energized and were motivated to |
| 23 | | challenge the officers that were trying to hold the circle.  Um -- Mr. |
| 24 | | Cantor specifically got directly in the face of I believe Officer Christ |
| 25 | | who was one of our officers in the -- um -- circle -- uh -- and made |
| 26 | | multiple derogatory comments towards him about what he was |
| 27 | | doing, his ability to do so, and -- uh -- did they know who he was. |
| 28 | | Uh -- my concern was the presence of Mr. Cantor and Mr. Id in the |

B.A.R.T.D.-000025

| | | |
|---|---|---|
| 1 | | circle was creating a worse situation and needed to be re -- they |
| 2 | | needed to be removed immediately from the circle.  I couldn't find |
| 3 | | Lieutenant to -- Coontz to direct him to do so, so I directed Officers |
| 4 | | Coduti and Jacobson to do so. |
| 5 | Haight: | Do you know what -- uh -- Cantor and Morse were talking about? |
| 6 | | Could you overhear the conversation? |
| 7 | Hartwig: | No.  No, it was far too loud. |
| 8 | Haight: | Okay.  Did it seem as though they were addressing the crowd or |
| 9 | | speaking with each other? |
| 10 | Hartwig: | Uh -- I think initially they were speaking with each other and then as |
| 11 | | I broke away -- uh -- they were talking to everybody around them. |
| 12 | | You know, not at no one in particular, but just a group they -- uh -- I |
| 13 | | want to say -- uh -- at that time -- time we had probably 25 to 35 |
| 14 | | people in that circle. |
| 15 | Haight: | Now -- |
| 16 | Hartwig: | And there were some -- there were some -- um -- some willing -- uh |
| 17 | | -- what appeared to be willing followers of Mr. Cantor and Mr. Id in |
| 18 | | that inner circle. |
| 19 | Haight: | Uh -- at any point did you see Cantor and/or Morse giving directions |
| 20 | | to the crowd that you can -- could hear? |
| 21 | Hartwig: | Verbal direction?  No -- uh -- uh -- it was way too loud in the -- I |
| 22 | | couldn't tell.  I mean it was a combination of the loud voices. |
| 23 | Haight: | How about as far as their actions?  Was Mr. Cantor and/or David |
| 24 | | Morse giving direction to the crowd -- |
| 25 | Hartwig: | Oh, I -- |
| 26 | Haight: | -- based on their actions? |
| 27 | Hartwig: | I think their actions was -- uh -- immediately -- uh -- after the |
| 28 | | discussion -- uh -- they broke into -- uh -- a chant.  Uh -- they had |

B.A.R.T.D.-000026

|   |   |   |
|---|---|---|
| 1 | | multiple chants -- uh -- many about their -- uh -- displeasure with |
| 2 | | BART Police. Uh -- and then what I witnessed specifically was -- |
| 3 | | uh -- Mr. Cantor get directly up in the face of Officer Christ as |
| 4 | | Officer Christ held the line. |
| 5 | Haight: | Out -- outside of the conversation that you saw take place between |
| 6 | | Cantor and Morse, could you identify any other actions on behalf of |
| 7 | | -- uh -- either party as far as actively engaged in protesting or |
| 8 | | leading the protest? |
| 9 | Hartwig: | Yeah -- uh -- they were at the front of the line as they marched |
| 10 | | around the fare gate -- uh -- the ticket vendors and the fare gates |
| 11 | | and they were at the heart of the fare gates when they stopped to |
| 12 | | impede and deny access to those patrons who were trying to come |
| 13 | | in and exit the BART Station. |
| 14 | Haight: | And were -- were either party, Cantor or Morse -- uh -- using -- uh |
| 15 | | -- a megaphone or -- uh -- calling out to the crowd? |
| 16 | Hartwig: | Cantor -- uh -- was the loudest voice heard in the chanting process |
| 17 | | that went on pretty much nonstop. Uh -- most often when they |
| 18 | | were marching -- uh -- Id would be in a camera -- uh -- video-taking |
| 19 | | mode. He would be within arm's reach, fairly close to Cantor, in the |
| 20 | | group marching, but he would have a camera very much looking |
| 21 | | like he may be -- uh -- a journalist. Uh -- the thing that separated |
| 22 | | him, in my personal opinion, from being a journalist was -- uh -- I |
| 23 | | believe that they were purposely targeting the fare gates to create a |
| 24 | | disruption and delay and impede our patrons from entering and |
| 25 | | exiting, and when that delay and the impeding of our patrons |
| 26 | | occurred -- uh -- then it became physical between some of our |
| 27 | | patrons wanting to get in -- uh -- or wanting to get out. And at that |
| 28 | | point in time when I saw hands-on, jostling, pushing and shoving -- |

B.A.R.T.D.-000027

| | | |
|---|---|---|
| 1 | | uh -- I deemed that situation to be unsafe. |
| 2 | Haight: | Were there other members of the media that were in the crowd and |
| 3 | | following the crowd around as they went and made the circle |
| 4 | | around the fare gates (inaudible)? |
| 5 | Hartwig: | Uh -- I -- I -- I think intermingled there were.  Uh -- before that there |
| 6 | | was a circle of law enforcement around this group -- um -- it was a |
| 7 | | kind of a herd of cow type thing circling the -- uh -- venders of the |
| 8 | | fare -- free area, passing by the mini booth, and coming ultimately |
| 9 | | back to the BART -- uh -- fare gates. |
| 10 | Haight: | So can you differentiate, was -- wa -- when Morse was -- uh -- with |
| 11 | | Cantor -- uh -- in your mind, was he following -- can -- could you |
| 12 | | differentiate was he following him to document, to -- to be a media |
| 13 | | person or what was he doing that -- that -- uh -- um -- besides |
| 14 | | standing next to Mr. Cantor, what -- were there -- what were -- what |
| 15 | | were his actions, the actions of a media person or the actions of a |
| 16 | | protester? |
| 17 | Hartwig: | Both. |
| 18 | Haight: | And can you -- uh -- |
| 19 | Hartwig: | That's the -- that's the conundrum with Mr. Id.  Many times he |
| 20 | | would look like a journalist and many times he would look like a |
| 21 | | protester. |
| 22 | Haight: | So, on this incidence, do you remember any specific things that he |
| 23 | | was doing that were -- |
| 24 | Hartwig: | He was part of the crowd. |
| 25 | Haight: | -- were -- were -- |
| 26 | Hartwig: | He was part of the crowd marching, chanting, circling the fare |
| 27 | | vendors -- or the ticket vendors -- uh -- and -- and most often |
| 28 | | holding his handheld camera as he was part of that crowd. |

B.A.R.T.D.-000028

| | | |
|---|---|---|
| 1 | Haight: | Do you remember seeing -- uh -- David Morse chanting, specifically |
| 2 | | remember him se -- seeing him chant? |
| 3 | Hartwig: | I don't know specifically.  I -- what I do remember -- um -- is multiple |
| 4 | | members of the media there with cameras -- |
| 5 | Haight: | Uh-huh. |
| 6 | Hartwig: | -- that would stand on the outer perimeter of the group that were |
| 7 | | marching and film from the outer perimeter.  Uh -- Mr. Id would be |
| 8 | | in the heart of the storm. |
| 9 | Haight: | Uh -- um -- is it possible the -- that based on his actions, can you |
| 10 | | differentiate was it possible that he was a -- as he was following |
| 11 | | Cantor around, was he acting solely in -- in a role of a media |
| 12 | | person, just being -- but standing next -- immediately next to |
| 13 | | Cantor? |
| 14 | Hartwig: | Are you asking my opinion? |
| 15 | Haight: | Right. |
| 16 | Hartwig: | I don't believe that was what he was doing, no.  You would have to |
| 17 | | ask Mr. Id what he was doing solely. |
| 18 | Haight: | But just ba -- based on your observations, you -- did you make the |
| 19 | | determination whether he was media or protester? |
| 20 | Hartwig: | Oh, I -- that's not how it works.  The crowds created a situation -- |
| 21 | | uh -- that was escalating.  When it got to the point that it became |
| 22 | | unsafe -- uh -- whether they were media or protesters had no |
| 23 | | bearing on the -- um -- stance we took and that's why I gave the |
| 24 | | order to encircle the crowd.  And at that point in time I didn't say |
| 25 | | separate media from protesters.  I said encircle the entire crowd. |
| 26 | | Uh -- understand at this point in time we've had a minimum of four |
| 27 | | dispersal announcements made.  Majority of the people who were |
| 28 | | part of this crowd have now left the area, 25 to 35 willing -- uh -- |

