# EXHIBIT D

PLAINTIFF'S
Exhibit No. 33
M. HAYES
10-16-13

| | | |
|---|---|---|
| Arrest [X]<br>Crime [ ]<br>Non-Criminal [ ] | **BART Police Department**<br>800 Madison Street, PO Box 12688<br>Oakland, CA 94604-2688<br>**CR-1** | CASE# 1109-1047<br>PAGE 1 |

OFFENSE(S): 369 I PC; Trespass:Railroad Property; Misd.

OFFENSE(S) cont'd:

DATE, TIME AND DAY OF OCCURRENCE: 09/08/11 17:44 Thursday
DATE AND TIME REPORTED: 09/08/11 17:44
MORE CHARGES: YES [ ] NO [X]
ESTIMATED LOSS VALUE: $ 0.00

LOCATION OF OCCURRENCE: 899 Market St, San Francisco
LOCATION NAME:
TYPE OF LOCATION:
BEAT: 40 SECTOR: 4

## PERSONS

Codes: V-Victim W-Witness ... 

| CODE | NAME - LAST, FIRST, MIDDLE, SUFFIX | ADDRESS 1 | PHONE 1 |
|---|---|---|---|
| V 1 of 2 | California, State of | | |

OCCUPATION: RACE: SEX: AGE: DOB: ADDRESS 2: PHONE 2:
DL: STATE: SSN: INJURIES: ADDRESS 3: PHONE 3:

| CODE | NAME - LAST, FIRST, MIDDLE, SUFFIX | Business | OTHER |
|---|---|---|---|
| V 2 of 2 | BART DISTRICT | 300 Lakeside Av, Oakland, CA 94612 | (510) 464-6000 |

OCCUPATION: RACE: SEX: AGE: DOB: ADDRESS 2: PHONE 2:
DL: STATE: SSN: INJURIES: ADDRESS 3: PHONE 3:

CODE: OF NAME - LAST, FIRST, MIDDLE, SUFFIX: ADDRESS 1: PHONE 1:
OCCUPATION: RACE: SEX: AGE: DOB: ADDRESS 2: PHONE 2:
DL: STATE: SSN: INJURIES: ADDRESS 3: PHONE 3:

## CASE SUMMARY / VEHICLE INFORMATION

SUMMARY

Arrestee Morse failed to leave a protest area after a lawful dispersal order was given. Morse was arrested for trespassing on railroad property.

VEHICLE USED IN CRIME: YES [ ] NO [ ] UNK [ ] OF — LICENSE (NO. AND STATE): YEAR: MAKE: MODEL: BODY TYPE: COLOR: VIN: MORE VEHICLES: YES [ ] NO [X]

TOW REPORT: YES [ ] NO [ ] GARAGE NAME AND PHONE: REGISTERED OWNER: R/O ADDRESS:

## SUSPECT(S) / ARRESTEE(S)

| CODE | NAME - LAST, FIRST, MIDDLE, SUFFIX | RESIDENCE | UNKNOWN |
|---|---|---|---|
| A 1 of 1 | Morse, David | 709 27th St, Oakland, CA 94612 | |

| RACE | SEX | HT | WT | HAIR | EYE | AGE | DOB |
|---|---|---|---|---|---|---|---|
| W | M | 5'10" | 180 | BRO | HZL | 43 | 02/28/1968 |

ADDRESS 2: PHONE 2:
OCCUPATION: INJURIES: ADDRESS 3: PHONE 3:

SCARS / MARKS / TATTOOS: YES [ ] NO [ ] AKA's:
ARRESTEE DISPOSITION: 3-Misdemeanor
RELEASE LOCATION: San Fran CJ9
ARREST DATE / TIME: 09/08/2011 / 17:35

DL: A8416383 STATE: CA ARRESTED: YES [X] NO [ ] BOOKING #: WARRANT: YES [ ] NO [X] CITATION #: 2871259 SS#: CII:

CHARGES: 369 I PC (1)

CODE: OF NAME - LAST, FIRST, MIDDLE, SUFFIX: ADDRESS 1: PHONE 1:
RACE: SEX: HT: WT: HAIR: EYE: AGE: DOB: ADDRESS 2: PHONE 2:
OCCUPATION: INJURIES: ADDRESS 3: PHONE 3:
SCARS / MARKS / TATTOOS: YES [ ] NO [ ] AKA's: ARRESTEE DISPOSITION: RELEASE LOCATION: ARREST DATE / TIME:
DL: STATE: ARRESTED: YES [ ] NO [ ] BOOKING #: WARRANT: YES [ ] NO [ ] CITATION #: SS#: CII:
CHARGES:

**CONTROLLED DOCUMENT**
DUPLICATION OR REISSUANCE
CONTROLLED BY LAW

## ADMINISTRATION

VICTIM DESIRES PROSECUTION: YES [X] NO [ ]
FOLLOW-UP: YES [ ] NO [X]
COPIES TO: [ ] PAT [ ] DET. [ ] DA [ ] COURT [ ] PROB.

Date 7-10-12

BART Police Department
CONFIDENTIAL

| BY OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| S. Coduti 060651 | 09/09/11 13:37 | Edgardo Alvarez 55957 | 09/10/11 |

OFFICER: UNIT/BEAT: ASSIGNED TO: CASE STATUS: Closed

07/11/2012  08:39   15104647089         BART POLICE                    PAGE   05

| Arrest | X | | | CASE # |
|--------|---|--|--|--------|
| Crime | | | | 1109-1047 |
| Non-Criminal | | | | |

## Case MO

PAGE  1  OF  1

| OFFENSE(S) | OFFENSE(S) cont'd. |
|------------|--------------------|
| 369 I PC; Trespass:Railroad Property; Misd. | |

| DATE, TIME AND DAY OF OCCURRENCE | DATE AND TIME REPORTED |
|--------------------------------|------------------------|
| 09/08/11  17:44 Thursday   TO | 09/08/11  17:44 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|-----------------------|---------------|------------------|------|--------|
| 999 Market St, San Francisco | | | 40 | 4 |

**MO DATA**

Trespassing
 Structure

**CONTROLLED DOCUMENT**
DUPLICATION OR REASSIGNMENT

**ADMINISTRATION**

| FOLLOW-UP | COPIES TO | | | | |
|-----------|-----------|--|--|--|--|
| YES ☐  NO ☒ | ☐ PAT  ☐ DET | ☐ DA  ☐ COURT | By: | Date: 7-10-12 |
| BY OFFICER | INITIATED | APPROVED BY | BART Police Department | DATE APPROVED |
| S. Coduti  060651 | 09/09/2011 13:37 | Edgardo Alvarez 56957 | C O N F I D E N T I A L | 09/10/11 |
| OFFICER | ASSIGNED | ASSIGNED TO | | CASE STATUS |
| | | | | Closed |

CR-1 Coduti/060651  Entered by: Shane Coduti

APDC (Rev. 06/16/06)  Print Date: 07/11/2012

07/11/2012  08:39    15184647885                    BART POLICE                          PAGE  06

| Arrest | [x] | **BART Police Department** | CASE # |
|--------|-----|---------------------------|--------|
| Crime | | 800 Madison Street, PO Box 12688 | 1109-1047 |
| Non-Criminal | | Oakland, CA 94604-2688 | |
| | | **Person Profile** | PAGE 1 OF 1 |

OFFENSE(S)
369 I PC; Trespass:Railroad Property: Misd.                    OFFENSE(S) cont'd

| DATE TIME AND DAY OF OCCURENCE | | DATE AND TIME REPORTED |
|---|---|---|
| 09/08/11 17:44 Thursday | | 09/08/11 17:44 |
| LOCATION OF OCCURRENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
| 899 Market St, San Francisco | | | 40 | 4 |

## PERSONS

| CODE | | | NAME - LAST, FIRST, MIDDLE, SUFFIX | DOB | |
|------|--|--|-----------------------------------|-----|--|
| A | 1 OF 1 | Morse, David | | 02/28/1968 | This report contains Person Profile information only. Please refer to the primary report(s) for additional information. |

### PHYSICAL DESCRIPTION

Appearance                     Build
Calm                           Medium

BART Individual Type           Complexion
Facility Occupant              Light/Fair
Trespasser
                               Demeanor
                               Calm

### IDENTIFIERS

| CODE | | | NAME - LAST, FIRST, MIDDLE, SUFFIX | DOB | |
|------|--|--|-----------------------------------|-----|--|
| V | 1 OF 2 | California, State of | | | This report contains Person Profile information only. Please refer to the primary report(s) for additional information. |

### MEI INFORMATION

BART Individual Type
Not a BART Individual

| CODE | | | NAME - LAST, FIRST, MIDDLE, SUFFIX | DOB | |
|------|--|--|-----------------------------------|-----|--|
| V | 2 OF 2 | BART DISTRICT, Business | | | This report contains Person Profile information only. Please refer to the primary report(s) for additional information. |

**CONTROLLED DOCUMENT**
DUPLICATION OR REISSUANCE
CONTROLLED BY LAW\
Released by: John Glenn Arlington Administrated

## ADMINISTRATION

| BY OFFICER | INIT/DATE/TIME | APPROVED BY | BART Police Department | APPROVED |
|------------|---------------|-------------|------------------------|----------|
| S. Coduti 060651 | 09/09/11 13:37 | Edgardo Alvarez 56957 | **CONFIDENTIAL** | 09/10/11 |
| OFFICER | DATE/REF | ASSIGNED TO | | CASE STATUS |
| | | | | Closed |

CR-1 Coduti/060651 Entered by: Shane Coduti                    APDC (Rev. 05/03/11) Print Date:07/11/2012

07/11/2012 08:39 15104647889 BART POLICE PAGE 07

| Arrest | x | | **BART Police Department**<br>800 Madison Street, PO Box 12688<br>Oakland, CA 94604-2688<br>**Narrative Report** | | CASE #<br>1109-1047<br>Page 1 of 1 |
|---|---|---|---|---|---|
| Crime | | | | | |
| Non-Criminal | | | | | |

| OFFENSE(S)<br>3691 PC; Trespass:Railroad Property; Misd. | | OFFENSE(S) cont'c. | | |
|---|---|---|---|---|
| DATE, TIME AND DAY OF OCCURRENCE<br>09/08/11 17:44 Thursday | | DATE AND TIME REPORTED<br>09/08/11 17:44 | | |
| LOCATION OF OCCURRENCE<br>899 Market St, San Francisco | LOCATION NAME | TYPE OF LOCATION | BEAT<br>40 | SECTOR<br>4 |

NARRATIVE

On 9/8/11 at approximately 1730 hours, I was assigned to an arrest team at the Powell Street BART Station. This was in response to an unauthorized protest at the Powell Street BART Station (Case#1109-1019). I was standing in the free area near the fare gates when I heard a dispersal order given to the protestors. The protestors were standing in between the fare gates and the ticket machines. After a couple minutes BART Police Officers moved in and surrounded the remaining protestors that did not comply with the lawful dispersal order. Deputy Chief Hartwig #C4 approached me and said he wanted me to start arresting protestors that were not complying with the dispersal order. Deputy Chief Hartwig pointed at a man, later identified as Arrestee Morse, who was standing in group of protestors near the edge of the circle. Deputy Chief ordered me to arrest Morse for tresspassing on railroad property. (3691 P.C.)

I walked up to Morse and told him he was under arrest. I placed Morse in handcuffs, double locked them, and checked them for proper fit. I escorted Morse back to the Powell Street BART Police Facility. Morse's handcuffs were removed and replaced with zip ties. Morse was later taken to County Jail 1 in San Francisco where he was cited and released on 3691 P.C., Tresspassing on railroad property.

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE
CONTROLLED BY LAW

ADMINISTRATION

| REPORTING OFFICER<br>S. Coduti 060651 | DATE/TIME<br>09/09/2011 13:37 | APPROVED BY<br>Edgardo Alvarez 5695 | DATE | APPROVED |
|---|---|---|---|---|
| OFFICER | ASSIGNED TIME | ASSIGNED TO | | CASE STATUS<br>Closed |

BART Police Department
CONFIDENTIAL

CR-1 Coduti/060651 Entered by: Shane Coduti          Page 1 of 1          APDC (Rev. 03/17/10) Print Date:07/11/2012

07/11/2012 08:39 15104547089    BART POLICE    PAGE 08

**BART POLICE DEPARTMENT**

NOTICE TO APPEAR   ☐ MISDEMEANOR   ☐ Infra.   ☐ Nonraffic

**BP- 2871259**

DATE OF VIOLATION: 4-8-11   TIME 535 ☒ PM   DAY OF WEEK: S M T W T F S   CASE NUMBER 1109-10047

☐ OWNER'S RESPONSIBILITY (Veh. Code, § 40001)

NAME (First, Middle, Last): DAVID B MORSE

ADDRESS: 709 27TH ST #A

CITY: OAKLAND   STATE: CA   ZIP CODE: 94612   ☐ JUVENILE (PHONE NO.)

DRIVER LIC. NO.: DV416383 CA   CLASS: C   COMMERCIAL ☐ YES ☒ NO   AGE: P   BIRTHDATE: 1/14/68

SEX: M   HAIR: BRN   EYES: HZL   HEIGHT: 5'10   WEIGHT: 180   RACE: O   ☐ CITE (5, 180, 291L)

VEH. LIC. NO. OF VIN:   STATE:

YR. OF VEH.   MAKE   MODEL   BODY STYLE   COLOR
☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b))

EVIDENCE OF FINANCIAL RESPONSIBILITY:   ☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

REGISTERED OWNER OR LESSEE:   ☐ SAME AS DRIVER

ADDRESS:   ☐ SAME AS DRIVER

CITY:   STATE:   ZIP CODE:

CORRECTABLE VIOLATION (Veh. Code, § 40610)   ☐ Parking Required (Non-moving)   Maintenance or Financial Interest

YES NO   Code and Section   Description

13. ☒ ☐   369J P.C. INTERFERING WITH   M   0

14. ☐ ☐   RAILROAD OPERATIONS   M   1

15. ☐ ☐                M   1

16. ☐ ☐                M   1

SPEED APPROX.   PVT/MAX. SPEED   SAFE   ☐ CONTRIBUTING CIRCUMSTANCES

LOCATION OF VIOLATION: POWELL STREM BART   CITY/COUNTY OF OCCURRENCE: SF

COMMENTS (Weather, Road, & Traffic Conditions):   ☐ ACCIDENT

20. ☐ Violations not committed in my presence, declared on information and belief.

I swear/declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

21.   Arresting or Citing Officer

22.   9 18 11   Date   S. COTTON #4207   Name of Arresting Officer if different from Citing Officer

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

23. X (Signature)

24. WHEN: ON OR BEFORE THIS DATE: 10-11-11   TIME: 0830 ☒ AM ☐ PM   TIME: ☐ AM ☐ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

25. WHERE:

☐ Richmond Superior Ct.   100 37th St., Room 185, Richmond, CA 94805   (510) 374-3171
☐ Fremont Hall of Justice   39439 Paseo Padre Parkway, Fremont, CA 94538   (510) 795-2391
☐ Hayward Superior Ct.   24405 Amador Street, Hayward, CA 94544   (510) 670-5030

26. ☐

3691

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE
CONTROLLED BY LAW

Released to John Burns Adjusters & Administrators

By Cheryl Punch   Date 7-10-12

BART Police Department
**CONFIDENTIAL**

B.A.R.T.D.-000005

**EXHIBIT E**

1          UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF CALIFORNIA

3                       ---oOo---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                                No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15         DEPOSITION OF BENSON H. FAIROW

16           (Pages 1 to 71, inclusive)

17

18         Taken before SANDRA M. LEE

19              CSR No. 9971

20             October 16, 2013

21

22
           Aiken Welch Court Reporters
23         One Kaiser Plaza, Suite 505
           Oakland, California 94612
24         (510) 451-1580/(877) 451-1580
              Fax:  (510) 451-3797
25            www.aikenwelch.com

7

1       A.  I do not believe so.

2       Q.  So prior to today, that was the only time you

3   saw Mr. Morse in person?

