# EXHIBIT J

**pages 1, 46-49 only of EXHIBIT 24
to the Deposition of Michael Hayes**

PLAINTIFF'S
Exhibit No. ___
M. HAYES
10-16-13

- INTERVIEW -

| | | |
|---|---|---|
| 2 | Kwon: | This is a recorded interview.  The date of this interview is May the |
| 3 | | 24th, 2012.  The time is approximately 0830 hours.  My name is |
| 4 | | Sergeant Kwon.  I'm here interviewing Lieutenant Mike Hayes who |
| 5 | | is represented by his attorney Mr. Justin Buffington from the law |
| 6 | | firm of Rains, Lucia, and Stern.  This is -- uh -- uh -- an -- an |
| 7 | | administrative investigation regards to an allegation of misconduct, |
| 8 | | specifically conduct unbecoming an officer, discourtesy and |
| 9 | | discrimination against Lieutenant Hayes.  And this centers around |
| 10 | | an incident that occurred -- uh -- back on September the 8th, 2011 |
| 11 | | -- uh -- at approximately 1800 hours at the Powell Street BART |
| 12 | | station.  Uh -- Lieutenant, I have here your Lybarger |
| 13 | | admonishment.  Were you able to review this form with your |
| 14 | | attorney? |
| 15 | Hayes: | Yes, I was. |
| 16 | Kwon: | Okay.  Do you have any questions about this form? |
| 17 | Hayes: | No, I don't. |
| 18 | Kwon: | Okay.  Uh -- from what I understand, back in September, around |
| 19 | | September there were a string of protests.  Do you recall -- uh -- |
| 20 | | those protests going on around that time? |
| 21 | Hayes: | I remember the string of protests, yes. |
| 22 | Kwon: | Okay.  And -- uh -- do you recall working any of those protests? |
| 23 | Hayes: | I worked several of those -- |
| 24 | Kwon: | Okay. |
| 25 | Hayes: | -- protests. |
| 26 | Kwon: | And -- uh -- do you recall this specific incident in question? |
| 27 | Hayes: | I do because I reviewed the roster from that day. |
| 28 | Kwon: | Okay. |

| | | |
|---|---|---|
| 1 | Hayes: | -- and Jacobson's. |
| 2 | Kwon: | Okay. And did you -- |
| 3 | Hayes: | Jacobson's I approved. Lucas's I did, but I sent the email saying |
| 4 | | there needs to be a supplement on this case to document the |
| 5 | | observations. And then when -- uh -- because Lucas's was a cite |
| 6 | | and release case, we could write a supplement on that and it |
| 7 | | wouldn't be as detrimental as Coduti's case where it's an actual |
| 8 | | arrest, we needed a supplement written that evening and |
| 9 | | unfortunately -- uh -- Deputy Chief Hartwig wasn't here at that time. |
| 10 | Kwon: | Okay. Or did you ever in -- uh -- request Deputy Chief Hartwig or |
| 11 | | voice your concerns that he should write a supplement as well? |
| 12 | Hayes: | Hmm, I don't think I did it directly to Deputy Chief Hartwig that |
| 13 | | evening. Uh -- I believe I discussed that with -- uh -- uh -- |
| 14 | | Lieutenant Kaneely (phonetic) at the same time that I discussed |
| 15 | | the -- uh -- my concerns with -- uh -- Brian Lucas's case as far as |
| 16 | | individuals were being cited or arrested and -- uh -- the reports |
| 17 | | themselves did not have the observations of the violation in the |
| 18 | | body of the narrative. |
| 19 | Kwon: | Okay. And what was Lieutenant Kan -- Kaneely's response to -- uh |
| 20 | | -- what you -- what you talked to him -- (overlapping) -- |
| 21 | Hayes: | Um -- I -- I have an email back and I -- I don't remember his exact |
| 22 | | response, but it was an understanding that -- uh -- my |
| 23 | | interpretation of that was it would be discussed because these |
| 24 | | were going to happen again in the future and that we needed to -- |
| 25 | | uh -- get these documented properly. |
| 26 | Kwon: | Okay. And -- uh -- just for clarification -- uh -- both Lucas and |
| 27 | | Officer Coduti, they had similar issues in the report; is that correct? |
| 28 | Hayes: | Correct. |

B.A.R.T.D.-000384

| | | |
|---|---|---|
| 1 | Kwon: | Okay. And was there a difference between Officer Coduti -- uh |
| 2 | | --finally -- I mean what prompted Officer Coduti to finally put in the |
| 3 | | elements of the crime? |
| 4 | Hayes: | Uh -- I don't know if he ever did put in the elements of the crime -- |
| 5 | | uh -- just based on the report that I saw that night. |
| 6 | Kwon: | Uh-huh. |
| 7 | Hayes: | Uh -- I don't know if -- because I never saw that report past that |
| 8 | | evening. I -- I haven't looked at the report since so I -- I don't know |
| 9 | | how to answer that. |
| 10 | Kwon: | Was it -- was there a difference between the concerns between |
| 11 | | Officer Coduti and Officer Lucas as far as -- uh -- uh -- why they |
| 12 | | didn't put the elements? Was -- was there a difference between |
| 13 | | why they did not? I know you stated that Officer Lucas -- uh -- |
| 14 | | voice concerns that he did not witness those violations; is that |
| 15 | | correct? |
| 16 | Hayes: | That is correct. |
| 17 | Kwon: | And what about Officer Coduti? Is there -- is there -- did have a |
| 18 | | similar response or was it different? |
| 19 | Hayes: | I believe it was a similar response that he did not directly observe |
| 20 | | the violations, but, again, because the -- the violations -- um -- |
| 21 | | because this individual was in the immediate area where the |
| 22 | | violations were occurring, that this individual -- uh -- was |
| 23 | | participating in the protest and in the protest itself was blocking the |
| 24 | | gates. |
| 25 | Kwon: | Okay. I'm going to back up here. |
| 26 | Hayes: | Okay. |
| 27 | Kwon: | For clarification again, now, so -- uh -- what you're saying is that |
| 28 | | Officer Coduti's reasoning was that he agreed that this person was |

B.A.R.T.D.-000385

| | | |
|---|---|---|
| 1 | | part of the protest but he did not specifically see this particular |
| 2 | | person; is that correct?  Or -- I'm -- I'm just trying to get a clear -- |
| 3 | | clear picture if he just did not believe there was probable cause at |
| 4 | | -- at all to arrest these people. |
| 5 | Hayes: | No. |
| 6 | Kwon: | Or is it because he did not recall this specific person's exact |
| 7 | | actions while they were in the crowd of people. |
| 8 | Hayes: | That he did not observe his exact participation in the circle or in -- |
| 9 | | in the movement -- (overlapping) -- whatever it was, but this |
| 10 | | individual was involved -- uh -- and when I say as a group, the |
| 11 | | group's actions were a violation of 369.  As a group, the group was |
| 12 | | blocking -- |
| 13 | Kwon: | Okay. |
| 14 | Hayes: | -- the gate. |
| 15 | Kwon: | And did Officer Coduti -- uh -- relate to you that he felt the group |
| 16 | | was in violation of -- 369?  Did he -- |
| 17 | Hayes: | Yes. |
| 18 | Kwon: | -- seem agreeable with that or was he -- |
| 19 | Hayes: | Yes. |
| 20 | Kwon: | -- disagreeable? |
| 21 | Hayes: | No, no, no.  As -- as a group he felt that he group was in violation -- |
| 22 | | (overlapping) -- |
| 23 | Kwon: | And -- |
| 24 | Hayes: | -- 369. |
| 25 | Kwon: | -- conversely, similar to Officer Lucas (inaudible) -- |
| 26 | Hayes: | Yes. |
| 27 | Kwon: | -- was it on the same lines? |
| 28 | Hayes: | Along the same lines, even though he didn't see that individual |

B.A.R.T.D.-000386

| | | |
|---|---|---|
| 1 | | actions but the individual was partaking in the group movement or |
| 2 | | the group action, and as a group, the group was violating |
| 3 | | PC 369(i). |
| 4 | Kwon: | Okay. |
| 5 | Hayes: | Okay. Does that -- |
| 6 | Kwon: | Thank you. Yes. |
| 7 | Hayes: | Does that clarify -- okay. |
| 8 | Kwon: | Yes. Okay. Uh -- any -- anything else that you feel is important to |
| 9 | | know? |
| 10 | Hayes: | No. No. I'm -- I'm -- I'm done. |
| 11 | Kwon: | Mr. Buffington. |
| 12 | Buffington: | I think the horse is dead and beaten. |
| 13 | Kwon: | Okay. Anything else, Mr. Buffington? |
| 14 | Buffington: | No. |
| 15 | Kwon: | Okay. If there's nothing else, then that will be -- uh -- that'll |
| 16 | | conclude our interview. The time now is approximately 0926 |
| 17 | | hours. (Recording Ends) |
| 18 | | **- INTERVIEW CONCLUDED -** |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

