1  DALE L. ALLEN, JR., State Bar No. 145279
   dallen@aghwlaw.com
2  KEVIN P. ALLEN, State Bar No. 252290
   kallen@aghwlaw.com
3  ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
   180 Montgomery Street, Suite 1200
4  San Francisco, CA  94104
   Telephone:     (415) 697-2000
5  Facsimile:     (415) 813-2045

6  Attorneys for Defendants
   BART DEPUTY POLICE CHIEF DAN HARTWIG
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  DAVID MORSE,                        Case No.: C12-5289 JSC (DMR)

12                 Plaintiff,           **DECLARATION OF KEVIN P. ALLEN IN
                                        SUPPORT OF DEFENDANT DEPUTY CHIEF
13       v.                             DAN HARTWIG'S MOTIONS IN LIMINE
                                        NOS. 1-5**
14  SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT (BART); and        Hon. Jacqueline Scott Corley
15  BART Deputy Police Chief DAN
    HARTWIG, sued in his official and   Date:      September 4, 2014
16  individual capacities,              Time:      2:00 p.m.
                                        Ctrm:      F, 15th Floor
17                 Defendants.
                                        Trial:     September 22, 2014
18

19       I, KEVIN P. ALLEN, declare as follows:

20       1.     I am an attorney licensed to practice in the State of California. I am an associate at

21  the law firm of Allen, Glaessner, Hazelwood & Werth, LLP, and am counsel of record for

22  Defendants SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT DEPUTY POLICE

23  CHIEF DAN HARTWIG ("Defendant") in this matter.  I have personal knowledge of the

24  statements made in this declaration and could competently testify to them if called as a witness.

25       2.     A true and correct copy of the relevant portions of the deposition transcript

26  of David Morse, taken in the above-captioned action on October 15, 2013, is attached

27  hereto as Exhibit "A."

28       3.     A true and correct copy of the relevant portions of the deposition transcript

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

19294.1

of Kenton W. Rainey, taken in the above-captioned action on November 6, 2013, is attached hereto as Exhibit "B."

4. A true and correct copy of the relevant portions of the deposition transcript of Benson Fairow, taken in the above-captioned action on October 16, 2013, is attached hereto as Exhibit "C."

5. A true and correct copy of the relevant portions of the deposition transcript of Daniel Hartwig, taken in the above-captioned action on October 15, 2013, is attached hereto as Exhibit "D."

6. A true and correct copy of the relevant portions of the deposition transcript of Michael D. Hayes, taken in the above-captioned action on October 16, 2013, is attached hereto as Exhibit "E."

7. A true and correct copy of the relevant portions of the deposition transcript of Ken Dam, taken in the above-captioned action on October 16, 2013, is attached hereto as Exhibit "F."

8. A true and correct copy of the relevant portions of the deposition transcript of Shane Coduti, taken in the above-captioned action on November 5, 2013, is attached hereto as Exhibit "G."

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed on August 19, 2014, at San Francisco, California.


_____/s/ Kevin P. Allen_____
KEVIN P. ALLEN

DECLARATION
C12-5289 JSC (DMR)

# EXHIBIT "A"

1  UNITED STATES DISTRICT COURT FOR THE

2  NORTHERN DISTRICT OF CALIFORNIA

3  ---oOo---

4  DAVID MORSE,

5      Plaintiff,

6  vs.                               No. C12-5289 JSC

7  SAN FRANCISCO BAY AREA RAPID
   TRANSIT DISTRICT (BART); and BART
8  Deputy Police Chief DAN HARTWIG,
   sued in his official and
9  individual capacities,

10     Defendants.
   _____/

11

12

13

14

15          DEPOSITION OF DAVID MORSE

16       (Pages 1 to 131, inclusive)

17

18       Taken before SANDRA M. LEE

19          CSR No. 9971

20         October 15, 2013

21

22

23  Aiken Welch Court Reporters
    One Kaiser Plaza, Suite 505
    Oakland, California 94612
24  (510) 451-1580/(877) 451-1580
       Fax:  (510) 451-3797
25       www.aikenwelch.com

|  | 90 |
|---|---|
| 1 | Q. So this confrontation takes place. You're up |
| 2 | there getting photos. You think your video is running. |
| 3 | What happens next? |
| 4 | A. Then -- I don't really remember how that |
| 5 | incident, if you can call it that, defused. Somehow, I |
| 6 | don't know, they were tired of confronting him. I don't |
| 7 | think he said anything back. |
| 8 | Then I started walking to document the police |
| 9 | line towards -- that was in front of the fare gates. |
| 10 | And then at that point, I noticed another line of police |
| 11 | had come in. I don't know if it was one or two lines, |
| 12 | but basically that was when the circle enclosed, within |
| 13 | probably a couple minutes of that. |
| 14 | Q. Did you hear any order given at that time to |
| 15 | the people who were inside the circle? |
| 16 | A. No. |
| 17 | Q. What happened then? |
| 18 | A. People started trying to inquire what the |
| 19 | officers -- as to what was going on for being detained. |
| 20 | Were we free to go? I remember at one point I was |
| 21 | standing next to Rebecca Bowe. She asked for a show of |
| 22 | hands of how many people were journalists, and Probably |
| 23 | 15 hands went up or so. |
| 24 | Q. This was before the officers started making |
| 25 | arrests? |

|  | 91 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Did you hear anything from anybody from the |
| 3 | police department instructing you where you could go to |
| 4 | leave the circle prior to that circle closing? |
| 5 | A. No. |
| 6 | Q. When that circle first closed, did you hear |
| 7 | anything from the police instructing people who were not |
| 8 | part of the demonstration to leave the circle? |
| 9 | A. To clarify, I'm defining the circle as the |
| 10 | police, the circle the police created around people. |
| 11 | Q. Prior to that, did you ever hear the police |
| 12 | instruct people that while the lines were around you, |
| 13 | the police lines were forming up around you, that those |
| 14 | people not part of the demonstration should leave the |
| 15 | circle? |
| 16 | A. I wasn't aware of police lines forming around |
| 17 | us, and I did not hear any announcements other than the |
| 18 | initial red bullhorn one that I already spoke about. |
| 19 | Q. You were aware that people who were press were |
| 20 | moving outside the line of the police prior to the |
| 21 | circle closing, weren't you? |
| 22 | A. No. Where I was standing, it seemed just as |
| 23 | thick with journalists as it had been the entire time. |
| 24 | Q. So the circle closes, and you're all standing |
| 25 | there, and the situation between Cryst and Krystoff and |

|  | 92 |
|---|---|
| 1 | Ream defused. |
| 2 | What happens next? |
| 3 | A. I'm sorry. I don't understand what you're |
| 4 | getting at. |
| 5 | Q. I'm going back now to when the situation |
| 6 | defuses slightly, and you're standing there documenting |
| 7 | this. |
| 8 | What happens next? |
| 9 | A. I walked away and was heading towards the |
| 10 | police line that was blocking the fare gates. |
| 11 | MR. SIEGEL: Dale, before the next question, if |
| 12 | you could -- how much longer do you have? |
| 13 | MR. ALLEN: 20 minutes, at most. |
| 14 | MR. SIEGEL: Let's take a quick break. |
| 15 | (Recess taken.) |
| 16 | BY MR. ALLEN: |
| 17 | Q. The situation defuses between Krystoff, Cryst |
| 18 | and Ream, and you move over to the side away from them |
| 19 | as the circle closes on all of you have; have I got the |
| 20 | timing right? |
| 21 | A. Can you state that one more time? I was |
| 22 | thinking about the sunlight in my face. |
| 23 | Q. As the situation defuses between Ream, Cryst |
| 24 | and Krystoff, you move way from them over to the edge as |
| 25 | the circle is completed around you by the BART police; |

|  | 93 |
|---|---|
| 1 | do I have the timing right? |
| 2 | A. Yes. |
| 3 | Q. At this point, if I understood you correctly, |
| 4 | Rebecca Bowe asks for a show of hands of everybody there |
| 5 | who was a reporter? |
| 6 | A. Within a few minutes. |
| 7 | Q. Why did she ask for that show of hands? |
| 8 | MR. SIEGEL: Objection; calls for speculation. |
| 9 | BY MR. ALLEN: |
| 10 | Q. Let me rephrase. |
| 11 | At this point in time, was the dispersal order |
| 12 | read? |
| 13 | A. No. |
| 14 | Q. Did you hear a dispersal order read after the |
| 15 | officers had encircled you? |
| 16 | A. Yes. |
| 17 | Q. And when you heard the dispersal order read, |
| 18 | what did you understand it to mean? |
| 19 | A. That those who were not inside of what I call a |
| 20 | kettle or a police encirclement needed to leave the |
| 21 | station. "Leave the station or you will be arrested." |
| 22 | Q. Those that were already encircled or those in |
| 23 | the circle? |
| 24 | A. Those outside of the circle, because those |
| 25 | inside of the circle were encircled and were told we |

102

1  he relaxed, because he had my arms pulled up real high
2  when he was putting on the handcuffs. Then he put them
3  on rather tightly. Then I said, "These handcuffs are
4  hurting me. You put them on too tightly." He didn't
5  respond.
6       Then he escorted me through I think it's one of
7  those little access doors, it's not a fare gate, and he
8  took me into the paid area and he brought me back to
9  what I understand now is a police substation. There was
10 a small office in the back he put me in.
11 BY MR. ALLEN:
12      Q. Did he unhandcuff or loosen up the handcuffs at
13 any point in time?
14      A. No, he did not.
15      Q. Did someone?
16      A. Yes. The officer who stood watch over me for a
17 few hours, Officer Rudy, he did. As soon as Coduti was
18 gone, he loosened the handcuffs.
19      Q. Coduti brings you back.
20      Does he turn you over to Officer Rudy and
21 leave?
22      A. Pretty much, yes.
23      Q. So this all happened -- how much time would you
24 say transpired between the time you were first
25 physically taken into custody by Dfficer Coduti to

103

1  before Coduti turned you over to Rudy? One minute, two
2  minutes, 30 seconds?
3       A. Probably around two minutes, maybe. However
4  long it takes to walk from that part of the station to
5  the other part of the station.
6       Q. At that point, Rudy then loosened the cuffs for
7  you?
8       A. Yes.
9       Q. Did he take them off and handcuff you to
10 something or keep you handcuffed behind your back while
11 you sat in the substation?
12      A. It just my hands cuffed together. I was never
13 cuffed to anything.
14      Q. Were your hands cuffed behind you or in front
15 of you?
16      A. Behind me.
17      Q. Did they remain handcuffed -- did you remain
18 handcuffed behind you for the entirety of the two hours?
19      A. Yes.
20      Q. Were they metal cuffs that were taken off and
21 plastic cuffs put on?
22      A. Yes. Before I was transported.
23      Q. But that was approximately two hours later?
24      A. Yes.
25      Q. During the time you were in the substation, did

104

1  Coduti have any other conversations with you?
2       A. No.
3       Q. Did Rudy have any conversations with you?
4       A. Probably, but I can't remember the nature of
5  them. The only thing that stands out is me speaking
6  with Hartwig.
7       Q. Did Hartwig speak to you when you were at the
8  substation?
9       A. Yes. He came to visit me twice.
10      Q. As best you can, recount the two conversations.
11      A. I was objecting to my arrest. He told me that
12 even journalists could be arrested if they broke the
13 law. I told him, "You know I didn't break any laws.
14 What are you talking about?"
15      He told me that -- in the first conversation
16 that I could be arrested without a
17 dispersal order, because I had said there was no
18 dispersal order ever to clear out the area. "Leave or
19 you will be arrested. This is an unlawful assembly."
20 Whatever you normally hear with a dispersal order.
21      He left. We probably spoke for a good four or
22 five minutes the first time. The second time it was
23 probably about four or five minutes. The second time he
24 came back, he told me that there had been dispersal
25 orders. I can't remember offhand now, memory fades, but

105

1  he told me that other journalists had been arrested.
2  That's basically the nature of it.
3       I did mention to him at one point -- I was,
4  like -- "I believe what you're doing is illegal and
5  unjustified. You know, I can understand a temporary
6  detainment if you felt like you needed to control the
7  situation, but, you know, if you don't let me go and you
8  keep me in these handcuffs, I'm going to try to sue
9  you."
10      Q. Did he ever speak derogatorily toward you with
11 any profanity toward you?
12      A. Profanity, no.
13      Q. Derogatorily?
14      A. Well, other than he was saying that I had
15 broken the law. He didn't specify which law I'd broken.
16 He said journalists could be arrested if they broke the
17 law. I don't know that that qualifies as derogatory.
18      Q. Did he belittle you in any way while he was
19 talking to you?
20      A. I just felt like the entire arrest was
21 belittling.
22      Q. What I'm trying to get at is something
23 substantive in the form of words as opposed to your
24 feelings. You're absolutely entitled to your feelings.
25 You can describe them to a jury. What I'm trying to

**106**

1 establish is whether or not there's any subset.

2      Did he verbally belittle you or demean you or

3 in some way make fun of you, that type of language, that

4 you can recount today outside of that he told you that

5 journalists can be arrested?  I'm looking for anything

6 in your best memory.

7      A. No.

8      Q. To the best of your memory, then, the extent of

9 the two conversations were first -- in the first five

10 minutes were his commentary about journalists can be

11 arrested if they break the law, your rebuttal that there

12 was never any dispersal orders, but he said there was.

13 Even if there wasn't, he could arrest you anyway.

14      Did that capture the substance of the first

15 conversation?  I'm sure there was other things said, but

16 anything more specific?

17      A. I was speaking to both conversations.  I

18 believe it was the second conversation when he came in

19 and said that there had been dispersal orders.

20      Q. But there was no language -- there was no

21 profanity, there was no verbal harangue or belittling or

22 trying to make fun of you in front of other people

23 present?

24      A. Not from Hartwig, but from another officer

25 there was.

**107**

1      Q. That was Officer Knudsen?

2      A. Correct.

3      Q. Did Dan Hartwig make any references during this

4 time you were in the substation to the fact that you had

5 written articles of BART?

6      A. I believe, you know, when I was speaking to him

7 I said, "You know my reporting.  You know I'm reporting

8 on this."  I would go into BART board meetings, and they

9 would have Indybay articles on their phones, so I knew

10 everybody else was reading my stuff.

11      Q. Did he say anything to you that suggested or

12 outright made reference to "I arrested you, and we know

13 all about your Indybay articles and the criticism you

14 have of the BART Police Department"?

15      A. He did not say that, no.

16      Q. What did Knudsen do?

17      A. He was -- he was the officer who, I suppose,

18 was assigned to take off my metal handcuffs and put on

19 the plastic cuffs, and he was just unnecessarily rough

20 and hostile towards me.  It was a real

21 passive-aggressive kind of hostility, I suppose.  Do you

22 want me to elaborate, or do you have another question?

23      Q. Feel free to elaborate.

24      A. He came into the office -- This was

25 approximately two hours later -- and said, you know

**108**

1 "Stand up," so I stood up.  He said, "Turn around."  I

2 turned around.  He said, "Spread your legs," so I spread

3 my legs.  And then he said, "Spread your legs more."  I

4 spread my legs more.  He said, "Spread your legs more.

5 I spread my legs more.

6      And then I asked him, "Can you just tell me how

7 much you want me to spread my legs so there's not any

8 confusion and I can comply with your orders?"

9      He said, "Oh, you like to fight, huh?"

10      And I was, you know, just really concerned.  He

11 had this hostile attitude towards me.  I didn't realize

12 who he was because he was behind me.  I couldn't see his

13 number.  But he came back in to gawk at me later, as a

14 number of others officers did, and that's when I saw his

15 badge and knew who he was.

16      Q. Was anyone else represent when Knudsen was

17 speaking to you in this way?

18      A. Rudy.

19      Q. Anybody else besides Rudy?

20      A. No.

21      Q. Any other subjects that were detained or

22 arrested from the demonstration?

23      A. I was in my own private office.

24      Q. Anybody else, in your view, mistreat you while

25 you were in the substation?

**109**

1      A. I felt like officers were unnecessarily coming

2 in to gawk at me.  My driver's license was set out on

3 the desk.  The desk was between Rudy and I.  I'd say at

4 least three or four officers came in, you know, looked

5 at me and walked over, picked up my driver's license,

6 looked at it, put it down.

7      It's a little bit scary.  I don't know who

8 these cops are.  They're all coming in.  They're looking

9 at my home address.  Why?  They had nothing to do with

10 arresting me.  At least Knudsen had an excuse to be in

11 there because he was the one that was transferring me to

12 the plastic cuffs.

13      When I was -- I was lined up -- after the

14 plastic cuffs, a few minutes after that, I was lined up

15 in the hallway that does lead up to the, I guess,

16 Stockton exit.  We were all just lined up there with our

17 possessions set in front of us in handcuffs.  Two

18 different officers pulled my ID that was loose in a

19 plastic bag out.  "Oh, you don't look this old."  I

20 don't know.

21      I would attribute some of that later to the

22 BOLO that I later found out about.  I was put up as

23 public enemy No. 2 to these officers, so they wanted to

24 know who I was.  They thought it was free season to come

25 in and look at my ID.

**110**

1    Q. Did you ever hear any officer say that you were
2  arrested because you had been writing critical articles
3  on BART?
4    A. No.
5    Q. Did you ever hear any officers make reference
6  to the critical articles on BART that you had been
7  writing?
8    A. No.  But I don't think it was a coincidence how
9  Knudsen treated me.
10    Q. Did you ever obtain information subsequent to
11  that arrest through people you talked to who were also
12  arrested or in your investigation independent of your
13  counsel providing you information where you were the
14  target of the police department because of your critical
15  articles of BART?
16    A. Not directly, but I believe it can be inferred.
17    Q. I understand that.  I'm only entitled to what
18  you have -- actually completely entitled to what you
19  have in the way of independent evidence about the
20  officers of BART targeting you because of your reporting
21  against BART over the last two and a half years.
22      Do you have anything that we haven't talked
23  about today where you have obtained information either
24  from a witness or by documents that officers of the BART
25  Police Department had targeted you for your reporting

**111**

1  and criticism of the BART Police Department?
2    A. Not directly, no.
3    Q. Do you have any indirectly?
4    A. I could say it can be inferred.
5      MR. SIEGEL:  He's asking for a "yes" or "no"
6  answer.
7  BY MR. ALLEN:
8    Q. I get the inferred.  I've tried to do due
9  diligence on behalf of my client.
10      I want to know if there's any evidence you have
11  that is in the form of documents or eyewitnesses that
12  will be brought forward to testify that they heard or
13  learned of a desire to arrest you because you had been
14  writing critical articles.
15    A. No.  I did not have any documents where an
16  officer confessed that.
17    Q. How long were you -- were you ever told why you
18  were arrested?
19    A. No.  Actually, I wasn't.  I was never read my
20  Miranda rights either.
21      MR. SIEGEL:  Yes or no questions.
22      THE WITNESS:  I'm sorry.
23  BY MR. ALLEN:
24    Q. Did Dan Hartwig in the conversation you were
25  having with him articulate why you were arrested?