B.A.R.T.D.-000029

| | | |
|---|---|---|
| 1 | | protesters, willing members of the media remained behind. Uh -- |
| 2 | | when we made the order to circle the group, it was made based |
| 3 | | upon that situation had become unsafe. Uh -- their -- uh -- wish is |
| 4 | | to block, disrupt, impede the flow of our patrons -- uh -- was about |
| 5 | | to -- uh -- come to fruition. Uh -- I witnessed pushing, shoving, |
| 6 | | jostling between protesters and -- uh -- what -- what I appe -- I |
| 7 | | believed the protesters and patrons and at that's the time the order |
| 8 | | was made to encircle the group. It was not encircle the media and |
| 9 | | the protesters. It was collectively the group and whoever was there |
| 10 | | that point in time chose not to abide by the dispersal admonishment |
| 11 | | that we read multiple times -- um -- and were -- some were |
| 12 | | encapsulated in that circle. |
| 13 | Kwon: | Uh -- ju -- just for clarification, Chief -- uh -- who -- was that you |
| 14 | | who gave the ultimate order to encircle the group? |
| 15 | Hartwig: | Yes. |
| 16 | Kwon: | Okay. |
| 17 | Haight: | And were there any other persons similar to David Morse that -- |
| 18 | | that you identified as far as being -- um -- acting in dual roles, a |
| 19 | | member of the media and a protester? |
| 20 | Hartwig: | No. |
| 21 | Kwon: | Chief, are you familiar with -- uh -- who a Hannah Brown is? Have |
| 22 | | you ever heard that name? |
| 23 | Hartwig: | Not until you gave me the e-mail that I read earlier prior to this |
| 24 | | meeting. |
| 25 | Kwon: | So, if I -- just as -- just for clarification -- uh -- is this in fact -- uh -- |
| 26 | | the person you recognize as Dave Id? |
| 27 | Hartwig: | Yes. |
| 28 | Kwon: | Okay. And of course, this is another photo of him -- uh -- slightly |

B.A.R.T.D.-000030

# EXHIBIT 10
# to the Deposition of Daniel Hartwig

PLAINTIFF'S
Exhibit No. 10
D. HARTWIG
10-15-13

# BART Police Department
800 Madison Street, PO Box 12688
Oakland, CA 94604-2688

## Event Record

| Event #: 1109-1019 Case #: 1109-1019 | Date 09/08/11 | Final Type Protest Event | Disposition(s) Info Only (2) Station – Free Area |
|---|---|---|---|

Address: **899 Market St, San Francisco; PPS - POWELL ST. STATION**

Related Events:

| Beat: 40 | Sector: 4 | Fire Area: | EMS Post: | Parcel: |
|---|---|---|---|---|

### Event Times and Assignment Data

Received By: **ECASEY**
Received: **15:40:16**
Dispatched: **17:10:55**
Arrived:
Cleared: **17:11:01**

Primary Unit:
First/Original Unit: **1B14**
Priority When Assigned: **Cold**
Original Type: **Protest Event**

Units Assigned: **1B14 17:10**

### Case Assignments

| Case # | Assigned To | Report Title |
|---|---|---|
| 1109-1019 | Sincerny, Ravi | Supp-1-Since/57969 |
| 1109-1019 | Sincerny, Ravi | Scan-1-Since/57969 |
| 1109-1019 | Rincon, Kristin | CR-1 Rinco/060679 |
| 1109-1019 | Rincon, Kristin | Evid-1-Rinco/060679 |
| 1109-1019 | Gurecki, Tracy | Supp-1-Gurec/060162 |
| 1109-1019 | Rincon, Kristin | Scan-1-Rinco/060679 |
| 1109-1019 | Gurecki, Tracy | Scan-1-Gurec/060162 |
| 1109-1019 | Records | |
| 1109-1019 | Records | |
| 1109-1019 | Records | |
| 1109-1019 | OConnell, Jennifer | Supp-1-OConn/57606 |

### Parties

| Name | Phone | Address | Notes |
|---|---|---|---|
| RAMIREZ, GREGORY | | | |
| MCGARRAH, STEPHANIE | | | |

### Dispatch Notes

| Dispatcher ID | Date / Time | Notes |
|---|---|---|
| ECASEY | 09/08/11 15:41:27 | ROLL CALL COMPLETED. NO RESPONSE FROM C4 (BLKBERRY UNAVAIL) |
| ECASEY | 09/08/11 15:50:57 | NO JUSTICE, NO BART PROTEST SCHEDULED FOR 1700HRS |
| ECASEY | 09/08/11 16:15:14 | Location: Start Location Protesters will demonstrate at Powell St. (4:30 PM) Another Possible location is |
| | 09/08/11 16:15:14 | Embarcadero BART."No Justice No BART" group. |
| KALAMED | 09/08/11 16:23:18 | Power support rpts they have closed the north end of pps |
| ECASEY | 09/08/11 16:43:59 | S22: 2ndry pps is secure. A patrol team may need to respond to free up tac squad 1 |
| ECASEY | 09/08/11 16:44:12 | S47 (patrol team 1) copied |
| ECASEY | 09/08/11 16:45:57 | S56: 2ndry subj david is in paid area conc level primary @ pps |
| ECASEY | 09/08/11 16:46:29 | 226: subj is by enterance to police ofc |
| ECASEY | 09/08/11 16:55:21 | S22: media btwn machines & fare gates |
| ECASEY | 09/08/11 16:58:48 | C3: 50 DEMONSTRATERS PER SFPD |
| ECASEY | 09/08/11 17:06:55 | C2: PLT DCS END M BLK & WHI CHECKERED JKT JUMPING & INTERFERING WITH TRAIN TRAFFIC |

BART-D-019400

# BART Police Department
800 Madison Street, PO Box 12688
Oakland, CA 94604-2688

## Event Record

| Event #: 1109-1019<br>Case #: 1109-1019 | Date<br>09/08/11 | Final Type<br>Protest Event | Disposition(s)<br>Info Only<br>(2) Station - Free Area |
|---|---|---|---|

Address: **899 Market St, San Francisco; PPS - POWELL ST. STATION**

Related Events:

| Beat: 40 | Sector: 4 | | Fire Area: | EMS Post: | Parcel: |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| ECASEY | 09/08/11 17:07:27 | WHEN A TRAIN COMES IN HE PRETENDS TO JUMP IFO A TRAIN |
| ECASEY | 09/08/11 17:07:56 | BOARDEDt453MB LEAD CAR |
| ECASEY | 09/08/11 17:08:09 | Wm blk short hair army knap sack blk & whi checkered jkt |
| ECASEY | 09/08/11 17:08:58 | Per c2 trn holding ccs. Per c2 just id subj |
| ECASEY | 09/08/11 17:09:36 | C4: NEXT TO FARE GATES AWAY FROM TKT MACHINES.. LARGE GROUP CHANTING |
| ECASEY | 09/08/11 17:09:55 | IF GROUP MOVES TWRDS THE FARE GATES UNITS TO MOVE INTO PLACE |
| ECASEY | 09/08/11 17:10:06 | HAVE SFPD TOPSIDE BE ON STANDBY |
| ECASEY | 09/08/11 17:11:11 | 453 RLSD |
| ECASEY | 09/08/11 17:11:22 | C3 @ SFPD COPIED |
| ECASEY | 09/08/11 17:13:07 | 122: RAMIREZ GREGORY L 050885 D3156853 HM |
| ECASEY | 09/08/11 17:13:15 | ABOVE IS SUBJ FROM T453 @ CCS |
| ECASEY | 09/08/11 17:13:30 | ** NLETS query run on GREGORY RAMIREZ 05/08/1985 M ** |
| ECASEY | 09/08/11 17:16:48 | C3: PER SFPD 40-60 |
| ECASEY | 09/08/11 17:17:01 | C4: MOVE OUR UNITS INTO PLACE. REQ STN BE CLOSED. REQ SFPD RESPOND DOWNSTAIRS. |
| ECASEY | 09/08/11 17:17:17 | C2 & C3 COPIED |
| ECASEY | 09/08/11 17:18:13 | SFPD TO RESPOND TO HALLIDAE PLAZA & MUNI GATES |
| ECASEY | 09/08/11 17:19:26 | C4: 75-100 IN CROWD |
| ECASEY | 09/08/11 17:19:38 | ARE MARCHING CIRCULAR |
| ECASEY | 09/08/11 17:19:44 | WANT OUR UNITS TO CIRCLE |
| ECASEY | 09/08/11 17:19:53 | SFPD TO BACKUP |
| ECASEY | 09/08/11 17:20:06 | S57: A LOT ARE USING TKTS TO ENTER SYSTEM |
| ECASEY | 09/08/11 17:21:59 | S57: CAP TEAM RESPOND TO PRIMARY |
| ECASEY | 09/08/11 17:23:26 | C2: ARRESTS? |
| ECASEY | 09/08/11 17:23:47 | C3: SOUNDS LIKE C4 IS MAKING THE ORDERS NOW, CAN'T COPY RADIO |
| ECASEY | 09/08/11 17:25:59 | C4 MEETING WITH SFPD COMMANDER |
| ECASEY | 09/08/11 17:26:18 | 212: PER L23 EVERYONE IS BEING LEGALLY DETAINED IN MIDDLE OF CIRCLE |
| ECASEY | 09/08/11 17:26:53 | S57: CLOSING STN & READING DISPERSAL ORDER |
| ECASEY | 09/08/11 17:28:28 | LARGE GROUP IN CIRCLE WILL BE PLACED UNDER ARREST. |
| ECASEY | 09/08/11 17:29:11 | AFTER NEXT TRAIN PICKUP THERE'LL BE RUN THROUGHS |
| ECASEY | 09/08/11 17:30:13 | C2 WORKING ON TRAINS CLOSING DOORS & LEAVING. THEY'RE CAUSING CROWD PROBLEMS. |
| ECASEY | 09/08/11 17:30:36 | PPS PLATFORM CLEAR |
| ECASEY | 09/08/11 17:31:07 | ONCE SFPD TAKES OVER. KRYSTOPH & HIS SIDE KICK ARE TO BE ARRESTED. |
| ECASEY | 09/08/11 17:32:49 | C2 HAS PLACED 2 CALLS TO MUNI TO HAVE THEM RUN THRU. |
| ECASEY | 09/08/11 17:34:52 | C2: CHRISTOPHER CANTOR & DAVE ID REMOVED FROM GROUP. |
| JDEVERA | 09/08/11 17:35:17 | ****** SF ADV THEY ARE MOVING IN AND MAKING ARRESTS AS NEEDED ******* |

BARTD 019469

# BART Police Department
800 Madison Street, PO Box 12688
Oakland, CA 94604-2688

## Event Record

| Event #: 1109-1019<br>Case #: 1109-1019 | Date<br>09/08/11 | Final Type<br>Protest Event | Disposition(s)<br>Info Only<br>(2) Station - Free Area |
|---|---|---|---|

**Address: 899 Market St, San Francisco; PPS - POWELL ST. STATION**

Related Events:

| Beat: 40 | Sector: 4 | Fire Area: | EMS Post: | Parcel: |
|---|---|---|---|---|

| | | |
|---|---|---|
| ECASEY | 09/08/11 17:35:43 | TAC SUPES TO RESPOND TO AGTS BOOTH |
| ECASEY | 09/08/11 17:36:10 | SFPD IS ONLY LATERAL SUPPORT SO FAR PER C3 |
| ECASEY | 09/08/11 17:37:16 | S57: SWAT TEAM IS NEEDED.  SFPD WON'T GO IFO OUR LINE. |
| ECASEY | 09/08/11 17:38:06 | S22: SQUAD1 IS NEEDED IFO BOOTH |
| ECASEY | 09/08/11 17:38:34 | 205 IS IN THE LINE & NEEDS TO BE RELIEVED TO RESPOND TO BOOTH |
| ECASEY | 09/08/11 17:39:29 | S57: MAKING INDIVIDUAL ARRESTS |
| ECASEY | 09/08/11 17:39:52 | S28:TOPSIDE 2NDRY CLEAR.  CHECKING PRIMARY |
| ECASEY | 09/08/11 17:39:59 | C3:PER SFPD ALL CLEAR TOPSIDE |
| ECASEY | 09/08/11 17:48:19 | S57: PRIMARY CONC. SWAT TEAM TO ASSIST WITH PULLING PEOPLE OUT OF CIRCLE. |
| ECASEY | 09/08/11 17:50:37 | S57:  SWAT TO RELIEVE TAC IN CIRCLE.  TAC OFFICERS TO COMPLETE ARRESTS |
| ECASEY | 09/08/11 17:51:18 | TAC OFCRS TO RESPOND TO BOOTH ONCE RELIEVED. |
| ECASEY | 09/08/11 17:54:27 | 121: MOS 1 PROTESTOR GOING TO PLATFORM. |
| ECASEY | 09/08/11 18:02:12 | 121:  OP SUP SAY 15-20 FORMING UPSTAIRS @ MOS. |
| ECASEY | 09/08/11 18:02:20 | C2 HAD INFO ALSO & ADVD SFPD |
| ECASEY | 09/08/11 18:05:18 | 196:MCGARRAH STEPHANIE A WF 091483 |
| ECASEY | 09/08/11 18:05:36 | ** NLETS query run on STEPHANIE MCGARRAH 09/14/1983 F ** |
| ECASEY | 09/08/11 18:07:07 | S44: NEW MONT & MKT ENTERANCE NO GROUP FORMING |
| ECASEY | 09/08/11 18:07:18 | S54: NOTHING GOING ON AT PPS |
| ECASEY | 09/08/11 18:07:38 | CORR: S54: NOTHING GOING ON AT EMS |
| ECASEY | 09/08/11 18:08:07 | S21: C4 CCS |
| ECASEY | 09/08/11 18:10:06 | PER C4 HAVE D69 (POWER) RESPOND TO PPS |
| ECASEY | 09/08/11 18:10:18 | S38: EMS C4 |
| JDEVERA | 09/08/11 18:36:06 | ***** AS BEAT INFO, SFPD TAKING BOTTLES TOPSIDE PPS PER 163.  NO REQUEST FOR ASISTANCE |
| | 09/08/11 18:36:06 | AT THIS TIME ***** |
| ECASEY | 09/08/11 18:56:59 | S54: EMS TOPSIDE C4. |
| ECASEY | 09/08/11 18:57:14 | S38: EMS C4 |
| ECASEY | 09/08/11 18:57:45 | S44: MOS TRAFFIC HIGHER NO PROTEST ACTIVITY. |
| ECASEY | 09/08/11 19:11:46 | S57: S21 & PATROL TEAM 1 RESPOND TO 850 BRYANT TO ASSIST WITH BOOKINGS. WILL BE ER |
| | 09/08/11 19:11:46 | WITH 10-15'S SHORTLY. |
| ECASEY | 09/08/11 19:14:15 | PER C3 TOTAL ARRESTS 28 (20 MALE, 8 FEMALE) |
| ECASEY | 09/08/11 19:21:24 | C4:60-90SECONDS MKT BY PRIMARY ADJACENT TO NORDSTROMS WILL BE ONLY ENTRANCE OPEN |
| ECASEY | 09/08/11 19:21:47 | WILL HAVE TRAINS BE ATO @ STN THEN |
| WCOSTA | 09/08/11 19:24:35 | X's will be in one van, sf wagon will take group of males, and acso will assist in taking males to cj9 |
| WCOSTA | 09/08/11 19:28:36 | C2 to c4...Demobilizing some of the other stn's? |
| WCOSTA | 09/08/11 19:28:51 | L23 to relay to c4 |