4       A.  I had seen him at some protests, some of the No

5   Justice No BART protests.  Which ones, I can't recall.

6   I believe that's it.  There may have been other times I

7   don't specifically recall.

8       Q.  Approximately how many times did you see Mr.

9   Morse at a protest?

10       A.  Two, three.

11       Q.  What were these protests about?

12       A.  Protests against -- well, there were kind of a

13   combination of protests.  Initially they began as

14   protests against the officer involved in the shooting of

15   Charles Hill that occurred on the 3rd of July.  Later

16   on, it became -- Anonymous became involved, and they

17   became all BART protests.  I don't recall which ones,

18   but sometimes they merged together and those would have

19   been the occasions.

20       Q.  These protests were approximately during the

21   summer and fall of 2011?

22       A.  Yes.

23       Q.  When you observed Mr. Morse at these protests,

24   what was he doing?

25       A.  I don't recall.  Sometimes in the crowd.  That

8

1   would probably be the only time I would have seen him,

2   because during the protest I wasn't physically there.

3   It would have been through close-circuit TV.

4        Q.  Did you have audio with that CCTV?

5        A.  No.

6        Q.  Were you able to recognize that Mr. Morse was

7   carrying a photo camera?

8        A.  I've seen him with a camera before.

9            MR. ALLEN:  Can I interrupt for a second?

10           Go off the record.

11           (Discussion off the record.)

12   BY MR. SIEGEL:

13       Q.  When you were at the BART board meeting in

14   which you observed Mr. Morse, did he speak at that

15   meeting?

16       A.  Yes.

17       Q.  What do you recall him speaking about?

18       A.  It was something about the -- I don't recall.

19   It was somehow related to the protest or the way things

20   were being handled at BART regarding the

21   officer-involved shooting.  Something to that effect,

22   but I don't specifically recall.

23       Q.  Did Mr. Morse speak at an appropriate time on

24   the agenda?

25       A.  I would have to go back and look, but I believe

1    it was during public comment.

2        Q.  He wasn't shouting out; he was speaking when it

3    was his turn?

4        A.  In turn.  I'm sorry.  I shouldn't speak at the

5    same time.  In turn.

6        Q.  At what point did you become aware Mr. Morse is

7    a journalist?

8        A.  I believe at that time when I saw him at the

9    board meeting.

10        Q.  What do you know about Mr. Morse's journalism?

11        A.  I believe he writes for Indybay on-line.

12    That's about the extent of it.

13        Q.  Have you read any of his articles?

14        A.  I have.

15        Q.  Approximately how many?

16        A.  I don't recall.  Any that had to do with the

17    protest.

18        Q.  How long have you been with BART?

19        A.  Since March 21st, 2011.

20        Q.  You weren't here when Oscar Grant was killed?

21        A.  No.

22        Q.  Where did you work previously?

23        A.  The Oakland Police Department.

24        Q.  How long were you OPD?

25        A.  Since March of 1990.

13

1    qualify you as a commander?

2         A.  You're considered a commander in Oakland when

3    you're a lieutenant or above.  As a lieutenant and

4    captain, I was a commander.

5         Q.  For how long have you held such high-ranking

6    positions?

7         A.  I do not specifically recall when I was

8    promoted to lieutenant.  I believe it was sometime in

9    2001.

10        Q.  Do you recall that the City of Oakland was sued

11   for its mass demonstration or crowd control policies?

12        A.  I do.

13        Q.  Do you know that there's a consent degree of a

14   certain sort that now regulates Oakland crowd control

15   policy?

16        A.  I don't have specific knowledge of it.  I

17   believe I may have read something of it in the press.

18        Q.  What topics did David Morse write about in your

19   experience?

20        A.  Again, I don't specifically recall, but they

21   were usually about how the BART Police Department was

22   handling -- at least the ones I read, I'm sure he wrote

23   other articles not related to the BART police, but they

24   were usually about how the BART police were handling

25   something, the officer-involved shooting or the

14

1    protests.

2        Q.  How would you characterize the tone of his

3    articles?

4        A.  Generally negative towards the police.

5        Q.  Do you feel that criticism was warranted?

6            MR. ALLEN:  Objection; argumentative.

7            You can answer.

8            THE WITNESS:  I don't generally engage in those

9    types of things.  It's my job to allow them to happen.

10   BY MR. SIEGEL:

11       Q.  To allow what to happen?

12       A.  If somebody has an opinion they want to express

13   about the police negative or positive, that's their

14   right.

15       Q.  How did you come across Mr. Morse's articles?

16       A.  I looked them up on-line.

17       Q.  Through a Google search, for example?

18       A.  Initially perhaps.  At some point, I bookmarked

19   Indybay.

20       Q.  When do you think you started following his

21   articles in that way?

22       A.  More likely than not, it would have been late

23   July, early August of 2011.

24       Q.  So in the context of these No Justice No BART

25   or Op BART protests?

1      Q.  Do you recall ordering any arrests that

2  day?

3      A.  I do not.

4      Q.  You produced a summary e-mail of the events of

5  September 8th.

6          Do you remember that?

7      A.  Not specifically.

8          MR. SIEGEL:  I'd like to introduce Exhibit 1 to

9  this deposition.

10         MR. ALLEN:  I might want to make a suggestion.

11  If you want to make this exhibit next in order for all

12  of the depositions, then you have a continuity to them.

13  Otherwise we'll be crossing back and forth when you make

14  reference to the earlier one.

15         MR. SIEGEL:  Let's call this Exhibit 14.

16         MR. ALLEN:  Just for the record, what we're

17  doing is beginning with the depositions that have --

18  Mr. Siegel's depositions of BART and parties related to

19  BART, he will be using his deposition exhibits in

20  seriatim from the first depo beginning with Deputy Chief

21  Hartwig.

22         MR. SIEGEL:  Could we go off the record?

23         (Discussion off the record.)

24         (Plaintiff's Exhibit 14 marked for

25         identification.)

20

1    BY MR. SIEGEL:

2         Q.  Do you see the document in front of you?

3         A.  I do.

4         Q.  Do you recognize it?

5         A.  It appears to be an e-mail I sent to Marcia

6    deVaughn and Chief Rainey.

7         Q.  Who is Marcia?

8         A.  I don't know her exact title.  It's like

9    assistant general manager.  She's the chief's boss.

10        Q.  Is this a report of BART PD's activities during

11   the September 8th, 2011, protest?

12        A.  I need to review it real quick if that's okay.

13            Yes.  It appears to be an e-mail report I sent

14   to Marcia deVaughn.

15        Q.  How did you create this report?

16        A.  I would have typed it up.

17        Q.  What information did you rely upon?

18        A.  I don't specifically recall, but it would have

19   been my experience from the night before.  I don't know

20   that I had any documents at that point to review.  It

21   might have been just information I received by phone or

22   a report when dealing with specific numbers, people

23   detained or arrested.

24        Q.  Is it fair to say that you included reliable

25   information in your report?

21

1     A.   It was as reliable as I would have been able to
2 give at that time.
3     Q.   This was a report that you gave to the chief?
4     A.   He was cc'd in it.   I may have been in an
5 acting capacity at the time this was written, because
6 that's usually the only time I would be sending a report
7 directly to Marcia deVaughn.
8     Q.   Did you ever update this report?
9     A.   I don't recall.
10     Q.   Ordinarily if you made a report and learned
11 information that contradicted the report, would you
12 create an update?
13     A.   I might.   Probably wouldn't have caused an
14 update to go to Marcia deVaughn, though.   When you're
15 acting chief, you report to that person during the time
16 span that you're actually acting.   So if something were
17 to come up -- and I don't recall that anything did, but
18 if something were to, I would give it to the chief and
19 let him tell her if he felt it was important for her to
20 know.
21     Q.   What is Marcia's status within BART?
22     A.   She's -- I might have said acting assistant
23 general manager.
24     Q.   Is that who the chief of police reports to?
25     A.   Yes.

1      Q.   In this e-mail document, you write that the
2  protest began around 5:00 p.m.
3           Is that your recollection?
4      A.   I don't have an independent recollection of it.
5  That would have been my recollection at the time.
6      Q.   You write several warnings were given to
7  individuals in the group to not block the gates.
8           What did you base that statement upon?  I'm
9  looking at the second paragraph of your e-mail.  Second
10  large paragraph.
11      A.   I see it.  I don't specifically recall.
12  Probably reports from people in the field.
13      Q.   At the bottom of this page and the beginning of
14  the next, you write, "The station was closed at this
15  point and officers began to sort through the group of
16  detainees, releasing bonified members of the press and
17  taking those protesters participating in blocking gates
18  into custody."
19      A.   Yes.
20      Q.   What did you mean by "releasing bonified
21  members of the press"?
22      A.   Generally speaking, like, members of the press
23  with press credentials, that had been issued press
24  credentials.  In today's world, there's a lot of
25  bloggers and a lot of people that report on things and

1     aren't necessarily considered bona fide press.  It was

2     basically that.

3          Q.  Are you familiar with the BART policy regarding

4     media?

5          A.  Not off the top of my head.

6              MR. SIEGEL:  Let's try Exhibit 15, please.

7              (Plaintiff's Exhibit 15 marked for

8              identification.)

9     BY MR. SIEGEL:

10         Q.  Have you reviewed this policy previously?

11         A.  Not recently.

12         Q.  I'd like to direct your attention to the second

13    page of this document under the heading of "Media

14    Access."  Under item (a), it states, "The media

15    representative shall produce valid press credentials

16    that shall be prominently displayed at all times while

17    in areas otherwise closed to the public."

18             Do you know what valid press credentials is?

19         A.  I would consider those to be credentials issued

20    by the police department.  I know Oakland does.  I know

21    San Francisco does.

22         Q.  Are you aware that a journalist does not have

23    to have such credentials in order to practice

24    journalism?

25         A.  I think that's a common-sense approach to it,

24

1    yes.

2         Q.  When you wrote -- when you refer to "bonified

3    members of the press," were you referring to David Morse

4    as a non-bona fide member of the press?

5         A.  Apparently I was in that e-mail.

6         Q.  And why did you consider Mr. David Morse not to

7    be bona fide?

8         A.  I don't specifically recall.  I think what I

9    was referring to -- I don't have independent

10   recollection.

11        Q.  Do you know whether Mr. Morse had press

12   credentials that day?

13        A.  I don't believe he did, but I don't recall.

14        Q.  Is it true that other self-proclaimed

15   journalists were primarily detained on that day?

16        A.  I don't specifically recall.  I do recall there

17   were some journalism students.  I would probably lump

18   them into that category.  They were released.

19        Q.  And were they bona fide members of the press?

20        A.  Not with press credentials, no.

21        Q.  They weren't included in your statement of

22   "releasing bonified members of the press"; is that fair

23   to say?

24             MR. ALLEN:  I'm going to object it's vague,

25   it's argumentative, calls for speculation.

26

1    provides a limited amount of information to me when I'm

2    sitting there remotely in Oakland.

3        Q.  Is it fair to say when you wrote this report,

4    you were not necessarily relying on direct knowledge?

5        A.  That's true.

6        Q.  You were relying on what other people told you?

7        A.  True.

8        Q.  I have caught up with my earlier question.  I'd

9    like you to look at Exhibit 1, which has already been

10   introduced which your counsel has a copy of.  From my

11   understanding of what BART has told me, this is the

12   tactical team and crowd control policy.

13          Do you recognize this policy?

14       A.  Yes.

15       Q.  I'd like to direct your attention to 459.7,

16   which is on the page numbered 411 by the policy number

17   or 19356 by the Bates stamp.  It's entitled "The Media &

18   Public Information."

19       A.  459.7?

20       Q.  Yes.

21       A.  Got it.

22       Q.  Would you please read the first two sentences

23   of the second paragraph of that section?

24       A.  "Those with a right to cover photograph

25   demonstrations are not limited to representatives of

27

1    major newspapers, radio or television stations.  Persons

2    who represent small newspapers or magazines,

3    free-lancers and other citizens are also entitled to

4    take notes or photographs."

5         Q.  Is it fair to say that the second sentence of

6    that paragraph covers non-bona fide members of the

7    press?

8         A.  Absolutely.

9         Q.  Whether you're bona fide or not, you have the

10   right to report on protests occurring on BART

11   facilities?

12        A.  As long as you don't break the law, yes.

13        Q.  I'd like to direct your attention to the fourth

14   paragraph of that same section.  It states, "Officer

15   should recognize media credentials issued by police

16   agencies or the media representative's employer as valid

17   identification."

18        Does that refresh your recollection about what

19   proper credentials would be?

20        A.  It does.

21        Q.  So if the credentials are issued by the media

22   organization, that's sufficient; is that correct?

23        A.  Yes.

24        Q.  Do you have any independent knowledge of how

25   David Morse might have blocked fare gates?

39

1    command staff.  It would be with our operations

2    counterparts within the BART system, those who patrol

3    the trains and the stations, that type of thing.

4        Q.  Do you recall at one of those meetings a "Be On

5    the Look Out" document was distributed?

6        A.  No.

7        Q.  I'd like to direct your attention to -- I

8    thought we had it here -- Exhibit 4.

9        A.  Got it.

10       Q.  Do you recall this document?

11       A.  I do.

12       Q.  What is it?

13       A.  It's pictures of Christopher Cantor and Mr.

14   Morse.  At that point, we had identified Mr. Cantor.  We

15   didn't know Mr. Morse's actual name.  He was identified

16   by his moniker, Dave Id.

17       Q.  Is this a BOLO?

18       A.  No.  It's a document that was handed out to

19   officers who were out there that day.  Again, as you

20   recall earlier, I mentioned that if Mr. Morse showed up,

21   it was highly likely that that's where the protest would

22   be, So actually if either one of them showed up.  What

23   this was created for was to allow field personnel to

24   know what both of them looked like and to advise us when

25   they showed up so we knew whether we would have the

40

1   resources in the right place or not.

2         Q.   How is this distinguishable from a BOLO?

3         A.   BOLOs usually have some kind of action

4   requested, either arrest, identify, missing people if

5   it's a missing person, a BOL for a missing person.  I'm

6   sure there's a couple I'm missing.  But this was solely

7   to provide field personnel with an idea what these two

8   individuals looked like.

9         Q.   Did you use a mugshot of Christopher Cantor in

10  this BOLO?

11        A.   I would be guessing, but it appears as though

12  the one on the left -- upper left-hand corner is a

13  mugshot.  It could be a driver's license, though.

14        Q.   Why was the PFN included?

15        A.   Because he had been arrested before.

16        Q.   How did that help to identify him?

17        A.   I didn't need to identify him.  He had already

18  been identified.

19        Q.   I'm saying:  This document was issued to help

20  people visually identify Cantor and Dave Id; is that

21  correct?

22        A.   Yes.

23        Q.   So why is the PFN included?

24        A.   I don't have specific knowledge of why.  I can

25  think of a variety of reasons, one being if we did come

41

1   in contact with them and they were taken into custody

2   again, it would speed the process.  We wouldn't have to

3   do a record-check to know what his PFN is.