B.A.R.T.D.-000387

# EXHIBIT K

1        UNITED STATES DISTRICT COURT FOR THE

2          NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4   DAVID MORSE,

5        Plaintiff,

6   vs.                              No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART
8   Deputy Police Chief DAN HARTWIG,
    sued in his official and
9   individual capacities,

10       Defendants.
    _____/

11

12

13

14

15          DEPOSITION OF KEN DAM

16        (Pages 1 to 43, inclusive)

17

18      Taken before SANDRA M. LEE

19          CSR No. 9971

20         October 16, 2013

21

22

23          Aiken Welch Court Reporters
            One Kaiser Plaza, Suite 505
            Oakland, California 94612
24      (510) 451-1580/(877) 451-1580
            Fax:  (510) 451-3797
25            www.aikenwelch.com

12

1    on the bottom "Not to be released to the general public
2    or media."
3         Q.  How would you -- after you create a document
4    like this, how would you distribute it?
5         A.  Via e-mail.
6         Q.  Who would you send it to?
7         A.  I would send it to law enforcement personnel.
8         Q.  Do you have a list of all the BART PD, for
9    example?
10        A.  I don't have a list personally, but I do send
11   it to law enforcement personnel.  Yeah, BART police.
12        Q.  If you would also look at Exhibit 4, it's in
13   the other stack and if you would keep that document in
14   front of you.
15            Do you recognize this document?
16        A.  Yes, I do.
17        Q.  What is it?
18        A.  It's an informational bulletin that I produced.
19        Q.  Is it true that Deputy Chief Fairow asked you
20   to produce it?
21        A.  Yes.
22        Q.  Have you ever produced a "Be On the Look Out"
23   document, a BOLO?
24        A.  I have produced that.
25        Q.  Is it the same format as this?

14

1        A.  I was not in his presence while the protest was

2    happening.  I'm actually in my office.  My office is

3    actually separate from dispatch where they have the

4    close circuit.

5        Q.  You didn't enter what they call the command

6    room?

7        A.  DC Fairow is at the command post.  I don't know

8    exactly where he was that day.  I'm in my office, and

9    I'm monitoring things in my office.

10        Q.  Before DC Fairow asked you to produce this

11    document, had you ever heard about Dave Id?

12        A.  I have not.

13        Q.  Had you heard of Christopher Cantor?

14        A.  Yes, I have.

15        Q.  In what context?

16        A.  Well, I believe he's been arrested before

17    for -- for 369i at protests, causing disturbances.

18        Q.  Do you know he was arrested under 369i?

19        A.  I believe so.  That's the common Penal Code

20    that we use, so I believe so.

21        Q.  Might it also have been 409?

22        A.  You know, to be honest with you, I'm not sure

23    which Penal Code they used.

24        Q.  How did you go about acquiring these images?

25        A.  The images are on websites.  But for

15

1    Christopher Cantor, this one could have been on CRIMS.

2    Alameda County, they have people that have been arrested

3    before database.

4        Q.   So the picture in the top left of this flier is

5    a mugshot?

6        A.   I can't say for sure, honestly.   I'm not sure.

7        Q.   What types of pictures would be in the CRIMS

8    database?

9        A.   It would be mugshots.

10       Q.   And you think you got it from there?

11       A.   I can't be positive, to be honest with you.

12       Q.   How did you find the picture of Dave Id?

13       A.   I found that picture on Indybay, I believe.

14       Q.   Did you capture an image from the video?

15       A.   Going back, it appears that, yeah.

16       Q.   When did DC Fairow give you the assignment of

17   creating this document?

18       A.   Sometime during that day before the protest.

19       Q.   It was the same day?

20       A.   I believe so.

21       Q.   Have you ever created a flier like this for a

22   protest before?

23       A.   I don't recall.

24       Q.   How about since you created this one; have you

25   created another one like it for any protest?

17

1          Q.  How many people are at a briefing?

2          A.  This would be a rough estimate.  This is a

3     guess.  Because you have the CAP team, the tactical

4     team, you have officers coming in that were called in.

5     So roughly between 30 to 60 maybe.

6          Q.  You made dozens of copies pretty much?

7          A.  Right.

8          Q.  Do you recall what you said as you described

9     this document?

10         A.  No.  I don't recall.

11         Q.  Was somebody leading the briefing?

12         A.  Yes.  There was somebody else.  The command

13    staff was leading the briefing.

14         Q.  Who led the briefing that day?

15         A.  I don't recall.  It could be -- it could have

16    been the deputy chief.  It could have been one of the

17    lieutenants.  It could be -- it changed depending on who

18    was there.

19              MR. SIEGEL:  I'd like to mark this as Exhibit

20    21.

21              (Plaintiff's Exhibit 21 marked for

22              identification.)

23    BY MR. SIEGEL:

24         Q.  After you review this document, if you could

25    tell me whether you recognize this message.

18

1          A.   Uh-huh.

2               MR. ALLEN:   You have to reply audibly.

3               THE WITNESS:   Yes.

4     BY MR. SIEGEL:

5          Q.   Is this when you distributed Exhibit 4 to other

6     BART police?

7          A.   Yes.

8          Q.   How did you select the names to add to the cc

9     column of this e-mail?

10         A.   They're members of the tactical team, people

11    that work in the protest.

12         Q.   Do you think you added them one by one to the

13    e-mail, or do you have a group that you select that adds

14    multiple names?

15         A.   This looks like I added a group.  This looks

16    like I added all the command staff.  This one looks like

17    I included the command chief, lieutenants and sergeants

18    at the time.

19         Q.   And all of those ranks are included within

20    command staff?

21         A.   Yes -- well, command staff is primarily deputy

22    chiefs, lieutenants.  But for something like this, I

23    would probably put down sergeants as well.  This is what

24    I have in my address book, which is groups, so command

25    and then I have sergeants.

19

1        MR. SIEGEL:  Off the record for a second.

2        (Discussion off the record.)

3   BY MR. SIEGEL:

4        Q.  Do you recall that after you created -- let me

5   back up.

6            Do you notice that Exhibit 21 mentions it has

7   two attachments to the e-mail?

8        A.  Yes.

9        Q.  To the best of your recollection, are those

10  attachments represented by Exhibits 4 and 16?

11       A.  Yes.

12       Q.  Do you recall that at a certain point DC Fairow

13  asked you to produce updated versions of this document?

14       A.  Yes.  I believe so.  In fact, it's just this

15  one right here, I believe.

16       Q.  You're referring to Exhibit 16?

17       A.  Yes.  It's just whoever was additionally

18  arrested.  He wanted me to update this.

19       Q.  And do you recall if you did that?

20       A.  I honestly don't recall, because -- you have

21  all the e-mails we gave.  I don't recall.

22       Q.  Do you recall adding Mr. Morse to such a

23  document?

24       A.  Again, I don't recall, but you do have all the

25  e-mails.

1    Q.  You don't know that; you assume that, right?

2         MR. ALLEN:  We're in a delicate area here.

3    Part of that is attorney-client privilege, but you could

4    say you assume.

5         THE WITNESS:  I assume.

6         MR. ALLEN:  You don't know one way or the other

7    if he has them or not.

8         THE WITNESS:  That's correct.  I don't know.

9    BY MR. SIEGEL:

10    Q.  How was Exhibit 4 explained to the other BART

11   police staff?

12    A.  As I recall, it was only for informational

13   purposes only, and it was when -- that day we didn't

14   know where the protest was going to be, what station.

15   Again, for public safety and to run smoothly, we wanted

16   to know where the protest was going to be.  The way I

17   recall, it was being explained generally if they're

18   there, the demonstration tended to come to those

19   stations.

20    Q.  Were Cantor and Dave Id identified as subjects?

21    A.  Correct.  Subjects.

22    Q.  Were they identified as potential wrongdoers?

23    A.  I don't recall exactly that verbiage.

24    Q.  Was it inferred in any way that these two

25   individuals were likely to commit criminal activities?

22

1      A.  About the protest.  The day of September 8th

2  was the topic.

3      Q.  Did you ever get to see the transcript of your

4  Internal Affairs interview?

5      A.  I've only seen little bits.

6      Q.  What little bits did you see?

7      A.  The one about the radio.  That's all I

8  remember.  What else?  I know they referred to the

9  radio.  I didn't look at much of it, to be honest with

10  you.

11      Q.  Do you remember telling IA that Christopher

12  Cantor was a known instigator?

13      A.  I might have.  I might have.

14      Q.  Do you remember telling IA that Cantor was an

15  inciter of what would be the soon riots?

16      A.  I might have said that.

17      Q.  Do you remember why you might have said that?

18          MR. ALLEN:  Objection; calls for speculation.

19          MR. SIEGEL:  Sure.  Let's just cut to the

20  chase.

21          Exhibit 22, please.

22          (Plaintiff's Exhibit 22 marked for

23          identification.)

24  BY MR. SIEGEL:

25      Q.  I can represent to you that this is a

1   transcript that was provided to me by BART, what appears

2   to be a record of your IA interview.

3           You've not seen this complete document before;

4   is that correct?

5       A.  Correct.  I have not.

6       Q.  I'd like to direct your attention first to page

7   2.