**112**

1    A. No.
2    Q. He did mention that journalists could be
3  arrested?
4    A. Correct.
5    Q. Did he mention that you were arrested because
6  you were not dispersing under a lawful -- under his
7  belief that there was a lawful dispersal order given?
8    A. No.
9    Q. Did he ever mention that a dispersal order was
10  given?
11    A. He said the second time he visited me that
12  there had been several dispersal orders.
13    Q. So he told you that within a short period of
14  time of your arrest?
15    A. Right.  But he didn't connect it to my arrest,
16  no.
17    Q. You were transported down to the Hall of
18  Justice.
19      Were you cited and released at the Hall of
20  Justice?
21    A. Yes.  And then -- I'm sorry.
22    Q. Go ahead.
23    A. They returned my possessions.
24    Q. Did you find a -- did you find your cameras to
25  be in working order or damaged?

**113**

1    A. They were okay.
2    Q. Was there anything taken from them and not
3  returned to you?
4    A. Not that I'm aware of.
5    Q. Did you check your cameras that evening --
6    A. Yes.
7    Q. -- or the next day to make sure that all your
8  photos were --
9    A. Everything was in working order, and nothing
10  had been deleted.
11    Q. I just want to close the door on this.
12      There was no indication any way, shape or form
13  that any tampering occurring to your cameras?
14    A. No.
15    Q. And all your personal belongings were returned
16  intact, and there was no tampering with any of them; is
17  that right?
18    A. Yes.
19    Q. Why do you understand your case was dismissed?
20  What's your understanding of why your case was
21  dismissed?  And I don't mean your attorney-client
22  privilege in this case.
23      MR. SIEGEL:  Don't speculate.
24  BY MR. ALLEN:
25    Q. Did you receive anything in writing that your

**114**

1    case was dismissed?
2        A. Not in writing, no.
3        Q. You learned of it from your attorney?
4        A. Yes.
5        Q. You didn't get a notice in the mail?
6        A. Not that I can recall.
7        Q. And I understand you filed an Internal Affairs
8    complaint in this case; is that correct?
9        A. Correct.
10       Q. You gave an interview in this case?
11       A. Yes.
12       Q. Did you provide the BART Police Department as
13   part of this Internal Affairs investigation any
14   documentary evidence in the form of your photo
15   journalism or other writings pertaining to this
16   incident?
17       A. I directed them towards the article I wrote
18   about my arrest, but I don't think I actually provided
19   them with a copy of it. They did ask to photocopy my
20   Indybay press pass, which I allowed them to do.
21       Q. So I'm going to go through my notes. I'm
22   pretty much at the conclusion. I just want to check my
23   notes before we wrap this up.
24       Have you come across anything in writing by Dan
25   Hartwig, via an e-mail, a Twitter account or otherwise,

**116**

1        Q. The audio is just as important as the video
2    because you can get contemporaneous statements of people
3    captured by the audio that could assist you in making
4    sure you're accurate in your reporting, right?
5        A. Yeah. I'm a big believer in, like, raw source
6    material.
7        MR. ALLEN: I don't have any further questions.
8        (Whereupon, the deposition was concluded at
9    4:46 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**115**

1    any blogging that indicates that he was -- carried a
2    personal animosity toward you prior to this incident?
3        A. No.
4        Q. You saw the exhibit that was used in this
5    deposition which is an e-mail exchange with Officer
6    Coduti, but other than that particular e-mail, have you
7    seen anything else, FaceBook, LinkedIn, any blogging,
8    where he has made comments on -- about you or Indybay?
9        A. I'm not familiar with any personal on-line
10   presence that he has.
11       Q. Have you looked?
12       A. No, I have not. That's outside the scope of
13   his professional behavior.
14       Q. Have you ever spoken with Deputy Chief Fairow
15   at any time?
16       A. No.
17       Q. Have you ever attempted to interview him?
18       A. I wasn't even aware he existed until this case.
19       Q. You don't even know what he looks like?
20       A. No.
21       Q. In other demonstrations or protests you have
22   covered prior to this incident, had you used your video
23   camera and audio to review -- your audio in conjunction
24   with the video in order to fact-check your reporting?
25       A. Definitely.

**117**

1                REPORTER'S CERTIFICATE
2
3
4        I, SANDRA M. LEE, a Shorthand Reporter, State of
5    California, do hereby certify:
6        That DAVID MORSE, in the foregoing deposition
7    named, was present and by me sworn as a witness in the
8    above-entitled action at the time and place therein
9    specified;
10       That said deposition was taken before me at said
11   time and place, and was taken down in shorthand by me, a
12   Certified Shorthand Reporter of the State of California,
13   and was thereafter transcribed into typewriting, and
14   that the foregoing transcript constitutes a full, true
15   and correct report of said deposition and of the
16   proceedings that took place;
17       That before completion of the proceedings,
18   review of the transcript was not requested.
19       IN WITNESS WHEREOF, I have hereunder subscribed
20   my hand this 1st day of November, 2013.
21
22
23
24   _____
                SANDRA M. LEE, CSR NO. 9971
25              State of California

# EXHIBIT "B"

1              UNITED STATES DISTRICT COURT FOR THE

2                 NORTHERN DISTRICT OF CALIFORNIA

3                          ---o0o---

4    DAVID MORSE,

5          Plaintiff,

6    vs.                                   No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10         Defendants.
     _____/

11

12

13

14

15              DEPOSITION OF KENTON W. RAINEY

16               (Pages 1 to 52, inclusive)

17

18             Taken before SANDRA M. LEE

19                   CSR No. 9971

20                  November 6, 2013

21

22                         Aiken Welch Court Reporters
23                         One Kaiser Plaza, Suite 505
                           Oakland, California 94612
24                         (510) 451-1580/(877) 451-1580
                              Fax:  (510) 451-3797
25                            www.aikenwelch.com

6

1   complete California Peace Officer Standards and

2   Training, what we call POST, background check.

3       Q.  Who made the decision to hire you?

4       A.  Dorothy Dugger.

5       Q.  And who is she?

6       A.  She was the former general manager.

7       Q.  When you were brought to BART, was there a

8   specific mandate you were given?

9       A.  Several mandates.  But to cut to the chase,

10  they wanted me to bring in the Noble reforms, make the

11  department more professional.

12      Q.  Is it fair to say BART had suffered in the year

13  or two prior to you coming onboard?

14          MR. ALLEN:  I'll object that's irrelevant and

15  has nothing to do with this case.  His background and

16  the mandate was as far as I think you need to go.  You

17  do not have a Monell claim.  And if and when you need to

18  plead one in and want to bring him back to discuss

19  Monell issues, you're welcome.  This is about his --

20  this deposition is about his interaction with an event

21  that took place that day and anything leading up to it

22  in terms of the ops plan and order.  You disagree, we

23  can call Judge Corley and wait and deal with this after

24  the fact.  I certainly will reproduce him if you can

25  establish why you should be able to get into anything

1    having to do with BART, certainly not in the Grant case
2    or anything going before that.
3            MR. SIEGEL:  Dale, to clarify why I'm asking
4    these questions, we have a First Amendment retaliation
5    claim in this case.
6            MR. ALLEN:  Sure.
7            MR. SIEGEL:  I'm entitled to investigate
8    motive.
9            MR. ALLEN:  You can investigate it with respect
10   to the First Amendment case.  But I don't see where
11   going into whatever beyond the mandate that he was given
12   and the Noble report that he was given have to do
13   specifically with the First Amendment case.  You're
14   welcome to ask him, but asking him questions such as
15   what were the problems and things like that has nothing
16   to do with your First Amendment case.  Deal with the
17   First Amendment question, and I'll decide whether you're
18   on track or you're not.
19           And, again, the whole thing -- the beauty of
20   federal court, as you know, is if we have a dispute, we
21   can go to court and we can ask whether or not this has
22   relevance to your causes of action.  And I will
23   reproduce him for purposes without any problem once we
24   talk to Corley on these issues.  But I'm not hearing
25   questions dealing with the First Amendment issues in its

1    entirety.

2    MR. SIEGEL: The record is my client David

3    Morse wrote hundreds of articles about the BART police,

4    including problems with killings of transit passengers

5    or people within the transit facilities and that the

6    institution's embarrassment about these issues may have

7    been a motive to retaliate against David Morse.

8    MR. ALLEN: Well, he wasn't part of the

9    institution prior to the date of his hire, so I think

10   anything you ask him regarding anything he discovered

11   about institutional bias against anybody in the press is

12   fair game once he gets there. You're asking about

13   things before he got there. I think you need to steer

14   your questions towards everything after June 10th.

15   THE WITNESS: June of 2010.

16   MR. ALLEN: June of 2010. I think it's fair

17   game if you want to ask him questions about what he

18   learned of as a percipient witness to. He wasn't there

19   before June, so I don't think that has anything to do

20   with this case. I'm certainly not going to stop you

21   from asking, and I haven't stopped you from asking, any

22   of these officers about the Charles Hill shooting. And

23   when you brought up -- and he brought up in his depo

24   that he started covering this after the Oscar Grant

25   shooting. Fair game to what he knows as a percipient

9

1    witness, but his percipient participation of the BART

2    Police Department started June of 2010.

3            MR. SIEGEL:  Let me try this a different way.

4    BY MR. SIEGEL:

5        Q.  Chief Rainey, what is the Noble report?

6        A.  The Noble report is an audit agency as far as

7    compliance with best practices, best law enforcement

8    practices, a group of law enforcement professionals

9    brought in to look at the agency top to bottom after the

10   Oscar Grant shooting.

11       Q.  And did the Noble report include

12   recommendations with regards to Internal Affairs?

13       A.  Yes.

14       Q.  Can you summarize those?

15           MR. ALLEN:  I'm going to object.  This is

16   completely outside the scope of the causes of action in

17   your complaint.  The Internal Affairs issues are all

18   Monell issues.  Monell is not brought forth in this

19   lawsuit.  Whether or not Noble talked about Internal

20   Affairs changes has no bearing on what occurred here.

21   I'm going to instruct him not to answer these questions.

22   You can ask direct questions as it pertains to this

23   incident and things he's learned about the incident and

24   what percipient action he had in this incident, but I'm

25   not going to let you go into and litigate something

10

1     that's not part of the case.

2     BY MR. SIEGEL:

3         Q.   Are you aware that David Morse filed an IA

4     complaint after his arrest on September 8th, 2011?

5         A.   Yes.

6         Q.   Are you aware that BART undertook an IA

7     investigation in response to his complaint?

8         A.   Yes.

9         Q.   Are you aware that numerous officers were

10    interviewed as part of this process?

11        A.   Yes.

12        Q.   Did you at one point ask that the investigation

13    be tolled?

14        A.   Yes.

15        Q.   Why did you ask the investigation to be tolled?

16        A.   Because the litigation -- in order to render a

17    complete decision -- we don't know what else is going to

18    be discovered through additional testimony or if any

19    additional witnesses are going to appear, any additional

20    evidence going to be produced throughout this

21    litigation.  And so it would be impossible from my

22    standpoint to give a fair assessment exactly what

23    occurred.

24        Q.   Was your request that the investigation be

25    tolled consistent with the recommendations of the Noble

1  report?

2       A.  I don't know if the Noble report looked into

3  tolling cases or not.  I'm sure the Noble report gave

4  recommendations as far as how long you should try to --

5  an Internal Affairs report should take place, but I'm

6  sure -- let me back up.  I think the gist of any

7  management is make sure if you're going to do any type

8  of Internal Affairs investigation you collect all the

9  evidence -- all the evidence before you render a

10 decision.

11      Q.  Are you aware BART has a policy or more than

12 one policy -- back that up.

13      Are you aware that BART has policies that

14 concern the rights of media within BART facilities?

15      A.  Yes.

16      Q.  Are you aware that BART policies concerning

17 media do not distinguish between formal and informal

18 media?

19      A.  I'm not understanding what you're asking me.

20      MR. ALLEN:  I think the gist of what you're

21 trying to drive at, Mike, is simply whether or not the

22 new-wave media, the new media, is distinguishable from

23 the old mainstream media.  He's more than happy to

24 answer that question.

25 BY MR. SIEGEL:

19

1    MR. ALLEN:  Production?

2    BY MR. SIEGEL:

3        Q.  Creation.

4        A.  I'm aware of the document.  I don't know if I

5    specifically told my personnel to produce it or if it

6    was a deputy chief who was my incident commander over

7    these incidents.  I'm aware of it.

8        Q.  You're aware of this document.

9            When you say "Deputy Chief," do you mean DC

10   Fairow?

11       A.  Yes.

12       Q.  Do you believe that this document criminalized

13   David Morse?

14       A.  No.

15       Q.  How do you believe BART police officers

16   perceived this document?

17           MR. ALLEN:  Objection; calls for speculation,

18   lacks foundation, vague.

19   BY MR. SIEGEL:

20       Q.  Are you familiar with a BOLO?

21       A.  Yes.

22       Q.  Do you think this document is similar to a

23   BOLO?

24       A.  Is it similar to a BOLO?

25       Q.  (Attorney nods head.)

1          A.   Our BOLOs actually say "BOLO" on it.

2          Q.   Other than the title of the document, would you

3    say this is similar to a BOLO?

4          A.   It probably has the same look of a BOLO.  All

5    our bulletins do.

6          Q.   You have many categories of intelligence

7    bulletins?

8          A.   And we get many intelligence bulletins as well.

9    BOLOs -- you want to know -- they specifically say

10   "BOLO" on it.  It's usually issued when you're looking

11   to identify certain individuals or a person because you

12   have a photo of somebody.  And based on my experience,

13   even if you have the person's identity, you're looking

14   for those individuals because they're involved in some

15   kind of serious crime.  This is an intelligence

16   bulletin.  Specifically because, again, as these

17   protests went on, what we were finding is that one or

18   two of these guys -- wherever these guys showed up on a

19   date that a protest was supposed to take place, if one

20   or two of these guys showed up at a station, there was a

21   good likelihood that's where this disruption was going

22   to occur.  We wanted our personnel to know what they

23   looked like so they could call in to our incident

24   commander and let them know so we could shift resources.

25        Q.   I've alluded to it in my questions.

29

1          Q.   At the time.

2          A.   I didn't consider him a mainstream member of

3     the press.  I considered him -- I think he's a blogger.

4     But I treated him just like I treat any other member of

5     the press whenever I interacted with him.

6          Q.   Are you -- I think we've already established

7     it, but you're aware that Mr. Morse filed an IA

8     complaint after his arrest?

9          A.   Yes.

10         Q.   And do you recall taking action to look for

11    evidence in response to his complaint?

12             MR. ALLEN:  Chief Rainey specifically looked

13    for evidence?

14             MR. SIEGEL:  Yes.

15             THE WITNESS:  Can you, I guess, clarify?  Do

16    you mean did I physically go out and seek out evidence.

17    BY MR. SIEGEL:

18         Q.   Do you recall asking BART police to look for

19    video evidence of David Morse?

20         A.   In regards to an IA complaint?

21         Q.   Yes.

22             MR. ALLEN:  Don't guess or speculate.  If you

23    don't remember, you don't remember.

24             THE WITNESS:  Yeah.

25    BY MR. SIEGEL:

```
1           Q.  Is the answer no?
2               MR. ALLEN:  By the way, because it was not in
3       the initial admonishments, you're not to guess or
4       speculate to anything.  If you don't know or don't
5       remember, you can say so.  If he has something to
6       refresh your memory, he will do that.
7               THE WITNESS:  I don't recall specifically I
8       happened to tell my personnel to go out and seek
9       evidence in the IA complaint.
10      BY MR. SIEGEL:
11          Q.  Do you know who Ken Dam is?
12          A.  He's my crime analysis officer.
13              MR. SIEGEL:  I'd like to introduce the next
14      exhibit in order.
15                  (Plaintiff's Exhibit 28 marked for
16                  identification.)
17              MR. ALLEN:  So we have a number?
18              MR. SIEGEL:  28.
19      BY MR. SIEGEL:
20          Q.  This is a series of e-mail threads.
21              My question is based upon an e-mail that
22      essentially begins at the bottom of the first page, and
23      the rest of it is on the second page.
24              MR. ALLEN:  Hold on.  I'm going to object that
25      this is all protected by attorney-client privilege.
```

35

1    in place safeguards to ensure that a similar incident

2    does not happen again."

3          Do you see that?

4       A.  Yes.

5       Q.  Do you know if BART enacted any new safeguards

6    in response to this letter?

7          MR. ALLEN:  I'm going to object that this is

8    irrelevant and goes beyond any claims against BART, and

9    also it is argumentative to the form of the question.

10         Go ahead.  You can answer.

11         THE WITNESS:  Do I know if they did anything

12   else?  Not to my knowledge.

13   BY MR. SIEGEL:

14      Q.  Do you know if BART changed any policies?

15      A.  As far as --

16         MR. ALLEN:  Objection; vague.

17   BY MR. SIEGEL:

18      Q.  As far as media relations.

19         MR. ALLEN:  Objection; relevance under Monell.

20   It's not a Monell case.

21         Go ahead.  You can answer.

22         THE WITNESS:  I don't know of anything we

23   changed.

24   BY MR. SIEGEL:

25      Q.  Are you aware that BART policies provide for a

36

1    safety staging area for media at protests whenever
2    possible?
3         A.   In our policy?
4              MR. ALLEN:  Objection; vague, overbroad.
5    BY MR. SIEGEL:
6         Q.   That's my understanding.
7              Is that your understanding?
8              MR. ALLEN:  Objection; vague and overbroad to
9    the form of the question.  Safe staging areas for what?
10             MR. SIEGEL:  For media.
11             MR. ALLEN:  For what, where, when, how?
12             MR. SIEGEL:  For media at protests.
13             MR. ALLEN:  So you didn't form the question in
14   that way.  You want to form the question to the BART
15   policy and his knowledge of BART policy in the context
16   of media at a demonstration.  It's still an incomplete
17   question.
18             MR. SIEGEL:  Madam Court Reporter, would you
19   read back my question?
20             (Record read.)
21             MR. ALLEN:  Objection; vague, overbroad as to
22   the context of when and why they would need a safe
23   staging area.
24             You can answer the question if you understand
25   what his question is and how it's being posed.  I can

1  have her read it back.

2         THE WITNESS:  Is he talking about for disaster

3  scenes?  Does he want me to refer directly to what's in

4  our policies and procedures?

5         MR. ALLEN:  Michael, I'm not trying to be

6  obstructionist.  Let me frame it this way:  What you've

7  read may actually be what it says, but we don't know.

8  You're asking in a generic form.  There are

9  demonstrations of a violent nature where a safe area is

10  created for media so they don't get involved in that.

11  In the context of what you've pointed to, it's overbroad

12  and vague as what you're striving to do or asking of the

13  chief.  That's how I view it.  I don't know if that's

14  how he views it.  It sounds like that's how he views it

15  as well.  So you understand what my objection is.

16         MR. SIEGEL:  I guess when I find the code

17  section, I'll come back to that question.

18  BY MR. SIEGEL:

19         Q.  Chief, do you recall working with any other

20  BART officials to respond to the Society of Professional

21  Journalists letter of October 4th, 2011?

22         A.  Yes.

23         Q.  Who did you work with in crafting the response?

24         A.  I believe it was Jennifer Barton who was in

25  charge of our communications department.