BART-ID-019470

APDC (Rev. 10/26/10)     Print Date: 05/05/2013

# BART Police Department
800 Madison Street,  PO Box 12688
Oakland, CA 94604-2688

## Event Record

| Event #: 1109-1019<br>Case #: 1109-1019 | Date<br>09/08/11 | Final Type<br>Protest Event | Disposition(s)<br>Info Only<br>(2) Station - Free Area |
|---|---|---|---|

Address: **899 Market St, San Francisco; PPS - POWELL ST. STATION**

Related Events:

| Beat: 40 | Sector: 4 | Fire Area: | EMS Post: | Parcel: |
|---|---|---|---|---|

| | | |
|---|---|---|
| WCOSTA | 09/08/11  19:30:52 | Muni dropping off at pps... No way out at secondary ... Go back through muni and come back out other side |
| WCOSTA | 09/08/11  19:31:49 | Expedite x's in holding facilities to go to cj9 |
| WCOSTA | 09/08/11  19:33:40 | Hold down sec at pps..... Muni is letting off psgrs and there is no way out.... Asking for 2 op's employee's to |
| | 09/08/11  19:33:40 | secondary pps |
| WCOSTA | 09/08/11  19:35:01 | Patrol team one and patrol team 2 clear to return to b platoon assignments |
| ECASEY | 09/08/11  19:41:55 | S47: 5 MORE MALES TO TRANSPORT. |
| ECASEY | 09/08/11  19:44:43 | ONLY NEED ONES GOING FOR 369I |
| ECASEY | 09/08/11  19:46:04 | S57: STOCKTON & ELLIS NEED A RIDE FOR 169 TO 850 BRYANT |
| ECASEY | 09/08/11  19:50:49 | S57: FOR S22 ANYONE LEFT FOR VAN. |
| ECASEY | 09/08/11  19:51:09 | S22: ONLY 2 IN OFC ARE 10-15'S (MORE THAN 369I CHARGE). |
| ECASEY | 09/08/11  19:51:51 | LAST TRANSPORT WAGON ER |
| ECASEY | 09/08/11  19:56:10 | ER NOW |
| ECASEY | 09/08/11  19:57:28 | WILL USE PPS ST VEHS FOR LAST 2 TRANSPORTS. TAC TEAM WILL TAKE CARE OF IT. |
| ECASEY | 09/08/11  20:02:23 | C2: c4 in charge.  C3\c2 demobilizing. |
| JDEVERA | 09/08/11  20:05:18 | C3 ADV SFPD KEEPING 25 OFFICERS MOBILE IN THE AREA |
| ECASEY | 09/08/11  20:12:51 | C4: CLEAR TO OPEN 2NDRY END OF PPS.  NOTIFY WESTFIELD MALL. ENTIRE STN CLEAR TO BE |
| | 09/08/11  20:12:51 | OPENED. |
| ECASEY | 09/08/11  20:13:39 | CENSUP BRIAN ADVD |
| ECASEY | 09/08/11  20:13:58 | WESTFIELD MALL SECURITY ADVD |
| JDEVERA | 09/08/11  20:14:45 | 10-15 COUNT: 26 |
| ECASEY | 09/08/11  20:16:37 | S22: ALL TAC UNITS NOT ON AN ASSIGNMENT MEET IN OFC |
| ECASEY | 09/08/11  20:41:23 | S22: need swat team # of arrests & who had them. |
| ECASEY | 09/08/11  20:41:45 | L22:TWO, 147 & 191 |
| JDEVERA | 09/08/11  20:52:47 | ALL UNITS SWITCHING TO MAIN CHANNEL |
| JDEVERA | 09/08/11  20:52:57 | ** Case 1109-1019 assigned to KRINCON ** |
| CMANDE | 09/08/11  21:28:12 | ** Event Re-Opened ** |
| EHAMMER | 09/09/11  15:52:23 | ** Event Re-Opened ** |
| EHAMMER | 09/09/11  15:54:27 | SUBJ WAS EVALUATED 5150,DID NOT MEET REQUIREMENTS FOR 5150 (SUBJECT |
| | 09/09/11  15:54:27 | CONTACTED@17:13:30) |
| GHESSON | 09/28/11  10:04:23 | ** Event Re-Opened ** |
| GHESSON | 09/28/11  10:04:29 | ** Call Type changed from INFO to PROTEST by GHESSON ** |
| JDEVERA | 05/03/13  19:01:56 | ** Event Re-Opened ** |

## Event Unit Log

| Date / Time | Unit ID | Status | Location |
|---|---|---|---|
| 09/08/2011  17:10:55 | 1B14 | Enroute | 899 Market St - - - |

B·A·R·T·D  019471

APDC  (Rev. 10/26/10)   Print Date: 05/05/2013

# BART Police Department

800 Madison Street, PO Box 12688
Oakland, CA 94604-2688

## Event Record

| Event #: 1109-1019 | Date | Final Type | Disposition(s) |
|---|---|---|---|
| Case #: 1109-1019 | 09/08/11 | Protest Event | Info Only<br>(2) Station – Free Area |

Address: **899 Market St, San Francisco; PPS - POWELL ST. STATION**

Related Events:

| Beat: 40 | Sector: 4 | Fire Area: | EMS Post: | Parcel: |
|---|---|---|---|---|

| 09/08/2011 17:11:01 | 1B14 | Cleared | 899 Market St - - - |
|---|---|---|---|

NLETS Request(s)

LEWI\NAME\S\RAMIREZ,GREGORY\05081985\M\UID=ECASEY

LEWI\NAME\S\MCGARRAH,STEPHANIE\09141983\F\UID=ECASEY

APDE (Rev. 10/26/10)  Print Date: 05/05/2013

B A R T D 019472

# EXHIBIT 11
# to the Deposition of Daniel Hartwig

From: Shane Coduti
To: Daniel Hartwig
Cc:
Bcc:
Subject: Re: Re:
Date: 6/21/2012 1:21:02 PM


```
<font face="Default Sans Serif,Verdana,Arial,Helvetica,sans-serif"
size="2"><DIV>Deputy Chief Hartwig,</DIV>
<DIV> </DIV>
<DIV>Checked with Sandra today.  The case is still active.  Will you
be attending?</DIV>
<DIV> </DIV>
<DIV>Officer S. Coduti<BR><BR><FONT color=#990099>-----Daniel Hartwig/bpd/BART
wrote: -----</FONT> </DIV>
<DIV style="PADDING-LEFT: 5px">
<DIV style="BORDER-LEFT: black 2px solid; PADDING-LEFT: 5px; PADDING-RIGHT:
0px">To: Shane Coduti/bpd/BART@BART<BR>From: Daniel Hartwig/bpd/BART<BR>Date:
06/14/2012 08:14PM<BR>Subject: Re:<BR><BR><FONT size=2>
<P>You are hitting the pipe-they threw the charges out last
week.<BR>-----------------------<BR>Sent from my BlackBerry Wireless
Handheld<BR></P></FONT>
<HR>
<FONT size=2>
<P><B>  From: </B>Shane Coduti<BR><B>  Sent: </B>06/14/2012 08:10 PM
PDT<BR><B>  To: </B>Daniel Hartwig<BR></P></FONT><BR><FONT size=2
face="Default Sans Serif,Verdana,Arial,Helvetica,sans-serif">
<DIV>Deputy Chief Hartwig,</DIV>
<DIV> </DIV>
<DIV> </DIV>
<DIV>I just wanted to inform you I was subpoenaed for a 369i
case from the September 8th 2011 protest.  This protest was
conducted by the No Justice No BART group at the Powell Street BART
Station. The defendant in the case is David Morse.  This involves the
case where you witnessed a violation and ordered me to arrest
Moorse.  I wanted to see if you could come to court so you could
explain what you saw to the judge, to make this violation stick.  It is
on 6/28/12 at 1330 hours in San Francisco.  Please let me know if you can
attend.</DIV>
<DIV> </DIV>
<DIV> </DIV>
<DIV> </DIV>
<DIV>Thank You, </DIV>
<DIV> </DIV>
<DIV> </DIV>
<DIV>Officer S. Coduti #227</DIV>
<DIV> </DIV>
<DIV></DIV></FONT></DIV></DIV>
<DIV></DIV></font>
```