4        Q.  So in certain ways this document is

5   anticipating the arrest of Cantor?

6             MR. ALLEN:  Objection.  It's argumentative,

7   calls for speculation.

8             THE WITNESS:  No.  Not at all.

9   BY MR. SIEGEL:

10       Q.  Is it fair to say this document stigmatizes

11  Cantor?

12            MR. ALLEN:  Objection; argumentative.

13            THE WITNESS:  No.  It's for police use only.

14  BY MR. SIEGEL:

15       Q.  There aren't any specific instructions on how

16  to use this document on the document, are there?

17       A.  No.

18       Q.  It doesn't say use this document to identify

19  these two people, does it?

20       A.  No.

21       Q.  How often does BART create a BOLO, an official

22  BOLO?

23       A.  Once or twice a week.

24       Q.  And how often -- let me take that back.

25            Does BART create BOLOs for protests?

42

1    A.   Not unless someone is wanted.

2    Q.   What would you call this document?

3    A.   I don't know that I would give it a label.   I

4    don't know.

5    Q.   Have you ever created something like this

6    before?

7    A.   Not that I recall.

8    Q.   Since this document was created, have you

9    created another like it?

10   A.   No.   There hasn't been a need.

11   Q.   What was the need for September 8th to create

12   this document?

13   A.   We knew that if either Mr. Cantor or Mr. Morse

14   appeared on a day when there was a protest scheduled to

15   occur that it was more likely than not that the protest

16   would occur where they showed up.   So having early

17   intelligence that they were present was helpful in

18   determining where we were going to send resources.   As I

19   recall, this particular day there was some confusion as

20   to whether they would actually be at Powell or another

21   station.   It's difficult for us as a law enforcement

22   agency to mobilize enough resources to cover every

23   contingency.   We try to cover them as best we can and

24   try to minimize surprises whenever possible.   In this

25   case, it was going to be to our advantage to know where

43

1   either Mr. Cantor or Mr. Morse showed up because we

2   would be able to put our resources in that location and

3   not play catchup by having to move to another station we

4   weren't aware of.

5        Q.  Did you work with Officer Dam in preparing this

6   document?

7        A.  I don't know that I worked with him.  I knew he

8   was preparing it.

9        Q.  Did you order him to prepare it?

10       A.  I may have.

11       Q.  If you had to do it over again, would you

12  prepare this document in the same manner?

13       A.  Yes.

14       Q.  Other than this document, did you highlight

15  David Morse in any other way in advance of the protest?

16       A.  Not that I recall other than maybe at briefings

17  talking about if either one of them were seen, they need

18  to alert us as soon as they were seen.

19       Q.  Were you hoping to arrest Mr. Morse?

20       A.  Not necessarily.  I was hoping the protest

21  would be just that, a protest, that there wouldn't be

22  any law-breaking.

23       Q.  Were you hoping to learn his true name?

24       A.  I don't know that I gave that any consideration

25  at the time.  He hadn't committed any criminal acts, so

44

1     I really wouldn't be interested in that.

2          Q.   Who is Christopher Vogan?

3          A.   That's one of our officers.

4          Q.   What is his title?

5          A.   Just an officer.

6          Q.   Do you remember working with him with regards

7     to the protest in question?

8          A.   I may have.

9          Q.   What role would he play in the protest?

10         A.   He and another officer -- I don't have specific

11    recall to this protest.   He and another officer at that

12    time had assignments that were undercover type of

13    assignments, so I know I used them on occasion to do

14    undercover work.   Basically surveillance.

15         Q.   Do you remember if any undercover officer was

16    used on September 8th?

17         A.   I don't specifically recall, but I may have.

18         Q.   Did you utilize any confidential informants

19    that day?

20         A.   I do not believe so.

21         Q.   Would there be a record of such a thing?

22         A.   If -- if the information that a confidential

23    informant gave were to be used in that person's arrest,

24    I would assume there would be some kind of record.   I

25    don't have any recall of confidential informants being

53

1    contain every possible action or thought, it would be

2    much thicker and take a long time to read through.

3              MR. SIEGEL:  Take a break.

4              (Recess taken.)

5    BY MR. SIEGEL:

6         Q.  Other than September 8th, 2011, during your

7    tenure as a BART commander, have you utilized 369i to

8    make arrests?

9         A.  Not personally.  But during other -- I believe

10   during other protests that followed.  I'd have to check.

11        Q.  You don't know for sure?

12        A.  No, I don't.

13        Q.  Do you know why 369i was used on the protest in

14   question?

15        A.  Not specifically because I didn't witness it.

16   I believe it was because they were blocking the fare

17   gates.

18        Q.  I'd like to show you an exhibit we looked at

19   yesterday.  It's Exhibit 10.

20        A.  Okay.

21        Q.  What is this document?

22        A.  This is an event record printed from our CAD

23   system or Alliance.  I believe it's called the Alliance

24   Reporting System.

25        Q.  Do you know how this record is created

54

1    specifically?

2        A.  It is based off of dispatchers in our dispatch

3    center.

4        Q.  Is it reliable in terms of the times?

5        A.  To the extent that what is typed is typed at

6    that time.

7        Q.  Is there a process to review an event record

8    for accuracy?

9        A.  Not that I'm aware of, but communications

10   doesn't come under my area of responsibility.

11       Q.  On the first two pages of this record, do you

12   see yourself referenced through some of the entries?

13       A.  Yes.

14       Q.  You're C2?

15       A.  I am.

16       Q.  On the first page, the last entry refers to C2.

17           Can you decipher what that means?

18       A.  Not a hundred percent.

19       Q.  What's your best guess?

20       A.  There's a male at one end of the station, black

21   and white checkered jacket, so that's a clothing

22   description, jumping and interfering with train traffic.

23       Q.  A few lines above that, do you see where it

24   says "S56"?

25       A.  Yes.

55

1    Q.  Seems to state "Secondary subject Dave Id is in

2   paid area."

3    A.  Yes.

4    Q.  What does "secondary subject" mean?

5    A.  Probably have to ask S56.  That would be the

6   supervisor at the time.  Perhaps he's the second person

7   on the list of photos.

8    Q.  So the BOLO made Mr. Morse a subject; is that

9   fair to say?

10    MR. ALLEN:  Objection.  That mischaracterizes

11   the testimony of Deputy Chief Fairow as to what that

12   document is.  You're characterizing it as a BOLO and he

13   did not.

14   BY MR. SIEGEL:

15    Q.  With that caveat, did the document lead to

16   David Morse being characterized as a subject?

17    A.  It may have.  He's the second person on that

18   document.

19    Q.  And right below S56, it says, "226:  subject is

20   by entrance to police office."

21    Do you see that?

22    A.  I see that.

23    Q.  Do you think that refers to Christopher Cantor?

24    A.  I don't know.  Doesn't say.

25    Q.  How were you participating in the protest

1      Q.  Do you remember taking any efforts to obtain

2   video footage of BART meetings regarding Mr. Morse?

3      A.  It would appear based on this that -- which is

4   what I would normally do -- I asked Tom Smith to pull

5   the footage.  They're the ones with control over that.

6   He says he's checking on it.

7      Q.  Do you know for what purpose the footage was

8   pulled?

9      A.  I could only speculate based on what the chief

10  wrote to me.

11      MR. SIEGEL:  I'd like to mark Exhibit 19,

12  please.

13      (Plaintiff's Exhibit 19 marked for

14      identification.)

15  BY MR. SIEGEL:

16      Q.  Is this an e-mail message you sent to Ken Dam?

17      A.  Yes.

18      Q.  Did you tell Officer Dam to create the

19  BOLO-like flier that we've discussed earlier?

20      MR. ALLEN:  Objection; mischaracterization of

21  the question, the form of the question.

22  BY MR. SIEGEL:

23      Q.  Did you direct Officer Dam to create Exhibit 4?

24      A.  Yes.

25      Q.  How were you able to recognize David Morse in

68

1   the picture?

2       A.  I'd seen him before.  I'm not sure exactly

3   where.  Perhaps this e-mail gives me a clue.  I'd seen

4   him in board meetings.

5       Q.  Directing your attention to the second page of

6   this document, the top paragraph, it states, "Dave Id

7   hasn't been identified yet.  He's the Indybay 'reporter'

8   who collaborates with Cantor."

9           Did you write that?

10      A.  Yes.

11      Q.  What did you mean David Morse collaborates with

12  Christopher Cantor?

13      A.  Because he had been with Cantor and engaged in

14  conversations and appeared to be participatory in the

15  activity that was going on.

16      Q.  Prior to September 8th?

17      A.  Yes.

18      Q.  What do you mean by "participatory"?

19      A.  Just most reporters will report on what they

20  see, observe, report what happens in the interviews.

21  They aren't usually engaged in a personal exchange or

22  writing and leading at the same time with their

23  subjects.  It's based on observation.

24      Q.  Based on the style of reporting, essentially?

25          MR. ALLEN:  Objection; calls for speculation.

71

REPORTER'S CERTIFICATE

1

2

3

4    I, SANDRA M. LEE, a Shorthand Reporter, State of

5    California, do hereby certify:

6    That BENSON H. FAIROW, in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time and

9    place therein specified;

10    That said deposition was taken before me at said

11    time and place, and was taken down in shorthand by me, a

12    Certified Shorthand Reporter of the State of California,

13    and was thereafter transcribed into typewriting, and

14    that the foregoing transcript constitutes a full, true

15    and correct report of said deposition and of the

16    proceedings that took place;

17    That before completion of the proceedings,

18    review of the transcript was not requested.

19    IN WITNESS WHEREOF, I have hereunder subscribed

20    my hand this 1st day of November, 2013.

21

22

23

24    _____

     SANDRA M. LEE, CSR NO. 9971
25    State of California

# EXHIBIT F

CONFIDENTIAL

 **BART POLICE DEPARTMENT**
**KENTON W. RAINEY, CHIEF OF POLICE**

**OPERATIONS ORDER NO.** 11-18
**DATE OF ISSUE:** 9/8/11

## Tactical/SWAT/CAP Team Deployment – 09/08/11

**INCIDENT COMMANDER:** Deputy Chief Benson H. Fairow (C2)
**Operations Chief:** Deputy Chief Daniel Hartwig (C4)
**Planning Section Chief:** Lieutenant Aaron Ledford (L16)
**Logistics Section Chief:** Deputy Chief Janeith Glenn-Davis (C3)
**Fiscal Section Chief:** Supervisor Matt Cromer

## DEPARTMENT CORE VALUES

SERVICE – Placing Service above Self, we work in partnership with the community, serving with pride, courage and compassion.

ACCOUNTABILITY – We take ownership of our duties, remaining answerable to the public and accountable to the laws, polices and procedures that govern and guide us.

PROFESSIONALISM – We are committed to conduct and performance reflective of the highest standard of personal and organizational excellence.

INTEGRITY – We inspire trust and carry ourselves in a manner that demonstrates the highest levels of honesty, ethics and moral conduct.

DIVERSITY – We acknowledge and embrace the diversity in the communities we serve and strive to ensure diversity is reflected in all levels of our organization.

Law Enforcement Sensitive – Do Not Distribute

PLAINTIFF'S
Exhibit No. 2
D. HARTWIG
10-15-13

B.A.R.T.D.-000618

## CONFIDENTIAL

**SITUATION:** "No Justice, No BART" NJNB held a press conference on 09/05/11, during which they announced their intention to force BART to allow people to ride for free during the evening commute on Thursday, 09/08/11, beginning at 1630 hours, at Powell Street Station. NJNB stated that patron fare dollars should not be used to support the BART Police Department and they want BART to "throw open" the fare gates. They stated they would allow people to enter and leave the station, but they intend to flood the station with enough protesters that BART will simply open the gates and allow patrons to enter without charge. NJNB indicated they would move the protest action to other stations if the police attempted to intervene. Protest organizers also stated on various internet postings that there will be roles for people on the platforms, as well as above ground, that they will maintain a presence at multiple BART stations, and that this action will be very different than previous NJNB protests.

Recently, NJNB organizer Christopher Cantor (aka: Kristof) was interviewed on KPFA radio. During this interview, Cantor stated the protest would be held at the Embarcadero Station and railed at main-stream media for focusing on inconvenienced BART patrons.

**MISSION:** It is the mission of the BART Police Department to provide for the safety and security of BART's customers and maintain a heightened vigilance against terrorism during crowd events system-wide. A rapid, tactical response to calls, judicious enforcement of applicable laws, and sound crowd-management practices will be used to safeguard the public and minimize service disruptions. This department's policy (Policy 459) regarding crowd management and crowd control is to apply the appropriate level of direction and control to protect life, property, system facilities and maintain public peace and order and to uphold the constitutional rights of free speech and assembly. This should be accomplished using the minimal amount of physical control and authority required to address crowd management and crowd control issues.

**EXECUTION: There will be a mandatory call-out for the Tactical Team, CAP Team and SWAT Team for Thursday, 09/08/11.** Only those members on annual vacation or other non-discretionary leave will be excused from this call-out. Tactical, CAP and SWAT personnel will muster at 1330 hours in the MTC Auditorium for briefing. (Tactical Team supervisors will meet in the MTC Auditorium at 1230 hours.) After briefing, SWAT personnel will be transported from the MTC parking lot to San Francisco in vans driven by BART police CSOs (R. Nagata, K. Potter and D. Puktianie).

**"B" platoon patrol officers, with the exception of those officers who normally report to Powell Street Station, will report to work one hour early** and will be deployed as directed to assist with crowd control/crowd management at the downtown San Francisco stations. **All "A" platoon officers will be held over until the conclusion of the protest. All personnel are to report for duty with their helmets and standard batons.** "A" platoon officers will maintain the beats they worked during day shift. Oncoming "B" platoon officers will deploy as directed to San Francisco as soon as they are in service to assist with crowd management at the downtown stations, as assigned. Zone 1, "B" platoon personnel should concentrate their patrol efforts and provide a visible presence at West Oakland, 12th and 19th Streets. If necessary, all Zone 1 personnel may be sent to downtown San Francisco stations as reinforcements.

2

## Law Enforcement Sensitive – Do Not Distribute

# CONFIDENTIAL

In that event, Zone 1 priority calls at West Oakland, 12th Street, 19th Street, MacArthur, and Rockridge Stations would be handled by Zone 2 personnel.  Zone 1 priority calls at Lake Merritt, Fruitvale, and Coliseum Stations would be handled by Zone 3 personnel.

Depending on the movement of the crowd, the Tactical, CAP and SWAT teams may be re-deployed to other stations to effectively manage the event.

Personnel available for this protest event are as follows:

Tactical Team:
- 1 Lieutenant
- 7 Sergeants
- 20 Officers

SWAT Team:
- 2 Sergeants
- 8 Operators

CAP Team:
- 6 Officers
- 3 VIPR's

Patrol/Admin:
- 5 Sergeants
- 14 Officers

Total Strength for Event:
- 1 Lieutenant
- 14 Sergeants
- 48 Officers

Persons will be allowed to peacefully protest on the station concourses, outside the paid area, as long as they do not attempt to disrupt BART service, create a safety hazard for patrons or commit other unlawful acts.

For clarity in communicating with outside agencies, the entrances to the downtown San Francisco Stations have been numbered.  Beginning at the east end of the stations, the entrances are numbered 1-8.  The odd numbers are located on the north side of Market Street and the even numbers on the south side.  See attached area maps (Appendix A) for further information.