8       A.  Okay.

9       Q.  I believe during the IA interview you were

10  interviewed by Sergeant Kwon; is that your recollection?

11      A.  Yes.

12      Q.  In the middle of this page beginning at line

13  13, Kwon asks you a question that ends with why these

14  two people were placed on the BOLO, and your answer --

15  it's apparent on the document here, but it refers to

16  Cantor having a history of being a visual leader for the

17  protest, a known instigator, inciter of what would soon

18  be riots.

19          Do you wish to change the testimony you gave to

20  IA?

21      A.  No.  That's what I said at the time.

22      Q.  And on what basis did you describe Cantor as an

23  instigator or inciter of riots; what information did you

24  rely upon when making that statement?

25      A.  Previous arrest history.

24

1     Q.  So other officers informed you of his previous

2  acts?

3     A.  There was also -- yes.  Other officers have

4  informed me.  There was also an incident.  I believe it

5  was the board of directors were -- paint was thrown at

6  one of the board of directors, and Cantor was visibly

7  present.

8     Q.  He was visibly present at that time?

9     A.  At that time.

10     Q.  Do you have any information that would

11  suggest that David Morse was an instigator or inciter of

12  riots?

13     A.  No.

14     Q.  I'd like to direct your attention to the next

15  page, page 3, beginning at about line 11.  Here you

16  mention that Dave Id was scouting the area -- actually,

17  I should probably back up.

18         Beginning at the last line of page 28 -- I'm

19  sorry -- page 2, line 28, leading onto the next page,

20  you state that Deputy Chief Benson Fairow gave you the

21  information that you were relying upon.

22         Do you see that?

23     A.  Uh-huh.

24     Q.  "Yes"?

25     A.  Yes.

25

1          MR. ALLEN:  You have to say "yes."

2          THE WITNESS:  Yes.

3   BY MR. SIEGEL:

4      Q.  Is that true?

5      A.  Yes.

6      Q.  Then I believe it is DC Fairow who mentioned,

7   quote, unquote, "Dave Id was scouting the area," as it

8   says on line 11.

9      A.  Yes.

10     Q.  What does that mean, "Dave Id was scouting the

11  area"?

12         MR. ALLEN:  Objection; calls for speculation.

13  BY MR. SIEGEL:

14     Q.  What did you mean when you relayed that

15  information to IA?

16     A.  I just was -- relayed that.  Again, as Intel

17  officer, I just take what was given and I take it for

18  what it is, face value, what I was told.

19     Q.  You don't do any fact-checking?

20         MR. ALLEN:  Objection; argumentative.

21  BY MR. SIEGEL:

22     Q.  Is that correct?

23         MR. ALLEN:  Mischaracterizes his testimony.  Is

24  that a question?  If it's a question, it's vague and

25  overbroad.

27

1    BY MR. SIEGEL:

2        Q.  The next line of this same section, it states,

3    quote, "posing quote/unquote as a -- a possible

4    reporter."

5            This is also something that DC Fairow related

6    to you?

7        A.  I believe so.

8        Q.  Did you learn from anybody else that Dave Id or

9    David Morse was reporting as a reporter?

10       A.  Not that I -- I don't know.  I don't believe

11   so.

12       Q.  I'd like to direct your attention to page 15 of

13   this transcript.  Actually, your testimony on page 15 is

14   prompted by a question that begins on page 14, line 28.

15   And I'll read it without some of the in-between

16   punctuation.

17            Sergeant Kwon stated, "At any of

18            these protests or these events, did you

19            ever hear someone stating on radio

20            something to the effect that Krystoff

21            a.k.a. Christopher Cantor and his

22            quote/unquote sidekick were to be

23            arrested first?  Did you ever hear that

24            on the radio?  Does that ring any bells

25            or jog your memory?"

28

1          And your answer at line 9 is, "I

2          know they were to be watched closely

3          because they were the leaders of the

4          group, according to the Intel we got."

5          So is that statement true?

6          MR. ALLEN:   Which statement?

7     BY MR. SIEGEL:

8          Q.   That "they were the leaders of the group,

9     according to the Intel that we got."

10         A.   I believed that at the time.   That was the

11    Intel that I got.

12         Q.   You received Intel that Dave Id was a leader of

13    the protest group?

14         A.   Well, "leaders" meaning that if they were

15    there, that was possibly where the protest was going to

16    occur.

17         Q.   Did you mean "leader" in any other way other

18    than that they were going to be at the protest?

19         A.   No.

20         Q.   Did you have any information that my client was

21    directing other protesters in any way?

22         A.   No.   Not that I recall.

23         Q.   Looking at page 17, halfway down starting at

24    line 14, you described Christopher Cantor as very vocal,

25    and later you say, "he speaks in front of several

30

1      Q.  Did you have any information that Dave Id

2   engaged in marching?

3      A.  I don't believe so.

4      Q.  On page 18 at line 7, you appear to state that

5   Christopher Vogan also provided you with Intel regarding

6   Cantor and Mr. Morse.

7          Is that true?

8      A.  Yes.

9      Q.  What did Christopher Vogan tell you about those

10   two individuals?

11      A.  Well, at that time I was just following

12   directions.

13          MR. ALLEN:  That's not the question.  Listen to

14   the question.

15          Can you repeat the question, please?

16          (Record read.)

17          THE WITNESS:  You know, I don't recall exactly

18   what he told me, but he might have, in essence, said the

19   same thing that Deputy Chief Fairow said.  When one is

20   at the protest, one or both are at that particular

21   location, that's where the demonstration could possibly

22   occur.

23   BY MR. SIEGEL:

24      Q.  And who is Christopher Vogan?

25      A.  He was an officer at the time.

31

1   Q.   Was he working as an undercover officer?

2        MR. ALLEN:   Objection; vague as to time.

3   BY MR. SIEGEL:

4   Q.   During the summer and fall of 2011, was he

5   working as an undercover officer?

6        MR. ALLEN:   Objection.   That invades the safety

7   rights of public transit people using BART and gets into

8   tactical and safety issues involving BART.   I'm not

9   going to let him answer the question.

10  BY MR. SIEGEL:

11  Q.   Do you know if Christopher Vogan was working

12  undercover on September 8th?

13  A.   I don't -- you know, no.   I don't believe so.

14       MR. ALLEN:   Do you know or don't you know?

15  That's the question.

16       THE WITNESS:   I don't know.   Actually, I don't

17  know.

18  BY MR. SIEGEL:

19  Q.   Prior to the actual protest on September 8th,

20  did you anticipate that David Morse would be arrested?

21  A.   No.

22  Q.   Would you look at page 12 of this transcript?

23  A.   (Witness complying.)

24  Q.   Beginning at line 24, Sergeant Kwon asked you

25  "what was the order?"   And his question -- well, let's

32

1   back up.  At line 17, Kwon states, "During these

2   briefings, was it ever implied in any way that

3   Christopher Cantor and/or particularly Mr. Dave Id --

4   was the impression ever given they were to be arrested

5   on-site?"

6         And you state no.

7         Then later Kwon asked "What was the order?"

8   You state, "the order was we have to see what they're

9   doing, if they're inciting a riot or acting in a

10   criminal manner, they were to be arrested?"

11         Does this refresh your recollection that there

12   was discussion of arresting David Morse prior to the

13   protest?

14         MR. ALLEN:  I'm going to object to the form of

15   your question.  You're suggesting by that question he

16   has changed his answer.  Your previous question was

17   whether there were discussions to arrest him, not

18   whether there were discussions whether they would be

19   arrested and for what reasons.  I'm objecting to the

20   form of your question and mischaracterizes his testimony

21   by the form of your question.

22         MR. SIEGEL:  Let's try again.

23   BY MR. SIEGEL:

24         Q.  On September 8th, was there specific discussion

25   of David Morse and Christopher Cantor?

33

1          A.   Specific?

2          Q.   During the briefing or at any time prior to the

3     protest itself, did you discuss with other BART police

4     officers Cantor and Morse?

5               MR. ALLEN:   Objection; asked and answered.

6               Go ahead.

7               THE WITNESS:   Again, was I the one presenting?

8               MR. ALLEN:   No.   That's not his question.

9               THE WITNESS:   I don't understand the question.

10              MR. SIEGEL:   Maybe read it to see if it's a

11    good one.

12              (Record read.)

13              MR. ALLEN:   Listen to the question.   There's no

14    trick to it.   If there was, I'd pose an objection.

15    There's no trick to his question.

16              (Record read.)

17              THE WITNESS:   During the briefing, did I

18    discuss?   I may have.

19    BY MR. SIEGEL:

20         Q.   You don't recall specifically?

21         A.   I don't recall specifically.

22         Q.   Was there discussion that if Morse or Cantor

23    were inciting a riot or acting in a criminal manner,

24    they were to be arrested?

25         A.   There might have.

34

1      Q.  Do you remember that?

2      A.  Do I recall that for sure?  I'm not a hundred

3   percent sure.

4      Q.  How sure are you?

5      A.  It goes on to anybody commits a criminal act,

6   they are to be arrested.  Every week we had a briefing

7   on protests, and so it was mentioned that if people

8   commit criminal acts, they're to be arrested following

9   policies and procedures.