52

1              REPORTER'S CERTIFICATE

2

3

4          I, SANDRA M. LEE, a Shorthand Reporter, State of

5     California, do hereby certify:

6          That KENTON W. RAINEY, in the foregoing

7     deposition named, was present and by me sworn as a

8     witness in the above-entitled action at the time and

9     place therein specified;

10         That said deposition was taken before me at said

11    time and place, and was taken down in shorthand by me, a

12    Certified Shorthand Reporter of the State of California,

13    and was thereafter transcribed into typewriting, and

14    that the foregoing transcript constitutes a full, true

15    and correct report of said deposition and of the

16    proceedings that took place;

17         That before completion of the proceedings,

18    review of the transcript was not requested.

19         IN WITNESS WHEREOF, I have hereunder subscribed

20    my hand this 19th day of November 2013.

21

22

23

24    _____
                SANDRA M. LEE, CSR NO. 9971
25              State of California

Aiken Welch Court Reporters    Kenton Rainey    11/06/2013

# EXHIBIT "C"

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                          ---o0o---

 4    DAVID MORSE,

 5         Plaintiff,

 6    vs.                                    No. C12-5289 JSC

 7    SAN FRANCISCO BAY AREA RAPID
      TRANSIT DISTRICT (BART); and BART
 8    Deputy Police Chief DAN HARTWIG,
      sued in his official and
 9    individual capacities,

10         Defendants.
      _____/
11

12

13

14

15               DEPOSITION OF BENSON H. FAIROW

16                 (Pages 1 to 81, inclusive)

17

18               Taken before SANDRA M. LEE

19                      CSR No. 9971

20                   October 16, 2013

21

22
                       Aiken Welch Court Reporters
23                     One Kaiser Plaza, Suite 505
                       Oakland, California 94612
24                 (510) 451-1580/(877) 451-1580
                        Fax:  (510) 451-3797
25                     www.aikenwelch.com
```

22

1    Q. In this e-mail document, you write that the
2    protest began around 5:00 p.m.
3        Is that your recollection?
4    A. I don't have an independent recollection of it.
5    That would have been my recollection at the time.
6    Q. You write several warnings were given to
7    individuals in the group to not block the gates.
8        What did you base that statement upon?  I'm
9    looking at the second paragraph of your e-mail.  Second
10   large paragraph.
11   A. I see it.  I don't specifically recall.
12   Probably reports from people in the field.
13   Q. At the bottom of this page and the beginning of
14   the next, you write, "The station was closed at this
15   point and officers began to sort through the group of
16   detainees, releasing bonified members of the press and
17   taking those protesters participating in blocking gates
18   into custody."
19   A. Yes.
20   Q. What did you mean by "releasing bonified
21   members of the press"?
22   A. Generally speaking, like, members of the press
23   with press credentials, that had been issued press
24   credentials.  In today's world, there's a lot of
25   bloggers and a lot of people that report on things and

23

1    aren't necessarily considered bona fide press.  It was
2    basically that.
3    Q. Are you familiar with the BART policy regarding
4    media?
5    A. Not off the top of my head.
6        MR. SIEGEL: Let's try Exhibit 15, please.
7        (Plaintiff's Exhibit 15 marked for
8        identification.)
9    BY MR. SIEGEL:
10   Q. Have you reviewed this policy previously?
11   A. Not recently.
12   Q. I'd like to direct your attention to the second
13   page of this document under the heading of "Media
14   Access."  Under item (a), it states, "The media
15   representative shall produce valid press credentials
16   that shall be prominently displayed at all times while
17   in areas otherwise closed to the public."
18       Do you know what valid press credentials is?
19   A. I would consider those to be credentials issued
20   by the police department.  I know Oakland does.  I know
21   San Francisco does.
22   Q. Are you aware that a journalist does not have
23   to have such credentials in order to practice
24   journalism?
25   A. I think that's a common-sense approach to it,

24

1    yes.
2    Q. When you wrote -- when you refer to "bonified
3    members of the press," were you referring to David Morse
4    as a non-bona fide member of the press?
5    A. Apparently I was in that e-mail.
6    Q. And why did you consider Mr. David Morse not to
7    be bona fide?
8    A. I don't specifically recall.  I think what I
9    was referring to -- I don't have independent
10   recollection.
11   Q. Do you know whether Mr. Morse had press
12   credentials that day?
13   A. I don't believe he did, but I don't recall.
14   Q. Is it true that other self-proclaimed
15   journalists were primarily interested on that day?
16   A. I don't specifically recall.  I do recall there
17   were some journalism students.  I would probably lump
18   them into that category.  They were released.
19   Q. And were they bona fide members of the press?
20   A. Not with press credentials, no.
21   Q. They weren't included in your statement of
22   "releasing bonified members of the press"; is that fair
23   to say?
24       MR. ALLEN:  I'm going to object it's vague,
25   it's argumentative, calls for speculation.

25

1        You can answer the question.  Unless I
2    specifically instruct you not to, you have to answer the
3    question.
4        THE WITNESS:  Okay.  I have to ask for the
5    question again.
6        (Record read.)
7        THE WITNESS:  Yes.
8    BY MR. SIEGEL:
9    Q. Do you know why the journalism students were
10   released?
11   A. I think it was determined they had not
12   committed any crime.
13   Q. And what is your understanding of the crime
14   that David Morse was accused of committing?
15   A. Obstructing transit business, 369i under the
16   Penal Code.
17   Q. Did you watch the protest via close-circuit
18   television that day?
19   A. I could see portions of it.
20   Q. What do you mean by "portions"?
21   A. The camera system doesn't give you -- that's
22   the whole reason I have an operations commander there,
23   to have that granular awareness of what's going on
24   because the close-circuit TV doesn't provide sound.  It
25   also doesn't cover all areas of the station.  And it

26

1   provides a limited amount of information to me when I'm

2   sitting there remotely in Oakland.

3        Q. Is it fair to say when you wrote this report,

4   you were not necessarily relying on direct knowledge?

5        A. That's true.

6        Q. You were relying on what other people told you?

7        A. True.

8        Q. I have caught up with my earlier question.  I'd

9   like you to look at Exhibit 1, which has already been

10  introduced which your counsel has a copy of.  From my

11  understanding of what BART has told me, this is the

12  tactical team and crowd control policy.

13        Do you recognize this policy?

14        A. Yes.

15        Q. I'd like to direct your attention to 459.7,

16  which is on the page numbered 411 by the policy number

17  or 19356 by the Bates stamp.  It's entitled "The Media &

18  Public Information."

19        A. 459.7?

20        Q. Yes.

21        A. Got it.

22        Q. Would you please read the first two sentences

23  of the second paragraph of that section?

24        A. "Those with a right to cover photograph

25  demonstrations are not limited to representatives of

27

1   major newspapers, radio or television stations.  Persons

2   who represent small newspapers or magazines,

3   free-lancers and other citizens are also entitled to

4   take notes or photographs."

5        Q. Is it fair to say that the second sentence of

6   that paragraph covers non-bona fide members of the

7   press?

8        A. Absolutely.

9        Q. Whether you're bona fide or not, you have the

10  right to report on protests occurring on BART

11  facilities?

12        A. As long as you don't break the law, yes.

13        Q. I'd like to direct your attention to the fourth

14  paragraph of that same section.  It states, "Officer

15  should recognize media credentials issued by police

16  agencies or the media representative's employer as valid

17  identification."

18        Does that refresh your recollection about what

19  proper credentials would be?

20        A. It does.

21        Q. So if the credentials are issued by the media

22  organization, that's sufficient; is that correct?

23        A. Yes.

24        Q. Do you have any independent knowledge of how

25  David Morse might have blocked fare gates?

28

1        A. Not specific, no.

2        Q. Do you remember noticing on the close-circuit

3   TV David Morse was blocking fare gates?

4        A. Not specifically.  I saw a large group

5   traveling in a circular motion.  That was about it.

6        Q. Did Chief Rainey ask you to acquire video of

7   David Morse speaking at BART board of directors

8   meetings?

9        A. Not that I recall.

10        Q. Prior to September 8th, 2011, do you remember

11  having any conversation with any BART officer regarding

12  Dave Id or David Morse?

13        A. I don't have specific recollection, but I'm

14  certain that some conversations did occur.

15        Q. Who did you speak with regarding Dave Id?

16        A. I don't have specific recollections.  I can

17  tell you that we were aware because of the past

18  demonstrations that where he showed up usually

19  Christopher Cantor did, too.  We had an interest in

20  knowing when he arrived because he would arrive early.

21  It was a fair predictor where the protest would be.

22        Q. Who is Christopher Cantor?

23        A. He was one of the people from No Justice No

24  BART that would frequently speak out in public or give

25  press announcements, that type of thing.  He was the

29

1   visible face of No Justice No BART.

2        Q. Did you consider him to be a leader of this

3   movement?

4        A. Perhaps.  I know from my experience with

5   protests and these times that frequently there's a claim

6   of no leadership, but what is often the case is there

7   are certain individuals that will stand out.  He could

8   have been.  I don't have independent knowledge of it,

9   though.

10        Q. Other than the fact Mr. Morse seemed to arrive

11  around the same time as Mr. Cantor, did you have any

12  other information that Mr. Morse was a part of this

13  movement?

14        A. No.

15        Q. Did you have any knowledge that he should be

16  considered a dangerous person?

17        A. No.

18        Q. A threat to BART facilities?

19        A. No.

20        Q. Was a scribe designated for the September 8th,

21  2011, protest?

22        A. I don't specifically recall.  It was a new

23  thing for BART PD, so although I always wanted one, I

24  didn't always get one because of staffing needs.

25        Q. What's the function of a scribe?

Case3:12-cv-05289-JSC Document86 Filed08/28/14 Page30 of 66

**34**

1  did this work, and if it didn't work well, what could we
2  do better next time. That's ideal.
3      Q. So what actually happened?
4      A. I don't believe there was an after-action
5  completed with this one for a couple of reasons. Again,
6  keep in mind I'm new to BART. They aren't used to
7  having maybe as in-depth an ops order as this. I'm also
8  introducing some maybe new ideas. So they weren't in
9  the mode of doing after-action plans yet. Also at this
10  time, we had back-to-back protests. I believe this was
11  the fifth, if not sixth, at this point. Kind of on a
12  weekly basis. We didn't have time. It didn't get done.
13      Q. Were you creating ops orders for each of these
14  protests?
15      A. Yes.
16      Q. How did you distribute the ops orders? If you
17  recall.
18      A. I don't do the distribution. I turn it in to
19  one of the admin staff, and it gets distributed to
20  personnel. I believe it goes to all personnel, but I
21  don't know that for a fact.
22      Q. When you say "personnel," what do you mean?
23      A. Police personnel. The department.
24      Q. Every officer in the department?
25      A. I believe so. I don't know that for a fact.

**35**

1      Q. Do you know if officers were given sufficient
2  time to review this document?
3      A. It depends when it's actually distributed, but
4  yes, I always try to make sure they have enough time to
5  review it. There's also lineups where it's discussed
6  with the command personnel there in charge.
7      Q. Who did you meet with in command staff to
8  prepare for September 8th, 2011?
9      A. I don't specifically recall. More likely than
10  not Lieutenant Steve Coontz; may have been John
11  Conneeley, another lieutenant; both commanders of the
12  tactical team.
13      Q. You didn't meet with Deputy Chief Hartwig?
14      A. I don't specifically recall, but I may have.
15      Q. Is there a regular command staff meeting?
16      A. Yes. Every Tuesday.
17      Q. Every Tuesday.
18          On the face of the ops orders we're looking at
19  here, it states date of issue 9/8/11.
20          Is that a reliable indicator of when this
21  document was issued?
22      A. I don't know.
23      Q. Is it possible it was issued before?
24      A. It is.
25      Q. I'd like to direct your attention to the last

**36**

1  page of this document -- it's the second-to-the-last
2  page, page 17.
3      A. Okay.
4      Q. The second chart here is under the heading
5  "Criminal Codes Related to Protest Activities."
6          Why is that included here?
7      A. I include that in the operations order so
8  officers when faced with crime have some idea what it
9  might be. It's an easy reference for them. It's
10  similar to a traffic officer carrying around an abridged
11  version of the Vehicle Code. It's common statutes that
12  are used in those circumstances.
13      Q. Are you aware that the tactical team and crowd
14  control policy states that mass arrests should only be
15  conducted pursuant to Penal Code 409?
16      A. I'm not aware of that.
17      Q. I'd like to direct your attention back to
18  Exhibit 1, and the page I'm looking at is under the
19  title "Arrests," 459.4, and it's on BART 19354.
20      A. Bates?
21      Q. The Bates stamp is 19354. The smaller page
22  number is 409.
23      A. Okay.
24      Q. In the third paragraph here, one of the middle
25  sentences, it states, "the only proper basis for a

**37**

1  multiple simultaneous arrest of all the individuals at a
2  demonstration is failure to disperse (409 PC)."
3          Do you see that?
4      A. I do.
5      Q. On September 8th, was a simultaneous --
6  multiple simultaneous arrest conducted?
7      A. That is not my recall. I believe multiple 369i
8  arrests were made.
9      Q. Is it your contention they were not conducted
10  simultaneously?
11      A. The detention of the group was simultaneous,
12  but then one at a time they were identified as to who
13  had actually violated the statute and taken into
14  custody. It's my understanding -- I wasn't personally
15  there -- I know it wasn't a riot.
16      Q. If there was a multiple simultaneous arrest,
17  that doesn't mean that each arrest ticket or arrest card
18  is written at the same exact time?
19      A. No. But by multiple simultaneous arrests, I
20  believe this infers that it's 409 PC, the riot, and just
21  merely the presence, being there. What we're talking
22  about here in this situation was 369i, elements of the
23  events that each individual was, as far as I know,
24  identified as having committed. The fact that they were
25  all detained at the same time, taken into custody

**38**

1 following that, I don't think fits the multiple
2 simultaneous arrest statement that's made here regarding
3 409 PC.
4     Q. So are you distinguishing between a temporary
5 detention and an arrest?
6     A. Yeah.
7     Q. What's the definition of "an arrest"?
8     A. Taking someone into custody physically or
9 giving them a citation for a misdemeanor if they qualify
10 for committing an offense based on the elements of that
11 offense.
12     Q. How long can you be detained without being
13 arrested?
14     A. A reasonable amount of time.
15     Q. Where do you see 449 PC in this policy; is it
16 fair to say that it's not here?
17     A. I don't know.
18     Q. Would you consider yourself the author of the
19 operation orders?
20     A. I would consider myself the approver.
21     Q. How many meetings did you participate in to
22 plan for the September 8th protest?
23     A. I don't recall. At that point, we had been
24 meeting fairly regularly just because the protests had
25 been occurring so often. We would discuss it during the

**39**

1 command staff. It would be with our operations
2 counterparts within the BART system, those who patrol
3 the trains and the stations, that type of thing.
4     Q. Do you recall at one of those meetings a "Be On
5 the Look Out" document was distributed?
6     A. No.
7     Q. I'd like to direct your attention to -- I
8 thought we had it here -- Exhibit 4.
9     A. Got it.
10     Q. Do you recall this document?
11     A. I do.
12     Q. What is it?
13     A. It's pictures of Christopher Cantor and Mr.
14 Morse. At that point, we had identified Mr. Cantor. We
15 didn't know Mr. Morse's actual name. He was identified
16 by his moniker, Dave Id.
17     **Q. Is this a BOLO?**
18     **A. No. It's a document that was handed out to**
19 **officers who were out there that day. Again, as you**
20 **recall earlier, I mentioned that if Mr. Morse showed up,**
21 **it was highly likely that that's where the protest would**
22 **be, So actually if either one of them showed up. What**
23 **this was created for was to allow field personnel to**
24 **know what both of them looked like and to advise us when**
25 **they showed up so we know whether we would have the**

**40**

1 **resources in the right place or not.**
2     **Q. How is this distinguishable from a BOLO?**
3     **A. BOLOs usually have some kind of action**
4 **requested, either arrest, identify, missing people if**
5 **it's a missing person, a BOL for a missing person. I'm**
6 **sure there's a couple I'm missing. But this was solely**
7 **to provide field personnel with an idea what these two**
8 **individuals looked like.**
9     Q. Did you use a mugshot of Christopher Cantor in
10 this BOLO?
11     A. I would be guessing, but it appears as though
12 the one on the left -- upper left-hand corner is a
13 mugshot. It could be a driver's license, though.
14     Q. Why was the PFN included?
15     A. Because he had been arrested before.
16     Q. How did that help to identify him?
17     A. I didn't need to identify him. He had already
18 been identified.
19     Q. I'm saying: This document was issued to help
20 people visually identify Cantor and Dave Id; is that
21 correct?
22     A. Yes.
23     Q. So why is the PFN included?
24     A. I don't have specific knowledge of why. I can
25 think of a variety of reasons, one being if we did come

**41**

1 in contact with them and they were taken into custody
2 again, it would speed the process. We wouldn't have to
3 do a record-check to know what his PFN is.
4     Q. So in certain ways this document is
5 anticipating the arrest of Cantor?
6         MR. ALLEN: Objection. It's argumentative,
7 calls for speculation.
8         THE WITNESS: No. Not at all.
9 BY MR. SIEGEL:
10     Q. Is it fair to say this document stigmatizes
11 Cantor?
12         MR. ALLEN: Objection; argumentative.
13         THE WITNESS: No. It's for police use only.
14 BY MR. SIEGEL:
15     Q. There aren't any specific instructions on how
16 to use this document on the document, are there?
17     A. No.
18     Q. It doesn't say use this document to identify
19 these two people, does it?
20     A. No.
21     Q. How often does BART create a BOLO, an official
22 BOLO?
23     A. Once or twice a week.
24     Q. And how often -- let me take that back.
25         Does BART create BOLOs for protests?

**70**

1  not been found as of right now. We will make due
2  diligence efforts to produce everything we said we
3  would produce.
4          MR. SIEGEL:  Thank you.
5          MR. ALLEN:  You're welcome.
6          (Whereupon, the deposition was concluded at
7          12:17 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**71**

1                REPORTER'S CERTIFICATE
2
3
4          I, SANDRA M. LEE, a Shorthand Reporter, State of
5  California, do hereby certify:
6          That BENSON H. FAIROW, in the foregoing
7  deposition named, was present and by me sworn as a
8  witness in the above-entitled action at the time and
9  place therein specified;
10          That said deposition was taken before me at said
11  time and place, and was taken down in shorthand by me, a
12  Certified Shorthand Reporter of the State of California,
13  and was thereafter transcribed into typewriting, and
14  that the foregoing transcript constitutes a full, true
15  and correct report of said deposition and of the
16  proceedings that took place;
17          That before completion of the proceedings,
18  review of the transcript was not requested.
19          IN WITNESS WHEREOF, I have hereunder subscribed
20  my hand this 1st day of November, 2013.
21
22
23
24          _____
            SANDRA M. LEE, CSR NO. 9971
25                State of California

# EXHIBIT "D"

1              UNITED STATES DISTRICT COURT FOR THE

2                  NORTHERN DISTRICT OF CALIFORNIA

3                          ---o0o---

4    DAVID MORSE,

5              Plaintiff,

6    vs.                                    No. C12-5289 JSC

7    SAN FRANCISCO BAY AREA RAPID
     TRANSIT DISTRICT (BART); and BART
8    Deputy Police Chief DAN HARTWIG,
     sued in his official and
9    individual capacities,

10             Defendants.
                                          /
11

12

13

14

15              DEPOSITION OF DANIEL O. HARTWIG

16              (Pages 1 to 168, inclusive)

17

18              Taken before SANDRA M. LEE

19                    CSR No. 9971

20                  October 15, 2013

21

22
                    Aiken Welch Court Reporters
23                  One Kaiser Plaza, Suite 505
                    Oakland, California 94612
24               (510) 451-1580/(877) 451-1580
                      Fax:  (510) 451-3797
25                    www.aikenwelch.com

54

1 officers from San Francisco PD that were looking at
2 press passes, yes.
3     Q. Under your direction?
4     A. Yes.
5     Q. What if a person claiming to be a journalist
6 didn't have a press pass; what would you do then?
7     A. I had to utilize other avenues to identify
8 those people, and I had to set those people aside until
9 I could -- I divided people by press passes and
10 identifications and people without. There was a large
11 number of people in the circle that didn't have
12 either/or. So we went to the people with the press
13 passes and identified them.
14     Q. Some people claiming to be journalists didn't
15 have press passes; is that correct?
16     A. Yes.
17     Q. But you, nevertheless, released them, correct?
18     A. After determining that they had an adequate
19 reason for being there, were not violators of law, yes,
20 they were released.
21     Q. Are you familiar with Officer Lee?
22     A. Officer Lee?
23     Q. Yes.
24     A. You'd have to be more specific than Officer
25 Lee.

55

1     Q. Designated as the scribe for the incident
2 commander.
3     A. I'm -- is it Officer Myron Lee?
4     Q. Officer M. Lee, No. 182.
5     A. Yes. I know who Myron Lee is, yes.
6     Q. What is a scribe?
7     A. It's a note-taker for the person he's assigned
8 to.
9     Q. Were you the incident commander?
10     A. At the scene.
11     Q. Were you working with Officer Myron Lee?
12     A. No. I believe Officer Myron Lee was assigned
13 to Deputy Chief Benson Fairow.
14     Q. Did you review -- did you review any notes
15 created by Officer Lee?
16     A. I did not.
17     Q. Did you have plain clothes duty officers on
18 September 8th?
19     A. I would have to refer to the order. I don't
20 recall.
21     Q. Did you have any confidential informants on
22 Septembers 8th?
23     A. Not that I'm aware of.
24     Q. Does BART police utilize confidential
25 informants?

56

1     MR. ALLEN: I'm going to object and instruct
2 him not to answer if it's not specific to this
3 particular subject and incident.
4 BY MR. SIEGEL:
5     Q. Does BART police utilize confidential
6 informants during mass protest situations?
7     MR. ALLEN: I'm going to object and instruct
8 him not to answer on that particular question. I'll
9 allow him to answer specific to this incident.
10 BY MR. SIEGEL:
11     Q. You may answer, Mr. Hartwig.
12     MR. ALLEN: Just so we're clear, this is a
13 matter of BART policy and safety as to public as to how
14 they perform and do their duties with regard to the
15 transit system. Specific to this incident, I'll allow
16 him to answer. But in the absence of that, I'm going to
17 need to get a ruling from the judge whether you can go
18 broader than that. I believe it does impact on issues
19 pertaining to the safety of the train system.
20 BY MR. SIEGEL:
21     Q. Subject to that objection, within the narrow
22 scope described by your attorney, is your testimony
23 you're not aware of any?
24     A. For this incident, I'm not aware of any that
25 were utilized.

57

1     Q. Who would know such information?
2     A. I would refer to the incident commander.
3     Q. Did BART police meet prior to September 8th to
4 discuss the operations order?
5     A. Prior to the 8th, I believe it was issued by
6 Deputy Chief Fairow via e-mail. I believe he dropped a
7 hard copy off at my desk. It was reviewed. And
8 actually on the day of the event, there was a meeting
9 with the involved officers prior to the event in which
10 it is reviewed by all involved.
11     Q. Who is expected to read the order?
12     A. I was not at that meeting. Most often it is
13 the incident commander that reads it or his designee. I
14 don't know who read it that day. I was not at the
15 meeting.
16     Q. Is every officer working that day expected to
17 be familiar with the contents of this order?
18     A. Yes.
19     Q. How do they become familiar?
20     A. It's issued to them at that meeting.
21     Q. In paper form?
22     A. Yes.
23     Q. They're given time to read it?
24     A. Yes, sir.
25     Q. You recall only one meeting to prepare for the

62

1    Q. In Oakland, we call them beanbags.

2    A. It could be that very well.

3    Q. Could it also be chemical weapons?

4    A. It is not chemical weapons.

5    Q. And how can you determine that?

6    A. I do not believe we utilize chemical weapons

7    inside the BART stations.

8    Q. At what point is it permissible for BART police

9    to brandish a weapon during a protest?

10   A. Clarification on "brandish a weapon."

11   Q. Are you familiar with the term "brandish"?

12   A. Yes.

13   Q. What does it mean to you?

14   A. He is not brandishing a weapon in this

15   position.

16   Q. What does "brandish" mean?

17   A. That means to point the weapon in a threatening

18   manner.

19   Q. So if he's just holding it pointing it

20   downwards, that's not brandishing?

21   A. It is not.

22   Q. Were you prepared to use non-lethal ammunition

23   on September 8th?

24   A. I was prepared to use any force necessary

25   within the guidelines of the operations order.

63

1    Q. What is a BOLO?

2    A. Be on the look out for.

3    Q. What is it used for?

4    A. Information.

5    Q. When is a BOLO issued?

6    A. Specifically issued?

7    Q. (Attorney nods head.)

8    A. Patrol officers, officers trying to

9    locate/identify somebody.

10   Q. A criminal?

11   A. Could be.

12   Q. Usually?

13   A. Could be. Could be an at-risk citizen,

14   juvenile, adult. Could be a person of interest. And it

15   could be a criminal.

16   Q. During your tenure at BART, how often were

17   BOLOs issued?

18   A. Weekly. Most often through the detective

19   bureau.

20   Q. How many BOLOs would be issued a week on

21   average?

22   A. I couldn't begin to imagine.

23   Q. One to ten, one to a hundred?

24   A. One to ten.

25       MR. SIEGEL: Exhibit 4, please.

64

1        (Plaintiff's Exhibit 4 marked for

2        identification.)

3    BY MR. SIEGEL:

4    Q. Have you seen this document before?

5    A. I have.

6    Q. When did you see it?

7    A. I believe it was in the latter weeks of

8    September after the event. I believe it was part of an

9    e-mail that was initially distributed from Deputy Chief

10   Fairow. I did not open this portion. Deputy Chief

11   Fairow provided me a hard copy of the ops order. I

12   believe this was in the e-mail, but I did not open it at

13   the time.

14   Q. Were you involved in any way in the creation of

15   this BOLO?

16   A. I was not.

17   Q. This is a BOLO, correct?

18   A. This is not what I would determine as a BOLO.

19   The BOLOs that I'm familiar with specifically say that,

20   "Be on the look out for." I don't see that here,

21   anywhere here. I think the admonition at the bottom of

22   this document describes what it is. It's informational

23   use for law enforcement. I don't know -- this is not

24   what I would determine to be a BOLO that I would be

25   familiar with.

65

1    Q. Do you know why Mr. Morse was selected to

2    appear in this document?

3    A. I do not.

4    Q. Did you speak with Deputy Chief Fairow about

5    this document?

6    A. I did not.

7    Q. After the fact?

8    A. I may have. I do not specifically recall.

9    Q. Do you think a BOLO or this document, which is

10   comparable to a BOLO -- do you think it stigmatizes the

11   people who are represented in the document?

12   A. No.

13   Q. Does the first picture at the top left of this

14   page look like a mugshot you?

15   A. It could be.

16   Q. And do you see where it says "Christopher

17   Cantor" or "Cantor, Christopher"?

18   A. Yes.

19   Q. And under that "DOB," meaning date of

20   birth?

21   A. Yes.

22   Q. Under that "PFN"?

23   A. Yes.

24   Q. What does "PFN" stand for?

25   A. That's an Alameda County booking number.

**114**

1 for a split second, other people blocked the fare gates
2 for 20 seconds; is that substantially what you're
3 saying?
4      A. I don't know that there's a specific time frame
5 attached to the Penal Code section. I know that when I
6 see people blocking and impeding the flow of traffic
7 through the fare gates, I can recognize it.
8      Q. People are walking in a circle and the person
9 in front stops, everyone behind that person has to stop
10 as well; isn't that correct?
11     A. Not necessarily.
12     Q. But that's --
13     A. There's people jostling for position, because
14 some are taking pictures for whatever reason, they're
15 moving to the side, they're moving past the front,
16 They're moving to the rear. That all occurred.
17     Q. You told IA that Mr. Morse was at the front of
18 line; is that correct?
19     A. Based upon Mr. Morse's and Mr. Cantor's
20 location, what I stated is they stopped at the heart of
21 the fare gates and blocked the fare gates. And then
22 they would continue to march around, and when they got
23 back to the fare gates, they would stop again and delay
24 and continue to block the flow of traffic.
25          MR. SIEGEL: Could you read back the question?

**115**

1          (Record read.)
2          THE WITNESS: I stated they were at the front
3 of the line, yes.
4 BY MR. SIEGEL:
5      Q. Is that still your testimony now?
6      A. Yes.
7      Q. For how long approximately was Mr. Morse at the
8 front of the line?
9      A. I was not timing Mr. Morse or anybody else. I
10 have no idea. Mr. Morse moved about. He wasn't in one
11 location for any one period of time.
12     Q. He didn't block the fare gates the whole time?
13     A. No.
14     Q. He didn't stand with Mr. Cantor the whole time?
15     A. No.
16     Q. Other people stood with Mr. Cantor?
17     A. Yes.
18     Q. Other people blocked the fare gates?
19     A. Yes.
20     Q. Other journalists stood with Mr. Cantor?
21     A. Very possibly, yes.
22     Q. Other journalists blocked the fare gates?
23     A. Very possibly, yes.
24     Q. You didn't arrest any other journalists?
25     A. I didn't witness others what I witnessed

**116**

1 Mr. Morse doing.
2      Q. Did you ask the other officers if they
3 witnessed any such thing?
4      A. I did not. They had the authority to take
5 action based upon what they witnessed.
6      Q. Isn't the reason you focused on Mr. Morse that
7 you received a BOLO that identified him to you?
8          MR. ALLEN: Objection; misstates his testimony,
9 it's argumentative.
10         THE WITNESS: I stated I received -- I didn't
11 see that BOLO until after the event.
12 BY MR. SIEGEL:
13     Q. You had a Blackberry at the time, did you not?
14     A. I stated I received an e-mail from Deputy Chief
15 Fairow which may include that BOLO. I did not open it
16 up. I received a hard copy of the operations plan,
17 which I referred to for this event. If I even knew
18 there was a BOLO, I knew Mr. Id and Mr. Cantor. I was
19 with them at every protest, excluding one that I'm aware
20 of. I didn't need to look at any identifying
21 information.
22     Q. You've already testified that Mr. Morse didn't
23 break any law prior to this protest; isn't that right?
24     A. Not that I'm aware.
25     Q. Why do you associate the two, Mr. Morse and

**117**

1 Mr. Cantor?
2      A. In multiple events, I would see them
3 interacting verbally, conversation, walking together,
4 moving from one station to another station together.
5 All the things that protesters do that fall within the
6 legal ramifications of protest, I witnessed it multiple
7 times.
8          MR. SIEGEL: Sorry, Dale. Am I boring you?
9          MR. ALLEN: I think you're taking a great
10 deposition.
11         MR. SIEGEL: Just giving you a hard time.
12 BY MR. SIEGEL:
13     Q. You told IA Mr. Morse looks like a protester.
14 Do you recall that?
15     A. I would have to see the context, because we all
16 look like protesters. I found it.
17     Q. We're looking at page 23, stamped BART 28 in
18 the middle of the page.
19     A. Right.
20     Q. You stated, "that's the conundrum with Mr. Id."
21 I just want to clarify for the record that I
22 had it wrong. Dave Id, he was a psychology student.
23 It's a witty nom de pen.
24         MR. ALLEN: Give us a line number, too.
25         MR. SIEGEL: That was my aside.

**146**

1   your practice?

2       A. I would usually check it out, see what it was

3   referring to and/or delete it.

4       Q. Exhibit 13 shows that you received an

5   alert about an article that Dave Id wrote; is that

6   correct?

7       A. Yes.

8       Q. It was an article that announced a press

9   conference on the release of a shooting Charles Hill

10  video.

11      A. Yes.

12      Q. Ken Dam was your Intel officer on September

13  8th?

14      A. Yes.

15      Q. Why was he focusing on Mr. Morse as a

16  subject?

17      A. You would have to ask Officer Dam.  His purpose

18  was to gather intelligence information regarding

19  activities that occurred within the BART properties.

20      Q. Do you consider or did you consider Mr. Morse

21  to be a dangerous individual?

22      A. No.

23      Q. Did you consider him to be a threat to the

24  operation of BART?

25      A. No.

**147**

1       Q. How about Mr. Cantor?

2       A. I don't believe I thought he was a threat or a

3   danger.  He was certainly more aggressive than Mr.

4   Morse, more vocal.

5       Q. They played very different roles; is that

6   correct?

7       A. I don't know what roles they played, but I

8   witnessed, as I stated, Mr. Cantor was the

9   self-appointed leader of that group.

10      Q. When you say "self-appointed," people actually

11  followed Mr. Cantor on the day of the protest; is that

12  correct?

13      A. I witnessed that, yes, in trying to track down

14  Mr. Cantor.  We couldn't find him via media source,

15  telephone.  We had no contact with him, so we never

16  received notification from anybody that this group was

17  organized, there was a plan, whether there was a leader.

18  That was our determination based upon his actions at

19  these events.

20      Q. Among those actions were he made statements to

21  the media?

22      A. Yes.

23      Q. And he was at the front of the line?

24      A. Sometimes.

25      Q. He used a piece of paper to create a

**148**

1   bullhorn?

2       A. Sometimes.

3       Q. MR. SIEGEL:  Mr. Allen, do you have any

4   cross-examination?

5           MR. ALLEN:  I do not.

6           MR. SIEGEL:  We'll close.

7           (Whereupon, the deposition was concluded at

8           1:49 p.m.)

**149**

1           REPORTER'S CERTIFICATE

2

3

4       I, SANDRA M. LEE, a Shorthand Reporter, State of

5   California, do hereby certify:

6       That DANIEL O. HARTWIG, in the foregoing

7   deposition named, was present and by me sworn as a

8   witness in the above-entitled action at the time and

9   place therein specified;

10      That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17      That before completion of the proceedings,

18  review of the transcript was not requested.

19      IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 1st day of November, 2013.

21

22

23

24

25

        SANDRA M. LEE, CSR NO. 9971

        State of California

# EXHIBIT "E"

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                          ---o0o---

 4    DAVID MORSE,

 5          Plaintiff,

 6    vs.                                    No. C12-5289 JSC

 7    SAN FRANCISCO BAY AREA RAPID
      TRANSIT DISTRICT (BART); and BART
 8    Deputy Police Chief DAN HARTWIG,
      sued in his official and
 9    individual capacities,

10          Defendants.
                                         /
11

12

13

14

15              DEPOSITION OF MICHAEL D. HAYES

16              (Pages 1 to 45, inclusive)

17

18              Taken before SANDRA M. LEE

19                   CSR No. 9971

20                  October 16, 2013

21

22
                      Aiken Welch Court Reporters
23                   One Kaiser Plaza, Suite 505
                     Oakland, California 94612
24                (510) 451-1580/(877) 451-1580
                      Fax:  (510) 451-3797
25                   www.aikenwelch.com
```