PLAINTIFF'S
Exhibit No. ___
D. HARTWIG
10-15-13

**EXHIBIT 13
to the Deposition of Daniel Hartwig**

PLAINTIFF'S
Exhibit No. ___13___
D. HARTWIG
10-15-13

From: Google Alerts <googlealerts-noreply@google.com>
To: dhartwi@bart.gov
Cc:
Bcc:
Subject: Google Alert - BART
Date: 7/29/2011 3:52:00 PM


=== News - 3 new results for [BART] ===

BART Press Conference on Release of Shooting of Charles Hill Video: video
Bay Area Indymedia
by dave id BART PR spokesman Linton Johnson, interim General Manager
Sherwood Wakeman, and Police Chief Kenton Rainey present the closed-circuit
video which depicts a BART police officer shooting and killing Charles Hill
on the Civic Center station ...
<http://www.google.com/url?sa=X&q=http://www.indybay.org/newsitems/2011/07/29/
18686404.php&ct=ga&cad=CAcQARgAIAAoATAAOABAkPPM8QRIAVAAWABiBWVuLVVT&cd=kjyRDuE
qLnU&usg=AFQjCNGqO5SwHAjLUeO5G-aS7t32xZbSGw>
See all stories on this topic:
<http://www.google.com/url?sa=X&q=http://news.google.com/news/story%3Fncl%3Dht
tp://www.indybay.org/newsitems/2011/07/29/18686404.php%26hl%3Den%26geo%3Dus&ct
=ga&cad=CAcQARgAIAAoBjAAOABAkPPM8QRIAVAAWABiBWVuLVVT&cd=kjyRDuEqLnU&usg=AFQjCN
HI3ValozSyzS4qMAeO1zdVtA5r5Q>


New York Jets rework contracts; prepare for Asomugha
The Jet Press
"The New York Jets have made Bart Scott, Calvin Pace, LT and Brandon
Moore take pay cuts to make room for Nnadmdi Asomugha." In other news,
the New York Giants have signed P Steve Weatherford. At the end of the day
this team looks exactly the same as ...
<http://www.google.com/url?sa=X&q=http://thejetpress.com/2011/07/29/new-york-j
ets-rework-contracts-prepare-for-asomugha/&ct=ga&cad=CAcQARgAIAAoATABOAFAkPPM8
QRIAVAAWABiBWVuLVVT&cd=kjyRDuEqLnU&usg=AFQjCNGsj7c-mrZYkePk1cmScPIKC4y3UQ>
See all stories on this topic:
<http://www.google.com/url?sa=X&q=http://news.google.com/news/story%3Fncl%3Dht
tp://thejetpress.com/2011/07/29/new-york-jets-rework-contracts-prepare-for-aso
mugha/%26hl%3Den%26geo%3Dus&ct=ga&cad=CAcQARgAIAAoBjABOAFAkPPM8QRIAVAAWABiBWVu
LVVT&cd=kjyRDuEqLnU&usg=AFQjCNFvjMKJOiawbGjCXGCBfcDBogH4eg>


Sigrid Pettersen Robertson, 92
Kitsap Sun
Married Lt. Bart Robertson, Navy Medical Corps, May 10, 1938. During WWII,
Sigrid followed Bart to postings in Keyport and Bremerton WA, Long Beach
and San Diego CA, and Portsmouth VA. In retirement, they lived in Seattle
WA, Garden Grove and Anaheim ...
<http://www.google.com/url?sa=X&q=http://www.kitsapsun.com/news/2011/jul/29/si
grid-pettersen-robertson-92/&ct=ga&cad=CAcQARgAIAAoATACOAJAkPPM8QRIAVAAWABiBWV
uLVVT&cd=kjyRDuEqLnU&usg=AFQjCNGlmzfnlGLaTTrgmoJ4baoDgleiIQ>
See all stories on this topic:
<http://www.google.com/url?sa=X&q=http://news.google.com/news/story%3Fncl%3Dht
tp://www.kitsapsun.com/news/2011/jul/29/sigrid-pettersen-robertson-92/%26hl%3D
en%26geo%3Dus&ct=ga&cad=CAcQARgAIAAoBjACOAJAkPPM8QRIAVAAWABiBWVuLVVT&cd=kjyRDu
EqLnU&usg=AFQjCNHhNioqRIbUFvMABgcMQN5D7eLqBA>

This as-it-happens Google Alert is brought to you by Google.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Remove this Google Alert:
http://www.google.com/alerts/remove?hl=en&gl=us&source=alertsmail&s=AB2Xq4h3Uq

B.A.R.T.D. - 019107

XTy4A6gr0WeCr-3usoycnbddlaad4&cd=kjyRDuEqLnU&cad=CAcQARgAQJDzzPEESAE

Create another Google Alert:
http://www.google.com/alerts?hl=en&gl=us&source=alertsmail&cd=kjyRDuEqLnU&cad=
CAcQARgAQJDzzPEESAE

Sign in to manage your alerts:
http://www.google.com/alerts/manage?hl=en&gl=us&source=alertsmail&cd=kjyRDuEqL
nU&cad=CAcQARgAQJDzzPEESAE

B.A.R.T.D. - 019108

**EXHIBIT C**

1          UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4   DAVID MORSE,

5          Plaintiff,

6   vs.                              No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART
8   Deputy Police Chief DAN HARTWIG,
    sued in his official and
9   individual capacities,

10         Defendants.
    _____/

11

12

13

14

15          DEPOSITION OF SHANE R. CODUTI

16            (Pages 1 to 61, inclusive)

17

18         Taken before SANDRA M. LEE

19              CSR No. 9971

20            November 5, 2013

21

22

                  Aiken Welch Court Reporters
23                One Kaiser Plaza, Suite 505
                  Oakland, California 94612
24              (510) 451-1580/(877) 451-1580
                    Fax:  (510) 451-3797
25                   www.aikenwelch.com

1      A.   No.

2      Q.   Have you been given training in regards to

3   arrests?

4      A.   As in what type?

5      Q.   In how you make a probable-cause determination.

6      A.   Yeah.   That's general academy knowledge.

7      Q.   So when you make an arrest, is it the duty of

8   the arresting officer to make a finding of probable

9   cause?

10     A.   Yes.

11     Q.   Are you allowed to rely on other officers when

12  you make that determination?

13     A.   If other officers are taking participation in

14  the report, yes, if they are writing a report on it.

15     Q.   If you rely on another officer and you produce

16  the primary report, other officers need to supply a

17  supplemental report?

18     A.   That's usually how it goes, yes.

19     Q.   And when you say "usually," how does it go the

20  other times?

21     A.   The ones that I've always written where I've

22  not had probable cause and another officer has, they've

23  always written a report.

24     Q.   And that's called a supplemental usually?

25     A.   Usually.

1      Q.  You know this lawsuit concerns a particular

2  protest --

3      A.  Yes.

4      Q.  -- on September 8th, 2011?

5      A.  Uh-huh.

6      Q.  "Yes"?

7      A.  Yes.

8      Q.  Prior to that event, had you participated as an

9  officer in policing protests of BART facilities?

10     A.  If I recall correctly, I believe there was one

11 or two more before that particular incident I was

12 involved in.