Deputy Chief Hartwig is designated as the Operations Chief and will initially be responsible for all event-related activities at Powell Street Station.  Lieutenant Wong is designated as the Deputy Operations Chief and will function as an Operations Chief if there is a need to divide resources.  The SWAT Team may be deployed to other stations as needed, at the direction of the Operations Chief or Incident Commander.

3

## Law Enforcement Sensitive – Do Not Distribute

## CONFIDENTIAL

In the event the Incident Commander moves personnel from one section to another, the tactical supervisor in charge of that team will report to the Operations Chief as soon as possible after arrival.

The Tactical Team will be the primary crowd control/crowd management force for this deployment. **Downtown San Francisco stations will not be closed in advance of the planned protest. Civic Center and Powell Street Stations may be closed if protesters there attempt to disrupt BART service, create a safety hazard or commit other unlawful acts on the platform. Every effort will be made to keep these stations open.**

Montgomery and Embarcadero Stations will remain open unless circumstances dictate that they be closed. The Tactical Team will initially deploy to Powell Street Station. If the Incident Commander determines that Powell Street Station should be closed, the Tactical Team will re-deploy to Montgomery and/or Embarcadero as needed. Patrol officers will be assigned to Civic Center, Montgomery and Embarcadero Stations in order to provide security and a visible uniformed presence. Patrol personnel will be assigned to Powell Street Station to provide security for any arrestees and to assist with the booking and transport process. The patrol teams assisting with the protest will deploy as directed on the attached roster (Appendix B). These patrol teams will be responsible for maintaining situational awareness of activity in their assigned stations. All officers will provide a highly visible uniformed presence on the platform to discourage illegal behavior.

If police personnel need to be re-deployed, a minimum of one sergeant and four officers should remain within the downtown stations while those stations are open.

**The Department will take a "zero tolerance" approach to disruptive, unsafe and unlawful activity occurring on the platform or concourse during this planned protest. Station destination signs and PA systems will warn against deliberate attempts to disrupt revenue service. Officers will be assigned to intervene as soon as possible, making immediate arrests without prior warning of protesters who block train doors, climb atop trains or otherwise delay revenue service, or block fare gates to prevent patron access to the system. Protesters will not be permitted to use amplified sound systems, display signs or banners, or march while on the platform level of any station, as these activities are inherently unsafe on crowded train platforms. Protesters who unfurl banners, or who begin chanting or marching on the platform will be warned, then arrested if they do not desist. Protesters do not have the permission of the BART District to conduct such activities in the paid areas of the BART system and such conduct, if allowed to continue, would interfere with, interrupt or hinder the safe and efficient operation of the system. Such conduct is a violation of 369i PC.**

Tactical Team supervisors will coordinate the arrest of any protester in violation of the law as quickly as possible. If necessary, the station will be closed to revenue service and trains will run through the station. Tactical Team officers will work in squads of 4-6 officers to keep order. Squads #1 and #2 will be arrest teams. Squads #3 and #4 will

4

## Law Enforcement Sensitive – Do Not Distribute

# CONFIDENTIAL

be cover teams. The Tactical Team will ideally operate as a single crowd-control force. If it becomes necessary to divide the Tactical Team to respond to two separate incidents, Squads #1 and #3 will form one team, and Squads #2 and #4 will form the other. Officers should be mindful that patrons uninvolved in the protest activity may also be present on the platform. Personnel should make investigative detentions and contacts to maintain a high profile and document persons suspected of preparing to engage in illegal activity.

In the event that protest activity appears likely at other stations, the Incident Commander may re-deploy officers to new locations. If station closures are required, the lead car of a revenue train will be reserved for the transportation of police personnel to other stations.

SWAT Team members will deploy in two teams and will act as a Rapid Reaction Force and reserve crowd-control force. The SWAT Team will initially be deployed to Embarcadero Station. On order, the SWAT Team will provide additional arrest teams, assist in evacuating patrons from stations and will be prepared to deploy quickly to other stations if needed to provide crowd control. A SWAT officer will be assigned to escort the vans in a marked police vehicle.

Three 15-passenger vans will be available to transport SWAT/Tactical Team or other personnel in the event that train service is unavailable, or officers are needed at locations away from the BART system. CSO's will be assigned as drivers for these vehicles and will remain with the vans for security. The parking lot of the Federal Reserve Bank is available for secured vehicle parking. The Federal Reserve Bank is located at Mission/Main Streets. An alternate staging location is the San Francisco Transition Structure.

Patrol personnel will deploy to downtown stations, as detailed on the personnel assignments list in this order. **The sergeants accompanying patrol teams not assigned to the same station as an Operations Section Chief will be designated as the tactical supervisor for that station and will report to the Incident Commander.**

The Incident Commander will be located at the Incident Command Post and will be responsible for the movement of personnel and coordination with the Transportation/Operations Departments regarding the closure of stations and the movement of trains.

**Surgical Arrest Plan:** Based on NJNB's announced protest plan, they will likely gather at the primary end of the Powell Street Station concourse, in front of the agent's booth. The group may attempt to block or impede access to the ticket vending machines or the fare gates. Tactical Team squads will be present on the concourse, in close proximity to the primary protest group. If the group does not block access and does not engage in illegal behavior, officers will simply monitor the protest. If isolated individuals begin to engage in unlawful behavior, a supervisor will identify those to be arrested and an arrest squad will move in, protected by a cover squad, to make the arrests. Those arrested

5

## Law Enforcement Sensitive – Do Not Distribute

# CONFIDENTIAL

should be moved away from the area as soon as possible and secured out of public view to be identified and processed for booking. If multiple protesters engage in unlawful behavior, the mass arrest plan will go into effect. All arrests should be coordinated and at the direction of a supervisor. Individual officers should not enter crowded trains or crowds of protesters to make arrests.

**Mass Arrest Plan:** If the crowd becomes unruly due to arrests taking place, or is engaging in group unlawful actions, the following will occur: both Tactical Team supervisors and Operations/Transportation personnel will begin to warn protesters that they are subject to arrest if they block vendors or fare gates. If the protest group fails to move away from these areas, the Tactical Team commander will order the team to encircle the primary protest group and initiate an investigative detention. The Westfield Mall entrance will be closed and the Hallidie Plaza exit from the station may be restricted or closed. Operations personnel will direct patrons to the secondary end of the station to enter and exit the system. Once the group is encircled and the situation stabilizes, a supervisor will identify those individuals who are to be arrested. The CAP Team and patrol officers will be assigned to replace Tactical Team officers in the circle. Tactical Team officers will then begin to make arrests from the encircled group. The arrestees should be moved away from the scene as quickly as possible and taken to the temporary holding area where they will be secured until they are transported to County Jail #1. An SFPD mobile-field force will move into the station. SFPD officers may assist in containing the protest group while arrests are being made. The station will not be closed unless the tactical situation presents a safety hazard.

The CAP Team may be assigned as "markers" to observe the crowd and locate individual protesters violating 369i PC. The markers must work alongside the videographers, so that video footage can be obtained documenting the criminal activity. The markers will identify the violators to arrest teams, who will take them into custody. Each marker will subsequently complete reports documenting those observations resulting in arrests. Three Federal Air Marshals (FAMS) will work with the CAP team to assist with security. The FAMS will not take enforcement action on state or local criminal violations, unless exigent circumstances exist.

SFPD will provide assistance on the concourse and/or platform, if the crowd size requires it. While BPD personnel mark and arrest suspects, SFPD can be requested to move or secure arrestees, or form a skirmish line to prevent wayside incursions or prisoner escape.

As soon as practicable after criminal offenders begin to be removed from the protest area, those not committing crimes, such as regular patrons and the media, can be escorted away from the operations area. Patrons should be allowed to exit the stations, while media may be directed to a media staging area designated by the Operations Chief. All persons detained should be identified and documented by F.I. card.

6

**Law Enforcement Sensitive – Do Not Distribute**

# CONFIDENTIAL

**Temporary Detention Areas:**

**Embarcadero Station:** In the alcove adjacent to the Fire Command Post. Officers will be assigned to fixed posts to block access to the hallway in front of the command post while prisoners are present.

**Montgomery Station:** The Sansome/Sutter hallway will be used. The roll-down gate leading to the street will be closed and officers will be assigned to block access from the office building and from the secondary end of the station while prisoners are present.

**Powell Street Station:** The police office will be used. If the holding cell becomes too full, the hallway and squad room may be utilized. If the number of arrests dictate, the Yerba Buena tunnel may also be used.

**Civic Center Station:** The police office will be used, along with the adjoining conference room.

Prisoners will be escorted to the concourse level of the station for processing. **Arrestees will be photographed with the arresting officer** and field arrest cards completed. Sufficient Tactical Team and/or patrol officers will be assigned to provide prisoner security while arrestees await transport to jail. In the event that Tactical Team officers are insufficient to provide prisoner security, patrol officers will be moved from other stations to provide additional security. Detective Ravi Sincerney #224 will be assigned as the booking coordinator. If she is unavailable, a Tactical Team officer will be assigned as the booking coordinator. The booking coordinator is responsible for ensuring that the SFPD Field Arrest card is properly completed with all necessary information to document a misdemeanor arrest in San Francisco, that the proper booking photograph has been taken, that the appropriate charges are listed on the booking card, that the arresting officer is clearly identified and that there is sufficient probable cause for each charge listed. Once this has been completed, the arresting officer will return to the protest area for further assignment and patrol officers will be assigned to conduct prisoner transports.

The San Francisco Sheriff's Department (SFSD) will provide prisoner transportation as necessary. Requests for SFSD transportation are to be made through Deputy Chief Glenn-Davis, who will be in the SFPD command post.

SFPD will respond to protest related issues occurring in their jurisdiction. SFPD officers will stage at Fulton and Larkin Streets, along with their mobile command post. SFPD officers may be requested to provide assistance inside the downtown stations upon request from the Incident Commander.

BPD may be responsible for the transportation and booking of some arrestees resulting from this event. In addition to the patrol vehicles assigned to Zone 4, caged vehicles will be staged in San Francisco to provide additional prisoner transport capability. If necessary, one or more of the 15-passenger vans may be used for prisoner transportation. If the number of arrestees warrants it, the San Francisco Sheriff's

Law Enforcement Sensitive – Do Not Distribute

B.A.R.T.D.-000624

CONFIDENTIAL

Department will be contacted and they will set up a booking area in the jail sally-port. **BPD officers will be responsible for processing prisoners and issuing citations at the jail if the sally-port is used for processing.**

BART Operations/Transportation Departments will provide uniformed personnel to staff the downtown San Francisco stations during this event. These personnel will be identified by bright green safety vests, which will display the employee's identification card in a pocket on the left breast. These Operations/Transportation personnel will coordinate the dispatching of revenue trains and will monitor the concourse and platform for safety concerns. Teams of employees will also ride trains in the downtown corridor in order to monitor any suspicious or unsafe activity on board trains. They will relay any safety issues to the BART police on-scene Tactical supervisor, who will determine if the situation warrants police action. Operations/Transportation personnel should **not** become involved in physically confronting protesters.

**ADMINISTRATION and EQUIPMENT:** Tactical Team and SWAT personnel shall deploy in full tactical uniform and equipment, including helmets, gas masks and long batons. At least two grenadiers will be assigned to the event, equipped with both impact and crowd control chemical agents.

The use of chemical agents as a crowd control tool must be authorized by an Operations Chief or the Incident Commander. Any use of crowd control chemical agents should be coordinated with SFPD to avoid exposing allied agencies to chemical agents without warning. The use of chemical agents inside BART stations or on trains is inherently hazardous to patrons, officers and protesters alike and should be avoided if possible.

All uses of force by sworn officers are governed by the department's use of force policies (300, 304, 308 & 309) and applicable federal and state laws. Nothing about a crowd control situation eliminates or changes any of the constraints or policies governing the use of lethal or less-lethal force. Officers must be able to provide clear, detailed, articulable facts that would reasonably justify any use of force against a particular individual. Uses of force during a crowd control situation shall be treated as any other use of force and reported using the normal reporting procedures. Officers are required to provide appropriate first aid following any use of force. The Incident Commander will direct a supervisor to prepare a master Supervisor's Use of Force Report to document any uses of control holds or takedowns used to take protesters into custody. If significant force, other than control holds or takedowns are used against a person, a supervisor will be assigned to complete a separate use of force report.

Overtime for this detail will use work order NYD09 – 9/8/11 Protest.

Sergeant Kreitzer will ensure that sufficient SFSD property envelopes and field arrest cards are available to properly document mass arrests if this becomes necessary. She will provide a mobile-booking kit to the booking coordinator.

8

Law Enforcement Sensitive – Do Not Distribute

## CONFIDENTIAL

Two Tactical Team officers will be designated as team videographers. These officers should document protest activity on the platform and also any dispersal orders, arrests or other enforcement action taken by Tactical Team officers during the event. An officer will also be assigned to take photos of all arrestees, with the arresting officer, before the arrestee is transported to jail.

Bolt cutters are located at Embarcadero (System Service Room), Powell and Civic Center (police offices). If protesters employ lockdown devices that are beyond the capability of bolt cutters to remove, the BART "cut-crew" will respond to remove the devises. If the cut-crew is unavailable or is unable to safely remove the lockdown devices, the San Francisco Fire Department will be requested to respond and remove the devices.

Officer M. Lee #182 is designated as the Scribe for the Incident Commander. This officer is responsible for maintaining detailed notes as to the timeline of events and for documenting decisions that are made relative to policing the protest. This officer will be responsible for writing a police report at the conclusion of the event to memorialize what occurred with the event as a whole. The Scribe should remain with the Incident Commander at all times during the event.

Plainclothes-duty officers will not be utilized during this protest event.

In the event of a medical emergency, the request should be made through BART PD Dispatch via radio. The San Francisco Fire Department is the primary responding agency for medical emergencies. A paramedic is stationed on the Embarcadero platform during the evening commute.

The nearest trauma centers that service the downtown San Francisco Area are:

San Francisco General Hospital, 1001 Potrero Street, (415) 206-8111

St. Francis Hospital, 900 Hyde Street (at Bush), (415) 353-6000

**COMMUNICATIONS and CONTROL:**

The BART Incident Commander for this event is Deputy Chief Fairow. The Incident Command Center for this event will be located in the BART Operations Control Center, Lake Merritt Station, Oakland.

The Operations Chief will be Deputy Chief Hartwig. His Deputy Operations Chief is Lieutenant Wong. Deputy Chief Hartwig is primarily responsible for the Powell Street Station. The location of his command post will be at that station. As needed, the Operations Chief may divide his team for deployment to another location.

Deputy Chief Glenn-Davis is the Logistics Chief and also liaison to SFPD. She will be located in the SFPD Command Post, at Larkin & Hyde Streets.

9

## Law Enforcement Sensitive – Do Not Distribute

## CONFIDENTIAL

PIO requests should be made through DC Fairow, who will relay them to the Media Department representative in the OCC.

The BART Police Watch Commander will be responsible for coordinating the movements of patrol personnel not directly involved in the protest, working in conjunction with the Incident Commander.

The Tactical Team Commander and supervisors will be located at Powell Street Station with the Tactical Team.

Patrol Team sergeants will be assigned as station Tactical Supervisors for Montgomery and Civic Center Stations. These sergeants will function as the on-scene tactical supervisors, under the direction of the Incident Commander or appropriate Operations Chief.