10      Q.  Sure.

11         But was that comment made specifically in

12   connection with Cantor or Morse?

13      A.  You know, I don't -- I don't -- I don't recall.

14         MR. ALLEN:  Could I take a one-minute break

15   with my client?

16         MR. SIEGEL:  That's fine.

17         (Recess taken.)

18   BY MR. SIEGEL:

19      Q.  Officer Dam, if you could look at page 10

20   starting at line 20, if you could read from there and

21   read through all the way to the end of page 12.  Take a

22   minute.  I really want to get clear on a few things.

23      A.  Okay.

24         MR. ALLEN:  I'm going to ask him to read from

25   that page, line 11, to get context for the question.

35

1          MR. SIEGEL:   Sounds good.

2          MR. ALLEN:   While he's reading that, off the

3     record.

4          (Discussion off the record.)

5     BY MR. SIEGEL:

6          Q.  Officer, did you read that section I asked you

7     to read?

8          A.  From 10 to page 12, correct?

9          Q.  Yes.

10         A.  Yes.

11         Q.  Correct if I'm wrong, on these pages Sergeant

12    Kwon was asking you specifically about what discussion

13    there was of Cantor and Morse; is that correct?

14         A.  Uh-huh -- yes.

15         Q.  Then on page 11 at line 24 -- actually we'll go

16    to the question at line 20.  Sergeant Kwon states, "was

17    there ever any discussion during that briefing in

18    regards to who was to be arrested first during these

19    protests, or are there any game plan or strategies, or

20    thoughts about that?"

21         And you respond, "I don't know about arrested

22    first, but we did say that if they break the law, they

23    will be arrested?"

24         In your statement, "they," does it refer to

25    Morse and Cantor?

36

1          A.   Yes.

2          Q.   Does this refresh your recollection that there

3     was specific discussion of Morse and Cantor prior to the

4     protest in regards to making arrests?

5          A.   It refreshes my memory.

6          Q.   On the following page, page 12, the question

7     from Kwon beginning at line 17 states, "during these

8     briefings, was it ever implied in any way that

9     Christopher Cantor and/or particularly Mr. Dave Id --

10    was the impression ever given that they were to be

11    arrested on sight?

12              You say, "No."

13              Kwon asks, "What was the order?"

14              You state, "the order was we have to see what

15    they're doing, again, if they're inciting a riot or

16    acting in a criminal manner, they were to be arrested."

17              The "they" in your statement is referring to

18    Morse and Cantor; is that correct?

19         A.   Yes.

20         Q.   Officer, do you conduct surveillance?

21         A.   I personally do not.

22         Q.   Do you supervise any officers who conduct

23    surveillance?

24         A.   I'm not a supervisor.

25              MR. ALLEN:   That's not the question.   The

40

1          A.  Not a hundred percent.

2              MR. SIEGEL:  Could we take one minute off the

3      record.  I think we're close.  We'll be right back.

4              (Recess taken.)

5              MR. SIEGEL:  I'd like to introduce the next

6      exhibit in order.

7              (Plaintiff's Exhibit 23 marked for

8              identification.)

9      BY MR. SIEGEL:

10         Q.  Officer Dam, please take a minute to review

11     this document, and after you do so, tell me if you

12     recognize it.

13         A.  Yes.  I recognize this.

14         Q.  Is this a document that you prepared?

15         A.  Yes.  An e-mail.

16         Q.  How did you prepare this document?

17         A.  This is a quick informational blurb for the

18     command staff basically of what's going on.  And I just

19     take sections from either what SFPD has given me, social

20     media network.  It's just, like, for informational

21     purposes.

22         Q.  Do you see the section where it states "Crowd

23     Numbers"?

24         A.  Yes.

25         Q.  And the second sentence of that section states,

41

1   "Indybay reporter Dave Id is at primary Powell near the

2   entrance to the police office."

3          A.   Yes.

4          Q.   You wrote that?

5          A.   Yes.

6          Q.   Why did you mention Dave Id?

7          A.   Again, our report was that if we see Dave Id or

8   Christopher Cantor, there's a possibility the

9   demonstration could possibly be there.

10         Q.   Essentially based on the same information that

11  you produced, Exhibit 4, you also decided to include

12  Dave Id in your update?

13         A.   Right.  This update, I just listen on the

14  police radio, and I pretty much repeat what was there.

15  Possibly went on the radio and it said 50-plus

16  demonstrations at Powell Street.

17         Q.   You may have gathered that information from

18  another officer on the radio?

19         A.   Correct.

20         Q.   If you could look at Exhibit 17, please.

21         A.   (Witness complying.)

22         Q.   I believe there is an e-mail from DC Fairow to

23  yourself.

24              After reviewing it, if you could tell me if you

25  remember this document.  Actually, the first page is

43

<u>REPORTER'S CERTIFICATE</u>

1

2

3

4     I, SANDRA M. LEE, a Shorthand Reporter, State of

5 California, do hereby certify:

6     That KEN DAM, in the foregoing deposition named,

7 was present and by me sworn as a witness in the

8 above-entitled action at the time and place therein

9 specified;

10     That said deposition was taken before me at said

11 time and place, and was taken down in shorthand by me, a

12 Certified Shorthand Reporter of the State of California,

13 and was thereafter transcribed into typewriting, and

14 that the foregoing transcript constitutes a full, true

15 and correct report of said deposition and of the

16 proceedings that took place;

17     That before completion of the proceedings,

18 review of the transcript was not requested.

19     IN WITNESS WHEREOF, I have hereunder subscribed

20 my hand this 1st day of November, 2013.

21

22

23

24     _____

25     SANDRA M. LEE, CSR NO. 9971
        State of California

**EXHIBIT L**

**EXHIBIT 21
to the Deposition of Ken Dam**

**From:** Ken Dam
**To:** Benson Fairow, Daniel Hartwig
**Cc:** Frank Lucarelli, William Schultz, Horace Alkire, John Conneely, Matthew Cromer, Justin Morgan, Kevin Franklin, Tyrone Forte, Aaron Ledford, Jason DeVera, Gary Hesson, Kenton Rainey, Daniel Hartwig, Marlon Dixon, Gilbert Lopez Jr, Steven Coontz, Benson Fairow, Janeith Glenn-Davis, Eugene Wong, Keith Justice, Keith Smith, David Chlebowski, Alan Fueng, David Chlebowski, Eugene Wong, Forrest Tietz, Gerald Dominguez, John Austin, Keith Smith, Lance Haight, Mark Macaulay, Marlon Dixon, Paul Garcia, Steven Coontz, Terence McCarty, Timothy Pashoian, Seth Jamel, Randall Gregson, Keith Justice, Nathan Weissich, Jason Ledford, Paul Kwon, John Sandoval, Michael Hayes, Gilbert Lopez Jr, Edgardo Alvarez, Aaron Togonon, Thomas Smith Jr, Karen Kreitzer, David Salas, Rodney Barrera, Anisa McNack, Michael Rawski, Brando Cruz, Tracy Gurecki, Michael Maes, Joel Enriquez
**Bcc:**
**Subject:** Updated Protestors list and Photos of Cantor and Id.
**Date:** 9/8/2011 11:59:33 AM

**Attachment N1:** Protestors_photos.pdf
**Attachment N2:** Cantor_and_Id.pdf


LAW ENFORCEMENT SENSITIVE

WARNING: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


Ken Dam 163
Crime Analyst Officer
BART Police Department
800 Madison Street, PO Box 12688
Oakland, CA 94604-2688
(877) 679-7000, ext. 7096
Office (510) 464-7096
Fax (510) 464-7013

PLAINTIFF'S
Exhibit No. 21
K. DAM
10-16-13
Page 1734

**Pages 1-3, 10-12, and 15 only of
EXHIBIT 22
to the Deposition of Ken Dam**

PLAINTIFF'S
Exhibit No. 22
K. DAM
10-16-13

1                              -INTERVIEW-

2  Kwon:     Okay. The date of this interview is May the 24th, 2012. The time is

3            approximately 1450 hours. My name is Sergeant Kwon with the

4            Internal Affairs Unit, and I am here at the Lake Merritt Police Facility

5            fa -- small conference room speaking to witnesses Officer Ken

6            Dam. Uh -- Officer Dam is our crime analyst with -- uh -- the BART

7            Police Department, and -- um -- Ken -- um -- just pref -- I'd like to

8            preface the interview by stating that you're just a witness only. Uh -

9            - if at any point it appears that you may be subject to any type of

10           disciplinary issue -- uh -- you'll be afforded your Peace Officer Bill --

11           Bill of Rights. Okay?

12  Dam:      Uh-huh. Understand.

13  Kwon:     Um -- a -- and the reason why I'm talking to you is in regards to --

14            um -- I'm specifically investigating an incident that occurred on

15            September the 8th, 2011. Um -- during that time there were -- I

16            don't know if you were aware -- um -- a string of protests. Do you --