|   | 6 |   | 8 |
|---|---|---|---|
| 1 | Q. Your attorney might like me to advise you that | 1 | Q. Why did you leave that position? |
| 2 | today we're preparing a transcript. I'm going to ask | 2 | A. I was promoted. |
| 3 | you questions. At the time I ask the question, you | 3 | Q. To lieutenant? |
| 4 | should give the best answer that you give. If you later | 4 | A. Correct. |
| 5 | wish to supplement your answer, you do have the right to | 5 | Q. In your capacity as an IA officer, did you |
| 6 | do so. | 6 | conduct any investigations of complaints arising out of |
| 7 | Do you understand that? | 7 | the September 8th, 2011, protest at the Powell Street |
| 8 | A. Yes, I do. | 8 | station? |
| 9 | Q. Even after today when the court reporter | 9 | A. Initially I was assigned this case. However, I |
| 10 | prepares a written transcript, you have the opportunity | 10 | brought it to my supervisor's attention that I was on |
| 11 | to review that transcript before it becomes final. | 11 | duty that day and was involved in this case, and so they |
| 12 | Do you understand that? | 12 | referred that case to another investigator. |
| 13 | A. Yes, I do. | 13 | Q. Did you conduct any interviews before you made |
| 14 | Q. We started with a little bit of your employment | 14 | that determination? |
| 15 | history. | 15 | A. No. I did not conduct any interviews. |
| 16 | Where did you go to high school? | 16 | Q. What was -- what were your duties on September |
| 17 | A. Gault High School in Gault, California. | 17 | 8th, 2011? |
| 18 | Q. When was that? | 18 | A. I was a patrol sergeant assigned to San |
| 19 | A. 1979 to 1983. | 19 | Francisco downtown B platoon. That specific day, I was |
| 20 | Q. What did you do after that? | 20 | assigned to the Civic Center with my officers. |
| 21 | A. Went to school. | 21 | Q. How many officers were you supervising? |
| 22 | Q. What type of school? | 22 | A. I don't remember the exact number. |
| 23 | A. Junior college. | 23 | Q. Approximately? |
| 24 | Q. What did you study? | 24 | A. Five to six, maybe. |
| 25 | A. General ed. | 25 | Q. Did you go to the Powell Street station at any |

|   | 7 |   | 9 |
|---|---|---|---|
| 1 | Q. At what point did you enter law enforcement? | 1 | point? |
| 2 | A. I was hired with Alameda County Sheriff's | 2 | A. Yes, I did. |
| 3 | Department back in 1989. | 3 | Q. At what point? |
| 4 | Q. When did you leave the County, approximately? | 4 | A. It was later in the evening I went down there. |
| 5 | A. It was June -- it was June of 1996. | 5 | Q. During the protest? |
| 6 | Q. Where did you go after that? | 6 | A. When you say "during the protest," specifically |
| 7 | A. Over to BART. I lateraled from the sheriff's | 7 | what do you mean? It was during the operation, but it |
| 8 | department to BART. | 8 | wasn't when the protest at Powell Street was active. |
| 9 | Q. You've been at BART almost 20 years at this | 9 | Q. The protest had already been contained at that |
| 10 | point? | 10 | point? |
| 11 | A. 1996 to the present, correct. | 11 | A. Yes. |
| 12 | Q. What positions have you held at BART Police? | 12 | Q. And arrests were being conducted? |
| 13 | A. Patrol officer, patrol sergeant, K9 officer and | 13 | A. Arrests had already been completed prior to my |
| 14 | now patrol lieutenant. | 14 | arrival there. |
| 15 | Q. Did you also have duties with Internal Affairs? | 15 | Q. Why did you go to Powell? |
| 16 | A. I did, yes, as a sergeant. | 16 | A. I was ordered there over the radio to respond. |
| 17 | Q. When were you in Internal Affairs? | 17 | Q. Were you ordered to respond in any particular |
| 18 | A. Let me think back. I believe it was in | 18 | way? |
| 19 | December of -- I came out of Internal Affairs last year | 19 | A. It was over the radio. |
| 20 | in July of 2012. That would have had to have been | 20 | Q. So "respond" just means show up and await |
| 21 | December of 2011, is when I went into Internal Affairs, | 21 | orders? |
| 22 | if my calculations are right. Roughly I was there seven | 22 | A. Basically, yes. |
| 23 | months. | 23 | Q. When you arrived, what happened? |
| 24 | Q. How did you get that posting in IA? | 24 | A. I was given the task of responding to the San |
| 25 | A. I applied for the position. | 25 | Francisco City Jail with a number of the officers that |

**10**

1  were on my team, and the assignment I was given was to
2  cite and release individuals that had been arrested
3  during the protest.
4      Q. Did you see Mr. Morse at that time?
5      A. I don't recall seeing Mr. Morse. I don't
6  remember if he was there. I don't remember if he was
7  not there, to be honest with you. It's been two years
8  ago.
9      Q. Do you recall seeing Mr. Morse at any time
10 before today?
11     A. Before today, not in person, no.
12     Q. Do you remember seeing him on documents?
13     A. There was a document that was put out, but I'm
14 fuzzy if his picture was on there or not. I don't
15 remember. If you have a document, maybe that will help
16 refresh my memory.
17     Q. It's Exhibit 4 in your stack here. I'm not
18 sure how neat your stack is.
19         If you can review Exhibit 4, does that refresh
20 your recollection regarding whether you have seen Mr.
21 Morse before today?
22     A. This is the document that I remember seeing his
23 picture prior to today.
24     Q. How did you receive that document?
25     A. You know, I don't remember. I don't remember

**11**

1  how this document was presented to me.
2      Q. On the day in question, September 8th, 2011,
3  did you attend a briefing regarding the planned protest?
4      A. No.
5      Q. Did you receive this document via e-mail?
6      A. I don't remember if I did; I don't remember if
7  I didn't. I could go back and look at my e-mails, the
8  e-mail history, but I just don't know.
9      Q. If you could look at Exhibit 21. This is my
10 stack. Your stack is over here.
11     A. Okay. Is this the one from...?
12     Q. (Attorney indicating.)
13         I can represent to you Exhibit 21 was an e-mail
14 sent by Officer Ken Dam. I believe if you look on the
15 cc's of this document, the fourth line from the bottom,
16 you'll see your name.
17     A. Uh-huh. I do see it.
18     Q. Does that refresh your recollection about how
19 you might have received Exhibit 4?
20     A. Yes.
21     Q. How would you describe Exhibit 4; what kind of
22 document is it?
23     A. We're talking about this?
24     Q. Yes.
25     A. I would describe it as an informational sheet.