13     Q.  So the series of protests that occurred in the

14 summer/fall of 2011 is what you're referring to?

15     A.  Yes.

16     Q.  Prior to that, had you been involved in

17 policing protests?

18     A.  No.

19     Q.  What do you recall about that series of

20 protests?

21     A.  Mainly general.  I believe there was a -- one

22 of the groups Occupy was doing a bunch of protests

23 Downtown San Francisco, Downtown Oakland.  That's pretty

24 much what I remember.

25     Q.  Do you remember that the protest began around

12

1    the time of the killing of Charles Hill?

2         A.   Yes.   There was some during that time, yes.

3         Q.   Do you remember the term "Op BART"?

4         A.   Yeah.   I believe there was a term "Op BART."

5    I've heard that before.

6         Q.   Do you know what it means?

7         A.   No.

8         Q.   Do you remember No Justice No BART?

9         A.   Yeah.   I've heard that term before, but I don't

10   know what that means either.

11        Q.   Did you understand the protesters were upset

12   about BART policing practices?

13        A.   You know, I think it was explained to us, yeah.

14   I think there was somebody -- somebody did explain to us

15   that that's one of the reasons they were upset.

16        Q.   Do you recall a protest when BART turned off

17   cell phone service in the station?

18        A.   Yes.

19        Q.   Were you present that day?

20        A.   Yes, I was.

21        Q.   Do you remember that BART police were

22   criticized in the media following that action?

23        A.   Yes.

24        Q.   After that criticism, did you receive any

25   communications from command staff about BART policing

1      A.  Actually, a couple days after -- after I

2  arrested him.  Someone told me he wrote an article about

3  me on some website.

4      Q.  That was the first time you knew he was a

5  journalist?

6      A.  Yes.

7      Q.  Do you recall that when you arrested David

8  Morse on September 8th that you made a comment to him

9  about articles he had written?

10      A.  No.  I don't recall that.

11      Q.  Do you recall giving an interview with Internal

12  Affairs about the arrest of David Morse?

13      A.  Yeah, I do.  It was many years ago.  I don't

14  recall things discussed in that.  I do remember giving

15  an interview.

16      Q.  When you gave that interview with IA, were you

17  ordered to tell the truth?

18      A.  Yes.

19      Q.  Theoretically you were subject to discipline if

20  you did not tell the truth?

21      A.  Of course.

22      Q.  Giving an interview with IA is similar to an

23  interview here in the sense that you're ordered to tell

24  the truth.

25      A.  Right.

16

1      Q.   Do you think that what you told IA was true?

2      A.   From what I remember, yes.   I have no reason to

3   lie.

4      Q.   I'm going to introduce an exhibit here.   You

5   may or may not be aware, this is the fifth deposition in

6   a series of depositions.

7      A.   Okay.

8           MR. SIEGEL:   We have a stack of exhibits from

9   all of the depositions, so what I'm going to introduce,

10   I believe, is Exhibit 26, so I'll give a copy to the

11   court reporter and she'll share it with you.

12           (Plaintiff's Exhibit 26 marked for

13           identification.)

14   BY MR. SIEGEL:

15      Q.   So you haven't had a chance to see this

16   document before today?

17      A.   No.   Never have.

18      Q.   Officer Coduti, you already have maybe, but if

19   you could read the first three pages of this interview

20   transcript, and I'm going to follow up with some

21   questions.

22      A.   All three pages?

23      Q.   Please.

24      A.   All my responses or everything?

25      Q.   You can read them to yourself, actually.

17

1      A.  Three pages.

2      Q.  Thank you.

3          Does this refresh your recollection that you

4   may have seen some of Mr. Morse's articles prior to the

5   protest?

6      A.  Yes, it does.

7      Q.  What do you recall now?

8      A.  I don't remember when I saw the articles, but

9   apparently from what I told him and I told IA, I must

10  have seen a couple of his articles, and it must have

11  reminded me when we started talking.

12     Q.  Do you recall what the articles concerned?

13     A.  No, I don't.

14     Q.  Do you know they were about BART police?

15     A.  They may have been.  Again, I do not recall

16  specific articles, but if I talked to him about it and I

17  said it in IA, I must have talked to him about an

18  article.

19     Q.  Do you know how you were able to access his

20  articles?

21     A.  I believe they were on the internet.

22     Q.  You went on the internet to find them?

23     A.  Yes.

24     Q.  And were you directed to do so?

25     A.  No.

1      Q.  That was on your own time?

2      A.  Yeah.  I believe that was something I was

3   looking on Google and typed it in and came up under a

4   web search, and I pulled it up.

5      Q.  You don't remember what the articles discussed?

6      A.  No.

7      Q.  Do you recall that Mr. Morse was with a media

8   organization called Indybay?

9      A.  Apparently I asked him or he told me when I

10   arrested him, according to IA.

11      Q.  Do you know what Indybay is?

12      A.  Now I do, yes.

13      Q.  But that day you did not?

14      A.  I didn't know exactly.  I didn't know if it was

15   an article site, a blogger site, what it was.  He told

16   me it was a media organization, according to the IA.

17      Q.  I'd like you to -- you can put that aside for

18   now, and I'd like you to look at the first exhibit here,

19   Exhibit 1, and if you could locate Policy 459.7, please.

20          Before you read it, do you think you've

21   reviewed this policy previously?

22          MR. ALLEN:  At any time?

23   BY MR. SIEGEL:

24      Q.  Before today.

25      A.  Maybe at any time, yes, but I don't recall

1        Let's focus on the day in question.  I

2   recognize it was a little while ago.

3        A.  Yes.

4        Q.  How do you recall that day began?

5        A.  I recall we had a briefing at Lake Merritt

6   regarding a possible protest that was going to take

7   place that day.

8        Q.  Who led the briefing?

9        A.  If I recall correctly, Deputy Chief Hartwig was

10  there.  There was a couple of lieutenants and a few

11  other sergeants.

12       Q.  Was Deputy Chief Fairow there?

13       A.  I don't recall off the top of my head.

14       Q.  How about Chief Rainey?

15       A.  There were so -- there was a couple of other

16  ones that I was at before, so I don't -- I know he came

17  to one of them, but I don't know if that was the

18  particular one.

19       Q.  You're saying that in the series of protests --

20       A.  Yes.  The couple more -- because I told you

21  before I'd been to a couple of these, so I don't

22  remember which one he came to because we had meetings

23  before each one of these protests.

24       Q.  Do you recall that Deputy Chief Hartwig was the

25  on-site commander on September 8th, 2011?

1      A.  In both circumstances, yes, from my

2  understanding.

3      Q.  Does someone need to be blocked for a certain

4  amount of time?

5      A.  I don't think -- that's something that would

6  have to be determined by the courts.

7      Q.  Do you remember any particular instructions you

8  received about how blocking the fare gates would be

9  interpreted during the protest?

10     A.  From my --

11         MR. ALLEN:  Objection; vague.

12         THE WITNESS:  From my understanding, no.

13  It's -- if we see that people cannot access the fare

14  gates without having to go around people that are

15  blocking it, that's considered blocking fare gates.

16  BY MR. SIEGEL:

17     Q.  Did you understand that during the protest

18  there were media that were in the crowd?

19     A.  I -- well, I understood because I saw certain

20  media symbols when I was standing there, yes.

21     Q.  And I'll get back to that.

22         Going to the briefing, do you recall that

23  particular protesters were discussed at the briefing

24  that day?

25     A.  I believe there was.  There was something

1   talked about where there was protesters discussed,

2   regular protesters.

3        Q.  Do you recall that someone named Christopher

4   Cantor was discussed?

5        A.  I believe his name came up, yes.

6        Q.  He's known as Krystoff?

7        A.  Yes.  I've heard that name before.

8        Q.  Do you recall that Dave Id was discussed?

9        A.  May have, yes.

10        Q.  You do recall?

11        A.  Yes.

12        Q.  And do you know that Dave Id refers to David

13   Morse?

14        A.  I do now, yes.

15        Q.  In what context were Krystoff and Dave Id

16   discussed?