**All BART Police radio traffic related to this protest event (Tactical, CAP and SWAT Teams and patrol units in San Francisco) will be conducted on the Service channel (channel 1) unless otherwise directed.** Officers should disable the "scan" function on their radio at the start of the deployment. At least one dispatcher will be assigned to staff the service channel for the duration of the deployment. Tactical personnel shall use their badge numbers preceded by "Tac" as their call signs, e.g. Tac 111. Tactical Team sergeants will use their normal call signs. Patrol personnel not involved in the protest will use the Dispatch channel (channel 2). A roll-call will be performed to confirm that every unit assigned to the event has switched to the Service channel. If possible, the squad/team leader will advise that all officers are present and on the correct channel to avoid extended radio traffic. Dispatchers working the Service channel will advise units working the event of any major incidents occurring elsewhere in the District that might have an effect on the tactical incident.

In the event that radio communications fail for some reason, all officers will immediately switch to the following channel: *Talk Group 2 (radio display reads S2 SMA) and put their channel selector knob on Channel 10 (radio display reads BPD *TA)*. This channel does not use the radio repeater system and is therefore limited to line-of-sight communications. However, it should allow radio communication between officers working inside the same station, as well as short distances outside the station. In the event of communications failure, the Mission and Execution paragraphs of this order will remain in effect, with individual Tactical Sergeants taking responsibility for safe deployment within their stations. Cell phone communications should be attempted with the Operations Chief when possible, to provide a status update and receive instructions.

The radio patch that used to allow direct radio traffic between SFPD and our department is no longer in effect. As a result, SFPD officers will likely be unable to communicate effectively with their dispatch center once they enter the underground portion of the BART station. The primary means of communication with SFPD and SFSD personnel inside the BART stations is telephone or face-to-face. When SFPD units are deployed inside BART stations to assist us, a BART officer **shall** be assigned as a communications liaison.

10

## Law Enforcement Sensitive – Do Not Distribute

# CONFIDENTIAL

Radio protocol for the protest is as follows: A dispatcher will be on the Service channel beginning at 1500 hours and will create an "INFO" event once the teams arrive downtown. If arrests are made, a separate case number will be created and will include the arrest time, the charge, and officer-case assignment. There should be a note in the new arrest case referring to the main-incident event number. A lead dispatcher will be assigned to the Dispatch channel. The lead dispatcher will **not** be monitoring the Service channel, so protest updates need to go through the Service channel only. If asked on the main channel, the lead dispatcher will advise units to switch to the Service channel for any information/requests regarding the event. Once in service, "B" platoon units assisting in San Francisco need to switch to Service as well. Supervisor Gary Hesson will be the contact person when dispatch information is needed by phone, at extension 7094. He will be monitoring both the Service and Dispatch channels.

Intelligence indicates protesters may be monitoring police radio traffic in near real-time. All personnel should minimize radio traffic to the extent possible. Supervisors should communicate for their teams, except in emergency. All personnel should be aware that police radio traffic is not secure and that all transmissions they make may possibly be monitored by those attempting to disrupt service or commit crimes within the system.

Each team will be loaded in **ALLIANCE** as squads. EX: **SQUAD1, SQUAD2,** ETC. Each Squad / Team Sgt will be doing the radio communications for their team and will be using squad and then the number(s). *This includes teams assigned to the event from other zones.* The TAC team will be loaded as squads as well individual badge numbers. The two SWAT teams will be loaded as **TEAM1** and **TEAM2** as well as by badge. The CAP team will use their normal "X" call signs. If the VIPR team is on duty, they will be loaded individually as V1, V2, ETC. Their information will be proved to the Dispatch Supervisor after the TAC team briefing.

- **TAC, SWAT, CAP and patrol teams from other zones assigned to the incident will use the SERVICE channel exclusively:**
  A dedicated dispatcher will be assigned to this channel to monitor traffic, log information and handle requests from units in the field for this specific incident.

- Once squads switch to the designated channel, a roll-call will be performed to confirm EVERY involved team member, including beat units assigned to the event, tactical sergeants and lieutenants are on the correct channel. If possible, the sergeant or designated team leader will advise that all officers are present and on the correct channel to avoid extended radio traffic.

- Once the squad(s) switch to the designated channel, they will no longer be scanning and will not hear main dispatch traffic, including traffic from Command Staff. The dispatcher(s) working the Service channel will advise the squads of any major incidents that are going on over the main channel that could have an affect on the tactical incident. The dispatchers not on the main channel will not be

11

## Law Enforcement Sensitive – Do Not Distribute

## CONFIDENTIAL

able to hear all traffic on the designated Service channel. If incident updates are needed via the radio, the Service channel and not the main channel is to be used.

San Francisco County requires that copies of misdemeanor in-custody (arrestees that are physically booked into CJ #1, rather than being cited by BPD officers) reports are faxed to the OR Project and the SFPD Inspectors Bureau. Each case requires an Outside Agency Case Number (OACN), which must be written on the Field Arrest Card at the time of booking. The OACN can be obtained by calling SFPD Field Operations, at (415) 553-1071.

OR Project Fax – (415) 552-2202

SFPD Inspector Fax – (415) 553-9876

Law Enforcement Sensitive – Do Not Distribute

B.A.R.T.D.-000629

# CONFIDENTIAL

## Personnel Assignments

| | |
|---|---|
| **INCIDENT COMMANDER:** | Deputy Chief B. Fairow #C2 (510) 464-7230 (Incident CP) (510) 464-7054 (office) (510) 366-4792 (cell) Email: bfairow@bart.gov |
| **PLANNING SECTION CHIEF:** Deputy Incident Commander: BART PD Watch Commander: | Lieutenant A. Ledford #16 (510) 464-7020 (office) (510) 421-2454 (cell) (510) 464-7059 (fax) Email: aledford@bart.gov |
| Incident Command Post: | BART Operations Control Center 800 Madison Street, Oakland **(510) 464-7230** |
| Scribe: | Officer M. Lee #182 |
| Intelligence Unit: | Officer K. Dam #163 (510) 464-7096 (office) Email: kdam@bart.gov |
| **OPERATIONS SECTION CHIEF:** | Deputy Chief D. Hartwig #C4 (510) 464-7068 (office) (510) 421-2446 (cell) Email: dhartwi@bart.gov |
| Deputy Operations Chief: | Lieutenant E. Wong Email: ewong@bart.gov |
| **LOGISTICS SECTION CHIEF:** SFPD Liaison: | Deputy Chief J. Glenn Davis (C3) (510) 464-7031 (office) (510) 366-4750 (cell) Email: jglennd@bart.gov |
| **FINANCE SECTION CHIEF:** | Matt Cromer (510) 464-7077 (office) (510) 464-7075 (fax) |
| Tactical Team Operations Sergeant: | Sergeant S. Coontz #S57 (510) 464-7055 (office) Email: scoontz@bart.gov |

13

## Law Enforcement Sensitive – Do Not Distribute

B.A.R.T.D.-000630

CONFIDENTIAL

| | |
|---|---|
| SWAT Operations Sergeant: | Sergeant T. Pashoian #S51<br>(510) 476-3997 (office)<br>Email: tpashoi@bart.gov |
| CAP Team OIC: | Officer D. McCormick #137<br>(510) 464-7055 (office)<br>Email: dmccorm@bart.gov |

Tactical Team – Powell Street Station

| | |
|---|---|
| Commander | Lt. J. Conneely #L23 |
| Operations | Sergeant S. Coontz #S57 |
| Squad #1<br>(Arrests) | Sergeant M. Macaulay #S40<br>Sergeant G. Dominguez #S22<br>C. Shipley #109<br>K. Forehand #167<br>E. Jenkins #181<br>R. Martinez #205<br>B. Lucas #212 |
| Squad #2<br>(Arrests) | Sergeant T. Smith #S34<br>Sergeant K. Kreitzer #S52<br>R. Haney #110<br>L. Bush #111<br>S. Reiss #157<br>E. Schlegel #190<br>S. Christ #208 |
| Squad #3<br>(Cover) | Sergeant S. Jamel #S56<br>C. Perea #123 (video)<br>A. McNack #151<br>M. Manzano #186<br>E. Knudtson #197 |
| Squad #4<br>(Cover) | Sergeant T. Gurecki #S25<br>M. Pon #108 (video)<br>J. Power #169<br>Y. Joseph #196<br>P. Rodriguez #200<br>C. Valdehueza #201 |

14

Law Enforcement Sensitive – Do Not Distribute

# CONFIDENTIAL

### SWAT Team (Embarcadero Station - Rapid Reaction Force)

Team #1
Sergeant T. Pashoian #S51
E. Poindexter #147
L. Vallejo #140
J. Vuong #166
J. Enriquez #50

Team #2
Sergeant J. Ledford #S37
G. Washington #150
B. Cruz #24
P. Lennan #170
D. Boutain #191

### CAP Team/"Markers"– Powell Street

OIC D. McCormick #137
H. Abdoun #223
R. Jacobson #226
S. Coduti #227
R. Larson #228
E. Toscano #195
FAM C. Herren
FAM M. Reinhardt
FAM R. Salaz

### Patrol Personnel

Patrol Team #1-
Powell Street
Station:
Sergeant A. Fueng S47
Sergeant N. Weissich S35
G. Narcisse #220
D. Bussey #240
D. Greene #243
M. Kalagayan #217
A. Rudy #256
A. Rincon #229

15

## Law Enforcement Sensitive – Do Not Distribute

CONFIDENTIAL

Patrol Team #2 –       Sergeant J. Austin S44
Montgomery Street      Sergeant J. Sandoval S41
Station:               D. Jorgensen #121
                       I. Navarro #202
                       F. Guanzon #187
                       J. Tyler #128

Patrol Team #3 –       Sergeant M. Hayes S21
Civic Center           L. Scanlan #105
Station:               L. Shean #122
                       A. Dachauer #114
                       W. Woo #130


CSO Drivers:

R. Nagata (Van)
K. Potter (Van)
D. Puktianie (Van)
J. Garcia (DC Glenn-Davis)
C. Raine (DC Hartwig)

Law Enforcement Sensitive – Do Not Distribute

B.A.R.T.D.-000633

# CONFIDENTIAL

### Event Timeline

| Time | Event |
|------|-------|
| 1230 | Tac Team supervisors meeting in MTC Auditorium |
| 1330 | Briefing for Tac, SWAT & CAP Teams in MTC Auditorium |
| 1355 | "B" Platoon personnel report for duty at PPS |
| 1415 | "B" Platoon personnel report for duty at LMA |
| 1430-1445 | "B" Platoon personnel report for duty in Zones 2, 3 & 4 |
| 1500 | All designated "B" Platoon personnel report to assigned SF Stations |
| 1515 | All "A" Platoon personnel held-over until conclusion of protest |
| 1500 | Tac, SWAT and CAP teams in position in SF |
| 1630 | Protest begins |
| 1930 | Protest concludes |
| 2030 | "A" Platoon personnel released and "B" Platoon personnel assume beats |

### Criminal Codes Related to Protest Activities

| Code | Description |
|------|-------------|
| 148(a)(1) PC | Resist, Obstruct or Delay Officer (M) |
| 148(b) PC | Remove Weapon Other than Firearm (M) |
| 185 PC | Wearing a mask or disguise during the commission of a crime (M) |
| 243(b) PC | Battery on Peace Officer (M) |
| 243.3 PC | Battery on BART Employee (M) |
| 369i PC | Trespass/Interfere with Railroad (M) |
| 409 PC | Failure to Disperse from Unlawful Assembly (M) |
| 587(2) PC | Place Obstruction on Rails/Track (F) |
| 594.2(a) PC | Possession of Vandalism Tools (M) |
| 594.4 (a) PC | Vandalism by Caustic Chemical (M/F) |
| 640(d)(1) PC | Willfully Disturb Others in System (M) |
| 640(d)(2) PC | Carry Explosive, Acid or Flammable Liquid in System (M) |
| 640(d)(4) PC | Willfully Block Free Movement of Others (M) |
| 640(d)(5) PC | Tamper/Remove/Destroy System Facility or Vehicle (M) |
| 640.5(a)(1) PC | Graffiti on Public Transit (I) |

## Law Enforcement Sensitive – Do Not Distribute

B.A.R.T.D.-000634

# CONFIDENTIAL

### Contact Numbers

| | |
|---|---|
| Civic Center Police Office: | (510) 464-7635 |
| Powell Street Sgt's Office: | (415) 678-4012 |
| BART PD Dispatch: | (510) 464-7000 |
| | (877) 679-7000 (toll free) |
| BART Ops. Control Center: | (510) 464-4152 |
| San Francisco PD: | Southern Station (415) 553-1373 |
| | Tenderloin Station (415) 345-7300 |
| | Mission Station (415) 558-5400 |
| | Bayview Station (415) 671-2300 |
| | Field Operations (415) 553-1418 |
| San Francisco SD: | Captain Matt Freeman (415) 850-5480 |
| | Sergeant Michael Kim (415) 850-5559 |
| Oakland PD West W/C: | (510) 773-1344 |
| Oakland PD East W/C: | (510) 773-2756 |
| Alameda County SO W/C: | (510) 667-3601 |

Benson H. Fairow
Deputy Chief of Police
Operations Division

BHF:sc

Attachments:

Maps of Downtown SF Area
Protest Deployment Roster
Protest Situation History

18

## Law Enforcement Sensitive – Do Not Distribute

B.A.R.T.D.-000635

**EXHIBIT G**

1              UNITED STATES DISTRICT COURT FOR THE

2                 NORTHERN DISTRICT OF CALIFORNIA

3                          ---oOo---

4    DAVID MORSE,

5           Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10          Defendants.
     _____/

11

12

13

14

15              DEPOSITION OF STEVEN COONTZ

16              (Pages 1 to 82, inclusive)

17

18            Taken before SANDRA M. LEE

19                   CSR No. 9971

20                 December 2, 2013

21

22

23              Aiken Welch Court Reporters
                One Kaiser Plaza, Suite 505
                Oakland, California 94612
24            (510) 451-1580/(877) 451-1580
                 Fax:  (510) 451-3797
25                 www.aikenwelch.com

18

1    When?

2    BY MR. SATTERLUND:

3         Q.  If you have anything --

4         A.  I don't have anything to add, no.

5         Q.  You don't remember seeing him, for example,

6    taking photographs?

7         A.  Not particularly, no.  I can't say that he

8    wasn't, but I don't recall specifically that he was.

9         Q.  And were you aware of any of the media that

10   Mr. Morse was uploading to the internet about this

11   protest campaign?

12        A.  I saw -- had seen articles on Indybay, or

13   pieces, whatever you want to call them, that he had

14   written.

15        Q.  What sorts of --

16        A.  They were under the name of Dave Id.  I didn't

17   know who Dave Id was particularly.

18        Q.  And are you aware of other personnel at BART PD

19   following the work of Dave Id in any way?

20        A.  Not specifically, no.  They may have been.  I

21   don't know.

22        Q.  Did you have any conversations with fellow

23   officers about Dave Id or his work?

24        A.  Not specifically, no.  I mean, my -- my

25   interest in the articles was primarily as a means of

1    predicting when the next protest might occur, that sort

2    of thing.  It wasn't situational awareness of what was

3    going on.

4        Q.  Did you have any sense of Dave Id's position or

5    opinion or attitude towards the protests?

6        A.  Towards the protest?

7        Q.  Uh-huh.

8        A.  The pieces that I saw in Indybay were certainly

9    pro the protest message.  They supported it.  They

10   seemed to be editorializing in favor of the protest

11   groups that were there.

12       Q.  Was there any other content that you observed

13   in addition to editorialization, other print or other

14   sorts of media?

15            MR. ALLEN:  Objection; vague.

16            THE WITNESS:  I don't really understand what

17   your question is.  Other sorts of media?  What do you

18   mean?