17            do you recall that? The --

18  Dam:      Yes.

19  Kwon:     -- time era where we had a string of protests?

20  Dam:      Yes.

21  Kwon:     Um -- and -- and I believe it was the No Justice No BART

22            Movement -- um --

23  Dam:      Correct.

24  Kwon:     -- a -- and -- um -- and -- uh -- I had corresponded with you for the

25            record -- uh -- last -- a couple days ago in regards to any -- uh --

26            BOLOs that were issued or dissem -- disse -- that you created that

27            were diss -- disseminated -- um -- at -- uh -- some of these

28            briefings. And you sent me two -- uh -- two links -- um -- one of

| | | |
|---|---|---|
| 1 | | which was -- um -- BART Police and the -- the heading says BART |
| 2 | | PD Protests 7/7/2011 to 8/29/2011, and it's about -- um -- 7-page |
| 3 | | document. Um -- conversely, you also -- uh -- sent me ano -- a -- a |
| 4 | | single-sheet -- um -- BOLO -- uh -- that says BART PD Protest, and |
| 5 | | on the top -- uh -- there's -- uh -- uh -- two pictures of the same |
| 6 | | individual identified as Christopher Cantor (phonetic), and below |
| 7 | | Christopher Cantor's picture are two photographs of a subject who - |
| 8 | | - um -- identifies himself as Dave Id, and next to Dave Id it says |
| 9 | | unknown true name. Um -- and at the very bottom right-hand |
| 10 | | corner it says Prepared by Crime Analyst Officer K. Dam 163. Uh - |
| 11 | | - so did you create this? |
| 12 | Dam: | Yes, I did. |
| 13 | Kwon: | Okay. And could you kind of tell me -- um -- how this particular |
| 14 | | document came about as far as -- uh -- what -- why the -- why |
| 15 | | these two people specifically were -- um -- were placed on this |
| 16 | | BOLO. |
| 17 | Dam: | Well -- um -- as far as the first subject -- uh -- Christopher Cantor -- |
| 18 | | um -- we have a history of him -- uh -- leading -- um -- and being a |
| 19 | | visual leader for the protests -- um -- and -- uh -- he appeared in |
| 20 | | several of the protests -- um -- and was a known instigator and |
| 21 | | incitor of -- of -- uh -- of what would soon be riots -- |
| 22 | Kwon: | Okay. |
| 23 | Dam: | -- and -- uh -- very vocal, and -- um -- and -- uh -- was known to be |
| 24 | | the leader -- um -- basically -- |
| 25 | Kwon: | Okay. |
| 26 | Dam: | -- of the group. |
| 27 | Kwon: | All right. And how about the individual below that? |
| 28 | Dam: | Well -- um -- I was -- uh -- actually -- uh -- given -- uh -- this |

| | | |
|---|---|---|
| 1 | | information -- um -- uh -- by the field -- uh -- troops, actually Deputy |
| 2 | | Chief -- uh -- uh -- Benson Fairow -- uh -- was working the protest, |
| 3 | | and he observed -- um -- Dave Id -- |
| 4 | Kwon: | Uh-huh. |
| 5 | Dam: | -- um -- and he had mentioned to him that -- uh -- he had |
| 6 | | mentioned to me that -- um -- uh -- every time -- uh -- that there |
| 7 | | was a protest, he had noticed that -- uh -- Dave Id would -- um -- |
| 8 | | surveil the area, and then when there was an area where there |
| 9 | | were -- uh -- no or f -- uh -- no police officers or few police officers -- |
| 10 | | uh -- the protestors would end up in that location, and -- um -- in his |
| 11 | | -- uh -- mind, he felt that -- um -- Dave Id was scouting the area -- |
| 12 | | um -- and -- uh -- posing quote/unquote as a -- a possible reporter; |
| 13 | | however, was scouting the area -- um -- for -- uh -- Christopher |
| 14 | | Cantor and -- um -- the rest of the group -- um -- to cause -- uh -- |
| 15 | | to -- to -- to look for problems basically. |
| 16 | Kwon: | Okay. |
| 17 | Dam: | And -- um -- therefore, he said, hey -- um -- could you -- uh -- let the |
| 18 | | people know -- um -- and he wanted me to create this bulletin so if |
| 19 | | the officers -- uh -- ha -- like see any of them bu -- either -- uh -- |
| 20 | | Christopher Cantor or Dave Id that a big group could show up, and |
| 21 | | so we had to be prepared. And at the time they were going from |
| 22 | | BART station to BART station -- |
| 23 | Kwon: | Uh-huh. |
| 24 | Dam: | -- in a group, and they were trying to select areas where there was |
| 25 | | very little police presence so they can -- uh -- create the most |
| 26 | | amount of -- uh -- uh -- basically -- uh -- criminal acts of -- uh -- |
| 27 | | delaying the trains, of delaying -- uh -- uh -- patrons from -- uh -- |
| 28 | | entering the fare -- uh -- fare gates lawfully and -- um -- um -- so -- |

Foothill Transcription Company, Inc.　　　　　　　　　　Page 3

B.A.R.T.D.-000320

| | | |
|---|---|---|
| 1 | | mean — |
| 2 | Kwon: | Do you — |
| 3 | Dam: | — nothing -- |
| 4 | Kwon: | -- specifically recall him saying that? |
| 5 | Dam: | Uh -- I don't specifically recall him saying that. Uh -- |
| 6 | Kwon: | Okay. |
| 7 | Dam: | -- I did -- uh -- give him the photos and -- uh -- I -- I wasn't sure if |
| 8 | | that was actually Dave Id until -- |
| 9 | Kwon: | Uh-huh. |
| 10 | Dam: | -- um -- he had looked at the photos and confirmed it. |
| 11 | Kwon: | Okay. So in -- uh -- the -- what -- uh -- Deputy Chief Fairow was |
| 12 | | telling you -- um -- did he give you more of an impression that Dave |
| 13 | | Id usually conducted himself as a reporter -- uh -- solely a reporter |
| 14 | | during these -- uh -- incidents? |
| 15 | Dam: | Right. Na — |
| 16 | Kwon: | Or was it a combination of protestor/reporter? Or was it just a |
| 17 | | protestor, or somebody who was assisting — |
| 18 | Dam: | Well -- |
| 19 | Kwon: | -- the protest? |
| 20 | Dam: | I -- I would say that -- uh -- he felt it was a -- it was a combination, |
| 21 | | where he would go to areas -- um -- again if -- um -- there's not a |
| 22 | | lot going on, then, you know, sh -- him showing up and -- and kind |
| 23 | | of looking around, and -- and -- and -- and him seeing him on the |
| 24 | | camera, and then all of a sudden, you know, a group shows up — |
| 25 | Kwon: | Uh-huh. |
| 26 | Dam: | -- um -- uh -- really peaked his interest and -- and -- uh -- there |
| 27 | | wasn't anything to report there. It was just -- um -- uh -- there was |
| 28 | | really nothing going on until -- until afterwards. |

B.A.R.T.D.-000327

| | | |
|---|---|---|
| 1 | Kwon: | And -- uh -- you might have answered this already, but was this |
| 2 | | information -- uh -- do you remember this being this spe -- specific |
| 3 | | thing that you're telling me now -- uh -- was it discussed during |
| 4 | | briefing? |
| 5 | Dam: | Yes, it was. |
| 6 | Kwon: | Spes -- and it was. |
| 7 | Dam: | Uh -- |
| 8 | Kwon: | Okay. |
| 9 | Dam: | Uh-huh. |
| 10 | Kwon: | Did you know if it was specifically brought up during briefing on |
| 11 | | September the 8th, 2011? |
| 12 | Dam: | Uh -- you know, I believe it was, and you know -- um -- going back |
| 13 | | to -- uh -- knowing that he was a reporter and doing both -- uh -- |
| 14 | | type of thing -- um -- it -- it was -- I believe it was mentioned -- uh -- |
| 15 | | during the -- the briefing -- um -- that -- um -- you know, he -- we |
| 16 | | believe that he's -- does both, you know, he's -- he's reporting but is |
| 17 | | also a part of scouting the area, and -- uh -- |
| 18 | Kwon: | And that was brought up during the briefing you're saying. |
| 19 | Dam: | Right, right. |
| 20 | Kwon: | Okay. Okay. Um was there ever any discussion during that |
| 21 | | briefing in regards to -- um -- um -- who was to be arrested first |
| 22 | | during these protests, or there any game plan or strategies, or |
| 23 | | thoughts about that? |
| 24 | Dam: | Um -- I don't know about arrested first, but we did say that if they |
| 25 | | break the law, they will be arrested. |
| 26 | Kwon: | Okay. |
| 27 | Dam: | So -- |
| 28 | Kwon: | (Inaudible) -- |