**12**

1      Q. What information does it give you?
2      A. It's listing Mr. Cantor as an individual, the
3  leader of the group No Justice No BART, and it
4  identifies Indybay reporter calls himself Dave.
5      Q. Id?
6      A. It's Id? I don't want to be disrespectful.
7  Unknown true name.
8      Q. Does this document remind you of a BOLO?
9      A. Again, I don't recall seeing a BOLO.
10     Q. You know what a BOLO is?
11     A. Yes, I do.
12     Q. Does this document appear similar to a BOLO?
13     A. Well, a BOLO generally has -- BOLO stands for
14 be on the look out for. Generally it has information on
15 it that would lead to the individual's arrest or
16 information of a crime or something of that nature.
17         This particular -- just from reviewing this
18 particular sheet, I don't see anything here other
19 than identifying Mr. Cantor as a leader of the group
20 and Dave Id as an Indybay reporter. I don't see any
21 arrest information on here. I don't see any probable
22 cause to arrest. I don't see anything of that
23 nature, so I wouldn't classify this as a BOLO, in my
24 experience.
25     Q. Have you seen any documents like this one in

**13**

1  your experience?
2      A. I have.
3      Q. Have you ever acted as a police officer during
4  a protest?
5         MR. ALLEN: Prior to or since the incident?
6  BY MR. SIEGEL:
7      Q. At any time.
8      A. Not a protest. When I worked for Alameda
9  County Sheriff's Department, I was involved in a riot,
10 but it was not a protest.
11     Q. It wasn't an announced event?
12     A. No.
13     Q. Where was the riot?
14     A. It was at the Alameda County Fair, July 4th.
15     Q. Do you recall that IA interviewed you in
16 regards to a complaint filed by David Morse?
17     A. I don't recall them ID'ing me regarding a
18 complaint by David Morse. I know there was a complaint
19 made, but I don't believe the complaint was identified
20 as David Morse.
21     Q. You spoke to IA in regards to Hannah Brown?
22     A. The name sounds familiar. However, if you have
23 something with her name on it, I could be totally
24 assured that is correct. However, I know there is a
25 female that made a complaint against me.

14

1 Q. During that interview, IA asked you about David
2 Morse as well; is that correct?
3 A. You know, it's been a year since then. I'm not
4 a hundred percent positive.
5 Q. When a police officer is asked to speak with
6 IA, what are the expectations of that police officer?
7 A. Same as today. You will tell the truth.
8 Q. There's nobody swearing you to tell the truth;
9 is that correct?
10 A. You're ordered to tell the truth.
11 Q. By the IA officer?
12 A. By the Internal Affairs officer, yes.
13 MR. SIEGEL: I'd like to introduce the next
14 exhibit in order.
15 (Plaintiff's Exhibit 24 marked for
16 identification.)
17 BY MR. SIEGEL:
18 Q. This is a pretty thick document.
19 Have you ever seen this before, this document?
20 MR. ALLEN: Do you have a copy for me?
21 MR. SIEGEL: Good idea. Sorry.
22 THE WITNESS: Generally as the officer that was
23 interviewed, you don't see this documentation. After
24 when I was interviewed, I was never allowed access to
25 this.

15

1 BY MR. SIEGEL:
2 Q. It's not typical for someone interviewed at IA
3 to receive a copy of the transcript?
4 A. Not that I've ever done in my investigations,
5 unless it was requested by the attorney.
6 Q. I'd like to direct your attention to some of
7 the statements contained in this transcript.
8 A. What page?
9 Q. We're going to start with page 9.
10 A. And the line, please.
11 Q. Looks like the line of questioning begins on
12 the previous page. Let's start with the question at
13 line 18 of page 8 of this transcript.
14 A. Okay.
15 Q. In response to the question at line 18, you
16 state that you recalled during the time of the protest
17 that Dave Id was somehow linked to the movement.
18 Do you have any more information about how you
19 knew that Dave Id was linked to the movement?
20 A. Just off this informational.
21 Q. Based on Exhibit 4?
22 A. Correct.
23 Q. If you could look at the next page at line 19,
24 you state, "I remember that it was pretty much where
25 Christoff was, Dave Id was there. They were kind of in

16

1 tandem."
2 So Krystoff, is that the person whose name is
3 also Christopher Cantor?
4 A. Correct. That's why I know Christopher Cantor,
5 his aka.
6 Q. Have you ever encountered Mr. Cantor in public?
7 A. I saw him from across the street, but not --
8 not encountered or had a conversation with him.
9 Q. When did you see him?
10 A. I don't remember the specific time or the
11 specific date. I just remember seeing him Downtown San
12 Francisco.
13 Q. Other than Exhibit 4, did you have any
14 information that supported your statement that Krystoff
15 and Dave Id were in tandem?
16 A. There was. And I'm trying to remember if it
17 was just word of mouth, but there was basic information
18 that was put out, and I believe it was word of mouth,
19 and what it was was basically wherever Mr. Dave Id was,
20 Mr. Cantor would show up shortly thereafter. That's
21 what "in tandem" meant.
22 Q. Was it your understanding that Dave Id was a
23 protester?
24 A. I did not know he was a protester.
25 Q. Did you think that this document suggested he

17

1 was involved in unlawful activity?
2 A. It just says that he's an Indybay reporter
3 based on this document.
4 Q. Is it unusual to identify a reporter in a
5 document like this?
6 MR. ALLEN: Objection; calls for speculation,
7 lacks foundation.
8 BY MR. SIEGEL:
9 Q. In your experience.
10 MR. ALLEN: Calls for speculation.
11 BY MR. SIEGEL:
12 Q. You can answer.
13 MR. ALLEN: You can answer a question unless I
14 tell you not to. I object for the record.
15 THE WITNESS: Answer the question?
16 MR. ALLEN: Please. You want the question read
17 back?
18 THE WITNESS: Yes, please.
19 (Record read.)
20 BY MR. SIEGEL:
21 Q. Referring to Exhibit 4.
22 A. This is the first time in my experience that
23 I've seen this.
24 Q. This is the first time you've seen a journalist
25 identified like this?

**26**

1    Q. But it has similar problems to those you
2 identified in your IA investigation?
3    A. Well, again, not problems but details. It's
4 lacking details.
5    Q. Were you trained on how to write a report such
6 as this?
7    A. I was trained to write reports, yes.
8    Q. What training have you received regarding
9 report writing?
10    A. In the Alameda County Sheriff's Department,
11 basic academy. Also through BART, a report-writing
12 class that they had.
13    Q. Returning to the transcript, at line let's
14 start with line 15.
15    A. On what page?
16    Q. Page 31. Sergeant Kwon asks "And what issues
17 did you have when you read his report?"
18       You respond, "That I remember in Officer
19 Coduti's report is that he was instructed by," and then
20 later you say "he was instructed by Deputy Chief Hartwig
21 to place Dave Id under arrest?"
22       MR. ALLEN: May I ask you to read the
23 entire comment and not just a portion of it, so we have
24 clear context?
25       MR. SIEGEL: Okay.

**27**

1 BY MR. SIEGEL:
2    Q. Sergeant Kwon at 15 states, "And what issues
3 did you have when you read his report?"
4       Hayes states, "That I remember in Officer
5 Coduti's report is that he was instructed by -- and this
6 is all in his report."
7       Kwon states, "Uh-huh."
8       Hayes states, "And you can read it, that he was
9 instructed by Deputy Chief Hartwig to place Dave Id
10 under arrest."
11       Is it true that one of the issues you had with
12 the report is that it states that CD Hartwig directed
13 Coduti to place Dave Id under arrest?
14    A. Was that -- did I have an issue with that?
15    Q. (Attorney nods head.)
16    A. I did not have an issue with Coduti following
17 Deputy Chief Hartwig's direction.
18    Q. The question by Sergeant Kwon at 15 is what
19 issues did you have when you read his report. And your
20 answer references, I guess, Coduti's statement that,
21 quote, "he was instructed by Deputy Chief Hartwig to
22 place Dave Id under arrest."
23    A. But if you read down --
24       MR. ALLEN: I'll object to the form of the
25 question as vague. It's vague. I'm not sure what your

**28**

1 question is.
2 BY MR. SIEGEL:
3    Q. My question is: What is the issue you're
4 identifying in response to Sergeant Kwon's question?
5    A. If you refer to line 22, it says, "And as I
6 remember, Officer Coduti did not document in his report
7 what exactly Mr. Id was doing to violate the law." I
8 believe I brought that up today specifically.
9    Q. At 23, 24, you state, "he didn't have probable
10 cause in the arrest report."
11       Do you believe that's still true?
12       MR. ALLEN: Would you read the entire response,
13 please?
14 BY MR. SIEGEL:
15    Q. The full response between 22 and 25 is "And as
16 I remember, Officer Coduti did not document in his
17 report what exactly Mr. Id was doing to violate the law.
18 He -- he -- he didn't have probable cause in the arrest
19 report. He didn't document it."
20       MR. ALLEN: Thank you.
21       MR. SIEGEL: Remind me of my previous question.
22       (Record read.)
23       THE WITNESS: The basic elements of 369i are in
24 the report. However, it -- being the person that would
25 approve this report, I did not feel to my standard there

**29**

1 was enough details in this report for me to sign off on
2 arrest for 369i. However, I'm not saying that the
3 minimum amount of information is not appropriate for an
4 arrest for 369i.
5 BY MR. SIEGEL:
6    Q. And is that what you meant when you stated "he
7 didn't have probable cause in the arrest report"?
8    A. The details to my standard for approving the
9 report.
10    Q. Are your standards higher than BART PD
11 standards?
12    A. I'm BART PD, sir. I'm a supervisor. And as
13 far as the officer writing the report, I would say my
14 standards are higher than the officer that wrote this
15 report as far as the detail.
16    Q. I'd like to direct your attention to page 33 of
17 this transcript beginning at line 5. If you could read
18 all the way down to line 26, please.
19    A. Okay.
20    Q. Did you suggest to Officer Coduti that the
21 deputy chief write a supplement?
22    A. I did.
23    Q. What did he say?
24    A. He was reluctant, and rightfully so.
25    Q. Why do you say that?

38

1      Q. Yes.
2      A. -- that individual's actions?
3      Q. Yes.
4      A. That's who I was referring to.
5          MR. SIEGEL: Thank you. I have no further
6   questions.
7          Mr. Allen?
8          MR. ALLEN: No questions.
9          (Whereupon, the deposition was concluded at
10         4:55 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

39

1              REPORTER'S CERTIFICATE
2
3
4          I, SANDRA M. LEE, a Shorthand Reporter, State of
5   California, do hereby certify:
6          That MICHAEL D. HAYES, in the foregoing
7   deposition named, was present and by me sworn as a
8   witness in the above-entitled action at the time and
9   place therein specified;
10         That said deposition was taken before me at said
11  time and place, and was taken down in shorthand by me, a
12  Certified Shorthand Reporter of the State of California,
13  and was thereafter transcribed into typewriting, and
14  that the foregoing transcript constitutes a full, true
15  and correct report of said deposition and of the
16  proceedings that took place;
17         That before completion of the proceedings,
18  review of the transcript was not requested.
19         IN WITNESS WHEREOF, I have hereunder subscribed
20  my hand this 1st day of November, 2013.
21
22
23
24         _____
            SANDRA M. LEE, CSR NO. 9971
25          State of California

# EXHIBIT "F"

1                    UNITED STATES DISTRICT COURT FOR THE

2                        NORTHERN DISTRICT OF CALIFORNIA

3                                ---o0o---

4      DAVID MORSE,

5              Plaintiff,

6      vs.                                        No. C12-5289 JSC

7      SAN FRANCISCO BAY AREA RAPID
       TRANSIT DISTRICT (BART); and BART
8      Deputy Police Chief DAN HARTWIG,
       sued in his official and
9      individual capacities,

10             Defendants.
                                            /
11

12

13

14

15                        DEPOSITION OF KEN DAM

16                     (Pages 1 to 49, inclusive)

17

18                   Taken before SANDRA M. LEE

19                          CSR No. 9971

20                        October 16, 2013

21

22
                            Aiken Welch Court Reporters
23                          One Kaiser Plaza, Suite 505
                            Oakland, California 94612
24                          (510) 451-1580/(877) 451-1580
                            Fax:  (510) 451-3797
25                          www.aikenwelch.com

**2**

1                    I N D E X

2 PAGE

3 EXAMINATION BY MR. SIEGEL                         4

4

5                E X H I B I T S

6 NUMBER                                          PAGE

7 Exhibit 21 E-mail dated 9/8/2011 from Ken Dam to   17
            Benson Fairow and cc to others

8

  Exhibit 22 Transcript of Internal Affairs        22
9            Interview of Ken Dam

10 Exhibit 23 E-mail dated 9/8/2011 regarding        40
             Tactical 9-8-11 Deployment- Intel
11           Update

12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                DEPOSITION OF KEN DAM

2

3      BE IT REMEMBERED, that pursuant to Notice, and

4 on the 16th day of October 2013, commencing at the hour

5 of 1:23 p.m., in the offices of Siegel & Yee, 499 14th

6 Street, Suite 300, Oakland, California, before me,

7 SANDRA M. LEE, a Certified Court Reporter, personally

8 appeared KEN DAM, produced as a witness in said action,

9 and being by me first duly sworn, was thereupon examined

10 as a witness in said cause.

11                    ---oOo---

12 APPEARANCES:

13 For the Plaintiff:

14      MICHAEL SIEGEL
        Siegel & Yee
15      499 14th Street, Suite 300
        Oakland, California 94612
16      (510) 839-1200

17 For the Defendants:

18      DALE L. ALLEN
        Low, Ball & Lynch
19      505 Montgomery Street, 7th Floor
        San Francisco, California 94111-2584
20      (415) 981-6630

21 ALSO PRESENT:

22      David Morse.

23
24
25

**4**

1                    KEN DAM,

2              sworn as a witness,

3              testified as follows:

4 EXAMINATION BY MR. SIEGEL:

5      Q. Good afternoon, Officer.

6      A. Good afternoon.

7      Q. Please state and spell your name for the

8 record.

9      A. My name is Ken. Last name Dam, D-a-m. First

10 name K-e-n.

11      Q. Today we're conducting your deposition, as

12 you're aware. This is part of the lawsuit that David

13 Morse has filed against BART.

14         Are you aware of that?

15      A. Yes. Just became aware of it.

16      Q. Did you have a chance to prepare for this

17 deposition?

18      A. Yes.

19      Q. What did you do to prepare?

20      A. I just spoke with attorney Dale for X amount of

21 minutes to prepare.

22      Q. Did you review any documents?

23      A. I may have looked over a few of the documents

24 that I sent out.

25      Q. When you say documents you sent out, what are

**5**

1 you referring to?

2      A. The e-mails. Some of the e-mails that were

3 sent out.

4      Q. You're aware that today you're under oath?

5      A. Yes.

6      Q. That this deposition will result in a

7 transcript that is typed and produced by the court

8 reporter here, and it will then be used as evidence in

9 this case?

10      A. Yes.

11      Q. And are you also aware that we have the right

12 to ask for your truthful and complete answers?

13      A. Uh-huh.

14      Q. And that it is your obligation to give answers

15 to the best of your ability?

16      A. Yes.

17      Q. And also for the purposes of creating a clear

18 record, I need you to answer verbally, so instead of

19 saying "uh-huh" or nodding your head to a question, you

20 need to answer completely with words.

21      A. Okay.

22      Q. Is there any reason why you cannot give

23 truthful and complete testimony today?

24      A. No.

25      Q. Are you under a doctor's care?

**6**

1    A. No.

2    Q. Are you on any medications that affect your

3 cognitive abilities?

4    A. No.

5    Q. What is your role within the BART Police

6 Department?

7    A. Well, I'm a police officer. Currently I work

8 as a criminal analyst with the BART Police Department.

9    Q. How long have you been with BART?

10    A. I was hired by BART April 1997.

11    Q. Have you worked there continuously since then?

12    A. Yes.

13    Q. What positions have you held?

14    A. I've held positions as a community service

15 officer and police officer. Those are the two

16 positions.

17    Q. Do you recall that there was a protest at the

18 Powell Street station on September 8th, 2011?

19    A. Yes.

20    Q. Were you on duty that day?

21    A. Yes.

22    Q. What was your role that day?

23    A. I was the criminal analyst/Intel officer that

24 day.

25    Q. What were your duties as crime analyst?

**7**

1    A. Well, as crime analyst and Intel analyst, one,

2 I follow the orders from the command staff. I prepare

3 documents as necessary to prepare the units for the

4 protest. So I would get information from other police

5 agencies, from command staff, and I would provide that

6 information, get that information and send it out. I

7 would print a copy. I'm sure you've seen the

8 informational bulletins that I put out. That's what I

9 would prepare.