17        A.  From my understanding, they were said -- if my

18   recollection serves me right, they were discussing that,

19   because they said wherever those two show up is where

20   the protest is going to take place.

21        Q.  They were identified as regular protesters?

22        A.  I don't know if they were identified as that

23   term, "regular protesters," but they were saying that

24   they've seen them before where every protest takes

25   place, so we will know when the protest is going to take

1    place because those people will be there.

2         Q.  Do you recall that Krystoff was identified as

3    an agitator?

4         A.  I don't recall directly that he was.  He may

5    have been, but I don't remember that term being used

6    when I was sitting there.

7         Q.  In your stack if you could look at Exhibit 4,

8    please.

9         A.  Yes.

10        Q.  Officer, do you recognize this document?

11        A.  Yeah.  I believe I do.  This was something that

12   was handed out to us.

13        Q.  This was handed out to you during the briefings

14   that day?

15        A.  It was passed around or shown.  I've seen this

16   before.

17        Q.  Do you remember who gave it to you?

18        A.  Uh-uh.  No.

19        Q.  Is this a BOLO?

20        A.  No.  It's not a BOLO.

21        Q.  How is a BOLO different from this document?

22        A.  A BOLO is usually people that are wanted.

23   Usually have some criminal tie that they're going to be

24   wanted.  You need to contact them for a specific reason

25   because they're going to be wanted for a crime.  There's

1      A.  No, I have not.

2      Q.  That day, do you know who gave any dispersal

3   order?

4      A.  I don't remember directly who did it.  It might

5   be in my report.  Like I said, I haven't looked at it in

6   a long time.  I heard numerous people saying, "Stop

7   blocking the fare gates.  You're going to be arrested.

8   Stop blocking the fare gates."  That was it.  Something

9   to that recollection.

10      Q.  Do you think that an order to the effect of

11   what you just said, "Stop blocking the fare gates or

12   you'll be arrested" is a dispersal order?

13      A.  If I put it in the report that it was, that's

14   what I believed it was.

15      Q.  Putting aside whatever is in the report,

16   dispersal order, is that a term of art; is that a

17   specialized term?

18      A.  I don't know.

19      Q.  Is there a difference between an officer

20   directing an individual not to do something and an

21   official dispersal order?

22      A.  There may be.  I don't know.

23      Q.  You earlier mentioned at some point BART police

24   encircled some of the protesters.

25      A.  Correct.

1   Q. Do you remember what led to the encirclement?

2   A. Again, I remember a lot of screaming, a bunch

3 of people yelling "Don't block the fare gates.  You'll

4 be arrested."  I heard that numerous times.  Then

5 someone gave an order; the crowd was encircled.  That's

6 all I remember.

7   Q. Then after the encirclement, you became

8 involved; is that correct?

9   A. That's correct.

10   Q. What happened?

11   A. At that point, I was standing still at my

12 location by the hallway.  Deputy Chief Hartwig

13 approached me, and he pointed at David Morse and he

14 said, "Go arrest him."  I said, "Okay, sir."

15   Q. And prior to that order, had you been observing

16 David Morse?

17   A. I had seen him as part of the crowd, yes.

18   Q. Had you been paying special attention to him?

19   A. No.

20   Q. You were observing him as you were observing

21 the rest of the crowd?

22   A. That's correct.

23   Q. After Hartwig gave you this order, what did you

24 do?

25   A. I walked up to Mr. Morse, who was still part of

1    the circle.  I told him he was under arrest.  I told him

2    to put his hands behind his back.  I handcuffed him.  He

3    was cooperative.  I walked him to the back where the

4    police facility was at.

5        Q.  What did you do then?

6        A.  I placed him down in a seat.  I asked him to

7    identify himself.  He told me his name and -- that's

8    according to the IA document -- his affiliation.  I said

9    okay.  I told him what he was under arrest for.  I asked

10   for his identification.  He provided -- he told me where

11   it was at because he was handcuffed.  I got his

12   identification and I left the room.

13       Q.  Did you have further contact with him after

14   that?

15           MR. ALLEN:  That day?

16           MR. SIEGEL:  Sure.

17           THE WITNESS:  I don't recall any direct

18   contact.  Maybe when we walked outside when he was

19   placed with everybody else in the line to go off to the

20   jail, but that was it.  I don't remember any other

21   contact.

22   BY MR. SIEGEL:

23       Q.  Did you observe David Morse holding a sign that

24   day?

25       A.  Not to my recollection, no.

39

1   Q.  Do you recall him chanting?

2   A.  I don't remember any chanting, no.

3   Q.  Do you recall him marching?

4   A.  I don't think I recall anybody marching.

5   Q.  Now, I'd like to direct your attention back to

6   the IA transcript, Exhibit 26.

7        I'm going to ask you some questions, but I'm

8   going to give you a chance to read this section first.

9   I'd like you to start at page 12, line 10.  And from

10  there, I'd like you to read all the way through page 16,

11  so it's four pages.

12  A.  You said go to what page?

13  Q.  End of page 16.  Read to yourself.

14  A.  Okay.

15  Q.  I'm going to start on page 12.

16  A.  Okay.

17  Q.  I'm going to read the last question and answer

18  on that page.  The question from IA Officer Haight is:

19        "Did you have any conversation with

20        Deputy Chief Hartwig or any other

21        supervisor as to whether Morse was a

22        protester versus a member of the media?"

23        The answer:  "Not at that time, no.

24        We -- we -- I never really had a

25        discussion.  That wasn't for my -- that

40

1        wasn't for me to figure out.  Like I
2        said, I was ordered to arrest the people
3        that remained after the failure to
4        disperse order.  And then somebody else
5        above my level was supposed to figure
6        out what they want to do with each
7        individual."
8        My question today is:  Is that your
9    recollection, that it was up to the higher-ranking
10   officers to determine what to do with each detained
11   individual?
12       A.  Well, they can always overrule me if they feel
13   I don't have probable cause to arrest somebody.  That's
14   with any crime.  So my job for that particular protest
15   was to arrest people that were committing crimes.  If
16   they want to do something with them at a later time,
17   that was up to them just like with anything else.
18       Q.  And here DC Hartwig ordered you to arrest
19   Morse?
20       A.  Correct.
21       Q.  In this instance, he was the higher-level
22   person?
23       A.  He is one of the higher-level people, yes.
24       Q.  It wasn't your job to question his order?
25       A.  No.

42

1    particular paragraph.

2         THE WITNESS:  Would you like me to read the

3    whole one in?

4         MR. ALLEN:  Lines 19 to 24, and then you can

5    answer his question.

6         THE WITNESS:  "From what I saw, he was taking

7    pictures of protesters.  I don't know if, you know, a

8    person that's affiliated with the media could be doing

9    that, a -- another protester could be doing that, you

10   know.  I don't know what constitutes a person taking

11   pictures.  That's what I saw.  But he was in that group

12   of people that was blocking the fare gate."

13        MR. ALLEN:  Read his question back to him, and

14   he can answer the question.

15        (Record read.)

16   BY MR. SIEGEL:

17      Q.  I want to ask you about your recollection

18   today.

19        Do you recall that David Morse was taking

20   pictures that day?

21      A.  I do recall that, yes.

22      Q.  You recall he was in the group of people that

23   was blocking the fare gates?

24      A.  Correct.

25      Q.  If you look at page 14, the question and answer

43

1   between lines 3 and line 7 --

2        A.  Uh-huh.

3        Q.  -- if you could read Haight's question and your

4   answer, please, into the record?

5        A.  The question:

6                "Would you consider him to be an

7            agitator?"

8                "I don't know -- personally,

9            from -- this is my only interaction with

10           him.  I just know that he was taking

11           pictures.  He was, you know, getting in

12           there and taking pictures of the other

13           people that were in charge of this

14           demonstration."