19   BY MR. SATTERLUND:

20       Q.  Were there photos or video or audio?

21       A.  There were photos under some of the Indybay

22   stories.  I don't know specifically that they were

23   attached to his.  There were a number of articles

24   written by different people regarding the effects of

25   2011 and our department.  I couldn't attach one, whether

20

1    there was a video or a photo with one person's.  I don't

2    know who they were attached to or not.  I know they were

3    there, but I don't know what story they were attached

4    to.

5         Q.  You said you don't recall any conversations you

6    had with other officers indicating whether they were

7    following this material as well?

8         A.  Not particularly, no.

9         Q.  Was Dave Id discussed in your presence at any

10   time prior to the September 8th protest?

11        A.  I don't know.  May have been.  I don't know

12   specifically.

13        Q.  Do you recall him coming up at any meetings or

14   briefings that might have occurred?

15        A.  Again, I couldn't say specifically when.  I

16   know he was discussed, but I don't know -- I couldn't

17   tell you when exactly that occurred.

18        Q.  Understood.

19             What was the nature or subject of this

20   discussion that you do recall?

21        A.  Just that the sense was, as I said, he seemed

22   to be an active organizer of the group that seemed to be

23   behind most of the protests that we should be alert for.

24        Q.  Are you aware of the basis of that opinion on

25   the part of the people who told you that?

21

1    A.  No.  I mean, I could speak for myself.  I

2  formed that impression based on what I'd seen.  I don't

3  know what they based their impressions on.

4    Q.  You don't recall when you had that conversation

5  with other officers?

6    A.  No.  Not specifically.

7    Q.  Do you know for certain whether you had formed

8  your own belief before or after this belief was

9  expressed in this meeting you recall?

10   A.  I couldn't say whether it was before or after.

11 I could say I formed my impression fairly early on when

12 the protests began in I believe it was July.

13   Q.  Let's move to the September 8th protest more

14 specifically.

15       Were you involved in any of the planning for

16 BART PD's response to that?

17   A.  To some extent, yes.  We had formed sort of an

18 operational plan for the protest when they began in

19 July.  They were so frequent we basically modified the

20 plan slightly for each successive event that occurred.

21   Q.  Can you give me a sort of overview of that

22 plan?

23   A.  Well, as I recall -- it's been some time -- we

24 were not certain where the protests were going to occur,

25 what stations that were going to be selected by the

23

1    on what we thought was going to occur, then we would.  I

2    couldn't tell you what changes were made for each

3    protest.

4         Q.  You've said you don't remember when you got

5    involved in planning for the September 8th protest, but

6    you say you were involved in that specific round of

7    planning.

8             What were you doing?

9         A.  Well, my recollection is it was -- my role was

10   more of a logistics and operational type of assistance

11   rather than planning.  It wasn't -- I guess I'm not

12   finding the right words to describe it.  I was more of

13   an assistant to the lieutenant and people who were

14   charged to move the logistics and organize things so it

15   functioned as smoothly as possible.

16        Q.  Let's look at the plan for the protest.  This

17   has been previously produced and marked as Exhibit 2.

18            MR. ALLEN:  The court reporter needs you to

19   look at the official exhibit.

20   BY MR. SATTERLUND:

21        Q.  Did you yourself read this plan before the

22   protest?

23        A.  I'm sure I did.

24        Q.  What typically is done with an operations order

25   like this; how did it get rolled out?

1    A.  Our practice is generally that the hard copy or

2    photocopy order would be distributed to the supervisors.

3    Sometimes there's copies enough for the officers, but

4    generally speaking not.  The order is then gone over in

5    a verbal briefing with the people who are going to be

6    participating in whatever the operation is going to be

7    for that day.

8    Q.  Do you know who generated this specific order?

9    A.  No, I don't.  Deputy Chief Fairow signed it --

10   actually, I don't know who signed it.  I don't know who

11   generated it.

12   Q.  Who typically would be in charge of both

13   drafting and issuing a report like this?

14   A.  Well, as I said, my understanding was that the

15   basic order would just change for each succeeding

16   demonstration.  This is probably an amalgamation of the

17   orders that had gone before with any adjustments that

18   the person -- the commander felt were necessary, which

19   is Deputy Chief Fairow.  That would be published with

20   their signature on it.

21   Q.  And do you know what role that order assigned

22   to you specifically for this specific --

23   A.  I'd have to look, if that's all right.

24   Q.  Please.

25   A.  There's usually a schedule or roster attached.

25

1        MR. ALLEN:   Page 13.

2   BY MR. SATTERLUND:

3        Q.   Looks like you're on the bottom of the page.

4        A.   I was the operation sergeant for the tactical

5   team.

6        Q.   I see next to your name S57.

7        A.   Yeah.

8        Q.   What was -- was that a call number?

9        A.   That was my badge number.   For sergeants and

10  lieutenants, their badge number is their call sign in

11  the department.

12       Q.   So that would be consistent throughout?

13       A.   Yes.

14       Q.   And was your specific position also consistent,

15  or did you get moved to any other duty at any point

16  during this?

17       A.   I couldn't -- I don't recall exactly.  I may

18  have been doing different duties on different events.

19  It could have been.  I don't remember specifically.

20       Q.   If this says for September 8th you're tactical

21  operations sergeant, does that mean that you would be

22  reliably in that role throughout?

23       A.   For that day, yes.

24       Q.   We've sort of chipped at this before.

25            What is the duty specifically of a tactical

1        Q.  And is there any room for interpretation as to

2    what --

3            MR. ALLEN:  Vague, overbroad, calls for

4    speculation.

5    BY MR. SATTERLUND:

6        Q.  What I'm trying to get at is:  How obstructed

7    do the fare gates need to be before they're blocked?

8        A.  If people cannot access the system to get on

9    the trains, then it's blocked.  If they can't safely get

10   by whoever or whatever is in the way, then they

11   effectively prevent access to the system.

12       Q.  What about in the instance of a dense crowd; if

13   it is possible to navigate through albeit slowly and

14   with some bumping into people, are the fare gates still

15   blocked?

16       A.  That would be something I would have to see and

17   make a determination based on what I see as to whether

18   the patrons can realistically access the system.

19       Q.  So would the crowd have to be more difficult to

20   get through than the sort of 5:15 p.m. weekday rush hour

21   to constitute a blocked fare gate?

22           MR. ALLEN:  For purposes of 369i, or are you

23   just asking his opinion as to whether or not a blocked

24   fare gate is just a congested area in front of the fare

25   gates with patrons coming and going?

30

1       MR. SATTERLUND:  Right.  With regard to

2 blocking fare gates as this order is discussing it.

3       MR. ALLEN:  That's vague, calls for

4 speculation.  This order is designed for that person who

5 had the intent to block the fare gates to create a

6 disturbance and/or otherwise interfere with the

7 operation of the train system, which is different from

8 someone just simply having a rush hour congestion in

9 front of fare gates.

10 BY MR. SATTERLUND:

11     Q.  Let me get that from you, if I may.

12     A.  Well, the evening commute, having to stand in

13 line to get through the fare gates beyond other people

14 who are doing the same thing is not the same as not

15 being able to get to the fare gates because people are

16 deliberately standing in the way impeding your access to

17 the gates.  That's the distinction in my mind.

18       MR. ALLEN:  And, Mr. Sutherland, just so we're

19 clear on the record, because I always like my records to

20 be clean and not an inference of I'm trying to coach my

21 witnesses, you're referring to the fifth paragraph.  You

22 jumped down from the first sentence which states "The

23 department will take a zero tolerance approach to

24 disruptive, unsafe and unlawful activity occurring on

25 the platform or concourse during this planned protest,"

1  down to the fifth or sixth sentence and then asked him

2  to opine on what a blocked fare gate was.  I just wanted

3  to make sure that we were discussing it in the same

4  context of unlawful activity, which was the precedent --

5  the precedence to your question.

6          MR. SATTERLUND:  Okay.  The record is

7  clarified.

8  BY MR. SATTERLUND:

9      Q.  So what it seems to be getting at, and correct

10  me if I'm wrong, are you saying there's an intent

11  requirement?

12      A.  I think -- yeah.  I think that's fair.  The

13  intent, I believe, behind this paragraph in the order

14  was that we were not going to be allowing people to

15  block the gates, people intending to block the gates for

16  whatever purpose and they're restricting people from

17  using the transit system.

18      Q.  Does that intent have to be specific to each

19  person in order for them to be arrestable?

20          MR. ALLEN:  Objection; calls for a legal

21  conclusion.

22  BY MR. SATTERLUND:

23      Q.  In order for you to conclude you had the

24  authority to arrest somebody, would you have had to

25  believe that they personally intended to be preventing

1    others from entering the BART system?

2        A.  I think under 369i of the Penal Code, yeah,

3    there's an element of being a willful act to impede the

4    services of the system.

5        Q.  If hypothetically there was somebody caught up

6    in the crowd while trying to get through to use the

7    system, would it be fair to say you would not think that

8    that person was guilty of blocking the fare gates?

9        A.  If it did not appear that they intended to be

10   there and they weren't intending to block the fare

11   gates, then, no, I would not think they were breaking

12   the law.

13       Q.  How would you have gone about determining in a

14   large crowd of people who intended to be blocking the

15   fare gates?

16           MR. ALLEN:  Objection; vague and overbroad.

17   It's also an improper hypothetical and assumes facts not

18   in evidence.

19   BY MR. SATTERLUND:

20       Q.  You can answer.

21       A.  How would I go about -- can you restate your

22   question?  I don't think I really understood it.

23       Q.  What evidence would lead you to conclude that a

24   given person in a crowd of people intended to be

25   blocking the fare gate?

48

1    BY MR. SATTERLUND:

2        Q.  Can you give me an idea of the frequency with

3    which you noticed Mr. Morse?

4            MR. ALLEN:  Objection; vague as to time,

5    overbroad.

6            THE WITNESS:  If you're asking me while they're

7    marching around, I suppose I would have seen him every

8    time they came around.  I don't know how many times that

9    was.  I wasn't specifically looking for him, but I would

10   have captured him in my field of view.

11   BY MR. SATTERLUND:

12       Q.  Was he chanting?

13           MR. ALLEN:  Objection; vague as to time.

14           THE WITNESS:  If you're asking me was he

15   chanting during that particular protest at that

16   particular time, I don't know.

17   BY MR. SATTERLUND:

18       Q.  During this phase while people are circling the

19   ticket machines, you don't have any specific

20   recollection of seeing Morse chanting?

21       A.  Specifically, no, I don't.

22       Q.  Roughly how long would you say people were

23   circling the kiosk?

24       A.  Again, I have no -- I couldn't tell you an

25   exact time.  It went on for some minutes, very slowly

1        A.  Well, there was a group of -- large group of

2    people that were in a mass, and then there were people

3    that were trying to make their way around the outskirts

4    of the group to get by or do whatever business they had

5    to do.

6        Q.  Where were the media that were covering the

7    group?

8        A.  Some were on the outskirts.  Some were filming

9    it from a distance.  Some were, I'm assuming, talking to

10   people, interviewing, taking recordings, et cetera.  It

11   just depended on what media person you're talking about.

12       Q.  When you say "inside," you mean inside the

13   group?

14       A.  I'm sure they were, some of them, yes.

15       Q.  And during this phase, were you still inside

16   the paid area of the concourse?

17       A.  I don't recall where -- I moved around because

18   I was making announcements to the crowd that if they

19   blocked the fare gates they were subject to arrest.  I

20   moved to different locations for everyone in the group

21   to be able to hear my announcements so everybody would

22   have the information they needed.  I moved to various

23   locations so my announcements would be heard by

24   everybody.

25       Q.  What specifically did you announce?

52

1        A.  I don't recall the exact verbiage.  Essentially

2   I was telling them that it was unlawful to block the

3   fare gates, to block access to the system, and that if

4   they did so or continued to do so, they'd be subject to

5   arrest.

6        Q.  Did you receive during this phase any orders,

7   instruction or information from the chain of command?

8        A.  While I was doing that, no, other than to

9   continue what I was doing.  I was moving around the

10  outskirts because I couldn't really get through the

11  group so everybody could hear what I was saying.

12       Q.  Were these the only fare gates into the

13  station?

14       A.  No.  There's a secondary set down roughly a

15  block away at the other end of the station.

16       Q.  Were there any obstructions that you could see

17  around the secondary set of fare gates?

18       A.  Not that I recall, no.

19       Q.  Where did you observe people going who tried to

20  get into the system and could not?

21       A.  They would walk away.  I don't know where they

22  went.  I don't know.  It's difficult to tell where they

23  went.  I wasn't focusing on the people that weren't

24  creating a problem.

25       Q.  When you were making these announcements, what

53

1    force did those announcements have?

2            MR. ALLEN:  Objection; calls for speculation.

3            THE WITNESS:  Are you talking about the volume

4    of them or what impact did they have on the people who

5    heard them?  Because I couldn't speak to them.

6    BY MR. SATTERLUND:

7        Q.  What impact did you intend them to have on the

8    people?

9        A.  My intent was that everyone who was there would

10   understand that if they broke the law that they would be

11   subject to arrest, and that if they were blocking

12   ingress and egress from the system that they were

13   breaking the law and that they were subject to arrest so

14   no one would be surprised if they were to be arrested

15   and give people the opportunity to make a choice.

16       Q.  Would it be fair to say these were on the order

17   of instructions or admonitions rather than orders?

18       A.  They were advisements as to what the possible

19   consequences were of them continuing or if they moved on

20   to do other illegal acts.

21       Q.  How did the crowd respond; did they react in

22   any way to your instruction?

23       A.  Not that I recall, no.  I got no specific

24   response from anyone that I remember.

25       Q.  What happened next?

54

1    A.  Well, again, I don't know what the timeline is,
2    but at some point, the group appeared to be stationary
3    and unwilling to move.  A decision was made that they
4    had violated 369i of the Penal Code and we were going to
5    make a mass arrest.
6    Q.  When you say "a decision was made," who made
7    the decision?
8    A.  I don't know.  I assume -- I believe it was
9    Deputy Chief Hartwig who then passed his instructions to
10   Lieutenant Conneely and to me and the other sergeants
11   who were there.
12   Q.  What makes you assume that?
13   A.  Because he was in charge at the scene and would
14   have been the one to logically make that decision.
15   Q.  What specific form did the instruction you
16   received take?
17   A.  It was -- I don't recall if he told me directly
18   or Lieutenant Conneely told me, but I was told that the
19   group that was the core protest group was going to be
20   encircled and arrested or detained at least.
21   Q.  And how was that put into effect; how were
22   officers arrayed to accomplish this?
23   A.  Officers were instructed to form a circle
24   around the group that was in front of the gates and not
25   allow anyone to enter or leave.  They were being

55

1    detained for violation of 369i of the Penal Code.  The

2    officers stayed in a circle around them, and we then

3    went with our mass arrest plan, which was to remove

4    individuals from the group, either arrest them or

5    whatever we were going to do with them depending on what

6    they had done.

7         Q.  Did you give any specific instructions as to

8    how this was to be carried out?

9         A.  I believe my recollection is I helped place

10   some of the officers in the circle, and then I assisted

11   with some of the logistics as far as who the arrest team

12   officers were going to be, but I didn't specifically, to

13   the best of my knowledge, tell anybody to go get any

14   particular individual or make a particular arrest of a

15   person.  My role at that point became more of a

16   logistics and liaison role once the arrests started.

17        Q.  Would you have given any specific instructions

18   to arrest any specific person?