B.A.R.T.D.-000328

| | | |
|---|---|---|
| 1 | Dam: | -- that -- that was discussed. |
| 2 | Kwon: | Okay. Well did they say that, hey -- um -- we shall give a dispersal |
| 3 | | order first, or was it kind of like if they break the law, they're going |
| 4 | | to be arrested? |
| 5 | Dam: | Oh, no. Uh -- it was to follow the procedures. They were -- they |
| 6 | | were first to be given the dispersal order -- uh -- and -- um -- to be |
| 7 | | given the dispersal order -- uh -- the -- to follow the directives, and |
| 8 | | then -- um -- if the -- the dispersal order was not heeded, then they |
| 9 | | were -- they were to arrest. So, yeah, that's -- that's always been |
| 10 | | part of the -- I mean there was a -- a policy written out -- um -- and - |
| 11 | | - uh -- I recall -- |
| 12 | Kwon: | Okay. |
| 13 | Dam: | -- them going to the policies. |
| 14 | Kwon: | Okay. Um -- this policy you're talking about, are you referring to |
| 15 | | actual Lexipol policy, or was this kind of like an operations order? |
| 16 | Dam: | It's an operational order. |
| 17 | Kwon: | Okay. Uh -- now during these -- um -- um -- briefings -- uh -- was it |
| 18 | | ever implied in any way that -- uh -- Christopher Cantor and/or -- |
| 19 | | particularly Mr. Dave Id -- uh -- was it -- uh -- was the impression |
| 20 | | ever given that they were to be arrested on sight? |
| 21 | Dam: | No. |
| 22 | Kwon: | Okay. |
| 23 | Dam: | No. |
| 24 | Kwon: | Okay. What was the order? |
| 25 | Dam: | Uh -- the order was we have to see what they're doing -- |
| 26 | Kwon: | Uh-huh. |
| 27 | Dam: | -- again, if they're -- uh -- inciting a riot or creating a -- or acting -- |
| 28 | | uh -- in a criminal manner, they were to be arrested. |

B.A.R.T.D.-000329

| 1  |       | telephone that -- uh -- a San Francisco -- um -- their team -- uh -- |
|----|-------|---|
| 2  |       | command center post -- |
| 3  | Kwon: | Uh-huh. |
| 4  | Dam:  | -- um -- uh -- when they're available, they contact me, and then -- |
| 5  |       | um -- I -- I'm online -- uh -- looking at the information. Uh -- once I |
| 6  |       | get that information, I'll -- uh -- send out the information -- uh -- and |
| 7  |       | -- uh -- or radio -- or telephone it into the command staff so they're |
| 8  |       | aware of situation realtime. |
| 9  | Kwon: | Now on this particular -- um -- protest -- um -- do you specifically |
| 10 |       | recall working LEO that day? |
| 11 | Dam:  | You know, I'd ha -- I'd ha -- really honestly have to check my |
| 12 |       | records. Uh -- I may have, and I -- and looking at this -- uh -- I -- I -- |
| 13 |       | I probably have worked it, but I just do have to look at my records. |
| 14 |       | There were -- |
| 15 | Kwon: | Okay. |
| 16 | Dam:  | -- qu -- I mean there were quite a few protests going on, like -- |
| 17 | Kwon: | Sure. |
| 18 | Dam:  | -- every third day, so. |
| 19 | Kwon: | Now -- now -- um -- let me just ask you -- |
| 20 | Dam:  | Uh-huh. |
| 21 | Kwon: | -- what you recall, you know -- uh -- based on your recollection, |
| 22 |       | okay? |
| 23 | Dam:  | Okay. |
| 24 | Kwon: | And you said that you monitor the police radios. Is -- |
| 25 | Dam:  | Yes. |
| 26 | Kwon: | -- that including BART Police radios? |
| 27 | Dam:  | Yes, that's correct. |
| 28 | Kwon: | Um -- at any of these protests or these events -- uh -- did you ever |

B.A.R.T.D.-000331

**EXHIBIT 23
to the Deposition of Ken Dam**

**From:** Ken Dam
**To:** Frank Lucarelli, William Schultz, Horace Alkire, John Conneely, Matthew
Cromer, Justin Morgan, Kevin Franklin, Tyrone Forte, Aaron Ledford, Jason
DeVera, Gary Hesson, Kenton Rainey, Daniel Hartwig, Marlon Dixon, Gilbert
Lopez Jr, Steven Coontz, Benson Fairow, Janeith Glenn-Davis, Eugene Wong,
Keith Justice, Keith Smith, David Chlebowski
**Cc:** Eamonn Casey, scott.gaines@sfgov.org, tadao.yamaguchi@sfgov.org,
Francis.Feliciano@sfgov.org, Sherry.Hicks@sfgov.org
**Bcc:**
**Subject:** Tactical 9-8-11 Deployment- Intel Update 5:
**Date:** 9/8/2011 5:08:40 PM


Tactical 9-8-11 Deployment- Intel Update:

Crowd Numbers: Large crowd chanting  50 + Demonstrators at Powell St (To be
determined and continue to monitor).  Indybay reporter Dave Id is at primary
Powell near the entrance to the police office.  About 50 Media.

Location: Start Location  Protesters will demonstrate at Powell St. (4:30 PM)
Another Possible location is Embarcadero BART.
"No Justice No BART" group.

Changes:  -
-W/M blk short hair, wearing a black checkered jacket, wearing army nap sack
jumping up and down delaying train.  Officers will do a well fare check. Lead
car Millbrae bound from Powell St BART.
-SFPD Reporting 50 Protestors
- Powell Street Secondary end fare gates will close down at 1415 hours.

Tactics / MO: Protestors: Christopher Cantor has called for a mass fare
evasion
day.  Protestors may facilitate a mass fare evasion

SFPD VCC- 1Y31 and Bus Number 2 97 5th and Market Street
-4M101 97 at Powell Street Station currently 40 protestors

Social Network / Media:  Protestors listening to police scanners.  News -
Reporting unspecified Terrorist Threat. Credible but unconfirmed.  Elevated
terror treat level.

estimarlqk Mihail Matikov
#nofare #OpBART Bart police is taping as well
5 minutes ago Favorite Retweet Reply

ChrisAstro Chris Calubaquib
As always RT @abc7newsBayArea: Reporter @BloomTV says right now the scene at
Powell Street BART is more reporters and police than protesters

Ken Dam 163
Crime Analyst Officer
BART Police Department
800 Madison Street, PO Box 12688
Oakland, CA 94604-2688
(877) 679-7000, ext. 7096
Office (510) 464-7096
Fax (510) 464-7013

PLAINTIFF'S
Exhibit No. 23
K. DAM
10-16-13

B.A.R.T.D.- 018466

# EXHIBIT M

1              UNITED STATES DISTRICT COURT FOR THE

2                NORTHERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                              No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15           DEPOSITION OF KENTON W. RAINEY

16             (Pages 1 to 52, inclusive)

17

18          Taken before SANDRA M. LEE

19               CSR No. 9971

20             November 6, 2013

21

22

23           Aiken Welch Court Reporters
             One Kaiser Plaza, Suite 505
             Oakland, California 94612
24          (510) 451-1580/(877) 451-1580
              Fax:  (510) 451-3797
25              www.aikenwelch.com

15

1   They ask very pointed questions based on background and

2   experience.  But I've never seen them get up and

3   actually give testimony.

4        Q.  The difference is that he was describing his

5   first-person experiences?

6        A.  Giving his first-person experiences, getting up

7   and going to the mic.  I had never seen that.

8        Q.  Are you familiar with editorials?

9        A.  Yes.

10        Q.  Isn't an editorial a similar thing in that it's

11   a journalist giving an opinion?

12        A.  Absolutely.  I've seen editorials in newspapers

13   and magazines, but, again, I've never seen a journalist

14   or member of an editorial board actually come to a body

15   and give that editorial to a political body or oversight

16   body.  I've never seen that.

17        Q.  Are you aware that before the September 8th,

18   2011, protest, that is the subject of this lawsuit that

19   BART police officers identified David Morse as somebody

20   to focus on for police officers?

21        A.  To focus on?

22        Q.  Yes.

23        A.  What do you mean?

24        Q.  Are you aware that his picture was distributed

25   among BART police officers?

16

1     A.  Yes.

2     Q.  Are you aware that an intelligence officer was

3  assigned to investigate his identity?

4     A.  Yes.

5     Q.  When did you become aware that David Morse was

6  being investigated in this manner?

7     A.  It's not so much he was being investigated.  We

8  had had numerous protests disrupting service,

9  jeopardizing public safety in our downtown San Francisco

10  stations.  It was very, very burdensome for us because

11  we never knew where these individuals were going to show

12  up.  But based on our experience with some of the

13  interactions, two individuals in particular, when one

14  showed up or the other showed up, that's where things

15  would occur.  So through intelligence, we were trying to

16  get out to our personnel "If you see one or two of these

17  guys, make sure you call the OCC.  Let the incident

18  commander know where these individuals are because

19  there's probably a good chance that's where the

20  disruption is going to occur."

21     Q.  What is the OCC?

22     A.  Operations communications center.

23     Q.  In your experience, have you ever identified a

24  journalist in this manner previously as someone that

25  would indicate where a protest would occur?

18

1    Q.  They were involved in policing some of these

2  protests?

3    A.  I don't know.  I don't know.  I know they do

4  come out and patrol with our personnel sometimes.  I

5  don't recall if they actually came out and worked the

6  protest.  I don't know.

7    Q.  Prior to the protest in question, did you have

8  any information that David Morse had violated any laws?