10    Q. That's in advance of the day?

11    A. Correct.

12    Q. What did you do the day of September 8th, 2011?

13    A. Well, from what I recall, I was asked to

14 prepare a document, and I just followed orders and

15 prepared a document, an informational bulletin.

16    Q. So when you got to work that day, you went to

17 the computer and prepared the document?

18    A. Throughout the entire day.

19    Q. If you could take us through the day.

20    A. Well, from what I recall, because as a crime

21 analyst I do a lot of things, I analyze crime, which is

22 the primary duty. I'll look at numbers, statistical

23 analysis of crimes that occur. So when you look at --

24 for instance, what a crime analyst does is he looks at

25 where crimes occur.

**8**

1        For instance, I'll give an example. At the

2 Coliseum, we have a lot of auto burglaries. I'll look

3 at trends and patterns of auto burglaries, find out who

4 has been arrested, find out if they're on probation or

5 parole. Create a document based on the times they hit,

6 the days that they hit and do, like, a predictive

7 analysis and forecast when that crime can occur again.

8        Then I have the administrative side where the

9 chief, or anybody, sergeants or anybody, even officers,

10 ask me what are the crime numbers like. Even the media

11 or civilians will ask me where is crime happening, what

12 are the numbers. I will provide that, too. I have,

13 like, a multi -- I have a lot of tasks that need to be

14 completed.

15        On that day, yeah, I know I had to complete

16 several different tasks. We did know that we had to

17 prepare, I mean, for a protest. We have between 200-

18 and 400,000 passengers taking BART every day. It's a

19 big event when a demonstration and protest would slow

20 down people from coming home and being able to be with

21 their families or go to work or vice versa. That was

22 something I had to prepare for.

23    Q. At the start of the day, did you report to a

24 particular police department?

25    A. The Lake Merritt police station.

**9**

1    Q. And approximately what time did you report?

2    A. 0700.

3    Q. How long did you spend there?

4    A. That particular day, I might have spent longer

5 because of the protest. I'm also there as kind of,

6 like, the link between other police agencies as well.

7    Q. At any time did you leave the Lake Merritt

8 station?

9    A. Maybe to grab lunch.

10    Q. You weren't dispatched to the actual scene?

11    A. No.

12    Q. Does that ever happen?

13    A. Do I ever go to demonstrations?

14    Q. Correct.

15    A. Sometimes.

16    Q. In what capacity?

17    A. As a police officer.

18    Q. To conduct arrests, for example?

19    A. Well, the primary concern is to protect the

20 civilians and keep the peace and crowd control.

21    Q. Did you monitor for the protest as it was

22 occurring that day?

23    A. Yes.

24    Q. How did you do that?

25    A. I did that via the radio, the TV and the

10

1  computer.

2    Q. The radio, you're referring to the radio you're

3  wearing right now?

4    A. Correct.

5    Q. And the TV, what are you referring to?

6    A. So they have television broadcasting the

7  protest. It was affecting a lot of people in the Bay

8  Area, so it was televised. I would watch television to

9  monitor the protest.

10    Q. Did you also monitor BART close-circuit

11  television?

12    A. I did not.

13    Q. What were you looking at on the computer?

14    A. If I got information from SFPD, they would

15  relay that to me. I would relay information back to

16  SFPD, if necessary.

17    Q. Is that via e-mail?

18    A. It's done via e-mail. And we do have an

19  on-line kind of a chat where we can communicate.

20    Q. Is it fair to say you don't know much about the

21  demonstration itself?

22    A. Correct. I do not know.

23    Q. You have no firsthand knowledge of what

24  occurred there?

25    A. I have no firsthand knowledge.

11

1    Q. Did you produce any reports regarding the

2  demonstration afterwards?

3    A. I might have. Sure. I don't recall, but I

4  produced fliers, informational bulletin throughout.

5  Whatever was requested.

6    Q. Do you recall any specific reports?

7    A. I don't.

8    Q. What types of reports would you be asked to

9  create?

10    A. For example, reports of who has been arrested

11  for informational purposes.

12    Q. In your stack here are exhibits from the two

13  previous depositions in this case. If you would turn to

14  Exhibit 16.

15    A. (Witness complying.)

16    Q. Is this the type of report that you might

17  produce after a protest?

18    A. Yes.

19    Q. What is this document?

20    A. This is an informational document on the

21  protesters who have been arrested.

22    Q. Was this a document only for internal purposes?

23    A. Yes.

24    Q. Was it shared with the media?

25    A. No, it was not. In fact, there's a disclaimer

12

1  on the bottom "Not to be released to the general public

2  or media."

3    Q. How would you -- after you create a document

4  like this, how would you distribute it?

5    A. Via e-mail.

6    Q. Who would you send it to?

7    A. I would send it to law enforcement personnel.

8    Q. Do you have a list of all the BART PD, for

9  example?

10    A. I don't have a list personally, but I do send

11  it to law enforcement personnel. Yeah, BART police.

12    Q. If you would also look at Exhibit 4, it's in

13  the other stack and if you would keep that document in

14  front of you.

15    Do you recognize this document?

16    A. Yes, I do.

17    Q. What is it?

18    A. It's an informational bulletin that I produced.

19    Q. Is it true that Deputy Chief Fairow asked you

20  to produce it?

21    A. Yes.

22    Q. Have you ever produced a "Be On the Look Out"

23  document, a BOLO?

24    A. I have produced that.

25    Q. Is it the same format as this?

13

1    A. Different format.

2    Q. How is the format different?

3    A. I will put "BOLO" on the very top portion.

4    Q. Other than a different title, is it different

5  in any way?

6    A. Yes. A BOL would have more information on it.

7  For example, if a person was missing, there's a blurb on

8  person missing, BOL, contact information.

9    If the person has an active warrant or whatnot,

10  it says, "Please confirm all warrants, and this person

11  has a warrant for that." Everybody needs to be

12  confirmed before you take any action. Normally has "Do

13  not arrest or take action solely based on the

14  information that you have at the bottom."

15    Q. The difference is this document doesn't have

16  the same level of instructions?

17    A. Right. This is -- this is just an

18  informational bulletin.

19    Q. What information is this bulletin conveying?

20    A. Identification.

21    Q. Were you with DC Fairow on the day of the

22  protest?

23    A. You mean physically there during when the

24  protest happened?

25    Q. Were you in his presence?

**14**

1    A. I was not in his presence while the protest was
2  happening.  I'm actually in my office.  My office is
3  actually separate from dispatch where they have the
4  close circuit.
5    Q. You didn't enter what they call the command
6  room?
7    A. DC Fairow is at the command post.  I don't know
8  exactly where he was that day.  I'm in my office, and
9  I'm monitoring things in my office.
10    Q. Before DC Fairow asked you to produce this
11  document, had you ever heard about Dave Id?
12    A. I have not.
13    Q. Had you heard of Christopher Cantor?
14    A. Yes, I have.
15    Q. In what context?
16    A. Well, I believe he's been arrested before
17  for -- for 369i at protests, causing disturbances.
18    Q. Do you know he was arrested under 369i?
19    A. I believe so.  That's the common Penal Code
20  that we use, so I believe so.
21    Q. Might it also have been 409?
22    A. You know, to be honest with you, I'm not sure
23  which Penal Code they used.
24    Q. How did you go about acquiring these images?
25    A. The images are on websites.  But for

**15**

1  Christopher Cantor, this one could have been on CRIMS.
2  Alameda County, they have people that have been arrested
3  before database.
4    Q. So the picture in the top left of this flier is
5  a mugshot?
6    A. I can't say for sure, honestly.  I'm not sure.
7    Q. What types of pictures would be in the CRIMS
8  database?
9    A. It would be mugshots.
10    Q. And you think you got it from there?
11    A. I can't be positive, to be honest with you.
12    Q. How did you find the picture of Dave Id?
13    A. I found that picture on Indybay, I believe.
14    Q. Did you capture an image from the video?
15    A. Going back, it appears that, yeah.
16    Q. When did DC Fairow give you the assignment of
17  creating this document?
18    A. Sometime during that day before the protest.
19    Q. It was the same day?
20    A. I believe so.
21    Q. Have you ever created a flier like this for a
22  protest before?
23    A. I don't recall.
24    Q. How about since you created this one; have you
25  created another one like it for any protest?

**16**

1    A. I don't believe so.  In fact, from my
2  recollection, I believe the protests had gone down quite
3  a bit since.
4        MR. MORSE:  Can I call time?
5        MR. SIEGEL:  No.  That's fine.
6  BY MR. SIEGEL:
7    Q. How many copies of this document were created,
8  do you know?
9    A. I'm not positive.  I know I made copies to
10  distribute during the briefing.  I'm not exactly sure.
11    Q. What briefing do you refer to?
12    A. We generally have a briefing before a protest.
13    Q. Do you recall the briefing that day?
14    A. Not exactly.
15    Q. Where did it occur?
16    A. We have briefings, and I'm not sure exactly --
17  there were protests weekly, so to be honest with you,
18  there's so many protests week after week after week that
19  we've changed the briefing rooms.  We can be in a large
20  conference room, in the auditorium.  They can be
21  depending on which room was open.  So there's various
22  places where the briefings can occur.
23    Q. Do you remember where this briefing occurred?
24    A. This one, I'm not -- to be honest with you, I'm
25  not sure.  Again, there's weekly briefings for protests.

**17**

1    Q. How many people are at a briefing?
2    A. This would be a rough estimate.  This is a
3  guess.  Because you have the CAP team, the tactical
4  team, you have officers coming in that were called in.
5  So roughly between 30 to 60 maybe.
6    Q. You made dozens of copies pretty much?
7    A. Right.
8    Q. Do you recall what you said as you described
9  this document?
10    A. No.  I don't recall.
11    Q. Was somebody leading the briefing?
12    A. Yes.  There was somebody else.  The command
13  staff was leading the briefing.
14    Q. Who led the briefing that day?
15    A. I don't recall.  It could be -- it could have
16  been the deputy chief.  It could have been one of the
17  lieutenants.  It could be -- it changed depending on who
18  was there.
19        MR. SIEGEL:  I'd like to mark this as Exhibit
20  21.
21        (Plaintiff's Exhibit 21 marked for
22        identification.)
23  BY MR. SIEGEL:
24    Q. After you review this document, if you could
25  tell me whether you recognize this message.

**18**

1    A. Uh-huh.

2    MR. ALLEN: You have to reply audibly.

3    THE WITNESS: Yes.

4  BY MR. SIEGEL:

5    Q. Is this when you distributed Exhibit 4 to other

6  BART police?

7    A. Yes.

8    Q. How did you select the names to add to the cc

9  column of this e-mail?

10    A. They're members of the tactical team, people

11  that work in the protest.

12    Q. Do you think you added them one by one to the

13  e-mail, or do you have a group that you select that adds

14  multiple names?

15    A. This looks like I added a group. This looks

16  like I added all the command staff. This one looks like

17  I included the command chief, lieutenants and sergeants

18  at the time.

19    Q. And all of those ranks are included within

20  command staff?

21    A. Yes -- well, command staff is primarily deputy

22  chiefs, lieutenants. But for something like this, I

23  would probably put down sergeants as well. This is what

24  I have in my address book, which is groups, so command

25  and then I have sergeants.

**19**

1    MR. SIEGEL: Off the record for a second.

2    (Discussion off the record.)

3  BY MR. SIEGEL:

4    Q. Do you recall that after you created -- let me

5  back up.

6    Do you notice that Exhibit 21 mentions it has

7  two attachments to the e-mail?

8    A. Yes.

9    Q. To the best of your recollection, are those

10  attachments represented by Exhibits 4 and 16?

11    A. Yes.

12    Q. Do you recall that at a certain point DC Fairow

13  asked you to produce updated versions of this document?

14    A. Yes. I believe so. In fact, it's just this

15  one right here, I believe.

16    Q. You're referring to Exhibit 16?

17    A. Yes. It's just whoever was additionally

18  arrested. He wanted me to update this.

19    Q. And do you recall if you did that?

20    A. I honestly don't recall, because -- you have

21  all the e-mails we gave. I don't recall.

22    Q. Do you recall adding Mr. Morse to such a

23  document?

24    A. Again, I don't recall, but you do have all the

25  e-mails.

**20**

1    Q. You don't know that; you assume that, right?

2    MR. ALLEN: We're in a delicate area here.

3  Part of that is attorney-client privilege, but you could

4  say you assume.

5    THE WITNESS: I assume.

6    MR. ALLEN: You don't know one way or the other

7  if he has them or not.

8    THE WITNESS: That's correct. I don't know.

9  BY MR. SIEGEL:

10    Q. How was Exhibit 4 explained to the other BART

11  police staff?

12    A. As I recall, it was only for informational

13  purposes only, and it was when -- that day we didn't

14  know where the protest was going to be, what station.

15  Again, for public safety and to run smoothly, we wanted

16  to know where the protest was going to be. The way I

17  recall, it was being explained generally if they're

18  there, the demonstration tended to come to those

19  stations.

20    Q. Were Cantor and Dave Id identified as subjects?

21    A. Correct. Subjects.

22    Q. Were they identified as potential wrongdoers?

23    A. I don't recall exactly that verbiage.

24    Q. Was it inferred in any way that these two

25  individuals were likely to commit criminal activities?

**21**

1    A. I don't recall. I don't believe so. I don't

2  recall.

3    Q. Other than the two documents in front of you,

4  the informational flier and the document describing the

5  arrests, did you create any other documents -- scratch

6  that.

7    Other than Exhibit 4, did you create any other

8  documents that mentioned Dave Id or David Morse?

9    A. I don't believe I did.

10    MR. ALLEN: This is prior to or up to November

11  September 8th?

12  BY MR. SIEGEL:

13    Q. Well, truthfully, at any time other than

14  September 8th, did you create a document that displayed

15  Dave Id or David Morse?

16    A. I don't believe so, but I don't recall. I

17  don't believe so.

18    Q. Do you remember that you gave an interview with

19  Internal Affairs?

20    A. Yes.

21    Q. What was the subject of that interview?

22    A. Well, Internal Affairs is never -- they don't

23  let you know what they're interviewing for, but this was

24  the topic.

25    Q. When you say "this," what do you mean?

22

1    A. About the protest. The day of September 8th
2    was the topic.
3        Q. Did you ever get to see the transcript of your
4    Internal Affairs interview?
5        A. I've only seen little bits.
6        Q. What little bits did you see?
7        A. The one about the radio. That's all I
8    remember. What else? I know they referred to the
9    radio. I didn't look at much of it, to be honest with
10   you.
11       Q. Do you remember telling IA that Christopher
12   Cantor was a known instigator?
13       A. I might have. I might have.
14       Q. Do you remember telling IA that Cantor was an
15   inciter of what would be the soon riots?
16       A. I might have said that.
17       Q. Do you remember why you might have said that?
18       MR. ALLEN: Objection; calls for speculation.
19       MR. SIEGEL: Sure. Let's just cut to the
20   chase.
21       Exhibit 22, please.
22       (Plaintiff's Exhibit 22 marked for
23       identification.)
24   BY MR. SIEGEL:
25       Q. I can represent to you that this is a

23

1    transcript that was provided to me by BART, what appears
2    to be a record of your IA interview.
3        You've not seen this complete document before;
4    is that correct?
5        A. Correct. I have not.
6        Q. I'd like to direct your attention first to page
7    2.
8        A. Okay.
9        Q. I believe during the IA interview you were
10   interviewed by Sergeant Kwon; is that your recollection?
11       A. Yes.
12       Q. In the middle of this page beginning at line
13   13, Kwon asks you a question that ends with why these
14   two people were placed on the BOLO, and your answer --
15   it's apparent on the document here, but it refers to
16   Cantor having a history of being a visual leader for the
17   protest, a known instigator, inciter of what would soon
18   be riots.
19       Do you wish to change the testimony you gave to
20   IA?
21       A. No. That's what I said at the time.
22       Q. And on what basis did you describe Cantor as an
23   instigator or inciter of riots; what information did you
24   rely upon when making that statement?
25       A. Previous arrest history.

24

1    Q. So other officers informed you of his previous
2    acts?
3    A. There was also -- yes. Other officers have
4    informed me. There was also an incident. I believe it
5    was the board of directors were -- paint was thrown at
6    one of the board of directors, and Cantor was visibly
7    present.
8        Q. He was visibly present at that time?
9        A. At that time.
10       Q. Do you have any information that would
11   suggest that David Morse was an instigator or inciter of
12   riots?
13       A. No.
14       Q. I'd like to direct your attention to the next
15   page, page 3, beginning at about line 11. Here you
16   mention that Dave Id was scouting the area -- actually,
17   I should probably back up.
18       Beginning at the last line of page 28 -- I'm
19   sorry -- page 2, line 28, leading onto the next page,
20   you state that Deputy Chief Benson Fairow gave you the
21   information that you were relying upon.
22       Do you see that?
23       A. Uh-huh.
24       Q. "Yes"?
25       A. Yes.

25

1        MR. ALLEN: You have to say "yes."
2        THE WITNESS: Yes.
3    BY MR. SIEGEL:
4        Q. Is that true?
5        A. Yes.
6        Q. Then I believe it is DC Fairow who mentioned,
7    quote, unquote, "Dave Id was scouting the area," as it
8    says on line 11.
9        A. Yes.
10       Q. What does that mean, "Dave Id was scouting the
11   area"?
12       MR. ALLEN: Objection; calls for speculation.
13   BY MR. SIEGEL:
14       Q. What did you mean when you relayed that
15   information to IA?
16       A. I just was -- relayed that. Again, as Intel
17   officer, I just take what was given and I take it for
18   what it is, face value, what I was told.
19       Q. You don't do any fact-checking?
20       MR. ALLEN: Objection; argumentative.
21   BY MR. SIEGEL:
22       Q. Is that correct?
23       MR. ALLEN: Mischaracterizes his testimony. Is
24   that a question? If it's a question, it's vague and
25   overbroad.