15       Q.  Today as we sit here, is your recollection any

16   different than you gave to IA?

17       A.  No.

18       Q.  You don't remember David Morse being, quote,

19   unquote, in charge of the demonstration?

20       A.  Not to my knowledge, no.

21       Q.  You recall he was getting in there and taking

22   pictures?

23       A.  Yes.

24       Q.  And what does "getting in there" mean?

25       A.  He was part of the circle.

44

1    Q.   Instead of outside the circle?

2    A.   No.   He was part of the circle inside that was

3    blocking the fare gates.

4    Q.   Now, other than being a part of the group and

5    taking pictures, do you recall any other conduct by

6    David Morse that day?

7    A.   No.   The only -- my only recollection of Mr.

8    Morse was taking pictures, conversating with other

9    people in the group and being part of the circle that

10   was blocking the fare gates.

11   Q.   Thank you.

12        When you placed Mr. Morse in handcuffs, do you

13   recall that he complained they were too tight?

14   A.   I believe I did when we were back in the

15   office.   He said something about them being tight, yes.

16   Q.   Do you recall that Officer Rudy loosened the

17   handcuffs?

18   A.   He may have.   I think he told it to me.   I

19   don't remember witnessing it.   I think he said he

20   loosened them for me.

21   Q.   I'd like you to look at Exhibit 8 in your

22   stack, please.

23   A.   Okay.

24   Q.   I can represent to you this is a photograph

25   that was published by the San Francisco Chronicle on the

50

1    approximately 1730 hours, I was assigned to an arrest

2    team at the Powell Street BART station."

3            Do you recall who assigned you to the arrest

4    team?

5        A.  I do not recall.

6        Q.  I'm going to skip to the third sentence.  "I

7    was standing in the free area near the fare gates when I

8    heard a dispersal order given to the protesters."

9            Is your recollection today that a dispersal

10   order was given?

11       A.  My recollection is an order was given which I

12   took as a dispersal order, that the people needed to

13   stop blocking the fare gates or they were going to be

14   arrested.  That's what I heard.

15       Q.  You do not recall who gave that order?

16       A.  No.

17       Q.  The order you're referring to now to not block

18   the fare gates, was that given more than once?

19       A.  Yes.

20       Q.  Approximately how many times was it given?

21       A.  I heard numerous times, but I can't tell you by

22   who.  I also heard the station agents come over the air

23   and told people to not block the fare gates, so I heard

24   that, too.  There was a lot of yelling going on.

25       Q.  That was over the intercom you heard that?

1        A.  Yes.

2        Q.  So maybe station agents.  Somebody over the

3   intercom gave that order.

4            And then the other people giving that order, do

5   you remember who they were?

6        A.  No.

7        Q.  Do you remember if they were using amplified

8   sound?

9        A.  I don't recall if they were.

10       Q.  I don't recall anybody using a bullhorn?

11       A.  They could have.  I don't recall.

12       Q.  The next sentence reads, "The protesters were

13   standing in between the fare gates and the ticket

14   machines."

15       A.  Yes.

16       Q.  To the best of your recollection, how much

17   space is between the fare gates and the ticket machines?

18       A.  The total distance between the two?

19       Q.  Yes.  Approximately.

20       A.  Approximately 20, 25 feet.

21       Q.  And so the protesters, are they standing still

22   or moving?

23       A.  At this time after they've been encircled or

24   before, sir?

25       Q.  I guess that's a good question.

53

1          A.  No.  I'm sure I wrote a report about it.  If I

2     saw a report, it would refresh my memory.  I don't

3     recall any details about that arrest.

4          Q.  I'm looking at the final page of Exhibit 25,

5     the police report.  It appears to be the ticket that you

6     issued that day.

7               What do you call this document?

8          A.  A citation.

9          Q.  And it appears to read that Mr. Morse was

10     charged with 369i.

11               Do you see that?

12          A.  Yes, sir.

13          Q.  Then circled is "I" for infraction.

14          A.  Correct.

15          Q.  That means that Morse was charged with an

16     infraction?

17          A.  Correct.

18          Q.  Is it a BART policy to cite and release

19     individuals who are cited with an infraction?

20          A.  Most of the time, yes.

21          Q.  But on this day, Mr. Morse was not cited and

22     released; is that correct?

23          A.  From my understanding, no.

24          Q.  Do you know why he was not immediately cited

25     and released?

1          A.  I do not know why.  My guess --

2              MR. ALLEN:  Don't guess.

3              THE WITNESS:  Okay.  I would not know why.

4     BY MR. SIEGEL:

5          Q.  In terms of Mr. Morse specifically, do you have

6     any recollection as to how long he may have blocked a

7     fare gate?

8          A.  Not with him personally.  The group was there

9     for many minutes.

10         Q.  So he's indistinguishable from the group?

11             MR. ALLEN:  Vague as to time.

12    BY MR. SIEGEL:

13         Q.  In terms of the time we're talking about, the

14    time of the trespass, the alleged trespass.

15             MR. ALLEN:  It's still vague as to time and

16    overbroad.  He testified he saw him in the crowd and

17    blocking the fare gates.

18    BY MR. SIEGEL:

19         Q.  For how long did the crowd block the fare

20    gates?

21         A.  I couldn't -- approximately multiple minutes.

22    I couldn't give you an exact minute count.

23         Q.  And do you have any information that would

24    distinguish Mr. Morse from anyone else in the crowd?

25             MR. ALLEN:  Objection; vague.

55

1          What do you mean "information"?  The way he

2     looked?  The fact that he recognized him from a

3     photograph?

4     BY MR. SIEGEL:

5          Q.  How about this?

6               MR. ALLEN:  He's talking to Cantor at the time?

7     What?

8               MR. SIEGEL:  I understand what you're getting

9     at, Dale.

10    BY MR. SIEGEL:

11         Q.  Was there any conduct by Mr. Morse that

12    distinguished him from anyone else in the crowd?

13         A.  Not to my recollection.

14         Q.  Other than DC Hartwig's order, did you rely

15    upon any other officer before arresting Mr. Morse?

16         A.  No.

17         Q.  Do you recall that there was a criminal

18    proceeding against Mr. Morse?

19         A.  I don't recall.  I was never -- I never

20    attended one if there was.

21         Q.  Do you recall that you were notified that there

22    was a hearing date approaching?

23         A.  I do recall that, yes.

24         Q.  Do you recall that you contacted DC Hartwig

25    about your pending appearance?

56

1      A.  Yes.  I believe I did talk to him about it.

2      Q.  Do you recall that you asked him to appear with

3  you?

4      A.  I recall me asking something to the effect,

5  "Hey, are you going to come as a witness to what I saw?"

6  And he said, "No.  Your report stands on its own.  You

7  saw everything.  Just go do it" or something to that

8  effect.

9      Q.  Did you ever ask DC Hartwig to produce a

10  supplemental report?

11      A.  No.

12      Q.  Why not?

13      A.  Because it's not my job to ask a deputy chief

14  to write a report.

15      Q.  Outside of the chain of command?

16      A.  Pretty much, yes.

17      Q.  I'd like you to look at Exhibit 11 from the

18  stack.  I will represent to you this is a document that

19  BART gave us in the course of this case, and what I

20  understand it to be is a somewhat garbled transcript of

21  an e-mail exchange.

22      A.  Uh-huh.

23      Q.  In 2012, were you issued a Blackberry by BART?

24      A.  No.

25      Q.  But did you have a BART e-mail account?

<u>REPORTER'S CERTIFICATE</u>

1

2

3

4     I, SANDRA M. LEE, a Shorthand Reporter, State of

5  California, do hereby certify:

6     That SHANE R. CODUTI, in the foregoing

7  deposition named, was present and by me sworn as a

8  witness in the above-entitled action at the time and

9  place therein specified;

10     That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17     That before completion of the proceedings,

18  review of the transcript was not requested.

19     IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 19th day of November 2013.

21

22

23

24     _____

25     SANDRA M. LEE, CSR NO. 9971
       State of California