19            MR. ALLEN:  Would he have or did he?

20   BY MR. SATTERLUND:

21        Q.  Did you?

22        A.  I don't believe I did, no.

23        Q.  I'm going to play you an audio file that we

24   received from the defendants.  The Bates numbering has

25   just rearranged, so I will be in touch with you as soon

56

1   as we figure out where it is in the record.

2             (Whereupon, an audio file was played.)

3   BY MR. SATTERLUND:

4        Q.  Do you recognize either of those two voices?

5        A.  Yeah.  That's me and one of the dispatchers.

6        Q.  So --

7             MR. ALLEN:  Are you going to play any more on

8   that audio file, or is that the exhibit?

9             MR. SATTERLUND:  That's the exhibit.

10            MR. ALLEN:  Do you have the CD you want to pop

11  out?

12            MR. SATTERLUND:  It's in the other room.

13            MR. ALLEN:  Let me take a stab at a

14  stipulation.

15            I will stipulate that the audio file that has

16  just been played and identified by Lieutenant Coontz

17  as his voice regarding words to the effect that

18  Krystoff and his sidekick would be arrested is an

19  audio file produced by defendants under a request

20  for production of documents.  Recently the Bates

21  stamping on these documents was reorganized, and I

22  will stipulate that rather than have the need to

23  mark and produce it as an exhibit for this deposition,

24  that, in fact, it's a document in the form of that

25  audio file that's in our possession, has been produced

57

1    to plaintiffs.   Thus there shouldn't be any dispute at

2    trial over its use.

3              Are you satisfied with that?

4              (Discussion off the record.)

5              MR. ALLEN:   What I suggest, then, if you want

6    that exact language, you're going to need to burn a

7    copy of that so we can attach it as an exhibit if

8    my stipulation isn't good enough at this point in

9    time.

10             MR. SATTERLUND:   It's just in case we wind up

11   needing the language before trial and before

12   moving exhibits into the record.

13             MR. ALLEN:   Obviously if you need the language

14   in that transmission to oppose our summary judgment

15   motion, I'm not objecting to the use of it.   He has

16   identified his voice.   What we don't have, because we

17   don't have an exhibit specific at this point in time, is

18   the exact portion you played.   So I think to be on the

19   safe side, would you burn a copy of that and we'll

20   attach it as an exhibit to the record?

21             MR. SATTERLUND:   Sounds good.   We have copies

22   here, so I can bring it back here.

23             MR. ALLEN:   Is it just going to be that one

24   isolated portion?

25             MR. SATTERLUND:   Yes.

58

1          (Plaintiff's Exhibit 35 marked for

2          identification.)

3     BY MR. SATTERLUND:

4          Q.  Do you recall now having issued that

5     instruction?

6          A.  I did.  I passed it on.  It wasn't my -- I

7     didn't originate that.  I was told -- my recollection --

8     we had a circle of officers around a group of people.

9     We had to start somewhere, and that was where we

10    started.

11         Q.  So to whom were you issuing that order?

12         A.  To everybody on the radio who heard it

13    essentially.  That was the plan of how we were going to

14    begin removing people from that group as individuals as

15    opposed to the group and process them.

16         Q.  You said you didn't originate that.

17         Who did?

18         A.  To the best of my recollection, Chief Hartwig

19    made the decision on who was going to be first to be

20    removed from the circle.

21         Q.  Was Chief Hartwig present at the scene?

22         A.  Yes.

23         Q.  He passed that instruction along to you over

24    the radio?

25         MR. ALLEN:  I'm going to object; calls for

59

1    speculation.  It's been asked and answered.

2         THE WITNESS:  My recollection is that it was

3    verbal instruction.  I don't know if it was directly to

4    me or through Lieutenant Conneely to me, but that was

5    the plan.

6    BY MR. SATTERLUND:

7         Q.  What did you understand to be the reason for

8    starting with who were identified as Krystoff and his

9    sidekick?

10        A.  Because Cantor and, as I said, my impression

11   was, Mr. Morse, although I didn't know his name at the

12   time, were the organizers of the group.  And my

13   understanding was the hope was by removing the

14   organizers of the group, we would remove the potential

15   for violence or any further agitation as people were

16   removed from the circle.

17        Q.  You've told me everything that you know that

18   formed the basis for your impression that Mr. Morse was

19   one of the organizers?

20        A.  My personal impression, yes.

21        Q.  I'm sorry.

22             Who ordered the encirclement in the first

23   place?

24        A.  As I said, I believe it was Deputy Chief

25   Hartwig who made the decision that we were going to make

60

1   a mass arrest and that our standard practice would be to

2   encircle the crowd and detain them and then remove them

3   individually for the processing and investigation,

4   whatever needed to be done.

5       Q.  Was it your understanding that all the officers

6   who heard your order would understand what was meant by

7   "Krystoff's sidekick"?

8       A.  It was a term that I used.  I think everybody

9   understood the two were very close together and that

10  they were working together and that everyone there would

11  have understood what I meant, yes.

12      Q.  Had that specific term been used before in

13  connection with Mr. Morse?

14      A.  I don't know.

15      Q.  So can you think of a specific reason why you

16  would have believed everyone would understand who

17  Morse -- who Krystoff's sidekick was?

18      A.  As I said, my impression was they were working

19  together.  I believe the impressions of the other

20  officers were they were working together.  The term

21  "sidekick" is a brevity term to be used on the radio

22  that people would understand that the person with Cantor

23  was -- who was with him was his, quote, "sidekick" and

24  that they were the first two to be removed from the

25  circle.

61

1      Q.  Can you give me the definition of the brevity

2   term "sidekick"?

3      A.  No particular definition.  It's just a term

4   that came to me at the time to describe the person who

5   was with Cantor.  I think people there understood what I

6   meant.  That was my only intent behind using that term,

7   was it was a quick description that I think everybody

8   there would probably understand.

9      Q.  After the group was encircled -- first of all,

10   what happened outside of the encirclement; what was the

11   conduct of the rest of the protest at that time after

12   the encirclement was solidified?

13      A.  Well, the encirclement contained, to my belief,

14   the people who were involved in the protest.  The people

15   who were outside were either media or people that

16   happened to be passing by or patrons who were trying to

17   get around or uninvolved in the protest itself.

18      Q.  There were no significant developments in the

19   conduct of what was going on outside the circle while

20   you were processing?

21         MR. ALLEN:  Objection; vague and overbroad.

22         THE WITNESS:  If you're asking me if there were

23   other people who attempted to get involved or were

24   creating a disturbance as we were processing, yes, there

25   were.  We closed the station down because there was a

62

1   number of angry people who were yelling and screaming

2   and creating a disturbance.  It was decided to close the

3   station so we could safely process people.  The people

4   who were moved out of the station remained in Hallidie

5   Plaza.  You could see through the roll-up gates what was

6   going on, and they continued to yell and scream from

7   outside and photograph whatever.

8   BY MR. SATTERLUND:

9       Q.  When you say "it was decided," who made that

10  decision?

11      A.  Again, I believe it was Deputy Chief Hartwig.

12  He may have collaborated with some of the transportation

13  supervisors who were there at the time, because it

14  became an issue as to whether the station could safely

15  remain open or not.  I don't know if that occurred or

16  not.

17      Q.  How was the closure of the station effected?

18      A.  I began making announcements over the megaphone

19  that the station was closed and that trains would not be

20  stopping and that everyone who was in the station had to

21  leave.  To the best of my knowledge, the station agent

22  also used the PA system in the booth to make similar

23  announcements because we also had to clear people off

24  the platforms and the other parts of the station so that

25  we could roll down the gates and truly close the

63

1    station, which takes a little bit of time.

2        Q.  What was the -- what was the force or effect of

3    those announcements; were those also in the way of being

4    information or instructions?

5        A.  Well, they were instructions.  Some people

6    began to leave of their own accord once they realized

7    the station was closing and the trains weren't going to

8    stop.  There was some people who didn't want to leave,

9    and they had to be told the station was now closed and

10   they no longer had the right to be there.

11       Q.  At that stage, were there formal dispersal

12   orders issued?

13       A.  No.  I never issued a formal dispersal order.

14   They were told that the station was closed and that they

15   would have to leave.  It was not a dispersal order under

16   the law.  It was just an advisement that the station was

17   closed.  It was no longer open for business.

18       Q.  So no dispersal orders were issued throughout

19   the entire day?

20       A.  No.  Not by me.

21       Q.  So we have the circle.  The entire crowd is

22   eventually cleared out of the station.

23            During that time, is the circle actively being

24   processed, or do they stay there until everybody is

25   gone?

64

1    A.   The circle of officers around the group

2  remained in place.   People that were inside the group

3  were moved individually.   They were identified.   If they

4  were subject to arrest, they were arrested.   If they

5  were not, then they were released under 849b of the

6  Penal Code, and then they were escorted out one of the

7  exits so they could go about their business.

8    Q.   Who was making that determination?

9    A.   The determination as to whether someone would

10  be arrested or not?

11    Q.   Yes.

12    A.   If an officer had seen a person actively

13  involved in the 369i violation of blocking the gates,

14  then they were arrested and taken into the office to be

15  processed.   If they were not -- there were a number of

16  media people that were involved -- that became involved.

17  Inside the circle, there was, I believe, a patron who

18  just happened to be involved, gotten encircled.   Once

19  that was established, they were released as soon as they

20  could be done so.

21    Q.   How did you determine who was media?

22    A.   I don't -- I didn't determine any of it.   My

23  sense of -- my recollection of what was done was people

24  who had a press pass issued by the San Francisco or

25  Oakland Police Departments, anyone with an ID from, you

65

1   know, TV, radio, whatever station, those were taken at

2   face value.  And they were -- as long as they hadn't

3   been doing anything otherwise illegal, they were

4   released.

5        Q.  You said earlier that there were some

6   journalists within the group who were blocking the fare

7   gates.

8        A.  Yes.

9        Q.  Is it fair to characterize your testimony as

10  saying that it was the group as a whole that was

11  blocking the fare gates?

12       A.  Yeah.  I mean, there were people -- there were

13  protesters and media that were there that got encircled.

14  Chief Hartwig at one point made several announcements to

15  the group that was inside the arrest circle that anyone

16  who was media should come forward, identify themselves

17  and they would be released from the circle.  Several

18  took advantage of that.

19       Q.  To the best of your understanding, why were the

20  journalists being released?

21       A.  Because they had been covering the story and

22  were not involved in the actual protest.  They had not

23  committed any violations of the law.  They were allowed

24  to leave.

25       Q.  Even those who had been while covering the

66

1   story incidentally in front of the fare gates?

2       A.  I assume yes -- yes.

3       Q.  Were all of the people released as journalists

4   displaying press credentials?

5       A.  I wasn't involved in that process.  I can only

6   assume they had some sort of credential that identified

7   them as media.

8       Q.  Did you make any observations of Mr. Morse

9   during the processing of the arrestees?

10      A.  Not that I recall, no.  He and Mr. Cantor were

11  moved from the circle early on.  I stayed outside, so I

12  didn't have any contact, to my recollection, after that.

13          MR. SATTERLUND:  Let's go through this now so I

14  can clear up any -- if you could mark that as Exhibit

15  36.

16          (Plaintiff's Exhibit 36 marked for

17          identification.)

18  BY MR. SATTERLUND:

19      Q.  Have you seen this document before?

20      A.  No.

21      Q.  Could you take a minute to look over the first

22  page and see if you can tell me what it is.

23      A.  It appears to be a transcript of my Internal

24  Affairs interview with our IA investigator.

25      Q.  When was that interview conducted?

<u>REPORTER'S CERTIFICATE</u>

1

2

3      I, SANDRA M. LEE, a Shorthand Reporter, State of

4  California, do hereby certify:

5      That STEVEN COONTZ, in the foregoing deposition

6  named, was present and by me sworn as a witness in the

7  above-entitled action at the time and place therein

8  specified;

9      That said deposition was taken before me at said

10  time and place, and was taken down in shorthand by me, a

11  Certified Shorthand Reporter of the State of California,

12  and was thereafter transcribed into typewriting, and

13  that the foregoing transcript constitutes a full, true

14  and correct report of said deposition and of the

15  proceedings that took place;

16      That before completion of the proceedings,

17  review of the transcript was not requested.

18      IN WITNESS WHEREOF, I have hereunder subscribed

19  my hand this 20th day of December, 2013.

20

21

22

23      _____

24      SANDRA M. LEE, CSR NO. 9971
       State of California

25

# EXHIBIT H

# EXHIBIT I

1                UNITED STATES DISTRICT COURT FOR THE

2                  NORTHERN DISTRICT OF CALIFORNIA

3                            ---oOo---

4   DAVID MORSE,

5         Plaintiff,

6   vs.                                      No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART
8   Deputy Police Chief DAN HARTWIG,
    sued in his official and
9   individual capacities,

10        Defendants.
    _____/

11

12

13

14

15             DEPOSITION OF MICHAEL D. HAYES

16              (Pages 1 to 39, inclusive)

17

18            Taken before SANDRA M. LEE

19                  CSR No. 9971

20                October 16, 2013

21

22
             Aiken Welch Court Reporters
23           One Kaiser Plaza, Suite 505
               Oakland, California 94612
24           (510) 451-1580/(877) 451-1580
                Fax:  (510) 451-3797
25                www.aikenwelch.com

14

1      Q.   During that interview, IA asked you about David

2   Morse as well; is that correct?

3      A.   You know, it's been a year since then.  I'm not

4   a hundred percent positive.

5      Q.   When a police officer is asked to speak with

6   IA, what are the expectations of that police officer?

7      A.   Same as today.  You will tell the truth.

8      Q.   There's nobody swearing you to tell the truth;

9   is that correct?

10      A.   You're ordered to tell the truth.

11      Q.   By the IA officer?

12      A.   By the Internal Affairs officer, yes.

13          MR. SIEGEL:  I'd like to introduce the next

14   exhibit in order.

15          (Plaintiff's Exhibit 24 marked for

16          identification.)

17   BY MR. SIEGEL:

18      Q.   This is a pretty thick document.

19          Have you ever seen this before, this document?

20          MR. ALLEN:  Do you have a copy for me?

21          MR. SIEGEL:  Good idea.  Sorry.

22          THE WITNESS:  Generally as the officer that was

23   interviewed, you don't see this documentation.  After

24   when I was interviewed, I was never allowed access to

25   this.

1    was involved in unlawful activity?

2         A.  It just says that he's an Indybay reporter

3    based on this document.

4         Q.  Is it unusual to identify a reporter in a

5    document like this?

6              MR. ALLEN:  Objection; calls for speculation,

7    lacks foundation.

8    BY MR. SIEGEL:

9         Q.  In your experience.

10             MR. ALLEN:  Calls for speculation.

11   BY MR. SIEGEL:

12        Q.  You can answer.

13             MR. ALLEN:  You can answer a question unless I

14   tell you not to.  I object for the record.

15             THE WITNESS:  Answer the question?

16             MR. ALLEN:  Please.  You want the question read

17   back?

18             THE WITNESS:  Yes, please.

19             (Record read.)

20   BY MR. SIEGEL:

21        Q.  Referring to Exhibit 4.

22        A.  This is the first time in my experience that

23   I've seen this.

24        Q.  This is the first time you've seen a journalist

25   identified like this?

18

1        A.   In my history.

2        Q.   I'd like to direct your attention to page 31 of

3    the transcript.   Read this page to yourself, and I'll

4    have a few questions.