9    A.  No.

10    Q.  Did you consider him to be a protester prior to

11  the event in question?

12    A.  No.

13    Q.  Did you authorize the production of an

14  informational flier that had David Morse's picture on

15  it?

16    A.  Do you have something that I can look at?  It

17  sounds like you're referring to something in particular.

18    Q.  Sure.  I believe it's Exhibit 4 in your stack.

19    A.  This is 1.

20    Q.  Here's 4.

21    A.  Okay.

22    Q.  Have you seen Exhibit 4 before?

23    A.  Yes.

24    Q.  Did you authorize the production of this

25  document?

40

1        A.  About him, no.

2        Q.  Do you recall directing any of your officers to

3    contact the District Attorney with regards to

4    prosecution of David Morse?

5            MR. ALLEN:  I'd like to clarify something.

6    Would you look at the bottom of page 31?  Is that the

7    contact you're referring to?

8            I don't want him misstating testimony when he

9    has a document in front of him that George Gascon got

10   cc'd on.

11           MR. SIEGEL:  That's not what I'm referring to.

12   BY MR. SIEGEL:

13       Q.  Do you recall asking any of your officers to

14   contact the District Attorney to encourage the DA to

15   press charges against David Morse?

16       A.  Specifically against him, I don't recall that.

17   Did I contact them regarding prosecuting individuals who

18   were engaged in what I considered illegal behavior as

19   far as disrupting our operations and threatening public

20   safety?  Yes.  I wanted these individuals -- anybody we

21   ultimately arrested prosecuted, yes.

22       Q.  So you did make that contact?

23           MR. ALLEN:  But not to a specific person.

24           THE WITNESS:  Definitely not to a specific

25   person.

41

1   BY MR. SIEGEL:

2        Q.  Did you contact the DA directly?

3        A.  No.  Not to a specific person.  Went through my

4   personnel.

5        Q.  Who did you use to contact the DA?

6        A.  It went through my criminal investigation

7   sergeant, Tom Smith.

8        Q.  Do you know if any criminal proceedings went

9   forward against any of the arrestees that day?

10       A.  I don't recall what exactly transpired.  We

11  definitely would have filed cases.  I don't know what

12  the ultimate outcome was.

13            MR. ALLEN:  Take a break?  A good spot?

14            MR. SIEGEL:  Let's do it.  Could we take ten?

15            MR. ALLEN:  Sure.

16            (Recess taken from 10:17 a.m. to 10:29 a.m.)

17  BY MR. SIEGEL:

18       Q.  Chief, I'd like to refer back to Exhibit 31,

19  please, which    s the response to the journalists'

20  concern.

21       A.  Okay.

22       Q.  At the end of this letter, you remark that

23  you'd be happy to meet with Rebecca Bowe and Jeffrey

24  King in regards to their issues.

25            Did that meeting ever occur?

43

1       Q.  Is it your belief that David Morse did not have

2   a press credential displayed during the protest in

3   question?

4       A.  No.  That's not my point.  Again, as I said, I

5   worked 35 years in law enforcement, three different

6   states, three different jurisdictions and California.

7   Most people have their press credentials.  I'm just

8   putting that out there.  I wasn't there.  I don't know

9   what he had, what he did there.

10      Q.  What were you responding to with this sentence?

11      A.  What I just said.  It helps to have your -- if

12  there's any confusion or anything like that, it helps

13  law enforcement to have -- if you have press credentials

14  displayed.  Like, if we had -- when different things

15  happen and if I just showed up to a law enforcement

16  event, if I don't put something out that readily

17  identifies me as a law enforcement official, I would be

18  shooed away or wouldn't be allowed to get involved.  I

19  have to identify myself.

20      Q.  Do you know if journalists were arrested on

21  September 8th who did not display press credentials?

22      A.  The only person that I know that was arrested

23  on September 8th supposedly as a journalist was your

24  client.

25      Q.  You say "supposedly," but you acknowledge he's

44

1   a journalist?

2        A.   Yes.

3        Q.   Did you ever recover video evidence of David

4   Morse speaking at a BART board of directors meeting?

5        A.   I didn't, no.

6            MR. ALLEN:  If there is, we will produce it.

7            MR. SIEGEL:  Okay.

8            MR. ALLEN:  I'll supplement our Rule 26.  You

9   did not ask for the document.  We'll supplement it as a

10  Rule 26.  We're looking for it now as well.

11           MR. SIEGEL:  Thank you, Dale.

12  BY MR. SIEGEL:

13       Q.   Did you speak with anyone at the UC Police

14  Department in regards to a previous prosecution of David

15  Morse?

16       A.   I know I had some interactions with their

17  former chief of police.

18       Q.   Did you recover any evidence from UC police?

19       A.   Any evidence?

20       Q.   Yes.

21       A.   No.

22       Q.   Did you recover --

23           MR. ALLEN:  Objection; vague and overbroad.

24  Evidence as to what?  To this incident or something

25  else?  So we're clear.  I want to make sure.

52

REPORTER'S CERTIFICATE

1

2

3

4      I, SANDRA M. LEE, a Shorthand Reporter, State of

5  California, do hereby certify:

6      That KENTON W. RAINEY, in the foregoing

7  deposition named, was present and by me sworn as a

8  witness in the above-entitled action at the time and

9  place therein specified;

10      That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17      That before completion of the proceedings,

18  review of the transcript was not requested.

19      IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 19th day of November 2013.

21

22

23

24      _____

25      SANDRA M. LEE, CSR NO. 9971
       State of California

Aiken Welch Court Reporters   Kenton Rainey   11/06/2013

# EXHIBIT N

1          UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4   DAVID MORSE,

5        Plaintiff,

6   vs.                              No. C12-5289 JSC

7   SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and BART
8   Deputy Police Chief DAN HARTWIG,
    sued in his official and
9   individual capacities,

10       Defendants.
    _____/

11

12

13

14

15          DEPOSITION OF EDWARD SCHLEGEL

16           (Pages 1 to 23, inclusive)

17

18       Taken before SANDRA M. LEE

19            CSR No. 9971

20          November 6, 2013

21

22
            Aiken Welch Court Reporters
23          One Kaiser Plaza, Suite 505
            Oakland, California 94612
24       (510) 451-1580/(877) 451-1580
            Fax:  (510) 451-3797
25           www.aikenwelch.com

8

1    Morse writes articles under the name Dave Id?

2        A.  I do.

3        Q.  When did you learn that David Id was writing

4    articles about BART police?

5        A.  I had seen articles on the Indybay website and

6    I've seen his name on the byline.  I came to recognize

7    seeing names, but I don't recall who wrote what article

8    about what.  I know I've seen his name on the website.

9        Q.  Why did you go to the website?

10       A.  There was a lot being written about all the

11   issues with BART PD.  It was a good form of information

12   gathering as to what events were coming up and what

13   people felt about what was going on.

14       Q.  To the best of your recollection, at how many

15   of these protests in 2011 in terms of -- let me back

16   that up.

17           Do you recall the killing of Charles Hill?

18       A.  Yes.

19       Q.  Do you understand that one series of protests

20   started after that killing?

21       A.  Well, I know -- there were protests, like I

22   said, the whole period of time starting January 1st of

23   2009 until just recently.  There were different issues

24   that reenergized those protests.  Sometimes they were

25   stated to be about one thing or another, but I saw the

9

1    same core group appearing with the same banners with the

2    same chants.  I don't know ultimately what their

3    motivation was for any of the particular protests.  I

4    know as new issues came up, they added that to their

5    list of grievances.

6         Q.  Do you recall the use of the term "No Justice

7    No BART"?

8         A.  I've heard that.

9         Q.  That was used to describe some of the protests

10   after the Charles Hill death.

11        A.  That chant I heard a lot starting January of

12   2009 straight through -- through the Charles Hill

13   protest up until the last one I went to.

14        Q.  In your mind, are you able to isolate the 2011

15   protest as a distinct series of events as compared to

16   the earlier 2009, 2010 events?

17        A.  I'm not sure.  How do you mean?

18        Q.  Do they all mix together in your head, or do

19   you have recollection of those protests in 2011?

20        A.  Again, there were a series in 2011, and I was

21   at most of them, if not all of them.  There was one or

22   two centered at Civic Center, one at Powell.  There was

23   some that roved the area.  So I have recollection of a

24   lot of different instances, but I don't remember every

25   briefing before every one or taking the train ride from

10

1    Oakland to the protest.  I remember arrests that I made,

2    other notable events, but I can't say that I remember

3    every one of those events from beginning to end.

4        Q.  Sure.

5            Do you recall how many arrests were made in

6    2011?

7            MR. ALLEN:  Objection; vague.

8    BY MR. SIEGEL:

9        Q.  I guess what I mean is:  At how many different

10   protests were people arrested?  Were arrests made at

11   every protest?

12       A.  No.

13       Q.  It is my understanding at the protest that is

14   the subject of this lawsuit, approximately 30 people

15   were detained in an encirclement.

16           Were you there when that occurred?

17       A.  Yes.

18       Q.  At any protest prior to that, had a large

19   number of people been encircled in that fashion?