26

```
1   BY MR. SIEGEL:
2       Q. Did you verify that Dave Id was a scout?
3           MR. ALLEN: A scout as to what? Objection;
4   vague and overbroad.
5   BY MR. SIEGEL:
6       Q. Referring to a document that refers to Dave Id
7   was scouting the area in the context of protests.
8           MR. ALLEN: I'm not sure what your question is.
9   If your question is directed to what he understood
10  Deputy Chief Fairow to be telling him, he's testified
11  that that's what he told him. If your question is as to
12  what it meant, I object that it calls for speculation.
13  I'm not sure what your question is.
14  BY MR. SIEGEL:
15      Q. Other than DC Fairow telling you something to
16  the effect of Dave Id was scouting the area, did you
17  have any other information that suggest that my client,
18  David Morse, was acting as a scout?
19      A. I took what DC Fairow told me at face value,
20  and I used that.
21          MR. ALLEN: That's not the question. He's
22  asking if you have independent information other than
23  what DC Fairow told you.
24          THE WITNESS: I don't recall. I don't
25  recall.
```

27

```
1   BY MR. SIEGEL:
2       Q. The next line of this same section, it states,
3   quote, "posing quote/unquote as a -- a possible
4   reporter."
5           This is also something that DC Fairow related
6   to you?
7       A. I believe so.
8       Q. Did you learn from anybody else that Dave Id or
9   David Morse was reporting as a reporter?
10      A. Not that I -- I don't know. I don't believe
11  so.
12      Q. I'd like to direct your attention to page 15 of
13  this transcript. Actually, your testimony on page 15 is
14  prompted by a question that begins on page 14, line 28.
15  And I'll read it without some of the in-between
16  punctuation.
17          Sergeant Kwon stated, "At any of
18          these protests or these events, did you
19          ever hear someone stating on radio
20          something to the effect that Krystoff
21          a.k.a. Christopher Cantor and his
22          quote/unquote sidekick were to be
23          arrested first? Did you ever hear that
24          on the radio? Does that ring any bells
25          or jog your memory?"
```

28

```
1           And your answer at line 9 is, "I
2           know they were to be watched closely
3           because they were the leaders of the
4           group, according to the Intel we got."
5           So is that statement true?
6           MR. ALLEN: Which statement?
7   BY MR. SIEGEL:
8       Q. That "they were the leaders of the group,
9   according to the Intel that we got."
10      A. I believed that at the time. That was the
11  Intel that I got.
12      Q. You received Intel that Dave Id was a leader of
13  the protest group?
14      A. Well, "leaders" meaning that if they were
15  there, that was possibly where the protest was going to
16  occur.
17      Q. Did you mean "leader" in any other way other
18  than that they were going to be at the protest?
19      A. No.
20      Q. Did you have any information that my client was
21  directing other protesters in any way?
22      A. No. Not that I recall.
23      Q. Looking at page 17, halfway down starting at
24  line 14, you described Christopher Cantor as very vocal,
25  and later you say, "he speaks in front of several
```

29

```
1   demonstrations and will have a lot of followers." And
2   then you say at 22, people essentially "physically
3   following him."
4           It was your belief that Christopher Cantor had
5   people that followed him directly; is that a fair way to
6   say it?
7       A. Yes.
8       Q. Did you have that same belief about Dave Id or
9   my client David Morse?
10          MR. ALLEN: What belief? The question is
11  vague.
12  BY MR. SIEGEL:
13      Q. That he was vocal. Let's just go one by one.
14          Did you have any information that Dave Id was
15  very vocal?
16      A. No.
17      Q. Did you have any information that Dave Id had a
18  microphone?
19      A. No.
20      Q. Did you have any information that Dave Id had,
21  quote, "a lot of followers"?
22      A. No.
23      Q. Did you have any information that Dave Id had
24  people physically following him?
25      A. No.
```

**30**

1    Q. Did you have any information that Dave Id
2  engaged in marching?
3    A. I don't believe so.
4    Q. On page 18 at line 7, you appear to state that
5  Christopher Vogan also provided you with Intel regarding
6  Cantor and Mr. Morse.
7        Is that true?
8    A. Yes.
9    Q. What did Christopher Vogan tell you about those
10  two individuals?
11    A. Well, at that time I was just following
12  directions.
13    MR. ALLEN: That's not the question. Listen to
14  the question.
15    Can you repeat the question, please?
16    (Record read.)
17    THE WITNESS: You know, I don't recall exactly
18  what he told me, but he might have, in essence, said the
19  same thing that Deputy Chief Fairow said. When one is
20  at the protest, one or both are at that particular
21  location, that's where the demonstration could possibly
22  occur.
23  BY MR. SIEGEL:
24    Q. And who is Christopher Vogan?
25    A. He was an officer at the time.

**31**

1    Q. Was he working as an undercover officer?
2    MR. ALLEN: Objection; vague as to time.
3  BY MR. SIEGEL:
4    Q. During the summer and fall of 2011, was he
5  working as an undercover officer?
6    MR. ALLEN: Objection. That invades the safety
7  rights of public transit people using BART and gets into
8  tactical and safety issues involving BART. I'm not
9  going to let him answer the question.
10  BY MR. SIEGEL:
11    Q. Do you know if Christopher Vogan was working
12  undercover on September 8th?
13    A. I don't -- you know, no. I don't believe so.
14    MR. ALLEN: Do you know or don't you know?
15  That's the question.
16    THE WITNESS: I don't know. Actually, I don't
17  know.
18  BY MR. SIEGEL:
19    Q. Prior to the actual protest on September 8th,
20  did you anticipate that David Morse would be arrested?
21    A. No.
22    Q. Would you look at page 12 of this transcript?
23    A. (Witness complying.)
24    Q. Beginning at line 24, Sergeant Kwon asked you
25  "what was the order?" And his question -- well, let's

**32**

1  back up. At line 17, Kwon states, "During these
2  briefings, was it ever implied in any way that
3  Christopher Cantor and/or particularly Mr. Dave Id --
4  was the impression ever given they were to be arrested
5  on-site?"
6        And you state no.
7        Then later Kwon asked "What was the order?"
8  You state, "the order was we have to see what they're
9  doing, if they're inciting a riot or acting in a
10  criminal manner, they were to be arrested?"
11        Does this refresh your recollection that there
12  was discussion of arresting David Morse prior to the
13  protest?
14    MR. ALLEN: I'm going to object to the form of
15  your question. You're suggesting by that question he
16  has changed his answer. Your previous question was
17  whether there were discussions to arrest him, not
18  whether there were discussions whether they would be
19  arrested and for what reasons. I'm objecting to the
20  form of your question and mischaracterizes his testimony
21  by the form of your question.
22    MR. SIEGEL: Let's try again.
23  BY MR. SIEGEL:
24    Q. On September 8th, was there specific discussion
25  of David Morse and Christopher Cantor?

**33**

1    A. Specific?
2    Q. During the briefing or at any time prior to the
3  protest itself, did you discuss with other BART police
4  officers Cantor and Morse?
5    MR. ALLEN: Objection; asked and answered.
6    Go ahead.
7    THE WITNESS: Again, was I the one presenting?
8    MR. ALLEN: No. That's not his question.
9    THE WITNESS: I don't understand the question.
10    MR. SIEGEL: Maybe read it to see if it's a
11  good one.
12    (Record read.)
13    MR. ALLEN: Listen to the question. There's no
14  trick to it. If there was, I'd pose an objection.
15  There's no trick to his question.
16    (Record read.)
17    THE WITNESS: During the briefing, did I
18  discuss? I may have.
19  BY MR. SIEGEL:
20    Q. You don't recall specifically?
21    A. I don't recall specifically.
22    Q. Was there discussion that if Morse or Cantor
23  were inciting a riot or acting in a criminal manner,
24  they were to be arrested?
25    A. There might have.

**34**

1    Q. Do you remember that?
2    A. Do I recall that for sure?  I'm not a hundred
3 percent sure.
4    Q. How sure are you?
5    A. It goes on to anybody commits a criminal act,
6 they are to be arrested.  Every week we had a briefing
7 on protests, and so it was mentioned that if people
8 commit criminal acts, they're to be arrested following
9 policies and procedures.
10   Q. Sure.
11       But was that comment made specifically in
12 connection with Cantor or Morse?
13   A. You know, I don't -- I don't -- I don't recall.
14       MR. ALLEN:  Could I take a one-minute break
15 with my client?
16       MR. SIEGEL:  That's fine.
17       (Recess taken.)
18 BY MR. SIEGEL:
19   Q. Officer Dam, if you could look at page 10
20 starting at line 20, if you could read from there and
21 read through all the way to the end of page 12.  Take a
22 minute.  I really want to get clear on a few things.
23   A. Okay.
24       MR. ALLEN:  I'm going to ask him to read from
25 that page, line 11, to get context for the question.

**35**

1        MR. SIEGEL:  Sounds good.
2        MR. ALLEN:  While he's reading that, off the
3 record.
4        (Discussion off the record.)
5 BY MR. SIEGEL:
6    Q. Officer, did you read that section I asked you
7 to read?
8    A. From 10 to page 12, correct?
9    Q. Yes.
10   A. Yes.
11   Q. Correct if I'm wrong, on these pages Sergeant
12 Kwon was asking you specifically about what discussion
13 there was of Cantor and Morse; is that correct?
14   A. Uh-huh -- yes.
15   Q. Then on page 11 at line 24 -- actually we'll go
16 to the question at line 20.  Sergeant Kwon states, "was
17 there ever any discussion during that briefing in
18 regards to who was to be arrested first during these
19 protests, or are there any game plan or strategies, or
20 thoughts about that?"
21       And you respond, "I don't know about arrested
22 first, but we did say that if they break the law, they
23 will be arrested?"
24       In your statement, "they," does it refer to
25 Morse and Cantor?

**36**

1    A. Yes.
2    Q. Does this refresh your recollection that there
3 was specific discussion of Morse and Cantor prior to the
4 protest in regards to making arrests?
5    A. It refreshes my memory.
6    Q. On the following page, page 12, the question
7 from Kwon beginning at line 17 states, "during these
8 briefings, was it ever implied in any way that
9 Christopher Cantor and/or particularly Mr. Dave Id --
10 was the impression ever given that they were to be
11 arrested on sight?
12       You say, "No."
13       Kwon asks, "What was the order?"
14       You state, "the order was we have to see what
15 they're doing, again, if they're inciting a riot or
16 acting in a criminal manner, they were to be arrested."
17       The "they" in your statement is referring to
18 Morse and Cantor; is that correct?
19   A. Yes.
20   Q. Officer, do you conduct surveillance?
21   A. I personally do not.
22   Q. Do you supervise any officers who conduct
23 surveillance?
24   A. I'm not a supervisor.
25       MR. ALLEN:  That's not the question.  The

**37**

1 question is do you personally supervise.  If you'd like
2 the question read back.  It doesn't matter if you're a
3 supervisor or not.
4        THE WITNESS:  Do I supervise people who conduct
5 surveillance?  I have to think.  Do I?  I honestly don't
6 know how to answer that.
7        MR. ALLEN:  Go off the record to clarify if
8 this is a public safety issue.
9        (Recess taken.)
10       MR. ALLEN:  I'm going to impose an objection.
11 I'm going to allow him to answer and see where this
12 goes.  The objection is just that, the form of the
13 question as posed is a public safety issue for Officer
14 Dam in his intelligence role with the BART Police
15 Department.  I think he can clarify and see where the
16 next question goes.  If I feel I have to invoke and stop
17 his testimony, I will.  We can preserve it and we can
18 raise it at another time.
19       And I also want to make one other thing clear.
20 When I raise this public safety objection, I'm not -- I
21 will reproduce Officer Dam outside of the discovery
22 cutoff if, in fact, you can convince a judge that the
23 information you're seeking should be provided at this
24 deposition.  But I have to err on the side of caution
25 for public safety.

Page 38 to 41 of 49

---

**38**

1    So with the objection raised, I'm going to let
2  him answer to this extent, his understanding of what
3  you're asking him about supervising.
4    THE WITNESS: So, again, I'm not a supervisor,
5  but I do gather information from undercover officers at
6  times.
7  BY MR. SIEGEL:
8    Q. Did you look up Christopher Cantor on Facebook
9  at any time?
10    A. That I don't recall.
11    Q. Is that one of the ways you might gather
12  information, through Facebook?
13    A. Sometimes.
14    Q. Have you ever gathered information about my
15  client?
16    A. I -- the only time that I recall was that day I
17  went on Indybay and obtained the photo.
18    Q. Other than in preparation for creating this
19  document, Exhibit 4, have you engaged in
20  information-gathering about Christopher Cantor?
21    A. Have I -- repeat that again.
22    (Record read.)
23    THE WITNESS: I don't believe so.
24  BY MR. SIEGEL:
25    Q. During the protest, were you listening to the

---

**39**

1  police radio?
2    A. Yes, I was.
3    Q. Do you recall that at a certain point the
4  officer gave the order to arrest Krystoff and his
5  sidekick?
6    A. That might have been mentioned. I don't recall
7  specifically.
8    Q. Do you know that the name Krystoff refers to
9  Christopher Cantor?
10    A. Yes.
11    Q. Do you know that his sidekick refers to David
12  Morse?
13    A. I believe so.
14    Q. Did anyone tell you that David Morse was
15  Krystoff's sidekick?
16    A. No. Nobody specific.
17    Q. Do you recall during the briefing in
18  preparation for the September 8th protest if any
19  discussion of the media occurred?
20    A. I don't recall.
21    Q. Do you remember any discussion of a media
22  staging area?
23    A. I don't recall.
24    Q. Are you familiar with the BART police media
25  policies?

---

**40**

1    A. Not a hundred percent.
2    MR. SIEGEL: Could we take one minute off the
3  record. I think we're close. We'll be right back.
4    (Recess taken.)
5    MR. SIEGEL: I'd like to introduce the next
6  exhibit in order.
7    (Plaintiff's Exhibit 23 marked for
8    identification.)
9  BY MR. SIEGEL:
10    Q. Officer Dam, please take a minute to review
11  this document, and after you do so, tell me if you
12  recognize it.
13    A. Yes. I recognize this.
14    Q. Is this a document that you prepared?
15    A. Yes. An e-mail.
16    Q. How did you prepare this document?
17    A. This is a quick informational blurb for the
18  command staff basically of what's going on. And I just
19  take sections from either what SFPD has given me, social
20  media network. It's just, like, for informational
21  purposes.
22    Q. Do you see the section where it states "Crowd
23  Numbers"?
24    A. Yes.
25    Q. And the second sentence of that section states,

---

**41**

1  "Indybay reporter Dave Id is at primary Powell near the
2  entrance to the police office."
3    A. Yes.
4    Q. You wrote that?
5    A. Yes.
6    Q. Why did you mention Dave Id?
7    A. Again, our report was that if we see Dave Id or
8  Christopher Cantor, there's a possibility the
9  demonstration could possibly be there.
10    Q. Essentially based on the same information that
11  you produced, Exhibit 4, you also decided to include
12  Dave Id in your update?
13    A. Right. This update, I just listen on the
14  police radio, and I pretty much repeat what was there.
15  Possibly went on the radio and it said 50-plus
16  demonstrations at Powell Street.
17    Q. You may have gathered that information from
18  another officer on the radio?
19    A. Correct.
20    Q. If you could look at Exhibit 17, please.
21    A. (Witness complying.)
22    Q. I believe there is an e-mail from DC Fairow to
23  yourself.
24    After reviewing it, if you could tell me if you
25  remember this document. Actually, the first page is

**42**

1  what I'm talking about here.

2      A. Just the first page, okay.

3      Q. Do you see in this e-mail that you write, "The

4  KTVU camera guy had a live feed on the protesters the

5  whole time"?

6      A. Yes.

7      Q. Did you capture the footage from KTVU that day?

8      A. Did I record it?  Is that what you're asking?

9      Q. Sure.

10      A. No.  I did not record it.  I watched it, I

11  believe.

12      Q. You don't know if BART has this video in its

13  possession?

14      A. I don't believe so.

15      Q. You didn't operate a computer program to

16  capture the live streaming?

17      A. No.

18          MR. SIEGEL:  That's it.

19          Any cross-examination, Dale?

20          MR. ALLEN:  No.

21          MR. SIEGEL:  Thank you.

22          (Whereupon, the deposition was concluded at

23          2:35 p.m.)

24

25

**43**

1              REPORTER'S CERTIFICATE

2

3

4          I, SANDRA M. LEE, a Shorthand Reporter, State of

5  California, do hereby certify:

6          That KEN DAM, in the foregoing deposition named,

7  was present and by me sworn as a witness in the

8  above-entitled action at the time and place therein

9  specified;

10          That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17          That before completion of the proceedings,

18  review of the transcript was not requested.

19          IN WITNESS WHEREOF, I have hereunder subscribed

20  my hand this 1st day of November, 2013.

21

22

23

24      _____

        SANDRA M. LEE, CSR NO. 9971

25          State of California

# EXHIBIT "G"

Case3:12-cv-05289-JSC Document86 Filed08/28/14 Page60 of 66

1               UNITED STATES DISTRICT COURT FOR THE

2                  NORTHERN DISTRICT OF CALIFORNIA

3                          ---o0o---

4      DAVID MORSE,

5            Plaintiff,

6      vs.                                        No. C12-5289 JSC

7      SAN FRANCISCO BAY AREA RAPID
       TRANSIT DISTRICT (BART); and BART
8      Deputy Police Chief DAN HARTWIG,
       sued in his official and
9      individual capacities,

10           Defendants.
                                          /
11

12

13

14

15                  DEPOSITION OF SHANE R. CODUTI

16                    (Pages 1 to 69, inclusive)

17

18                  Taken before SANDRA M. LEE

19                        CSR No. 9971

20                      November 5, 2013

21

22
                       Aiken Welch Court Reporters
23                     One Kaiser Plaza, Suite 505
                       Oakland, California 94612
24                 (510) 451-1580/(877) 451-1580
                       Fax:  (510) 451-3797
25                       www.aikenwelch.com

**14**

1    A. There was always general stuff being discussed,
2  but I know when I saw Mr. Morse, it was during the
3  comment section where people can stand up and make
4  comments towards the BART board.
5    Q. Do you remember what the substance of his
6  comments was?
7    A. I know there were negative comments criticizing
8  BART. I can't remember the direct -- something about he
9  worked at some youth facility and was able to take
10  weapons out of youths' hands, so why can't police
11  officers just do that when they handle something --
12  something to that. I can't remember the exact wording.
13    Q. But you do remember the substance of --
14    A. A little bit before I walked out of the room,
15  yes.
16    Q. And why did you walk out of the room?
17    A. Because we were actually rotating positions.
18  And so when I saw him is when I was coming through the
19  room, and I walked out.
20    Q. Did you know his true name at that point?
21    A. No.
22    Q. And did you know his identity as a journalist?
23    A. No.
24    Q. When did you learn that Mr. Morse was a
25  journalist?

**15**

1    A. Actually, a couple days after -- after I
2  arrested him. Someone told me he wrote an article about
3  me on some website.
4    Q. That was the first time you knew he was a
5  journalist?
6    A. Yes.
7    Q. Do you recall that when you arrested David
8  Morse on September 8th that you made a comment to him
9  about articles he had written?
10    A. No. I don't recall that.
11    Q. Do you recall giving an interview with Internal
12  Affairs about the arrest of David Morse?
13    A. Yeah, I do. It was many years ago. I don't
14  recall things discussed in that. I do remember giving
15  an interview.
16    Q. When you gave that interview with IA, were you
17  ordered to tell the truth?
18    A. Yes.
19    Q. Theoretically you were subject to discipline if
20  you did not tell the truth?
21    A. Of course.
22    Q. Giving an interview with IA is similar to an
23  interview here in the sense that you're ordered to tell
24  the truth.
25    A. Right.

**16**

1    Q. Do you think that what you told IA was true?
2    A. From what I remember, yes. I have no reason to
3  lie.
4    Q. I'm going to introduce an exhibit here. You
5  may or may not be aware, this is the fifth deposition in
6  a series of depositions.
7    A. Okay.
8    MR. SIEGEL: We have a stack of exhibits from
9  all of the depositions, so what I'm going to introduce,
10  I believe, is Exhibit 26, so I'll give a copy to the
11  court reporter and she'll share it with you.
12    (Plaintiff's Exhibit 26 marked for
13    identification.)
14  BY MR. SIEGEL:
15    Q. So you haven't had a chance to see this
16  document before today?
17    A. No. Never have.
18    Q. Officer Coduti, you already have maybe, but if
19  you could read the first three pages of this interview
20  transcript, and I'm going to follow up with some
21  questions.
22    A. All three pages?
23    Q. Please.
24    A. All my responses or everything?
25    Q. You can read them to yourself, actually.