5        A.   Okay.

6        Q.   Is it true that Office Coduti asked you to look

7    at his report regarding the arrest of David Morse?

8        A.   It's true.

9        Q.   And it's true that he asked you to improve his

10   in-custody report?

11       A.   You said improve or approve?

12       Q.   Improve.

13       A.   "Improve" would not be the correct term.   He

14   asked me to approve.

15       Q.   I'm working from lines 5, 6 and 7.   Here it

16   states, "Officer Coduti asked me to look at his report

17   and to improve his in-custody report, and that's how I

18   know that he arrested Dave Id."

19       A.   It should be "approve," not "improve."

20       Q.   Were you asked to approve the investigative

21   report?

22       A.   Yes, I was.

23       Q.   Did you approve it?

24       A.   No, I did not.

25       Q.   Why not?

1          A.  There were certain details that I felt were

2     lacking in his report, and based on the fact I was not

3     there, I was not his direct supervisor and I didn't know

4     what those details were, I did not approve the report.

5          Q.  Did anybody order you to approve the report?

6          A.  No.

7          Q.  Why were you having the conversation with

8     Officer Coduti?

9          A.  Again, he came to me to -- because I was the

10    sergeant on duty, he asked me to approve his report

11    before going home.

12         Q.  So at what point were you the sergeant on duty?

13         A.  When I started at 1355 hours that day in Powell

14    Street, San Francisco.

15         Q.  Where was this conversation occurring?

16         A.  This happened in the Powell Street office.

17         Q.  If could you look at lines 13 and 14 on this

18    page, it reads, "I know I had issues when I read the

19    report."

20              Do you see that statement?

21         A.  Yes, I do.

22         Q.  What issues did you have with the report?

23         A.  Lack of detail.

24         Q.  How much detail is required in an arrest report

25    or an in-custody report?

22

1    BY MR. SIEGEL:

2         Q.  Lieutenant, I can represent to you that this

3    report was provided to us by BART in the course of this

4    lawsuit.  I don't know if there were earlier versions of

5    the report that were not finalized.

6         Did you help Officer Coduti edit his report?

7         A.  No.

8         Q.  Did you suggest he should edit it?

9         A.  As I recall from our conversation, I brought up

10   the fact that, in my opinion, there were details missing

11   from this report, and I did have concerns regarding

12   those details.  I wanted more specifics from him

13   regarding the violation of 369.

14        Q.  In this type of report, is the detail that

15   you're referencing, is that provided in the narrative

16   section?

17        A.  It would be provided in the narrative section,

18   correct.

19        Q.  If you could review page 4 of this document,

20   and I'll ask you a couple of questions.

21        A.  Page 4?

22        Q.  Yes, please.

23        A.  You're referring to the narrative?

24        Q.  Yes, please.

25        A.  On this copy, it says page 7.

23

1    Q.  The page number I'm referring to is on the

2    bottom of the document to the right.

3    A.  Got it.

4    Q.  Does this report have enough detail?

5    A.  For the violation of 369i?

6    Q.  Yes.  For a report of this nature, does it

7    explain in adequate detail the basis for the arrest?

8    A.  When you say "in adequate detail," this has

9    very basic minimal amount of information regarding the

10   violation of 369.

11   Q.  To have a better report, what information would

12   you like to see?

13   A.  Well, there's several areas, again, if I was to

14   approve this I would want.  Referring to this, when it

15   says, "I was standing in the free area near the fare

16   gates."  What's the distance?  I don't know what the

17   distance is.  I wasn't there.  I can't picture where

18   Officer Coduti was standing.

19       "When I heard a dispersal order given to the

20   protesters," what means or what information was that

21   disposal order given?  Again, I don't know.  I wasn't

22   there.

23       "The protesters were standing in between the

24   fare gates and the ticket machines."  Specifically

25   where?  What was the distance from the fare gates?  What

Aiken Welch Court Reporters   Michael Hayes   10/16/2013

24

1    was the distance from the ticket machines?

2              "After a couple of minutes," again,

3    approximately how long?

4              "BART police officers," which BART police

5    officers?

6              "Moved in and surrounded the remaining

7    protesters that did not comply with the lawful dispersal

8    order."  Again, remaining protesters, approximately how

9    many protesters did they surround?  How many officers

10   were used to surround them?

11             "Deputy Chief Hartwig approached me and said he

12   wanted me to start arresting protesters that were not

13   complying with the dispersal order."  That's pretty

14   simple.  It's basic.

15             "Deputy Chief Hartwig pointed at a man," I

16   would like a description of the individual.  Which man?

17   Give me a basic description of who that individual was.

18             "Later identified as Arrestee Morse."  I would

19   have put his name after "Arrestee Morse," first name,

20   last name, date of birth.

21             "Who was standing in a group of protesters,"

22   again, how large was the group?

23             "Near the edge of the circle," what does near

24   the edge of the circle mean?  How big was the circle?

25   Where was that circle located?

25

1      "Deputy Chief ordered me to arrest Morse for

2  trespassing on railroad property."   I would have asked

3  "In detail, what was the actions of that individual that

4  you were arresting at that time?"

5      He says, "I walked up to Morse and told him he

6  was under arrest."   For what?   I would have added what

7  he was under arrest for.

8      "I placed Morse in handcuffs, double locked

9  them, and checked them for proper fit."   That's

10 standard.   That's fine.

11      "I escorted Morse back to the Powell Street

12 BART Police Facility.   When you say "escort," what do

13 you mean?   Did you walk him?   Did you transport him on a

14 train, car?   What is escort?

15      "Morse's handcuffs were removed and replaced

16 with zip ties."   Why?   What was the reasoning behind it?

17      Morse was later taken to County Jail 1 in San

18 Francisco where he was cited and released on 369i PC,

19 trespassing on railroad property."   Who cited him, who

20 released him and what time did that occur?

21      Q.  Is it fair to say that this report is in

22 similar condition to the report you reviewed on the date

23 in question?

24      A.  I cannot testify that this report was the exact

25 report that I reviewed that day verbatim.

26

1    Q.  But it has similar problems to those you

2    identified in your IA investigation?

3    A.  Well, again, not problems but details.  It's

4    lacking details.

5    Q.  Were you trained on how to write a report such

6    as this?

7    A.  I was trained to write reports, yes.

8    Q.  What training have you received regarding

9    report writing?

10   A.  In the Alameda County Sheriff's Department,

11   basic academy.  Also through BART, a report-writing

12   class that they had.

13   Q.  Returning to the transcript, at line let's

14   start with line 15.

15   A.  On what page?

16   Q.  Page 31.  Sergeant Kwon asks "And what issues

17   did you have when you read his report?"

18        You respond, "That I remember in Officer

19   Coduti's report is that he was instructed by," and then

20   later you say "he was instructed by Deputy Chief Hartwig

21   to place Dave Id under arrest?"

22        MR. ALLEN:  May I ask you to read the

23   entire comment and not just a portion of it, so we have

24   clear context?

25        MR. SIEGEL:  Okay.

29

1    was enough details in this report for me to sign off on

2    arrest for 369i.  However, I'm not saying that the

3    minimum amount of information is not appropriate for an

4    arrest for 369i.

5    BY MR. SIEGEL:

6        Q.  And is that what you meant when you stated "he

7    didn't have probable cause in the arrest report"?

8        A.  The details to my standard for approving the

9    report.

10       Q.  Are your standards higher than BART PD

11   standards?

12       A.  I'm BART PD, sir.  I'm a supervisor.  And as

13   far as the officer writing the report, I would say my

14   standards are higher than the officer that wrote this

15   report as far as the detail.

16       Q.  I'd like to direct your attention to page 33 of

17   this transcript beginning at line 5.  If you could read

18   all the way down to line 26, please.

19       A.  Okay.

20       Q.  Did you suggest to Officer Coduti that the

21   deputy chief write a supplement?

22       A.  I did.

23       Q.  What did he say?

24       A.  He was reluctant, and rightfully so.

25       Q.  Why do you say that?

30

1    A.  You have to follow the chain of command.

2    Q.  So it wouldn't be typical practice for a

3   lower-ranking officer to ask a higher-ranking officer to

4   help write a report?

5    A.  It wouldn't be typical for an officer to

6   recommend or suggest to a deputy chief that he write a

7   supplement.  No, that is correct.

8    Q.  Further down between 20 and 26, you state,

9   "I -- what I remember is -- is he was following the

10  orders of Deputy Chief Hartwig and he felt confident

11  that the probable cause for the arrest and the

12  observations of the violations were made by Deputy Chief

13  Hartwig and because Dave Id was in the immediate area

14  where the violations were occurring that it -- that

15  they'd had -- somehow interfered with running --"

16          Sergeant Kwon says, "Okay.  So --"

17          And you say "of the railroad."

18          Did Officer Coduti communicate to you that he

19  was basing his arrest report on the observations of

20  Deputy Chief Hartwig?

21    A.  No.

22    Q.  Again, I'm looking between 21 and 23 in

23  particular.  You state, "he was following the orders of

24  Deputy Chief Hartwig and he felt confident that the

25  probable cause for the arrest and the observations of

1    that point.  You posed the question at the end of line

2    23 where he says "Deputy Chief Hartwig" and then you

3    don't continue on.

4            MR. SIEGEL:  I posed the follow-up question

5    previously, and I already read the entire response.

6            MR. ALLEN:  You want to reframe the question

7    and take it out of context, that's why I'm posing it

8    now, this objection retroactively.  I'm asking you to

9    put it in context.  Or alternatively, I've made my

10   record and you can pursue the question based on stopping

11   in mid-sentence and asking the question.

12   BY MR. SIEGEL:

13       Q.  Let's look at page 34 between lines 1 and 11.

14   I believe this is a complete question and response.

15           Sergeant Kwon asks, "So just for clarification

16   did he give you -- did Officer Coduti give the

17   impression that he did feel there was probable cause or

18   did not feel there was probable cause?"

19           Response by Hayes, "I -- I believe he did feel

20   there was probable cause.  It's just that he could --

21   Coduti could not document what the observations were or

22   what the violations were because he had not viewed them

23   directly.  It was my impression that Deputy Chief

24   Hartwig had on-viewed the violations and it was a -- a

25   general thing that -- uh -- you know, his -- he was in

33

1   the area, he was standing near the fare gates, he was

2   blocking the -- the -- his participation was interfering

3   with running the railroad, he was blocking the fare

4   gates."

5           My question:   Is it still your impression that

6   Deputy Chief Hartwig viewed the violations that were

7   then the basis of Officer Coduti's report?

8       A.   Yes.

9       Q.   And Officer Coduti did not view directly the

10  violations?

11          MR. ALLEN:   Is that a question as to his

12  impressions, or is that asking his opinion?  You're

13  asking an opinion.  It calls for speculation.  I'm

14  objecting to the form of the question.

15          Could you read the question, please?

16          (Record read.)

17          MR. ALLEN:   I'll object; calls for speculation

18  and it's been asked and answered.

19  BY MR. SIEGEL:

20      Q.   Let's break this down.

21          Did you believe that Coduti could not document

22  what the observations were or what the violations were?

23      A.   Did I believe that Coduti could not document?

24      Q.   (Attorney nods head.)

25      A.   No.  I did not believe that.

1          You can answer the question.

2          THE WITNESS:  I'm sorry?

3          MR. ALLEN:  You may answer the question.

4          THE WITNESS:  No.

5     BY MR. SIEGEL:

6          Q.  You stand by the testimony you gave to IA?

7          A.  Yes.

8          MR. ALLEN:  Retroactively, this is as to pages

9     33 or 34 or the entirety of the transcript?

10         MR. SIEGEL:  Actually, we probably have the

11    time.  I'd like to give you the chance to read the

12    entire transcript.

13         If you don't mind, Counsel, could we do that

14    off the record?

15         MR. ALLEN:  That's fine.

16         (Recess taken.)

17    BY MR. SIEGEL:

18         Q.  Thank you, Lieutenant, for taking the time.

19    We've given you a pretty small window of time to read a

20    49-page transcript.  I appreciate you making the attempt

21    to read it in a deliberate fashion.

22         After reviewing the entire transcript, do you

23    have any modifications to the testimony you gave?

24         A.  On the transcript?

25         Q.  The testimony --

36

1      A.   The Internal Affairs transcript?

2      Q.   Yes.

3      A.   No.

4      Q.   Just like to direct your attention to the

5   second-to-the-last page, 48, throughout this page and

6   the following page, there's a kind of ongoing question

7   and follow-up.   Feel free to refer to this page.

8          Is it true, to the best of your recollection,

9   that Officer Coduti felt that the group on September 8th

10  was violating 369i?

11     A.   Well, in his report, it states that "when

12  deputy chief pointed out a man identified as Rusty Morse

13  who was standing in a group of protesters near the edge

14  of the circle, he ordered me to arrest Morse for

15  trespassing on the road or property."   So if Morse was

16  standing in the middle or in the group and Deputy Chief

17  Hartwig ordered him to arrest Morse, it would be

18  reasonable to believe that the group was in violation of

19  369i.

20     Q.   Again, there's kind of an ongoing question and

21  answer, but if you could look at the statement you make

22  at line 28 of page 48 and then the first two or three

23  lines of page 49, is it true that Officer Coduti did not

24  see individual actions, but the individual was partaking

25  in the group movement?

37

1        MR. ALLEN:  I'm going to object that it

2   mischaracterizes his testimony, it's overbroad as to the

3   entire context of this 49-page interview.  It's also

4   been asked and answered.

5   BY MR. SIEGEL:

6        Q.  Do I understand your IA statement correctly?

7        MR. ALLEN:  I'm going to object that it's vague

8   and overbroad, that question you just asked.

9   BY MR. SIEGEL:

10        Q.  In the context of my previous question, am I

11   interpreting your statement correctly, that Officer

12   Coduti didn't see individual actions but the individual

13   was partaking in the group movement?

14        MR. ALLEN:  I'm going to object that it's

15   vague, overbroad, calls for speculation.

16        THE WITNESS:  Am I to answer that?

17        MR. ALLEN:  If you understand what he's asking

18   you.

19        THE WITNESS:  I'm kind of confused.  What I

20   said is what I said here.  It's based on...

21   BY MR. SIEGEL:

22        Q.  In lines 28 of page 48 and 1, 2, 3 of page 49,

23   when you use the word "individual," are you referring to

24   David Morse?

25        A.  When you say "that individual" --

38

1       Q.  Yes.

2       A.  -- that individual's actions?

3       Q.  Yes.

4       A.  That's who I was referring to.

5           MR. SIEGEL:  Thank you.  I have no further

6   questions.

7           Mr. Allen?

8           MR. ALLEN:  No questions.

9           (Whereupon, the deposition was concluded at

10          4:55 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3

4          I, SANDRA M. LEE, a Shorthand Reporter, State of

5     California, do hereby certify:

6          That MICHAEL D. HAYES, in the foregoing

7     deposition named, was present and by me sworn as a

8     witness in the above-entitled action at the time and

9     place therein specified;

10          That said deposition was taken before me at said

11    time and place, and was taken down in shorthand by me, a

12    Certified Shorthand Reporter of the State of California,

13    and was thereafter transcribed into typewriting, and

14    that the foregoing transcript constitutes a full, true

15    and correct report of said deposition and of the

16    proceedings that took place;

17          That before completion of the proceedings,

18    review of the transcript was not requested.

19          IN WITNESS WHEREOF, I have hereunder subscribed

20    my hand this 1st day of November, 2013.

21

22

23

24          _____

         SANDRA M. LEE, CSR NO. 9971
25          State of California