20       A.  I don't believe so.

21       Q.  This protest is unique in terms of that tactic;

22   is that right?

23       A.  Yes.

24       Q.  Prior to the protest in question, were there

25   ever more than ten people arrested?  2011 is what I'm

1    focusing on.

2              MR. ALLEN:  Thank you.

3              THE WITNESS:  I don't believe there were that

4    many arrests at any other protest, but probably not as

5    many as 11 or 12.  What did you say, as many as 30?

6    BY MR. SIEGEL:

7         Q.  I'm saying more than ten.

8         A.  Probably not.  I know there was one protest at

9    Civic Center where we had a few arrests.  I don't know

10   if it added up to ten or not.

11        Q.  Do you recall if any protests occurred after

12   the protest in question?

13        A.  I don't recall.

14        Q.  Do you recall that this was the final protest

15   in a series?

16        A.  No.  I just don't recall if that was the last

17   one I went to or not.

18             MR. ALLEN:  Just so we clear, he's only

19   entitled to what you can remember, not to what you guess

20   or speculate on.  You're doing fine with that.  Just so

21   you're clear on that concept.

22   BY MR. SIEGEL:

23        Q.  In front of you are the exhibits so far in this

24   case from the prior depositions.  I'm going to ask you

25   to look at what is Exhibit 4.

12

1    A.   This top sheet here?

2    Q.   Yes, please.

3         Officer, have you seen this document before?

4    A.   I believe I have.

5    Q.   When do you recall seeing it?

6    A.   Before one of the protests I was at in 2011.

7    Q.   What is this document?

8    A.   This is an informational flier relating to Mr.

9    Cantor and Mr. Morse, although he's identified here as

10   Dave Id.

11   Q.   What does that document tell you?

12   A.   It puts names with the faces.

13   Q.   Do you recognize Mr. Cantor?

14   A.   Yes, I do.

15   Q.   And what do you know him from?

16   A.   Various protests.  Most of the ones in question

17   in San Francisco and earlier from 2009 all the way

18   through.

19   Q.   How would you characterize his participation in

20   those protests?

21   A.   He was -- I don't know what the correct term

22   would be -- organizer or leader of the group.  He

23   usually had a megaphone.  He was usually leading the

24   chants.  He was the one that -- he was the one that led

25   the protests or the demonstrations.

13

1    Q.   He was a very prominent figure?

2    A.   Yes.

3    Q.   Perhaps notorious among BART police officers?

4         MR. ALLEN:   Objection; argumentative.

5         THE WITNESS:   He was known.

6    BY MR. SIEGEL:

7    Q.   Did you have a particular feeling about Mr.

8    Cantor one way or the other?

9         MR. ALLEN:   Particular fearing?

10        MR. SIEGEL:   Feeling.

11        THE WITNESS:   He was the leader of the group

12   with their protest.   I kept an eye on him, because while

13   generally most of the protesters were happy to walk

14   their picket line and shout the slogans, he would try to

15   push through lines and see how far he could go with or

16   without getting arrested.   He was one to keep an eye on

17   because he would walk a fine line between expressing

18   himself constitutionally and violating the law.   As to

19   his point of view, he's welcome to it.

20   BY MR. SIEGEL:

21   Q.   Did you know Dave Id as he was known in that

22   flier as a similar protest leader?

23   A.   I didn't know him as a leader of the protest.

24   Q.   Did you know him at all?

25   A.   Again, I recognize the name.

Aiken Welch Court Reporters   Edward Schlegel   11/06/2013

14

1       Q.  You hadn't seen him at previous protests?

2       A.  I may have.  I just recognize Mr. Cantor.  And

3   there was another gentleman that was with him a lot that

4   I haven't seen lately.  That was the prime people I

5   recognize.

6       Q.  Do you recall that prior to this protest that

7   BART designated a free speech zone?

8            MR. ALLEN:  Objection; vague as to time and

9   place.

10  BY MR. SIEGEL:

11      Q.  BART designated that on September 8th, 2011,

12  there would be a free speech zone?

13           MR. ALLEN:  You're asking him if he knew that?

14  BY MR. SIEGEL:

15      Q.  Do you recall?

16      A.  I don't -- what do I know?  I know that the

17  protesters were told "You can't march on the platforms

18  and in the paid area, that you're welcome to

19  demonstrate, march, protest in the free area as long as

20  you don't block access."  I don't recall how that

21  information came to me, but I know that was, if you want

22  to call it that, the free speech zone.  They were told

23  that they're welcome to do that anywhere in the free

24  area as long as it didn't block access or the operations

25  of the transit system.

Aiken Welch Court Reporters   Edward Schlegel   11/06/2013

1    they circled around in between this area here, which is

2    between the fair gates and the ticket machines.  Then

3    they got closer and closer to the fair gates and just

4    became a blocked group of people blocking the gates.

5         Q.  Did a particular commander order this line of

6    officers?

7         A.  I don't recall who ordered that.

8         Q.  Who were you reporting to that day?

9         A.  My sergeant was Sergeant Kreitzer.  She was

10   sergeant on my arrest team, although later on, things

11   became a little more chaotic and I was actually

12   receiving direction from Officer Dominguez.

13        Q.  Do you recall after that line formed, a circle

14   was created around the block of protesters?

15        A.  Yes.

16        Q.  Were you part of that circle?

17        A.  Yes.

18        Q.  Do you recall if a formal dispersal order was

19   given before that circle was created?

20            MR. ALLEN:  I'm going to object; vague.

21   BY MR. SIEGEL:

22        Q.  Let's back up.

23            Do you know what a formal dispersal order is?

24        A.  Yes.

25        Q.  What is a formal dispersal order?

20

1       A.  In a riot or riot situation under Penal Code

2   409, I believe, a representative of the agency will give

3   an announcement "This is an unlawful assembly.  You have

4   X amount of time to disperse.  Here are your available

5   means of exit.  Then you'll be subject to arrest."

6   That's given usually, if possible, by some kind of PA.

7       Q.  Is it correct that during this protest that

8   kind of order was not given?

9       A.  I don't recall if it was given.  I didn't hear

10  it if it was, which isn't unusual.

11      Q.  Which is not unusual?

12      A.  No.  Because some of these protests when

13  dispersal orders have been given, the crowd rises to

14  shout it down either because they don't want to hear it

15  or so that they can claim they didn't hear it.

16      Q.  Do you recall that happening during this

17  protest?

18      A.  I don't recall.  There was a lot of noise.  I

19  did not hear a dispersal order.

20          MR. SIEGEL:  I'd like to introduce Exhibit 34.

21          (Plaintiff's Exhibit 34 marked for

22          identification.)

23  BY MR. SIEGEL:

24      Q.  Officer Schlegel, I'll represent to you this is

25  a transcript of the interview you gave with IA in

21

1   regards to the complaints of Hannah Brown.  I'd like to

2   cut to the chase and direct your attention to page 24

3   and if you would read to yourself line 10 through line

4   17.

5        A.  Okay.

6        Q.  So is it true that you told IA that you did not

7   hear a formal dispersal order?

8        A.  I said I don't remember any such as a formal

9   dispersal order for lawful assembly.

10       Q.  You did hear other announcements?

11       A.  Yes.

12       Q.  Sitting here today, do you have any new

13  recollection of a formal dispersal order?

14       A.  No.  The answer I gave you before was almost

15  word for word what I answered it two years ago.

16       Q.  That's impressive.

17           During the protest in question, you arrested

18  Miss Brown?

19       A.  Yes.

20       Q.  Did you arrest anybody else?

21       A.  No.

22       Q.  Did you observe any members of the media being

23  detained by officers?

24       A.  Yes.

25       Q.  Did you observe any officers subsequently

22

1    releasing members of the media?

2        A.  I believe so.

3        Q.  What did you observe in that regard?

4        A.  I saw Deputy Chief or Commander -- I don't

5    remember what the title was at the time -- Hartwig.  He

6    was asking members of the media to come towards him.

7    Then he was checking their credentials.  He asked some

8    other officers assisting.  There may even have been a

9    San Francisco officer or sergeant there.  What procedure

10   they used, I don't know, but they were checking

11   credentials and then inviting members out of the line to

12   leave the station.

13           MR. SIEGEL:  I have nothing further.

14           Do you have any cross?

15           MR. ALLEN:  No.

16           (Whereupon, the deposition was concluded at

17           11:45 a.m.)

18

19

20

21

22

23

24

25

Aiken Welch Court Reporters   Edward Schlegel   11/06/2013

23

<u>REPORTER'S CERTIFICATE</u>

1

2

3

4          I, SANDRA M. LEE, a Shorthand Reporter, State of

5   California, do hereby certify:

6          That EDWARD SCHLEGEL, in the foregoing

7   deposition named, was present and by me sworn as a

8   witness in the above-entitled action at the time and

9   place therein specified;

10         That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17          That before completion of the proceedings,

18  review of the transcript was not requested.

19          IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 19th day of November 2013.

21

22

23

24         _____

           SANDRA M. LEE, CSR NO. 9971
25         State of California

Aiken Welch Court Reporters   Edward Schlegel   11/06/2013