**17**

1    A. Three pages.
2    Q. Thank you.
3    Does this refresh your recollection that you
4  may have seen some of Mr. Morse's articles prior to the
5  protest?
6    A. Yes, it does.
7    Q. What do you recall now?
8    A. I don't remember when I saw the articles, but
9  apparently from what I told him and I told IA, I must
10  have seen a couple of his articles, and it must have
11  reminded me when we started talking.
12    Q. Do you recall what the articles concerned?
13    A. No, I don't.
14    Q. Do you know they were about BART police?
15    A. They may have been. Again, I do not recall
16  specific articles, but if I talked to him about it and I
17  said it in IA, I must have talked to him about an
18  article.
19    Q. Do you know how you were able to access his
20  articles?
21    A. I believe they were on the internet.
22    Q. You went on the internet to find them?
23    A. Yes.
24    Q. And were you directed to do so?
25    A. No.

18

1    Q. That was on your own time?

2    A. Yeah.  I believe that was something I was

3    looking on Google and typed it in and came up under a

4    web search, and I pulled it up.

5    Q. You don't remember what the articles discussed?

6    A. No.

7    Q. Do you recall that Mr. Morse was with a media

8    organization called Indybay?

9    A. Apparently I asked him or he told me when I

10   arrested him, according to IA.

11   Q. Do you know what Indybay is?

12   A. Now I do, yes.

13   Q. But that day you did not?

14   A. I didn't know exactly.  I didn't know if it was

15   an article site, a blogger site, what it was.  He told

16   me it was a media organization, according to the IA.

17   Q. I'd like you to -- you can put that aside for

18   now, and I'd like you to look at the first exhibit here,

19   Exhibit 1, and if you could locate Policy 459.7, please.

20      Before you read it, do you think you've

21   reviewed this policy previously?

22      MR. ALLEN:  At any time?

23   BY MR. SIEGEL:

24   Q. Before today.

25   A. Maybe at any time, yes, but I don't recall

19

1    specifics about it.

2    Q. In the second paragraph under 459.7, it states,

3    "Those with the right to cover or photograph

4    demonstrations are not limited to representatives of

5    major newspapers, radio or television stations."

6       Do you see that?

7    A. Yes.

8    Q. Is that consistent with your training, that you

9    don't have to be major media to be considered media?

10   A. If it's in the policy, I guess so.

11   Q. Is it your understanding that if someone is a

12   journalist for a website, they're still entitled to the

13   same protection as, say, a TV reporter?

14   A. I'm not the person who makes the policy, so

15   that has never been told to me.  I just go by what it

16   says here.

17   Q. Have you ever been told that if someone is a

18   blogger they're not a journalist?

19   A. No.  No one has said that to me either way.

20   Q. Was that ever your impression, that someone who

21   deals with web media is not a legitimate journalist?

22   A. I've never really had time to think about what

23   is a legitimate journalist or isn't.  I've never had to

24   operate under those principles.

25   Q. Let's focus -- you can put that aside.

20

1       Let's focus on the day in question.  I

2    recognize it was a little while ago.

3    A. Yes.

4    Q. How do you recall that day began?

5    A. I recall we had a briefing at Lake Merritt

6    regarding a possible protest that was going to take

7    place that day.

8    Q. Who led the briefing?

9    A. If I recall correctly, Deputy Chief Hartwig was

10   there.  There was a couple of lieutenants and a few

11   other sergeants.

12   Q. Was Deputy Chief Fairow there?

13   A. I don't recall off the top of my head.

14   Q. How about Chief Rainey?

15   A. There were so -- there was a couple of other

16   ones that I was at before, so I don't -- I know he came

17   to one of them, but I don't know if that was the

18   particular one.

19   Q. You're saying that in the series of protests --

20   A. Yes.  The couple more -- because I told you

21   before I'd been to a couple of these, so I don't

22   remember which one he came to because we had meetings

23   before each one of these protests.

24   Q. Do you recall that Deputy Chief Hartwig was the

25   on-site commander on September 8th, 2011?

21

1    A. He was the patrol commander, so that would make

2    sense he was the on-site commander.

3    Q. What was your assignment that day?

4    A. My assignment was -- I was put on stand-by as a

5    possible arrest team.

6    Q. Were you also assigned to the CAP team?

7    A. That's my normal position, yes.

8    Q. What does CAP stand for?

9    A. Critical asset patrol team.

10   Q. What are the responsibilities of the CAP team?

11   A. We are a -- we are technically a

12   high-visibility team that specializes in

13   counterterrorism, terrorism awareness, and we go between

14   the high-trafficked stations and just make sure

15   everything is safe.

16   Q. Do you recall you were on the CAP team during

17   the protest?

18   A. 2011, I still should have been on the CAP team,

19   yes.

20   Q. Were you assigned to be a marker that day?

21   A. A marker?  I don't know what that means.

22   Q. So that's not a typical term?

23   A. No.

24   Q. In your stack, Exhibit 2, looks like it's right

25   in front there, I will represent to you that this is the

26

1    A. In both circumstances, yes, from my
2    understanding.
3        Q. Does someone need to be blocked for a certain
4    amount of time?
5        A. I don't think -- that's something that would
6    have to be determined by the courts.
7        Q. Do you remember any particular instructions you
8    received about how blocking the fare gates would be
9    interpreted during the protest?
10       A. From my --
11           MR. ALLEN:  Objection; vague.
12           THE WITNESS:  From my understanding, no.
13   It's -- if we see that people cannot access the fare
14   gates without having to go around people that are
15   blocking it, that's considered blocking fare gates.
16   BY MR. SIEGEL:
17       Q. Did you understand that during the protest
18   there were media that were in the crowd?
19       A. I -- well, I understood because I saw certain
20   media symbols when I was standing there, yes.
21       Q. And I'll get back to that.
22           Going to the briefing, do you recall that
23   particular protesters were discussed at the briefing
24   that day?
25       A. I believe there was.  There was something

27

1    talked about where there was protesters discussed,
2    regular protesters.
3        Q. Do you recall that someone named Christopher
4    Cantor was discussed?
5        A. I believe his name came up, yes.
6        Q. He's known as Krystoff?
7        A. Yes.  I've heard that name before.
8        Q. Do you recall that Dave Id was discussed?
9        A. May have, yes.
10       Q. You do recall?
11       A. Yes.
12       Q. And do you know that Dave Id refers to David
13   Morse?
14       A. I do now, yes.
15       Q. In what context were Krystoff and Dave Id
16   discussed?
17       A. From my understanding, they were said -- if my
18   recollection serves me right, they were discussing that,
19   because they said wherever those two show up is where
20   the protest is going to take place.
21       Q. They were identified as regular protesters?
22       A. I don't know if they were identified as that
23   term, "regular protesters," but they were saying that
24   they've seen them before where every protest takes
25   place, so we will know when the protest is going to take

28

1    place because those people will be there.
2        Q. Do you recall that Krystoff was identified as
3    an agitator?
4        A. I don't recall directly that he was.  He may
5    have been, but I don't remember that term being used
6    when I was sitting there.
7        Q. In your stack if you could look at Exhibit 4,
8    please.
9        A. Yes.
10       Q. Officer, do you recognize this document?
11       A. Yeah.  I believe I do.  This was something that
12   was handed out to us.
13       Q. This was handed out to you during the briefings
14   that day?
15       A. It was passed around or shown.  I've seen this
16   before.
17       Q. Do you remember who gave it to you?
18       A. Uh-uh.  No.
19       Q. Is this a BOLO?
20       A. No.  It's not a BOLO.
21       Q. How is a BOLO different from this document?
22       A. A BOLO is usually people that are wanted.
23   Usually have some criminal tie that they're going to be
24   wanted.  You need to contact them for a specific reason
25   because they're going to be wanted for a crime.  There's

29

1    nothing here that says to contact.  There's nothing here
2    that says they're wanted for something or that charges
3    are going to be sought on them for something.
4        Q. How do you interpret this document?
5        A. This is more like an informational flier or
6    "for your information only" kind of thing.
7        Q. Was it your understanding that if you saw these
8    people at the protest, you should focus on them?
9        A. Not focus.  Just like I said in my previous
10   statement, it was -- from what I understand, this was
11   linked to if you see these people, that's where the
12   protest is going to be.
13       Q. Do you recall a document like this ever being
14   distributed at a protest -- at a briefing before?
15       A. I don't remember.  There's a lot of documents
16   that are given at briefings for all sorts of things.
17   Could or could not.
18       Q. Have you ever seen Christopher Cantor
19   identified in a document like this before?
20       A. I don't recall.
21       Q. How about Dave Id?
22       A. I don't recall either him -- ever seeing him
23   before in a document.
24       Q. Have you ever seen a journalist other than
25   David Id identified in a document like this?

**38**

1 the circle. I told him he was under arrest. I told him
2 to put his hands behind his back. I handcuffed him. He
3 was cooperative. I walked him to the back where the
4 police facility was at.
5 Q. What did you do then?
6 A. I placed him down in a seat. I asked him to
7 identify himself. He told me his name and -- that's
8 according to the IA document -- his affiliation. I said
9 okay. I told him what he was under arrest for. I asked
10 for his identification. He provided -- he told me where
11 it was at because he was handcuffed. I got his
12 identification and I left the room.
13 Q. Did you have further contact with him after
14 that?
15 MR. ALLEN: That day?
16 MR. SIEGEL: Sure.
17 THE WITNESS: I don't recall any direct
18 contact. Maybe when we walked outside when he was
19 placed with everybody else in the line to go off to the
20 jail, but that was it. I don't remember any other
21 contact.
22 BY MR. SIEGEL:
23 Q. Did you observe David Morse holding a sign that
24 day?
25 A. Not to my recollection, no.

**39**

1 Q. Do you recall him chanting?
2 A. I don't remember any chanting, no.
3 Q. Do you recall him marching?
4 A. I don't think I recall anybody marching.
5 Q. Now, I'd like to direct your attention back to
6 the IA transcript, Exhibit 26.
7 I'm going to ask you some questions, but I'm
8 going to give you a chance to read this section first.
9 I'd like you to start at page 12, line 10. And from
10 there, I'd like you to read all the way through page 16,
11 so it's four pages.
12 A. You said go to what page?
13 Q. End of page 16. Read to yourself.
14 A. Okay.
15 Q. I'm going to start on page 12.
16 A. Okay.
17 Q. I'm going to read the last question and answer
18 on that page. The question from IA Officer Haight is:
19 "Did you have any conversation with
20 Deputy Chief Hartwig or any other
21 supervisor as to whether Morse was a
22 protester versus a member of the media?"
23 The answer: "Not at that time, no.
24 We -- we -- I never really had a
25 discussion. That wasn't for my -- that

**40**

1 wasn't for me to figure out. Like I
2 said, I was ordered to arrest the people
3 that remained after the failure to
4 disperse order. And then somebody else
5 above my level was supposed to figure
6 out what they want to do with each
7 individual."
8 My question today is: Is that your
9 recollection, that it was up to the higher-ranking
10 officers to determine what to do with each detained
11 individual?
12 A. Well, they can always overrule me if they feel
13 I don't have probable cause to arrest somebody. That's
14 with any crime. So my job for that particular protest
15 was to arrest people that were committing crimes. If
16 they want to do something with them at a later time,
17 that was up to them just like with anything else.
18 Q. And here DC Hartwig ordered you to arrest
19 Morse?
20 A. Correct.
21 Q. In this instance, he was the higher-level
22 person?
23 A. He is one of the higher-level people, yes.
24 Q. It wasn't your job to question his order?
25 A. No.

**41**

1 Q. Then if you could look at page 13, please.
2 Beginning at line 17, Haight asks:
3 "In regards to Mr. Morse, based on
4 what you observed in the crowd, was he
5 protesting or was he acting as a member
6 of the media?"
7 Coduti's response in the transcript:
8 "From what I saw, he was taking
9 pictures of protesters."
10 Then further down in that same answer you say:
11 "But he was in that group of people
12 that was blocking the fare gate."
13 MR. ALLEN: You're just going to take that out
14 of context, what that entire paragraph says? You're
15 going to frame your question by taking part of that
16 answer, or are you going to use the entire answer?
17 BY MR. SIEGEL:
18 Q. On the record, I'm referring to the question
19 and answer between lines 17 all the way through line 24
20 on page 13. You just had a chance to review it.
21 Is it your recollection today David Morse was
22 taking pictures of protesters?
23 MR. ALLEN: You know, I'd like you, Officer
24 Coduti, to read the entire context of that. Read that
25 into the record instead of two sentences out of that

**42**

1  particular paragraph.
2        THE WITNESS: Would you like me to read the
3  whole one in?
4        MR. ALLEN: Lines 19 to 24, and then you can
5  answer his question.
6        THE WITNESS: "From what I saw, he was taking
7  pictures of protesters. I don't know if, you know, a
8  person that's affiliated with the media could be doing
9  that, a -- another protester could be doing that, you
10 know. I don't know what constitutes a person taking
11 pictures. That's what I saw. But he was in that group
12 of people that was blocking the fare gate."
13       MR. ALLEN: Read his question back to him, and
14 he can answer the question.
15       (Record read.)
16 BY MR. SIEGEL:
17       Q. I want to ask you about your recollection
18 today.
19       Do you recall that David Morse was taking
20 pictures that day?
21       A. I do recall that, yes.
22       Q. You recall he was in the group of people that
23 was blocking the fare gates?
24       A. Correct.
25       Q. If you look at page 14, the question and answer

**43**

1  between lines 3 and line 7 --
2        A. Uh-huh.
3        Q. -- if you could read Haight's question and your
4  answer, please, into the record?
5        A. The question:
6             "Would you consider him to be an
7        agitator?"
8             "I don't know -- personally,
9        from -- this is my only interaction with
10       him. I just know that he was taking
11       pictures. He was, you know, getting in
12       there and taking pictures of the other
13       people that were in charge of this
14       demonstration."
15       Q. Today as we sit here, is your recollection any
16 different than you gave to IA?
17       A. No.
18       Q. You don't remember David Morse being, quote,
19 unquote, in charge of the demonstration?
20       A. Not to my knowledge, no.
21       Q. You recall he was getting in there and taking
22 pictures?
23       A. Yes.
24       Q. And what does "getting in there" mean?
25       A. He was part of the circle.

**44**

1        Q. Instead of outside the circle?
2        A. No. He was part of the circle inside that was
3  blocking the fare gates.
4        Q. Now, other than being a part of the group and
5  taking pictures, do you recall any other conduct by
6  David Morse that day?
7        A. No. The only -- my only recollection of Mr.
8  Morse was taking pictures, conversating with other
9  people in the group and being part of the circle that
10 was blocking the fare gates.
11       Q. Thank you.
12       When you placed Mr. Morse in handcuffs, do you
13 recall that he complained they were too tight?
14       A. I believe I did when we were back in the
15 office. He said something about them being tight, yes.
16       Q. Do you recall that Officer Rudy loosened the
17 handcuffs?
18       A. He may have. I think he told it to me. I
19 don't remember witnessing it. I think he said he
20 loosened them for me.
21       Q. I'd like you to look at Exhibit 8 in your
22 stack, please.
23       A. Okay.
24       Q. I can represent to you this is a photograph
25 that was published by the San Francisco Chronicle on the

**45**

1  internet --
2        A. Okay.
3        Q. -- that related to the protest we're discussing
4  here today.
5        I'd like to ask you, first of all: Do you see
6  yourself in this picture?
7        A. I can't make out myself, no.
8        Q. Do you recall this moment during the protest or
9  approximately this moment?
10       A. No. It probably did happen. I was back more
11 down the hallway right over here on the side from what I
12 recall.
13       Q. When you say -- using right and left
14 directional in terms of this picture, where were you?
15       A. The fare gates are on the right-hand side.
16 There's a hallway to the right. I'm just a little bit
17 out of the picture down the hallway.
18       Q. At that time, you're still in the paid area?
19       A. No. I'm in the free area in the hallway.
20       Q. The protest occurred in the free area; is that
21 correct?
22       A. Yes.
23       Q. I'm seeing the fare gates to the right, but is
24 there a hallway kind of that's not?
25       A. There's a hallway -- yes, Counselor. There's a

**58**

1        Do you see that?

2        A. Yes, I do.

3        Q. That was a message from Hartwig to you?

4        A. Apparently, yes.

5        Q. Do you know what he meant when he said you were

6    hitting the pipe?

7        A. Must be because I'm ill-informed that the

8    charges were still going.

9        Q. So he's kind of making fun of you?

10        A. Looks like it, yes.

11        Q. Do you recall receiving that message?

12        A. I don't recall specifically, but now looking at

13    it, it looks like I did.

14        Q. After this exchange, do you recall that Hartwig

15    called you into his office?

16        A. That might be the time when I said I spoke to

17    him, yes.

18        Q. So what did you discuss?

19        A. I asked -- I think I asked -- again, because I

20    didn't know, maybe I didn't see e-mail yet or

21    whatever -- if he was going to go with me. He said,

22    "No. I don't think the case is going anymore. They

23    threw the charges out."

24        Q. Do you recall anything more about the

25    conversation?

**59**

1        A. No.

2        MR. SIEGEL: Could we go off the record a

3    minute?

4        (Recess taken from 11:23 a.m. to 11:32 a.m.)

5    BY MR. SIEGEL:

6        Q. Officer Coduti, during the protest or after you

7    arrested David Morse, you took him to a particular room

8    within the Powell Street substation.

9        A. Yes.

10        Q. How did you know to take him to that room?

11        A. That was the first room we crossed when we

12    walked into the station.

13        Q. It was just the first available room?

14        A. Right.

15        Q. If I could direct your attention to Exhibit 26,

16    I'm going to direct your attention to page 5 starting at

17    line 21.

18        A. Okay.

19        Q. If you could read through page 6, line 9, to

20    yourself.

21        A. Okay.

22        Q. Does reviewing this portion of the transcript

23    refresh your recollection that DC Hartwig told you to

24    use PC 369i?

25        A. He may have added that in there, but I believe

**60**

1    that's what I witnessed anyways. I wasn't going to

2    arrest him for anything else.

3        Q. There was no discussion of utilizing PC 409

4    that day?

5        A. No.

6        MR. SIEGEL: I have no further questions.

7        Dale, do you have any cross?

8        MR. ALLEN: No questions.

9        MR. SIEGEL: That's it.

10        (Whereupon, the deposition was concluded at

11        11:34 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**61**

1                    REPORTER'S CERTIFICATE

2

3

4        I, SANDRA M. LEE, a Shorthand Reporter, State of

5    California, do hereby certify:

6        That SHANE R. CODUTI, in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time and

9    place therein specified;

10        That said deposition was taken before me at said

11    time and place, and was taken down in shorthand by me, a

12    Certified Shorthand Reporter of the State of California,

13    and was thereafter transcribed into typewriting, and

14    that the foregoing transcript constitutes a full, true

15    and correct report of said deposition and of the

16    proceedings that took place;

17        That before completion of the proceedings,

18    review of the transcript was not requested.

19        IN WITNESS WHEREOF, I have hereunder subscribed

20    my hand this 19th day of November 2013.

21

22

23

24

                            SANDRA M. LEE, CSR NO. 9971

25                          State of California